# EXHIBIT 1

**EXHIBIT 1**

[redacted] – [redacted]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AZURITY PHARMACEUTICALS, INC., *Plaintiff*, v. ALKEM LABORATORIES LTD., *Defendant*. | C.A. No.: 19-2100 (MSG) |

**EXHIBIT 1**

**PLAINTIFF'S AND DEFENDANT'S**
**JOINT STATEMENT OF UNCONTESTED FACTS**

**EXHIBIT 1**

[REDACTED] – [REDACTED]

## I. PARTIES

1. Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity"), formerly Silvergate Pharmaceuticals, Inc. ("Silvergate"), is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 8 Cabot Road, Suite 2000, Woburn, MA 01801.

2. Defendant Alkem Laboratories, Ltd. ("Alkem") is an Indian corporation having a place of business at Devashish Building, Alkem House, Senapti Bapat Road, Lower Parel, Mumbai – 400 013, India.

## II. ASSERTED PATENTS

### A. U.S. Patent No. 10,786,482

3. United States Patent No. 10,786,482 (the "'482 patent"), entitled "Enalapril Formulations," issued on September 29, 2020.

4. Gerold L. Mosher and David W. Miles are named as inventors of the '482 patent.

5. The '482 patent claims priority to provisional U.S. patent application No. 62/310,198, which was filed March 18, 2016.

6. Azurity owns the '482 patent.

### B. U.S. Patent No. 10,918,621

7. United States Patent No. 10,918,621 (the "'621 patent"), entitled "Enalapril Formulations," issued on February 16, 2021.

8. Gerold L. Mosher and David W. Miles are named as inventors of the '621 patent.

9. The '621 patent claims priority to provisional U.S. patent application No. 62/310,198, which was filed March 18, 2016.Azurity owns the '621 patent.

10. Azurity owns the '621 patent.

## III. ALKEM'S ABBREVIATED NEW DRUG APPLICATION

**EXHIBIT 1**

[redacted] – [redacted]

11. Alkem submitted Abbreviated New Drug Application ("ANDA") No. 213714 to the FDA under the provisions of 21 U.S.C. § 355(j), seeking approval for a generic version of Azurity's Epaned® product ("Alkem's ANDA product").

12. Alkem's ANDA included a certification under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the Asserted Patents are invalid, unenforceable, or will not be infringed by the manufacture, use, offer for sale, and/or importation of Alkem's ANDA product.

## IV. AZURITY'S CLAIMS

13. Azurity asserts that Alkem's ANDA product infringes claims 14-23 and 27-28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent (collectively, the "Asserted Claims").

# EXHIBIT 2

**EXHIBIT 2**

[REDACTED] – [REDACTED]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., *Plaintiff*, v. ALKEM LABORATORIES LTD., *Defendant*. | ) | C.A. No.: 19-2100 (MSG) |

**EXHIBIT 2**

**PLAINTIFF'S STATEMENT OF ISSUES**
**OF FACT THAT REMAIN TO BE LITIGATED**

**EXHIBIT 2**

[redacted] – [redacted]

**TABLE OF CONTENTS**

**Page**

I. BACKGROUND ..... 1

II. STATEMENTS OF INTENDED PROOF ..... 5

III. ALKEM'S ANDA PRODUCT LITERALLY INFRINGES THE ASSERTED CLAIMS ..... 6

A. Person of Ordinary Skill in the Art ..... 6

B. Alkem's ANDA Product ..... 6

C. Alkem's ANDA Product Infringes Claim 14 of the '482 Patent ..... 8

D. Alkem's ANDA Product Infringes Claims 15-23 and 27-28 of the '482 Patent ..... 8

E. Alkem's ANDA Product Infringes Claim 1 of the '621 Patent ..... 11

F. Alkem's ANDA Product Infringes Claims 2-13 and 16-18 of the '621 Patent ..... 11

G. Alkem's ANDA Product Infringes Claim 19 of the '621 Patent ..... 14

H. Alkem's ANDA Product Infringes Claims 20-27 and 29 of the '621 Patent ..... 15

I. Alkem's ANDA Product Infringes Claim 30 of the '621 Patent ..... 17

IV. ALKEM'S NON-INFRINGEMENT ARGUMENTS ..... 17

A. Alkem Is Incorrect in Arguing that Formulations Containing Sugar Alcohols and Parabens Are Outside the Scope of the '482 Patent ..... 18

i. Hensel ..... 20

ii. Ma ..... 20

iii. Handbook ..... 21

iv. Zupanets ..... 21

v. Bradshaw ..... 22

vi. Regan, Farrant, Sidelman, and the acyl glucuronide/glucoside argument ..... 22

**EXHIBIT 2**

[redacted] – [redacted]

B. The Plain and Ordinary Meaning of the Asserted Claims Encompasses Formulation with Parabens and Sugars/Sugar Alcohols ....................................... 22

C. The Addition of HCl or NaOH Does Not Render Alkem's ANDA Product Non-Infringing ....................................................................................... 23

V. ALKEM CANNOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS ARE OBVIOUS .................................................... 24

A. Alkem's Prior Art References ....................................................................... 25

i. The '747 patent ..................................................................... 25

ii. Epaned® Kit Insert ................................................................ 25

iii. Allen ...................................................................................... 26

iv. Boukarim ................................................................................ 26

v. Casas ...................................................................................... 27

vi. Sosnowska ............................................................................. 27

vii. Nahata ................................................................................... 27

viii. Rippley .................................................................................. 28

ix. The '066 Application ............................................................. 28

x. Strickley ................................................................................. 28

xi. WO '425 ................................................................................. 29

xii. de Villiers .............................................................................. 29

B. The Asserted Claims Would Not Have Been Obvious to a POSA ....................... 29

i. None of the Prior Art Provides a POSA with Motivation to Modify the Epaned® Kit insert, the '747 Patent, and/or Allen to Create a Stable, Ready-to-Use Enalapril Maleate Formulation .............................. 30

ii. Claims 14-17, 27, and 28 of the '482 Patent and the Asserted Claims of the '621 Patent Are Not Obvious In Light of the '747 Patent, the Epaned® Kit Insert, or Allen ................................................. 32

iii. Claims 18 and 19 of the '482 Patent Are Not Obvious ............................ 33

iv. Claims 20, 21, and 22 of the '482 Patent Are Not Obvious ..................... 34

**EXHIBIT 2**

[REDACTED] – [REDACTED]

v. Claim 23 of the ’482 Patent and Claims 17 and 18 of the ’621 Patent Are Not Obvious ... 34

vi. Claim 16 of the ’621 Patent is Not Obvious ... 34

C. Alkem’s Secondary References Do Not Render the Asserted Claims Obvious ... 34

D. Secondary Considerations Support Non-Obviousness of the Asserted Claims ... 35

i. Unexpected Results ... 35

ii. Failure of Others ... 37

iii. Long-felt But Unmet Need ... 37

VI. THE ASSERTED CLAIMS ARE DEFINITE ... 41

A. The Term “Stable” Is Definite ... 41

B. The Buffer Limitations of the ’621 Patent Are Definite ... 43

VII. THE ASSERTED CLAIMS ARE ADEQUATELY DESCRIBED ... 43

A. The Paraben Limitations Are Adequately Described ... 44

B. The Stability Limitations Are Adequately Described ... 44

VIII. THE ASSERTED CLAIMS ARE ENABLED ... 45

IX. THERE IS NO ISSUE WITH REGARDS TO INVENTORSHIP ... 45

**EXHIBIT 2**

**[REDACTED] – [REDACTED]**

Pursuant to D. Del. LR 16.3(c)(4), Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") submits the following Statement of Issues of Fact That Remained to Be Litigated. The following statement is based upon the parties' pleadings, documentary and testimonial evidence, expert reports, and on Azurity's current understanding of Defendant Alkem Laboratories, Ltd.'s ("Alkem") claims and defenses. Azurity reserves the right to revise, amend, supplement, or modify the following statement based on any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence, or other developments in the case—including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.

To the extent that Azurity's Statement of Issues of Law set forth in **Exhibit 4** contains issues of fact, those issues are incorporated herein by reference. Should the Court determine that any issue identified below is more appropriately considered as an issue of law, Azurity incorporates such issues by reference in **Exhibit 4**. By including a fact herein, Azurity does not assume either the burden of proof or of production with regards to the fact.

Azurity contends that the issues of fact that remain to be litigated at trial are as follows:

## I. BACKGROUND

1. The formulations of the Asserted Claims[1] cover an angiotensin-converting enzyme ("ACE") inhibitor for the treatment of hypertension in children under the age of six. These formulations are for the treatment of hypertension in adults, heart failure, and asymptomatic left ventricular dysfunction. The claimed formulations can be used to treat patients with left ventricular dysfunction and heart failure in the absence of hypertension.

1 Azurity asserts that Alkem infringes claims 14-23 and 27-28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent ("Asserted Claims").

**EXHIBIT 2**

[redacted] – [redacted]

2. The formulations of the Asserted Claims are a ready-to-use oral liquid formulations that represent the research and effort of inventors Dr. Gerold L. Mosher and David W. Miles.

3. The active ingredient in the formulations of the Asserted Claims is enalapril. Enalapril is a pro-drug in the class of anti-hypertensive compounds known as ACE inhibitors. ACE inhibitors such as enalapril work by preventing the conversion of angiotensin I to angiotensin II. Angiotensin II is a potent vasoconstrictor, *i.e.* a compound which constricts blood vessels. The presence of angiotensin II will cause increase blood pressure. ACE inhibitors work by blocking the production of angiotensin II.

4. A pro-drug is a compound that metabolizes to a pharmacologically active drug following administration to a patient. In this case, the pro-drug enalapril converts into the compound enalaprilat. Enalaprilat is an effective anti-hypertensive. Oral administration of enalaprilat is ineffective due to enalaprilat's poor absorption in the gastrointestinal tract. Enalapril exhibits superb absorption in the gastrointestinal tract. Healthcare professionals may administer enalapril orally for the treatment of hypertension.

5. Enalapril tablets for oral administration were approved by FDA in 1985 and marketed under the trade name Vasotec®. Enalapril tablets are ill-suited for pediatric and geriatric patients that have difficulty swallowing. Enalapril was available only in tablet form for years followings Vasotec®'s FDA approval despite industry awareness regarding the difficulty some patients had swallowing tableted formulations. Patients that suffered issues with swallowing tablets had to find other ways to administer enalapril.

6. Compounding became enalapril's primary route of administration. Compounding involves cutting up then crushing a solid tablet using a mortar and pestle. The crushed powder is

EXHIBIT 2

[redacted] – [redacted]

then combined with a diluent, creating a liquid solution. Compounding eliminated issues relating to difficulty in swallowing tablets. Compounding is an imperfect solution with serious drawbacks.

7. Compounding presents substantial risk of inaccurate and inconsistent dosing. A pharmacist—no matter how well trained and educated—cannot precisely and accurately gauge the amount of drug product to dispense to a child from cutting up and crushing a tablet designed for adult consumption. Compounding does not guarantee that the entirety of the compounded tablet mixes with the diluent because some of the crushed tablet would cling to the mortar and pestle.

8. Compounding also risks exposing the patient to unwanted—and sometimes deadly—contaminants. Lingering drug substances from prior compounding may inadvertently slip into the compounded mixture. Patients may ingest excipients that, while necessary to create the tablet form of the drug and harmless to those who may ingest tablets, are not necessary or desirable for a liquid formulation.

9. In pediatric patients, the problems associated inaccurate dosing and contamination are exacerbated. Small mistakes in dosing can lead to large differences in treatment due to the patient's small body weight and developmental status. This is especially so in newborn patients.

10. Compounding is not available at every pharmacy. Specialized compounding pharmacies exist but are not common and—depending on the area—may not be easy to locate.

11. Recognizing these concerns, Azurity endeavored to develop a liquid enalapril dosage form.

12. The result was an enalapril powder for reconstitution called Epaned® Kit. Epaned® Kit includes one bottle of a dry powder blend and one bottle of Ora-Sweet SF diluent. The powder blend contains enalapril, mannitol, and colloidal silicone dioxide. Pharmacists are instructed to follow a multi-step procedure to mix the powder with the diluent. Once reconstituted, Epaned®

**EXHIBIT 2**

[redacted] – [redacted]

Kit is dispensed to the patient in a multiple-dose bottle. Epaned® Kit was the first FDA-approved drug product containing enalapril in an oral liquid form.

13. Epaned® Kit is the commercial embodiment of U.S. Patent No. 8,568,747 (the "'747 patent"), assigned to Azurity's predecessor-in-interest Silvergate Pharmaceuticals, Inc. ("Silvergate") and the University of Kanas.

14. Epaned® Kit has drawbacks. Epaned® Kit requires a pharmacist to engage in a multi-step reconstitution process to mix the enalapril powder and diluent. The dry powder is prone to incomplete solubilization in the diluent, which leaves room for dosage errors, contamination, and inconsistencies. Epaned® Kit demonstrates 60-day stability after reconstitution. This limited stability results in the product needing to be supplied as a Kit for reconstitution because it is not shelf-stable for long enough to enable its manufacture and distribution as a ready-to-use solution. Stability is important for, among many other reasons, long-term patient compliance. There remained a need for an oral liquid dosage form of enalapril that could remain stable for long periods of time and that did not require manipulation prior to administration.

15. Azurity recognized the shortcomings of the Epaned® Kit and the need for an oral liquid formulation of enalapril that exhibit long-term stability.

16. Azurity developed the formulations of the Asserted Claims to address the shortcomings of Epaned® Kit. Specifically, the Asserted Claims cover oral liquid formulations the exhibit long-term stability. Such "ready-to-use" formulations do not require reconstitution, compounding, or other type of manipulation prior to administration. Ready-to-use formulations eliminate the risks of variability in dosages due to human error or incomplete solubilization and therefore have safety and convenience advantages relative to the Epaned® Kit and relative to compounding.

**EXHIBIT 2**

[redacted] – [redacted]

17. The formulations of the Asserted Claims are stable under refrigerated temperatures for at least 12, 18 or 24 months. In contrast, patients are instructed to discard the Epaned® Kit formulation within two months after reconstitution. Thus, the claimed formulations have an enhanced stability profile as compared to the Epaned® Kit. This facilitates patient compliance and ease of use.

18. Drug products made according to the formulations of the Asserted Claims and approved by the FDA as a substitute for Epaned® improve the lives of patients who would otherwise have to take oral tablets or rely on less-safe and less-stable compounded or reconstituted solutions.

19. Defendant Alkem has received FDA approval to make and sell generic versions of Epaned® and seeks to do so before the expiration of the Asserted Patents.[2]

## II. STATEMENTS OF INTENDED PROOF

20. Azurity will show by a preponderance of the evidence that Alkem's ANDA Product meets every limitation in the Asserted Claims.

21. Alkem bears the burden of overcoming the statutory presumption of patent validity by demonstrating that the Asserted Claims are invalid by clear and convincing evidence. Azurity intends to show that Alkem has not met this burden of proving by clear and convincing evidence that the Asserted Claims are invalid.

---

[2] The Asserted Patents are United States Patent Nos. 10,786,482 (the "'482 patent") and 10,918,621 (the "'621 patent").

**EXHIBIT 2**

[REDACTED] – [REDACTED]

## III. ALKEM'S ANDA PRODUCT LITERALLY INFRINGES THE ASSERTED CLAIMS

22. Azurity will demonstrate by a preponderance of the evidence that Alkem's ANDA Product literally infringes claims 14-23 and 27-28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent.

### A. Person of Ordinary Skill in the Art

23. A person of ordinary skill in the art would have a Ph.D. in formulation-relevant pharmaceutical science, chemistry, or a similar subject with minimal post-degree experience in formulation pharmaceutical products. Alternatively, a person of ordinary skill would have a minimum bachelor's degree in pharmacy, pharmaceutical science, chemistry, or a similar subject, with at least five years of post-degree practical experience in formulating pharmaceutical products. A POSA would also have experience with pharmaceutical excipients as applied to their selection and use in drug formulations.

### B. Alkem's ANDA Product

24. The Quantitative and Qualitative composition of Alkem's ANDA Product is:

**EXHIBIT 2**

REDACTED

*# For pH adjustment.*

*q.s.: Quantity sufficient*

*The qualitative and quantitative composition of* ***Mixed Berry Flavour*** *is enclosed in* ***Module 3 Section 3.2.P.1****.*

ALK_ENPL_00000369.

**EXHIBIT 2**

–

REDACTED

**EXHIBIT 2**

–

REDACTED

**EXHIBIT 2**

–

REDACTED

**EXHIBIT 2**

–

REDACTED

**E. Alkem's ANDA Product Infringes Claim 1 of the '621 Patent**

**F. Alkem's ANDA Product Infringes Claims 2-13 and 16-18 of the '621 Patent**

REDACTED

**EXHIBIT 2**

–

REDACTED

**EXHIBIT 2**

–

REDACTED

**EXHIBIT 2**

–

REDACTED

**EXHIBIT 2**

–

REDACTED

**H. Alkem's ANDA Product Infringes Claims 20-27 and 29 of the '621 Patent**

REDACTED

**EXHIBIT 2**

–

REDACTED

**EXHIBIT 2**

–

REDACTED

**I. Alkem's ANDA Product Infringes Claim 30 of the '621 Patent**

## IV. ALKEM'S NON-INFRINGEMENT ARGUMENTS

73. Alkem's purported non-infringement arguments fail to rebut Azurity's case that Alkem's ANDA Product infringes the Asserted Claims.

**EXHIBIT 2**

[redacted] – [redacted]

### A. Alkem Is Incorrect in Arguing that Formulations Containing Sugar Alcohols and Parabens Are Outside the Scope of the '482 Patent

74. Alkem asserts that the specification indicates to a POSA that formulations containing both parabens and sugars/sugar alcohols are unsafe and thus outside the literal scope of the claim. Alkem's argument is premised on the following passage from the patent specification:

> Paraben preservatives (especially methylparaben) can react with selected sugars (glucose, fructose, sucrose, lactose, maltose) and sugar alcohols (xylitol, mannitol, lactitol, maltitol, sorbitol) to form transesterification reaction products. This can be undesirable from a formulation and stability standpoint as the transesterification creates additional degradants. '482 patent, 13:9-15.[3]

75. A POSA would not understand this passage or any portion of the specification to exclude from the literal scope of the claims formulations containing both parabens and sugars or sugar alcohols. This passage does not discuss any sort of safety issue, but merely indicates a reaction between parabens and sugars/sugar alcohols that may occur.

76. No portion of the specification or prosecution history, including the above passage, conveys a clear or unequivocal statement that embodiments containing parabens and sugar alcohol are excluded from the scope of the invention. Similarly, no portion of the specification or prosecution history, including the above passage, conveys a clear or unequivocal statement that embodiments containing parabens and sugar are excluded from the scope of the invention.

77. The asserted claims expressly include formulations containing parabens and sugar/sugar alcohol. The specification explicitly teaches that parabens and sugar/sugar alcohol can appear in combination. *See, e.g.*, '482 patent, 6:29-37, 8:44-47, 9:8-11.

[3] The '482 and '621 patents share a common specification. For ease of reference, all citations are to the '482 patent unless otherwise noted.

**EXHIBIT 2**

[redacted] – [redacted]

78. The specification discloses exemplary amounts of both parabens and sugar/sugar alcohol. *See, e.g.*, '482 patent, 9:62-10:22; 12:34-13:7.

79. The specification also provides example formulations which include parabens and sugar/sugar alcohol. Example A5 includes methylparaben and xylitol. Example A6 includes methylparaben, propylparaben, and xylitol. Examples C4 and C5 contain sodium methylparaben and xylitol. Tables A1, A2, and C1-22 demonstrate the degradation profiles of such formulations.

80. A POSA would understand that the literal scope of the asserted claims include formulations containing parabens and sugars/sugar alcohol.

81. Alkem, furthermore, relies on several references to demonstrate that a POSA would understand the discussion of parabens and sugars/sugar alcohols in the shared specification to disclaim literal claim scope. To the extent these references are at all relevant, they do not demonstrate that a POSA would understand that formulations with parabens and sugar/sugar alcohol are excluded from the scope of the asserted claims.

82. The first such reference is a slide show presentation by Guo and Knutsen (ALK_ENAL00258515-71) (the "G/K Slides"). The G/K slides do not demonstrate that a POSA would believe there was a safety issue relating to parabens and sugars/sugar alcohols. The portion of the G/K Slides which discusses paraben and sugar/sugar alcohol interactions specifically are consistent with the discussion in the specification and merely note that transesterification may occur. The G/K Slides discuss issues with sodium benzoate and paraben preservatives generally. Aside from the portion noted above the G/K Slides do not discuss paraben and sugar/sugar alcohol interactions specifically. Nor do the G/K Slides discuss any toxicity resulting from paraben and sugar/sugar alcohol interactions. The G/K Slides attribute paraben loss in solution to absorption to the container wall.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

83. Alkem cites three references which are listed in the specification under the "References Cited" section of the patent:

- Hensel, et al., *Transesterification reaction of parabens (Alkyl 4-Hydroxybenzoates) with polyols in aqueous solution*. J. Pharm Sci 84 (1):115-119 (1995) ("Hensel");
- Ma, et. al., *HPLC and LC-MS studies of the transesterification reaction of Methylparaben with twelve 3- to 6- carbon sugar alcohols and propylene glycol and the isomerization of the reaction products by acyl migration*. J. Chromatographic Sci. 40(3):170-177, 2002 ("Ma"); and
- *Handbook of Pharmaceutical Excipients, Fifth Edition*. Edited by Raymand C. Rowe, et. al., London: Pharmaceutical Press 2006 ("Handbook").

84. Although these references are in the "References Cited" section of the patent, none were discussed in the prosecution history or in the specification.

*i.* *Hensel*

85. Hensel characterizes reaction products that occur from a reaction between methylparaben and xylitol. Hensel notes that the transesterification reaction takes place at pH levels between 9 and 11. Below a pH of 6, the transesterification reaction will take place only to a very minor extent and that no transesterification will occur below a pH of 5. Hensel notes that a formulator may easily avoid undesirable transesterification reactions by lowering the pH or lowering the xylitol concentrations. A POSA would not understand Hensel to limit or disclaim the scope of the asserted claims. Among other reasons, each asserted claim requires a pH below 5.

*ii.* *Ma*

86. Ma discusses the reaction products of a reaction between paraben and sugar/sugar alcohol. Ma discusses how the number of reaction products depends upon the concentration of sugar alcohol in the formulation and that these products are positional isomers.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

87. Ma does not warn that a combination of paraben and sugar/sugar alcohol is unsafe or toxic. A POSA would not understand Ma to limit or disclaim the scope of the asserted claims.

*iii.* *Handbook*

88. The Handbook discusses monographs of citric acid monohydrate, sodium benzoate, sodium citrate, sodium hydroxide, and xylitol. The Handbook acknowledges that transesterification reactions occur between parabens and sugars/sugar alcohols. The Handbook does not link these transesterification reactions to safety issues. A POSA would not understand the Handbook to limit or disclaim the scope of the asserted claims.

89. Alkem also relies on several references which do not appear on the face of the patent. None of these references demonstrate that the Asserted Patents surrendered claim scope or that a POSA would read the patents as such.[4]

*iv.* *Zupanets*

90. Zupanets was published in 2021 five years after the priority date of the patents in suit. Zupanets does not provide any guidance as what a POSA would understand regarding parabens, sugars/sugar alcohols, and any incompatibilities between the two as of the priority date of the Asserted Patents.

91. Additionally, Zupanets is substantively irrelevant. Zupanets generally discusses the toxicity of parabens. Zupanets does not link paraben toxicity to incompatibilities between parabens and sugars/sugar alcohols.

4 Azurity contends that this extrinsic evidence is irrelevant to the scope of the claims. By presenting these arguments, Azurity in no way is acknowledging that such references are relevant to understanding the literal scope of the claim.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

*v.* *Bradshaw*

92. Bradshaw was published well after the priority date of the Asserted Patents. Bradshaw is irrelevant. Bradshaw does not provide any guidance as to how or what a POSA would understand regarding parabens, sugars/sugar alcohols, and any incompatibilities between the two as of the priority date of the Asserted Patents.

*vi.* *Regan, Farrant, Sidelman, and the acyl glucuronide/glucoside argument*

93. Alkem contends that several references—Regan, Farrant, or Sidelman—would indicate that these compounds are linked to paraben and sugar/sugar alcohol toxicity. These references are irrelevant to whether Alkem's ANDA Product infringes the Asserted Claims. These references would not demonstrate or suggest to a POSA that the transesterification reaction products would exhibit safety or toxicity issues in an enalapril formulation.

**B. The Plain and Ordinary Meaning of the Asserted Claims Encompasses Formulation with Parabens and Sugars/Sugar Alcohols**

94. To the extent Alkem argues that the plain and ordinary meaning of the remaining, unconstrued terms excludes formulations with parabens and sugars/sugar alcohols, Alkem is incorrect. The plain language of the claims expressly covers formulations containing parabens and sugars/sugar alcohols. Some claims explicitly cover such combinations. Claim 14 of the '482 patent—from which all other Asserted Claims depend and incorporate—explicitly recites a "paraben or a mixture of parabens." Claims 15 and 16 further recite a sweetener generally (claim 15) and a sucralose sweetener specifically (claim 16).

95. A POSA would not look at the external references Alkem cites—especially those which are published long after the priority date of the Asserted Patents such as Zupanets and Bradshaw—to determine the scope of the claims or to ascertain a disclaimer. A POSA would

**EXHIBIT 2**

█████████ – ████████████████████

especially not do so in an attempt to contradict or otherwise circumvent the express langauge of the claims.

96.     Alkem points to FDA guidance relating to excipient-excipient interactions generally to bolster its argument.  That general guidance does not at all limit the scope of the claims or evidence a disclaimer.

97.     Nothing in the specification, prosecution history or in the literature would lead a POSA to conclude that the scope of the Asserted Claims excludes formulations containing parabens and sugar/sugar alcohol.

### C.   The Addition of HCl or NaOH Does Not Render Alkem's ANDA Product Non-Infringing

98.     Alkem argues that the addition of hydrochloric acid (HCl) or sodium hydroxide (NaOH) renders its ANDA Product non-infringing with regards to the Asserted Claims of the '621 patent.[5]  Alkem's argument does not rebut Azurity's claim that Alkem's ANDA Product infringes the Asserted Claims.

99.     NaOH and HCl are optional ingredients in Alkem's ANDA product.  The addition of NaOH and/or HCl in Alkem's ANDA Product, to the extent it is added, does not materially affect the basic and novel properties of the invention.

100.    Alkem's ANDA specifies that HCl or NaOH may be added if necessary, and when necessary, is added in the amount "q.s.," meaning "quantity sufficient."

101.    To the extent that HCl or NaOH is added to Alkem's product, it is in a sub-stochiometric amount.  If NaOH is added, none of it remains in the formulation because it is completely dissociated by the reaction with excess citric acid.  If added, citric acid and sodium

---

[5] Alkem only presents this defense vis-à-vis the '621 patent and not the '482 patent.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

citrate would still remain in the formulation. Salt and water would form as a byproduct of the reaction but there would be insufficient acid or base to react with all of the citric acid or sodium citrate in the solution.

102. Alkem's ANDA demonstrates that there is no requirement that either NaOH or HCl is added to every batch. In any event, neither substance is found in Alkem's ANDA Product as prepared.

103. Alkem cannot rebut Azurity's infringement arguments.

## V. ALKEM CANNOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS ARE OBVIOUS

104. Alkem cannot prove by clear and convincing evidence that any of the Asserted Claims would have been obvious to a POSA as of the March 18, 2016 priority date.

105. Alkem alleges that claims 14-23 and 27-28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent are invalid for obviousness under 35 U.S.C. § 103.

106. In alleging that the claimed formulation would have been obvious, Alkem relies on the '747 patent, the Epaned® Kit insert, and Allen as primary references. Alkem also uses Boukarim, Casas, Sosnowska, Nahata, Rippley, the '066 Application, and WO '425 as secondary references.

107. Although not prior art, Alkem relies on de Villiers to provide support regarding what a POSA's understanding of formulation chemistry would be.

108. Alkem's obviousness analysis is hindsight driven.

109. None of the prior art cited by Alkem is directed towards an oral liquid formulation of enalapril that is stable under refrigerated conditions for at least 12, 18 or 24 months.

EXHIBIT 2

[redacted] – [redacted]

110. None of the prior art cited by Alkem discusses formulations of enalapril with long-term stability sufficient for those formulations to be manufactured and distributed as oral liquid products.

111. With the exception of the Epaned® Kit—which is a powder for reconstitution—all of the prior art that Alkem cites discusses compounding of enalapril tablets—if they discuss enalapril at all. All of these solutions demonstrate only short-term stability.

**A. Alkem's Prior Art References**

*i. <u>The '747 patent</u>*

112. U.S. Patent No. 8,568,747 (the "'747 patent"), entitled "Enalapril Compositions," issued on October 29, 2013. The '747 patent describes a powder which may be reconstituted into an enalapril maleate oral liquid formulation. The compositions described in the '747 patent exhibits stability for only 12 weeks. The Epaned® Kit (described further below) embodies the claimed formulation of the '747 patent. The compositions of the '747 patent contain enalapril, mannitol, colloidal silicon dioxide, sucrose, glycerin, sorbitol, flavoring, citric acid, sodium phosphate, methylparaben, potassium sorbate, and water.

113. The '747 patent does not describe an oral liquid enalapril formulation that is stable for at least 12, 18 and 24 months.

114. The Patent Office considered the '747 patent during prosecution.

*ii. <u>Epaned® Kit Insert</u>*

115. The September 2014 package insert for Epaned® (enalapril) for Oral Solution (the "Epaned® Kit insert") is directed to the Epaned® Kit product. The Epaned® Kit was a powder formulation that was packaged together with a diluent. The pharmacist mixed the powder with the diluent to create a reconstituted oral solution. The Epaned® Kit insert describes a product

**EXHIBIT 2**

████████████ – ████████████████████████

containing at least 12 ingredients in the reconstituted formulation, not all of which appear in the Asserted Claims.

116.    The Epaned® Kit insert does not describe an oral liquid enalapril formulation that is stable for at least 12, 18 and 24 months.

117.    The Epaned® Kit insert does not provide stability data beyond mentioning that the product has a 60 day shelf life under refrigerated conditions after reconstitution.

*iii.    Allen*

118.    Allen, et. al., *Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids*, Am. J. Health-Sys. Pharm., 5:1915-20 (1998) ("Allen"), discusses compounded liquid formulations with one of five APIs—including formulations of enalapril.  None of the formulations discussed by Allen exhibit stability for longer than 60 days.  None were made at the claimed pH.  Additionally, the stability requirement in Allen was lower than that of the Asserted claims. Allen defined stability as 90% w/w of the initial enalapril amount; not the 95% w/w of the initial enalapril amount required by each of the Asserted Claims.

119.    The Patent Office considered Allen during prosecution.

*iv.    Boukarim*

120.    Boukarim, et al., *Preservatives in Liquid Pharmaceutical Preparations*, J. Applied Research, 9(1)(2):14-17 (2009) ("Boukarim") discusses side effects of commonly used preservatives.

121.    Boukarim does not disclose enalapril liquid formulations of any kind.  Nor does Boukarim disclose stability testing of such formulations.

122.    Boukarim was disclosed to the Patent Office during the prosecution of the Asserted Patents.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

*v.* *Casas*

123. Casas, et al., *Physicochemical stability of captopril and enalapril extemporaneous formulations for pediatric patients*, Pharm. Dev. & Tech., 20(3):271-78 (Published online Nov. 26, 2013) ("Casas") discussed the development and stability of pediatric extemporaneously compounded enalapril maleate formulations. Casas disclosed formulations which were more acidic than those disclosed in the Asserted Claims, with pHs of around 2.55 to 2.78.

124. Casas also noted that, at 5°C and at 25°C, the extemporaneously prepared formulations had dropped below 95% w/w of the initial enalapril content by 50 days. Casas further noted that the drug content had decreased by 40% after 3 months.

125. Casas noted issues with parabens in formulations designed for pediatric patients. Specifically, Casas noted that parabens are linked to allergic reactions in pediatric patients.

126. Casas was disclosed to the Patent Office during prosecution of the Asserted Patents.

*vi.* *Sosnowska*

127. Sosnowska, et al., *Stability of Extemporaneous Enalapril Maleate Suspensions for Pediatric Use Prepared From Commercially Available Tablets*, Acto Poloniae Pharmaceutica-Drug Research, 66(3):321-26 (2009) ("Sosnowska") discusses compounded enalapril suspensions in sugar-containing and sugar free vehicles. Sosnowska does not disclose stability beyond 30 days.

128. Sosnowska was disclosed to the Patent Office during prosecution of the Asserted Patents.

*vii.* *Nahata*

129. Nahata, et al., *Stability of enalapril maleate in three extemporaneously prepared oral liquids*, Am. J. Health-Sys. Pharm., 55:1155-57 (1998) ("Nahata") evaluates the stability of three extemporaneously prepared oral liquid formulations of enalapril.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

130. Nahata does not provide stability beyond 91 days. Additionally, Nahata defines stability as the formulation retaining 90% w/w of the initial enalapril amount; the claims require 95% w/w of the initial enalapril amount at the end of the storage period.

131. The Patent Office cited Nahata during prosecution of the Asserted Patents.

*viii.* *Rippley*

132. Rippley, et al., *Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children*, Biopharm. Drug. Dispos., 21:339-344 (2000) ("Rippley") compares the bioavailability of an enalapril suspension with commercially available enalapril tablets. Rippley noted that the suspension demonstrated stability for four weeks. Rippley does not provide the underlying stability data. Additionally, Rippley does not provide a definition of "stable."

133. Rippley was disclosed to the Patent Office during prosecution of the Asserted Patents.

*ix.* *The '066 Application*

134. U.S. Patent Application Publication No. 2006/0121066A1, titled "Sucralose Formulations to Mask Unpleasant Tastes" (the "'066 Application"), published on June 8, 2006, discusses taste masking liquids as an excipient for unpleasant tasting medicine. The '066 Application does not teach any enalapril formulations.

135. The '066 Application was disclosed to the Patent Office during prosecution of the Asserted Patents.

*x.* *Strickley*

136. Strickley, et al., *Pediatric Drugs—A Review of Commercially Available Oral Formulations*, J. Pharm. Sci. 97(5):1731-1774 (2008) ("Strickley") is a review article that discusses various commercially available oral formulations for pediatric drugs. Such formulations

**EXHIBIT 2**

[redacted] – [redacted]

include solutions, syrups, suspensions, tablets, powders for reconstitution, bulk oral powders, and others.

137. Strickley does not discuss enalapril formulations. Nor does Strickley discuss any stability testing regarding such formulations.

*xi.* *WO ’425*

138. International Patent Application Publication No. WO 2017/077425A1, entitled "Oral Solution of ACE Inhibitors" ("WO ’425") having a priority date of November 7, 2015, is directed to a pharmaceutical oral solution of ACE inhibitors. This formulation has a pH of between 5 to 9.

139. WO ’425 mentions that enalapril is an ACE inhibitor, but the preferred embodiment of the formulation is lisinopril dihydrate (another ACE inhibitor). All of the examples use lisinopril dihydrate. WO ’425 provides no stability data or information regarding enalapril or lisinopril dihydrate.

*xii.* *de Villiers*

140. M. de Villiers, "Buffers and pH Adjusting Agents," *A Practical Guide to Contemporary Pharmacy Practice*, 3d Ed. (J.E. Thomson, Ed.), Ch. 18 (Lippincott, Williams, & Wilkins 2009) (ALK_ENPL_00257972-978) ("de Villiers") is a book chapter that generally discusses buffers, pH adjusting agents, buffer capacity, and selection of buffers to adjust the pH. de Villiers does not provide any enalapril liquid formulation stability data.

**B. The Asserted Claims Would Not Have Been Obvious to a POSA**

141. Alkem cannot establish that the claims are obvious by clear and convincing evidence. The references Alkem relies on, either alone or in combination, do not render the Asserted Claims obvious.

**EXHIBIT 2**

[redacted] – [redacted]

i. *None of the Prior Art Provides a POSA with Motivation to Modify the Epaned® Kit insert, the '747 Patent, and/or Allen to Create a Stable, Ready-to-Use Enalapril Maleate Formulation*

142. A POSA lacked motivation to create the claimed stable, oral liquid formulations by using the prior art related to extemporaneously prepared formulations. None of the Epaned® Kit insert, the '747 patent, or Allen provide a POSA with motivation to develop an oral liquid enalapril formulation with stability of at least 12, 18 or 24 months.

143. With regards to the Epaned® Kit insert and the '747 patent, a POSA would not understand those references to provide any sort of motivation to develop an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months. Rather, a POSA would see the presence of the Epaned® Kit on the market—an embodiment of the '747 patent—as an indication that an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months is unreachable.

144. A POSA would appreciate the superiority of an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months—compared to drug products that require manipulation prior to administration. Knowing this, a POSA would view the Epaned® Kit and the '747 as evidence that an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months was not viable. A POSA would understand that the Epaned® Kit would not have launched if an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months was easily attainable. Furthermore, a POSA would understand that the Epaned® Kit represented a compromise between compounded formulations and the ideal—but not attainable— formulations of the asserted claims.

145. A POSA would come to the conclusion that the Epaned® Kit insert and the '747 patent do not provide guidance or motivation for the creation of an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months; rather those references teach away from the formulations of the asserted claims.

**EXHIBIT 2**

[redacted] – [redacted]

146. Alkem's prior art recognizes stability issues with liquid formulations of enalapril but offers no solution to the problems nor motivation to solve them. Although some of the prior art provides stability data, Alkem's prior art provides a definition of stability that is significantly lower than those provided for in the Asserted Claims. For example, both the '747 patent and Allen define stability of retaining not less than 90% w/w of the initial enalapril amount at the end of the storage period; each of the Asserted Claims requires 95% w/w of the initial enalapril amount at the end of the storage period. A POSA would not find motivation to create a formulation with the required stability from the prior art.

147. A POSA also would not have been able to utilize routine optimization to create the claimed formulations from the prior art.

148. First, the prior art lacks motivation for a POSA to pursue an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months.

149. Second, the prior art provides no guidance regarding how a POSA would go about routinely optimizing the prior art to reach the claimed formulations. Indeed, the prior art does not explain or provide a starting point as to how a POSA would go about combining the multitudinous excipients taught in the prior art to create the stable, oral liquid formulation of the claims.

150. Finally, the amount of experimentation a POSA would have to undertake to create the claimed ready-to-use liquid formulation from the extemporaneously prepared prior art solutions would be undue.

151. Additionally, the prior art which Alkem cites spans over three decades and notes the need for a ready-to-use enalapril liquid formulation; but no such formulation existed during the time period spanned by this prior art. This further bolsters the conclusion that no motivation to create the claimed invention existed. Had such a motivation existed and had the creation of

**EXHIBIT 2**

████████████ – █████████████████████

such a formulation been a matter of simple, routine optimization as Alkem suggests, then a POSA would have expected the formulation to have been developed sometime in the nearly thirty years spanned by the prior art.  Since no such formulation was developed during that time, a POSA would believe that an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months was unachievable, that there was no reasonable expectation of success in creating such a formulation, and that no motivation to create such a formulation from the prior art existed.

> ii.  *Claims 14-17, 27, and 28 of the '482 Patent and the Asserted Claims of the '621 Patent Are Not Obvious In Light of the '747 Patent, the Epaned® Kit Insert, or Allen*

152.    The '747 patent, the Epaned® Kit Insert, and Allen are not directed towards oral liquid enalapril formulations that are stable for at least 12, 18 or 24 months.  The '747 patent and the Epaned® Kit insert discuss enalapril powders for reconstitution.   Allen discusses extemporaneously prepared formulations created by the compounding of enalapril tablets.  Thus, as explained above, a POSA would have not have any motivation or expectation of success in creating the claimed formulation from Alkem's prior art references.

153.    None of the '747 patent, the Epaned® Kit insert, or Allen teach the claimed buffer concentrations.  Nor is the buffer concentration a product of routine optimization.  For the reasons discussed above, a POSA would not have a reasonable expectation of success in routinely optimizing or motivation to routinely optimize.   Nowhere in the prior art is buffer concentration discussed or is any rationale provided to determine and arrive at the buffer concentration that will maximize stability.

154.    Compounding this issue is the fact that the prior art provides no starting off point for a POSA to routinely optimize the pH and buffer concentration from.  The Epaned® Kit insert, for example, does not disclose the amount of the citric acid/sodium citrate buffer in the

32

**EXHIBIT 2**

███████████ – █████████████████████

reconstituted kit such that a POSA would not have a starting point to determine a proper buffer concentration.

155.    Additionally, none of the '747 patent, the Epaned® Kit insert, or Allen teach the claimed stability.  Each of Asserted Claims requires that the product retain 95% w/w of the initial enalapril amount and 5% w/w or less of impurities for at least 12 months at 5±3°C with independent claims requiring stability for 18 and 24 months.  However, Allen defines stability as having 90% w/w of the initial enalapril amount at the end of the storage period and only provides stability for 60-days.  Although the '747 patent defines stability similar to the Asserted Claims— 95% w/w of the intitial enalapril amount at the end of a 12 month storage period at 5±3°C—the '747 patent is a powder for reconstitution, which has a significantly different stability standard than the ready-to-use liquid formulation embodied by the Asserted Claims.  Indeed, similar to Allen, the '747 patent defines stability in a liquid formulation as retaining 90% w/w of the initial amount after the storage period.  In its reconstituted, liquid form, the '747 patent exhibited stability a mere 36 weeks.

156.    For those same reasons, Alkem's prior art also does not render obvious the "about 5% w/w or less total impurity or related substances" in the Asserted Claims of the '621 patent.

<em>iii.    <u>Claims 18 and 19 of the '482 Patent Are Not Obvious</u></em>

157.    The '747 patent and the Epaned® Kit insert disclose formulations which contain mannitol and silicon dioxide; claims 18 and 19 each require the absence of mannitol and silicon dioxide respectively.  Neither the '747 patent nor the Epaned® Kit insert provide any motivation to exclude mannitol or silicon dioxide from their formulations.  And there is no expectation of success with regards to the creation of a formulation with the claimed stability if a POSA were to remove mannitol and silicon dioxide.

**EXHIBIT 2**

[redacted] – [redacted]

*iv. Claims 20, 21, and 22 of the ’482 Patent Are Not Obvious*

158. None of Alkem’s prior art renders claims 20, 21, and 22 of the ’482 patent as obvious. Claim 20 recites a formulation pH of less than about 3.5; claim 21, of between about 3 and about 3.5; claim 22, of about 3.3.

159. For example, Allen discloses a pH of 3.9, far above the prior art required by the claims.

*v. Claim 23 of the ’482 Patent and Claims 17 and 18 of the ’621 Patent Are Not Obvious*

160. None of Alkem’s prior art renders claim 23 of the ’482 patent or claims 17 and 18 of the ’621 patent as obvious. Claim 23 of the ’482 patent and claim 17 of the ’621 patent require that the formulation remain stable for up to 18 months at 5±3°C. Claim 18 of the ’621 patent requires that the formulation remain stable for up to 24 months at 5±3°C. As explained above, none of the prior art provides stability for 12 months—let alone 18 or 24 months.

*vi. Claim 16 of the ’621 Patent is Not Obvious*

161. None of Alkem’s prior art renders Claim 16 of the ’621 patent as obvious. Claim 16 requires that the parabens are present in the formulation from about 2% w/w to about 30% w/w of solids. The prior art, however, describes the parabens in terms of % w/w of the total formulation, thus providing no guidance for a POSA to determine the % w/w of solids in the claimed formulation.

**C. Alkem’s Secondary References Do Not Render the Asserted Claims Obvious**

162. None of Boukarim, Casas, Sosnowska, Nahata, Rippley, the ’066 Application, Strickley, and WO ’425 would fill in the necessary gaps between Alkem’s primary prior art and the Asserted Claims.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

163. Boukarim, the ’066 Application, Strickley, and WO ’425 do not disclose enalapril formulations.

164. None of Casas, Sosnowska, Nahata, or Rippley describe or teach a formulation with the claimed stability. This holds true regardless of whether these formulations apply the claimed definition of stability (*i.e.* 95% w/w of the initial enalapril amount) or the less stringent definition of stability (*i.e.* 90% w/w of the initial enalapril amount). A POSA would find these references unhelpful at best.

165. Some of the secondary references explicitly teach away from the claimed formulations. Casas, for example, teaches that parabens are linked to allergic reactions in pediatric patients. A POSA seeking to create a ready-to-use oral formulation of enalapril for pediatric consumption, upon reading Casas, would be discouraged from using parabens.

**D. Secondary Considerations Support Non-Obviousness of the Asserted Claims**

166. Secondary considerations support non-obviousness of the Asserted Claims.

*i.* *Unexpected Results*

167. The unexpected stability of the claimed formulations supports non-obviousness. The claimed formulations are stable at 5±3°C for up to 12, 18, or 24 months. During this storage time, the claimed formulations retain at least 95% or more w/w of their initial enalapril amount and have less than 5% w/w of impurities and degradants.

168. The specification shows examples of formulations exhibiting this unexpected stability. Tables B-2 and E-2 of the patents describe formulations that show less than 1% w/w degradation formation at 5°C for 52 and 62 weeks.

169. The May 15, 2020 Inventor’s Declaration of Dr. Gerold Mosher shows more examples of formulations demonstrating unexpected stability. Formulations H1 and H7-H9 retain

**EXHIBIT 2**

████████ – ████████████

more than 98% enalapril and have less than 2% w/w of total impurities after being stored at 5°C

for 52 weeks.  SLVGT_RTU_00005142-143.

170.    A POSA would have found this level of stability unexpected.  Indeed, Alkem's

prior art references confirm that the stability found in the claimed formulations is wholly

unexpected.

171.    Nahata, for example, shows that enalapril extemporaneous formulations lost 5% of

their initial enalapril amount after merely 56 days at 4°C.  A similar situation occurred in Allen;

the extemporaneously prepared formulations there lost 5% of their initial enalapril amount after

60 days at 5°C.  A POSA reviewing Nahata and Allen would not expect that an enalapril liquid

formulation would retain more than 95% of its initial enalapril amount after 60 days.

172.    The fact that the '747 patent shows formulations stable at 12 weeks is of no

moment.  The '747 patent describes a powder for reconstitution.  Thus, it uses different excipients

than a ready-to-use oral liquid formulation.  Some of these additional excipients include stability

agents such as lactose, mannitol, and sucrose granulations.  Such additional excipients contribute

to the stability of the formulation in the '747 patent and are not found in the formulation of the

Asserted Patents.  Even assuming that one could extrapolate the 12-week stability data to 12

months, the fact that the Asserted Claims exhibit such long-lasting stability without the need for

lactose, mannitol, and sucrose granulations is unexpected.

173.    Moreover, Nahata, Allen, and the '747 patent use a lower threshold for stability.

Those references define stability as retaining 90% of the initial enalapril amount whereas the

claims define stability as retaining 95% of the initial enalapril amount.  These references fail to

demonstrate stability on par with the stability in the Asserted Claims, even at this lowered

**EXHIBIT 2**

███████████ – ██████████████

threshold.  This further suggests that a POSA would not expect an enalapril oral liquid formulation to retain 95% w/w of its initial enalapril amount after 12, 18, or 24 months.[6]

### ii.   *Failure of Others*

174.   Also demonstrating the non-obviousness of the Asserted Claims is the failure of others to obtain an oral, liquid enalapril formulation that retains 95% w/w or more of the initial enalapril amount when stored at 5±3°C for 12, 18, or 24 months.  Indeed, the claimed formulations were the first to exhibit such stability.  As explained above, none of Alkem's prior art teaches formulations that exhibit the same order of magnitude of stability as the claimed formulations.

### iii.   *Long-felt But Unmet Need*

175.   The formulation embodied by the Asserted Claims satisfies a long-felt but unmet need for stable liquid formulation of enalapril for pediatric patients that did not require compounding, reconstitution, or any other manipulation prior to administration.

176.   The medical community initially viewed pediatric and adolescent hypertension as a rare occurrence.  Indeed, until the 1970's, the exact prevalence of pediatric hypertension was virtually unknown.  However, in the mid-1970's, the medical community recognized that gaps existed in the understanding of abnormal pediatric blood pressures.  By the late 1970's, a clear view of abnormal pediatric blood pressure emerged.  This led to an increased awareness of hypertension in children and the specific issues and challenges relating to pediatric hypertension.

177.   In conjunction with this increased awareness of pediatric hypertension, a well-documented need for safe, effective pharmaceutical formulations for children developed.  Indeed, this need was the reason that Azurity—then known as Silvergate—was founded in the first place.

---

[6] Alkem's remaining references do not examine enalapril liquid formulation stability.

**EXHIBIT 2**

**[redacted] – [redacted]**

178. The need for safe and effective pediatric pharmaceutical formulations can also be seen in the numerous legislative efforts to incentive drug manufactures to conduct pharmaceutical studies in children. For example, Congress passed the Food and Drug Administration Modernization Act (FDAMA) in 1997 which provided financial incentives for drug manufacturers to conduct studies in children. Further litigation included the Best Pharmaceuticals for Children Act (BPCA) in 2002 and the Pediatric Research Equity Act (PREA) in 2003. The BPCA and the PREA extended the financial incentives provided for in the FDAMA. And in 2012, Congress passed the Food and Drug Administration Safety and Innovation Act (FDASLA), permanently reauthorizing the BPCA and the PREA.

179. The need for safe and effective pharmaceutical formulations for pediatric patients have been recognized in the context of antihypertensives, including specifically with respect to enalapril. Numerous publications have recognized and discussed this need.

180. In recent years, fueled by the ongoing childhood obesity epidemic, this need has increased and intensified. Current estimates posit that up to 5% of children and adolescents have hypertension—a number that has increased substantially over the last few decades. Several publications have recognized and discussed the heightened need for safe, effective pharmaceutical formulations for the treatment of hypertension in children.

181. In pediatric patients, the optimal oral drug formulation is a ready-to-use liquid formulation. Specifically, a ready-to-use formulation is optimal when (1) dose flexibility is required; (2) taste is acceptable; (3) the API is soluble in a convenient volume; and (4) the drug is stable in a solution for a two-year shelf life. Such a formulation is preferable because it eliminates possible dosing inconsistencies or contamination during compounding or reconstitution and increases patient compliance.

**EXHIBIT 2**

[REDACTED] – [REDACTED]

182. Enalapril maleate was approved by the FDA in tablet form in December of 1985 and was marketed under the trade name Vasotec®. Vasotec® was not originally labeled for pediatric use but, nonetheless, it was commonly used to treat pediatric hypertension. Indeed, the National High Blood Pressure Working Group on Hypertension Control in Children and Adolescents recommended enalapril for pediatric use.

183. In 2002, enalapril received FDA approval for the treatment of pediatric hypertension. It was the first ACE inhibitor approved by the FDA for pediatric hypertension. The label for enalapril is unique insofar as it has a pediatric indication for all young children except neonates. It is the only ACE inhibitor that is approved for treatment in children younger than six.

184. Although enalapril had been commercially available since 1985 and labeled for pediatric use since 2002, enalapril was only available in tablet form for many years. Enalapril was not commercially available in oral liquid form until the release of Azurity's Epaned® Kit in 2013.

185. For patients unable to swallow solid tablets—particularly children—the primary way of administering enalapril was to compound the tablet with a mortar and pestle into a powder, dissolve the powder into a solution, and then administer the resulting solution to the patient. For example, the insert for Vasotec® instructed pharmacists to take 10 compounded tablets of 20 mg Vasotec® in a bottle with 50 mL of Bicitra®, shake well for at least 2 minutes, let the concentrate stand for 60 minutes, and then add 150 mL of Ora-Sweet® SF. This resulted in a 1 mg/mL enalapril maleate suspension.

186. Compounding pharmaceutical products such as in the manner described above has many drawbacks. These drawbacks were frequently discussed in the literature. Compounding created such notorious and widespread concern that Congress intervened several times to address safety issues surrounding the practice. For example, Congress added Section 503A to the Food

**EXHIBIT 2**

████████ – ████████████████████

Drug and Cosmetic Act in 1997, which limited when compounding for human consumption may occur.  As another example, Congress enacted the Drug Quality and Security Act ("DQSA") in 2013 which clarified and enhanced public health protections relating to compounded drug products.

187.    Following the enactment of the DQSA, the FDA increased its oversight over drug compounding.  The FDA, for example, has provided industry guidance with respect to Section 503A.  Furthermore, the FDA has inspected hundreds of compounding facilities since the enactment of the DQAS and taken remedial action as appropriate.

188.    There was a need to address the long-recognized issues with compounding.

189.    The Epaned® Kit was an improvement over the then-existing enalapril tablets and compounded solutions, but it had its own problems.  The Epaned® Kit still required a pharmacist to engage in a multi-step reconstitution process to correctly mix the enalapril powder and diluent.  This left ample room for dosage errors and other errors and inconsistencies.  Other issues with the Epaned® Kit related to incomplete solubilization of the enalapril powder in the liquid, pharmacist using the incorrect diluent, and contamination issues.

190.    After reconstitution, the solution resulting from the Epaned® Kit was stable for only 60 days.  Thus, even after Azurity introduced Epaned® Kit into the market, there still existed the need for a safe, effective, oral liquid formulation of enalapril for children that remained stable for long periods of time.

191.    Azurity developed the oral liquid formulations of the Asserted Claims in response to this need.  Because the Asserted Patents are directed towards an oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months, compounding, reconstitution, or any other drug manipulation prior to administration is not required.  Thus, the risks accompanying those dosage

forms are eliminated and the patented formulation has significant safety and convenience advantages relative to the Epaned® Kit and other prior art formulations.

192. The formulations of the Asserted Claims demonstrate long-term stability for at least 12, 18 or 24 months at refrigerated conditions. By contrast, patients were instructed to discard the Epaned® Kit within 60 days of reconstitution. Thus, the formulations of the Asserted Claims have enhanced stability and storage properties as compared to the Epaned® Kit, which facilitates patient compliance and ease of use.

193. A major advantage of the Asserted Patents is the claimed oral liquid enalapril formulation that is stable for at least 12, 18 or 24 months does not require compounding, reconstitution or manipulation prior to administration. By virtue of this advantage, the claimed formulations eliminate the potential for errors or contamination and facilitate patient compliance.

194. Azurity will demonstrate that the Asserted Patents met a long-felt but unresolved need which demonstrates that they are nonobvious.

## VI. THE ASSERTED CLAIMS ARE DEFINITE

195. Alkem cannot prove by clear and convincing evidence that any of the Asserted Claims are invalid for indefiniteness.

### A. The Term "Stable" Is Definite

196. Alkem argues incorrectly that the term "stable" is indefinite because the '621 Asserted Claims are directed to a stable oral liquid formulation and each of the '482 Asserted Claims incorporates the specification's standard for stability without claiming a stable formulation.

197. The term "stable" is not included in any of the Asserted Claims of the '482 patent. Thus, the word stable cannot render the '482 patent indefinite.

198. A POSA would readily understand the claimed definition of stable. The benchmark for stabilityis expressly stated in the claims. The Asserted Claims of the '482 patent require that

**EXHIBIT 2**

[redacted] – [redacted]

"the formulation maintain 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 [or 18] months at about 5±3°C." The Asserted Claims of the '621 Patent require that "the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period" or 12, 18, or 24 months "at about 5±3°C."

199. The fact that the specification defines stability for powder similarly to the claimed stability for the ready-to-use oral formulations does not render the Asserted Claims indefinite. Instead of contradicting this definition of stability, the specification provides further support to this definition of stability. The specification, for example, provides examples of formulations with less than 5% impurities after one year of storage at 5°C (Examples E1-E6).

200. A POSA would find no ambiguity regarding the specific type of stability at issue in the Asserted Claims. In addition to the claims defining stability in terms of the amount of enalapril remaining and, for the '621 patent, the amount of impurities present, the specification provides an identical and explicit definition. '482 patent at 18:38-45. A POSA would understand that either a formulation will meet these parameters—and thus meet the definition of stable—or it will not. There is no ambiguity.

201. A POSA would also not find ambiguity in the prosecution history. This is especially so when the claims provide an unambiguous definition of stability.

202. The prosecution history supports the claimed definition of stable. For example, the May 15, 2020 Inventor Declaration of Dr. Gerold Mosher touting the superior stability of the example formulations E1-E6 and H1, H7—H13 over the prior art. SLVGT_RTU_00005140-142. In this discussion, Dr. Mosher walked through the superior stability of example formulations E1-E6 in the specification. SLVGT_RTU_000005140-141. Dr. Mosher further discussed the superior

**EXHIBIT 2**

[redacted] – [redacted]

stability of example formulations H1 and H7-H13. *Id.* In his declaration, Dr. Mosher shows how the stability data in the declaration and stability data generated for his declaration support the stability standard described in the specification and claims. Thus, Dr. Mosher—through his May 15, 2020 declaration—explained and provided evidence regarding the stability limitations.

203. Thus, Alkem cannot demonstrate that the stability limitations are indefinite by clear and convincing evidence.

### B. The Buffer Limitations of the ’621 Patent Are Definite

204. Alkem alleges that buffer limitations of the Asserted Claims of the ’621 patent are indefinite because the specification discloses over 30 buffers.

205. A POSA would readily understand the scope of the claims, including the meaning of "buffer" or "buffer system." In addition to the general knowledge of a POSA, the specification provides a definition of "buffering agents." ’621 patent at 13:37-59. The specification describes "buffering agents" as agents that maintain the pH of the liquid formulation. *Id.* The specification further lists several examples of buffering agents which may be used to form a buffer. *Id.* A POSA would readily understand the identity and properties of these buffers. And the specification describes preferred buffer systems comprising, *inter alia*, citric acid and sodium citrate. ’621 patent at 13:62-14:10.

206. Thus, Alkem will not be able to prove that the Asserted Claims of the ’482 and ’621 patents are invalid for indefiniteness by clear and convincing evidence.

## VII. THE ASSERTED CLAIMS ARE ADEQUATELY DESCRIBED

207. Alkem cannot prove by clear and convincing evidence that the Asserted Claims lack written description. The content of the specifications of the ’482 and ’621 patents demonstrates possession of the claimed formulations.

EXHIBIT 2

[redacted] – [redacted]

208. Alkem cannot prove that the shared specification of the ’482 and ’621 patents would lead a POSA to believe that the inventors were not in possession of formulations with parabens or mixtures of parabens and where the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3°C.

### A. The Paraben Limitations Are Adequately Described

209. The specification provides descriptions of enalapril oral liquid formulations where the preservative is a paraben or a mixture of paraben and the specification provides the amounts of the parabens. ’482 patent at 6:35-37; 12:34-13:7. The claimed amount of parabens—1 mg/mL of a paraben or a mixture of parabens—is specifically disclosed. ’482 patent at 12:42.

210. The specification specifically lists methylparaben and propylparaben as acceptable preservatives for the claimed enalapril oral liquid formulations. ’482 patent at 10:23-32.

211. The examples provided in the specification disclose formulations that provide written description support for the claims. Examples A and C, for example, disclose formulations that include methylparaben or a combination of sodium methylparaben and sodium propylparaben. ’482 patent at 31:24-44; 33:33-34:17.

### B. The Stability Limitations Are Adequately Described

212. The specification defines stable enalapril liquid formulations as a formulation “having 95% w/w or greater of the initial enalapril amount and about 5% w/w or less of total impurities or related substances at the end of a given storage period.” ’482 patent at 18:41-45. This tracks the definition of stable provided in the claims themselves. The claimed storage periods are also disclosed. ’482 patent at 18:64-19:3; 2:57-60; 3:12-15; 3:34-37. And the specification provides examples of formulations that are expected to meet these stability guidelines. ’482 patent at 2:21-28; 2:63-3:3; 3:18-25; 3:40-49.

**EXHIBIT 2**

█████████ – ████████████████████

213.   Thus, Alkem cannot demonstrate that the claims lack written description by clear and convincing evidence.

## VIII.   THE ASSERTED CLAIMS ARE ENABLED

214.   Alkem cannot demonstrate that the Asserted Claims are not enabled by clear and convincing evidence.

215.   Specifically, Alkem cannot demonstrate that the shared specification of the Asserted Patents would not allow a POSA to practice the claimed inventions without undue experimentation.

216.   A POSA can make and use the Asserted Claims upon reading the specification without undue experimentation.  The specification provides the critical information needed to make and use the formulations of the Asserted Claims.  As explained above, for example, the specification provides ample support regarding the stability and paraben limitations.

217.   Alkem cannot demonstrate that the Asserted Claims are not enabled.

## IX.   THERE IS NO ISSUE WITH REGARDS TO INVENTORSHIP

218.   Alkem cannot demonstrate that the patents are invalid due to improper inventorship.  Specifically, Alkem cannot demonstrate that David Miles is improperly listed as a joint inventor on the Asserted Patents.

219.   Dr. Miles and Mr. Mosher conceived and worked jointly to create the formulations of the Asserted Claims.  Dr. Mosher and Mr. Miles engaged in joint decision making regarding the Asserted Patents.  Both decided the direction to take during development.  Both would discuss results of various testing and experiment and decide on the best step forward.

220.   Even to the extent inventorship is determined to be incorrect, incorrect inventorship is a curable defect which does not render a patent invalid.

# EXHIBIT 3

**EXHIBIT 3**

[redacted] – [redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., | : | |
| *Plaintiff*, | : | C.A. No.: 19-2100 (MSG) |
| v. | : | |
| ALKEM LABORATORIES LTD., | : | |
| *Defendant*. | : | |

**EXHIBIT 3**

**DEFENDANT'S STATEMENT OF ISSUES**
**OF FACT THAT REMAIN TO BE LITIGATED**

**EXHIBIT 3**

[redacted] – [redacted]

Pursuant to D. Del. LR 16.3(c)(4), Defendant Alkem Laboratories Ltd. ("Alkem") submits the following statement of facts believed to be contested and remaining to be litigated in this case. This statement of contested facts is based on information presently known to Alkem, and Alkem reserves all rights to supplement and/or modify this statement. Alkem bases this statement on the parties' pleadings, the parties' documentary and testimonial evidence, Alkem's current understanding of Plaintiff's claims and defenses, and the Court's rulings to date. By including a fact herein, Alkem does not assume the burden of proof or production with regard to that fact. For example, the facts contained within this statement directed to issues on which Plaintiff Azurity Pharmaceuticals, Inc. ("Plaintiff" or "Azurity") bears the burden of proof, *i.e.*, infringement, are based on information presently known to Alkem, including through Azurity's discovery responses, invalidity contentions, and expert discovery. Although Alkem has tried to anticipate these issues to the extent possible, Azurity may not raise all these issues at trial and/or may seek to modify these issues or raise additional issues. In addition, some of Azurity's arguments or evidence may be objectionable and the subject of motions to be filed at a later date. Alkem also intends to offer evidence to rebut evidence offered by Azuirty.

This statement is not intended to be exhaustive, and Alkem reserves the right to prove any matters identified in its pleadings, invalidity contentions, interrogatory responses, and/or expert reports. By submitting this statement, Alkem is not waiving its rights to amend or supplement its submission after considering Azurity's submissions, whether made in pretrial proceedings, the trial itself, or post-trial briefing. To the extent this exhibit contains issues of law, those issues are incorporated into Alkem's Statement of Issues of Law that Remain to Be Litigated (Exhibit 5). To the extent Alkem's Statement of the Issue of Law contains issues of fact, those issues are incorporated by reference in this exhibit. To the extent that a fact or an issue of fact in one section

applies to another section, claim or theory, it is incorporated therein as well without separate repetition.

Alkem further reserves the right to affirmatively use, elaborate upon, or dispute any fact cited by Azurity, including the scientific bases for such fact or Azurity's application of such fact in this case. Alkem also incorporates by reference its expert reports in support of any proof to be presented by expert testimony.

Any fact not specifically admitted in the parties' Joint Statement of Uncontested Facts should be considered contested, even if not specifically enumerated herein. Alkem reserves the right to further modify, supplement, and/or amend the Final Pretrial Order and the attachments thereto, including this exhibit, in light of any future rulings by the Court and/or issues that remain open until entry of the Final Pretrial Order.

## I. THE PATENTS-IN-SUIT

1. The Asserted Patents share a common specification.

2. The common specification discloses the following:

> Buffering agents maintain the pH of the liquid enalapril formulation. Non-limiting examples of buffering agents include, but are not limited to sodium bicarbonate, potassium bicarbonate, magnesium hydroxide, magnesium lactate, magnesium glucomate, aluminum hydroxide, aluminum hydroxide/sodium bicarbonate co-precipitate, mixture of an amino acid and a buffer, a mixture of aluminum glycinate and a buffer, a mixture of an acid salt of an amino acid and a buffer, and a mixture of an alkali salt of an amino acid and a buffer. Additional buffering agents include citric acid, sodium citrate, sodium tartarate, sodium acetate, sodium carbonate, sodium polyphosphate, potassium polyphosphate, sodium pyrophosphate, potassium pyrophosphate, disodium hydrogen phosphate, dipotassium hydrogen phosphate, trisodium phosphate, tripotassium phosphate, sodium acetate, potassium metaphosphate, magnesium oxide, magnesium hydroxide, magnesium carbonate, magnesium silicate, calcium acetate, calcium glycerophosphate, calcium chloride, calcium hydroxide, calcium lactate, calcium carbonate, calcium bicarbonate, and other calcium salts. Some buffering agents also impart effervescent qualities when a powder is reconstituted in a solution. In some embodiments, the buffering agent is not sodium bicarbonate.

(U.S. Patent No. 10,786,482 ("'482 Patent"), at 13:23-45.)

**EXHIBIT 3**

████████ –  ██████████████████

3.      The common specification discloses the following with respect to the "buffer":

In some embodiments, the oral liquid formulation comprises a buffer.

> In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises citric acid. In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises citric acid and sodium citrate. In some embodiments, the buffer in the enalapril oral liquid formulation described herein comprises citric acid and sodium citrate dihydrate or an equivalent molar amount of sodium citrate anhydrous. In some embodiments, the sodium citrate is monosodium citrate. In some embodiments, the sodium citrate is disodium citrate. In some embodiments, the sodium citrate is trisodium citrate.

('482, at 13:48-58.)

4.      The common specification discloses, "[i] In some embodiments, modulation of the pH is desired to provide the best antimicrobial activity of the preservative, sodium benzoate. In some embodiments, the antimicrobial activity of sodium benzoate drops when the pH is increased above 5."  ('482, at 10:42-46.)

5.      The common specification discloses, "[i]n some embodiments, modulation of the pH is desired to provide a lowered impurity profile. In the exemplary stability studies, the main enalapril degradants are enalapril diketopiperazine and enalaprilat[]."  ('482, at 13:64-67.)

6.      The common specification also discloses that "[i]n some embodiments, the formation of degradants is dependent on the buffer concentration. In some embodiments, the buffer concentration impacts the taste of the enalapril oral liquid formulation." ('482, at 14:47-50.)

7.      The common specification also discloses various examples, all of which include as ingredients in the formulations the buffer pair of citric acid and sodium citrate. ('482, at 31:11-40:24.) The differences in this buffer pair across the examples includes whether the sodium citrate would be dissolved from the dihydrate or anhydrous form, for example, and the particular concentrations expressed as either the mass or molar amount divided by the total volume of solution.  (*Id.*)

3

**EXHIBIT 3**

██████████ – ████████████████

8.      The common specification acknowledges that enalapril was known in the prior art, known as a potent angiotensin-converting enzyme ("ACE") inhibitor, and known and used to treat hypertension, symptomatic congestive heart failure, and asymptomatic left ventricular dysfunction. ('482, at 1:49-2:17.)

9.      The common specification also acknowledges that it was known in the art that enalapril is a pro-drug that is rapidly hydrolyzed in the liver to enalaprilat after oral administration, and that enalapril was administered in the prior art in the form of oral tablets or liquid formulations obtained by reconstitution of enalapril powder formulations. (*Id.*, at 1:30-52.)

10.     The common specification acknowledges that it was known that some people have difficulty ingesting tablets and capsules, and that solid dosage forms were not recommended for children and the elderly due to their increased risk for choking. (*Id.*, at 5:24-32.)

11.     The common specification also acknowledges that pulverizing enalapril tablets and attempting to reconstitute the resulting powder has "significant drawbacks." (*Id.* at 5:41-53.)

12.     The common specification acknowledges that enalapril powder compositions for reconstitution as oral liquids was known and described in the prior art, including U.S. Patent No. 8,568,747 (the "'747 Patent"), and states that those compositions "require[d] mannitol and colloidal silicon dioxide for stability and dissolution." (*Id*. at 5:54-58.)

13.     The common specification acknowledges that sodium benzoate was one of several known preservatives. (*Id.* at 10:41.)

14.     The common specification acknowledges that paraben preservatives, especially methylparaben, was known to react with some sugars (including glucose) and some sugar alcohols (including mannitol) to form transesterification reaction products, and acknowledges that this is

undesirable from a formulation and stability standpoint, because transesterification creates additional degradants. (*Id.* at 13:19-34.)

15. Example B in the common specification includes formulations, "[t]he pH of which was measured and adjusted as needed to pH 3.3 with ~1N HCL or ~0.5N NaOH." (*Id.* at 32:1-8.) The Example B formulations also include the buffer citric acid, anhydrous/sodium citrate, anhydrous. (*Id.* at 32:46-64.)

16. Example G in the common specification includes formulations having, "HCl/NaOH as need to achieve pH." (*Id.* at 39:36-57.) The Example G formulations also include the buffer citric acid, anhydrous/sodium citrate, anhydrous/sodium citrate, dihydrate. (*Id.*)

## II. THE PROSECUTION HISTORY OF THE PATENTS-IN-SUIT

### A. The '482 Patent

17. United States Patent No. 10,786,482 (the "'482 patent"), entitled "Enalapril Formulations," issued on September 29, 2020.

18. Gerold L. Mosher and David W. Miles are named as inventors of the '482 patent.

19. The '482 patent claims priority to provisional U.S. patent application No. 62/310,198, which was filed March 18, 2016.

20. The '482 patent states as follow:

> Sweetener and Preservative Incompatibility
> Paraben Preservatives (especially methylparaben) can react with selected sugars (glucose, fructose, sucrose, lactose, maltose) and sugar alcohols (xylitol, mannitol, lactitol, maltitol, sorbitol) to form transesterification reaction products. This can be undesirable from a formulation and stability standpoint as the transesterification creates additional degradants.
> In some embodiments, the enalapril oral liquid formulation described herein does not comprise a paraben preservative. In further embodiments, the enalapril liquid formulation described herein does not comprise a paraben preservative when the formulation also comprises a sugar or sugar alcohol.

’482 patent at 13:8-21.

21. Azurity owns the ’482 patent.

22. Azurity’s predecessor-in-interest, Silvergate, filed the patent application which resulted in the ’482 patent.

23. In prosecuting the ’482 patent, Azurity/Silvergate did not support the patent application with data pertaining to formulations using one or more parabens as a preservative.

24. In the FDA’s Orange Book the ’482 patent is listed for Epaned®, which does not practice the Asserted Claims.

25. The ’159 application, from which the ’482 patent issued, was submitted to the U.S. Patent and Trademark Office on October 31, 2018.

26. On June 24, 2019, the Examiner issued a Final Rejection of claim numbers 1-11, 13-26, and 29-30 in the ’159 application. ’482 patent Pros. Hist., 06/24/2019, Final Office Action, SLVGT_RTU_00005010. The Examiner discussed an affidavit by named inventor Mosher, filed on March 1, 2019, and found it insufficient to overcome the rejections of the pending claims. *Id.* at SLVGT_RTU_00005012. The Examiner stated that the compositions of E7 and E8 in the Affidavit were essentially the same, and “limited to compositions comprising a single, specific amount of enalapril; a single, specific amount and ratio of citric acid and sodium citrate; and a single, specific preservative (sodium benzoate) in a specific amount.” *Id.* at SLVGT_RTU_00005013. The Examiner stated that Applicant had failed to provide data supporting the breadth of the claims. *Id.*

27. In the same Final Rejection, regarding the requirement for adequate written description, the Examiner stated that the subject matter claimed in the ’159 application, extends far beyond the select embodiments in the application [examples including: “(i) 1.0 mg/ml enalapril

**EXHIBIT 3**

█████████ – █████████

maleate; (ii) a buffer comprising 1 to 4 mg/ml of a mixture of citric acid and sodium citrate; and (iii) 1 mg/ml sodium benzoate; (i) 1.0 mg/ml enalapril maleate; b) a buffer comprising 1.96-1.97 mg/ml of a mixture of citric acid and sodium citrate; and (iii) 1 mg/ml sodium benzoate[]"]. '482 patent Pros. Hist., 06/24/2019, Final Office Action, SLVGT_RTU_00005021 - SLVGT_RTU_00005022. The Examiner stated further, there "is no disclosure, either explicitly or with a sound basis to support the breadth of the claimed invention, particularly the allegedly unexpected long-term stability that Applicant contents is the inventive concept of the claimed formulations." *Id.* at SLVGT_RTU_00005022 - SLVGT_RTU_00005023.

28. On Aug. 1, 2019, Applicant responded to the Final Office action, by amending the claims to add specific amounts of certain components to address the Examiner's section 112(a) rejection, and filing a terminal disclaimers with respect to U.S. Patent Numbers 9,669,008, 9,808,442, 10.039,745, 10,154,987, and U.S. Patent Application Number 16/242,898.

29. On May 15, 2020, the Applicant responded to a Non-Final Office Action that rejected all claims under 35 U.S.C. § 112(b) (under the A.I.A.) as indefinite for reciting the term "stable," because one of ordinary skill in the art could not reasonably determine the metes and bounds of this limitation. See generally '482 patent Pros. Hist., 01/07/2020, Non-Final Office Action, SLVGT_RTU_00005103 - SLVGT_RTU_00005123. To overcome the Examiner's rejection, the Applicant amended to claims to remove the term "stable." '482 Pros. Hist., 05/15/2020, Reply to Non-Final Office Action, SLVGT_RTU_00005127 - SLVGT_RTU_00005150. I further understand that none of the claims that later issued in the '482 patent contain the word "stable."

30. On May 15, 2020, the Applicant responded to the January 1, 2020 Non-Final Rejection, that rejected independent claims 1, 11, 17, and 30, and all claims depending from them,

EXHIBIT 3

██████████ ─ █████████████████

under 35 U.S.C. § 112(b) (under the A.I.A.) as indefinite because, as the Examiner stated, it was

if the recitations "wherein the formulation is stable at about 5 ± 3 °C for at least 12 months" and

"wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril

amount and about 5% w/w or less total impurity or related substances at the end of the given

storage period" are claim limitations. *Id.* at SLVGT_RTU_00005108. The Examiner stated further

that, "In particular, it is unclear if the recited formulations would necessarily possess the properties

"wherein the formulation is stable at about 5 ± 3 °C for at least 12 months" and "wherein the stable

oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5%

w/w or less total impurity or related substances at the end of the given storage period." In other

words, it is unclear if the recitations are claim limitations, or if the recitations regarding stability

merely describe the composition of instant claims 1, 17, and 31." *Id.* at SLVGT_RTU_00005108.

31.     On May 15, 2020, Applicant responded to the January 1, 2020 Non-Final Rejection,

that rejected independent claims 1-11, 13, 15-17, 19-26, and 28-31 under 35 U.S.C. § 112(a) (under

the A.I.A.) as failing to comply with the written description requirement. '482 Pros. Hist.,

05/15/2020, Reply to Non-Final Office Action, SLVGT_RTU_00005110. The Examiner stated

there that, in particular, the specification fails to provide adequate support for the limitations

wherein the composition "a buffer comprising about 1-4 mg/ml of a mixture of citric acid and

sodium citrate" as recited in instant claims 1, 17, and 31. *Id.*

32.     Applicant responded to the Examiner's rejections under section 112 on May 15,

2020, including by amending the claims and submitting the affidavit of named inventor Mosher.

'482 Pros. Hist., 05/15/2020, Applicant Arguments/Remarks Made in an Amendment; Affidavit

traversing   rejections   or   objections   –   Rule   132,   SLVGT_RTU_00005127   –

SLVGT_RTU_00005144.

EXHIBIT 3
██████████ – ██████████████████

33.     The Mosher affidavit makes several assertions in support of the claims pending in the '159 application. These include alleged advantages: improved ease of administration, patient compliance, and accuracy of dosing. '482 Pros. Hist., 05/15/2020, Mosher Affidavit, SLVGT_RTU_00005140. The Mosher Affidavit present formulations H1, and H7-H3, none of which appear in the specification of the '159 application as filed. All of H1, and H7-H13 include only the citric acid/sodium citrate buffer system and only the sodium benzoate preservative. *Id.* at SLVGT_RTU_00005142.

34.     The pending claims of the '159 application issued on September 29, 2020, including sodium benzoate as the claimed preservative, and the citric acid/sodium citrate buffer system.

### B.  The '621 Patent

35.     United States Patent No. 10,918,621 (the "'621 patent"), entitled "Enalapril Formulations," issued on February 16, 2021.

36.     Gerold L. Mosher and David W. Miles are named as inventors of the '621 patent.

37.     The '621 patent claims priority to provisional U.S. patent application No. 62/310,198, which was filed March 18, 2016.Azurity owns the '621 patent.

38.     The '621 patent states as follow:

> Sweetener and Preservative Incompatibility
> Paraben Preservatives (especially methylparaben) can react with selected sugars (glucose, fructose, sucrose, lactose, maltose) and sugar alcohols (xylitol, mannitol, lactitol, maltitol, sorbitol) to form transesterification reaction products.  This can be undesirable from a formulation and stability standpoint as the transesterification creates additional degradants.
> In some embodiments, the enalapril oral liquid formulation described herein does not comprise a paraben preservative.  In further embodiments, the enalapril liquid formulation described herein does not comprise a paraben preservative when the formulation also comprises a sugar or sugar alcohol.

**EXHIBIT 3**

███████████ – █████████████████████

'621 patent at 13:19-34.

39.     Azurity's predecessor-in-interest, Silvergate, filed the patent application which resulted in the '621 patent.

40.     In prosecuting the '482 patent, Azurity/Silvergate did not support the patent application with data pertaining to formulations using one or more parabens as a preservative.

41.     In the FDA's Orange Book the '621 patent is not listed for Epaned®, which does not practice the Asserted Claims.

42.     The '575 application, from which the '621 patent issued, was submitted to the U.S. Patent and Trademark Office on August 12, 2020. The '575 application as filed included the claim term "stable" in claim numbers 1-30. '621 Pros. Hist., Application as Filed, 08-12-2020, SLVGT_RTU_00005422 – SLVGT_RTU_00005497.

43.     On December 28, 2020, the Applicant filed supplemental response in accordance with a [sic] communications between the Patent Office and the Applicant's representative on December 17, 2020 and December 28, 2020. '621 Pros. Hist., 12-28-2020, Supplemental Response, SLVGT_RTU_00005574 – SLVGT_RTU_00005576. This supplemental response included a terminal disclaimer, disclaiming the terminal part of the statutory term of any patent granted on the '575 application that would extend beyond the expiration of seven patents, including the '482 patent. '621 Pros. Hist., 12-16-2020, Approving Terminal Disclaimer, SLVGT_RTU_00005531 – SLVGT_RTU_00005538.

44.     The supplemental response further included three, separate declarations by named inventor Mosher. These included a declaration dated May 14, 2020, filed for the patent application number 16/242,898 (now U.S. Patent No. 10,772,868) on May 14, 2020; a declaration dated February 2, 2017, filed for the patent application number 15/081,603, on March 25, 2016; and a

declaration dated May 15, 2020, filed for the patent application 16/177,159 (now U.S. Pat. No. 10,786,482), on May 15, 2020. Pros. Hist., 12-28-2020 Affidavit Filings, SLVGT_RTU_00005564 – SLVGT_RTU_00005571, SLVGT_RTU_00005546 – SLVGT_RTU_00005552 and SLVGT_RTU_00005553 – SLVGT_RTU_00005563, respectively.

45. In the March 25, 2016 Affidavit, named inventor Mosher makes several assertions in support of the claims pending in the ’603 application, including alleged advantages: improved ease of administration, patient compliance, and accuracy of dosing as compared to the allegedly then-currently available methods. ’621 Pros. Hist., 12/28/2020, Mosher Affidavit, SLVGT_RTU_00005566. The March 2016 affidavit also includes information concerning purported “exemplary formulations E7 and E8[,] which show minimal degradation as compared to current formulations.” The specification of the ’603 application as filed does not contain either formulation E7 or E8.

46. In the October 31, 2018 Affidavit, named inventor Mosher makes several assertions in support of the claims pending in the ’159 application, including alleged advantages: improved ease of administration, patient compliance, and accuracy of dosing as compared to the allegedly then-currently available methods. ’621 Pros. Hist., 12/28/2020, Mosher Affidavit, SLVGT_RTU_00005549. The October 31, 2018 Mosher Affidavit present formulations H1, and H7-H13, none of which appear in the ’159 application as filed, in support of the pending claims. All of H1, and H7-H13 include only the citric acid/sodium citrate buffer system and only the sodium benzoate preservative. *Id.* at SLVGT_RTU_00005550.

47. In addition, the Mosher October 31, 2018 affidavit in Table 3 depicts Assay Results After Storage of Formulations at 60$^{o}$ C and for time periods of: 0, 2, 4, and 7 days. *Id.* at SLVGT_RTU_00005551. No justification is provided why the 60 °C was chosen as accelerated

**EXHIBIT 3**

███████████ – ███████████████

condition nor interpretation of the obtained data. Guidelines for drug products intended for storage in a refrigerator are provided in the FDA's November 2003 Guidance For Industry, Q1A(R2) Stability Testing of New Drug Substances and Products, emphasizing the fact that the recommended time period for testing is "minimum time period covered by data at submission" and where long-term testing is performed at 5 °C± 3 °C for 12 months and accelerated stability testing at 25° C± 2° C / 60% RH ±5% RH for 12 months. (2003 FDA Guidance at page 13).

48.    In the January 8, 2019 Affidavit, named inventor Mosher makes several assertions in support of the claims pending in the '898 application, including alleged advantages: improved ease of administration, patient compliance, and accuracy of dosing as compared to the allegedly then-currently available methods. '621 Pros. Hist., 12/28/2020, Mosher Affidavit, SLVGT_RTU_00005555. The January 2019 Mosher Affidavit presents formulations H1-H9, none of which appear in the specification of the '898 application as filed. *Id.* at SLVGT_RTU_00005556 – SLVGT_RTU_00005557. Five out of nine of these "H" formulations appear to have been prepared with buffer systems other than citric acid/sodium citrate, however, four out of the nine include citric acid. *Id.* These "H" formulations were all prepared using the preservative sodium benzoate. *Id.*

49.    Table 2 of the January 8, 2019 Mosher Affidavit purports to show Assay and Total Degradant Content After Storage, the storage temperatures including 5° C and 25° C. *Id.* at SLVGT_RTU_00005557 – SLVGT_RTU_00005558. Table 3 of the January 2019 Mosher Affidavit purports to show formulations, not identified by any lettering or numbering system, including fifteen different, commonly used, buffer systems. *Id.* at SLVGT_RTU_00005558 – SLVGT_RTU_00005559. Likewise, the preservative included in all of these formulations was sodium benzoate. *Id.* Table 4 of the January 8, 2019 Mosher Affidavit purports to show Assay

**EXHIBIT 3**

■■■■■■■ – ■■■■■■■■■■■■

Results After Storage of Formulations at 60o C for time points 0, 2, 4, and 7 days. *Id.* at SLVGT_RTU_00005559 – SLVGT_RTU_00005560. These results lack justification on the selection of this temperature as accelerated condition for a drug product that is intended to be stored in a refrigerator as well as interpretation of the obtained data.

50.     The January 8, 2019 Mosher Affidavit includes a comparison of the formulations of the Nahata prior art reference to the formulations identified by Mosher as H1-H9, regarding Enalapril content in formulations after storage at 5° C. *Id.* at SLVGT_RTU_00005560 – SLVGT_RTU_00005563. No data was collected by Mosher for the Nahata formulations in the comparison Table beyond 91 days and, instead extrapolated from there, while data appears to have been collected for the "H" formulations for up to 364 days. *Id.* In other words, it is not appropriate to compare real time to extrapolated stability data of the liquid formulations of the claimed invention to those of the prior art, since the two sets of stability data are generated by two different research laboratories. The Nahata formulations were selected for this stability comparison among other prior art references where liquid enalapril formulations were extemporaneously produced from powder formulations using commercially available compounding vehicles.

## III.     TECHNICAL BACKGROUND

### A.     EPANED®

51.     Azurity is the holder of New Drug Application ("NDA") No. 208686 for the oral liquid medication known by the trade name Epaned®.

52.     Epaned® is approved by the U.S. Food and Drug Administration ("FDA").

53.     Epaned® is an angiotensin converting enzyme ("ACE") inhibitor administered as a ready-to-use oral solution.

**EXHIBIT 3**

████████ – ████████████████

54.     Epaned® is indicated for the treatment of hypertension in adults and children older than one month to lower blood pressure.  Lowering blood pressure reduces the risk of fatal and nonfatal cardiovascular events, primarily strokes and myocardial infarctions.

55.     Epaned® is indicated for the treatment of symptomatic heart failure.

56.     Epaned® is indicated for the treatment of asymptomatic left ventricular dysfunction, to decrease the rate of development of overt heart failure, and reduce hospitalization for heart failure.

57.     The active ingredient of Epaned® is enalapril.

58.     The pH of Epaned® is between about 3.1 and 3.5.

59.     On September 20, 2016, FDA approved NDA No. 208686 as an oral solution for, among other things, treatment of pediatric and adult hypertension.

60.     No product currently available to consumers in the United States practices the claims Azurity has asserted against Alkem in this case.

###     B.     Enalapril – Pharmacology and Physicochemical Properties

61.     Enalapril is an angiotensin converting enzyme (ACE) inhibitor. (Epaned® Insert, Section 12.) It is used for the treatment of hypertension, congestive heart failure, post-myocardial infraction and other indications. Enalapril itself is a weak ACE inhibitor that is metabolically transformed to an active metabolite Enaloprilat, in the liver. Thus, Enalapril is a prodrug of Enaloprilat. A maleate salt of Enalapril is what is used in marketed oral dosage forms, Vasotec® (tablet) and Epaned® (liquid solution). The structure of Enalapril Maleate is shown below.

62. Enalapril maleate is white to off-white, crystalline powder with a MW of 492.5. It has two ionization constants, pKa1 of 3.0 and pKa2 of 5.4. It is soluble in water (24 mg/ml), and in alcohol (80 mg/ml). In aqueous solutions, it exhibits pH dependent chemical stability which is maximum at a pH of ~3. At pH > 5 the rate of decomposition increases. (Allen at 1917.)

### C. Liquid Oral Drug Formulations

#### *i. Overview*

63. Oral liquid formulations are homogeneous liquid preparations containing one of more active pharmaceutical ingredients (APIs) in the form of a solution, suspension or emulsion that can be administered undiluted or after dilution. (William M. Kolling and Tapash K. Khosh, *Oral Liquid Dosage Forms: Solutions, Elixirs, Syrups, Suspensions and Emulsions in Theory and Practice of Contemporary Pharmaceutics*, CRC Press, (2005).) Oral liquids are either aqueous-based for water-soluble APIs or oil-based for poorly water-soluble APIs and are supplied as ready to use liquid preparations or upon reconstitution of a dry powder form. Syrups and Elixirs are also classes of oral liquid preparations. Syrups are viscous oral liquids where the vehicle usually contains high levels of sucrose or other sugars to which certain polyhydric alcohols may be added to inhibit crystallization or to modify solubilization, taste masking and other properties. Unsweetened syrups may contain sweetening agents and viscosity increasing (thickening agents). They may contain ethanol (95%) as a preservative or a solvent for flavoring agents and like other

liquid preparations antimicrobial agents for preservation. Elixirs are clear, flavored oral liquids containing one or more active ingredients dissolved in a vehicle that usually contains high proportion of sucrose or a suitable one or more polyhydric alcohol and may also contain ethanol concentrated or diluted.

64. In reference to the selection of buffers and pH adjusting agents there are many literature publications and review articles on this subject. Exemplary is the book chapter by Melgrardt de Villiers *Buffers and pH Adjusting Agents*, Chapter 18 in the book A Practical Guide to Contemporary Pharmacy Practice 3rd Edition (2009), Editor, Judith E. Thomson, Lippincott, Williams & Wilkins, Publisher ("de Villiers"). In the first part of this book chapter, there is a general discussion and justification on the uses of buffers and pH adjusting agents, definition of the buffer capacity and selection criteria for a buffer system or a compound to adjust the pH. Then, detailed information is provided of general equations defining pH and pK that are useful in acid-base equilibria and buffer calculations (Table 18.1). De Villiers then provides examples on the preparation and use of commonly used pharmaceutical buffers such as acetate, phosphate and citrate. Of special interest and relevance is Table 18.4 in de Villiers on a Concentrated Multi-Purpose Buffer Solution (Citrate Buffer) by preparing stock solution of citric acid monohydrate and sodium citrate dihydrate in purified water followed by mixing at the indicated volumes depending on the targeted pH in the pH range 2.5 – 6.5. Also, relevant is Table 18.6 Buffer Choices for Specific pH Ranges where Citrate Buffer is recommended for pH 2.5 – 6.5. De Villiers is a useful guide to, and would be known to, POSA seeking to select and evaluate a buffer system for enalapril maleate oral liquid formulation, ready-to-use solution or extemporaneously compounded.

***ii. Compounding Vehicles for Oral Liquid Formulations***

65. Compounding of oral liquid formulations using commercially available vehicles expands treatment options for patient-centric populations, pediatric, geriatric and patients who

have difficulty swallowing solid dosage forms, such as, tablets and capsules. Multiple oral vehicles are available with different physicochemical and organoleptic properties. These vehicles can be used to reconstitute powder formulations from tablets and capsules to produce a variety of oral liquid ready to use dosage forms, such as, solutions, suspensions and emulsions. By comparing physicochemical and organoleptic properties, compounding pharmacists can select the oral extemporaneous vehicle that is best suited for the drug, route of administration and patient. Literature information on these vehicles with various drugs, including enalapril maleate in the prior art references, can be found: a) in the publication by Helin-Tanninen et al; *Comparison of six different suspension vehicles in compounding of oral extemporaneous nifedipine suspension for paediatric patients*. Eur. J. Hosp. Pharm. (2012) 19: 432-437; b) in the prior art references "Allen", "Casas", "Sosnowska"," Nahata" , "Rippley" and "Strickley"; and c) in the prosecution history file of the '482 patent (e.g., FH US786482 at SLVGT_RTU_00005020). There exist four commercially available and widely used sweetened compounding vehicles (Ora-Plus, Oral-Sweet, Ora-Sweet-SF, SyrSpend SF-Cherry) value as present in Table 1 of Helin-Tanninen.

**Table 1. Excipients and pH Value of Compounding Vehicles**
**(Ref. Helin-Tanninen, et al., 2012)**

–

| Compounding Vehicle | Suspending Agents | Flavoring Agents | Preservatives | Antifoaming Agents | Buffering Agents | pH |
|---|---|---|---|---|---|---|
| Ora-Plus | Microcrystalline cellulose, sodium carboxymethyl cellulose, xanthan gum, carrageenan | - | Methylparaben, Potassium sorbate | Simethicone | Sodium phosphate, citric acid, purified water | 4.2 |
| Ora-Sweet | - | Sucrose, glycerine, sorbitol, citrus berry | Methylparaben, Potassium sorbate | - | citric acid, sodium phosphate, purified water | 4.2 |
| Ora-Sweet SF | Xanthan gum | Glycerine, sorbitol, Sodium saccharin, citrus berry | Methylparaben, propylparaben potassium sorbate | - | Citric acid, sodium citrate, purified water | 4.2 |
| SyrSpend SF- Cherry | Modified food starch | Sucralose, artificial cherry flavor | Sodium benzoate | Simethicone | Citric acid, sodium citrate, malic acid, purified water | 4.2 |

jpNote: From the information presented in Table 1 of the cited reference by Henin-Tanninen et al; 2012, only the excipients (referred to as ingredients by Henin-Tanninen et al.) and pH value of the compounding vehicles (referred to as suspension vehicles by Henin-Tanninen et al.) that are relevant to obviousness of the Asserted Patents and cited prior art are included.

66. The liquid dosage form may contain other excipients such as, buffering, solubilizing, stabilizing, wetting, emulsifying, dispersing, suspending, thickening agents and antimicrobial agents for preservation. Most commonly used preservatives are methyl and propyl paraben, sodium benzoate and potassium sorbate. The liquid formulation may also contain sweetening and flavoring agents for palatability or taste masking. It should be emphasized that, for pediatric applications in general, as outlined in regulatory guidances, minimal/safe levels of excipients are required as well as avoidance of extemporaneous compounding. (Ivanovska, V., et al.; Pediatric Drug Formulations: A Review of Challenges and Progress, Pediatrics (2014) 154, 341-372).

**EXHIBIT 3**

████████ – ████████████████████

67.     It has long been known that oral liquid dosage forms are patient-centric and better suited than solid dosage forms (tablets and capsules) for pediatric, geriatric and patients with swallowing difficulties. Liquids absorb faster than solids in the body fluids and have more flexibility in achieving the proper dosage form and bioavailability, especially in children. In addition, liquids are in general, more palatable than solids. Shortcomings of the liquid dosage forms, when compared to solid dosage forms include, solubility challenges in the case of poorly water-soluble drugs, lower chemical stability, and often shorter shelf-life and the need to be kept refrigerated since they are not stable at room temperature; harder to measure/titrate required dose; and are easily contaminated by microorganisms. (Boukarim, C., et al.; Preservatives in Liquid Pharmaceutical Preparations, J. Applied Res. (2009) 9: 14-17.) Development and commercial availability of oral solution drug products of water-soluble and poorly soluble APIs have been around for more than three decades and were known to the POSA well before the priority dates of the '482 and '621 patents, which, is March 18, 2016. (Strickley, R.G. et al; Pediatric Drugs b – A Review of Commercially Available Oral Formulations, J. Pharm. Sci. 2008, 97:1731-1774.)

### D.  Product Development Considerations

#### i.      *Target Product Profile*

68.     As with other drug products, a Target Product Profile (a "TPP") for an oral liquid formulation can be developed describing the key desired product attributes which are ; a) drug related and includes indication, route of administration, dose range and frequency, expressed duration of treatment, drug concentration, pharmacokinetic profile, etc.: b) product-related and includes, pH, organoleptic properties, compendial excipients to consider and select, manufacturing equipment and process parameters, packaging requirements, storage conditions, shelf-life, and shipping requirements. A general description and requirements of a Target Product Profile can be found in the March 2007 FDA Guidance for Industry and Review Staff, Target Product Profile –

EXHIBIT 3

████████ – ████████████████████

A Strateric Development Process Tool. It should also be emphasized that legal-related product attributes such as freedom to operate and drug product intellectual property, as well as knowledge of relevant patent and scientific literature, are also part of TPP from a formulation development perspective.

### ii. Excipient Selection

69.    Prior to formulation development work which applies to any drug substance and route of administration, and as part of the preformulation work, drug-excipient compatibilities studies are performed to better understand how the various excipients under consideration interact with the drug substance which can impact its chemical stability positively or negatively, that is, stabilize or destabilize the drug substance. Known drug-excipient and excipient-excipient interactions and incompatibilities reported in the scientific literature are first identified and supplemented, as needed, with studies on the drug substance under investigation. (Bharate, S. K. et al.; *Interactions and Incompatibilities of Pharmaceutical Excipients with Active Pharmaceutical Ingredients; A Comprehensive Report*, J. Excipients and Food Chem. (2010) 1:3-26; Hotha, K. K., *Drug-Excipient Interactions: Case Studies and Overview of Drug Degradation Pathways*, Am. J. Anal. Chem. (2016) 7:107-140). In summary, developing a stable formulation of a particular drug requires: a) good understanding of the intrinsic stability of the compound (thermal, photo and oxidative) at the preformulation stage of development; b) thorough literature search on reported drug-excipient interactions and incompatibilities along with relevant excipient compatibility studies as needed, to identify low risk excipients; c) detailed stability studies of the prototype formulations under accelerated conditions to understand the stability of the formulations and predict shelf-life, and d) optimize the formulation based on the stability and other drug product quality attributes.

### iii. Drug Substance and Drug Product Stability

**EXHIBIT 3**

████████ – ████████████████████

70.     There are various versions of FDA's guidance for drug substance and drug product stability, updated as needed, and where stability is defined as the capacity of drug substance or drug product to remain within established specifications upon long-term and accelerated testing under well-established storage conditions, in order to maintain its identity, strength, quality and purity throughout the retest or expiration dating periods. (FDA Guidance for Industry: Q1A(R2) Stability Testing of New Drug Substances and Products, November 2003.) "Physical, chemical and microbiological data are generated as a function of time and storage conditions (e.g. temperature and relative humidity or RH)." This and other information, including Tables on recommended storage and testing conditions for Long-Term Stability, Accelerated Stability, Short-Term Temperature Extrusion Study and Thermal Cycling Extrusion Study are discussed in the publication by Lucas, T.I. et al.; *A Stability Program for the Distribution of Drug Products Pharmaceutical Technology*, July 2014 pp. 68-73. For predicting drug product stability using data collected at higher temperatures, the Arrhenius plot is applied (LnK against 1/T whereas the slope =Ea/R, K=reaction rate constant, T=temperature in degrees Kelvin, Ea=activation energy and R=ideal gas constant) which provides the ability to determine the reaction rate and thus, predict stability at any temperature with knowledge of the activation energy (Ea) and reaction rate at another temperature. (M.Duncan and I. Zaresky, *Do the Math for Shelf-Life: Predict stability using data collected at higher temperatures*, *Pharmaceutical Formulation and Quality*, April/May 2011.)

### E. Incompatibility Between Parabens and Sugars & Sugar Alcohols in Drug Formulations Has Long Been Known

71.     FDA requires demonstration that a drug is both safe and effective before approving it. These twin requirements reflect a history of disasters in the use of drugs, and implementation of regulations to prevent these from ever happening again. To this end, the relationships between

drug degradation, corresponding formation of new chemical impurities, and potential toxicities of these entities underlie the approach to recognition and control of both degradation and toxicity.

72. FDA has also specifically added the following question to its Question-based Review (QbR) format for NDAs and ANDAs: "9. What evidence supports excipient-drug substance compatibility and if applicable, excipient-excipient compatibility?" As this document explains, "This MAPP (Manual of Policies and Procedures) clarifies how drug substance and drug product reviewers in the Office of Pharmaceutical Science (OPS) should assess new drug applications (NDAs), abbreviated new drug applications (ANDAs), or Type II DMF submissions that follow a Question-based Review (QbR) format in conjunction with the International Conference on Harmonisation (ICH) guidance M4Q: The CTD – Quality, (ICH M4Q) Module 2."

73. Not surprisingly, once FDA issued this, one started to see examples of implementation of excipient-excipient compatibility studies in publications. For example, from the abstract of one such publication:

> "The objective of this study was to evaluate possible incompatibilities/interaction between drug-drug, drug-excipient, drugs-excipients, and excipient-excipient for possible nano-formulation design, using DSC, HPLC, XRPD, and FTIR techniques…" "For selecting suitable and compatible APIs and excipients for the development of pharmaceutical formulation, drug-drug/drug-excipient/drugsexcipients/ excipient-excipient compatibility studies were performed…" "Binary, ternary, or multi-combination mixtures of drug-drug, drug-excipient, drugs-excipients, or excipient-excipient were prepared in 1:1 (w/w) ratios as presented in Table 1."

74. Many such examples exist among liquid oral dosage forms, amongst others. For example, the literature states; "Preparation of such liquid oral dosage forms from solid dosage forms demands meticulous consideration of many factors, such as physicochemical characteristics of both active substances and excipients, along with drug-excipient and excipient-excipient compatibility." "Drug-excipient and excipient-excipient compatibility studies are also considered

EXHIBIT 3

[redacted] – [redacted]

during formulation development in order to avoid any interaction among drug and excipients in the final dosage form." A number of publications appeared studying excipient-excipient interactions using DSC (Differential Scanning Calorimetry) or Infrared Spectroscopy.

75. Research organizations (CROs) offer services to evaluate excipient-excipient interactions. "We specialize in the design and execution of pertinent pre-formulation activities required for successful pharmaceutical product development. These include: Excipient-Excipient Compatibility"13 and "BOC Sciences, Excipient compatibility assays including drug-excipient and excipient-excipient compatibility investigation."

76. The '482 and '621 focused on impurities only of the API, and not of the known degradation products resulting from the reaction of the excipients parabens with sugar alcohols. The '482 patent specification itself refers to these degradants, (13:8-21, "Sweetener and Preservative Incompatibility"), and includes references which further expand on the structures of the impurities, as well as reference their potential toxicity. Other concerns are mirrored in the literature.

77. It would appear that the patent should have commented on the glaring safety issue. The antimicrobial safety test, USP<51> that was reported in Example G and Table G-1 is required, but is not a surrogate for the chemical degradation and potential toxicity resulting from the paraben-sugar alcohol reaction. The evidentiary burden of the explanation of this degradation reaction and the references provided relating to both chemical reaction and toxicity, contrasts with the total absence of any supporting information as to quantitation of degradation products and acceptable safety from Examples A and C stated in the patent specifications. One is left to conclude that parabens and sugar alcohols have not been shown to be adequately stable and safe, thus

**EXHIBIT 3**

███████ – ████████████████

questioning enablement and validity of the claims involving combining parabens with sugar alcohols.

78.     The specification of the '482 patent contains a subheading titled, "Sweetener and Preservative Incompatibility." *Id.* 13:8. There, the named inventors state:

Sweetener and Preservative Incompatibility

Paraben preservatives (especially methylparaben) can react with selected sugars(glucose, fructose, sucrose, lactose, maltose) and sugar alcohols (xylitol, mannitol, lactitol, maltitol, sorbitol) to form transesterification reaction products. This can be undesirable from a formulation and stability standpoint as the transesterification creates additional degradants. In some embodiments, the enalapril oral liquid formulation described herein does not comprise a paraben preservative. In further embodiments, the enalapril oral liquid formulation described herein does not comprise a paraben preservative when the formulation also comprises a sugar or sugar alcohol.

*Id.* at 13:8-21.

79.     The inventors' thoughts on the matter of the incompatibility of certain preservatives, specifically parabens and particularly methylparaben, with sugar alcohols in enalapril compositions, a POSA, or anyone for that matter, would have noted the relevant articles among the list of references in the patent. These include:  1) Hensel et al . Transesterification reactions of parabens (Alkyl 4 - Hydroxybenzoates ) with polyols in aqueous solution. J Pharm Sci 84 (1) : 115-119 (1995); Ma et al . HPLC and LC - MS studies of the transesterification reaction of Methylparaben with twelve 3- to 6 - carbon sugar alcohols and propylene glycol and the isomerization of the reaction products by acyl migration. Journal of Chromatographic Science, 40 (3) : 170-177, 2002; and Handbook of Pharmaceutical Excipients, Fifth edition, edited by Raymond C. Rowe et al., London: Pharmaceutical Press, 2006, (monographs for citric acid monohydrate, sodium benzoate, sodium citrate, sodium hydroxide, and xylitol), 23 pages.

80. Ma et al. derived experimental support for their studies from Hensel, also noted in the patent, who characterized the isomeric reaction products resulting from reactions of methylparaben with xylitol. Ma extended the program by looking at many more sugar alcohols, in addition to xylitol. He teaches that parabens can acylate all positions of alcohols, here shown schematically for sorbitol. He identified all the possible reaction products of xylitol and many other sugar alcohols using LC-MS, and quantitated them using HPLC.

**Figure 1.** Transesterification reaction of methylparaben with sugar alcohol showing one of the six sorbitol monoesters of *p*-hydroxybenzoic acid.

81. Ma summarizes: "This study has demonstrated that all the hydroxyl groups in a sugar alcohol molecule can react with methylparaben to form transesterification reaction products. The number of possible reaction products is dependent on the number of hydroxyl groups present in the sugar alcohol molecule and the symmetry characteristics of the molecule. These reaction products are positional isomers and if isolated individually they can isomerize (convert) reversibly to other isomers."

82. This information was significant enough to be incorporated in the Handbook of Pharmaceutical Excipients 5th ed., stating with reference to methyl paraben, "It also reacts with various sugars and related sugar alcohols. (20)." The comments continue:

> Hypersensitivity reactions to parabens, generally of the delayed type and appearing as contact dermatitis, have been reported. However, given the widespread use of parabens as preservatives, such reactions are relatively uncommon; the classification of parabens in some sources as high-rate sensitizers may be overstated. (22) Immediate hypersensitivity reactions following injection of

**EXHIBIT 3**

██████████ – ██████████████████████

preparations containing parabens have also been reported. (23–25) Delayed contact dermatitis occurs more frequently when parabens are used topically, but has also been reported to occur after oral administration.

(26–28).

83.     The hypersensitivity issue is echoed by other sources as well. "Parabens are reported to cause contact dermatitis reactions in some individuals on cutaneous exposure. Parabens have been implicated in numerous cases of contact sensitivity associated with cutaneous exposure; however, the mechanism of this sensitivity is unknown. Sensitization has occurred when medications containing parabens have been applied to damaged or broken skin. Allergic reactions to ingested parabens have been reported, although rigorous evidence of the allergenicity of ingested paraben is lacking…Using human intestinal (Caco-2) cells, it was observed that hydrolysis of parabens to p-hydroxybenzoic acid is reduced markedly by ethanol concentrations that can occur in the human intestine, 0.25-0.5% (v/v). Ethanol concentrations of 1.0-2.5% (v/v) were optimal for transesterification to ethylparaben in Caco-2 cell homogenates. The kinetics of the transesterification reaction with regard to ethanol concentration (0-20%), time, pH (3-9), protein concentration (1-5 mg/mL) and substrate concentration (6.25-200 uM) as well as the effects of different alcohols were studied. … The clinical or toxicological implication is that, following co-ingestion of ester compounds with ethanol, transesterification could provide the basis for a previously unrecognized drug-alcohol interaction."

84.     Additionally, from another source, Zupanets *et al.*, "There is a range of data showing the association between parabens exposure and allergic sensitization [52]. In one study that involved 455 children, it was proved that exposure to propylparaben is related to aeroallergen sensitization and an increase of Eczema Area and Severity Index (EASI) score [52]. Several studies also confirm that parabens are significantly associated with allergic diseases development [54,55].

26

Considering these data and the fact that paraben-sensitive individuals might be consistently exposed to parabens in everyday life by various products, the use of parabens in pediatric medicines should be avoided. This conclusion is completely consistent with the EMA position regarding parabens as sensitizing agents [56].

85. The efficacy of parabens mixture (usually methyl hydroxybenzoate and propyl hydroxybenzoate) can be impaired by the presence of hydrophilic polymers (generally employed to enhance viscosity) because of interaction [10]. To avoid this effect, producers increase the overall preservative concentration which becomes a safety concern again."24

86. Some of the confusion in the literature dealing with paraben toxicity may be due to the fortuitous presence of co-excipients, exacerbating the immune potential. Referring again to the quote from PubChem above, "The clinical or toxicological implication is that, following coingestion of ester compounds with ethanol, transesterification could provide the basis for a previously unrecognized drug-alcohol interaction."

87. Turning over this stone reveals an entire ecosystem of adverse effects, as shown by the related molecules, acyl glucuronides. Reflecting the state of the art as of the filing date of the '482 and '621 patents, Bradshaw et al. stated, "Acyl glucuronide metabolites have been implicated in the toxicity of several carboxylic acid-containing drugs, and the rate of their degradation via intramolecular transacylation and hydrolysis has been associated with the degree of protein adduct formation. Although not yet proven, the formation of protein adducts in vivo – and subsequent downstream effects – has been proposed as a mechanism of toxicity for carboxylic acid-containing xenobiotics capable of forming acyl glucuronides."

88. Bradshaw continues, "[u]sually, glucuronides are not only less biologically active than the parent aglycone 6 but also subject to more rapid biliary excretion because of their

**EXHIBIT 3**

██████████ – █████████████████████

enhanced affinity for transporter proteins 7-12. These generalisations have been incorporated in the FDA's guidance on metabolites in safety testing (MIST) 13. MIST guidance recommends that those metabolites formed by conjugation should be considered generally as not constituting a risk in respect of toxicity 14. However, acyl glucuronides represent an exception to this principle: 'Phase II conjugation reactions generally render a compound more water soluble and pharmacologically inactive, thereby eliminating the need for further evaluation. However, if the compound forms a toxic conjugate such as an acyl glucuronide, additional safety assessment may be needed (Faed et al., 1984)."

89.     The toxicological significance of acyl glucuronides has centered on their electrophilic properties, namely their well-documented ability to undergo spontaneous hydrolysis, intramolecular rearrangements and nucleophilic substitution reactions with proteins (Figures 1-3). Schematically, the transacylation reactions around the glucuronide itself and to proteins is summarized in *Regan et al.*:

90. Bradshaw continues, "A structurally-related series of metabolites, the acyl glucosides, have also been shown to undergo similar degradation reactions and consequently the potential to display a similar mode of toxicity. Here we report detailed kinetic models of each transacylation and hydrolysis reaction for a series of phenylacetic acid acyl glucuronides and their analogous acyl glucosides…The measured kd values for each of these acyl glucosides were largely similar to those previously reported for their corresponding acyl glucuronide analogues; the unsubstituted and mono-methyl substituted compounds having nearly the same t1/2 values, … This study highlights a potential role that acyl glucosides may play in the toxicology of carboxylic acid containing compounds and merits further investigation. Whilst acyl glucoside conjugates are minor metabolites (based on the current literature) the transacylation/hydrolysis kinetics observed compare well to those of the corresponding acyl glucuronides. It is currently unknown whether

such acyl glucosides form protein adducts in vitro or in vivo, but it seems highly probable that they will, and therefore future investigations will be needed to examine their alkylating capacity."

Scheme 1 Selected reactions of acyl glucosides: hydrolysis, anomerisation/mutarotation, and transacylation.

91. In summary, acyl glucuronides are implicated in a series of adverse reactions, mechanistically believed to be related to their ability to transacylate proteins. A related series of compounds, the acyl glucosides, is of interest to us because this is the class of compounds resulting from the reactions of parabens with sugar alcohols. A POSA would understand that the rate constants for the analogous reactions of the two series of compounds are quite comparable, thus suggesting the same adverse event profiles for the glucosides as seen for the glucuronides. This would be of particular concern for ACE inhibitors, chronically administered drugs taken over long periods of time. Key references were quoted in the '482 patent, hence it is clear that the inventors were well aware of the reaction chemistry. A survey of the abstracts from some of the references

listed in their cited Ma, 2002 reference suggests that they should have been aware of the potential for toxicity as well.

92. Farrant et al. has stated, "Many drugs containing carboxylic acid functional groups are metabolised in vivo to ester glucuronides (1-O-acyl-beta-D-glucopyranuronates) and, of these, a number show a propensity to undergo internal isomerisation via a transacylation process, causing the carboxylic acid moiety to migrate successively to the 2-, 3- and 4-positions of the glucuronic acid. These products may be responsible, through reactions with plasma proteins, for some of the allergenic side effects in a number of non-steroidal anti-inflammatory drugs."

93. "Ester glucuronides (beta-1-O-acyl-D-glucopyranuronates) of many drugs can undergo a series of acyl migration reactions, resulting in positional isomers and anomers which can react with serum proteins with possible toxicological consequences." The following is copied from Sidelmann et al.:

> Many carboxylate-containing drugs form β-1-*O*-acyl glucuronic acid conjugates in vivo. The acyl glucuronides formed are potentially reactive metabolites due to the susceptibility of the acyl group to nucleophilic reactions. They have been shown to undergo hydrolysis (regeneration of parent compound),[9,10] intramolecular rearrangement (isomerization by acyl migration),[11,12] and covalent adduct formation with both low molecular weight nucleophiles (such as methanol) and proteins.[11,13−15] In the rearrangement reactions of acyl glucuronides, the susceptibility of the ester linkage to nucleophilic reactions allows the drug moiety to move from one hydroxyl group to an adjacent hydroxyl group on the glucuronic acid ring (Scheme 1). The mechanism of transacylation via a tetrahedral cyclic ortho ester intermediate is well established.[10,16−21] The acyl groups migrate from C-1

94. In a later publication, Sidelmann states, "Acyl migration reactions of drug 1-O-acyl glucuronides are of interest because of their possible role in covalent binding to serum proteins and consequent allergic reactions."

95. It is relevant what the patentees thought of these references, insofar as it informs the meaning of the specification. The cautions were stated clearly upfront in the abstracts, which even a casual reader couldn't help but notice.

96. It was evident, at least as early as the mid-1990's, that reaction products resulting from combining parabens and sugar alcohols were likely associated with some serious toxicity. The inventors of the '482 patent noted the chemical reaction products, and referenced the toxicity associated with them.

### F. The Scope of the '482 Patent Excludes Formulating Parabens with Sugar Alcohols

97. The claim terms of the '482 patent are to be given their plain and ordinary meaning to a POSA at the time of filing of the '482 patent. Based on the foregoing explanation, a POSA would understand that independent claim 14, and all claims depending therefrom, would not include a paraben or a mixture of parabens with sugar alcohol(s).

98. The published articles referred to in the patents attest to both identification of chemical degradation products and likely resulting toxicity from combining parabens with sugar alcohols. Hence, the concern raised in the patents was real, and put formulators on notice NOT to proceed with such a combination.

99. Several years prior to issuance of the patent, FDA had expressly issued a concern regarding excipient-excipient interactions, of which parabens-sugar alcohols were an obvious example. Following issuance of the new FDA concern, we see numerous publications demonstrating analysis for such excipient-excipient interactions, indicating the pharmaceutical world was taking notice. The examples in the patent, purportedly demonstrating efficacious formulations, looked only at stability of the API, not degradation products of parabens, sugar alcohols, or analysis of toxicity of such interaction products, in clear disregard of FDA concerns.

100. In view of the requirement to demonstrate both safety and efficacy of pharmaceutical formulations in order to secure FDA approval, it would be clear to a POSA that the inventions cited in the ’482 and ’621 patents were limited and, hence, combinations of parabens and sugar alcohols are outside the scope of the claims. Therefore, that combination is outside the scope of the asserted claims of the ’482 patent, and a POSA would understand that a formulation including parabens and sugar alcohols would not be considered infringing of the asserted claims of the ’482 patent.

**F. The Substances HCl and NaOH Are Not Buffers**

101. A POSA would have understood that pH clearly drives the rate of degradation of enalapril. In this figure, the least degradation occurs for the plot of degradation with the flattest slope, line D with pH 3.4. Greater levels of degradation occur for pH both lower than this value and higher than this value.



EXHIBIT 3

Fig. 1. Plots of log (% enalapril maleate remaining) against time for the degradation of enalapril maleate in samples of about 400 μg ml$^{-1}$ enalapril maleate in aqueous buffers of pH 10.5 (A); 7.0 (B); 5.5 (C); 3.4 (D); and 2.2 (E) at 80°C.

102. It is a basic principle that pH is a measure of the acidity of a solution, i.e., the concentration of protons or hydronium ions, [H+]. Because of the great range of values that [H+] can assume in aqueous solutions, the pH is defined on a logarithmic scale.

$$pH = -\log[H+]$$

Eqn 1

103. "Use of the pH notation allows all degrees of acidity and alkalinity normally encountered in chemistry to be expressed on a scale from 0 to 14, corresponding to the concentrations of H+ ions contained in the solution. Solutions with a pH < 7 are considered acidic, solutions with a pH > 7 are alkaline, while a solution with a pH = 7 is neutral."

104. The reason for the importance of this concept is that these H+ species are charged, and are attracted to oppositely charged, i.e., negatively charged atoms in molecules. They can thus

enter into hydrogen-bonded equilibrium reactions with many species dissolved in water. The chemical reactivity of a species so bonded to a hydronium ion or proton, differs greatly from the unbound, bare state. It follows, and the POSA understands, that pH drives many reactions in pharmaceutical chemistry.

105. For example, a strong acid, such as HCl, which is completely ionized in aqueous solution, the concentration of the reagent is nearly equivalent to the concentration of hydronium ions, HCl →H+ + Cl-. An analogous situation pertains to the concentration of OH- for a strong base, such as NaOH, NaOH → Na+ + OH-.

106. For these situations, Eqn. 1 can be used to adjust the pH of an aqueous solution to any desired value, by noting the relationship between pH and [H+], which is nearly identical to the molarity of the acid reagent, used to adjust the pH.

107. In a real aqueous pharmaceutical formulation, other sources of acids and bases can arise over the shelf life. This can come from the API, excipients, container packaging, reactions between API and excipients, and reactions between excipients themselves. Changes to pH can arise as well from solubilization of carbon dioxide from the air which then yields carbonic acid and tends to reduce pH.

108. Because of the criticality of pH in effecting degradation, as shown above, it is required to not only adjust the pH to a particular value, but to maintain the pH at the value of optimal stability. This is where buffers come in. "A buffer solution is a solution that resists changes in pH. If acid is added then, within reason, the pH does not fall; if base is added, the pH does not rise. Buffers are usually composed of a mixture of weak acids or weak bases and their salts..."

109. Utilizing chemical equations, the weak acid HA dissociates weakly into its conjugate base, A- and the strong acid, a proton, H+.

$$HA \rightleftharpoons H^+ + A^-$$

110. The extent of this dissociation is given by the equilibrium constant for the ionization

$$K_a = \frac{[H^+] \times [A^-]}{[HA]}$$

Eqn 2

111. The buffering effect comes from the fact that the ratio of the dissociated species to the undissociated parent molecule must obey a fixed value, Ka. The effect of a putative change to [H+] thus is mitigated because of this suppressive effect.

112. All the buffers listed in column 13 of the ’621patent are composed of a mixture of weak acids and their conjugate bases or weak bases and their conjugate acids, in line with how a POSA understands the concept of buffers. A POSA would understand that, “maintaining pH constant,” is conceptually and materially different from the concept of adjusting pH to a particular value. When the patent refers to this operation, as in the ’621 patent (32:64), it specifies that the pH adjustors to be used are “~ 1N HCl or ~ 0.5N NaOH.” These are strong acids and bases, respectively, which are completely dissociated and ionized in aqueous solution, unlike the weak buffers which are only partially dissociated. The diametrically opposed concepts of “maintaining pH constant” and “adjusting pH” thus make use of conceptually different reagents, one being completely ionized, and the other only weakly or partially ionized. This difference between pH buffers and pH adjustors is completely familiar to a POSA, who would be fully conversant with the purpose of each.

113. The common specification states, “Buffering agents maintain the pH of the enalapril formulation. Non-limiting examples of buffering agents include, but are not limited to sodium bicarbonate, …:” (’621, at 13:36-59.) The list of buffering agents identified in the

**EXHIBIT 3**

███████████ – ██████████████████████

Common specification does not include the acid HCl or the base NaOH. The substances NaOH and HCl are not included in this long list of buffers because as a POSA knows they are not buffers. Clearly the purpose of NaOH and HCl is expressly not to maintain the pH, but to alter it, "The pH of each solution was measured and adjusted as needed to pH 3.3 with ~ 1N HCl or ~ 0.5N NaOH." ('621, at 32:64-67.) Table G-1 in the common specifications state that an amount of HCl/NaOH is added as needed to achieve pH, changing pH and not maintaining it. (*Id.* at 40:31-44.)

114.    The function of HCl and NaOH, to alter pH to a desired set point, is commonly understood by a POSA.  (Rabinow Rebuttal Report, ¶133.)

### G.  Drug Compounding Is a Well Established, Reliable Endeavor

115.    Motivation for the claimed invention at issue derives from extemporaneous compounding of oral liquid formulations. This follows from the numerous references in the patents to prior extemporaneously compounded oral liquid formulations of enalapril, published separately by Allen, Casas, Sosnowska, Nahata, Rippley, Glass and Haywood, Patel, Schlatter, MC Nahata et al., and Strickley. Due to its importance, a brief summary of this technology will be given.  It is recognized that "it is simply not economical for a pharmaceutical company to produce a product in 10 different conceivable doses or in 5 different dosage forms to meet the needs of the entire range of individuals receiving therapy. … Some individuals and their health care needs do not fall in the windows of theoretical dosage strength and dosage forms and that large-scale manufacturers cannot tailor-make a medication for a handful of patients and do so cost effectively and meet the ever-changing needs of a given patient or institution."

116.    Two documents provide guidelines and standards for pharmaceutical compounding. These include: 1) National Association of Boards of Pharmacy Good Compounding Practices Applicable to State Licensed Pharmacies, and 2) USP 26/NF 21 Chapter <795>,

EXHIBIT 3

██████████ – █████████████████████

Pharmacy Compounding Non-sterile Preparations and Chapter <797>, Pharmacy Compounding-Sterile Preparations (Allen, Remington). (Allen, Remington, p. 1909.)

117.    The National Association of Boards of Pharmacy has defined compounding; "Compounding means the preparation, mixing, assembling, packaging, or labeling of a drug or pharmacist/patient/prescriber relationship in the course of professional practice, or (ii) for the purpose of, as an incident to research, teaching, or chemical analysis and not for sale or dispensing. Compounding also includes the preparation of drugs and devices in anticipation of Prescription Drug Order based on routine, regularly observed patterns." (Allen, Remington, p 1904).

118.    This situation can be compared with commercially manufactured drugs, which fall under the auspices of FDA approval rather than State Boards of Pharmacy practice, and are sold throughout the country, rather than restricted by script. For the industry, "Windows of activity are determined that meet the majority of patient needs, but the very nature of the process cannot meet all patient needs" (Allen, Remington, p. 1903).

119.    The chemicals and supplies that can be used in compounding, are enumerated in USP <795>: "A USP or NF grade drug substance is the preferred source of ingredients for compounding all drug preparations….A manufactured drug product may be a source of active ingredient. Only manufactured drugs from containers labeled with a batch control number and a future expiration date are acceptable as a potential source of active ingredient." (Allen, Remington, p.1906). From this, it is clear that use of pure API in compounding is not only contemplated, but is preferred, although utilizing crushed tablets is also acceptable, inasmuch as "a manufactured drug product may be a source of active ingredient" from above.

120.    Compounding pharmacists resorted to the widely available vehicles like Ora-Sweet and others to facilitate compounding by incorporating many required excipients, such as buffers,

38

EXHIBIT 3

██████████ – ███████████████████████

preservatives, flavors, sweeteners, and suspension agents, into a single, already available aqueous solution.

121.    "Over the years it has been interesting to note that many compounded products eventually become commercially available products. Examples include: Fentanyl Lozenges, Minoxidil Topical Solution, Nystatin Lozenges, Clindamycin Topical Solution, Tetracaine-Adrenalin-Cocaine (TAC) Solution, Dihydroergotamine Mesylate Nasal Spray, Buprenorphine Nasal Spray, Buffered Hypertonic Saline Solution, Erythromycin Topical Solution, as well as numerous other dermatological and pediatric oral liquids and some premixed intravenous solutions. It is inevitable that a product will be manufactured when a product becomes economically profitable for a pharmaceutical manufacturer to produce it." (Allen, Remington, p.1905).

122.    A POSA would understand that there exists an anticipated natural progression of compounded formulations migrating to commercial manufacture based upon simple economics. From this perspective, compounding, besides developing the successful formulation, acts as a simple screening procedure for economically viable candidates that pharmaceutical manufacturers can simply pluck, after their development effort has been sufficiently derisked.

123.    Pharmacists, are professionally employed to extemporaneously compound medications, and would have had access to well-known references to guide their efforts, analogous to the references relied upon by any professional. For general background on extemporaneously compounding the pharmacist would have been aware of Lloyd V. Allen, Jr. The Art, Science, and Technology of Pharmaceutical Compounding, 5th ed. (American Pharmacists Association, Washington D.C., 2016). For specific compound formulations he would certainly be aware of Trissel's™ Stability of Compounded Formulations. 5th ed., American Pharmacists Association,

Washington D.C., 2012. Simply looking up "enalapril" in this book would provide the examples at pages 183-84, for example.

124. Further details could be gleaned from the original articles referenced in Trissel's at these pages. It must be emphasized that these citations are reviewed for the presence of stability information, which is the whole point of Trissel's compendium.

125. Additionally, the compounding pharmacist would have been aware of the International Journal of Pharmaceutical Compounding and capability to search back issues for formulations of any particular drug, using the keyword search feature . Entering "enalapril", e.g., the website returns many references to enalapril maleate formulations.

126. There are many more references available, but the ones above would be very familiar and easily accessible. These resources provide an intermediate screening of worthwhile publications for specific formulations, to provide reliable information. Certainly, one can simply google "Drug X" AND "compounding" or "Drug X" AND "Oral suspension" AND compounding or "Drug X" AND "Oral suspension" AND compounding AND stability, to quickly identify relevant literature. The last search would return, e.g., publications on compounded oral suspensions of enalapril mentioning stability, and presumably containing stability data. Assuming a POSA with honorable intentions, there are many ways to obtain these long-known compounding formulations and are readily available to such professionals.

127. Next, in this technical background, it must be understood that there are a series of modifications that a drug formulation typically undergoes. As its use becomes more prevalent, disadvantages are noted, and then subsequently solved by additional formulation modifications. Initially of course is the introduction of the API itself, followed by development of a dosage form which is commercially most attractive, in terms of minimizing cost while serving the largest

**EXHIBIT 3**

███████████ – ████████████████████████

market sectors. Very often the tablet serves this function. As issues with administration to children or the elderly may become evident, innovative pharmacists serve the initial need by extemporaneously compounding oral suspensions, made from crushed tablets. As the size of this market segment increases, development of a ready-to-use (RTU) manufactured dosage form eventually becomes justifiable from an economic perspective.

128.    Now, this product concept pipeline can be further examined. Many of the articles cited by Dr. Mahan refer to the inappropriateness of the tablet dosage form for which young children have difficulty swallowing. This is a real problem, getting the drug into the patient. If tablets were the only dosage form, then parents would have the responsibility of crushing them, attempting to measure out accurately some portion of the crushed tablet, and mixing that with food, milk, or applesauce and administer that to children. Especially with the rise of childhood obesity, this drug administration problem only became larger. Getting an accurate amount of a dosage form into the patient was largely addressed by development of extemporaneously compounded oral suspensions, which children could then drink. This was clearly a step forward, which solved the main problem associated with difficulty in swallowing solid tablets.

129.    At some point, the compounded product becomes commercially available: "Over the years it has been interesting to note that many compounded products eventually become commercially available products.  Examples include:  Fentanyl Lozenges, Minoxidil Topical Solution, Nystatin Lozenges, Clindamycin Topical Solution, Tetracaine-Adrenalin-Cocaine (TAC) Solution, Dihydroergotamine Mesylate Nasal Spray, Buprenorphine Nasal Spray, Buffered Hypertonic Saline Solution, Erythromycin Topical Solution, as well as numerous other dermatological and pediatric oral liquids and some premixed intravenous solutions.  It is inevitable

41

EXHIBIT 3

██████████ – █████████████████████████

that a product will be manufactured when a product becomes economically profitable for a pharmaceutical manufacturer to produce it."

130.    A POSA would understand that there exists an anticipated natural progression of compounded formulations migrating to commercial manufacture based upon simple economics. From this perspective, compounding, besides developing the successful formulation, acts as a simple screening procedure for economically viable candidates that pharmaceutical manufacturers can simply pluck, after their development effort has been sufficiently de-risked.

131.    Summarizing, two steps in dosage form evolution have been identified. The step from tablet to compounded oral suspension was critical to addressing a real problem, administration of a drug to a child who has difficulty swallowing tablets. The step from compounded oral suspension to manufactured oral product does not deal with the originally identified problem of capability of children to swallow tablets; that had already been addressed. Rather, the manufactured RTU addresses a different issue, that of difficulties in extemporaneous compounding of drugs due to complexity of the operation, leading to errors. However, it turns out that the magnitude of this issue is actually comparable to the overall medication error rate reported in hospital studies over the last decades, and so it is not unusual or all that surprising. It appears that there is nothing particularly special about errors due to extemporaneous compounding, when viewed in context of the overall medication error rate experienced by patients, due to errors in drug administration caused by doctors and nurses, in addition to pharmacists. Thus, the 30% error rate in extemporaneously compounded formulations must be compared to 30% medication error rate overall:

132.    A medication error is any error occurring in the medication use process, including during prescribing, transcribing, dispensing, administration, adherence, and/or monitoring …Upon

hospital discharge, 30% of patients have at least one medication discrepancy[.] Medication errors harm an estimated 1.5 million people every year, costing at least $3.5 billion annually. It is estimated that ADEs affect approximately 2 million hospital stays annually and prolong the length of stay by 1.7–4.6 days.

133. Tariq next continues, "[T]he National Coordinating Council for Medication Error Reporting and Prevention defines a medication error as: "… any preventable event that may cause or lead to inappropriate medication use or patient harm while the medication is in the control of the healthcare professional, patient, or consumer. Such events may be related to professional practice, health care products, procedures, and systems, including prescribing; order communication; product labeling, packaging, and nomenclature; compounding; dispensing; distribution; administration; education; monitoring; and use.…In general, medication errors usually occur at one of these points:

Ordering/prescribing
Documenting
Transcribing
Dispensing
Administering
Monitoring

134. Continuing, "Errors by pharmacists are usually judgmental or mechanical. Judgmental errors include failure to detect drug interactions, inadequate drug utilization review, inappropriate screening, failure to counsel the patient appropriately, and inappropriate monitor. A mechanical error is a mistake in dispensing or preparing a prescription, such as administering an incorrect drug or dose, giving improper directions, or dispensing the incorrect dose, quantity, or strength….Medication errors are most common at the ordering or prescribing stage. Typical errors include the healthcare provider writing the wrong medication, wrong route or dose, or the wrong

**EXHIBIT 3**

██████████ – ███████████████████████

frequency. These ordering errors account for almost 50% of medication errors. Data show that nurses and pharmacists identify anywhere from 30% to 70% of medication-ordering errors."

135.    Further, "Medication errors are the sixth highest cause of death in America after car crash, diabetes, renal diseases, breast cancer, and influenza (Dirik, Samur, Seren Intepeler, & Hewison, 2019). Medication errors happen in every country and studies have examined the nurses' medication errors… Medication errors happen during each part of the medication procedure like doctor's orders, prescription, and dispensing medication, administering medication, and registering them…A recent meta-analysis study showed that the prevalence of medication errors is 32.1% (Sutherland et al., 2020) to 94% (Assiri et al., 2018). Also, statistics showed 39% of medication errors were related to general practitioners, 38% to nurses, and 23% to pharmacies." The literature further shows that there is nothing unusual or surprising about the error rate using extemporaneous oral solutions compared to all medications.

136.    There exist two steps in dosage form development that should not be conflated:

1)    tablets → extemporaneous compounding of oral suspension, and
2)    extemporaneous compounding of oral suspension → manufactured RTU oral solution product.

137.    Azurity's expert Dr. Mahan conflates these steps, so that he can associate the Epaned® RTU oral solution dosage form with the much larger benefit associated with step 1). It is particularly misleading because step 1) actually provided the inventive motivation for step 2). The VASOTEC® label provided a formulation with which to make a compounded oral suspension from VASOTEC® (enalapril) tablets. Additionally, Lloyd Allen, the key opinion leader of extemporaneous compounding referenced above, also provided a very similar formulation for enalapril.

138. The VASOTEC® instructions for extemporaneous compounding are indicated in the product labeling. Bicitra is a commercially available solution of citric acid and sodium citrate, pH 4.3. Pediatric Dosing guidance is also provided in the VASOTEC® labeling. is an example of FDA approval of the pediatric dosing for an extemporaneously compounded oral suspension formulation of enalapril. VASOTEC® dosing guidance is essentially identical to what appears in the labeling for both RTU Epaned® Oral Solution, and Epaned® for Solution

139. Given the similarity between the Epaned® and VASOTEC® labeling, it is unclear what exactly was the contribution of either RTU Epaned® Oral Solution or Epaned® for Solution to pediatric formulation and treatment guidance in medical practice.

140. As discussed in paragraphs 42-55 of the Rabinow Reply Report, which are expressly incorporated herein by reference, there was no long felt unmet need satisfied by Epaned® oral solution due to the availability of VASOTEC® and the Allen work.

**H. References Relied on by Plaintiff's Expert Dr. Mahan Do Not Support Plaintiff's Long Felt Unmet Need Argument**

141. Referenced here are references and sources relied on by Plaintiff's Dr. Mahan that on close inspection do not support Plaintiff's Long Felt Unmet Need argument. These references, presented here, do not support Dr. Mahan's use of them and in most cases undermine his opinions.

142. The references cited fall into three categories, which may be abbreviated as: "anti-tablet," "anti-compounding," and "Enalapril-compounding-accepting." The articles in each category together, so as to facilitate the understanding of shared viewpoints.

143. Referenced here are references and sources relied on by Plaintiff's Dr. Mahan that on close inspection do not support Plaintiff's Long Felt Unmet Need argument. These references, presented here, do not support Dr. Mahan's use of them and in most cases undermine his opinions.

144. The references cited fall into three categories, which may be abbreviated as: "anti-tablet," "anti-compounding," and "Enalapril-compounding-accepting." The articles in each category together, so as to facilitate the understanding of shared viewpoints. Counter points on each are summarized below.

***i. Anti-Tablet References***

1. Sedrati, et al., "Splitting tablets in half ," Am. J. Hosp. Pharm., 51:548, 550 (Feb. 15, 1994) (SLVGT_RTU_00008225-226) ("Sedrati 1994")

145. Clear directions for prepared suspensions are provided in the VASOTEC® label, Allen 1998, and Trissel's Stability of Compounded Formulations.

2. **Schirm, et al., "Lack of appropriate formulations of medicines for children in the community," Acta Paediatr., 92:1486-1489 (2003)**

146. The overall tone of this article is primarily negative with regard to availability primarily of solid oral dosage forms for pediatrics ("strength of formulation, the ability to ingest solid dosage formulations"). An interest is expressed for commercially available liquid formulations. Compounded liquid formulations seem to be dismissed without discussion of the clear instructions in the VASOTEC® labeling that would minimize "the possibility of over-dosing and problems with administration." Schirm is, however, a general article bemoaning the lack of pediatric-tailored medications, and thus does not recognize that VASOTEC® "enalapril became the first ACE inhibitor approved by the FDA for pediatric hypertension following completion of required clinical trials in 2002."

3. **Ivanokska, et al., "Pediatric Drug Formulations: A Review of Challenges and Progress," Pediatrics, 134(2):361-372 (Aug. 2014) (SLVGT_RTU_00006702-715) ("Ivanokska 2014")**

147. The quote that "In 2008, a WHO expert forum proposed a paradigm shift toward pediatric oral solids in view of stability problems and the high transportation and storage costs

involved in liquid formulations" reflects the logistical needs of supplying drugs to third world nations as opposed to the US market. It also teaches away from developing an oral suspension.

148. As with Schirm above, Ivanokska is primarily an anti-tablet publication ("The use of inadequate drug formulations in children may pose problems not seen in adults, such as difficulty in swallowing conventionally sized tablets") with general castigation of extemporaneous alternatives "(extemporaneous dispensing (i.e., compounding medicines from ingredients within pharmacies). Administering medicines in this way is difficult and unsafe because limited data are available to validate stability, bioavailability, pharmacokinetics, pharmacodynamics, dosing accuracy, tolerability, and reproducibility. . . All these manipulations may compromise drug efficacy and/or safety)."

149. Again, the relevant issue is not the general state of affairs of extemporaneous compounding for pediatrics, but the specific availability of enalapril. For this drug, sufficient data are available to validate stability, bioavailability, pharmacokinetics, pharmacodynamics, dosing accuracy, tolerability, and reproducibility. This information is provided in the VASOTEC® labeling, Allen 1998, Rippley's 2000 PK study, and Trissel's.

#### 4. Meyers, R.S. & A. Siu, "Pharmacotherapy Review of Chronic Pediatric Hypertension," Clinical Therapeutics, 33(10):1331-1356 (Oct. 2011) (SLVGT_RTU_00008370-395) ("Meyers 2011")

150. Meyers expresses negative views on tablets or capsules for children. His perspective on extemporaneous preparations seems to be more measured and fair (Extemporaneous preparations can be compounded when appropriate recipes and directions are available, although manipulation of available dosage forms allows for the possibility of errors). Generally, he is quite positive toward the situation for enalapril, noting that "oral suspension: extemporaneous formulation available" as noted in Table II:

Table II. Antihypertensive agents used in the treatment of chronic pediatric hypertension.[7,8]

| Antihypertensive Class | Pediatric Indication for Hypertension* | Dosing Recommendation | Dosage Forms |
|---|---|---|---|
| Enalapril(Vasotec® [Biovail Pharmaceuticals, Inc, Bridgewater, New Jersey]) | Age 6-16 y | Neonates: initial 0.1 mg/kg/d q24h, then titrate to desired<br>Infants and children: initial 0.1 mg/kg/d ÷ 1-2 times/d, then titrate (max, 0.5 mg/kg/d)<br>Adolescents: initial 2.5-5 mg/d, then titrate dose to desired and ÷ 1-2 times/d (max, 40 mg/d) | Tablet: 2.5, 5, 10, and 20 mg<br>Oral suspension: extemporaneous formulation available |

151. ACE inhibitors did very well in the author's overall conclusions.

**5. <u>Hansen, et al., "Adolescents' struggles with swallowing tablets: barriers, strategies, and learning," Pharm. World Sci., 30:65-69 (2008) (SLVGT_RTU_00007890-894("Hansen 2008")</u>**

152. VASOTEC® labeling specifically addresses the need in the case of enalapril. However, Azurity's Dr. Mahan seems to have omitted the emphasis of Hansen: "Over one-third of the adolescents spontaneously provided accounts of the difficulties they experienced with taking oral medications, especially with swallowing tablets." This article clearly has an anti-tablet focus and is compounding-silent, or perhaps compounding-accepting.

**6. <u>Habib, et al., "Accuracy of tablet splitting: Comparison study between hand splitting and tablet cutter," Saudi Pharm. J., 22:454-459 (2014) (SLVGT_RTU_00008043-048) ("Habib 2014")</u>**

153. It is known that splitting tablets is not a good practice. The recommendation to introduce "liquid formulations" is met by the Vasotec labeling, Allen 1998, and Trissel's.

***ii.*** **Enalapril-Compounding-Accepting References**

**1. <u>Strickley, et al., "Pediatric Drugs—A Review of Commercially Available Oral Formulations," J. Pharm. Sci., 97(5):1731-1774 (May 2008) (SLVGT_RTU_00009614-657) ("Strickley 2008")</u>**

154. Strickley opposes tablets and capsules for children under 6 years. Most of Strickley's requirements for "A drug molecule in which a measurable dosage form is required, the taste can be masked, is water-soluble, and chemically stable can be formulated as an aqueous-based oral solution or syrup with no organic solvents" are satisfied by the VASOTEC® label-

**EXHIBIT 3**

██████████ – ████████████████████████

specified compounded formulation for oral liquid suspension. While *preferring* an RTU solution or syrup, Strickley *accepts* compounded formulations leading to an oral suspension, noting that there are 17 different varieties of oral pediatric formulations.

### 7. Li, et al., "Pediatric Antihypertensive Clinical Trials," Clinical Hypertension & Vascular Diseases: Pediatric Hypertension (J.T. Flynn, et al. eds.), Ch. 33 (Springer 2011) SLVGT RTU 00007940 – SLVGT RTU 00007950

155.    The requirements specified by Li for liquid formulations, permitting precise dosing, which are effective, tolerated, have good stability, and palatability are met by the VASOTEC® pediatric labeling, specifying dosing, PK, efficacy, stability and Allen 1998.

### 8. S.N. Pagay, "Pediatric Formulations," FDA (Dec. 15, 2009) (unpublished presentation) (SLVGT RTU 00006675-701) ("Pagay 2009").

156.    Azurity quotes Pagay for alleged, Advantages of a *Liquid Dosage Form for Pediatrics*. However, Pagay's specified requirement for a liquid dosage form permitting accurate dosing, solubility, and stability is met by the extemporaneously prepared oral liquid formulation, per the VASOTEC® label, Allen 1998, and Trissel's.

### 9. M.C. Nahata, "Lack of Pediatric Drug Formulations," Pediatrics, 104(3):607-609 (Sept. 1999) (SLVGT RTU 00009419-423) ("Nahata 1999")

157.    Azurity relies on Nahata for the notion that many drugs are not available in suitable pediatric forms. This reference, however, points out the *general* dire situation for extemporaneously compounded drugs for pediatrics. However, in the *specific* case of enalapril, there is a suitable pediatric liquid dosage form, in which the dose, formulation, and stability was approved by FDA, in the VASOTEC® labeling. It involves neither crushing tablets or emptying contents of a capsule into solid food.

EXHIBIT 3

███████ – ███████████████████

**10. Hurtado, J. & B.S. Moffett, "Pediatric Oral Formulations: A Continual Challenge," Int'l J. Pharm. Compounding, 11(1):17-19 (Jan./Feb. 2007) (SLVGT_RTU_00006760-762) ("Hurtado 2007")**

158.     Azurity relies on Hurtado for the notion that relatively few medications are commercially available in liquid forms suitable for pediatric use. Thus, compounding is necessary to ensure that infants and children receive the medications they need.

159.     Hurtado laments the few medications available in liquid forms suitable for pediatric use, thereby requiring compounding, although *generally* data is not available to support this practice. However, for the *specific* case of enalapril, there is in fact an FDA approved procedure for making the oral suspension, supporting dosing, PK, PD, as elaborated in the VASOTEC® label. Also see Allen 1998 and Trissel's.

**11. Jonville, et al., "Characteristics of Medication Errors in Pediatrics," DICP Ann. Pharmacotherapy, 25:1113-1118 (Oct. 1991) (SLVGT_RTU_00008167-172) ("Jonville 1991")**

160.     Azurity relies on Jonville for its assertion regarding medical errors allegedly associated with compounding.

161.     The article states, however, "The most frequent error characteristics were family responsibility, 87 percent (a member of the patient's family most often committed the error in medication use); parental prescribing decision, 31.5 percent (medication administered to the child by the parents without medical consultation or the advice of a pharmacist); incorrect execution of the prescription by the parents, 30 percent (error in dispensing, route of administration, etc.); oral forms, 52 percent (errors occurred most frequently with oral as opposed to other forms); incorrect dosage, 31.5 percent; and drug error, 30 percent (the drug dispensed was not the one prescribed)." It would appear that most of these issues would be avoided by an oral suspension of enalapril

formulated according to the instructions of the VASOTEC® label by a pharmacist, providing dosing instructions to the parents.

**12. Rippley, et al., "Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children," Biopharm. Drug Dispos., 21:339-334 (2000) (SLVGT_RTU_00008364-369) ("Rippley 2000")**

162. Azurity relies on Rippley for the notion of the existence of drug administration to pediatric patients presents certain challenges including lack of labeling for pediatric use, amongst other related concerns.

163. Azurity's expert Dr. Mahan cites only the introductory statements made by Rippley to justify his larger effort, that of *making* an oral suspension and *comparing its PK* to that of tablets. As Dr. Mahan would know, this is the typical purpose of the introduction section of a publication. Rippley further conducted *stability studies*. Thus, Rippley *addressed all of his identified needs*: "absence of commercially available formulations suitable for use in pediatric patients and a lack of data to support the stability of extemporaneously prepared formulations. Liquid formulations are needed to allow accurate dosing based on body weight. In addition, liquids are necessary for children who are unable to swallow solid dosage forms and for children with dysphagia." . (Rippley, p. 339; SLVGT_RTU_00008364.) Rippley's key experimental data are stated. His compounded formula generally followed the VASOTEC® directions, and he documented stability.

164. The key PK data are also shown are also shown in Rippley. In generating this data, Rippley provided valuable PK data for enalapril oral suspension and demonstrated its equivalence to tablet dosage forms.

**13. N. Canavan, "For the Mouths of Babes," Pharm. Formulation & Quality, 13(2):18-20 (April/May 2011)(SLVGT_RTU_00007996-8039) ("Canavan 2011").**

**EXHIBIT 3**

165. Azurity relies on Canavan for the idea that children tend to be treated with suboptimal dosing due in part to lack of shell-stable medicine.

166. More accurately, this article argues for dosing information aimed at the pediatric population. "Far and away the most important reason for creating an age-appropriate formulation for a drug is to allow flexibility in dosing." (Canavan, p. 19.) This has been accomplished *specifically* in the case of enalapril, where the dosing and administration, pharmacokinetics, and pharmacodynamics have been well studied for the pediatric population. For these drug parameters, sections of the product labeling of Vasotec, RTU Epaned® Oral Solution, and Epaned® for Solution are displayed side-by-side below to highlight the essential identicality of this information across all three products. The conclusion to be drawn is that, from the standpoint of Canavan's concerns in his article, there was no unmet need. Dosing and administration, pharmacokinetics, and pharmacodynamics for the enalapril dosage forms were well known for the pediatric population, from the time of Vasotec, as well as for Epaned® for Solution. RTU Epaned® Oral Solution merely copied this already existing information. (*See* Rabinow Reply Report, at ¶ 107 (graphic).)

***iii.*** **Anti-Compounding References**

**1.*Richey, et al., "Manipulation of drugs to achieve the required dose is intrinsic to paediatric practice but is not supported by guidelines or evidence," BMC Pediatrics, 13:81 (2013) (SLVGT_RTU_00008080-087) ("Richey 2013")***

167. Azurity relies on Richey for lack of commercially-available, age-appropriate formulations makes it difficult to administer medication to children accurately, and related concerns.

**EXHIBIT 3**

████████ – ████████████████

168.    Concern with "A lack of commercially-available, age-appropriate formulations makes it difficult to administer medication to children accurately" may be true generally, but not for the FDA-approved, VASOTEC® enalapril label, specifying how to formulate an oral liquid suspension. Concerns with "manipulations…(being) inaccurate, and have unknown effects on the stability and bioavailability of the drug. This risks the administration of toxic or sub-therapeutic doses" are adequately addressed by the FDA-approved VASOTEC® labeling, specifying how to formulate an oral suspension. Regarding the statement, "dose calculation errors are the most common medication error in neonatal and paediatric practice," it would appear that this issue would be avoided by an oral suspension of enalapril formulated according to the instructions of the VASOTEC® label by a pharmacist, providing dosing instructions to the parents. Additionally, there are the formulations provided by Allen 1998 and Trissels.

1.    **Lugo, et al., "A Survey of Children's Hospitals on the Use of Extemporaneous Liquid Formulations in the Inpatient Setting" (2011) (unpublished presentation) (SLVGT RTU 00006766-790 ("Lugo 2011").**

169.    Azurity relies on Lugo stated "Study Objectives" that identify extemporaneously prepared liquid formulations that are most commonly used in children's hospitals.

170.    Of the top 10 liquid formulations by sales, the median number of doses per hospital is lowest for enalapril. This suggests that questions concerning issues like demand and profitability are relevant to lack of a commercial formulation at the time of this paper, recalling Allen's comments in Remington, p. 1905, noted above.

171.    More accurately, the Lugo presentation concerns (lack of stability studies, short shelf-life, lack of PK/PD studies, efficacy and safety concerns) apply *generally*. But for enalapril *specifically*, all concerns are addressed by the extemporaneously compounded oral liquid suspensions. (VASOTEC® label, Allen 1998, PK Rippley 2000.)

EXHIBIT 3

██████████ – █████████████████████████

> ### 2.   Rood, et al., "Variability in compounding of oral liquids for pediatric patients: A patient safety concern," J. Am. Pharm. Ass'n, 54:383-389 (Jul/Aug 2014) (SLVGT_RTU_00006716-722) ("Rood 2014").

172.   Azurity relies on Rood apparently for the idea that medications are not compounded consistently.  However, the VASOTEC® labeling itself indicates 4 different dosage strengths for the tablet: 2.5, 5, 10 and 20mg. One could imagine that even more strengths may be required for the oral suspension intended for the wide range of pediatric doses, to provide for the growing child. As Rood himself points out,

> It should be recognized, however, that in some circumstances, one standard concentration may not be adequate. For example, the volume required to provide a dose for a neonate compared with an older child may preclude the use of a single standard concentration. Were one standard concentration to be selected, measurability of a small volume for the neonate or tolerability of a large volume for the bigger child may not be feasible. In these situations, a standardized alternative concentration with criteria for use is warranted.

173.   So Rood raises an issue, but then provides a solution to that issue.

> ### 3.   M. Kromelis, "Ensuring Pediatric Medicine Safety," Pharmacy Purchasing & Prods., (Nov. 2012) (SLVGT_RTU_00006763-765) ("Kromelis 2012").

174.   Azurity relies on Kromelis for the points that pediatrtic doses should be accurately measure and delivered appropriately for children and safety could be increased by preparing medications in a ready to administer form.

175.   It is clear, however, that a compounding pharmacist can prepare a compounded oral suspension for use at the patient's bedside, so that no further dilution or manipulation is required there.  Kromelis acknowledges that even his own institution utilizes compounding.

176.   Kromelis states here that his major concern with compounding is that a formula from a reliable source be used, "such as a compounding reference, a journal article, or

EXHIBIT 3

████████ – ████████████████████

correspondence from the manufacturer of the active ingredient-to ensure the drug is compounded safely and correctly." These requirements are all met by the Vasotec labeling, Allen 1998, and Trissel's. Once again, while Kromelis may disparage extemporaneous compounding in general, the specific case of enalapril is in quite good shape.

### 4. Sellers, S. & W.H. Utian, "Pharmacy Compounding Primer for Physicians: Prescriber Beware," Drugs, 72(16):2043-2050 (2012) (SLVGT_RTU_00006870-877) ("Sellers 2012").

177.    Azurity relies on Sellers for the premise that compounding allegedly has the drawback of inaccurate dosage and thus leads to medication errors.

178.    This is an inaccurate picture, however, because "Extemporaneous formulations generally lack studies to document stability, bioavailability, pharmacokinetics, pharmacodynamics, efficacy and safety", however, *specifically* for enalapril all of these studies were done.  (e.g., FDA-Approved VASOTEC® label, Allen 1998, Rippley PK study, Trissel's.) And, importantly, the "ingesting excipients that are included to create the tablet form of the medication but are not necessary for a liquid formulation" was specifically approved by FDA in the VASOTEC® label.

179.    The compounding failure rate of 33% can be viewed in the context of the overall medication error rate for all medications. The magnitude of the issue for compounding is actually comparable to the overall medication error rate reported in hospital studies over the last decades. It appears that there is nothing particularly special about errors due to extemporaneous compounding, when viewed in context of the overall medication error rate experienced by patients, due to errors in drug administration caused by doctors and nurses, in addition to pharmacists. Thus, the 30% error rate in extemporaneously compounded formulations must be compared to 30% medication error rate overall, as discussed in the Technical Background.

EXHIBIT 3
████████  – ██████████████████

5.    **Gudeman, et al., "Potential Risks of Pharmacy Compounding," Drugs R&D, 13:1-8 (2013) (SLVGT_RTU_00006627-634) ("Gudeman 2013").**

180.    Azurity relies on Gudeman for the premise that regulatory oversight of pharmacy compounding is significantly less rigorous than that required for Food and Drug Administration (FDA)-approved drugs; as such, compounded drugs may pose additional risks to patients[], amongst other purported drawbacks.

181.    Gudeman 2013 in his paper acknowledges, however, the advantages of compounding pharmacies (SLVGT_RTU_00006628; Gudeman, pp. 2).   The general concern about stability studies, below, does not pertain to enalapril which has documented stabilities, for example in the VASOTEC® label, Allen 1998, and Trissel's, as discussed above.

182.    One interesting thing about Gudeman 2013 is the company affiliation of the authors, Ther-Rx Corporation. https://en.wikipedia.org/wiki/KV_Pharmaceutical. This, and KV's own history, throw serious doubt on the objectivity of Gudeman and applicability of the statements Azurity relies on from Gudeman.

## IV.    THE LEVEL OF A PERSON OF ORDINARY SKILL IN THE ART

183.    A POSA to whom the '482 and '621 patents are directed would have an undergraduate or graduate degree in chemistry, chemical engineering, or pharmaceutical sciences, as well as hands-on experience formulating liquid oral drug formulations, on a team of scientists, including a medical doctor with knowledge in designing and conducting the clinical studies with oral liquid drug formulations to evaluate their safety and efficacy in humans. The POSA qualifications could include (i) a Ph.D. in chemistry, chemical engineering, pharmaceutical sciences or a related field, and relevant hands-on experience in drug development including oral liquid drug formulation; (ii) a master's degree in the same fields and at least three years of the same relevant experience; or (iii) a bachelor's degree in the same fields and at least five years of

**EXHIBIT 3**

██████████ – ██████████████████████

the same relevant experience. The POSA would have been familiar with oral liquid dosage forms. Such a person would have understood that the process of formulation and dosage form development requires a multidisciplinary approach, and would have drawn upon not only his or her own skills, but also could have taken advantage of certain specialized skills of others to solve any given problem. It should also be emphasized that a POSA, in addition to having familiarity with the scientific literature and patents on oral liquid formulations, had also access to the Handbook of Pharmaceutical Excipients ("HPE") and the FDA Inactive Ingredients Guide ("FDA IIG") on excipients present in approved and marketed oral liquid and other dosage forms and drug products and their potency (concentrations) in these drug products. The FDA IIG in general, the content of which can also be searched online, cover all routes of administration and dosage forms and is updated quarterly in April, July, October and January. The data file contains seven fields: 1) Inactive Ingredient, 2) Route, 3) Dosage Form, 4) CAS Number where CAS stands for Chemical Abstracts Service, 5) UNII (Unique Ingredient Identifier), 6) Potency Amount, and 7) Potency Unit. An archived FDA IIG dated January 2016, can be found at: www.fda.gov/drugs/drugapprovals-and-databases/inactive-ingredients-database-download. From time to time there are different editions of the HPE to better reflect the status and pharmaceutical applications of existing excipients, as well as, to include any new excipients approved for use in pharmaceuticals. Both the IIG and HPE are useful tools to a POSA with a task to develop a formulation and dosage form for a specific drug and disease.

184.    Even if the Court were to adopt Plaintiff's proposed definition of a POSA, it would not alter Alkem's showing that the Asserted Claims are invalid.

## V.    STATEMENTS OF INTENDED PROOF

**EXHIBIT 3**

█████████ – ████████████████████

185.    Alkem bears the burden of demonstrating that the Asserted Claims are invalid by clear and convincing evidence.  Alkem intends to show that it has met this burden of proving by clear and convincing evidence that the Asserted Claims are invalid.

186.    Azurity bears the burden of proof to demonstrate by a preponderance of the evidence that Alkem's ANDA Product meets each and every limitation of the asserted claims either literally or under the doctrine of equivalents.  Alkem intends to show that Azurity has failed to meet this burden to establish literal patent infringement.  Alkem will further demonstrate that Azurity has made no arguments under the doctrine of equivalents and therefore that theory of infringement is unavailable to it.

## VI.    AZURITY HAS NOT MET ITS BURDEN TO SHOW THAT THE ALKEM ANDA PRODUCTS WILL INFRINGE THE ASSERTED CLAIMS

187.    Azurity has failed to meet its burden to show that Alkem's ANDA Product literally infringes claims 14-23 and 27-28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent.

188.    Alkem is entitled to a declaratory judgment that Alkem's anticipated manufacture, use, sale, offer for sale, or importation of Alkem's ANDA Product will not infringe, induce infringement of, or contributorily infringe any of the Asserted Claims of the '482 or '621 Patents.

189.    Azurity is precluded from asserting infringement under the doctrine of equivalents because in the course of fact and expert discovery in this lawsuit, it has failed to advance or argue a single theory of infringement under the doctrine of equivalents.  Defendant Alkem received zero notice of a single fact or a single argument how any components of the Alkem ANDA Product are equivalent to each and every element of the Asserted Claims of the '482 and '621 patents.

190. Azurity is precluded from asserting infringement under the doctrine of equivalents also because it has provided no analysis at all concerning any alleged insubstantial differences between the Alkem ANDA Product and each ’482 and ’621 Patents.

191. Alkem is entitled to a declaratory judgment that Alkem’s anticipated manufacture, use, sale, offer for sale, or importation of Alkem’s ANDA Product will not infringe, induce infringement of, or contributorily infringe any of the Asserted Claims of the ’482 or ’621 Patents

REDACTED

**B. The asserted Claims of the ’482 Patent**

***i. Independent claim 14***

195. Claim 14 of the ’482 Patent is the only independent claim asserted against Alkem. Asserted Claims 15-23 and 27-28 depend from claim 14 and incorporate all of the elements of claim 14.

196. Because Alkem’s ANDA Product does not infringe claim 14, it cannot infringe any of the claims that depend from claim 14.

REDACTED

**EXHIBIT 3**

–

**D. The asserted Claims of the ’621 Patent -- 1-13, 16-27, and 30**

***ii. Independent claims 1, 19, and 30***

200. Claims 1, 19, and 30 of the ’621 Patent are the independent claims asserted against Alkem. Asserted Claims 2-13 and 16-18 depend from claim 1. Asserted Claims 20-27 depend from claim 19.

201. Because Alkem’s ANDA Product does not infringe any of independent claims 1, 19, or 30, it cannot infringe any of the claims that depend from claim any one of those independent claims.



REDACTED

## VII. THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 103

205. Alkem's purported non-infringement arguments fail to rebut Azurity's case that Alkem's ANDA Product infringes the Asserted Claims.

### A. Prior Art

#### *i. U.S. Patent No. 8,568,747 ("the '747 Patent")*

206. The '747 Patent issued October 29, 2013 and is entitled "Enalapril Compositions." It is prior art to the Asserted Patents under 35 U.S.C. 102(a)(1).

207. The '747 patent explains that a significant segment of the consuming public has difficulty swallowing tablets, which can lead to noncompliance, and tablets are not always recommended for children and the elderly. ('747 patent at 4:68-5:15). The '747 patent aimed to address those issues, among others, by providing for "stable enalapril oral liquid compositions as well as enalapril powder compositions for oral liquid administration." (*Id.* at 5:28-32.) After identifying various concentrations of enalapril and mannitol in disclosed embodiments, the '747 patent describes embodiments of the claimed invention to include commonly known excipients, including, without limitation buffering agents, preservatives and sweeteners before noting that additional common excipients were contemplated and citing to widely known, highly regarded treatises such as Remington: The Science and Practice of Pharmacy, Remington's Pharmaceutical Sciences, Pharmaceutical Dosage Forms and Pharmaceutical Dosage forms and Drug Delivery Systems, which the '747 patent expressly "incorporated by reference." (*Id.* at 7:11-9:36). The '747 patent also teaches the use of buffering agents to "maintain the pH." (*Id.* at 7:17-41.) The '747 patent teaches the use of colloidal silicon dioxide despite acknowledging its reported effect of reducing enalapril's stability. (*Id.* at 10:12-22.)

208. The ’747 patent teaches that the liquid formulations claimed and described therein are “stable,” which the ’747 patent explains refers to “enalapril oral liquid compositions having at least about 90% enalapril and 5% or less total impurities or substances at the end of a given storage period” that is not otherwise defined. (*Id.* at 13:4-10.) The ’747 Patent discloses, “[a]t refrigerated and ambient conditions, in some embodiments, the enalapril oral liquid compositions described [in the ’747 patent] are stable for at least 1 week, 2 weeks, 4 weeks, 6 weeks, 8 weeks, 10 weeks, 12 weeks, 16 weeks, 20 weeks, at least 24 weeks, or at least 36 weeks.” (*Id.* at 13:29-33.) The ’747 patent includes examples of oral liquid enalapril formulations that are stable, without the addition of preservatives or buffering agents, even if a person of ordinary skill in the art would understand the stability of the claimed formulations to be of limited duration.

***ii. September 2014 Package Insert for Epaned® (enalapril) for Oral Solution (“the Epaned Insert”)***

209. The Epaned Kit Product (Epaned Powder for Oral Solution, which contains 150 mg of enalapril maleate in a 150 mL bottle, to be reconstituted with 150 mL of ORA-SWEET® SF provided) was approved for commercial marketing in 2013 under NDA No. 204308. (Epaned Kit Approval Letter, ALK_ENPL_00258781.)

210. The Epaned® Kit Product was approved for commercial marketing in 2013 under NDA No. 204308.

211. Silvergate launched the Epaned® Kit Product in October of 2013.

212. The Epaned Kit Product is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

213. The Epaned Kit Product Insert (“Epaned Insert”) describes the Epaned Kit Product as follows:

**EXHIBIT 3**

████████████ – ████████████████████████

> EPANED Powder for Oral Solution is a kit consisting of 1 bottle containing a dry powder blend of enalapril maleate, USP, mannitol, and colloidal silicon dioxide and 1 bottle of Ora-Sweet SF diluent for reconstitution resulting in a 1 mg/mL EPANED oral solution. The Ora- Sweet SF diluent contains: purified water, glycerin, sorbitol, sodium saccharin, xanthan gum, and flavoring. Buffered with citric acid and sodium citrate. Preserved with methylparaben (0.03%), propylparaben (0.008%), and potassium sorbate (0.1%).

(Epaned Insert, §11.)

214. The Epaned Insert notes, "Enalapril has been evaluated for safety in more than 10,000 patients, including over 1,000 patients treated for more than one year." (Epaned Insert § 6.1.)

215. The Epaned Insert describes the formulation to include a citric acid/sodium citrate buffering composition and paraben preservatives:

> EPANED Powder for Oral Solution is a kit consisting of 1 bottle containing a dry powder blend of enalapril maleate, USP, mannitol, and colloidal silicon dioxide and 1 bottle of Ora-Sweet SF diluent for reconstitution resulting in a 1 mg/mL EPANED oral solution. The Ora- Sweet SF diluent contains: purified water, glycerin, sorbitol, sodium saccharin, xanthan gum, and flavoring. Buffered with citric acid and sodium citrate. Preserved with methylparaben (0.03%), propylparaben (0.008%), and potassium sorbate (0.1%).

(Epaned Insert, §11.)

216. The Epaned Insert is prior art to the Asserted Claims under 35 U.S.C. § 102(a)(1).

217. The Epaned Insert provided persons of ordinary skill in the art with a clear starting point for formulating enalapril maleate into a stable solution that would not require a reconstitution step prior to administration, including providing for preservatives and a citric acid/sodium citrate buffering solution. Moreover, the Epaned Insert bolsters the notion that enalapril could be effective in formulations using one or more parabens as a preservative.

218. There exist two separate Epaned® products. One product, "RTU Epaned® Oral Solution" throughout this report referring to the product that is the subject of NDA

208686(https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No=208686#32978), and which is the subject of this lawsuit. This product contains as the preservative sodium benzoate. Dr. Mahan refers to the product in his report simply as "Epaned®."

219. The other Epaned® product, referred to by Alkem's experts as "Epaned® For Solution," the product that is the subject of NDA 204308 (https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No=204308#17015), a product produced as a powder that is reconstituted by addition of liquid vehicle. This product contains as the preservative a mixture of parabens and is not listed in the Orange Book as covered by either the '482 or '621 patents, and is not the subject of this lawsuit. Azurity's expert refer to this product as the "Epaned Kit."

***iii. Allen, Jr., L., and Erickson III, M., Stability of Alprazolam, Chloroquine Phosphate, Cisapride, Enalapril Maleate, and Hydralazine Hydrochloride in Extemporaneously Compounded Oral Liquids, 55 Am. J. Health-Syst. Pharm., at 1915-20 (Sep. 15, 1998) ("Allen")***

220. Allen is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

221. Allen is a peer-reviewed publication from the American Journal of Health-System Pharmacy.

222. The authors studied the chemical stability of several drugs including Enalapril Maleate in extemporaneously compounded oral liquids. Allen discloses detailed information on the stability of 1 mg/mL Enalapril Maleate in aqueous solutions and its pH and temperature dependence. Allen also teaches that the pH of an Enalapril Maleate solution would differ depending upon the liquid with which the drug is mixed. Allen specifically states that the Enalapril Maleate solutions "were stable in three oral liquids compounded extemporaneously from sweetened vehicles and tablets for 60 days when stored without light at 5 and 25° C." (*Id*. at 1919).

EXHIBIT 3

████████ – ████████████████

iv.     *Boukarim, C., et al., Preservatives in Liquid Pharmaceutical Preparations, 9 J. Appl. Res. 1&2, at 14-17 (2009) ("Boukarim")*

223.    Boukarim is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

224.    Boukarim is a peer-reviewed publication from the Journal of Applied Research.

225.    Boukarim (Defendants' Invalidity Contention- Exhibit 4; SLVGT_RTU_00011171 – SLVGT_RTU_00011174) broadly discusses the use and justification of preservatives in liquid pharmaceutical preparations, which "are particularly susceptible to microbial growth because of the nature of their ingredients.  Such preparations are protected by the addition of preservatives that prevent the alteration and degradation of the product formulation."  (*Id.* at 14.)  Boukarim adds, "Among the most commonly used preservatives in the conservation of liquid pharmaceutical preparations are sodium benzoate, potassium sorbate, and methyl hydroxybenzoate (methylparaben)." (*Id.* at 14).  Boukarim highlights the high amount of preservatives that may be found in some liquid pharmaceutical preparations." (*Id.* at 17.)  This observation can be linked to the statement in the Abstract of the Boukarim publication that preservatives can be utilized to "intentionally extend the shelf-life" of liquid pharmaceutical products.

226.    A POSA would have been motivated by the teachings of Boukarim to utilize one or more commonly used preservatives with liquid pharmaceutical preparations, including sodium benzoate and/or one or more parabens, for improving the stability and extending the shelf-life of Enalapril Maleate oral liquid formulations.

v.      *Casas, M., et al., Physicochemical Stability of Captopril and Enalapril Extemporaneous Formulations for Pediatric Patients, 20 Pharm. Dev. & Tech. 3, at 271-78 (Published online Nov. 26, 2013) ("Casas")*

227.    Casas is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

228.    Casa is a peer-reviewed publication from Pharmaceutical Development and Technology.

**EXHIBIT 3**

██████████ – ██████████████████

229.    Casas (Defendants' Invalidity Contention- Exhibit 5; SLVGT_RTU_00011175 – SLVGT_RTU_00011182) discloses the development and physicochemical stability of oral liquid extemporaneous formulations of the antihypertensive drugs Captopril and Enalapril, emphasizing the advantages of liquid formulations to adjust the dose and frequency to pediatric patients, thus improving patient compliance.  (Casas at 271.)  The Enalapril formulations in Casas, included a buffering solution but no preservative, and the pH was maintained slightly more acidic than the pH of around 3 known to result in maximal stability for Enalapril.  (Casas at 275.)  Although this conclusion is consistent with what was already known in the art as of the Casas publication date, it would have, nevertheless, motivated a POSA to formulate Enalapril Maleate in liquid solutions using buffering agents and preservatives to maintain the pH of around 3 to maximize the drug product stability and commercial viability.

230.    In reference to the temperature effect on the stability of the investigated oral liquid solutions according to the ICH Guidelines, Casas discloses that these solutions were "more stable at 5° C than at the upper temperatures" and noted that, "[f]or enalapril PEF, the drug content was above the 95% until 50 days of study for 5° and 25° C, decreasing below this value only in the case of 40° C."  (*Id.* at 277.)  These observations are consistent with what was already known in the art on the stability of liquid dosage forms as presented in a comprehensive review article. (Glass, B.D and Haywood. A*., Stability considerations in liquid dosage forms extemporaneously prepared from commercially available products*. J. Pharm. Pharmaceut. Sci. (2006) 9:398-426) ("Glass")).  From the investigation of 83 liquid formulations reported in the literature as of 2006, stability considerations were of a concern for only 7.2% of these liquid dosage forms.  Among the investigated 83 stable liquid dosage forms was enalapril maleate.  The stability of enalapril maleate 1 mg/ml extemporaneous liquid formulations from the investigated three compounding vehicles

**EXHIBIT 3**

██████████ – █████████████████████████

reported in the 'Allen' prior art that is cited as reference #83 in the "Glass" review article, is

summarized in Table 1. on p. 405 "1mg/mL mixture stored in the dark was stable for 60 days at 5

and 25° C".

> ### vi. Sosnowska, K., et al., Stability of Extemporaneous Enalapril Maleate Suspensions for Pediatric Use Prepared from Commercially Available Tablets, 66 Acta Poloniae Pharmaceutica—Drug Research 3, at 321-26 (2009) ("Sosnowska")

231.  Sosnowska is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

232.  Sosnowska is a peer-reviewed publication from Acta Poloniae – Drug Research.

233.  Sosnowska (Defendants' Invalidity Contention- Exhibit 6; ALK_ENPL_00258616

– ALK_ENPL_00258621), first provide an overview of Enalapril Maleate and its use in pediatric

cardiology and some of the drawbacks of the powder formulations when mixed with liquid foods,

such as accuracy of measurement, not easy to administer and unpleasant taste.  (Sosnowska at

321.)  Sosnowska identifies a number of factors when the task is to prepare liquid formulations,

emphasizing the significance of formulation stability.  Sosnowska teaches that liquid enalapril

maleate formulations can be stabilizing by modifying the pH using a buffering system and can

include one or more preservatives. (Sosnowska at 325.)

> ### vii. Nahata, M., et al., Stability of Enalapril Maleate in Three Extemporaneously Prepared Oral Liquids, 55 Am. J. Health-Syst. Pharm. At 1155-57 (June 1, 1998) ("Nahata")

234.  Nahata is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

235.  Nahata is a peer-reviewed publication from the American Journal of Health-System

Pharmacists.

236.  Nahata (Defendants' Invalidity Contention- Exhibit 7; SLVGT_RTU_00011183 –

SLVGT_RTU_00011185) points out upfront that that "[no] liquid formulation form [of enalapril

maleate] is commercially available for pediatric patients (Nahata at 1155), thus, establishing the

EXHIBIT 3

███████████ – ███████████████████████

motivation to develop this formulation in order to address a medical and market need. Nahata makes reference to previous stability data with enalapril maleate pointing to the fact that there are no known stability data for enalapril in readily available vehicles such as carboxymethylcellose in syrup. Nahata presents the rationale of the study by explaining that, "Our study was designed to determine the stability of enalapril maleate in deionized water, citrate buffer solution, and a sweetened suspending agent at 4 and 25° C." (*Id*. at 1156.) Nahata discloses that at 4° C, all of the enalapril formulations retained >94% of the initial concentration throughout the 91-day study period. (*Id*.) Nahata states that whereas at 25° C enalapril mixed with deionized water retained >90% of the initial concentration for only 56 days, enalapril mixed with the citrate buffer solution and with the sweetened suspending agent maintained >92% of the initial concentration for the full 91-day period, thus, providing further motivation to the POSA to stabilize liquid enalapril solutions with a citrate buffer and would ease concerns about the effect of flavoring on the drug's stability.

237.    Nahata concludes the discussion of the study by noting the following: Because of the lack of stability data, some doses of enalapril maleate have been dispensed as a powder prepared by diluting crushed tablets with lactose. This practice is cumbersome and labor-intensive, however. The knowledge that enalapril maleate is stable in widely available vehicles should simplify the preparation and delivery of weight-specific doses to infants and young children.

### viii.    Rippley, R., et al., Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children, 21 Biopharmaceutics & Drug Disposition at 339-44 (2000) ("Rippley")

238.    Rippley is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

239.    Rippley is a peer-reviewed publication from Biopharmaceutics & Drug Disposition.

240.    Rippley (Defendants' Invalidity Contention- Exhibit 8; SLVGT_RTU_00008364 – SLVGT_RTU_00008369) contains many teachings similar to those discussed in connection with

EXHIBIT 3

██████████ – ████████████████████████

other prior art references cited above, however, Rippley also establishes that the liquid

formulations tested were stable and equally bioavailable as the then-commercialized tablets, thus,

linking the liquid formulation's stability to its in vivo performance, i.e. bioavailability.  Rippley

concludes:

> An enalapril suspension preparation with documented stability and known
> bioavailability is now available and has been used in clinical studies in children and
> infants with hypertension. This enalapril suspension provides for greater ease and
> individualization of dosing in pediatric patients. In addition, the similarity of
> enalapril suspensions to marketed tablets will provide chronically treated pediatric
> patients with the flexibility to change formulations over time.

(Rippley at p. 344 last paragraph.)

> ### ix. *U.S. Patent Application Publication No. 2006/0121066 A1 Sucralose Formulations to Mask Unpleasant Tastes ("the '066 Publication")*

241.    The '066 Publication is prior art to the Asserted Patents under 35 U.S.C. §

102(a)(1).

242.    The '066 Publication (Defendants' Invalidity Contention- Exhibit 9;

SLVGT_RTU_00011215 - SLVGT_RTU_00011225 ) discloses taste masking methods using

sucralose to mask the taste of bitter drugs.  A person of ordinary skill in the art would be motivated

to mask enalapril's known bitter taste using one or more sweeteners, including specifically

sucralose.

243.    As stated in the Abstract of the '006 Publication:

> The present invention is directed to a pharmaceutically acceptable taste masking
> liquid excipient base for administration of a relatively large amount of unpleasant
> tasting medicines.  More particularly, the enhanced Sweetness and taste masking
> effect are produced by the addition of Sucralose to the excipient base with
> maintenance of a pH from about 2 to about 5.  The invention is further directed to
> medicinal compositions comprising such a liquid excipient base and unpleasant
> tasting medicines.  Still further, the invention is directed to a method for taste
> masking unpleasant tasting medicines through their incorporation into the claimed
> liquid excipient bases.

EXHIBIT 3
██████████  – █████████████████████

('066 Publication, Abstract.)

244.    The '006 Publication, in the specification under Formulations, in the Examples of Tables 4 through Table 9, it discloses the use of citric acid and sodium citrate as buffering agent and sodium benzoate as a preservative, motivating the POSA to use these excipients in oral liquid preparations of other drugs, including cardiovascular drugs, such as Enalapril.

> x.    *Strickley, Robert G., et al., Pediatric Drugs—A Review of Commercially Available Oral Formulations, J. Pharm. Sci., [97] 1731-1774 (May 2008) ("Strickley")*

245.    Strickley is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

246.    Strickley is a peer-reviewed publication from the Journal of Pharmaceutical Sciences.

247.    Strickley          (ALK_ENPL_00257873      –      ALK_ENPL_00257916; SLVGT_RTU_00009614 – SLVGT_RTU_00009657) provides a comprehensive review of commercially available oral formulations of pediatric drugs as of 2007.  Strickley emphasizes both the regulatory incentives and clinical challenges to develop oral formulations for pediatric patients, which are required to have a measurable dosage form to administer based upon body weight, and also an acceptable taste-masking for children.   Formulation selection is based on the physicochemical and organoleptic properties of the active drug substance such as solubility, chemical stability, and taste along with the targeted dose.  Stickley further explains:

> oral pediatric formulations are available in 17 different varieties and can be either a ready-to-use formulation such as a solution, syrup, suspension, tablet, scored tablet, chewable tablet, orally disintegrating tablet, or thin strip, or can also be a formulation that requires manipulation such as a powder for constitution to a suspension, tablet for constitution to a suspension, powder for constitution to a solution, drops for reconstitution to a suspension, concentrated solution for dilution, effervescent tablet, bulk oral granules, bulk oral powder, or solid in a capsule to

**EXHIBIT 3**

███████████ — ██████████████████████

mix with food or drink. Recently there has been an increase in pediatric formulation development inspired by increased regulatory incentives.

(Strickley, at Abstract.)

248.    Table 1 in Strickley lists "Excipients Used in Pediatric Formulations," whereas the identified "Ready to Use or Required Manipulation of Selected Listings of Commercially Available Pediatric Oral Formulations" are comprehensively presented in Table 2 and Table 3, respectively.  Strickley states in the Abstractt, "The intent of this review is to educate the reader on the various types of formulations administered orally to pediatrics, the rationale in deciding which type of formulation to develop, the excipients used, development challenges, the in-use handling of oral pediatric formulations, and the regulatory incentives."

249.    In Table 2, Strickley discloses the Inactives in Formulation (as listed in Package Insert or PDR) of commercially available ready-to-use oral liquid solution formulations of various drugs incorporating citric acid and sodium citrate as buffer and sodium benzoate or methylparaben and propylparaben as preservatives and which can be stored at room temperature unlike the Epaned oral solution which requires to be refrigerated.  Room temperature storage is certainly more challenging to achieve but advantageous from a product development, commercialization and marketing perspectives.  The Strickley review is a valuable source of guidance to those involved in the development of oral pediatric formulations, including oral liquid solutions, and would have certainly motivated the POSA having the task to develop a stable, bioavailable, safe and efficacious oral liquid formulation of Enalapril Maleate.

> ### xi.    *International Patent Application Publication No. WO 2017/077425 A1 Oral Solution of ACE Inhibitor ("WO '425") Priority Date: 7 November 2015*

250.    WO '425 is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

**EXHIBIT 3**

–

251. The priority date of the WO ’425 which is the date of the original filing of the international patent application is November 7, 2015 which is earlier to the priority date of the ’482 and ’621 patents which is March 18, 2016.

252. The WO ’425 discloses oral solution compositions of ACE Inhibitor and more specifically lisinopril dihydrate with improved stability and improved palatability. It emphasizes the importance of drug-excipient interactions and incompatibilities with certain pharmaceutical excipients which lead to drug degradation by various mechanisms. “Lisinopril upon contact with some pharmaceutical excipients is converted into cyclized degradation product, lisinopril diketopiperazine. Further, lisinopril also get degraded by hydrolysis of side chain ester group or oxidation. It was surprisingly found that the combination of lisinopril and preservative in solution form results in enhanced stability ACE inhibitor, lisinopril toward cyclization, hydrolysis and oxidation.” (WO ’425 at 4.)

253. Example 1 in WO ’425 disclosed the use of sucralose as a sweetener and methylparaben and ethylparaben as preservatives.

***xii. FDA Guidance for Industry: Q1A(R2) Stability Testing of New Drug Substances and Products (2003) (“FDA Stability Guidance”)***

254. FDA Stability Guidance is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

***xiii. The Handbook of Pharmaceutical Excipients (6th ed. 2009) (“HPE”)***

255. HPE is prior art to the Asserted Patents under 35 U.S.C. § 102(a)(1).

***xiv. Remington: The Science and Practice of Pharmacy, 745–75 (21st ed. 2006) (“Remington”)***

256. Remington is prior art to the Asserted Patents under 35 U.S.C. $ 35 102(a)(1).

EXHIBIT 3

█████████ – █████████████████

      **xv.**        *World Health Organization, WHO Expert Committee on Specifications for Pharmaceutical Preparations, 46 WHO Technical Report Series 970 (2012) ("WHO Report")*

257.    WHO Report is prior art to the Asserted Patents under 35 U.S.C. $ 35 102(a)(1).

      **xvi.**     *de Villiers, Melgardt, Buffers and pH Adjusting Agents, Ch. 18 in "A Practical Guide to Contemporary Pharmacy Practice" (Judith E. Thomson, ed., Lppincott, Williams & Wilkins, 3rd ed. 2009)("de Villiers")*

258.    de Villiers is prior art to the Asserted Patents under 35 U.S.C. $ 35 102(a)(1).

## B.    Motivation to Combine or Modify

259.    As discussed throughout the prior art analysis above, each piece of prior art includes teachings that would motivate a drug formulator to seek out the other relevant prior art and modify the teachings therein with a reasonable expectation of arriving at the claimed inventions. At the time of the effective filing date for the patents-in-suit, the U.S. market for safe, effective anti-hypertensive drugs would have provided ample motivation for a person of ordinary skill in the art to try to improve upon the enalapril options then available by formulating an enalapril maleate ready-to-use solution that eliminated the need to reconstitute  the drug from powder formulations in connection with administration and to maximize its economic potential by creating and marketing a long-lasting, stable, orally dosed liquid enalapril maleate formulation that cardiac patients would consume especially pediatric patients..

260.    Further motivation to combine references explanation appears above, in my description of the prior art, and in my Detailed Analysis, below. It should also be added that a motivation for a POSA to combine prior art references is the fact that complimentary teachings can be found in the prior art references.  The '747 patent, Epaned Insert and Allen address formulation development and testing areas that are specific to enalapril /enalapril maleate whereas, de Villiers and Boukarim broadly address the areas of Buffers & pH Adjusting Agents and

**EXHIBIT 3**

████████ – ███████████████████

Preservatives in Liquid Pharmaceutical Preparations, respectively, which can be applied to any drug molecule.

> **C.      The Asserted Claims of the '482 Patent Would Have Beed Obvious to a POSA**
>
> *i.        Claim 14 of the '482 Patent*

261.    *An oral liquid formulation, comprising:*

262.    Oral liquid formulations of enalapril are disclosed in the prior art.  For example, the '747 patent discloses oral liquid formulations.  (*Id.* at 2:7-21).  Likewise, the Epaned Insert and Allen references disclose oral liquid formulations of enalapril maleate.  (Epaned Insert, at Dosage Forms and Strengths; Allen at 1915.)

263.    *(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;*

264.    Oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the '747 patent.  (*Id.* at 3:13-15) (about 0.5 – 5.0 mg/ml enalapril or a pharmaceutically acceptable salt thereof).  Likewise, oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the Epaned Insert (at 11), and Allen (at 1915 and 1918).

265.    *(ii) a buffer comprising a mixture of citric acid and sodium citrate, wherein the buffer is present at a concentration between about 5 mM and about 20 mM in the oral liquid formulation;*

266.    The '747 patent describes enalapril formulations including buffer mixtures of citric acid and sodium citrate.  (*Id.* at 7:10-27).  The Epaned Insert describes the components of Epaned, including it being buffered with citric acid and sodium citrate.  (Insert at 10).  Citric acid and sodium buffer is also present in the extemporaneously compounded oral liquids in Allen using

**EXHIBIT 3**

█████████████ – █████████████████████████

Ora-Plus, Ora-Sweet, Ora-Sweet-SF and Cherry-Syrup as indicated in Table 1, Excipients and pH of Compounding Vehicles. The indicated buffer concentration can be obtained through routine experimentation and calculated as taught by de Villiers. (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

267.    *(iii) about 1 mg/ml of a preservative, wherein the preservative is a paraben or a mixture of parabens; and*

268.    A POSA would have known that 1 mg/ml of a preservative corresponds to 0.1 % w/v. The '747 patent disclosed enalapril formulations containing preservatives, including parabens. (*Id.* at 7:51-59). The Epaned Insert is described as "preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%). (Insert at 11). These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report.

269.    *(iv) water, wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of the storage period of at least 12 months at about 5 +/- 3° C.*

270.    Water is present in the extemporaneous oral liquid formulations of enalapril disclosed in the '747 patent, Epaned Insert and Allen as shown in Table 1 of the Constantinides Opening Report.

271.    *wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of the storage period of at least 12 months at about 5 +/- 3 °C.*

272.    The '747 patent discloses enalapril powder formulations, reconstituted into oral liquid enalapril maleate formulations, that are stable, maintaining 95% w/w or greater of initial enalapril amount (*id.* at 10:51-56, 11:3-6) at the storage condition of at least 12 months (*id.* at 11:7-17).

**EXHIBIT 3**

[redacted] – [redacted]

273. Allen reports 60-day stability of a 1 mg/ml enalapril maleate in extemporaneously compounded oral liquid formulations stored at 5 and 25° C, (Table 2 at 1918), where the formulation maintained at least about 95% w/w or greater of the initial enalapril amount at the end of the storage period.

***ii. Claim 15 of the '482 Patent***

274. *The oral liquid formulation of claim 14 further comprising a sweetener*

275. The '747 patent discloses enalapril formulations including a sweetener. (*Id.* at 7:60-67; 8:1-37). The Epaned Insert describes Ora-Sweet SF which contains sorbitol and sodium saccharin as sweeteners (Insert at 10) also Table 1 of the Constantinides Opening Report.

276. The Allen compounding vehicles used to prepare extemporaneous oral liquid formulations of enalapril maleate also contain sweeteners. Allen refers to these vehicles as being "Sweetened Vehicles." (Table 2 at 1918.)

***iii. Claim 16 of the '482 Patent***

277. *The oral liquid formulation of Claim 15 where the sweetener is sucralose*

278. The '747 patent disclosed a long list of sweeteners including sucralose. (*Id.* at 7:60-67; 8:1-37). As indicated in Table 1 in the Constantinides Opening Report, sucralose in also a sweetener present in the Cherry Syrup used in Allen. (Allen at 1915).

***iv. Claim 17 of the '482 Patent***

279. *The oral liquid formulation of Claim 14 further comprising a flavoring agent*

280. The '747 patent discloses enalapril formulations including a flavoring agent. (*Id.* at 8:52-67; 9: 1-8). The Epaned Insert discloses Ora-Sweet SF that contains a flavoring agent (Insert at 11), which is citrus berry as indicated in Table 1 in the Constantinides Opening Report.

***v. Claim 18 of the '482 Patent***

**EXHIBIT 3**

[redacted] – [redacted]

281. *The oral liquid formulation of claim 14, wherein the formulation does not contain mannitol*

282. A POSA would have known that mannitol is a solid dose excipient and thus, not to consider using with ready-to-use oral liquid formulation of enalapril.

***vi. Claim 19 of the '482 Patent***

283. *The oral liquid formulation of claim 14, wherein the formulation does not contain silicon dioxide*

284. Silicon dioxide is a well-known excipient for use with tablet solid dosage forms. A POSA would have known this and thus, would not consider using such an excipient in ready-to-use oral liquid formulation of enalapril. Use of that excipient would be clearly contrary to a ready-to-use oral liquid formulation.

***vii. Claim 20 of the '482 Patent***

285. *The oral liquid formulation of claim 14, wherein the pH of the oral liquid formulation is less than about 3.5.*

286. Allen reported that the extemporaneous oral liquid formulation of enalapril using cherry syrup as the compounding vehicle had an apparent initial pH value of 3.9. (Allen at 1917) (and noting "Throughout the study, the change in apparent pH values of the oral liquids was <0.5 pH unit"[]). The indicated pH value can be obtained through routine experimentation and calculated as taught by de Villiers. (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

***viii. Claim 21 of the '482 Patent***

287. *The oral liquid formulation of claim 14, wherein the pH of the oral liquid formulation is between about 3 and about 3.5.*

288. Allen reported that the extemporaneous oral liquid formulation of enalapril using cherry syrup as the compounding vehicle had an apparent initial pH value of 3.9. (Allen at 1917) (and noting "Throughout the study, the change in apparent pH values of the oral liquids was <0.5 pH unit"[]). The indicated pH values can be obtained through routine experimentation and calculated as taught by de Villiers. (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

***ix. Claim 22 of the '482 Patent***

289. *The oral liquid formulation of claim 14, wherein the pH of the oral liquid formulation is about 3.3.*

290. Allen reported that the extemporaneous oral liquid formulation of enalapril using cherry syrup as the compounding vehicle had an apparent initial pH value of 3.9. (Allen at 1917.) (and noting "Throughout the study, the change in apparent pH values of the oral liquids was <0.5 pH unit"[]). The indicated pH value can be obtained through routine experimentation and calculated as taught by de Villiers. (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

***x. Claim 23 of the '482 Patent***

291. *The oral liquid formulation of claim 14, wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 18 months at about 5 +/- 3o C.*

292. The POSA from the teachings in the prior art on the stability of oral liquid formulations, including oral liquid formulations of enalapril, would have known how to optimize the stability of the enalapril oral liquid formulations in order to achieve at least 18 months storage at about 5 +/- 3$^{o}$ C (refrigerated conditions) which is an achievable goal at this low temperature

**EXHIBIT 3**

███████████ – ██████████████████████

storage.  A POSA would understand that "refrigerated" conditions include about 5 +/- 3º C.  (See, e.g., 11:34-38.)

### xi.      Claim 27 of the '482 Patent

293.    *The oral liquid formulation of claim 14, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate, and wherein the enalapril maleate is present in the oral liquid formulation at about 1.0 mg/ml.*

294.    The '747 patent discloses oral liquid formulations including enalapril maleate.  (*Id.* at 5:32-41.)  The Epaned insert describes Epaned containing enalapril maleate in 1 mg/ml oral solution.  (Insert at 11.)  Allen also reported on the stability of enalapril maleate 1.0 mg/ml extemporaneously prepared oral liquid formulation (Allen at 1915).

### xii.     Claim 28 of the '482 Patent

295.    *The oral liquid formulation of claim 14, wherein the buffer is present at a concentration between about 10 mM and about 20 mM in the oral liquid formulation.*

296.    A POSA would have known how to determine the concentration of the buffer by applying equations used in acid base equilibria and buffer calculations as taught in the prior art (e.g. de Villiers 2009 , Table 18.1at 226).

### D.    The Asserted Claims of the '621 Patent Would Have Beed Obvious to a POSA

### i.     Claim 1 of the '621 Patent

297.    *A stable oral liquid formulation, consisting essentially of:*

*(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;*

298.    Oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the '747 patent.  (*Id.* at 3:13-15) (about 0.5 – 5.0 mg/ml enalapril or a pharmaceutically acceptable salt thereof.)  Likewise, oral liquid formulations including about 0.6

to about 1.2 mg/ml of enalapril maleate are found in the Epaned Insert (Insert at 11), and Allen (Allen at 1915, 1918).

299. *(ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;*

300. The ’747 patent describes enalapril formulations including buffer mixtures of citric acid and sodium citrate. (*Id.* at 7:10-27). The Epaned Insert describes the components of Epaned, including it being buffered with citric acid and sodium citrate. (Insert at 10). Citric acid and sodium buffer is also present in the extemporaneously compounded oral liquids in Allen using Ora-Plus, Ora-Sweet, Ora-Sweet-SF and Cherry-Syrup as indicated in Table 1, Excipients and pH of Compounding Vehicles. The listed Compounding Vehicles have all a pH value of 4.2 The indicated buffer concentration can be obtained through routine experimentation and calculated as taught by de Villiers. (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

301. *(iii) a preservative, wherein the preservative is a paraben or a mixture of parabens; and*

302. The ’747 patent disclosed enalapril formulations containing preservatives, including parabens (*Id.* at 7:51-59). The Epaned Insert is described as “preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%). (Insert at 11). These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report. (Table 1, Excipients and pH of Compounding Vehicles.)

303. *(iv) water;*

304. Water is present in the extemporaneous oral liquid formulations of enalapril disclosed in the ’747 patent, Epaned Insert and Allen as shown in Table 1 of the Constantinides

**EXHIBIT 3**

███████████ ─ ██████████████████

Opening Report citing these and other prior art references wherein the formulation optionally comprises a sweetener, a flavoring agent, or both.

305.    *Wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;*

306.    The '747 patent provides a long list of sweeteners including sucralose. (*Id.* at 7:60-67; 8:1-37). As indicated in Table 1 in the Constantinides Opening Report, sucralose in also a sweetener present in the Cherry Syrup used in Allen. (Allen at 1915.)

307.    The Allen compounding vehicles used to prepare extemporaneous oral liquid formulations of enalapril maleate also contain sweeteners. Allen refers to these vehicles as being "Sweetened Vehicles." (Allen, Table 2 at 1918.)

308.    The '747 patent discloses enalapril formulations including a flavoring agent. (*Id.* 8:52-67; 9:1-8). The Epaned Insert describes Ora-Sweet SF that contains a flavoring agent (Insert at 11), which is citrus berry as indicated in Table 1 in the Constantinides Opening Report. The compounding vehicles used by Allen also contain flavoring agents as Table 1 in the Constantinides Opening Report indicates.

309.    *wherein the formulation is stable at about 5 +/- 3o C for at least 12 months;*

310.    The POSA from the teachings in the prior art on the stability of oral liquid formulations, including oral liquid formulations of enalapril, would have known how to optimize the stability of the enalapril oral liquid formulations in order to achieve at least 18 months storage at about 5 +/- 3o C (refrigerated conditions) which is an achievable goal at this low temperature storage. A POSA would understand that "refrigerated" conditions include about 5 +/- 3o C. (See, e.g., '747 patent,11:34-38.)

EXHIBIT 3

██████████ – ████████████████████████

311.   *and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.*

312.   Allen reports 60-day stability of a 1 mg/ml enalapril maleate in extemporaneously compounded oral liquid formulations stored at 5 and 25° C (Table 2 at 1918) where the formulation maintained at least about 95% w/w or greater of the initial enalapril amount at the end of the storage period.

### ii.    *Claim 2 of the '621 Patent*

313.   *The stable oral liquid formulation of claim 1, comprising a sweetener.*

314.   The '747 patent disclosed a long list of sweeteners including sucralose. (*Id.* at 7:60-67; 8:1-37). As indicated in Table 1 in the Constantinides Opening Report, sucralose in also a sweetener present in the Cherry Syrup used in Allen. (Allen at 1915.) The Allen compounding vehicles used to prepare extemporaneous oral liquid formulations of enalapril maleate also contain sweeteners. Allen refers to these vehicles as "Sweetened Vehicles." (Allen Table 2 at 1918.)

### iii.    *Claim 3 of the '621 Patent*

315.   *The stable oral liquid formulation of claim 1, comprising a flavoring agent.*

316.   The '747 patent discloses enalapril formulations including a flavoring agent (*Id.* at 8:52-67; 9: 1-8). The Epaned Insert dicloses Ora-Sweet SF that contains a flavoring agent (Insert at 11), which is citrus berry as indicated in Table 1 in the Constantinides Opening Report. The compounding vehicles used by Allen also contain flavoring agents as indicated in Table 1.

### iv.    *Claim 4 of the '621 Patent*

317.   *The stable oral liquid formulation of claim 1, wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.*

**EXHIBIT 3**

██████████ – ███████████████████

318.    All these buffers are listed in the specification of the '747 patent. (*Id.* at 7:17-41.) The Epaned insert states that Epaned is buffered with citric acid and sodium citrate.  (Insert at 11.) As Table 1 in the Constantinides Opening Report indicates, the compounding vehicles used in Allen and other prior art references, are buffered with sodium phosphate and citric acid (Ora-Plus and Ora-Sweet) or citric acid and sodium citrate (Ora-Sweet SF and SyrSpend SF-Cherry).

### v.    Claim 5 of the '621 Patent

319.    *The stable oral liquid formulation of claim 1, wherein the buffer concentration is about 10 mM to about 20 mM.*

320.    The specified buffer concentration range can be obtained through routine experimentation and calculated as taught by de Villiers.  (Section VI.B., above, Table 18.1 at 226.)

### vi.    Claim 6 of the '621 Patent

321.    *The stable oral liquid formulation of claim 1, wherein the buffer maintains the pH between about 3 and about 4.*

322.    Allen reported that the extemporaneous oral liquid formulation of enalapril using cherry syrup as the compounding vehicle had an apparent initial pH value of 3.9. (Allen at 1917) (and noting "Throughout the study, the change in apparent pH values of the oral liquids was <0.5 pH unit"[]).

### vii.    Claim 7 of the '621 Patent

323.    *The stable oral liquid formulation of claim 1, wherein the buffer maintains the pH at about 3.3.*

324.    Allen reported that the extemporaneous oral liquid formulation of enalapril using cherry syrup as the compounding vehicle had an apparent initial pH value of 3.9. (Allen 1917) (and noting "Throughout the study, the change in apparent pH values of the oral liquids was <0.5 pH unit"[]).

**EXHIBIT 3**

[redacted] – [redacted]

***viii. Claim 8 of the'621 Patent***

325. *The stable oral liquid formulation of claim 1, comprising about 1.0 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof.*

326. The '747 patent discloses oral liquid formulations including enalapril maleate. (*Id.* at 5:32-41.) The Epaned insert describes Epaned containing enalapril maleate in 1 mg/ml oral solution. (Insert at 11.) Allen reported on the stability of enalapril maleate 1.0 mg/ml extemporaneously prepared oral liquid formulation. (Allen at 1915.)

***ix. Claim 9 of the '621 Patent***

327. *The stable oral liquid formulation of claim 1, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate.*

328. Enalapril maleate is disclosed in '747 patent (5:32-41), in the Epaned Insert (Insert at 11) and in Allen. (Allen at 1915.)

***x. Claim 10 of the '621 Patent***

329. *The stable oral liquid formulation of claim 1, wherein the preservative is a mixture of parabens.*

330. The '747 patent disclosed enalapril formulations containing preservatives, including parabens. (*Id.* at 7:51-59). The Epaned Insert is described as "preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%) (Insert at 11). These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report.

***xi. Claim 11 of the '621 Patent***

331. *The stable oral liquid formulation of claim 1, wherein the paraben or the mixture of parabens is methylparaben, ethylparaben, propylparaben, butylparaben, salts thereof, or a combination thereof.*

**EXHIBIT 3**

█████████ – █████████████████

332.    The '747 patent disclosed enalapril formulations containing preservatives, including parabens (*Id.* at 7:51-59).   The Epaned Insert is described as "preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%).   (Insert at 11.) These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report. Further, methyl paraben and ethyl paraben are disclosed in the WO '425 reference with lisinopril dihydrate another ACE inhibitor (WO '425 at Example 1).   A POSA would have been motivated by the disclosure of WO '425 to use methyl paraben with enalapril because it is also an ACE inhibitor with not totally dissimilar and somewhat analogous chemical structures and similar stability features and considerations.

> ### xii.    Claim 12 of the '621 Patent

333.    *The stable oral liquid formulation of claim 1, wherein the preservative is a mixture of methylparaben and propylparaben.*

334.    The Epaned Insert is described as "preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%).   (Insert at 11). These three preservatives are present in the compounding vehicle Ora-Sweet SF (Table 1 in the Constantinides Opening Report) that was used in Epaned.

> ### xiii.    Claim 13 of the '621 Patent

335.    *The stable oral liquid formulation of claim 1, wherein the paraben or the mixture of parabens is present at about 0.1 mg/ml to about 2 mg/ml in the oral liquid formulation.*

336.    A POSA understands that 0.1 mg/ml corresponds to 0.01% and 2 mg/ml to 0.2 %, because it is a simple, well-known conversion of mg/ml to % w/w.   In Epaned, methylparaben is present at (0.03%) and propyl paraben at (0.008%), (Epaned Insert at 11), thus, the concentration of methylparaben alone or in a mixture with propyl paraben falls within the concentration range of

**EXHIBIT 3**

███████████ – ███████████

Claim 13.  Methylparaben concentration in commercial liquid drug formulations were reported to be in range from 0.03-0.55%.  (Boukarim at 16.)

> ### xiv.    Claim 16 of the '621 Patent

337.    *he stable oral liquid formulation of claim 1, wherein the paraben or the mixture of parabens is present at about 2% w/w to about 30% w/w of the solids in the oral liquid formulation.*

338.    First, it should be pointed out that the percentage range of the mixture of parabens in Claim 16 is in reference to the solids in the oral liquid formulation and not to the entire formulation where the levels of the paraben(s) are significantly lower.    Methylparaben concentration in commercial liquid drug formulations were reported to be in range from 0.03-0.55%.   (Boukarim at 16.)   The '747 patent disclosed enalapril formulations containing preservatives, including parabens.  (*Id.* at 7:51-59).  The Epaned Insert is described as "preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%).  (Insert at 11). These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report.

> ### xv.    Claim 17 of the '621 Patent

339.    *The stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5 +/- 3º C for at least 18 months.*

340.    The '747 patent discloses enalapril oral liquid formulations containing preservatives including parabens …. At refrigerated and ambient conditions for many time periods including for at least 18 months.  (*Id.* at 11:7-12.)  A POSA knows that "refrigerated" conditions include about 5 +/- 3º C.  (See '747 patent, at 11:34-38.)  In addition, a POSA at the time of the '747 patent would have a reasonable expectation of success of formulating the known active enalapril maleate, in a known oral liquid formulation stable for at least 91 days.  (Nahata at 1156.)  From there it would be a matter of routine experimentation to achieve longer stability times.

***xvi. Claim 18 of the ’621 Patent***

341. *The stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5 +/- 3º C for at least 24 months.*

342. The ’747 patent discloses enalapril oral liquid formulations containing preservatives including parabens …. At refrigerated and ambient conditions for many time periods including for at least 24 months. (*Id.* at 11:7-12.) A POSA knows that “refrigerated” conditions include about 5 +/- 3º C. (*See* ’747 patent, at 11:34-38.) In addition, a POSA at the time of the ’747 patent would have a reasonable expectation of success of formulating the known active enalapril maleate, in a known oral liquid formulation stable for at least 91 days. (Nahata at 1156.) From there it would be a matter of routine experimentation to achieve longer stability times.

***xvii. Claim 19 of the ’621 Patent***

343. *A stable oral liquid formulation, consisting essentially of:*

344. Oral liquid formulations of enalapril are disclosed in the prior art. For example, ’747 patent discloses oral liquid formulations. (*Id.* at 2:7-21). Likewise, the Epaned Insert and Allen references disclose oral liquid formulations of enalapril maleate. (Insert at Dosage Forms and Strengths; Allen at 1915.)

345. *(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;*

346. Oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the ’747 patent. (*Id.* at 3:13-15) (0.5 – 5.0 mg/ml enalapril or a pharmaceutically acceptable salt thereof.) Likewise, oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the Epaned Insert (11), and Allen (1915, 1918).

**EXHIBIT 3**

███████████ – ███████████████████

347.    *(ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;*

348.    The '747 patent describes enalapril formulations including buffer mixtures of citric acid and sodium citrate (*Id.* at 7:10-27).  The Epaned Insert describes the components of Epaned, including it being buffered with citric acid and sodium citrate.  (Insert at 10).  Citric acid and sodium buffer is also present in the extemporaneously compounded oral liquids in Allen using Ora-Plus, Ora-Sweet, Ora-Sweet-SF and Cherry-Syrup as indicated in Table 1. Excipients and pH of Compounding Vehicles.  The indicated buffer pH and concentration can be obtained through routine experimentation and calculated as taught by de Villiers.  (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

349.    *(iii) a preservative, wherein the preservative is methylparaben, ethylparaben, propylparaben, butylparaben, or a combination thereof; and*

350.    The '747 patent disclosed enalapril formulations containing preservatives, including parabens (*Id.* at 7:51-59).  The Epaned Insert discloses the formulation of enalapril maleate as "preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%).  (Insert at 11.)  These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report. Ethyl paraben was included in the WO '425 publication with lisinopril (Example 1).

351.    *(iv) water;*

352.    Water is present in the extemporaneous oral liquid formulations of enalapril disclosed in the '747 patent, Epaned Insert and Allen as shown in Table 1 of the Constantinides Opening Report citing these and other prior art references.

EXHIBIT 3

███████████ – ██████████████████████

353.    *wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;*

354.    The '747 patent discloses use of sweeteners and flavoring agents in enalapril maleate oral liquid formulations.  (*Id.* at 11:61-12:12).

355.    *wherein the formulation is stable at about 5 +/- 3o C for at least 12 months; and*

356.    The '747 patent discloses enalapril oral liquid formulations containing preservatives including parabens … at refrigerated and ambient conditions for many time periods including for at least 24 months.  (Id. at 11:7-12.)  A POSA knows that "refrigerated" conditions include about 5 +/- 3o C.  (See '747 patent, at 11:34-38.)

357.    *wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.*

358.    The '747 patent discloses enalapril powder formulations, reconstituted into oral liquid enalapril maleate formulations, that are stable, maintaining 95% w/w or greater of initial enalapril amount (*id.* at 10:51-56, 11:3-6) for storage of at least 12 months (*id.* at 11:7-17).

359.    Allen reports 60-day stability of a 1 mg/ml enalapril maleate in extemporaneously compounded oral liquid formulations stored at 5 and 25 °C (Table 2, at 1918) where the formulation maintained at least about 95% w/w or greater of the initial enalapril amount at the end of the storage period.

> *xviii.    Claim 20 of the '621 Patent*

360.    *The stable oral liquid formulation of claim 19, wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.*

361. All these buffers are disclosed as listed in the specification of the ’747 patent. (*Id.* at 7:17-41.) The Epaned insert states that Epaned is buffered with citric acid and sodium citrate. (Insert at 11.) As Table 1 in the Constantinides Opening Report indicates, the compounding vehicles used in Allen and other prior art references, are buffered with sodium phosphate and citric acid (Ora-Plus and Ora-Sweet) or citric acid and sodium citrate (Ora-Sweet SF and SyrSpend SF-Cherry).

***xix. Claim 21 of the ’621 Patent***

362. *The stable oral liquid formulation of claim 19, wherein the buffer concentration is about 10 mM to about 20 mM.*

363. The ’747 patent describes enalapril formulations including buffer mixtures of citric acid and sodium citrate. (*Id.* at 7:10-27). The Epaned Insert describes the components of Epaned, including it being buffered with citric acid and sodium citrate. (Insert at 10). Citric acid and sodium buffer is also present in the extemporaneously compounded oral liquids in Allen using Ora-Plus, Ora-Sweet, Ora-Sweet-SF and Cherry-Syrup as indicated in Table 1, Excipients and pH of Compounding Vehicles, above. The indicated buffer concentration can be obtained through routine experimentation and calculated as taught by de Villiers. (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

***xx. Claim 22 of the ’621 Patent***

364. *The stable oral liquid formulation of claim 19, wherein the buffer maintains the pH between about 3 and about 4.*

365. Allen reported that the extemporaneous oral liquid formulation of enalapril using cherry syrup as the compounding vehicle had an apparent initial pH value of 3.9. (Allen at 1917).

***xxi. Claim 23 of the ’621 Patent***

**EXHIBIT 3**

[REDACTED] – [REDACTED]

366. *The stable oral liquid formulation of claim 19, wherein the buffer maintains the pH at about 3.3.*

367. Allen reported that the extemporaneous oral liquid formulation of enalapril using cherry syrup as the compounding vehicle had an apparent initial pH value of 3.9. (Allen at 1917) (and noting "Throughout the study, the change in apparent pH values of the oral liquids was <0.5 pH unit"[]).

***xxii. Claim 24 of the '621 Patent***

368. *The stable oral liquid formulation of claim 19, comprising about 1.0 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof.*

369. "Oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the '747 patent. (*Id.* at 3:13-15) (0.5 – 5.0 mg/ml enalapril or a pharmaceutically acceptable salt thereof.) Likewise, oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the Epaned Insert (at 11), and Allen (at 1915, 1918).

***xxiii. Claim 25 of the '621 Patent***

370. *The stable oral liquid formulation of claim 19, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate.*

371. "Oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the '747 patent. (*Id.* at 3:13-15) (0.5 – 5.0 mg/ml enalapril or a pharmaceutically acceptable salt thereof.) Likewise, oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the Epaned Insert (at 11), and Allen (at 1915, 1918).

***xxiv. Claim 26 of the '621 Patent***

EXHIBIT 3

██████████ – █████████████████

372.   *The stable oral liquid formulation of claim 19, wherein the preservative is a mixture of parabens that are selected from methylparaben, ethylparaben, propylparaben, and butylparaben.*

373.   The '747 patent disclosed enalapril formulations containing preservatives, including parabens.  (*Id.* at 7:51-59).  The Epaned Insert is described as "preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%).  (Insert at 11).  These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report.

### xxv.   Claim 27 of the '621 Patent

374.   *The stable oral liquid formulation of claim 19, wherein the preservative is present at about 0.1 mg/ml to about 2 mg/ml in the oral liquid formulation.*

375.   Oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the '747 patent.  (*Id.* at 3:13-15) (0.5 – 5.0 mg/ml enalapril or a pharmaceutically acceptable salt thereof.)  Likewise, oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the Epaned Insert (at 11), and Allen (at 1915, 1918).

### xxvi.   Claim 30 of the '621 Patent

376.   *A stable oral liquid formulation, consisting essentially of:*

377.   Oral liquid formulations of enalapril are disclosed in the prior art.  For example, '747 patent discloses oral liquid formulations.  (*Id.* at 2:7-21).  Likewise, the Epaned Insert and Allen references disclose oral liquid formulations of enalapril maleate.  (Insert at Dosage Forms and Strengths; Allen at 1915.)

378.   *(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;*

379. Oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the ’747 patent. (0.5 – 5.0 mg/ml enalapril or a pharmaceutically acceptable salt thereof. (*Id.* at 3:13-15). Likewise, oral liquid formulations including about 0.6 to about 1.2 mg/ml of enalapril maleate are found in the Epaned Insert (at 11), and Allen (at 1915, 1918).

380. *(ii) a buffer to maintain the pH about 4.5 or below;*

381. The ’747 patent describes enalapril formulations including buffer mixtures of citric acid and sodium citrate. (*Id.* at 7:10-27). The Epaned Insert describes the components of Epaned, including it being buffered with citric acid and sodium citrate. (Insert at 10). Citric acid and sodium buffer is also present in the extemporaneously compounded oral liquids in Allen using Ora-Plus, Ora-Sweet, Ora-Sweet-SF and Cherry-Syrup as indicated in Table 1, Excipients and pH of Compounding Vehicles. The indicated buffer concentration can be obtained through routine experimentation and calculated as taught by de Villiers. (Table 18.1 Equations Useful in Acid-Base Calculations at 226.)

382. *(iii) a preservative, wherein the preservative is methylparaben, ethyparaben, propylparaben, butylparaben, or a combination thereof; and*

383. The ’747 patent disclosed enalapril formulations containing preservatives, including parabens. (*Id.* at 7:51-59). The Epaned Insert is described as “preserved with methylparaben (0.03%), propyl paraben (0.008%) and potassium sorbate (0.1%). (Insert at 11). These preservatives are also present in the extemporaneously compounded oral liquid formulations of enalapril as shown in Table 1 of the Constantinides Opening Report.

384. *(iv) water;*

EXHIBIT 3

███████████ – ████████████████

385.   Water is present in the extemporaneous oral liquid formulations of enalapril disclosed in the '747 patent, Epaned Insert and Allen as shown in Table 1 of the Constantinides Opening Report citing these and other prior art references.

386.   *wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;*

387.   The '747 patent discloses use of sweeteners and flavoring agents in enalapril maleate oral liquid formulations.  (*Id.* at 11:61-12:12.)

388.   *wherein the formulation is stable at about 5+/-3º C for at least 12 months; and*

389.   The '747 patent discloses enalapril oral liquid formulations containing preservatives including parabens … At refrigerated and ambient conditions for many time periods including for at least 24 months.  (*Id.* at 11:7-12.)  A POSA would understand that "refrigerated" conditions include about 5 +/- 3º C.  (See, e.g., 11:34-38.)

390.   *wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less toral impurity or related substances at the end of the given storage period.*

391.   The '747 patent discloses enalapril powder formulations, reconstituted into oral liquid enalapril maleate formulations, that are stable, maintaining 95% w/w or greater of initial enalapril amount (*Id.* at 10:51-56, 11:3-6) at the storage of at least 12 months (*Id.* at 11:7-17.)

392.   Allen reports 60-day stability of a 1 mg/ml enalapril maleate in extemporaneously compounded oral liquid formulations stored at 5 and 25° C (Table 2 at 1918) where the formulation maintained at least about 95% w/w or greater of the initial enalapril amount at the end of the storage period.

   **E.   Azurity's Alleged Secondary Considerations Do Not Support the Non-Obviousness of the Asserted Claims**

94

EXHIBIT 3

██████████ – ███████████████████████

### i.   There Exists No Nexus Between the Commercial Product Epaned® Oral Solution and the Asserted Claims

393.   Plaintiff Azurity admitted during a discovery dispute hearing with the Court on July 5, 2022, that the Asserted Claims do not cover the product at issue in this lawsuit, Epaned® oral solution.  There exists no nexus between any secondary consideration of non-obviousness alleged by Azurity and Asserted Claims at issue in this lawsuit.

394.   Azuirity's expert Dr. Little states, that "there is a nexus between the objective indicia and the claimed inventions." (Little Resp. Rpt. ¶ 154.) Dr. Little failed to state what this nexus is between the claims asserted in this case and the relevant commercial product here: Epaned® Solution.  Neither Azuiryt's experts, Dr. Little and Dr. Mahan, have stated what the nexus is between the Asserted Claims and the Epaned® oral solution that is the subject of this lawsuit.

395.   The Asserted Claims in this lawsuit are:  claims 14-23 and 27-28 of the '482 patent, and claims 1-13, 16-27, and 30 of the '621 patent.  None of the claims at issue in this lawsuit claim sodium benzoate as the claimed preservative.  The claimed preservative in all the claims at issue here are "a paraben or a mixture of parabens."  The preservative in the Epaned® Solution is sodium benzoate.  Sodium benzoate is not a paraben or a mixture of parabens and POSA would readily understand this.  The asserted claims do not cover the Epaned® Solution product and there can be no nexus.  Both Azurity experts Dr. Little and Dr. Mahan overlook analyzing nexus in this lawsuit.

### ii.   There Were No Unexpected Results Relevant to the Asserted Claims

396.   In Dr. Mosher's May 15, 2020 Declaration in the USPTO on Enalapril Formulations, Serial No. 16/177,159 which was filed October 31, 2018 and led to the '482 patent and the removal of the word "stable" in the claims, on paragraph 12 he states, "The oral enalapril formulations of the '159 application have superior stability-they are stable at 5 ±3° C for 12 months

or longer with minimal degradation. The stability is an important aspect of the present formulations. It contributes to the consistency and uniformity of the formulations as well as the accuracy of dosing to patients." In reference to the stability data presented in Dr. Mosher's declaration, using sodium benzoate as a preservative, the longest storage time employed for most of the evaluated formulations to determine stability of enalapril maleate towards drug degradation by assaying the content of the degradants diketopiperazine and enalaprilat, was 62 weeks or approximately 15 months (Mosher, October 31, 2018 Declaration, Table E-2, p. 4), except one particular formulation stored and tested after approx. 18 months, example E-7. The same stability data of the liquid formulations up to 62 weeks storage at 5° C is also presented in Table E-2, at columns 38-39 in both the '482 and '621 patents. Data with example E-7 is not included in this Table. To the extent that Dr. Mosher considers the obtained stability of a RTU liquid formulation of enalapril maleate to be an unexpected advantage, this is incorrect for the following reasons. First, the obtained 62-week real time stability data with the refrigerated enalapril maleate liquid formulations do not support the stability data claimed in the specification upon storage up to at least 36 months (e.g., '482 patent, 18: 64-67; '621 patent, 19: 15-20) because that data disclosed in the patents came from formulations using sodium benzoate as the preservative, not a paraben or a mixture of parabens. Second, the required shelf-life of a marketed typical drug product, especially of a small molecule therapeutic, is at least 18 months and preferably 24 months based on supporting real time stability data at these storage times; "minimum long-term storage time of 12 months at 5° C ± 3° C supported by data is required at submission to the FDA." (2003 FDA Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products.) Therefore, this length of time is a minimum FDA requirement and there is nothing unusual or unexpected about it. Third, storage of a drug product at refrigerated conditions (5 ±3° C) especially

for small molecule therapeutics, such as enalapril, is considered disadvantageous from a commercialization and marketing perspectives particularly during transportation and distribution of the drug product to the patients because it is inconvenient and costly, also not suggesting unexpected results. Fourth, there existed oral liquid solution formulations of various drugs on the market prior to March 18, 2016, that used the same excipients as the enalapril formulations and could be stored at room temperature. (See Strickley Table 2, Selected Listing of Commercially Available Pediatric Oral Formulations-Ready-to-Use.) Last, for a patent applicant to show unexpected results, they need to compare the claimed subject matter at issue to the closest prior art. Dr. Mosher in his two other declarations, the one submitted on February 2, 2017 on the application 15/081,603 filed March 25, 2016 and the other one that was submitted on May 14, 2020 on the application 16/242,898 which was filed on January 8, 2019 compared the stability of various enalapril liquid formulations to those of Nahata and failed to compare them to those in the '747 patent which is the closest prior art (as well as the Epaned Insert and Allen references).

***iii. There Was No Long Felt Unmet Need Relevant to the Asserted Claims***

397. Plaintiff Azurity admitted during a discovery dispute hearing with the Court on July 5, 2022, that the Asserted Claims do not cover the product at issue in this lawsuit, Epaned® oral solution. There is no nexus between the secondary consideration long felt unmet need and the product allegedly meeting a purported long felt unmet need.

398. To be accorded substantial weight, secondary-consideration evidence must have a "nexus" to the claimed invention, which requires a legally and factually sufficient connection. A patent owner is entitled to a presumption of nexus if the asserted evidence is tied to a specific product that embodies and is coextensive with the claimed features. A presumption of nexus does not require a perfect correspondence between a product and the claimed features. The patent owner

EXHIBIT 3
■■■■■■■■■■ – ■■■■■■■■■■■■■■■■■

must, however, demonstrate a substantial correspondence such that the product is essentially the claimed invention.

399.    The Epanaed® oral solution at issue in this lawsuit contains as a preservative sodium benzoate.  The Asserted Claims in this lawsuit all include the claim element "a paraben or a mixture of parabens" as the claimed preservative.  None of the claims at issue in this lawsuit claim sodium benzoate as the preservative.

400.    A POSA would understand that sodium benzoate is not a paraben or a mixture of parabens. These two types of preservatives are literally different and a POSA would not consider them to be the same or equivalent.  Claim 1 of the '482 patent claims as the preservative sodium benzoate and apart from this difference is in all other respects the same as claim 14, which claims as the preservative, a paraben or mixture of parabens.  The named inventors, as well as the USPTO understood that sodium benzoate is different from a paraben or a mixture of parabens.

401.    Azuirty in the course of fact and expert discovery in this case made no argument that the accused Alkem ANDA Product meets a long felt unmet need.  The argument was suggested by counsel for Azurity for the first time during a discovery dispute hearing with the Court on July 5, 2022. Alkem had no prior notice. During the discovery dispute hearing, Azurity's counsel gave no analysis or explanation given how or why the accused Alkem ANDA Product met a purported long felt unmet need.

### iv.    There Was No Failure of Others Relevant to the Asserted Claims

402.    Azurity's expert Dr. Little in paragraph 161 of his Rebuttal Report states, "The failure of others to formulate an enalapril liquid formulation with particular level of stability required by the Asserted claims, i.e., that the formulation maintains 95% w/w or more of the initial enalapril amount when stored at 5 ±3° C for 12 months, is demonstrated in the prior art cited by Dr. Constantinides and supports non-obviousness." This is incorrect for at least two reasons. First,

the prior art references cited in the Rabinow Opening Report, and in Alkem's invalidity contentions, were investigating reconstituted liquid formulations of enalapril and not RTU liquid formulations. The existence of reconstituted enalapril formulations does not also mean that drug formulation workers in the field had tried and failed to produce an RTU type formulation of enalapril.

403. Second, Dr. Little provides no facts or evidence showing other drug formulation workers or drug development companies actually tried and failed to develop an RTU liquid formulation of enalapril with the particular level of stability required by the asserted claims. Neither Azurity nor its experts have identified any facts or evidence showing that other workers in the relevant field actually tried to develop an RTU liquid formulation of enalapril with the particular level of stability required by the asserted claims and failed.

404. A POSA as defined in the Rabinow Opening Report had teaching and knowledge of RTU oral liquid formulations of various drugs, including other ACE inhibitors that were structurally similar to enalapril (e.g., lisinopril) prior to March 18, 2016, and so developing a RTU liquid formulation of enalapril could readily be done and a POSA would reasonably expect success in doing so.

## VIII. THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112, BECAUSE THE PATENTS-IN-SUIT DO NOT PROVIDE AN ADEQUATE WRITTEN DESCRIPTION OF THE CLAIMED INVENTION

### A. The Asserted Claims of the '482 Patent Lack Adequate Written Description

405. Claims 14-23, and 27-28 of the '482 Patent are invalid for lack of written description.

406. Independent claim 14 claims an oral liquid formulation, comprising elements (i) – (iv), and element (iii) states "about 1 mg/ml of a preservative, wherein the preservative is a paraben

EXHIBIT 3

██████████ – ██████████████████████

or a mixture of parabens;" and wherein "the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3° C."

407.    All the claims asserted against Alkem in from the '482 patent claim a formulation that must include "a paraben or a mixture of parabens" and that "the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3° C."  There is no written description in the '482 patent that indicates to a POSA that the named inventors had invented or were in possession of such a formulation.

408.    The '482 patent specification includes Examples A-H.  Only examples A and C disclose formulations including the combination of sodium methylparaben and sodium proplyparaben.  ('482 patent, 31:25-45; 33:63-34:17.)

409.    Table A-2 does not show that the formulations A1-A6 maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3° C.  ('482 patent, 31:50-67.)  Table A-2 is labelled, "Primary Degradants Present in the Formulations," stating "Hours at 60° C."  *Id.*  That table shows a maximum of 180 hours, which equates to just 7.5 days.  None of Table A-2, nor any of the description associated with Example A, describe what atmospheric conditions were used, suggesting they were uncontrolled.

410.    A POSA would expect that accelerated stability be taken over certain standard, accepted conditions, for example, at 40o C+/-2° C/75% RH +/- 5% RH.  See e.g., Lucas, T.I. et al.; A Stability Program for the Distribution of Drug Products, Pharmaceutical Technology, July 2014 pp. 68-73.  The conditions stated in Example A do not reflect conditions that a POSA would understand to represent, or be approximate to, accelerated stability conditions.  The information associated with Example A, and particularly in Table A-2, would not represent to a POSA proof of anything, including stability of any of the formulations A1-A6.  A POSA would not conclude

**EXHIBIT 3**

████████ – ██████████████

from the data in Table A-2 that the formulations described there would maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3º C.

411.   Table C-2 does not show the formulations C1-C5 described there maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3º C.  That table shows storage of the formulations C1-C5 at 5º C for up to 8 weeks, but no longer.  (*Id.* at 34:23-44.)  The patent specification shows no data, no example, and no description of any formulations in Example C, that include a paraben or a mixture of parabens as the preservative, that maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3º C.  A POSA would not conclude from the information in Table C-2 that the formulations shown there would maintain about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3º C.

412.   There exists no data, description, or examples showing that the formulations in claims 14-23, and 27-28 of the '482 patent, which all include the claim element "a paraben or a mixture of parabens" as the preservative and the claim element "maintain[] about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3º C."  Nothing in the specification of the '482 patent indicates to a POSA that the named inventors of the '482 patent had possession of the subject matter claimed in 14-23, and 27-28 of the '482 patent.  Claims 14-23, and 27-28 of the '482 patent are invalid for lack of written description.

413.   Furthermore, a POSA would not consider a formulation that used sodium benzoate as a preservative, in the limited circumstances as disclosed in the '482 patent, to be indicative or

predictive at all for how a formulation using a paraben or a mixture of parabens would affect the formulation or what degree of "stability" that formulation would demonstrate. A POSA does not consider sodium benzoate and "a paraben or a mixture of parabens" to be interchangeable to any degree. Therefore, the absence of any disclosure of data, examples, or information of the claimed subject matter using a paraben or a mixture of parabens in the claimed formulations with the claimed "stability" indicate to a POSA that the named inventors did not have possession of the claimed invention, claiming a preservative that is a paraben or a mixture of parabens.

**B. The Asserted Claims of the '621 Patent Lack Adequate Written Description**

414. Claims 1-13, 16-27, and 30 of the '482 Patent are invalid for lack of adequate written description.

415. As stated above, the '621 patent issued from a continuation patent application that claimed priority to the patent application that issued as the '482 patent. Therefore, the specification of the '621 patent is substantially identical to the specification of the '482 patent, including the same examples and same data stated therein. Based on this information the claims of the '621 patent are invalid for lack of written description for all of the reasons stated above, in section XI.B.1, above.

416. Claims 1, 19, and 30 of the '621 patent are independent claims. Claim 1 claims as element (iii) "a preservative, wherein the preservative is a paraben or a mixture of parabens;" and claims 19 and 30 both claim at element (iii), "a preservative, wherein the preservative is methylparaben, ethylparaben, propylparaben, butylparaben, or a combination thereof." ('621 patent, 42:9-10, 43:8-10, and 44:22-24, respectively.) Therefore, the arguments and bases for the lack of written description for the '482 patent claims apply equally to the '621 claims.

417. The written description of the '621 patent does not convey the POSA that the inventors had possession of the claimed invention. There exists no data, description, or examples

EXHIBIT 3

████████  –  ██████████████

showing that the formulations in claims 1-13, 16-27, or 30 of the '621 patent, claim 1 of which includes the element "a preservative, wherein the preservative is a paraben or a mixture of parabens" and claims 19 and 30 include the element, "a preservative, wherein the preservative is methylparaben, ethylparaben, propylparaben, butylparaben, or a combination thereof" and the claim element "maintain[] about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3° C." Nothing in the specification of the '621 patent indicates to a POSA that the named inventors of the '621 patent had possession of the subject matter claimed in 1-13, 16-27, or 30 of the '621 patent. Claims 1-13, 16-27, or 30 of the '621 patent are invalid for lack of written description.

418.   Furthermore, a POSA would not consider a formulation that used sodium benzoate as a preservative, in the limited circumstances as disclosed in the '621 patent, to be indicative or predictive at all for how a formulation using a paraben or a mixture of parabens would affect the formulation or what degree of "stability" that formulation would demonstrate. A POSA does not consider sodium benzoate and "a paraben or a mixture of parabens" to be interchangeable to any degree. Therefore, the absence of any disclosure of data, examples, or information of the claimed subject matter using a paraben or a mixture of parabens in the claimed formulations with the claimed "stability" indicate to a POSA that the named inventors did not have possession of the claimed invention, claiming a preservative that is a paraben or a mixture of parabens.

## IX.   THE ASSERTED CLAIMS INVALID UNDER 35 U.S.C. § 112, BECAUSE THE PATENTS-IN-SUIT FAIL TO ENABLE A POSA TO MAKE AND USE THE CLAIMED INVENTION WITHOUT UNDUE EXPERIMENTATION

### A.   The Asserted Claims of the '482 Patent Are Not Enabled

419.   Claims 14-23 and 27-28 of the '482 Patent are invalid for failure to enable a POSA to make and use the claimed invention without undue experimentation.

420. In addition, based on the above discussion of the omissions of competent, reliable data in the ’482 patent Examples A and C, including the Tables and discussion associated with Examples A and C, a POSA would conclude that the patent specification does not provide sufficient information to allow one to make and use the invention.

421. For the avoidance of doubt, and as discussed above with regard to lack of written description, there is no example, no data, and no description in the ’482 patent specification of any formulation with "a paraben or a mixture of parabens" that "maintain[] about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3° C." There exists no information in the patent specification that would allow a POSA to make and use the subject matter claimed in 14-23, and 27-28 of the ’482 patent. This is because the POSA would in essence be required to conduct experiments using the formulations in Examples A and C and perform controlled stability studies at 5+/-3° C for: 12 months, 13 months, 14 months, and etc. to assess make and use the invention. Moreover, like for Example A and Table A-2, no atmospheric conditions were stated for the experiments that resulted in the data in Table A-2. This lack of disclosure would require the POSA to conduct undue experimentation to recreate the formulations, experiment with various atmospheric conditions, and monitor them over 12, 13, 14, 15, and etc. months and be forced to experiment with conditions with almost no guidance from the patent itself.

422. Claims 14-23, and 27-28 of the ’482 patent are invalid because the patent specification does not provide sufficient information to allow one to make and use the claimed invention.

**B. The Asserted Claims of the ’621 Patent Are Not Enabled**

423. Claims 1-13, 16-27, and 30 of the ’482 Patent are invalid for failure to enable a POSA to make and use the claimed invention without undue experimentation

424. In addition, based on the above discussion of the omissions of competent, reliable data in the '482 and '621 patents' Examples A and C, including the Tables and discussion associated with Examples A and C, a POSA would conclude that the patent specification does not provide sufficient information to allow one to make and use the invention.

425. For the avoidance of doubt, and as discussed above with regard to lack of written description, there is no example, no data, and no description in the '621 patent specification of any formulation with "a paraben or a mixture of parabens" or "a preservative, wherein the preservative is methylparaben, ethylparaben, proplylparaben, butylparaben, or a combination thereof" that "maintain[] about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5+/-3° C." There exists no information in the patent specification that would allow a POSA to make and use the subject matter claimed in claims 1-13, 16-27, and 30 of the '621 patent. This is because the POSA would in essence be required to conduct experiments using the formulations in Examples A and C and perform controlled stability studies at 5+/-3° C for: 12 months, 13 months, 14 months, and etc. to assess make and use the invention. Moreover, like for Example A and Table A-2, no atmospheric conditions were stated for the experiments that resulted in the data in Table A-2. This lack of disclosure would require the POSA to conduct undue experimentation to recreate the formulations, experiment with various atmospheric conditions, and monitor them over 12, 13, 14, 15, and etc. months and be forced to experiment with conditions with almost no guidance from the patent itself.

426. Claims 1-13, 16-27, and 30 of the '621 patent are invalid because the patent specification does not provide sufficient information to allow one to make and use the claimed invention.

## X. THE ASSERTED CLAIMS OF THE 621 PATENT ARE INVALID UNDER 35 U.S.C. § 112, BECAUSE THE CLAIMS ARE INDEFINITE

EXHIBIT 3

███████████  –  ███████████████████████

### A.   The Claim Term "Stable" in the Asserted Claims of the '621 Patent Is Indefinite Rendering the Asserted Claims Containing That Term Invalid

#### i.   *The common specifications do not inform the POSA of the scope of the Asserted Claims of the '621 Patent with Reasonable Clarity*

427.   Each of the claim of the '621 patent is directed to a "stable oral liquid formulation" and each claim of the '482 patent incorporates the specification's standard for stability without claiming a "stable" formulation.  The specification of these patents does state that, "stabile as used herein refers to enalapril **oral liquid formulations** having about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of a given storage period."  ('482 patent, 18:39-45 (emphasis added).)  Contradicting this statement, the specification also states, "stable as used herein refer [sic] to enalapril **powder formulations** having about 95% or greater of the initial enalapril amount and 5% w/w or less total impurities or elated substances at the end of a given storage period."  ('482 patent, 23:22-26 (emphasis added).)  Putting aside these two seemingly contradictory definitions of "stable," the claims themselves, however, do not clearly define what the word "stable" means and provide no meaningful guidance to a POSA as to its meaning.  In addition, the specification fails to provide a POSA with any guidance as to what properties, if any others, are pertinent to this "stable" characterization.  Lack of a clear definition of a "stable" whether each claim is directed specifically to a "stable" formulation ('621 patent) or that incorporates the specification standard for stability ('482 patent) render indefinite and thus, invalid, the claims in both patents, including the asserted claims.

428.   Underlying, and indicative of, the indefiniteness of the '482 and '621 patents is also evident in the testimony of named inventor Mosher in his February 8, 2022 testimony.  There, he stated, "[t]here's chemical stability which includes the acid-based chemistry. There's oxidative stability, There's photo. There's physical stability in the container, stability with regard to pH, stability with regard to color, to taste, to texture, to smell. Those are more of the organoleptic-type

parameters one would look at, stability to reconstitute suspensions, et cetera." (Mosher Trns. at 52: 9-16.) The patent specifications do not describe or teach a clear meaning of "stable," and named inventor Mosher identified many possibilities that would be known to a POSA. These teachings are absent in the patent specifications.

429. The '621 patent specification criticizes tablets and powders for use with children and the elderly. ('621, 5:24-40.) Likewise, the '621 patent criticizes use of solid dosage forms of enalapril for children. *Id.* 5:33-40. Difficulties and shortcomings of solid dosage forms, like tablets, require dividing to provide the correct dose and this leads to inaccurate dosing when solid dosage forms, such as tables, are compounded to prepare other formulations for children. *Id.* at 5:33-39.

430. The '621 patent references that for enalapril, one solution to overcoming use of the tablet form is form compounding pharmacists to pulverize and crush the tablets into a powder and reconstitute the powder in some liquid form. *Id.* at 5:41-44. Forming enalapril oral liquid in this fashion has "significant drawbacks" including large variability in the actual dosage, incomplete solubilizing of the enalapril tablet in the liquid, instability, and other significant potential issues. *Id.* at 5:45-503.

431. The '621 patent further criticizes enalapril formulated as a enalapril powder compositions for reconstitution as oral liquids. *Id.* at 5:54-56. Such powder compositions require mannitol and colloidal silicon dioxide for stability and dissolution. *Id.* at 5:56-58. The '621 patent further criticizes such formulations though as an improvement over crushing of solid tablets, they still require the step of mixing with a diluent. *Id.* at 5:58-60.

432. The '621 patent further states, however, under the heading "Enalapril Oral Powder Formulation," "In another aspect, enalapril oral liquid formulations described herein are prepared

**EXHIBIT 3**

█████████ – ████████████████

form the reconstitution of enalapril powder formulation.  In some embodiments, enalapril powder formulation comprising enalapril, a sweetener, a preservative, and optionally an excipient is dissolved in water, a buffer, other aqueous solvent, or a liquid to form an enalapril liquid formulation." *Id.* 19:55-63.

433.    The '621 patent states further, "Various amounts and concentrations of other components (sweeteners, buffers, preservatives, and the like) in the enalapril powder formulations are found in the previous section describing the amounts and concentrations for the analogous enalapril oral liquid formulations."  *Id.* 20:62-67.  The '621patent states, "Liquid vehicles suitable for the enalapril powder formulations to be reconstituted into an oral solution described herein are selected for a particular oral liquid formulation…Exemplary vehicles include water, ethyl alcohol, glycerin, propylene glycol, syrup (sugar or other sweetener based, e.g., Ora-Sweet® SF sugar-free flavored syrup)…."  *Id.* at 21:10-29.

434.    The '482 patent makes the same criticisms and assertions regarding the purported shortcomings of enalapril solid dosage forms like tablets, and regarding enalapril powder reconstituted as liquid dosage forms, as made in the preceding five paragraphs because the '482 and '621 patents share a common specification.

ii.     *The Prosecution History Does Not Inform the POSA of the Scope of the Claims with Reasonable Clarity*

435.    During prosecution of the application that led to the '482 patent, the Examiner rejected the claim term "stable" as indefinite.  *See* Section VII.A.2., above.  '482 Pros. Hist., 05/15/2020, Reply to Non-Final Office Action, SLVGT_RTU_00005127 – SLVGT_RTU_00005150.  In order to overcome the Examiner's rejection, the Applicant amended to claims to remove the term "stable."  '482 Pros. Hist., 05/15/2020, Reply to Non-Final Office

EXHIBIT 3

██████████ – ██████████████████

Action, SLVGT_RTU_00005127 – SLVGT_RTU_00005150.  The word "stable" does not appear in any of claims 14-23 or 27-28.

436.   The patent application that lead to the '621 patent, the '575 application, is a continuation application of application '179, which itself lead to the '482 patent.

437.   On May 15, 2020, the Applicant responded to the January 1, 2020 Non-Final Rejection, that rejected independent claims 1, 11, 17, and 30, and all claims depending from them, under 35 U.S.C. § 112(b) (under the A.I.A.) as indefinite because, as the Examiner stated, it was if the recitations "wherein the formulation is stable at about $5 \pm 3$ °C for at least 12 months" and "wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period" are claim limitations.  *Id.* at SLVGT_RTU_00005108.  The Examiner stated further that, "In particular, it is unclear if the recited formulations would necessarily possess the properties "wherein the formulation is stable at about $5 \pm 3$ °C for at least 12 months" and "wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."  In other words, it is unclear if the recitations are claim limitations, or if the recitations regarding stability merely describe the composition of instant claims 1, 17, and 31."  *Id* at SLVGT_RTU_00005108.  A POSA would not understand that the formulations claimed in the '482 and '621 patents would necessarily possess the properties as stated by the Examiner in the rejection dated January 1, 2020.  There is no teaching in the patent specifications that demonstrate this to any degree of reasonable certainty to a POSA and as lacking an objective boundary.

    **B.**    **The Claim Term "buffer" in the Asserted Claims of the '621 Patent Is Indefinite Rendering the Asserted Claims Containing That Term Invalid**

        *i.*    *The Specification Does Not Inform the POSA of the Scope of the Claims with Reasonable Clarity*

**EXHIBIT 3**

██████████ – ██████████

438.    There are over 30 different buffers disclosed in the patent specifications.  ('621, 21:31-49, '482, 21:9-30.)   The patent examples A-H use only sodium citrate/citric acid buffer systems as follows:

Example A:    sodium citrate dihydrate/citric acid anhydrous.  ('621, 32:20-35.)
Example B:    sodium citrate anhydrous/citric acid anhydrous ('621, 33: 5-24.)
Example C:    sodium citrate anhydrous/citric acid anhydrous ('621, 34:18-50.)
Example D:    sodium citrate anhydrous/citric acid anhydrous ('621, 36:34-62.)
Example E:    sodium citrate anhydrous/citric acid anhydrous ('621, 37:45-38:47.)
Example F:    represents a study using formulation examples C1-C3 and D1-D5 ('621, 39:35-39.)
Example H:    represents a study using formulation E5 ('621, 40:52-65.)

439.    While these examples A-H disclose specific concentrations of the buffer/buffer system used, there is no further teaching, example, or data showing how to use any of these 30 other buffer/buffer systems or in what amounts, and with what amounts of the other components of claimed formulations, to achieve a formulation with the claimed "stability."

440.    The patent specifications provide no other examples, data, explanation or guidance how to use the other buffers/buffer systems in the claimed subject matter.  The patent specifications provide no data or explanation on what other buffers would work or in what concentrations in the claimed subject matter.  These omissions give a POSA no guidance how to use the other roughly 30 buffers/buffer systems in the claimed subject matter, in what concentrations, or even if they would work to achieve the "stable" formulations as claimed.  A POSA would understand that buffers/buffer systems are not interchangeable and the appropriate buffer/buffer system and concentrations would have to be worked out by a POSA.  The patent Examples only use the citric acid/sodium citrate buffer.  This will also affect other components of the formulation because the pH is apparently important to the claimed inventions of the '621 patent, and the amount of buffer is directly related to the other components and the desired pH.

110

441. The concentration ranges claimed in claims 1, 19, and 30 in the ’621 patent are broad and provide no pH range, only an upper limit without a lower boundary. This would not inform a POSA of the scope of the claims, or how to determine which buffer to use, at what concentration, and what other elements (e.g., pH adjusters like NaOH or HCl) to achieve the claimed formulations with the required “stability.”

442. The ’621 patent dependent claim 4 claims: The stable oral liquid formulation of claim 1**,** wherein 25 the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.

443. This claim claims an additional 6 buffer/buffer systems apart from “a citrate.” A POSA would understand that these buffer/buffer systems are all distinct and cannot simply be substituted one for another. In addition, it is unclear what is meant by “an amino acid.” Claim 4, provides no guidance at all how to use any of these additional buffer/buffer systems or in what amount to achieve the claimed formulation with the claimed “stability.” While this claim claims fewer than the about 30 buffer/buffer systems suggested by the ’621 patent, the possible combinations, the uncertainty, and complete lack of examples, description or data for these 6 further buffers provide no guidance to the POSA as to the true boundaries of the claim.

444. The ’621 patent dependent claim 20 claims: The stable oral liquid formulation of claim 19, wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.

445. Similar to claim 4, this claim claims an additional 6 buffer/buffer systems apart from “a citrate.” A POSA would understand that these buffer/buffer systems are all distinct and cannot simply be substituted one for another. In addition, it is unclear what is meant by “an amino acid.” Claim 20, like claim 4, provides no guidance at all how to use any of these additional

buffer/buffer systems or in what amount to achieve the claimed formulation with the claimed "stability." While this claim claims fewer than the about 30 buffer/buffer systems suggested by the '621 patent, the possible combinations, the uncertainty, and complete lack of examples, description or data for these 6 further buffers provide no guidance to the POSA as to the true boundaries of the claim.

***ii. The Prosecution History Does Not Inform the POSA of the Scope of the Claims With Reasonable Clarity***

446. As referenced above, in the January 8, 2019 Affidavit, named inventor Mosher makes several assertions in support of the claims pending in the '898 application, including alleged advantages: improved ease of administration, patient compliance, and accuracy of dosing as compared to the allegedly then-currently available methods. '621 Pros. Hist., 12/28/2020, Mosher Affidavit, SLVGT_RTU_00005555. The January 2019 Mosher Affidavit presents formulations H1-H9, none of which appear in the specification of the '898 application as filed. *Id*. at SLVGT_RTU_00005556 - SLVGT_RTU_00005557. Five out of nine of these "H" formulations appear to have been prepared with buffer systems other than citric acid/sodium citrate, however, four out of the nine include citric acid. *Id*. Further, these "H" formulations were all prepared using the preservative sodium benzoate. *Id*.

447. Table 2 of the January 8, 2019 Mosher Affidavit purports to show Assay and Total Degradant Content After Storage, the storage temperatures including 5 °C and 25° C. *Id*. at SLVGT_RTU_00005557 - SLVGT_RTU_00005558. Table 3 of the January 2019 Mosher Affidavit purports to show formulations, not identified by any lettering or numbering system, including fifteen different, commonly used, buffer systems. *Id*. at SLVGT_RTU_00005558 - SLVGT_RTU_00005559. Likewise, the preservative included in all of these formulations was sodium benzoate. *Id*. Table 4 of the January 8, 2019 Mosher Affidavit purports to show Assay

Results After Storage of Formulations at 60° C for time points 0, 2, 4, and 7 days. *Id*. at (SLVGT_RTU_00005559 - SLVGT_RTU_00005560).

## XI. THE ASSERTED CLAIMS ARE INVALID FOR IMPROPER INVENTORSHIP

448. Inventorship compared to, for example, authorship. Scientific presentations at national and international meetings and journal publications, which report the results of a collaborative research on a given project, typically recognize everyone who contributed. This is different, however, from inventorship of a patent application, which legally recognize as inventors, the actual contributors to the conception of the subject matter of at least one claim in a patent. The status of a co-inventor or joint inventor may not be conferred merely as a reward for hard work or even outstanding science, but the actual conception of subject matter of the invention. In light of this definition, colleagues, research assistants, laboratory technicians and supervisors, even though they may gather essential data or construct a practical embodiment of the invention at the direction of others, are not co-inventors.

449. The ’482 and ’621 patents are invalid due to improper inventorship. Mr. David Miles, based on his work as analytical chemist and alleged contributions to the Enalapril Formulations project, he is not qualified to be a joint inventor in the claimed inventions. Upon reading both Dr. Gerold Mosher and Mr. David Miles deposition transcripts, dated February 8, 2022 and February 9, 2022, respectively and where, there is no evidence that Mr. Miles has contributed to the conception of the Enalapril formulations in the ’482 and ’621 patents or reduction to practice. Analytical chemistry techniques, methods, or steps form no part of the Asserted Claims.

# EXHIBIT 4

**EXHIBIT 4**

[REDACTED] – [REDACTED]

.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., *Plaintiff,* v. ALKEM LABORATORIES LTD., *Defendant.* | ) ) ) ) ) ) ) ) ) ) | C.A. No.: 19-2100 (MSG) |

**EXHIBIT 4**

**PLAINTIFF'S STATEMENT OF**
**ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

**EXHIBIT 4**

**[REDACTED] – [REDACTED]**

**TABLE OF CONTENTS**

**Page**

I. PERSON OF ORDINARY SKILL IN THE ART ........ 1

II. INFRINGEMENT ........ 2

III. OBVIOUSNESS ........ 5

A. Alkem Must Prove Obviousness by Clear and Convincing Evidence ........ 5

B. Obviousness Under 35 U.S.C. § 103 ........ 7

i. Long felt but unmet need ........ 14

ii. Unexpected Results ........ 15

iii. Failure of Others ........ 15

IV. WRITTEN DESCRIPTION, ENABLEMENT, AND DEFINITENESS ........ 16

V. INVENTORSHIP ........ 18

VI. EXCEPTIONAL CASE ........ 20

VII. REMEDIES ........ 20

**EXHIBIT 4**

[redacted] – [redacted]

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
334 F.3d 1343 (Fed. Cir. 2003)....................11, 12

*Abbott Labs. v. TorPharm, Inc.*,
300 F.3d 1367 (Fed. Cir. 2002)....................2

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011)....................3

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
817 F.3d 755 (Fed. Cir. 2016)....................2

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)....................3

*Alcon, Inc. v. Teva Pharm. USA, Inc.*,
664 F. Supp. 2d 443 (D. Del. 2009)....................9, 10

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015)....................9

*Amax Fly Ash Corp. v. United States*,
514 F.2d 1041 (Ct. Cl. 1975)....................19

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003)....................17, 18

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
839 F.3d 1034 (Fed. Cir. 2016)....................13

*Arbor Pharm., LLC. v. Lupin Ltd.*, No. 20-922 (MN),
2021 U.S. Dist. LEXIS 134770 (D. Del. July 20, 2021)....................4

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017)....................14

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010)....................17

*AstraZeneca AB v. Aurobindo Pharma Ltd.*,
232 F. Supp. 3d 636 (D. Del. 2017)....................9, 15

*Avanir Pharm., Inc. v. Actavis South Atl. LLC*,
36 F. Supp. 3d 475 (D. Del. 2014)....................11

**EXHIBIT 4**

[redacted] – [redacted]

*BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360 (Fed. Cir. 2017)....................17

*Beachcombers Int'l, Inc. v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154 (Fed. Cir. 1994)....................18

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339 (Fed. Cir. 2003)....................16

*Boston Sci. Corp. v. Cook Grp., Inc.*, No. 15-980-LPS-CJB, 2016 U.S. Dist. LEXIS 177053 (D. Del. Dec. 22, 2016)....................4, 5

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130 (Fed. Cir. 1995)....................2

*Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325 (Fed. Cir. 2013)....................13

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998)....................19

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364 (Fed. Cir. 2015)....................4

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399 (2012)....................2

*Carrol Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573 (Fed. Cir. 1993)....................3

*Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277 (Fed. Cir. 2002)....................12

*Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330 (Fed. Cir. 2013)....................16, 17

*Circuit Check Inv. v. QXQ Inc.*, 795 F.3d 1331 (Fed. Cir. 2015)....................13

*Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294 (Fed. Cir. 2010)....................7

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955 (Fed. Cir. 1986)....................1

*Dana-Farber Cancer Institute Inc. v. Ono Pharm. Co.*, 964 F.3d 1365 (Fed. Cir. 2020)....................19

**EXHIBIT 4**

[redacted] – [redacted]

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988).....13

*DSW, Inc. v. Shoe Pavilion, Inc.*,
537 F.3d 1342 (Fed. Cir. 2008).....4

*E.I. du Pont de Nemours & Co. v. Unifrax I LLC*,
921 F.3d 1060 (Fed. Cir. 2019).....3

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006).....15

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
323 F.3d 956 (Fed. Cir. 2002).....16

*Ferring B.V. v. Watson Labs., Inc.-Fla.*,
764 F.3d 1382 (Fed. Cir. 2014).....3

*Flo Healthcare Sols., LLC v. Kappos*,
697 F.3d 1367 (Fed. Cir. 2012).....4

*Fox Factory, Inc. v. SRAM, LLC*,
944 F.3d 1366 (Fed. Cir. 2019).....13

*Fromson v. Advance Offset Plate, Inc.*,
755 F.2d 1549 (Fed. Cir. 1985).....12

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
110 F.3d 1573 (Fed. Cir. 1997).....12

*General Elec. Co. v. Wilkins*,
750 F.3d 1324 (Fed. Cir. 2014).....19, 20

*Glaxo, Inc. v. Novopharm, Ltd.*,
110 F.3d 1562 (Fed. Cir. 1997).....3

*Henry Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019).....13

*Hess v. Advanced Cardiovascular Sys., Inc.*,
106 F.3d 976 (Fed. Cir. 1997).....19, 20

*Immunex Corp. v. Sandoz Inc.*,
395 F. Supp. 3d 366 (D.N.J. 2019).....14

*Immunex Corp. v. Sandoz Inc.*,
964 F.3d 1049 (Fed. Cir. 2020).....14

**EXHIBIT 4**

[redacted] – [redacted]

*Impax Labs. Inc. v. Lannett Holdings Inc.*,
893 F.3d 1372 (Fed. Cir. 2018)....................6

*In re Beattie*,
974 F.2d 1309 (Fed. Cir. 1992)....................13

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012).................... *passim*

*In re Geisler*,
116 F.3d 1465 (Fed. Cir. 1997)....................8

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995)....................1

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994)....................9

*In re Haruna*,
249 F.3d 1327 (Fed. Cir. 2001)....................8

*In re Kubin*,
561 F.3d 1351 (Fed. Cir. 2009)....................10

*In re Piasecki*,
745 F.2d 1468 (Fed. Cir. 1984)....................13, 14

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998)....................12, 13

*In re Soni*,
54 F.3d 746 (Fed. Cir. 1995)....................15

*In re Vaeck*,
947 F.2d 488 (Fed. Cir. 1991)....................17

*Interconnect Planning Corp. v. Feil*,
774 F.2d 1132 (Fed. Cir. 1985)....................10

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014)....................10

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
327 F.3d 1364 (Fed. Cir. 2003)....................3

*Jervis B. Webb Co. v. Southern Sys., Inc.*,
742 F.2d 1388 (Fed. Cir. 1984)....................12

**EXHIBIT 4**

█████ – ██████████

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012)....................6

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................6, 8

*Leo Pharm. Prods., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013)....................11, 14, 15

*Life Techs., Inc. v. Clontech Labs., Inc.*,
224 F.3d 1320 (Fed. Cir. 2000)....................7

*Medicines Co. v. Mylan, Inc.*,
853 F.3d 1296 (Fed. Cir. 2017)....................3

*Metalcraft of Mayville, Inc. v. Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017)....................8

*Millennium Pharm., Inc. v. Sandoz Inc.*,
862 F.3d 1356 (Fed. Cir. 2017)....................15

*National Presto Indus., Inc. v. W. Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996)....................6, 16

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)....................18

*Novartis Pharm. Corp. v. West-Ward Pharm. Int'l. Ltd.*,
923 F.3d 1051 (Fed. Cir. 2019)....................6

*Orexo AB v. Actavis Elizabeth LLC*,
903 F.3d 1265 (Fed. Cir. 2018)....................6

*Ortho Pharm. Corp. v. Smith*,
959 F.2d 936 (Fed. Cir. 1992)....................5, 6

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008)....................12

*Personalized Media Commc'ns L.L.C. v. ITC*,
161 F.3d 696 (Fed. Cir. 1998)....................18

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)....................6, 11

*Phillips Petroleum Co. v. U.S. Steel Corp.*,
673 Supp. 1278 (D. Del. 1987)....................5

**EXHIBIT 4**

[REDACTED] – [REDACTED]

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999)....................3, 4

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018)....................8, 9

*Power-One, Inc. v. Artesyn Techs., Inc.*,
599 F.3d 1343 (Fed. Cir. 2010)....................8

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008)....................7

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009)....................6, 14, 15

*Purdue Pharma L.P. v. Faulding, Inc.*,
230 F.3d 1320 (Fed. Cir. 2000)....................17

*Rosemount, Inc. v. Beckman Instruments, Inc.*,
727 F.2d 1540 (Fed. Cir. 1984)....................12

*Ruiz v. A.B. Chance Co.*,
234 F.3d 654 (Fed. Cir. 2000)....................13

*Shelcore, Inc. v. Durham Indus.*,
745 F.2d 621 (Fed. Cir. 1984)....................5, 6

*Shire LLC v. Amneal Pharm.*,
802 F.3d 1301 (Fed. Cir. 2015)....................6, 7, 10

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*,
183 F.3d 1347 (Fed. Cir. 1999)....................12

*Standard Oil Co. v. Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985)....................7

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983)....................12

*Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013)....................2

*Taro Pharm. Indus. Ltd. v. Novitium Pharma, LLC*, No. 19-01028 (FLW),
2020 U.S. Dist. LEXIS 60438 (D.N.J. Apr. 6, 2020)....................3

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.*,
192 F.3d 1353 (Fed. Cir. 1999)....................8

**EXHIBIT 4**

[REDACTED] – [REDACTED]

*Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
988 F.2d 1165 (Fed. Cir. 1993)....................14

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....................4

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010)....................18

*Trovan, Ltd. v. Sokymat SA*,
299 F.3d 1292 (Fed. Cir. 2002)....................19

*Unigene Labs., Inc. v. Apotex, Inc.*,
655 F.3d 1352 (Fed. Cir. 2011)....................8

*Vas-Cath Inc. v. Mahurkar*,
935 F.2d 1555 (Fed. Cir. 1991)....................17

*Vitronics Corp. v. Conceptronic*,
90 F.3d 1576 (Fed. Cir. 1996)....................3

*W.L Gore & Assocs., Inc. v. Garlock, Inc.*,
721 F.2d 1540 (Fed. Cir. 1983)....................10

*Water Techs. Corp. v. Calco, Ltd.*,
850 F.2d 660 (Fed. Cir. 1988)....................5

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016)....................14

*WMS Gaming Inc. v. Int'l Game Tech.*,
184 F.3d 1339 (Fed. Cir. 1999)....................13

*Yingbin-Nature (Guangdong) Wood Indus. Co. v. ITC*,
535 F.3d 1322 (Fed. Cir. 2008)....................17

**STATUTES**

35 U.S.C. § 103....................5, 7

35 U.S.C. § 112(a)....................16

35 U.S.C. § 112(b)....................16

35 U.S.C. § 256(b)....................19

35 U.S.C. § 271(e)(2)(a)....................2

35 U.S.C. § 271(e)(4)(A)....................20

**EXHIBIT 4**

[redacted] – [redacted]

35 U.S.C. § 271(e)(4)(B) ....................20

35 U.S.C. § 282(a) ....................5

35 U.S.C. § 285....................20

**EXHIBIT 4**

**[redacted] – [redacted]**

Pursuant to D. Del. L.R. 16.3(c)(5), Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") submits the following Statement of Issues of Law That Remained to Be Litigated. The following statement is based upon the parties' pleadings, documentary and testimonial evidence, expert reports, and on Azurity's current understanding of Defendant Alkem Laboratories, Ltd.'s ("Alkem") claims and defenses. Azurity reserves the right to revise, amend, supplement, or modify the following statement based on any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence, or other developments in the case—including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.

To the extent that Azurity's Statement of Issues of Fact set forth in **Exhibit 2** contains issues of law, those issues are incorporated herein by reference. Should the Court determine that any issue identified below is more appropriately considered as an issue of fact, Azurity incorporates such issues by reference in **Exhibit 2**.

Azurity contends that the issues of law that remain to be litigated at trial are as follows:

## I. PERSON OF ORDINARY SKILL IN THE ART

1. A person of ordinary skill in the art ("POSA") is "a hypothetical person who is presumed to know the relevant prior art." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). "In determining this skill level, the court may consider various factors including 'types of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.'" *Id.* (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)). In each case, certain factors may not be present, and one or more factors may predominate. *Id.*

2. Azurity and Alkem have provided differing definitions of a POSA.

**EXHIBIT 4**

[REDACTED] – [REDACTED]

## II. INFRINGEMENT

3. Alkem literally infringes claims of the Asserted Patents.[1]

4. 35 U.S.C. § 271(e)(2)(a) provides that "[i]t shall be an act of infringement to submit . . . an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent."

5. "The patent statute treats such a filing as itself an act of infringement, which gives the brand an immediate right to sue." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 407 (2012).

6. In the Hatch-Waxman context, "the ultimate infringement question is determined by traditional patent law principles and, if a product that an ANDA applicant is asking the FDA to approve for sale falls within the scope of an issued patent, a judgement of infringement must necessarily ensue." *Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013) (citing *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002)); *see also Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 760 (Fed. Cir. 2016); *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1135 (Fed. Cir. 1995) ("If the court determines that the patent is not invalid and that infringement *would* occur, and that therefore the ANDA applicant's paragraph IV certification is incorrect, the patent owner is entitled to an order that FDA approval of the ANDA containing the paragraph IV certification not be effective until the patent expires.").

---

[1] The Asserted Patents are United States Patent Nos. 10,786,482 (the "'482 patent") and 10,918,621 (the "'621 patent"). Azurity asserts that Alkem infringes claims 14-23 and 27-28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent.

**EXHIBIT 4**

[redacted] – [redacted]

7. The proper infringement inquiry "must be based on all of the relevant evidence, including the ANDA." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1568 (Fed. Cir. 1997). When "an ANDA is silent with respect to infringement . . . the correct analysis is . . . [whether] the ANDA applicant would likely sell an infringing composition pursuant to an approved ANDA." *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1310 (Fed. Cir. 2017) (citing *Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1382, 1387-88 (Fed. Cir. 2014)). In addition to the original ANDA, a court must also consider any amended ANDA filings. *Ferring*, 764 F.3d at 1390.

8. Determining whether a product or method infringes a patent is a two-step inquiry. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (quoting *Carrol Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "For literal infringement, the patentee must prove that the accused product meets all the limitations of the asserted claims." *E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1073 (Fed. Cir. 2019) (citation omitted).

9. Unconstrued claim terms receive their plain and ordinary meaning. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The ordinary and customary meaning of a claim term may be determined by reviewing a variety of sources, including the claims themselves. . ." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). In fact, although "the context supplied by the field of invention, the prior art, and the understanding of skilled artisans generally is key to discerning the normal usage of words in any claim" (*Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003)), the "starting point for any claim construction must be the claims themselves." *Taro Pharm. Indus. Ltd. v. Novitium Pharma, LLC*, No. 19-01028 (FLW), 2020 U.S. Dist. LEXIS 60438, at *11 (D.N.J. Apr. 6, 2020) (quoting

**EXHIBIT 4**

████████████ – ████████████████████

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999)).   "[A]bsent contravening evidence from the specification or prosecution history, plain and unambiguous claim language controls the construction analysis."  *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008).  "[E]ven if 'all of the embodiments discussed in the patent' included a specific limitation, it would not be 'proper to import from the patent's written description limitations that are not found in the claims themselves.'"  *Flo Healthcare Sols., LLC v. Kappos*, 697 F.3d 1367, 1375 (Fed. Cir. 2012).

10.     To depart from the plain and ordinary meaning, a patentee must "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term."  *Cadence Pharm. Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) (citation omitted). "The standard for disavowal of claim scope is . . . exacting." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).  The standard for disavowal is such that "a [POSA] would have to read the specification and conclude that the applicant has clearly disavowed claim scope or has acted as its own lexicographer. Simply referring to two terms as alternatives or disclosing embodiments that all use the term the same way is not sufficient to redefine a claim term."  *Id.* at 1368; *Arbor Pharm., LLC. v. Lupin Ltd.*, No. 20-922 (MN), 2021 U.S. Dist. LEXIS 134770, at *10-11 (D. Del. July 20, 2021) ("I do not think that the parts of the specification identified by Defendants demonstrate a clear and unmistakable disavowal of claim scope such that the [plain and ordinary] meaning of 'pH control agent' requires functional limitations.'"); *Boston Sci. Corp. v. Cook Grp., Inc.*, No. 15-980-LPS-CJB, 2016 U.S. Dist. LEXIS 177053, at *31 (D. Del. Dec. 22, 2016) ("Nor does the Court see how Defendants have met the 'exacting' standard to demonstrate that the patentee clearly disavowed the plain and

**EXHIBIT 4**

[redacted] – [redacted]

ordinary meaning of the terms" when the specification included examples discussing the allegedly disclaimed embodiments).

11. The transitional phrase "consisting essentially of" includes all the listed ingredients and "the addition of another ingredient [or ingredients] which do[] not materially affect the characteristics of the invention." *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 666 (Fed. Cir. 1988); *Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 Supp. 1278, 1286 (D. Del. 1987) ("Second, the product must be 'polypropylene, consisting essentially of recurring propylene units.' The claim of the '851 patent does not require that the composition be composed entirely of recurring propylene units but rather that it 'consist essentially of recurring propylene units.' A small degree of irregularity is permissible so long as it does not affect the basic and novel properties of the composition.").[2]

12. Alkem's ANDA product meets every limitation of the Asserted Patents literally. Azurity will demonstrate that Alkem infringes the Asserted Patents by a preponderance of the evidence.

## III. OBVIOUSNESS

### A. Alkem Must Prove Obviousness by Clear and Convincing Evidence

13. Alkem alleges that the Asserted Patents are invalid due to obviousness under 35 U.S.C. § 103.

14. Alkem bears the burden of demonstrating that the Asserted Patents are invalid. 35 U.S.C. § 282(a). A party asserting a patent is invalid "'must submit evidence supporting a conclusion of invalidity of each claim the challenger seeks to destroy.'" *Ortho Pharm. Corp. v.*

---

[2] The Court here construed "consisting essentially of" to mean "including the listed ingredients and open to unlisted ingredients that do not materially affect the basic and novel properties of the invention." D.I. 98.

**EXHIBIT 4**

[REDACTED] – [REDACTED]

*Smith*, 959 F.2d 936, 942 (Fed. Cir. 1992) (quoting *Shelcore, Inc. v. Durham Indus.*, 745 F.2d 621, 625 (Fed. Cir. 1984)).

15. Alkem must demonstrate invalidity by "clear and convincing evidence." *National Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1189 (Fed. Cir. 1996) ("[P]atent invalidity must be proved by clear and convincing evidence.").

16. "A party seeking to invalidate a patent based on obviousness must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012); *Impax Labs. Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372, 1381-82 (Fed. Cir. 2018); *Novartis Pharm. Corp. v. West-Ward Pharm. Int'l. Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019). A patent is not obvious merely because each element was disclosed, independently, in the prior art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Rather, it is "important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.*; *see also Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1271 (Fed. Cir. 2018) ("A party seeking to invalidate a patent on obviousness grounds must demonstrate by clear and convincing evidence that a person of ordinary skill would have selected and combined and modified the subject matter of the [prior art] references in the manner of the claimed invention, with a reasonable expectation of success.")

17. An added burden is called for when a defendant attempts to invalidate a patent using prior art which the USPTO has already considered. *Shire LLC v. Amneal Pharm.*, 802 F.3d 1301,

**EXHIBIT 4**

███████████████ – █████████████████████████

1307 (Fed. Cir. 2015) ("Defendants therefore 'ha[ve] the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.'") (alterations in original) (citing *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008)).

18.    Alkem has asserted prior art that was before the USPTO during prosecution of the Asserted Patents.

**B.    Obviousness Under 35 U.S.C. § 103**

19.    35 U.S.C. § 103 states that "[a] patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made."

20.    Obviousness "is determined entirely with reference to a *hypothetical* 'person having ordinary skill in the art.'" *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985); *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000) ("[P]atentability is assessed from the perspective of the hypothetical person of ordinary skill. . .").

21.    Furthermore, although obviousness is ultimately a question of law, a factfinder must determine several underlying factual inquiries including "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the prior art and the claimed invention; and (4) the extent of any objective indicia of non-obviousness." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1308 (Fed. Cir. 2010).

**EXHIBIT 4**

[REDACTED] – [REDACTED]

22. A party seeking to demonstrate that a patent is obvious cannot do so "merely by demonstrating that each of [the patent's] elements [were] independently known in the prior art." *KSR* , 550 U.S. at 418; *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("The district court correctly acknowledged that it is not enough for Toro to merely demonstrate that the elements of the claimed invention were independently known in the prior art."); *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1351 (Fed. Cir. 2010) ("Artesyn's argument that the '125 patent is obvious because all of the elements that comprise the invention were known in the prior art also fails.").

23. "Obviousness requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). "Rather, obviousness requires that additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.* To demonstrate obviousness, a defendant must show that "there was an apparent reason [or motivation] to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418.

24. However, when combining references, "[t]here is no suggestion to combine . . . if a reference teaches away from its combination with another source." *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999); *In re Haruna*, 249 F.3d 1327, 1335 (Fed. Cir. 2001) ("A prima facie case of obviousness can be rebutted if the applicant . . . can show 'that the art in any material respect taught away' from the claimed invention.") (alterations in original) (quoting *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997)); *see also Polaris Indus., Inc. v. Arctic*

**EXHIBIT 4**

[redacted] – [redacted]

*Cat, Inc.*, 882 F.3d 1056, 1067 (Fed. Cir. 2018) (reversing PTAB's finding of obviousness because the PTAB "failed to analyze whether [a reference] 'teaches away' from claims 17-19").

25. "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). "The degree of teaching away will of course depend on the particular facts; in general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Id.*

26. Courts have found that the prior art teaches away if one skilled in the art would have thought that the prior art could not have been improved upon. *AstraZeneca AB v. Aurobindo Pharma Ltd.*, 232 F. Supp. 3d 636, 647-48 (D. Del. 2017) (finding the claimed invention non-obvious in part because of expert testimony "that the prior art taught away from eliminating N-linkage from vildagliptin because it would have been a step backwards to abandon what was perceived to be the stabilizing feature of the compound" and "one skilled in the art would have been dissuaded from making [alleged infringer's allegedly obvious changes] because it was recognized that the Novartis N-linked compounds already had good potency and stability").

27. In the pharmaceutical context, prior art teaches away from the use of certain ingredients or formulations by describing unwanted side effects, toxicities, or risk associated with those ingredients or formulations. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305-06 (Fed. Cir. 2015) ("It is not clearly erroneous to find that those known side effects would have discouraged a person of ordinary skill from using higher concentrations of BAK in a bimatoprost formulation. . ."); *Alcon, Inc. v. Teva Pharm. USA, Inc.*, 664 F. Supp. 2d 443, 463 (D. Del. 2009)

**EXHIBIT 4**

[REDACTED] – [REDACTED]

("In light of the foregoing reasons the court concludes that both moxifloxacin's *Pseudomonas aeruginosa* resistance profile data, as well as its uncertain but probable toxicity, teach away from the invention of the '830 patent.").

28. Furthermore, it is impermissible "to fall victim to the insidious effect of a hindsight syndrome" by "imbu[ing] one of ordinary skill in the art with knowledge of the invention in suit, when no prior art or reference of record convey or suggest that knowledge." *W.L Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983). Courts must take extreme caution to not "succumb to hindsight claims of obviousness" and ensure that the defendant is not "merely throw[ing] metaphorical darts at a board filed with combinatorial prior art possibilities." *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1070-71 (Fed. Cir. 2012).

29. Indeed, courts must always keep in mind that '"[t]hat which may be made clear and thus 'obvious' to a court, with the invention fully diagrammed and aided, . . . may have been a breakthrough of substantial dimension when first unveiled.'" *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347-48 (Fed. Cir. 2014) (alterations in original) (quoting *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138 (Fed. Cir. 1985)). Thus, courts should reject obviousness theories which rely on hindsight. *See, e.g.*, *Shire*, 802 F.3d at 1308 ("We therefore reject the hindsight claims of obviousness."); *InTouch*, 751 F.3d at 1348-49 ("Dr. Yanco's testimony was nothing more than impermissible hindsight; she opined that all elements of the claims disparately existed in the prior art, but failed to provide the glue to combine these references. While she opined that the references were like separate pieces of a simple jigsaw puzzle, she did not explain what reason or motivation on of ordinary skill in the art at the time of the invention would have had to place these pieces together.").

**EXHIBIT 4**

**[REDACTED] – [REDACTED]**

30. Moreover, an invention is not obvious in light of routine experimentation if the prior art provides no reasonable expectation of success that the experimentation will succeed. *In re Cyclobenzaprine*, 676 F.3d at 1070 ("While it may have been obvious to experiment with the use of the same PK profile when contemplating an extended-release formulation, there is nothing to indicate that a skilled artisan would have had a reasonable expectation that such an experiment would succeed in being therapeutically effective."). "Without a reasonable expectation of success or clues pointing to the most promising combinations, an artisan could have spent years experimenting without success." *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013); *cf. Pfizer*, 480 F.3d at 1367 ("Rather, our conclusion here relies on the fact that one skilled in the art would have had a reasonable expectation of success at the time the invention was made, and merely had to verify that expectation.").

31. Even if the prior art denotes a general possibility of success, an invention is not obvious if the prior art does not denote which combinations will lead to success. *Leo Pharm. Prods.*, 726 F.3d at 1357 ("While the record shows that, as early as 1995, the prior art indicated that both vitamin D analogs and corticosteroids were effective treatments for psoriasis . . . that same prior art gave no direction as to which of the many possible combination choices were likely to be successful."); *c.f. Avanir Pharm., Inc. v. Actavis South Atl. LLC*, 36 F. Supp. 3d 475, 506-07 (D. Del. 2014) (finding that there was no reasonable expectation of success when "Plaintiffs presented evidence that several alternative CYP2D6 inhibitors were available to solve the Q-related problem, by avoiding the use of Q altogether, ***leading to a vast number of possible solutions***.") (emphasis added).

32. Likewise, an invention is not obvious merely because that invention represents a combination of known elements. *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1357

**EXHIBIT 4**

[redacted] – [redacted]

(Fed. Cir. 2003) ("Knowledge in the prior art of every element of a patent claim, however, is not itself sufficient to render [a] claim obvious."); *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1356 (Fed. Cir. 1999) ("[T]here is no basis for concluding that an invention would have been obvious solely because it is a combination of elements that were known in the art at the time of the invention."); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed. Cir. 1984) ("Beckman's effort to establish that each element may be found somewhere in the prior art is unavailing. As this court has held, a combination may be patentable whether it be composed of elements all new, partly new, or all old."); *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1392 (Fed. Cir. 1984) ("Next, the district court implied that a combination of old elements is less worthy of patent protection than other types of invention. We have stated numerous times that the conditions for patentability of so-called combination inventions are the same as those for other inventions."); *see also Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1556 & n.3 (Fed. Cir. 1985) (finding a patent which the district court characterized as "a combination patent comprised exclusively of old elements" not obvious and stating that "[o]nly god works from nothing. Men must work with old elements.") (citation omitted).

33. Secondary considerations of non-obviousness—or objective indicia of non-obviousness—"'may often be the most probative and cogent evidence of [nonobviousness] in the record.'" *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008); *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288 (Fed. Cir. 2002); *see also In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) ("The secondary considerations are also essential components of the obviousness determination.").

**EXHIBIT 4**

[redacted] – [redacted]

34. Secondary considerations include commercial success, long-felt but unsolved need, and industry praise and acceptance. *In re Rouffet*, 149 F.3d at 1355; *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1360 (Fed. Cir. 1999); *Apple Inc. v. Samsung Elecs. Co., Ltd.,* 839 F.3d 1034, 1052-1057 (Fed. Cir. 2016); *Circuit Check Inv. v. QXQ Inc.*, 795 F.3d 1331, 1336 (Fed. Cir. 2015). These secondary considerations help "the district court avert[] the trap of hindsight." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1335 (Fed. Cir. 2013).

35. Courts must consider evidence regarding secondary considerations when such evidence is presented. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) ("The district court erred in failing to consider, or at least discuss, evidence of secondary considerations. Our precedents clearly hold that secondary considerations, when present, must be considered in determining obviousness."); *In re Cyclobenzaprine*, 676 F.3d at 1076; *In re Beattie*, 974 F.2d 1309, 1313 (Fed. Cir. 1992) ("It is unquestioned that such evidence [of secondary considerations] must be considered."); *In re Piasecki*, 745 F.2d 1468, 1471 (Fed. Cir. 1984) ("[I]t is accepted that evidence of so-called secondary factors can shed light, and add weight, to the evaluation of obviousness under section 103. All the evidence on the question of obviousness must be considered.").

36. "[T]he evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." *Henry Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). Nexus may be established by "showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention." *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373-74 (Fed. Cir. 2019) (internal quotations omitted, citation omitted).

**EXHIBIT 4**

[redacted] – [redacted]

*i. Long felt but unmet need*

37. Evidence that the invention meets a long-felt but unsolved need demonstrates that the claimed invention is not obvious because "it is reasonable to infer that the need would have not persisted had the solution been obvious." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1332 (Fed. Cir. 2016); *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). "[W]hether there is a 'long-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem.'" *WBIP*, 829 F.3d at 1334 (quoting *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993)). The long-felt need is met at the time of the claimed invention. *See Arctic Cat*, 876 F.3d at 1364-65 (finding the claimed invention satisfied the long-felt need based on evidence of a prototype); *In re Piasecki*, 745 F.2d at 1473-75 (finding the claimed invention may meet the long-felt need based on evidence of a "concept" of a prototype); *see also Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366 (D.N.J. 2019) (affirmed by *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049 (Fed. Cir. 2020)) (finding the claimed invention satisfied the long-felt need based on evidence of a commercial embodiment).

38. With regard to pharmaceuticals, courts have found that evidence of a long-felt but unsolved need can support findings of non-obviousness. *Leo Pharm. Prods.*, 726 F.3d at 1359 ("The record also shows evidence of long felt but unsolved need, i.e., the need for a single formulation to treat psoriasis"); *In re Cyclobenzaprine*, 676 F.3d at 1083 ("Cephalon's proof indicates that a long-felt need existed for a therapeutically effective, extended-release cyclobenzaprine formulation. The immediate-release formulation existed for decades, but that formulation's regimen of multiple daily doses led to poor patient compliance"); *Procter & Gamble*, 566 F.3d at 998 (finding no error with the district Court's findings on long-felt need which was based "on the fact that, in the mid-1980s, osteoporosis was recognized as a serious disease and

**EXHIBIT 4**

[redacted] – [redacted]

existing treatments were inadequate"); *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1380 (Fed. Cir. 2006) ("The record shows a long-felt need for a safer, less toxic, and more effective clozapine-like drug."). An extended lapse in time between the prior art and the claimed invention weighs against finding claims obvious. *Leo Pharm. Prods.*, 726 F.3d at 1356 (finding prior art published decades before the asserted patent represented a "considerable time laps" that indicated the claims were not obvious); *see also AstraZeneca*, 232 F. Supp. 3d at 648 ("[Defendant] has not shown a motivation to try cyclopropanation. The dearth of data as of the priority date is particularly troubling. . . . [T]here were no data available to show the effect of cyclopropanation on the stability of a DPP4 inhibitor, because no one other than the inventors proposed cycloproponation in the context of DPP4 inhibitors.").

*ii.* *Unexpected Results*

39. "One way for a patent applicant to rebut a *prima facie* case of obviousness is to make a showing of 'unexpected results,' *i.e.*, to show that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected." *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995). The unexpected results inquiry focuses on comparing the results of claimed invention to the results seen in the closest prior art. *Millennium Pharm., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir. 2017) (reversing district courts conclusions that the patents were obvious because "the district court should have treated bortezomib as the closest prior art compound, and acknowledged the unrebutted evidence that the D-mannitol ester of bortezomib exhibit unexpected results compared with bortezomib, including unexpectedly superior stability, solubility, and dissolution.").

*iii.* *Failure of Others*

40. "Evidence that others tried but failed to develop a claimed invention may carry significant weight in an obviousness inquiry." *In re Cyclobenzaprine*, 676 F.3d at 1081;

**EXHIBIT 4**

[REDACTED] – [REDACTED]

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003) ("[T]here can be little better evidence negating an expectation of success than actual reports of failure."). This is especially so where the failure to develop the claimed product "is keyed to the problem that the patents in suit purport to solve." *In re Cyclobenzaprine*, 676 F.3d at 1082.

41. Alkem cannot demonstrate by clear and convincing evidence that the Asserted Claims would have been obvious to a POSA as of the March 18, 2016 priority date.

## IV. WRITTEN DESCRIPTION, ENABLEMENT, AND DEFINITENESS

42. Alkem alleges that the asserted claims are invalid for lack of written description and for failure to meet the enablement requirement of 35 U.S.C. § 112. Section 112(a) provides that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention."

43. Alkem alleged that the asserted claims are further invalid for failure to meet the definiteness requirement of 35 U.S.C. § 112(b). Section 112(b) provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."

44. Alkem must demonstrate invalidity by "clear and convincing evidence." *National Presto*, 76 F.3d at 1189 ("[P]atent invalidity must be proved by clear and convincing evidence."). *Id.* Alkem must present clear and convincing evidence in order to demonstrate that the asserted claims are invalid for lack of written description. *See Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 962 (Fed. Cir. 2002). Similarly, Alkem must present clear and convincing evidence that the Asserted Patents are invalid for lack of enablement. *See Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330,

**EXHIBIT 4**

[redacted] – [redacted]

1336 (Fed. Cir. 2013). And Alkem must present clear and convincing evidence that the Asserted Patents are invalid as indefinite. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

45. To satisfy the written description requirement, "one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (internal quotations omitted, citation omitted). Stated another way, "the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The disclosure does not need to "describe exactly the subject matter claimed." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562-63 (Fed. Cir. 1991) (citation omitted).

46. "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351.

47. The question of whether a patent meets the written description requirement is a factual one. *Yingbin-Nature (Guangdong) Wood Indus. Co. v. ITC*, 535 F.3d 1322, 1334-35 (Fed. Cir. 2008).

48. With regard to enablement, "the requirement is satisfied if, given what they already know, the specification teaches those in the art enough that they can make and use the invention without undue experimentation." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003); *In re Vaeck*, 947 F.2d 488, 495 (Fed. Cir. 1991) ("Although the statute does not say so, enablement requires that the specification teach those in the art to make and use invention without undue experimentation.").

**EXHIBIT 4**

[REDACTED] – [REDACTED]

49. Whether the specification enables the invention is a question of law. *Amgen*, 314 F.3d at 1334.

50. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[A]bsolute clarity" in claim scope "is not required." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1358 (Fed. Cir. 2010).

51. A claim term is not indefinite if the specification provides a definition of that claim term. *Personalized Media Commc'ns L.L.C. v. ITC*, 161 F.3d 696, 705-706 (Fed. Cir. 1998) ("We agree with PMC and conclude that the Commission erred in holding the asserted claims to be indefinite. Here, the written description of the specification is sufficient to inform one skilled in the art of the meaning of the claim language 'digital detector.' It explicitly defines 'digital detector' as a device that 'acts to detect the digital signal information' in another stream of information"); *see also Beachcombers Int'l, Inc. v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1159 (Fed. Cir. 1994) ("Again, the specification expressly identifies these tubes as object cells. Thus, it is clear from the specification that a meaning other than the conventional one and broad enough to encompass the liquid-filled channels or tubes illustrated… was intended. Accordingly, the district court erred in denying the motion for JMOL in relation to the indefiniteness question.").

52. Alkem cannot demonstrate by clear and convincing evidence that the patent is invalid for lack of written description, lack of enablement, or indefiniteness.

## V. INVENTORSHIP

53. Alkem alleges that the patents are invalid for improper inventorship.

**EXHIBIT 4**

[REDACTED] – [REDACTED]

54. "[B]ecause a patent is presumed valid, 35 U.S.C. § 282, there follows a presumption that the named inventors on a patent are the true and only inventors." *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1301 (Fed. Cir. 2002); *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997) ("'The inventors as named in an issued patent are presumed to be correct.'") (quoting *Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 1047 (Ct. Cl. 1975)).

55. With regards to joint inventors, "[t]here is no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Dana-Farber Cancer Institute Inc. v. Ono Pharm. Co.*, 964 F.3d 1365, 1371 (Fed. Cir. 2020) (quotations omitted). Indeed, "[p]eople may be joint inventors even though they do not physically work on the invention together or at the same time, and even though each does not make the same type or amount of contribution." *Id.* (quotations omitted).

56. Even if a patent lists an incorrect inventor, "[t]he error of . . . naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section." 35 U.S.C. § 256(b); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1352-53 (Fed. Cir. 1998) ("[T]o avoid inadvertent invalidity, 35 U.S.C. § 256 permits correction of the designated inventorship of a patent when an error was made without deceptive intent. . ."); *Trovan*, 299 F.3d at 1301 ("Moreover, to the extent that fewer [or more] than the true inventors are named on a patent, the patent may be corrected to so reflect as long as the nonjoinder [or misjoinder] was done without deceptive intent on the part of the person erroneously left off [or included on] the patent.").

57. Alkem must demonstrate incorrect inventorship by clear and convincing evidence. *General Elec. Co. v. Wilkins*, 750 F.3d 1324, 1329 (Fed. Cir. 2014) ("Because the issuance of a patent creates a presumption that the named inventors are the true and only inventors, [] the burden

**EXHIBIT 4**

[REDACTED] – [REDACTED]

of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence."); *Hess*, 106 F.3d at 979-80 (holding incorrect inventorship must be shown by clear and convincing evidence).

58. Alkem cannot demonstrate by clear and convincing evidence that the patent is invalid due to incorrect inventorship.

## VI. EXCEPTIONAL CASE

59. This case is exceptional under 35 U.S.C. § 285.

## VII. REMEDIES

60. Upon a finding of infringement, Azurity is entitled to an immediate order under 35 U.S.C. § 271(e)(4)(A) that the effective date of approval of Alkem's ANDA shall be no earlier than the expiration of the Asserted Patents, as extended by any applicable periods of exclusivity.

61. Azurity is entitled to an order under 35 U.S.C. § 271(e)(4)(B) permanently enjoining defendants from engaging in the commercial manufacture, use, offer to sell, or importation into the United States of any drug product covered by the Asserted Patents.

# EXHIBIT 5

**EXHIBIT 5**

[REDACTED] – [REDACTED]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AZURITY PHARMACEUTICALS, INC., *Plaintiff*, v. ALKEM LABORATORIES LTD., *Defendant*. | C.A. No.: 19-2100 (MSG) [REDACTED] |

**EXHIBIT 5**

**DEFENDANT'S STATEMENT OF**
**ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

**EXHIBIT 5**

[redacted] – [redacted]

Pursuant to D. Del. L.R. 16.3(c)(5), Defendant Alkem Laboratories Ltd. ("Alkem") submits the following Statement of Issues of Law That Remained to Be Litigated. The following statement is based upon the parties' pleadings, documentary and testimonial evidence, expert reports, and on Alkem's current understanding of Plaintiff Azurity Pharmaceuticals Inc.'s ("Azurity") claims and defenses.[1] Alkem reserves the right to revise, amend, supplement, or modify the following statement based on any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence, or other developments in the case—including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.

To the extent that Alkem's Statement of Issues of Fact set forth in **Exhibit 3** contains issues of law, those issues are incorporated herein by reference. Should the Court determine that any issue identified below is more appropriately considered as an issue of fact, Alkem incorporates such issues by reference in **Exhibit 3**.

Alkem contends that the issues of law that remain to be litigated at trial are as follows:

## I. INFRINGEMENT

1. The first legal issue that remains to be litigated is whether Azurity has met its burden of proving infringement by the preponderance of the evidence.

### A. The Hatch-Waxman Act and the ANDA Process

2. Under 35 U.S.C. § 271(e)(2), "[i]t shall be an act of infringement to submit—(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C § 355(j)] or described in section 505(b)(2) of such Act [21 U.S.C. § 355(b)(2)] for a drug claimed in

[1] Azurity alleges Alkem infringes claims 14-23 and 27-28 of U.S. Patent No. 10,786,482 ("'482 patent") and claims 1-13, 16-27 and 30 of U.S. Patent No. 10,918,621 ("'621 patent").

a patent or the use of which is claimed in a patent." The filing of an ANDA that contains a certification that the patent is invalid or will not be infringed by the manufacture, use or sale of the generic drug for which the application was submitted (a "Paragraph IV" certification) establishes jurisdiction to allow the NDA holder and patent owner(s) to commence a patent infringement action against the ANDA applicant. 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 35 U.S.C. § 271(e)(2). Section 271(e)(2) exists for the limited technical purpose of allowing patent holders to bring suit against generic companies despite the fact that the generic companies have not yet infringed the patents at issue. *See, e.g., Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990).

3. The focus of the infringement inquiry under 35 U.S.C. § 271(e)(2)(A) "is on 'what the ANDA applicant will likely market if its application is approved, an act that has not yet occurred." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1248 (Fed. Cir. 2000) (quoting *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997)). "This hypothetical inquiry is properly grounded in the ANDA application and the extensive materials typically submitted in its support." *Bayer*, 212 F.3d at 1248 (quoting *Glaxo*, 110 F.3d at 1569).

4. The infringement inquiry provoked by an ANDA filing consists of a comparison of the asserted claims of the patent against "the product that is likely to be sold following FDA approval." *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). The contents of an applicant's ANDA control the infringement analysis. *See Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1186 (Fed. Cir. 2014); *Bayer*, 212 F.3d at 1248.

**B. General Principles of Infringement**

5. Azurity has the burden of proving infringement of its patents by a preponderance of the evidence. *See Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011). The burden of proving infringement always lies with the patent holder and does not shift to the ANDA filer. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1570 (Fed. Cir. 1997). Instead,

the court in an ANDA case must determine "whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product." *Id.*

6. Infringement, both literal and under the doctrine of equivalents, is a question of fact. *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am.*, L.L.C., 375 F.3d 1126, 1133 (Fed. Cir. 2004).

7. Whether prosecution history applies, and thus, whether the doctrine of equivalentsis available for a particular claim limitation, is a question of law. *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1337 (Fed. Cir. 2015). In this case, Azurity has not asserted any theory of infringement based upon the doctrine of equivalents, and Alkem reserves the right to address any such theories Azurity asserts.

8. "A determination of patent infringement requires a two-step analysis. First, the court determines the scope and meaning of the patent claims asserted. [Second,] the properly construed claims are compared to the allegedly infringing device." *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1332 (Fed. Cir. 2003).

9. "Direct infringement" refers to the actual act(s) of making, using, selling, offering to sell and/or importing a patented invention. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993). Section 271(b) provides "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. §271(b). A party cannot be liable for induced infringement under 35 U.S.C. § 271(b) without direct infringement. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014). A party is liable for contributory infringement under 35 U.S.C. § 271(c) if it "sells or offers to sell a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in

EXHIBIT 5

██████████  –  ████████████████████

an infringement of such patent.'" *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (quoting 35 U.S.C. § 271(c)).  Like induced infringement, contributory infringement must be predicated on a finding of direct infringement. *Joy Techs.*, 6 F.3d at 774; *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006).

10.     The burden to establish induced infringement is high: "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007) (internal citations and quotation marks omitted). "A finding of induced infringement requires actual inducement. The inducement may be proven via circumstantial evidence." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1331 (Fed. Cir. 2016).

11.     Like induced infringement, contributory infringement requires a patent owner to prove that there is direct infringement and "that the accused infringer had knowledge of the patent, . . . that the component has no substantial noninfringing uses, and . . . that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

12.     Literal infringement requires the presence of each limitation, exactly as written in the claim, whereas an accused product or process may still infringe under the doctrine of equivalents if an insubstantial equivalent to the literally missing claim element is present in the accused product or process. *See e.g., V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 40 (1997).

**EXHIBIT 5**

██████████████ – ████████████████████████

13.    For an accused product to infringe a dependent claim, it must also infringe the corresponding independent claim(s). *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed. Cir. 1989).

**C.    Legal Bars to Infringement**

**i.    *Limiting Claim Language***

14.    An additional legal issue that remains to be litigated is whether Azurity can prove Alkem's ANDA infringes the '621 patent in view of components in Alkem's ANDA formulation that are not part of the ANDA product's buffer system and are utilized in the product to adjust and maintain pH, thus affecting the product's stability.

15.    The '621 patent employs the limiting phrase "consisting essentially of," which is a:

> transition phrase commonly used to signal a partially open claim in a patent. Typically, "consisting essentially of" precedes a list of ingredients in a composition claim or a series of steps in a process claim. By using the term "consisting essentially of," the drafter signals that the invention necessarily includes the listed ingredients and is open to unlisted ingredients that do not materially affect the basic and novel properties of the invention.

*PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998).

16.    The court must decide whether Azurity has proven the additional components do not materially affect the "basic and novel properties" of the alleged inventions. *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998).

**ii.    *Disavowal***

17.    An additional legal issue that remains to be litigated is whether Azurity is legally barred from asserting that Alkem's ANDA product infringes the asserted claims of the patents-in-suit based upon the fact that the patents-in-suit teach away of formulations combining parabens

EXHIBIT 5

███████ – ████████████████

with sugar alcohols as "incompatible" and affecting stability coupled with the lack of enabling disclosures that would permit persons or ordinary skill in the art to make and use the claimed formulations using parabens combined with sugar alcohols to obtain the claimed stability profile.

18.     Disavowal can be effectuated by language in the specification or the prosecution history.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).

> [T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.

*Id.*

19.     "While disavowal must be clear and unequivocal, it need not be explicit."  *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (finding disavowal based on cautionary language in the patent specification).

20.     "Where, as here, the specification plainly represents the scope of the invention to the exclusion of some embodiments, it is unnecessary that it also concede that those embodiments are 'infeasible' or even 'impossible' by reference to its teachings."  *Techtronic Indus. Co. v. ITC*, 944 F.3d 901, 909 (Fed. Cir. 2019).

21.     "The patentee cannot rely on its own use of inconsistent and confusing language in the specification to support a broad claim construction which is otherwise foreclosed."  *Trs. Of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1366 (Fed. Cir. 2016); *see also Meds. Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306-09 (Fed. Cir. 2017) (construing patent as having excluded from scope "inefficient mixing" based in part on failure of patent to enable the same).

**EXHIBIT 5**

██████████ – ████████████████████

22.     Where the scope of the asserted claims is ambiguous, "the canon that claims should be construed to preserve their validity, if possible, applies." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 914 (Fed. Cir. 2004).

23.     The party asserting disavowal has the burden of proving the same. *See Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016).

## II.     INVALIDITY

24.     The invalidity of the Asserted Claims remains to be litigated.  In particular, Alkem asserts that the Asserted Claims are invalid due to (i) obviousness; (ii) indefiniteness; (iii) lack of adequate written description; (iv) lack of enablement; and/or (v) improper inventorship.

### A.     Burden of Proof and Presumption of Validity

25.     "A patent shall be presumed valid," and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."  35 U.S.C. § 282. The presumption of validity, as the Federal Circuit has suggested, is meant to codify the deference due to the government agency that issued the patent—the United States Patent and Trademark Office.  *See Sciele Pharma Inc. v. Lupin Ltd*, 684 F.3d 1253, 1260 (Fed. Cir. 2012).  This presumption of validity is rebuttable, however.  *Id.*  Further, given that the presumption of validity stems from the notion of providing deference to the United States Patent and Trademark Office ("PTO"), it follows that "[i]f the PTO did not have all material facts before it, its considered judgment may lose significant force and the burden to persuade the finder of fact by clear and convincing evidence may, therefore, be easier to sustain."  *Id.* (citation and internal quotation marks omitted); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 111 (2011) ("Simply put, if the PTO did not have all material facts before it, its considered judgment may lose significant force.  And, concomitantly, the challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain.") (citation omitted).

**EXHIBIT 5**

██████████ – ████████████████████████

26.     Moreover, it is not necessary to prove conclusions of law, by clear and convincing evidence.  Rather, it is only necessary to prove the factual predicates of those conclusions by clear and convincing evidence.  The "clear and convincing" standard of proof "applies to questions of fact and not to questions of law."  *See id.* at 114, n.4 ("We use the term 'standard of proof' to refer to the degree of certainty by which the factfinder must be persuaded of a factual conclusion to find in favor of the party bearing the burden of persuasion.").  "Where the ultimate question of patent validity turns on the correct answer to legal questions . . . [the clear and convincing evidence] standard of proof has no application."  *Id.* at 114 (concurring opinion) (citing, inter alia, *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)).  Clear and convincing evidence is evidence that "could place in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are highly probable."  *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

### B.     Person of Ordinary Skill in the Art

27.     The person of ordinary skill in the art is a hypothetical person presumed to know all of the teachings of the prior art references at the time the invention was made.  *See Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1576 (Fed. Cir. 1984) (describing the person of ordinary skill in the art as "the inventor working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him").

28.     "Factors that may be considered in determining level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field."  *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983).  "Not all such factors may be present in every case, and one or more . . . may predominate."  *Id.* at 696-97.

EXHIBIT 5

██████████ – ████████████████

### C.   Obviousness

29.     Under 35 U.S.C. § 103, "[a] patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made."

30.     Obviousness is a conclusion of law premised on underlying factual inquiries involving (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art." (3) the "differences between the prior art and the claims at issue," and (4) "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." *KSR Int'l Co. v. Teleflex* Inc.*,* 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).

31.     A party seeking to invalidate a patent as obvious must demonstrate "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).  This does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art did not teach away.'" *Par Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014).

32.     A broader independent claim cannot be nonobvious where a dependent claim stemming from that independent claim is invalid for obviousness. *See Ormco Corp. v. Align Tech., Inc.,* 498 F.3d 1307, 1319 (Fed.Cir.2007).  Similarly, a single obvious species within a claimed

genus renders the claimed genus unpatentable under § 103. *See, e.g.*, *In re Kubin*, 561 F.3d 1351, 1361 (Fed. Cir. 2009).

33. "A person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely that product [was] not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103." *KSR*, 550 U.S. at 421.

34. "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *Id.* A person of ordinary skill is also "a person of ordinary creativity, not an automaton." *Id.*

35. Obviousness can be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so. *In re Kahn,* 441 F.3d 977, 986, 78 USPQ2d 1329, 1335 (Fed. Cir. 2006).

36. The routine optimization of a range or other variable within the claims that flows from the "normal desire of scientists or artisans to improve upon what is already generally known" may render a claim obvious. *See Pfizer v. Apotex*, 480 F.3d 1348, 1368 (Fed. Cir. 2007) (citing *In re Peterson*, 315 F.3d 1325, 1330 (Fed.Cir.2003)).

37. "[I]nherency may supply a missing claim limitation in an obviousness analysis." *Par Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1194–95 (Fed. Cir. 2014). To establish the existence of a claim limitation in the prior art in an obviousness analysis, "the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art." *Id.* at 1196.

**EXHIBIT 5**

██████████ ─ ██████████

38.     The obviousness determination includes an inquiry on objective evidence of non-obviousness ("secondary considerations").  *Pfizer*, 480 F.3d at 1360.  In *Graham v. John Deere Co. of Kansas,* the U.S. Supreme Court stated that secondary considerations can include commercial success, long-felt but unsolved need, and the failure of others.  383 U.S. at 17–18. Other factors recognized by the Federal Circuit after *Graham* include whether the invention received industry acclamation, the prior art teaches away from the invention, or others have copied the invention.  *See, e.g.*, *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1381 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 974 (2001).

39.     Secondary considerations are circumstantial evidence that shed light on the obviousness determination by drawing inferences from underlying facts.  They are found to be probative of whether an invention was obvious or not in that they "inoculate the obviousness inquiry against hindsight."  *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377–79 (Fed. Cir. 2012).  But secondary considerations of non-obviousness cannot overcome a strong showing of obviousness.  *Tokai Corp. v. Easton Enterprises,* 632 F.3d 1358, 1371 (Fed. Cir. 2011).

40.     While the overall burden in respect of obviousness remains on the challenger, the patentee must establish the existence of a secondary consideration supporting non-obviousness. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081 n.8 (Fed. Cir. 2012) (burden of establishing nonobviousness does not shift to patentee, but patentee could not rely on unexpected results because it "failed to offer adequate proof").

41.     The burden is also on the patentee to demonstrate a nexus between the secondary indicia of non-obviousness relied upon and the claimed invention.  *See, e.g.*, *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (although embodiments of the invention may have enjoyed commercial success, patentee failed to link that success to the patented features).

**EXHIBIT 5**

██████████ – ████████████████

42.     Where a "product embodie[s] at least two patents," the patentee is not entitled to a presumption of nexus because that is "not a situation where the success of a product can be attributed to a single patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1289, 1299 (Fed. Cir. 2010), *reh'g en banc* granted, opinion vacated on other grounds, 374 F. App'x 35 (Fed. Cir. 2010), and opinion reinstated in part, 649 F.3d 1276 (Fed. Cir. 2011).

43.     To establish a long-felt need as a supporting secondary consideration of non-obviousness, the patentee must demonstrate with objective evidence that the art at the time of the invention recognized a problem for a long period of time without solution, *In re Gershon*, 372 F.2d 535, 539 (C.C.P.A. 1967), and actually attempted to solve the same, *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382 (Fed. Cir. 1983).  It must then show that the invention actually satisfied the long-felt need, *In re Cavanagh*, 436 F.2d 491, 496 (C.C.P.A. 1971), and that another did not do so before the invention date.  *Newell Companies v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).

44.     In addition to nexus, in evaluating unexpected results, evidence must establish that the allegedly superior characteristic tending to show nonobviousness was in fact unexpected as compared to the prior art.  *See Prizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1370-71 (Fed. Cir. 2007).

45.     To demonstrate failure of others in support of nonobviousness, evidence must establish that "skilled workers in the art have tried and failed to solve the problem."  *Ecolochem, Inc. v. So. Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000).

46.     "Absent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness."  *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

47. Long felt need is evaluated from the date of the closest prior art. *See Warner Chilcott Co. v. Teva Pharms. USA, Inc.*, 37 F.Supp.3d 731, 739 (D. Del. 2014) (Stark, J.) (citing *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 36 (1966)).

48. Alleged industry praise must be linked to the patented invention. *See Geo M. Martin Co. v. Alliance Machine Sys. Intern. LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010). "While 'praise in the industry for a patented invention, and specifically praise from a competitor tends to 'indicate that the invention was not obvious,'" self-serving statements do not have the same reliability. *See In re Cree*, 818 F.3d 694, 702 (Fed. Cir 2016); *see also Geo M. Martin*, 618 F.3d at 1305.

**D. Indefiniteness**

49. A patent's specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . ." 35 U.S.C. § 112(a).

50. Section 112 "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014).

51. Indefiniteness is a question of law. *Infinite Computer Prods. v. Oki Data Ams., Inc.*, 987 F.3d 1053, 1059 (Fed. Cir. 2021).

**E. Lack of Adequate Written Description**

52. A patent's specification "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to

**EXHIBIT 5**

███████████ – ██████████████████████

enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . ." 35 U.S.C. § 112(a).

53.     The first paragraph of § 112 contains two separate requirements: a "written description" and "enablement." *See Ariad Pharm., Inc., v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

54.     Whether a specification satisfies the written description requirement is a question of fact. *GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 729 (Fed. Cir. 2014).

55.     To comply with the written description requirement, a patentee must describe "the invention, with all its claimed limitations." *ICU Med., Inc. v Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1379 (Fed. Cir. 2009) (citation omitted).  A specification contains adequate written description if "the description . . . clearly allow[s] persons of ordinary skill in the art to recognize that the inventor invented what is claimed," and "had possession of the claimed subject matter as of the filing date." *Ariad.* at 1351 (quotation and alterations omitted).

56.     "[T]he hallmark of written description is disclosure," and "the test requires an objective inquiry into the four corners of the specification" to determine whether it "show[s] that the inventor actually invented the invention claimed." *Id.* The Federal Circuit has "repeatedly stated that actual 'possession' or reduction to practice outside of the specification is not enough"; "the specification itself . . . must demonstrate possession." *Id.* at 1352.  A "description that merely renders the invention obvious does not satisfy the requirement." *Id.*

57.     Merely describing one embodiment of a claimed invention does not necessarily satisfy the written description requirement; instead, description of a "single embodiment would support [] a generic claim only if the specification would reasonably convey to a person of skill in the art that [the inventor] had possession of the claimed subject matter." *LizardTech, Inc. v. Earth*

*Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005). If "the specification … fail[s] to demonstrate that the patentee possessed the full scope of the invention recited in [a] claim" at the time of filing, it "provides inadequate support for the claim under section 112." *Id.* at 1345.

58. To evaluate the adequacy of the disclosure supporting claims, courts will analyze: (1) the existing knowledge in the particular field, (2) the extent and content of the prior art, (3) the maturity of the science or technology, and (4) the predictability of the aspect at issue. *Ariad*, 598 F.3d at 1351 (citing *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005)).

59. A "mere wish or plan" for obtaining the claimed invention is not an adequate written description. *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011).

**F. Lack of Enablement**

60. Enablement is a question of law, with factual inquiries underlying the determination. *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010).

61. To meet the enablement requirement, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012).

62. "Enablement serves the dual function in the patent system of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention." *Magsil Corp.* at 1380-1381. "Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *Id.* at 1381. "The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Id.* (internal quotation marks omitted).

**EXHIBIT 5**

[redacted] – [redacted]

63. Open claim language chosen by a patentee does not grant them any forgiveness on the scope of the required enablement. *See MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1383 (Fed. Cir. 2012).

64. To determine if the experimentation necessary is undue, courts consider: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

65. A patent "cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification." *ALZA Corp*. at 941.

66. The specification must enable one skilled in the art "how to make and how to use the invention as broadly as it is claimed." *See In re Goodman*, 11 F.3d 1046, 1050 (Fed. Cir. 1993) (citing *In re Vaeck*, 947 F.2d 488, 496 (Fed. Cir. 1991)). For instance, a patent may not be enabled where a single example in the patent specification did not enable the broad scope of the claims. *See In re Goodman*, 11 F.3d at 1050-1052; *see also Enzo Life Sci., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340 (Fed. Cir. 2019).

**G. Improper inventorship**

67. A patent is invalid if it incorrectly identifies the inventors of the inventions claimed therein. *See, e.g., Egenea, Inc. v. Cisco Sys.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020) (setting forth the relevant legal princples. Although the error may be corrected, failure to make the necessary corrections to inventorship invalidates the patent. *See id.* at 1376.

**EXHIBIT 5**

███████████ – ███████████████

## III.    REMEDIES

### A.    Permanent Injunction

68.    Another legal issue that remains to be litigated is, if Azurity prevails on its infringement claims against Alkem and Alkem does not invalidate the Asserted Claims, whether Azurity has carried its burden of proving entitlement to injunctive relief against Alkem.

69.    Under 35 U.S.C. § 271(e)(4)(B), "injunctive relief *may* be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug or veterinary biological product" (emphasis added); *see Voda v. Cordis Corp.*, 536 F.3d 1311, 1329 (Fed. Cir. 2008) (affirming the denial of a permanent injunction where generic drug manufacturer lost infringement decision).

70.    In order to establish that an injunction is warranted, Azurity must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Alcon, Inc. v. Teva Pharm. USA, Inc.*, No. 06-cv-234-SLR, 2010 U.S. Dist. LEXIS 78987, at *5 (D. Del. Aug. 5, 2010).

71.    "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *Id.* (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311-13 (1982)).

72.    A patentee's "statutory right to exclude alone [does not justify] [a] general rule in favor of permanent injunctive relief," and that "injunctive relief 'may' issue only 'in accordance with the principles of equity.'" *eBay*, 547 U.S. at 392; *Alcon*, 2010 U.S. Dist. LEXIS 78987, at *5.

**EXHIBIT 5**

███████████  – ████████████

### B.   Exceptional Case

73.   Should Alkem prevail, another legal issue that remains to be litigated is whether this case is exceptional and Alkem is entitled to an award of attorney fees.

74.   In exceptional cases, a court may award reasonable attorneys' fees to the prevailing party.  35 U.S.C. § 285.

75.   In deciding whether to award attorneys' fees, the court must undertake a two-step inquiry.  *See TruePosition, Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400, 413 (D. Del. 2009) (citing *Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994)).

76.   First, the court "must determine whether there is clear and convincing evidence that the case is 'exceptional.'"  *TruePosition*, 611 F. Supp. 2d at 413 (citation and quotation marks omitted). In deciding whether a case is exceptional, the court must evaluate whether it "stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). This determination is a "case-by-case exercise" to be made "considering the totality of the circumstances."  *Id*. The burden of proof rests with the prevailing party.  *See Otsuka Pharm. Co. v. Sandoz, Inc.*, No. CV 07-1000 (MLC), 2015 U.S. Dist. LEXIS, at *20 (D.N.J. Oct. 9, 2015).

77.   Second, the court must determine whether an award of attorneys' fees to the prevailing party is warranted.  *Id*.  Courts usually award attorney fees upon a finding of misconduct, including filing of frivolous lawsuits and re-litigation of issues already decided by the court.  *See, e.g., Intellect Wireless, Inc. v. Sharp Corp.*, 45 F. Supp. 3d 839, 853 (N. D. Ill. 2014); *Chalumeau Power Sys. LLC v. Alcatel–Lucent*, No. 11–1175-RGA, 2014 U.S. Dist. LEXIS 127645, at *2-*10 (D. Del. Sept. 12, 2014), aff'd, 611 Fed. App'x 1008 (Fed. Cir. 2015); *Cognex Corp. v.*

**EXHIBIT 5**

████████ – ███████████████████

*Microscan Sys., Inc.*, No. 13-cv-2027, 2014 U.S. Dist. LEXIS 91203, at *9-*12 (S.D.N.Y. June 30, 2014).

###### C.     Costs

78.     Should Alkem prevail, another legal issue that remains to be litigated is whether Alkem may recover costs.

79.     The process of deciding whether to award costs in a patent trial is no different than that employed in any other type of trial.  *See Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1183 (Fed. Cir. 1996).  Pursuant to Federal Rule of Civil Procedure 54(d)(1), costs must be awarded to the prevailing party as a matter of course, unless the court directs otherwise.  *See id.* at 1182.  By statute, courts have discretion to award costs for: (i) clerk and marshal fees; (ii) court reporter fees; (iii) printing and witness fees; (iv) copying fees; (v) docket fees; and (vi) compensation for court-appointed experts, interpreters, and special interpretation services.  28 U.S.C. § 1920; *see also* 28 U.S.C. § 1821; D. Del. LR 54.1.

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., Plaintiff, | ) | C.A. No. 19-2100 (LPS) (CJB) |
| v. | ) | [redacted] |
| ALKEM LABORATORIES LTD., Defendant. | ) | |

**EXHIBIT 6**

**PLAINTIFF'S WITNESS LIST**

[redacted]

Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") identifies the following witnesses whom it may call live or by deposition at trial. This list is not a commitment that Azurity will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial.

With respect to Defendant's witnesses, Azurity reserves the right to introduce testimony through deposition or live examination, as appropriate. Azurity also reserves the right to call any witness called by Defendant, and to revise this list in light of rulings by the Court, Defendant's witness list, or any other changed circumstances. Azurity further reserves the right to call one or more additional witnesses whose testimony is necessary to establish authenticity or admissibility of any trial exhibit if the admissibility of the exhibit is challenged.

## I. FACT WITNESSES

1. Michael Beckloff
2. Ujwal Chhabra
3. Mana Pradhan
4. Any witness named on Defendant's witness list

## II. EXPERT WITNESSES

Below are the expert witnesses Azurity proposes to call at trial live (whether in person or remotely) or by deposition. Azurity reserves the right to further modify, supplement, and/or amend the Final Pretrial Order and exhibits in light of issues that remain open and until entry of the Final Pretrial Order.

### 1. <u>Dr. Steven Little</u>

Dr. Little is the Department Chair of Chemical and Petroleum Engineering and a Distinguished Professor of the University of Pittsburgh, Swanson School of Engineering, a post Dr. Little has held since 2012. Dr. Little is an active researcher. He is the Director of a research laboratory at the

University of Pittsburgh where, over the past 15 years, he has served as the principal investigator on tens of millions of dollars of research activities focused on pharmaceutical formulation. Dr. Little has authored or coauthored over 100 peer-reviewed publications and book chapters relating to pharmaceutical formulation science. Dr. Little has also served as an editor and reviewer for over 50 scientific journals in the field of pharmaceutical formulations.

Dr. Little is the primary inventor on over 20 pieces of intellectual property relating to pharmaceutical formulations—four of which are licensed for industry use. He has experience developing a wide range of pharmaceutical formulations including small molecule drug products, protein-based products, and nucleic acid-based products, as well as experience formulating drug products for oral administration. Dr. Little co-founded a specialty pharmaceutical company, Qrono Inc., in 2011. Dr. Little has received numerous awards for his work in pharmaceutical science, including the American Society of Engineering Education Curtis McGraw Research Award in 2015. He has been elected as a Fellow of the Biomedical Engineering Society, a Fellow of the American Institute for Medical and Biological Engineering, a Fellow of the Controlled Release Society, a Fellow of the American Association for the Advancement of Science, and a Fellow of the National Academy of Inventors. Dr. Little currently serves as a member of the Executive Awards Committee for the American Association of Pharmaceutical Scientists where his responsibilities include reviewing and recognizing the most outstanding contributions to the field of pharmaceutical science.

Azurity will ask the Court to recognize Dr. Little as an expert in pharmaceutical formulation, pharmaceutical formulation development, and chemistry. Dr. Little is expected to testify in accordance with his expert reports and deposition testimony, including regarding: (1) Alkem's infringement of the Asserted Patents; (2) the validity of the Asserted Patents,; and (3) pharmaceutical formulation science.

[redacted]

**2. <u>Dr. John D. Mahan</u>**

Dr. Mahan is currently a Professor of Pediatrics at the College of Medicine at The Ohio State University, a post Dr. Mahan has held since 2001. Dr. Mahan is a board-certified pediatric nephrologist. Currently, Dr. Mahan is the Director of the Pediatric Nephrology Fellowship Program at the Nationwide Children's Hospital. Dr. Mahan is a recognized expert in his field, having co-authored more than 240 publications (including books and academic papers) and been invited to give over 260 presentations. His research focuses on hypertension, glomerular disorders, proteinuria, glomerular basement membrane structure, renal osteodystrophy, metabolic bone disease, growth failure in renal disorders, renal transplantation, and medical education.

Dr. Mahan has been the Principal Investigator on 20 clinical studies, many of which related to the treatment of pediatric hypertension. Dr. Mahan has also participated as a co-investigator in 30 other clinical studies. Additionally, Dr. Mahan has served as a reviewer for 20 journals, including *Pediatric Research*, the *Journal of Pediatrics*, *Clinical Pediatrics*, *Pediatrics*, and *Frontiers in Pediatrics*. Dr. Mahan also served as a grant reviewer for several organizations, including the National Institute of Diabetes and Digestive and Kidney Diseases.

Azurity will ask the Court to recognize Dr. Mahan as an expert in hypertension , including pediatric hypertension, and the treatment thereof. Dr. Mahan is expected to testify in accordance with his expert report~~s~~ and deposition testimony including regarding: (1) background related to cardiovascular disease, including hypertension, heart failure, and left ventricular dysfunction; and (2) objective indicia of non-obviousness of the Asserted Patents.

## III. DEFENDANT'S OBJECTIONS TO PLAINTIFF'S WITNESSES

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>ALKEM LABORATORIES LTD.,<br><br>*Defendant*. | : | C.A. No. 1:19-cv-02100-MSG<br><br>[redacted] |

**EXHIBIT 7**

**DEFENDANT, ALKEM LABORATORIES LTD.'S LIST**
**<u>OF WITNESSES TO BE CALLED LIVE OR BY DEPOSITION</u>**

Defendant, Alkem Laboratories Ltd. ("Defendant" or "Alkem") identifies the following witnesses whom it may call live or by deposition at trial.  This list is not a commitment that Alkem will call any particular witness at Trial, or a representation that any of the witnesses listed are available or will appear for Trial.  If any third-party witness is unavailable, Alkem reserves the right to use his or her deposition testimony.  With respect to Plaintiff's witnesses, Alkem reserves the right to introduce testimony through deposition or live examination, as appropriate.  Alkem also reserves the right to call any witness called by Plaintiff and to revise this list in light of further rulings by the Court or any other changed circumstances.  Alkem reserves the right to call one or more additional witnesses whose testimony is necessary to establish authenticity or admissibility or any Trial exhibit if the admissibility is challenged by Plaintiff.

## I.      EXPERT WITNESSES

Below are the expert witnesses Alkem intends to call as live witnesses at Trial to the extent permitted under the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

1.      Barrett E. Rabinow, Ph.D.

2.      Panayiotis P. Constantinides, Ph.D.

## II.     FACT WITNESSES

Below are the fact witnesses Alkem intends to call as fact witnesses and an indication as to whether the witness will testify live or by deposition.

1. Gerold Mosher (by deposition)

2. David Miles (by deposition)

3. Manas Pradhan (by deposition)

# EXHIBIT 8

# AZURITY'S DEPOSITION DESIGNATIONS, ALKEM'S OBJECTIONS AND COUNTER-DESIGNATIONS, AND AZURITY'S OBJECTIONS AND COUNTER-COUNTER DESIGNATIONS

## 1. UJWAL CHHABRA, February 8, 2022

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 7:16-19 | | | | |
| 13:6-8 | | | | |
| 17:2 – 18:7 | | | | |
| 18-13-16 | | | | |
| 18:18-22 | | | | |
| 18:25 – 19:4 | | | | |
| 20:14-16 | | | | |
| 20:21 – 22:2 | | | | |
| 22:10 – 23:1 | | | | |
| 23:10-13 | | | | |
| 23:18-21 | | | | |
| 23:22-23 | | | | |
| 24:1-2 | | | | |
| 24:7-22 | | | | |
| 25:3-4 | | | | |
| 25:10-15 | | | | |
| 25:19 – 26:9 | | | | |
| 26:12-14 | | | | |
| 26:16 – 27:18 | | | | |
| 28:1-4 | | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 28:21-24 | | | | |
| 29:3-5 | | | | |
| 29:7 – 30:11 | | | | |
| 30:12-14 | | | | |
| 30:19-20 | | | | |
| 30:23-25 | | | | |
| 31:3-4 | | | | |
| 31:6 – 32:5 | | | | |
| 32:24 – 33:1 | | | | |
| 33:3-7 | | | | |
| 33:9-10 | | | | |
| 33:12-16 | | | | |
| 33:18 – 34:3 | | | | |
| 34:11-17 | | | | |
| 34:19-20 | | | | |
| 36:3-5 | | | | |
| 36:11-12 | | | | |
| 36:14-19 | | | | |
| 36:22-25 | | | | |
| 37:2-9 | | | | |
| 37:11-20 | | | | |
| 37:25 – 38:4 | | | | |
| 38:6-14 | | | | |
| 38:17-19 | | | | |
| 38:21 – 39:25 | | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 40:6 – 42:5 | R, F | | | |
| 42:9-19 | R, F | | | |
| 43:4-6 | | | | |
| 43:13 – 45:10 | | | | |
| 45:13-15 | | | | |
| 45:17 – 46:9 | R, F, BE | | | |
| 46:12 | R | | | |
| 46:14-16 | R | | | |
| 46:19 | R | | | |
| 46:21 – 48:15 | F, BE | | | |
| 48:19 – 50:5 | F, BE | | | |
| 50:9 – 51:4 | F, BE | | | |
| 51:8-9 | F, BE | | | |
| 51:11-13 | F, BE | | | |
| 51:15 | F, BE | | | |
| 51:17-18 | F, BE | | | |
| 51:20-23 | F, BE | | | |
| 51:25 – 52:11 | F, BE | | | |
| 52:13 | F, BE | | | |
| 52:15-19 | F, BE | | | |
| 52:23-24 | F, BE | | | |
| 53:1-4 | X, F | | | |
| 53:6-9 | X, F | | | |
| 53:12-15 | X, F | | | |
| 53:17-19 | X, F | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 53:21-22 | X, F, S | | | |
| 54:5-7 | | | | |
| 55:2 – 57:7 | | | | |
| 57:10-11 | | | | |
| 57:14-15 | | | | |
| 57:19-22 | F, BE | 57:23-25, 58:3-5, 58:7-8, 58:10-15, 58:17-59:1, 59:6-8, 59:11-14 | R; P | |
| 59:15-17 | | | | |
| 59:24 – 60:5 | | | | |
| 60:7-8 | | | | |
| 60:10 – 62:25 | X, F, S, BE | | | |
| 63:5-8 | X, F | | | |
| 63:10-19 | X, F, S | | | |
| 63:24 – 64:8 | | | | |
| 64:12-17 | BE | | | |
| 64:19-24 | BE | | | |
| 65:5-7 | F, BE | | | |
| 65:18 – 66:1 | X, F, S, BE | | | |
| 68:21-23 | | | | |
| 69:3 – 70:7 | X, F, S, BE | | | |
| 70:10-12 | X, F, S, BE | | | |
| 70:14 – 71:15 | F, BE | | | |
| 71:19-22 | F, BE, S | | | |
| 71:24 – 72:16 | BE, S | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 72:19 | BE, S | | | |
| 72:21-24 | F, S | | | |
| 73:2-4 | S, F | | | |
| 73:6-23 | BE | | | |
| 74:2-6 | BE, S, F | | | |
| 74:9-10 | BE, S, F | | | |
| 74:12-13 | F, X, S | | | |
| 74:21 | F, X, S | | | |
| 74:23 – 75:4 | | | | |
| 75:6 | | | | |
| 75:8-16 | R | | | |
| 75:18-20 | R | | | |
| 75:24 – 77:2 | R, BE, S, F | | | |
| 77:8-11 | BE, F | | | |
| 81:14-16 | | | | |
| 81:21-22 | BE, F | | | |
| 81:25 – 82:12 | BE, F | | | |
| 82:16 | | | | |
| 83:16-19 | | | | |
| 83:22-24 | BE, F, H, X, S | | | |
| 84:2-8 | BE, F, H, X, S | | | |
| 84:17-22 | BE, F, H, X, S | | | |
| 84:25 – 85:2 | BE, F, H, X, S | | | |
| 85:4-7 | BE, F, H, X, S | | | |
| 85:11-12 | BE, F, H, X, S | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 85:14-18 | BE, F, H, X, S | | | |
| 85:20 | BE, F, H, X, S | | | |
| 85:22-25 | BE, F, H, X, S | | | |
| 86:2-6 | BE, F, H, X, S | | | |
| 86:8-12 | BE, F, H, X, S | | | |
| 86:19-21 | BE, F, H, X, S | | | |
| 86:23-25 | BE, F, H, X, S | | | |
| 87:6 | BE, F, H, X, S | | | |
| 94:15-17 | | | | |
| 94:22 – 95:1 | | | | |
| 95:5-6 | | | | |
| 95:9-10 | | | | |
| 95:12 – 96:16 | BE, F, H, X, S | | | |
| 96:20 – 97:3 | BE, F, H, X, S | | | |
| 97:5-18 | BE, F, H, X, S | | | |
| 97:20 | BE, F, H, X, S | | | |
| 97:23 – 98:3 | BE, F, H, X, S | | | |
| 98:6 – 99:14 | BE, F, H, X, S | | | |
| 99:19 – 100:24 | R, BE, H, F, S, WPAC | | | |
| 101:15-17 | Q, R, WPAC | | | |
| 102:3-6 | | | | |
| 102:10-25 | F, H, S | | | |
| 103:8-9 | F, H, R | | | |
| 103:15 – 104:9 | F, H, R | | | |
| 104:13 – 105:11 | H, BE, F, R, S | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 105:22-23 | F, H, R | | | |
| 106:3-21 | F, H, S, X | | | |
| 107:5-12 | R, H, F | R, H, F, X, S | | |
| 107:15-19 | R, H, F | | | |
| 107:21 – 108:2 | R, H, F, BE, S | | | |
| 108:7-8 | R, H, F, BE, S | | | |
| 108:10-19 | R, H, F, X, S | | | |
| 108:21-25 | R, H, F, X, S | | | |
| 109:2-3 | R, H, F, X, S | | | |
| 109:6-11 | R, H, F, X, S | | | |
| 109:20 – 110:15 | R, H, F, X, S | | | |
| 110:21-22 | R | | | |
| 111:14-18 | R | | | |
| 111:23 – 113:23 | R | | | |
| 119:7-21 | R, X, S, F | | | |
| 119:25 – 120:6 | R, X, S, F | | | |

## 2. MANAS PRADHAN, February 3, 2022

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 6:16-19 | | | | |
| 6:22 | | | | |
| 7:1-2 | | | | |
| 7:4-7 | | | | |
| 11:16 – 12:2 | | | | |
| 12:10-12 | | | | |
| 15:21 – 16:10 | | | | |
| 16:13-14 | | | | |
| 16:16-18 | | | | |
| 16:20 – 17:1 | | 18:3-5 | P; R | |
| 17:8-13 | | | | |
| 20:7-11 | | | | |
| 20:16-21 | | | | |
| 21:3-6 | | | | |
| 21:8-9 | | | | |
| 21:14-21 | | | | |
| 22:8-10 | | | | |
| 22:12 – 23:3 | | | | |
| 28:3-13 | | | | |
| 28:15 | | | | |
| 29:22-25 | | | | |
| 30:2 | | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 38:18-20 | | | | |
| 38:22 | | | | |
| 38:24 – 39:2 | | | | |
| 39:14-15 | F, BE | | | |
| 39:17-20 | F, BE | | | |
| 40:22-23 | | | | |
| 40:25 – 41:1 | | | | |
| 41:3-9 | | | | |
| 41:12-14 | | | | |
| 41:16-17 | | | | |
| 41:19-20 | | | | |
| 42:17-18 | | | | |
| 42:22-25 | | | | |
| 43:3 | | | | |
| 43:15-16 | | | | |
| 43:22 – 44:5 | | | | |
| 44:9-24 | | | | |
| 45:1-10 | | | | |
| 45:15 | | | | |
| 45:17 – 46:6 | | | | |
| 46:21 – 47:5 | | | | |
| 47:8 | | | | |
| 47:10-12 | | | | |
| 47:14-15 | | | | |
| 47:17 – 48:10 | F, S, X, BE | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 48:14-15 | F, S, X | | | |
| 48:17 – 49:5 | | | | |
| 49:10-12 | R, S, X | | | |
| 49:14 – 51:2 | F, BE, R, S, X | | | |
| 51:7-8 | | | | |
| 51:17-21 | | | | |
| 51:23-24 | | | | |
| 52:1-23 | | | | |
| 53:7 – 54:8 | | | | |
| 54:11-13 | S, X | | | |
| 54:16 – 55:2 | | | | |
| 55:4-19 | | | | |
| 56:2-8 | | | | |
| 56:11-12 | | | | |
| 56:14-17 | | | | |
| 56:22 – 57:14 | BE, S, X | | | |
| 57:18-21 | BE, S, X | | | |
| 57:24 – 58:20 | | | | |
| 60:18-24 | | | | |
| 61:2 – 62:1 | | | | |
| 62:7-11 | | | | |
| 62:15-19 | | 65:8-9, 65:19-66:2 | R; P; I | |
| 64:21 – 65:7 | S, X | | | |
| 67:6-9 | | | | |
| 67:13-23 | | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 68:2-8 | | | | |
| 68:11 – 69:1 | | | | |
| 69:3 | | | | |
| 69:5-7 | BE, S, X | | | |
| 69:9-12 | BE, S, X | | | |
| 69:15-18 | BE, S, X | | | |
| 71:17-25 | BE | | | |
| 72:2 | X | | | |
| 72:11 – 73:10 | BE, S, X | | | |
| 73:20-23 | | | | |
| 74:3-16 | BE, S, X | | | |
| 74:18 – 75:1 | BE, S, X | | | |
| 75:3-7 | | | | |
| 75:9-11 | | 75:13-15, 75:17-18 | R; P | |
| 76:10-17 | BE, NR | | | |
| 76:19-22 | BE, NR | | | |
| 76:25 – 77:2 | BE | | | |
| 77:4-5 | BE | | | |
| 77:24 – 78:12 | S, X | | | |
| 78:16-17 | S, X | | | |
| 78:20 – 79:2 | | | | |
| 79:6-11 | S, X | | | |
| 79:15 | S, X | | | |
| 79:21 | S, X, F | | | |
| 80:3-5 | | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 80:8 | | | | |
| 81:11-19 | | | | |
| 81:24 – 82:1 | F, S, X | | | |
| 82:4 | F, S, X | | | |
| 82:23 – 83:1 | H, S, X, R, BE, WPAC | | | |
| 83:10 – 84:8 | H, S, X, R, BE, WPAC | | | |
| 84:20-21 | H, S, X, R, BE, WPAC | 84:9-12, 84:15-16 | R; P | |
| 85:4-18 | H, S, X, R, BE, WPAC | | | |
| 86:17-21 | H, S, X, R, BE, WPAC, F | | | |
| 86:24-25 | H, S, X, R, BE, WPAC | | | |
| 87:3-4 | H, S, X, R, BE, WPAC | | | |
| 87:6-12 | H, S, X, R, BE, WPAC | | | |
| 87:19-21 | H, S, X, R, BE, WPAC | | | |
| 87:24-25 | H, S, X, R, BE, WPAC | | | |
| 88:2-4 | BE, S, X, F, R | | | |
| 88:7 | BE, S, X, F, R | | | |
| 88:10-12 | BE, S, X, F, R | | | |
| 88:14-19 | BE, S, X, F, R | | | |
| 88:23-25 | BE, S, X, F, R | | | |
| 89:3-6 | | | | |
| 89:11-14 | | | | |
| 89:24 – 90:6 | | | | |
| 90:12-24 | | | | |
| 91:4-8 | | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 91:11-13 | | | | |
| 91:15-16 | | | | |
| 91:18-20 | | | | |
| 92:8-9 | | | | |
| 93:12-14 | | | | |
| 93:16 | | | | |
| 93:18-19 | | | | |
| 93:24 | | | | |
| 94:5-7 | | | | |
| 94:9-11 | | | | |
| 94:13-16 | | | | |
| 94:19-20 | | | | |
| 98:1-12 | | | | |
| 98:15 – 99:19 | | | | |
| 99:22-25 | | | | |
| 100:3 – 101:2 | | | | |
| 101:4-5 | | | | |
| 101:7-15 | | | | |
| 101:17-18 | | | | |
| 101:20 – 102:3 | | 102:20-23, 102:25-103:1 | R; P | |
| 102:5-6 | | | | |
| 102:9-11 | | | | |
| 106:8-12 | | | | |
| 106:17-24 | | | | |
| 107:3 – 109:12 | | | | |

| Azurity's Designations | Alkem's Objections | Alkem's Counter-designations | Azurity's Objections to Counter-designations | Azurity's Counter-counter designations |
|---|---|---|---|---|
| 109:14-17 | | | | |
| 112:10 – 113:1 | | | | |
| 113:4-14 | | | | |
| 113:16-17 | | | | |
| 113:19 | | | | |
| 113:21-23 | | | | |
| 113:25 – 114:1 | | | | |
| 114:3-7 | | | | |
| 114:17-18 | | | | |
| 114:22 – 115:13 | | | | |
| 115:17-19 | | | | |
| 115:21-24 | | | | |
| 116:1-2 | | | | |
| 116:5-8 | | | | |
| 116:10 – 117:4 | | | | |
| 117:24 – 118:17 | | | | |
| 122:10 – 123:5 | | | | |
| 123:16 – 124:13 | | | | |
| 124:17-19 | | | | |
| 124:24 – 125:11 | | | | |
| 125:18-19 | | | | |
| 130:13-15 | | | | |
| 130:19 – 131:14 | | | | |
| 131:25 – 132:11 | | | | |
| 134:4-7 | | | | |

**ABBREVIATION AND FEDERAL RULE OF EVIDENCE**
**KEY TO ALKEM's OBJECTIONS**

| Code | Deposition Designation Objection | Applicable Rule(s) |
|---|---|---|
| R | Relevance | FRE 401, 402, 403 |
| H | Hearsay | FRE 801, 802, 805 |
| F | Lack of Foundation | FRE 602, 901 |
| S | Speculation | FRE 602 |
| BE | Best Evidence | FRE 1001, 1002 |
| X | Improper Expert Testimony | FRE 701 |
| NR | Non-Responsive | FRE 401, 403, 611(a) |
| WPAC | Privileged or Work Product | FRCP 26(b), FRE 501, 502 |
| Q | Colloquy | FRE 401, 402, 403 |

**AZURITY'S ABBREVIATION AND FEDERAL RULES OF EVIDENCE KEY TO THE OBJECTIONS**

| Code | Objection |
|---|---|
| A | Argumentative |
| AT | Attorney objections not removed |
| AU | Authenticity or Identification (FRE 901) |
| B | Violates Best Evidence Rule (FRE 1002-1004) |
| C | Compound |
| D | Duplicative/Cumulative |
| F | Lack of Foundation (FRE 602) |
| H | Hearsay/Improper Use of Deposition (FRE 801-802: FRCP 32) |
| I | Improper/Incomplete Designation (FRE 106: FRCP 32(a)(6)) |
| IC | Improper Counter-Designation (FRE 106: FRCP 32(a)(6)) |
| ID | Improper Designation of a Witness To Be Called Live (FRCP 32) |
| IO | Improper Lay or Expert Opinion (FRE 701-703) |
| K | Lack of Personal Knowledge/Incompetent (FRE 602) |
| L | Leading Objection in Redirects |
| LC | Improper Legal Conclusion (FRE 403) |
| M | Misleading/Mischaracterizes Prior Testimony |
| MD | Mischaracterizes Underlying Document (FRE 401-403) |
| N | Not previously produced, lacks production numbers, or illegible |
| NE | Assumes Facts Not In Evidence (FRE 103) |
| NR | Nonresponsive |
| NSW | No Sponsoring Witness |
| OS | Oversized document in terms of page length, rendering meaningful objections impossible until Defendant knows the purpose for which the document is being offered |
| P | Prejudice/Confusion/Delay/Waste of Time (FRE 403) |
| R | Relevance (FRE 401/402) |
| RRW | Writing or recorded statement cannot be introduced without other writing or recorded statement (FRE 106) |
| S | Calls for Speculation (FRE 602) |
| SC | Beyond the Scope of the Witness's Testimony as a Corporate Representative |
| U | Improper Use Against Other Parties or For Other Purposes (FRE 105) |
| V | Vague/Ambiguous/Overbroad |
| X | Incomplete Document (FRE 106) |
| Y | Wrong Document or Incorrectly Described |
| Z | Reserved Because Exhibit Has Not Been Provided, the Copy Provided is Illegible, and/or the Entry Includes Multiple Documents |

# EXHIBIT 9

**fIN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AZURITY PHARMACEUTICALS, INC.

*Plaintiff*,

v.

ALKEM LABORATORIES LTD.,

*Defendant*.

C.A. No. 1:19-cv-02100-MSG

**EXHIBIT 9A**

**DEFENDANT, ALKEM LABORATORIES LTD.'S DEPOSITION DESIGNATIONS AND COUNTER-DESIGNATIONS AND PLAINTIFF'S OBJECTIONS AND COUNTER-DESIGNATIONS OF THE DEPOSITION OF DAVID MILES TAKEN FEBRUARY 9, 2022**

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 38:23 – 39:1 | REL; P; I; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 39:4 – 39:14 | REL; P; I; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 39:17 – 39:19 | REL; P; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 40:16 – 41:1 | REL; P; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 41:4 – 41:11 | REL; P; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 41:15 – 41:16 | REL; P; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 41:19 – 41:22 | REL; P; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 41:25 – 42:4 | REL; P; I; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 42:7 – 42:8 | REL; P; I; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 42:12 – 42:14 | REL; P; I; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 42:17- 42:21 | REL; P; I; V | 19:15-20:3; 20:9-11; 22:2-7; 39:21-23; 40:1 | F, R, H | |
| 43:3 – 43:4 | REL; P; I; V | | | |
| 43:8 – 43:14 | REL; P; I; V | | | |
| 43:17 – 43:22 | REL; P; I; V | | | |
| 43:25 | REL; P; I; V | | | |
| 46:20 – 46:25 | REL; P; I; V | 45:25-46:6; 46:9-13; 46:15; 46:18 | | |
| 47:3 – 47:10 | REL; P; I; V | 45:25-46:6; 46:9-13; 46:15; 46:18 | | |
| 47:13 – 47:21 | REL; P; I; V | 45:25-46:6; 46:9-13; 46:15; 46:18 | | |
| 47:24 – 48:6 | REL; P; I; V | 45:25-46:6; 46:9-13; 46:15; 46:18 | | |
| 48:9 – 48:12 | REL; P; I; V | 45:25-46:6; 46:9-13; 46:15; 46:18 | | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AZURITY PHARMACEUTICALS, INC.

*Plaintiff*,

v.

ALKEM LABORATORIES LTD.,

*Defendant*.

C.A. No. 1:19-cv-02100-MSG

**EXHIBIT 9B**

**DEFENDANT, ALKEM LABORATORIES LTD.'S DEPOSITION DESIGNATIONS AND COUNTER-DESIGNATIONS AND PLAINTIFF'S OBJECTIONS AND COUNTER-DESIGNATIONS OF THE DEPOSITION OF MANAS PRADHAN TAKEN FEBRUARY 3, 2022**

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 41:6 – 41:14 | R; P; I | 7:22-24 | R | 7:10-13 |
| 59:17 – 60:3 | R; P; I | 7:22-24 | R | 7:10-13 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

AZURITY PHARMACEUTICALS, INC.

*Plaintiff*,

v.

ALKEM LABORATORIES LTD.,

*Defendant*.

C.A. No. 1:19-cv-02100-MSG

**EXHIBIT 9C**

**DEFENDANT, ALKEM LABORATORIES LTD.'S DEPOSITION DESIGNATIONS AND COUNTER-DESIGNATIONS AND PLAINTIFF'S OBJECTIONS AND COUNTER-DESIGNATIONS OF THE DEPOSITION OF GEROLD MOSHER TAKEN FEBRUARY 8, 2022**

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 10:4 – 10:6 | R; P; I | | | |
| 10:10 – 10:11 | R; P | | | |
| 11:6 – 11:8 | R; P | | | |
| 11:12 – 11:16 | R; P | | | |
| 11:20 – 11:24 | R; P | | | |
| 12:3 | R; P | | | |
| 12:4 – 12:10 | R; P | | | |
| 13:12 – 13:18 | R; P | | | |
| 13:19 – 14:2 | R; P | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 14:3 – 14:7 | R; P; I | 14:8-11 | | |
| 14:15 – 14:22 | R; P; I | | | |
| 14:23 – 15:12 | R; P; I | | | |
| 15:16 – 15:17 | R; P | | | |
| 15:23 | R; P | | | |
| 16:2 – 16:6 | R; P | | | |
| 16:10 – 16:12 | R; P | | | |
| 18:15 – 18:17 | R; P | 18:25-19:5 | R, F | |
| 18:21 | R; P | 18:25-19:5 | R, F | |
| 19:8 – 19:10 | R; P | 18:25-19:5 | R, F | |
| 20:25 – 21:1 | R; P | | | |
| 21:5 – 21:6 | R; P; S; V; SC | | | |
| 21:12 – 12:13 | R; P; I; S; V; SC | | | |
| 21:17 – 21:18 | R; P; S; V; SC | | | |
| 22:15 – 22:17 | R; P; S; V; SC | | | |
| 22:20 | R; P; S; V; SC | | | |
| 23:6 – 23:10 | R; P; S; V; SC | | | |
| 23:14 – 23:24 | R; P; S; V; SC | | | |
| 24:3 – 24:6 | R; P; S; V; SC; F; IO | | | |
| 24:20 – 24:23 | R; P; S; V; SC; F; IO | | | |
| 25:3 – 25:15 | R; P; S; V; SC; F; IO | | | |
| 25:19 – 26:3 | R; P; S; V; SC; I | 26:7-8 | NR, R | |
| 26:17 – 26:22 | R; P; S; V; SC; I | 26:7-8 | NR, R | |
| 27:7 – 27:12 | R; P | | | |
| 27:16 | R; P | | | |
| 27:20 – 27:25 | R; P | | | |
| 28:3 – 28:5 | R; P | | | |
| 28:14 | R; P | | | |
| 28:17 | R; P | | | |
| 29:13 – 29:14 | R; P | | | |
| 29:18 | R; P | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 29:25 – 30:1 | R; P | | | |
| 30:4 | R; P | | | |
| 30:10 – 30:12 | R; P; SC | | | |
| 30:16 – 30:24 | R; P; SC | | | |
| 31:19 – 31:24 | R; P; SC | | | |
| 32:3 – 32:4 | R; P; SC | | | |
| 32:14 – 32:19 | R; P; SC; S | | | |
| 32:23 – 33:7 | R; P; SC; S | | | |
| 33:11 – 33:12 | R; P; SC; S | | | |
| 33:18 – 33:19 | R; P; SC; S | | | |
| 33:23 – 34:7 | R; P; SC; S | | | |
| 34:12 – 34:14 | R; P; SC; S; F; IO | | | |
| 34:19 – 34:21 | R; P; SC; S; F; IO | | | |
| 34:25 – 35:3 | R; P; SC; S; F; IO | | | |
| 35:8 – 35:11 | R; P; SC; S; F; IO | | | |
| 35:15 – 36:1 | R; P; SC; S; F; IO | | | |
| 36:6 – 36:11 | R; P; SC; S; F; IO | | | |
| 36:16 – 36:20 | R; P; SC; S; F; IO | | | |
| 36:24 – 37:3 | R; P; SC; S; F; IO | | | |
| 37:7 | R; P; SC; S; F; IO | | | |
| 37:13 – 37:14 | R; P; SC; S; F; IO | | | |
| 37:18 – 37:22 | R; P; SC; S; F; IO | | | |
| 38:1 – 38:4 | R; P; SC; S; F; IO | | | |
| 38:9 – 38:13 | R; P; SC; S; F; IO | | | |
| 38:18 – 38:21 | R; P; SC; S; F; IO | | | |
| 38:25 – 39:4 | R; P; SC; S; F; IO | | | |
| 39:8 – 39:12 | R; P; SC; S; F; IO | | | |
| 39:16 – 39:18 | R; P; SC; S; F; IO | | | |
| 39:22 – 40:1 | R; P; SC; S; F; IO | | | |
| 40:5 – 40:8 | R; P; SC; S; F; IO | | | |
| 40:12 – 40:18 | R; P; SC; S; F; IO | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 40:22 | R; P; SC; S; F; IO | | | |
| 41:1 – 41:2 | R; P; SC; S; F; IO | | | |
| 41:6 – 41:8 | R; P; SC; S; F; IO | | | |
| 41:12 – 41:13 | R; P; SC; S; F; IO | | | |
| 41:25 – 42:2 | R; P; SC; S; F; IO | | | |
| 42:6 – 42:10 | R; P; SC; S; F; IO | | | |
| 42:14 – 42:17 | R; P; SC; S; F; IO | | | |
| 42:20 – 42:24 | R; P; SC; S; F; IO | | | |
| 43:2 | R; P; SC; S; F; IO | 43:4-6; 43:10-11 | F, R | |
| 43:20 – 43:24 | R; P; SC; S; F; IO | | | |
| 44:3 | R; P; SC; S; F; IO | | | |
| 44:13 – 44:16 | R; P; SC; S; F; IO | | | |
| 44:20 – 44:23 | R; P; SC; S; F; IO | | | |
| 45:2 – 45:5 | R; P; SC; S; F; IO | | | |
| 45:9 – 45:16 | R; P; SC; S; F; IO | | | |
| 45:20 – 45:21 | R; P; SC; S; F; IO | | | |
| 46:9 – 46:10 | R; P; SC; S; F; IO | | | |
| 46:14 | R; P; SC; S; F; IO | | | |
| 46:21 – 46:25 | R; P; SC; S; F; IO | | | |
| 47:12 – 47:14 | R; P; SC; S; F; IO | | | |
| 47:21 – 47:25 | R; P; SC; S; F; IO | | | |
| 48:4 – 48:8 | R; P; SC; S; F; IO | | | |
| 48:12 – 48:16 | R; P; SC; S; F; IO | | | |
| 48:20 – 48:25 | R; P; SC; S; F; IO | | | |
| 49:4 – 49:6 | R; P; SC; S; F; IO | 49:8-10; 49:14-16; 49:18-19; 49:23 | F, S | |
| 49:25 – 50:3 | R; P; SC; S; F; IO | | | |
| 50:7 – 50:9 | R; P; SC; S; F; IO | | | |
| 51:11 – 51:12 | R; P; SC; S; F; IO; V | | | |
| 51:16 – 52:5 | R; P; SC; S; F; IO; V | | | |
| 52:9 – 52:24 | R; P; SC; S; F; IO; V | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 53:3 – 53:10 | R; P; SC; S; F; IO; V | | | |
| 53:14 – 53:19 | R; P; SC; S; F; IO | | | |
| 53:23 – 54:2 | R; P; SC; S; F; IO | | | |
| 54:6 – 54:12 | R; P; SC; S; F; IO | | | |
| 54:16 – 54:17 | R; P; SC; S; F; IO | | | |
| 55:6 – 55:11 | R; P; SC; S; F; IO | | | |
| 55:16 | R; P; SC; S; F; IO | | | |
| 56:18 – 56:24 | R; P; SC; S; F; IO | | | |
| 57:3 – 57:4 | R; P; SC; S; F; IO | | | |
| 57:6 – 57:7 | R; P; SC; S; F; IO | | | |
| 57:11 | R; P; SC; S; F; IO | | | |
| 57:13 – 57:14 | R; P; SC; S; F; IO | | | |
| 57:18 – 58:4 | R; P; SC; S; F; IO | | | |
| 58:8 – 58:20 | R; P; SC; S; F; IO | | | |
| 58:24 – 59:6 | R; P; SC; S; F; IO | | | |
| 59:16 – 59:17 | R; P; SC; S; F; IO | | | |
| 59:20 – 59:23 | R; P; SC; S; F; IO | | | |
| 60:2 – 60:8 | R; P; SC; S; F; IO | | | |
| 60:12 – 60:15 | R; P; SC; S; F; IO | | | |
| 60:20 | R; P; SC; S; F; IO | | | |
| 61:4 – 61:6 | R; P; SC; S; F; IO | | | |
| 61:10 | R; P; SC; S; F; IO | | | |
| 62:12 – 62:17 | | | | |
| 63:6 – 63:10 | R; P; SC; S; F; IO | | | |
| 63:14 – 63:17 | R; P; SC; S; F; IO | | | |
| 64:2 – 64:3 | R; P; SC; S; F; IO | | | |
| 66:1 – 66:2 | R; P; SC; S; F; IO | | | |
| 66:6 | R; P; SC; S; F; IO | | | |
| 67:13 – 67:14 | R; P; SC; S; F; IO | | | |
| 67:18 – 67:20 | R; P; SC; S; F; IO | | | |
| 69:1 – 69:5 | R; P; SC; S; F; IO; V | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 69:10 – 69:16 | R; P; SC; S; F; IO; V | | | |
| 70:3 – 70:4 | R; P; SC; S; F; IO | | | |
| 70:8 – 70:12 | R; P; SC; S; F; IO | | | |
| 70:16 – 70:22 | R; P; SC; S; F; IO | | | |
| 71:1 – 71:4 | R; P; SC; S; F; IO | | | |
| 71:9 – 71:13 | R; P; SC; S; F; IO | | | |
| 71:18 – 71:21 | R; P; SC; S; F; IO | | | |
| 72:1 – 72:4 | R; P; SC; S; F; IO | | | |
| 72:9 – 72:15 | R; P; SC; S; F; IO | 72:17-18; 72:22 | F, S, X | |
| 73:8 – 73:10 | R; P; SC; S; F; IO | | | |
| 73:15 – 73:19 | R; P; SC; S; F; IO | | | |
| 73:23 – 74:2 | R; P; SC; S; F; IO | | | |
| 74:7 – 74:14 | R; P; SC; S; F; IO | | | |
| 74:19 – 74:21 | R; P; SC; S; F; IO | | | |
| 74:25 – 75:2 | R; P; SC; S; F; IO | | | |
| 75:5 – 75:9 | R; P; SC; S; F; IO | | | |
| 75:12 – 75:17 | R; P; SC; S; F; IO | | | |
| 75:19 – 76:3 | R; P; SC; S; F; IO | | | |
| 76:6 – 76:24 | R; P; SC; S; F; IO | | | |
| 77:10 – 78:4 | R; P; SC; S; F; IO | | | |
| 78:7 – 78:11 | R; P; SC; S; F; IO | | | |
| 78:15 – 78:21 | R; P; SC; S; F; IO | | | |
| 78:25 | R; P; SC; S; F; IO | | | |
| 79:19 – 79:21 | R; P; SC; S; F; IO | | | |
| 79:25 – 80:7 | R; P; SC; S; F; IO | | | |
| 80:11 – 80:15 | R; P; SC; S; F; IO | | | |
| 80:19 – 80:24 | R; P; SC; S; F; IO | | | |
| 81:3 – 81:8 | R; P; SC; S; F; IO | | | |
| 81:15 – 81:17 | R; P; SC; S; F; IO | | | |
| 81:22 – 81:24 | R; P; SC; S; F; IO | | | |
| 82:7 – 82:10 | R; P; SC; S; F; IO | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 82:14 – 82:24 | R; P; SC; S; F; IO | | | |
| 83:3 – 83:8 | R; P; SC; S; F; IO | | | |
| 83:25 – 84:1 | R; P; SC; S; F; IO | | | |
| 84:4 – 84:7 | R; P; SC; S; F; IO | | | |
| 84:10 – 84:22 | R; P; SC; S; F; IO | | | |
| 84:25 – 85:4 | R; P; SC; S; F; IO | | | |
| 85:7 – 85:8 | R; P; SC; S; F; IO | | | |
| 85:21 – 86:2 | R; P; SC; S; F; IO; I | 86:6-13 | F, S | |
| 86:16 – 86:22 | R; P; SC; S; F; IO; I | 86:6-13 | F, S | |
| 87:1 – 87:3 | R; P; SC; S; F; IO | | | |
| 87:9 – 87:18 | R; P; SC; S; F; IO | | | |
| 87:23 – 88:6 | R; P; SC; S; F; IO | | | |
| 88:10 – 88:13 | R; P; SC; S; F; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 88:17 – 88:23 | R; P; SC; S; F; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 89:3 – 89:7 | R; P; SC; S; F; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 89:10 – 89:14 | R; P; SC; S; F; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 89:19 | R; P; SC; S; F; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 91:10 – 91:11 | R; P; SC; S; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 91:15 | R; P; SC; S; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 92:3 – 92:6 | R; P; SC; S; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 92:10 | R; P; SC; S; IO | 90:10-12; 90:15-16; 90:22-91:4; 91:8 | F, S, BE | |
| 92:22 – 92:23 | R; P; SC; S; IO | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 93:3 – 93:8 | R; P; SC; S; IO | | | |
| 93:13 – 93:15 | R; P; SC; S; IO | | | |
| 93:19 – 93:24 | R; P; SC; S; IO | | | |
| 94:4 – 94:5 | R; P | | | |
| 94:8 – 94:11 | R; P | | | |
| 94:14 | R; P | | | |
| 95:21 – 95:22 | R; P | | | |
| 95:25 – 96:4 | R; P | | | |
| 96:8 – 96:11 | R; P; SC; S | | | |
| 96:14 – 96:20 | R; P; SC; S | | | |
| 96:24 | R; P; SC; S | | | |
| 97:1 – 97:2 | R; P; SC; S; IO | | | |
| 97:6 – 97:9 | R; P; SC; S; IO | | | |
| 97:14 – 97:16 | R; P; SC; S; IO | | | |
| 98:1 – 98:2 | R; P; SC; S; IO | | | |
| 98:6 – 98:10 | R; P; SC; S; IO | | | |
| 98:13 | R; P; SC; S; IO | | | |
| 98:16 – 99:2 | R; P | | | |
| 99:5 – 99:11 | R; P; SC; S; IO | | | |
| 99:15 | R; P; SC; S; IO | | | |
| 99:17 – 99:21 | R; P; SC; S; IO | | | |
| 100:4 – 100:7 | R; P; SC; S; IO | | | |
| 100:11 – 100:17 | R; P; SC; S; IO | | | |
| 100:22 – 101:3 | R; P; SC; S; IO | | | |
| 101:7 – 101:11 | R; P; SC; S; IO | | | |
| 104:16 – 104:18 | R; P; SC; S; IO | | | |
| 105:21 – 106:1 | R; P | | | |
| 106:5 – 106:6 | R; P | | | |
| 106:15 – 106:18 | R; P | | | |
| 106:21 – 106:23 | R; P | | | |
| 111:8 – 111:11 | R; P; SC; S; IO; V | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 111:19 – 111:25 | R; P; SC; S; IO; V | | | |
| 112:7 | R; P; SC; S; IO; V | | | |
| 112:11 – 112:15 | R; P; SC; S; IO; V | | | |
| 113:5 – 113:8 | R; P; SC; S; IO; V | 109:2-9; 109:16-17; 109:21; 109:23; 110:2 | F, S | |
| 113:13 – 113:17 | R; P; SC; S; IO; V | 109:2-9; 109:16-17; 109:21; 109:23; 110:2 | F, S | |
| 114:15 – 114:18 | R; P; SC; S; IO; V | | | |
| 114:22 – 114:23 | R; P; SC; S; IO; V | | | |
| 115:7 | | | | |
| 115:11- 115:14 | R; P; SC; S; IO; V | | | |
| 115:20 – 115:23 | R; P; SC; S | | | |
| 116:2 – 116:9 | R; P; SC; S | | | |
| 116:14 – 116:18 | R; P; SC; S | | | |
| 116:23 – 116:24 | R; P; SC; S | | | |
| 118:5 – 118:7 | R; P; SC; S | | | |
| 118:12 – 118:16 | R; P; SC; S | | | |
| 118:21 – 119:2 | R; P; SC; S | | | |
| 119:5 – 119:9 | R; P; SC; S | | | |
| 119:13 – 119:17 | R; P; SC; S | | | |
| 119:21 | R; P; SC; S | | | |
| 120:14 – 120:15 | R; P; SC; S | | | |
| 120:24 – 120:25 | R; P; SC; S | | | |
| 121:2 – 121:5 | R; P; SC; S | | | |
| 121:9 – 121:13 | R; P; SC; S; F; LC | | | |
| 121:20 | R; P; SC; S; F; LC | | | |
| 122:12 – 122:14 | R; P; SC; S | | | |
| 123:3 – 123:8 | R; P; SC; S | | | |
| 123:12 – 123:18 | R; P; SC; S | | | |
| 123:22 – 123:25 | R; P; SC; S | | | |
| 124:6 – 124:8 | R; P; SC; S; IO | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 124:13 – 124:18 | R; P; SC; S; IO | | | |
| 124:23 – 125:3 | R; P; SC; S; IO | | | |
| 125:13 – 125:15 | R; P; SC; S; IO | | | |
| 125:19 – 126:3 | R; P; SC; S; IO | | | |
| 126:8 – 126:11 | R; P; SC; S; IO | | | |
| 127:8 – 127:12 | R; P; SC; F; S | | | |
| 127:16 – 127:20 | R; P; SC; F; S | | | |
| 128:18 – 128:20 | R; P; SC; F; S | | | |
| 128:24 – 129:3 | R; P; SC; F; S | | | |
| 129:7 – 129:10 | R; P; SC; F; S | | | |
| 129:14 – 129:21 | R; P | 130:15-17; 130:20 | F, H, S | |
| 129:24 – 130:4 | R; P | 130:15-17; 130:20 | F, H, S | |
| 130:7 – 130:13 | R; P | 130:15-17; 130:20 | F, H, S | |
| 130:22 | R; P | | | |
| 131:1 – 131:10 | R; P | 130:15-17; 130:20 | F, H, S | |
| 131:14 – 131:20 | R; P | 130:15-17; 130:20 | F, H, S | |
| 131:24 – 132:11 | R; P | 130:15-17; 130:20 | F, H, S | |
| 132:21 – 133:1 | R; P | | | |
| 133:5 – 134:2 | R; P | | | |
| 134:6 – 134:8 | R; P | | | |
| 134:10 – 134:17 | R; P | | | |
| 134:21 – 134:25 | R; P | | | |
| 136:21 – 136:25 | R; P; S; F | | | |
| 137:4 – 137:5 | R; P; S; F | | | |
| 137:25 – 138:4 | R; P; SC; F; S | | | |
| 138:22 – 139:2 | R; P; SC; F; S; IO | | | |
| 139:8 – 139:10 | R; P; SC; F; S; IO | | | |
| 140:17 – 140:19 | R; P; SC; F; S | | | |
| 140:23 – 141:2 | R; P; SC; F; S | | | |
| 141:6 – 141:9 | R; P; SC; F; S | | | |
| 141:13 – 141:16 | R; P; SC; F; S | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 141:20 – 141:22 | R; P; SC; F; S | | | |
| 142:1 – 142:4 | R; P; SC; F; S | | | |
| 142:8 | R; P; SC; F; S | | | |
| 142:13 – 142:15 | R; P; SC; F; S | | | |
| 142:19 – 142:23 | R; P; SC; F; S | | | |
| 143:2 | R; P; SC; F; S | | | |
| 145:11 | R; P; SC | | | |
| 145:15 – 145:16 | R; P; SC | | | |
| 145:24 – 146:1 | R; P; SC | | | |
| 146:5 – 146:7 | R; P; SC | | | |
| 146:11 – 146:12 | R; P; SC | | | |
| 148:23 | R; P; SC | | | |
| 149:1 | R; P; SC | | | |
| 151:24 – 151:25 | R; P; SC | | | |
| 152:4 – 152:12 | R; P; SC | | | |
| 152:16 – 152:19 | R; P; SC | | | |
| 153:24 – 154:10 | R; P; SC; F; S; IO | | | |
| 154:18 – 154:23 | R; P; SC; F; S; IO | | | |
| 155:12 – 155:19 | R; P; SC; F; S; IO | | | |
| 155:23 – 156:7 | R; P; SC; F; S; IO | | | |
| 156:14 – 156:19 | R; P; SC; F; S; IO | | | |
| 157:1 – 157:6 | R; P; SC; F; S; IO | | | |
| 157:12 – 157:20 | R; P; SC; F; S; IO | | | |
| 158:2 – 158:9 | R; P; SC; F; S; IO | | | |
| 158:15 | R; P; SC; F; S; IO | | | |
| 159:2 – 159:7 | R; P | | | |
| 159:10 – 159:16 | R; P | | | |
| 159:25 – 160:6 | R; P | | | |
| 161:4 – 161:7 | R; P; SC; F; S; IO | | | |
| 161:13 | R; P; SC; F; S; IO | | | |
| 162:18 – 162:19 | R; P; SC; F; S; IO | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 162:23 – 163:2 | R; P; SC; F; S; IO | | | |
| 163:6 – 163:11 | R; P; SC; F; S; IO | | | |
| 163:15 | R; P; SC; F; S; IO | | | |
| 163:19 – 163:22 | R; P; SC; F; S; IO | | | |
| 164:1 | R; P; SC; F; S; IO | | | |
| 164:18 – 164:24 | R; P | | | |
| 165:3 – 165:5 | R; P; SC; F; S; IO | | | |
| 165:11 – 165:13 | R; P; SC; F; S; IO | | | |
| 165:16 – 165:22 | R; P; SC; F; S; IO | | | |
| 166:1 – 166:5 | R; P; SC; F; S; IO | | | |
| 166:12 – 166:17 | R; P; SC; F; S; IO | | | |
| 166:21 | R; P; SC; F; S; IO | | | |
| 167:1 – 167:2 | R; P; SC; F; S; IO | | | |
| 167:8 – 167:15 | R; P; SC; F; S; IO | | | |
| 167:19 | R; P; SC; F; S; IO | | | |
| 168:2 – 168:6 | R; P | | | |
| 168:14 – 168:25 | R; P; SC; F; S; IO | | | |
| 169:5 – 169:14 | R; P; SC; F; S; IO | | | |
| 169:19 – 169:23 | R; P; SC; F; S; IO | | | |
| 170:3 – 170:4 | R; P; SC; F; S; IO | | | |
| 170:9 – 170:14 | R; P; SC; F; S; IO | | | |
| 170:20 – 171:3 | R; P; SC; F; S; IO | | | |
| 171:6 – 171:9 | R; P; SC; F; S; IO | | | |
| 171:13 – 171:19 | R; P; SC; F; S; IO | | | |
| 171:23 | R; P; SC; F; S; IO | | | |
| 172:23 – 172:25 | R; P; SC | | | |
| 173:4 – 173:7 | R; P; SC | | | |
| 173:10 – 173:11 | R; P; SC | | | |
| 173:21 – 173:23 | R; P; SC | | | |
| 174:1 – 174:5 | R; P; SC | | | |
| 174:8 – 174:10 | R; P; SC | | | |

| Alkem's Designations (Pg:Ln) | Azurity's Objections | Azurity's Counter-Designations | Alkem's Objections | Alkem's Counter-Designations |
|---|---|---|---|---|
| 174:14 – 174:17 | R; P; SC | | | |
| 174:21 – 174:24 | R; P; SC | | | |
| 175:2 – 175:4 | R; P; SC | | | |
| 176:8 – 176:16 | R; P | | | |
| 176:24 – 177:4 | R; P | | | |

# EXHIBIT 10

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates  Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-1 | SLVGT_RTU_00003996 - SLVGT_RTU_00004022 | 9/29/2020 | U.S. Patent No. 10,786,482 | | |
| PTX-2 | SLVGT_RTU_00005394 - SLVGT_RTU_00005421 | 2/16/2021 | U.S. Patent No. 10,918,621 | | |
| PTX-3 | SLVGT_RTU_00004023 - SLVGT_RTU_00005393 | 10/31/2018 | U.S. Patent No. 10,786,482 File History | | |
| PTX-4 | SLVGT_RTU_00005422 - SLVGT_RTU_00005625 | 8/12/2020 | U.S. Patent No. 10,918,621 File History | | |
| PTX-5 | | 1/28/2022 | Azurity Pharmaceuticals, Inc.'s Objection and Responses to Defendant's Notice of Rule 30(b)(6) Deposition | Beckloff 1 | H, R |
| PTX-6 | SLVGT_RTU_00005714 - SLVGT_RUT_00005719 | 2/2/2015 | Letter from Silvergate Pharmaceuticals to FDA re Request for Type B Meeting re Epaned Oral Solution, 1 mg/mL (enalapril maleate) | Beckloff 2 | R |
| PTX-7 | SLVGT_RTU_00005703 - SLVGT_RTU_00005711 | 5/5/2015 | Letter from FDA to Silvergate Pharmaceuticals re April 16, 2015 meeting, Memorandum of Meeting Minutes attached | Beckloff 3 | H, R |
| PTX-8 | SLVGT_RTU_00007436 - SLVGT_RTU_00007471 | 7/15/2015 | Presentation: "Internal Valuation Project" Board of Directors Meeting, by Collective Acumen | Beckloff 4 | H, R, A, F |
| PTX-9 | SLVGT_RTU_00005961 - SLVGT_RTU_00005962 | 6/30/2016 | Email from S. Soukehal to M. Beckloff, S. Prather re Question about Epaned powder | Beckloff 5 | H, R, A, F |
| PTX-10 | SLVGT_RTU_00006940 | 8/18/2016 | FDA Telephone Contact Report re PSP Waiver request/results of PeRC review | Beckloff 6 | H, R, A, F |
| PTX-11 | SLVGT_RTU_00006937 - SLVGT_RTU_00006939 | 9/7/2016 | FDA Telephone Contact Report re Question from Sabry re: withdrawal of Epaned Powder from market post approval of Epaned Oral Solution | Beckloff 7 | H, R, A, F |
| PTX-12 | SLVGT_RTU_00006150 - SLVGT_RTU_00006175 | 9/20/2016 | Letter from FDA to Silvergate Pharmaceuticals re NDA Approval | Beckloff 8 | H, R, A, F |
| PTX-13 | SLVGT_RTU_00006933 - SLVGT_RTU_00006935 | 1/3/2017 | Email from M. Beckloff to F. Segrave re 2017 Thoughts | Beckloff 9 | H, R, A, F |
| PTX-14 | SLVGT_RTU_00006551 - SLVGT_RTU_00006582 | 1/6/2017 | Presentation: "Epaned RTU Launch" Silvergate Kickoff, by Silvergate Pharmaceuticals | Beckloff 10 | H, R, A, F |
| PTX-15 | SLVGT_RTU_00006306 - SLVGT_RTU_00006308 | 1/29/2017 | Email from R. Mauro to M. Beckloff, L. Carbone re Skywalk Pharmacy | Beckloff 11 | H, R, A, F |
| PTX-16 | SLVGT_RTU_00006319 - SLVGT_RTU_00006320 | 1/30/2017 | Email from L. Carbone to J. Olson, B. Westmacott, R. Mauro re Epaned information | Beckloff 12 | H, R, A, F |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates  Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-17 | SLVGT_RTU_00006321 | | "The Difference Between Epaned Oral Solution and Epaned Powder," attachment to January 30, 2017 email | Beckloff 13 | H, R, A, F |
| PTX-18 | SLVGT_RTU_00006131 | 3/6/2017 | Email from S. Prather to M. Beckloff re Silvergate "Silvergate, Products" | Beckloff 16 | H, R, A, F |
| PTX-19 | SLVGT_RTU_00006337 - SLVGT_RTU_00006338 | 11/29/2017 | Email from M. Beckloff to S. Prather re New voicemail 1 from 17637551259 | Beckloff 17 | H, R, A, F |
| PTX-20 | SLVGT_RTU_00007704 - SLVGT_RTU_00007729 | Spring 2018 | Presentation: "Confidential Corporate Presentation" by Silvergate Pharmaceuticals | Beckloff 18 | H, R, A, F |
| PTX-21 | SLVGT_RTU_00007310 - SLVGT_RTU_00007416 | 2/13/2019 | Presentation: "Board of Directors Update" by Silvergate Pharmaceuticals | Beckloff 20 | H, R, A, F |
| PTX-22 | SLVGT_RTU_00007823 - SLVGT_RTU_00007848 | 2/00/2019 | Presentation: "Confidential Corporate Presentation" by Silvergate Pharmaceuticals | Beckloff 21 | H, R, A, F |
| PTX-23 | | 1/18/2022 | Plaintiff Azurity Pharmaceuticals, Inc.'s Notice of Deposition of Defendant Alkem Laboratories Ltd. Pursuant to Fed. R. Civ. P. 30(b)(6) | Chhabra 2 | H, R |
| PTX-24 | ALK_ENPL_00000023 - ALK_ENPL_00000027 | 8/8/2019 | Letter from U. Chhabra to FDA re Pre-Assigned ANDA #213714 Original Submission | Chhabra 3 | R |
| PTX-25 | ALK_ENPL_00024815 - ALK_ENPL_00024854 | | Presentation: "Query status" by Alkem Laboratories India | Chhabra 4 | R |
| PTX-26 | ALK_ENPL_00002236 | | Expiration Dating Period, ANDA Original Submission, Alkem Laboratories Limited, India | Chhabra 9 | R |
| PTX-27 | ALK_ENPL_00006142 - ALK_ENPL_00006145 | 10/25/2019 | Letter from FDA to Alkem Laboratories re Discipline Review Letter Labeling | Chhabra 10 | R |
| PTX-28 | ALK_ENPL_00006139 - ALK_ENPL_00006141 | 11/1/2019 | Letter from U. Chhabra to FDA re ANDA #213714, Submission 0003, Discipline Review Letter Labeling | Chhabra 11 | R |
| PTX-29 | ALK_ENPL_00007054 - ALK_ENPL_00007058 | 5/8/2020 | Letter from FDA to Alkem Laboratories re Complete Response | Chhabra 12 | R |
| PTX-30 | ALK_ENPL_00007319 - ALK_ENPL_00007322 | | Response to Complete Response Letter, ANDA #213714, Submisson 0007, Alkem Laboratories Limited, India | Chhabra 13 | R |
| PTX-31 | ALK_ENPL_00007306 - ALK_ENPL_00007310 | 10/23/2020 | Letter from FDA to Alkem Laboratories re Complete Response | Chhabra 14 | R |
| PTX-32 | ALK_ENPL_00257407 - ALK_ENPL_00257409 | 1/4/2022 | Letter from U. Chhabra to FDA re ANDA #213714, Submission 0012, Final Approval Requested | Chhabra 15 | R |

# EXHIBIT 10

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-33 | ALK_ENPL_00257521 - ALK_ENPL_00257523 | 1/6/2022 | Letter from U. Chhabra to FDA re ANDA #213714, Submission 0013, Update to Final Approval Request | Chhabra 16 | R |
| PTX-34 | ALK_ENPL_00027372 - ALK_ENPL_00027383 | | Presentation: Alkem R&D Budget 2019-20 | Chhabra 17 | H, R, A, F |
| PTX-35 | ALK_ENPL_00031288 - ALK_ENPL_00031338 | | Presentation: Enalapril Maleate Oral Solution 1mg/ml, by Department | Chhabra 18 | H, R, A, F |
| PTX-36 | ALK_ENPL_00150854 | | Organizational Chart - Drugs Regulatory Affairs, Organogram - USA/Canada Filing Team | Chhabra 19 | R |
| PTX-37 | ALK_ENPL_00182414 [NATIVE] | | Spreadsheet: Litigation budger 19-20 sorted & Spend from Other Projects | Chhabra 20 | R |
| PTX-38 | | 00/00/1996 | The Merck Index, An Encyclopedia of Chemicals, Drugs, and Biologicals, 12th Ed. (Budvari, et al. eds), pp. 602-603 (Merck Research Laboratories 1996) | Constantinides 8 | |
| PTX-39 | SLVGT_RTU_00004036 | 3/28/2016 | Declaration for Utility or Design Application Using an Application Data Sheet, for Application No. 15/081,603, signed by David Miles | Miles 3 | R, H |
| PTX-40 | SLVGT_RTU_00005433 | 3/28/2016 | Declaration for Utility or Design Application Using an Application Data Sheet, for Application No. 15/081,603, signed by David Miles | Miles 4 | R, H |
| PTX-41 | SLVGT_RTU_00005539 - SLVGT_RTU_00005545 | | Curriculum Vitae for Gerold L. Mosher, Ph.D. | Mosher 1 | R. H, F |
| PTX-42 | | 3/00/2017 | Highlights of Prescribing Information for Epaned, Package Insert | Mosher 3 | R |
| PTX-43 | SLVGT_RTU_00005722 | 11/00/2015 | 2.3.P.1 Description and Composition of the Drug Product [Epaned (enalapril maleate) Oral Solution, DPT Laboratories, Ltd.], NDA 208686, Submission 0000 | Mosher 4 | R |
| PTX-44 | SLVGT_RTU_00004140 - SLVGT_RTU_00004147 | 2/2/2017 | Declaration of Gerold Mosher Under 37 C.F.R. § 1.132, filed in Application No. 15/081,603 | Mosher 8 | H, R |
| PTX-45 | SLVGT_RTU_00005546 - SLVGT_RTU_00005552 | 5/15/2020 | Declaration of Gerold Mosher Under 37 C.F.R. § 1.132, filed in Application No. 16/177,159 | Mosher 9 | H, R |
| PTX-46 | SLVGT_RTU_00005553 - SLVGT_RTU_00005563 | 5/14/2020 | Declaration of Gerold Mosher Under 37 C.F.R. § 1.132, filed in Application No. 16/242,898 | Mosher 10 | H, R |
| PTX-47 | SLVGT_RTU_00005564 - SLVGT_RTU_00005571 | 2/2/2017 | Declaration of Gerold Mosher Under 37 C.F.R. § 1.132, filed in Application No. 15/081,603 | Mosher 11 | H, R |
| PTX-48 | SLVGT_RTU_00004035 | | Declaration for Utility or Design Application Using an Application Data Sheet, for Application No. 15/081,603, signed by Gerold L. Mosher | Mosher 12 | H, R |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates  Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-49 | SLVGT_RTU_00005432 | | Declaration for Utility or Design Application Using an Application Data Sheet, for Application No. 15/081,603, signed by Gerold L. Mosher | Mosher 13 | H, R |
| PTX-50 | ALK_ENPL_00000736 - ALK_ENPL_00000742 | 6/7/2019 | Pharmaceutical Equivalence Report, Alkem Laboratories Limited | Pradhan 5 | R, F |
| PTX-51 | ALK_ENPL_00068220 - ALK_ENPL_00068221 | 2/23/2018 | Email from A. Sapre to various re Enalapril maleate oral solution 1mg/mL | Pradhan 6 | H, R, A, F |
| PTX-52 | ALK_ENPL_00043010 - ALK_ENPL_00043103 | 9/11/2011 | Alkem Laboratories  Ltd. Lab Notebook, No. FDC-865 re Enalapril Maleate Oral Solution 1mg/mL | Pradhan 7 | R |
| PTX-53 | ALK_ENPL_00043847 [NATIVE] | 8/00/2020 | Spreadsheet: Summary for August 2020 (Product Development Details - Formulation Development; Product Development Details - Analytical) | Pradhan 11 | R |
| PTX-54 | ALK_ENPL_00258614 - ALK_ENPL_00258615 | | "ORA-Sweet SF Sugar-Free Flavored Oral Syrup Vehicle," available at: www. PerrigoRx.com | Rabinow 10 | H, F, R |
| PTX-55 | | | Steven R. Little, Ph.D. Curriculum Vitae | | R, H |
| PTX-56 | | | Materials Considered by Dr. Steven Little | | R, H |
| PTX-57 | | 11/22/2021 | Defendant's Second Supplemental Responses and Objections to Plaintiff's Common Interrogatory No. 5 | | R, H |
| PTX-58 | | 3/00/2022 | "All Approvals and Tentative Approvals, March 2022," Drugs@FDA: FDA-Approved Drugs | | R, H, A, F |
| PTX-59 | ALK_ENPL_00000228 - ALK_ENPL_00000367 | | 2.3.P Drug Product, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-60 | ALK_ENPL_00000368 - ALK_ENPL_00000517 | | 2.3.P Drug Product, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-61 | ALK_ENPL_00000597 - ALK_ENPL_00000606 | | 3.2.P.1 Description and Composition of the Drug Product, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-62 | ALK_ENPL_00000829 - ALK_ENPL_00000830 | | 3.2.P.3.2 Batch Formula, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-63 | ALK_ENPL_00002361 - ALK_ENPL_00002537 | | 3.2.R.1.P.1 Executed Batch Records, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-64 | ALK_ENPL_00045973 - ALK_ENPL_00045984 | | Addendum to Product Development Report, Alkem Laboratories Limited | | |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-65 | ALK_ENPL_00006364 - ALK_ENPL_00006374 | 2/17/2020 | Addendum to Product Development Report, Alkem Laboratories Limited | | |
| PTX-66 | ALK_ENPL_00045248 | 7/7/2020 | Alkem Change Comparison Sheet | | |
| PTX-67 | ALK_ENPL_00000875 - ALK_ENPL_00000905 | 1/21/2019 | Exhibit Batch Report for Enalapril Oral Maleate Solution 1 mg/mL, Report No. EBR/A/G/18-025/00, Alkem Laboratories Limited | | |
| PTX-68 | ALK_ENPL_00000063 - ALK_ENPL_00000080 | 6/00/2019 | Highlights of Prescribing Information for Enalapril Maleate Oral Solution, Package Insert | | |
| PTX-69 | ALK_ENPL_00006154 - ALK_ENPL_00006171 | 10/00/2019 | Highlights of Prescribing Information for Enalapril Maleate Oral Solution, Package Insert | | |
| PTX-70 | ALK_ENPL_00257416 - ALK_ENPL_00257426 | 3/4/2021 | Letter from FDA to Alkem Laboratories Limited re ANDA Tentative Approval | | |
| PTX-71 | ALK_ENPL_00000743 - ALK_ENPL_00000825 | 6/19/2019 | Product Development Report, Alkem Laboratories Limited | | |
| PTX-72 | ALK_ENPL_00257564 | | Response to Information Request - Quality, ANDA #213714, Submission 0015, Alkem Laboratories Limited, India | | |
| PTX-73 | ALK_ENPL_00257620 - ALK_ENPL_00257637 | 12/29/2021 | Stability Summary Report, Enalapril maleate oral solution 1 mg/ml, Batch Nos. 8146014, 8146015, 8146016 | | |
| PTX-74 | | | Dr. Steven Little List of Testimony | | R, H |
| PTX-75 | | | Materials Considered by Dr. Steven Little | | R, H |
| PTX-76 | SLVGT_RTU_00011165 - SLVGT_RTU_00011170 | 9/00/1998 | Allen, L.V. & M.A. Erickson, “Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids,” Am. J. Health-Syst. Pharm., 55:1915-1920 (Sept. 1998) | | |
| PTX-77 | SLVGT_RTU_00011171 - SLVGT_RTU_00011174 | 00/00/2009 | Boukarim, et al., “Preservatives in Liquid Pharmaceutical Preparations,” J. Applied Research, 9(1)(2):14-17 (2009) | | |
| PTX-78 | SLVGT_RTU_00011175 - SLVGT_RTU_00011182 | 11/26/2013 | Casas, et al., “Physicochemical stability of captopril and enalapril extemporaneous formulations for pediatric patients, Pharm. Dev. & Tech., 20(3):271-78 (Published online Nov. 26, 2013) | | |
| PTX-79 | SLVGT_RTU_00009312 - SLVGT_RTU_00009328 | 9/00/2014 | Highlights of Prescribing Information for Epaned, Package Insert | | |
| PTX-80 | ALK_ENPL_00257972 - ALK_ENPL_00257978 | 00/00/2009 | M. de Villiers, “Buffers and pH Adjusting Agents,” A Practical Guide to Contemporary Pharmacy Practice, 3rd Ed. (J.E. Thomson Ed.), Ch. 18 (Lippincott, Williams & Wilkins 2009) | | |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-81 | SLVGT_RTU_00011183 - SLVGT_RTU_00011185 | 6/1/1998 | Nahata, et al., "Stability of enalapril maleate in three extemporaneously prepared oral liquids," Am. J. Health-Sys. Pharm., 55:1155-57 (June 1, 1998) | | |
| PTX-82 | SLVGT_RTU_00008364 - SLVGT_RTU_00008369 | 00/00/2000 | Rippley, et al., "Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children," Biopharm. Drug Dispos., 21:339-344 (2000) | | |
| PTX-83 | SLVGT_RTU_00011186 - SLVGT_RTU_00011192 | 00/00/2009 | Sosnowska, et al., "Stability of Extemporaneous Enalapril Maleate Suspensions For Pediatric Use Prepared From Commercially Available Tablets," Acta Poloniae Pharmaceutica-Drug Research, 66(3):321-26 (2009) | | |
| PTX-84 | SLVGT_RTU_00009614 - SLVGT_RTU_00009657 | 5/00/2008 | Strickley, et al., "Pediatric Drugs—A Review of Commercially Available Oral Formulations," J. Pharm. Sci., 97(5):1731-1774 (May 2008) | | |
| PTX-85 | SLVGT_RTU_00011193 - SLVGT_RTU_00011214 | 10/29/2013 | U.S. Patent No. 8,568,747 | | |
| PTX-86 | SLVGT_RTU_00000316 - SLVGT_RTU_00001169 | 3/25/2016 | U.S. Patent No. 9,669,008 File History | | R |
| PTX-87 | SLVGT_RTU_00011215 - SLVGT_RTU_00011225 | 6/8/2006 | U.S. Patent Application No. 2006/0121066 | | |
| PTX-88 | ALK_ENPL_00257942 - ALK_ENPL_00257957 | 5/11/2017 | WO 2017/077425 | | R |
| PTX-89 | | | Materials Considered by Dr. Steven Little | | R, H |
| PTX-90 | SLVGT_RTU_00005720 | 11/00/2015 | 2.2 Introduction to Summary, NDA 208686, Submission 0000, Silvergate Pharmaceuticals, Inc. | | R, H |
| PTX-91 | ALK_ENPL_00258572 - ALK_ENPL_00258584 | 00/00/2020 | Bradshaw, et al., "Kinetic modelling of acyl glucuronide and glucoside reactivity and development of structure–property relationships," Organic & Biomolec. Chem., 18(7):1389-1401 (2020) | | |
| PTX-92 | ALK_ENPL_00258458 - ALK_ENPL_00258514 | | Compound Summary - Methylparaben | | |
| PTX-93 | ALK_ENPL_00258695 - ALK_ENPL_00258701 | 7/00/1995 | Farrant, et al., "Assignment of the 750 MHz 1H NMR resonances from a mixture of transacylated ester glucuronic acid conjugates with the aid of oversampling and digital filtering during acquisition. Journal of pharmaceutical and biomedical analysis," 13(8):971-977 (July 1995) | | |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-94 | ALK_ENPL_00258515 - ALK_ENPL_00258571 | 2/15/2011 | Guo, H. & C. Knutsen, "Preservative Formulation and Effectiveness in Oral Solutions and Suspensions," PDA Metro Meeting (Feb. 15, 2011) | | |
| PTX-95 | SLVGT_RTU_00011226 - SLVGT_RTU_00011229 | 1/00/1995 | Hensel, et al., "Transesterification Reactions of Parabens (Alkyl 4-Hydroxybenzoates)_with Polyols in Aqueous Solution," J. Pharm. Sci., 84(1):115-119 (Jan. 1995) | | |
| PTX-96 | SLVGT_RTU_00011230 - SLVGT_RTU_00011246 | 00/00/2006 | Handbook of Pharmaceutical Excipients, 5th ed. (R.C. Rowe, et al. Eds.), pp. 185-187, 662-664, 675-677, 683-684, 824-827 (2006) | | |
| PTX-97 | ALK_ENPL_00000081 - ALK_ENPL_00000082 | 7/25/2019 | Letter from U. Chhabra to FDA re Waiver Request (Biavailability / Bioequivalence Study) | | |
| PTX-98 | SLVGT_RTU_00011247 - SLVGT_RTU_00011254 | 3/00/2002 | Ma, et al., "HPLC and LC-MS Studies of the Transesterification Reaction of Methylparaben with Twelve 3- to 6-Carbon Sugar Alcohols and Propylene Glycol and the Isomerization of the Reaction Products by Acyl Migration," J. Chromatographic Sci., 40:170-177 (March 2002) | | |
| PTX-99 | ALK_ENPL_00258585 - ALK_ENPL_00258613 | 00/00/2010 | Regan, et al., "Acyl glucuronides: the good, the bad and the ugly," Biopharm. Drug Dispos., 31:367-395 (2010) | | |
| PTX-100 | ALK_ENPL_00258668 - ALK_ENPL_00258671 | 00/00/1995 | Sidelmann, et al., "Identification of the positional isomers of 2-fluorobenzoic acid 1-O-acyl glucuronide by directly coupled HPLC-NMR," Anal. Chem., 67:3401–404 (1995) | | |
| PTX-101 | ALK_ENPL_00258672 - ALK_ENPL_00258680 | 00/00/1996 | Sidelman, et al., "High-performance liquid chromatography directly coupled to 19F and 1H NMR for the analysis of mixtures of isomeric ester glucuronide conjugates of trifluoromethylbenzoic acids," J. Chromatogr. A., 728:377-85 (1996) | | |
| PTX-102 | ALK_ENPL_00258663 - ALK_ENPL_00258667 | 1/00/1996 | Sidelmann, et al., "750 MHz HPLC-NMR spectroscopic studies on the separation and characterization of the positional isomers of the glucuronides of 6,11-dihydro-11-oxodibenz[b,e]oxepin-2-acetic acid," Anal Chem., 68(1):106-10 (Jan. 1996) | | |
| PTX-103 | ALK_ENPL_00258636 - ALK_ENPL_00258654 | 00/00/2021 | Zupanets, et al., "Cumulative Risks of Excipients in Pediatric Phytomucolytic Syrups: the Implications for Pharmacy Practice," Sci. Pharm., 89:32 (2021) | | |
| PTX-104 | ALK_ENPL_00258012 - ALK_ENPL_00258054 | 00/00/2011 | Baertschi, et al., "Stress testing: A predictive tool," Pharmaceutical Stress Testing: Predicting Drug Degradation," 2nd Ed. (S. Baertschi, et al., Eds.), Ch. 2 (Informa Healthcare 2011) | | |
| PTX-105 | | | Curriculum Vitae for John D. Mahan, Jr., M.D. | | R, H |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-106 | | | Materials Considered by Dr. John D. Mahan Jr., M.D. | | R, H |
| PTX-107 | SLVGT_RTU_00009424 - SLVGT_RTU_00009433 | 8/00/2012 | 2.3.P.2 Pharmaceutical Development [Enalaped [Enalapril Maleate, USP), Powder for Oral Solution, KP Pharmaceutical Technology, Inc.], NDA 204308, Submission 0000, Silvergate Pharmaceuticals, Inc. | | R, H, F |
| PTX-108 | SLVGT_RTU_00005739 - SLVGT_RTU_00005779 | 11/00/2015 | 2.5 Clinical Overview, NDA 208686, Submission 0000, Silvergate Pharmaceuticals, Inc. | | R, H, F |
| PTX-109 | SLVGT_RTU_00009329 - SLVGT_RTU_00009336 | 00/00/2018 | 3.2.P.8.1 Stability Summary and Conclusion [Epaned (enalapril maleate) Oral Solution, DPT Laboratories, Ltd.], NDA #208686, Submission 0036, Silvergate Pharmaceuticals, Inc. | | R, H, F |
| PTX-110 | SLVGT_RTU_00009308 - SLVGT_RTU_00009310 | | "ANDA 213714, Alkem Labs Ltd.," Drugs@FDA: FDA-Approved Drugs | | R, H |
| PTX-111 | SLVGT_RTU_00006647 - SLVGT_RTU_00006674 | 2/23/2016 | Presentation: J.A. Axelrad, “Title I Implementation – Pharmacy Compounding in 2016,” FDA (unpublished) | | R, H, F |
| PTX-112 | SLVGT_RTU_00008412 - SLVGT_RTU_00008426 | 3/00/2019 | Brady, et al., “Management of high blood pressure in children: Similarities and differences between US and European guidelines,” Pediatri. Nephrol., 34(3):405-412 (Mar. 2019) | | R, H, F |
| PTX-113 | SLVGT_RTU_00007996 - SLVGT_RTU_00008039 | April/May 2011 | N. Canavan, “For the Mouths of Babes,” Pharm. Formulation & Quality, 13(2):18-20 (April/May 2011) | | R, H, F |
| PTX-114 | SLVGT_RTU_00009280 - SLVGT_RTU_00009290 | 5/26/2014 | Chu, et al., “Anti-hypertensive drugs in children and adolescents,” World J. Cardiol., 6(5):234-244 (May 26, 2014) | | R, H, F |
| PTX-115 | SLVGT_RTU_00009291 - SLVGT_RTU_00009299 | 00/00/2007 | S.S. Dhareshwar, “Case Study: Enalapril: A Prodrug of Enalaprilat,” Prodrugs. Biotechnology: Pharmaceutical Aspects, Vol. V (V.J. Stella, et al. eds.), Ch. 5.7 (Springer 2007) | | R, H, F |
| PTX-116 | SLVGT_RTU_00009300 - SLVGT_RTU_00009303 | | Drugs@FDA: FDA-Approved Drugs (Epaned Kit) | | H, R |
| PTX-117 | SLVGT_RTU_00010004 - SLVGT_RTU_00010006 | | Drugs@FDA: FDA-Approved Drugs (Azurity NDA 208686) | | H, R |
| PTX-118 | SLVGT_RTU_00009311 | 3/15/2010 | "Enalaprilat Injection, USP" Package Insert | | R |
| PTX-119 | SLVGT_RTU_00009337 - SLVGT_RTU_00009349 | 00/00/2018 | B. Falkner, “Development of Blood Pressure Norms and Definition of Hypertension in Children,” Pediatric Hypertension (J. Flynn, et al. eds.), Ch. 15 (Springer 2018) | | R, H, F |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-120 | SLVGT_RTU_00006732 - SLVGT_RTU_00006747 | 1/00/2017 | FDA, "FDA's Human Drug Compounding Progress Report: Three Years After Enactment of Drug Quality and Security Act" (January 2017) | | R, H, F |
| PTX-121 | SLVGT_RTU_00009350 - SLVGT_RTU_00009364 | 1/00/2018 | FDA, "Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry" (January 2018) | | R, H, F |
| PTX-122 | SLVGT_RTU_00009434 - SLVGT_RTU_00009459 | | FDA, "Orange Book Preface," 42 Ed., U.S. Food & Drug Administration | | R, H, F |
| PTX-123 | SLVGT_RTU_00009365 - SLVGT_RTU_00009388 | 00/00/2018 | M.A. Ferguson, "Pharmacologic Treatment of Pediatric Hypertension," Pediatric Hypertension (J. Flynn, et al. eds.), Ch. 44 (Springer 2018) | | R, H, F |
| PTX-124 | SLVGT_RTU_00008243 - SLVGT_RTU_00008316 | 9/00/2017 | Flynn, et al., "Clinical Practice Guideline for Screening and Management of High Blood Pressure in Children and Adolescents," Pediatrics, 140(3):e20171904 (Sep. 2017) | | R, H, F |
| PTX-125 | SLVGT_RTU_00006627 - SLVGT_RTU_00006634 | 00/00/2013 | Gudeman, et al., "Potential Risks of Pharmacy Compounding," Drugs R&D, 13:1-8 (2013) | | R, H, F |
| PTX-126 | SLVGT_RTU_00008043 - SLVGT_RTU_00008048 | 00/00/2014 | Habib, et al., "Accuracy of tablet splitting: Comparison study between hand splitting and tablet cutter," Saudi Pharm. J., 22:454-459 (2014) | | R, H, F |
| PTX-127 | SLVGT_RTU_00007890 - SLVGT_RTU_00007894 | 00/00/2008 | Hansen, et al., "Adolescents' struggles with swallowing tablets: barriers, strategies, and learning," Pharm. World Sci., 30:65-69 (2008) | | R, H, F |
| PTX-128 | SLVGT_RTU_00009277 - SLVGT_RTU_00009279 | | "Heart Failure," CLS Health, https://www.cls.health/heart-failure/ (last visited Apr. 19, 2022) | | R, H, F |
| PTX-129 | SLVGT_RTU_00006760 - SLVGT_RTU_00006762 | Jan./Feb. 2007 | Hurtado, J. & B.S. Moffett, "Pediatric Oral Formulations: A Continual Challenge," Int'l J. Pharm. Compounding, 11(1):17-19 (Jan./Feb. 2007) | | R, H, F |
| PTX-130 | SLVGT_RTU_00006702 - SLVGT_RTU_00006715 | 8/00/2014 | Ivanovska, et al., "Pediatric Drug Formulations: A Review of Challenges and Progress," Pediatrics, 134(2):361-372 (Aug. 2014) | | R, H, F |
| PTX-131 | SLVGT_RTU_00008167 - SLVGT_RTU_00008172 | 10/00/1991 | Jonville, et al., "Characteristics of Medication Errors in Pediatrics," DICP Ann. Pharmacotherapy, 25:1113-1118 (Oct. 1991) | | R, H, F |
| PTX-132 | SLVGT_RTU_00009389 - SLVGT_RTU_00009413 | 00/00/2018 | Kapur, G. & T.K. Mattoo, "Primary Hypertension in Children," Pediatric Hypertension (J. Flynn, et al. Eds.), Ch. 23 (Springer 2018) | | R, H, F |
| PTX-133 | SLVGT_RTU_00006763 - SLVGT_RTU_00006765 | 11/00/2012 | M. Kromelis, "Ensuring Pediatric Medicine Safety," Pharmacy Purchasing & Prods. (Nov. 2012) | | R, H, F |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates  Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-134 | SLVGT_RTU_00006323 - SLVGT_RTU_00006332 | 5/5/2015 | Letter from FDA to Silvergate Pharmaceuticals re Meeting Minutes and attaching Memorandum of Meeting Minutes for April 16, 2015 meeting | | R, H, F |
| PTX-135 | SLVGT_RTU_00007940 - SLVGT_RTU_00007950 | 00/00/2011 | Li, et al., "Pediatric Antihypertensive Clinical Trials," Clinical Hypertension & Vascular Diseases: Pediatric Hypertension (J.T. Flynn, et al. eds.), Ch. 33 (Springer 2011) | | R, H, F |
| PTX-136 | SLVGT_RTU_00006766 - SLVGT_RTU_00006790 | 00/00/2011 | Presenatation: Lugo, et al., "A Survey of Children's Hospitals on the Use of Extemporaneous Liquid Formulations in the Inpatient Setting" (unpublished) | | R, H, F |
| PTX-137 | SLVGT_RTU_00008370 - SLVGT_RTU_00008395 | 10/00/2011 | Meyers, R.S. & A. Siu, "Pharmacotherapy Review of Chronic Pediatric Hypertension," Clinical Therapeutics, 33(10):1331-1356 (Oct. 2011) | | R, H, F |
| PTX-138 | SLVGT_RTU_00009414 - SLVGT_RTU_00009418 | 00/00/2018 | D. Matossian, "Pediatric Hypertension," Pediat. Ann., 47(12):e499-e503 (2018) | | R, H, F |
| PTX-139 | SLVGT_RTU_00009419 - SLVGT_RTU_00009423 | 9/00/1999 | M.C. Nahata, "Lack of Pediatric Drug Formulations," Pediatrics, 104(3):607-609 (Sept. 1999) | | R, H, F |
| PTX-140 | SLVGT_RTU_00005900 - SLVGT_RTU_00005923 | 8/00/2004 | NHBPEP Working Group on High Blood Pressure in Children and Adolescents, "The Fourth Report on the Diagnosis, Evaluation, and | | R, H, F |
| PTX-141 | SLVGT_RTU_00006675 - SLVGT_RTU_00006701 | 12/15/2009 | Presentation: S.N. Pagay, "Pediatric Formulations," FDA (unpublished) | | R, H, F |
| PTX-142 | SLVGT_RTU_00009460 - SLVGT_RTU_00009544 | 00/00/2016 | Ponikowski, et al., "2016 ESC Guidelines for the diagnoses and treatment of acute and chronic heart failure," Eur. J. Heart Failure, 18:891-975 (2016) | | R, H, F |
| PTX-143 | SLVGT_RTU_00008060 - SLVGT_RTU_00008066 | 00/00/2013 | Premier Research, "Developing Pediatric Studies" (2013) (unpublished white paper) | | R, H, F |
| PTX-144 | SLVGT_RTU_00009545 - SLVGT_RTU_00009555 | 00/00/2018 | K.M. Redwine, "Epidemiology of Primary Hypertension in Children," Pediatric Hypertension (J. Flynn, et al. eds.), Ch. 18 (Springer 2018) | | R, H, F |
| PTX-145 | ALK_ENPL_00257602 | | Response to Information Request – Quality, ANDA #213714, Submission 0015, Alkem Laboratories Limited, India | | R |
| PTX-146 | SLVGT_RTU_00008080 - SLVGT_RTU_00008087 | 00/00/2013 | Richey, et al., "Manipulation of drugs to achieve the required dose is intrinsic to paediatric practice but is not supported by guidelines or evidence," BMC Pediatrics, 13:81 (2013) | | R, H, F |
| PTX-147 | ALK_ENPL_00000084 - ALK_ENPL_00000105 | 7/00/2017 | RLD Package Insert with Label (Epaned) | | R |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-148 | SLVGT_RTU_00009556 - SLVGT_RTU_00009577 | 00/00/2015 | Rodieux, et al., "Effect of Kidney Function on Drug Kinetics and Dosing in Neonates, Infants, and Children," Clin. Pharmacokinet., 54:1183-1204 (2015) | | R, H, F |
| PTX-149 | SLVGT_RTU_00006716 - SLVGT_RTU_00006722 | July/Aug. 2014 | Rood, et al., "Variability in compounding of oral liquids for pediatric patients: A patient safety concern," J. Am. Pharm. Ass'n, 54:383-389 (Jul/Aug 2014) | | R, H, F |
| PTX-150 | SLVGT_RTU_00008180 - SLVGT_RTU_00008181 | 00/00/2012 | J. Samuels, "The Increasing Burden of Pediatric Hypertension," Hypertension, 60:276-277 (2012) | | R, H, F |
| PTX-151 | SLVGT_RTU_00008199 - SLVGT_RTU_00008202 | 00/00/2003 | Schirm, et al., "Lack of appropriate formulations of medicines for children in the community," Acta Paediatr., 92:1486-1489 (2003) | | R, H, F |
| PTX-152 | SLVGT_RTU_00008225 - SLVGT_RTU_00008226 | 2/15/1994 | Sedrati, et al., "Splitting tablets in half," Am. J. Hosp. Pharm., 51:548, 550 (Feb. 15, 1994) | | R, H, F |
| PTX-153 | SLVGT_RTU_00006870 - SLVGT_RTU_00006877 | 00/00/2012 | Sellers, S. & W.H. Utian, "Pharmacy Compounding Primer for Physicians: Prescriber Beware," Drugs, 72(16):2043-2050 (2012) | | R, H, F |
| PTX-154 | SLVGT_RTU_00009578 - SLVGT_RTU _00009596 | 00/00/2018 | Sharma, et al., "Secondary Forms of Hypertension in Children: Overview," Pediatric Hypertension, (J. Flynn, et al. eds.), Ch. 24 (Springer 2018) | | R, H, F |
| PTX-155 | SLVGT_RTU_00009597 - SLVGT_RTU_00009613 | 11/1/2019 | Siddiqi, N. & I.F. Shata, "Antihypertensive agents: a long way to safe drug prescribing in children," Pediatric Nephrology (Nov. 1, 2019), https://doi.org/10.1007/s00467-019-04314-7 | | R, H, F |
| PTX-156 | SLVGT_RTU_00006600 - SLVGT_RTU_00006613 | 2/00/2017 | Silvergate Pharmaceuticals, Inc., "Management of Pediatric Patients on Enalapril Maleate," White Paper | | R, H, F |
| PTX-157 | SLVGT_RTU_00008192 - SLVGT_RTU_00008198 | 00/00/2012 | Tran, et al., "Recent Trends in Healthcare Utilization Among Children and Adolescents With Hypertension in the United States," Hypertension, 60:296-302 (2012) | | R, H, F |
| PTX-158 | SLVGT_RTU_00009936 - SLVGT_RTU_00010003 | 2/1/2021 | Trial Testimony of Michael Beckloff, *Silvergate Pharmaceuticals Inc., v. Bionpharma Inc.* , Nos. 18-1962 & 19-1067 (D. Del.), February 1, 2021 (D.I. 193) | | R, H, F |
| PTX-159 | SLVGT_RTU_00006885 - SLVGT_RTU_00006888 | 2/11/2014 | "U-M leads state effort to create new standards for kids' medicine, reduce medication errors," (Feb. 11, 2014) | | R, H, F |
| PTX-160 | SLVGT_RTU_ 00008173 - SLVGT_RTU_ 00008179 | 00/00/2010 | Verrue, et al., "Tablet-splitting: a common yet not so innocent practice," J. Advanced Nursing, 67(1):26-32 (2010) | | R, H, F |
| PTX-161 | SLVGT_RTU_00008343 - SLVGT_RTU_00008350 | 7/00/2019 | D.J. Weaver, "Pediatric Hypertension: Review of Updated Guidelines," Pediatrics in Rev., 40(7):354-358 (July 2019) | | R, H, F |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates  Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-162 | SLVGT_RTU_00009658 - SLVGT_RTU_00009686 | 00/00/2009 | Weinhaus, A.J. & K.P. Roberts, "Anatomy of the Human Heart," Handbook of Cardiac Anatomy, Physiology, and Devices, 2d ed. (P.A. Iaizzo ed.), Ch. 4 (Humana Press 2009) | | R, H, F |
| PTX-163 | SLVGT_RTU_00009687 - SLVGT_RTU_00009935 | 00/00/2012 | World Health Organization, "Development of paediatric medicines: points to consider in formulation," WHO Expert Committee on Specifications for Pharmaceutical Preparations, 46th ed. (2012) | | R, H, F |
| PTX-164 | SLVGT_RTU_00006890 - SLVGT_RTU_00006899 | 10/00/2013 | Zajicek, et al., "A Report from the Pediatric Formulations Task Force: Perspectives on the State of Child-Friendly Oral Dosage Forms," AAPS J., 15(4):1072-1081 (Oct. 2013) | | R, H, F |
| PTX-165 | | 2/1/2021 | Notice Letter from Alkem Laboratories to Azurity Pharmaceuticals | | H, R |
| PTX-166 | ALK_ENPL_00000206 - ALK_ENPL_00000221 | | 1.4.2 DMF Letters of Authorization / References, ANDA Original Submission, Alkem Laboratories Limted, India | | |
| PTX-167 | ALK_ENPL_00000843 - ALK_ENPL_00000849 | | 3.2.P.3.4 Controls of Critical Steps and Intermediates, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-168 | ALK_ENPL_00002011 - ALK_ENPL_00002052 | | 3.2.P.5.4 Batch Analysis, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-169 | ALK_ENPL_00006912 - ALK_ENPL_00006926 | | 3.2.P.8.1 Stability summary and conclusion, ANDA #213714, Submission 0005, Alkem Laboratories Limited, India | | |
| PTX-170 | ALK_ENPL_00002352 - ALK_ENPL_00002355 | | 3.2.R.1.P.2 Information on Components, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-171 | ALK_ENPL_00000016 - ALK_ENPL_00000017 | | Basis for ANDA Submission, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-172 | ALK_ENPL_00006650 - ALK_ENPL_00006655 | 2/17/2020 | Certificate of Analysis (Finished Product), Batch Nos. 8146014, 8146015, 8146016 | | |
| PTX-173 | ALK_ENPL_00007207 - ALK_ENPL_00007213 | 8/7/2020 | Certificate of Analysis (Finished Product), Batch Nos. 8146014, 8146015, 8146016 | | |
| PTX-174 | ALK_ENPL_00007199 - ALK_ENPL_00007206 | 7/17/2020 | Finished Product Specification for Release, Enalapril maleate oral solution 1mg.mL, Alkem Laboratories Limited | | |
| PTX-175 | ALK_ENPL_00007263 - ALK_ENPL_00007280 | 7/28/2020 | Stability Summary Report, Enalapril maleate oral solution 1 mg/ml, Batch Nos. 8146014, 8146015, 8146016 | | |
| PTX-176 | ALK_ENPL_00006894 - ALK_ENPL_00006911 | 2/12/2020 | Stability Summary Report, Enalapril maleate oral solution 1 mg/ml, Batch Nos. 8146014, 8146015, 8146016 | | |

**EXHIBIT 10**

**Azurity Pharmaceuticals, Inc.'s Trial Exhibit List**

| Exhibit No. | Bates Number | Date | Description | Depo Exs. | Dft's Objections |
|---|---|---|---|---|---|
| PTX-177 | ALK_ENPL_00002290 - ALK_ENPL_00002320 | | Stability Summary Report, Enalapril maleate oral solution 1 mg/ml, Batch Nos. 8146014, 8146015, 8146016 | | |
| PTX-178 | ALK_ENPL_00002321 - ALK_ENPL_00002326 | | Summary and Conclusion of Stability Report of Enalapril Maleate Oral Solution 1 mg/mL, ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-179 | ALK_ENPL_00006845 - ALK_ENPL_00006880 | 12/13/2019 | Validation Protocol for Antimicrobial Effectiveness Test of Enalapril Maleate Oral Solution 1 mg/mL, Storage Condition: 5±3°, 12 Months, Protocol No. AQ/MI/19/221, Alkem Laboratories Limted | | |
| PTX-180 | ALK_ENPL_00000018 - ALK_ENPL_00000021 | | 1.12.12 Comparison Between Generic Drug and RLD-505(j)(2)(A), ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-181 | ALK_ENPL_00000595 | | 2.7. Clinical Summary (Bioequivalence), ANDA Original Submission, Alkem Laboratories Limited, India | | |
| PTX-182 | | 00/00/2011 | Pharmaceutical Stree Testing, Predicting Drug Degradation, 2nd Ed., Vol. 210 (Baertschi, et al. eds) (Informa Healthcare 2011) | | H, R, A, F |
| PTX-183 | | | Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, Patent and Exclusivity for: N208686 | | H, R, A, F |
| PTX-184 | | | Physical Exhibit of Azurity's Epaned Product | | H, R, A, F |

Key to Alkem;s Objections:
H = Hearsay, FRE 801, 802, 805
R = Relevance, FRE 401, 402, 403
A = Authenticity, FRE 901
F = Foundation, FRE 602, 701, 702

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC. | : | |
| *Plaintiff*, | : | |
| v. | : | C.A. No. 1:19-cv-02100-MSG |
| ALKEM LABORATORIES LTD., | : | [redacted] |
| *Defendant*. | : | |

**EXHIBIT 11**

**DEFENDANT, ALKEM LABORATORIES LTD.'S EXHIBIT LIST**

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1000 | | U.S. Patent No. 10,786,482 B2 | SLVGT_RTU_00003996 | SLVGT_RTU_00004022 | | |
| DTX-1001 | | File History for U.S. Patent No. 10,786,482 B2 | SLVGT_RTU_00004023 | SLVGT_RTU_00005393 | | |
| DTX-1002 | | U.S. Patent No. 10,918,621 B2 | SLVGT_RTU_00005394 | SLVGT_RTU_00005421 | | |
| DTX-1003 | | File History for U.S. Patent No. 10,786,482 B2 | SLVGT_RTU_00005422 | SLVGT_RTU_00005625 | | |
| DTX-1004 | 04/13/22 | Defendant's Opening Expert Report of Panayiotis P. Constantinides, Ph.D. | | | Panayiotis P. Constantinides, Ph.D. | R; P; H; IO; NE |
| DTX-1005 | 04/13/22 | Defendant's Opening Expert Report of Panayiotis P. Constantinides, Ph.D.- Exhibit A (Constantinides CV) | | | Panayiotis P. Constantinides, Ph.D. | R; P; H; IO; NE |
| DTX-1006 | 04/13/22 | Defendant's Opening Expert Report of Panayiotis P. Constantinides, Ph.D.- Exhibit B (Materials Considered) | | | Panayiotis P. Constantinides, Ph.D. | R; P; H; IO; NE |
| DTX-1007 | 04/13/22 | Defendant's Opening Expert Report of Panayiotis P. Constantinides, Ph.D.- Exhibit C ('482 Obviousness Claim Chart) | | | Panayiotis P. Constantinides, Ph.D. | R; P; H; IO; NE |
| DTX-1008 | 04/13/22 | Defendant's Opening Expert Report of Panayiotis P. Constantinides, Ph.D.- Exhibit D ('621 Obviousness Claim Chart) | | | Panayiotis P. Constantinides, Ph.D. | R; P; H; IO; NE |
| DTX-1009 | 05/06/22 | Defendant's Rebuttal Noninfringement Expert Report of Barrett E. Rabinow, Ph.D. | | | Barrett E. Rabinow, Ph.D. | R; P; H; IO; NE |
| DTX-1010 | 05/06/22 | Defendant's Rebuttal Noninfringement Expert Report of Barrett E. Rabinow, Ph.D.- Exhibit A (Rabinow CV) | | | Barrett E. Rabinow, Ph.D. | R; P; H; IO; NE |
| DTX-1011 | 05/06/22 | Defendant's Rebuttal Noninfringement Expert Report of Barrett E. Rabinow, Ph.D.- Exhibit B (Materials Considered) | | | Barrett E. Rabinow, Ph.D. | R; P; H; IO; NE |
| DTX-1012 | 06/01/22 | Defendant's Reply Expert Report of Panayiotis P. Constantinides, Ph.D. | | | Panayiotis P. Constantinides, Ph.D. | R; P; H; IO; NE |
| DTX-1013 | 06/01/22 | Defendant's Reply Expert Report of Panayiotis P. Constantinides, Ph.D.- Exhibit A (Materials Considered) | | | Panayiotis P. Constantinides, Ph.D. | R; P; H; IO; NE |
| DTX-1014 | 06/01/22 | Defendant's Reply Expert Report of Barrett E. Rabinow, Ph.D. | | | Barrett E. Rabinow, Ph.D. | R; P; H; IO; NE |
| DTX-1015 | 06/01/22 | Defendant's Reply Expert Report of Barrett E. Rabinow, Ph.D.- Exhibit A (Materials Considered) | | | Barrett E. Rabinow, Ph.D. | R; P; H; IO; NE |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1016 | | U.S. Patent No. 10,786,482 B2 | SLVGT_RTU_00003996 | SLVGT_RTU_00004022 | David Miles / Miles 01 | D |
| DTX-1017 | | U.S. Patent No. 10,918,621 B2 | SLVGT_RTU_00005394 | SLVGT_RTU_00005421 | David Miles / Miles 02 | D |
| DTX-1018 | 03/25/16 | Declaration (37 CFR 1.63) for Utility or Design Application Using Application Data Sheet (37 CFR 1.76) | SLVGT_RTU_00004036 | | David Miles / Miles 03 | D |
| DTX-1019 | 03/25/16 | Declaration (37 CFR 1.63) for Utility or Design Application Using Application Data Sheet (37 CFR 1.76) | SLVGT_RTU_00005433 | | David Miles / Miles 04 | D |
| DTX-1020 | 02/03/22 | Plaintiff Azurity Pharmaceuticals, Inc.'s Notice of Deposition of Manas Pradhan | | | Manas Pradhan / EX 001 - PRADHAN, M. | R; P |
| DTX-1021 | 01/18/22 | Plaintiff Azurity Pharmaceuticals, Inc.'s Notice of Deposition of Defendant Alkem Laboratories Ltd. Pursuant to Fed. R. Civ. P. 30(b)(6) | | | Manas Pradhan / EX 002 - PRADHAN, M. | R; P |
| DTX-1022 | | Enalapril Maleate Oral Solution 1 mg/ML 2.3.P Drug Product | ALK_ENPL_00000368 | ALK_ENPL_00000517 | Manas Pradhan / EX 003 - PRADHAN, M. | R; P |
| DTX-1023 | | Product Development Report | ALK_ENPL_00000743 | ALK_ENPL_00000825 | Manas Pradhan / EX 004 - PRADHAN, M. | R; P |
| DTX-1024 | | Pharmaceutical Equivalence Report | ALK_ENPL_00000736 | ALK_ENPL_00000742 | Manas Pradhan / EX 005 - PRADHAN, M. | R; P |
| DTX-1025 | 02/23/18 | E-mail from Amol Sapre; To Manoj Senapati, et al. (Alkem); Re: Enalapril Maleate Oral Solution 1 mg/mL | ALK_ENPL_00068220 | ALK_ENPL_00068221 | Manas Pradhan / EX 006 - PRADHAN, M. | R; P; H |
| DTX-1026 | 11/09/17 | Alkem Laboratories Ltd. Record Book (Book No. FDC-865) | ALK_ENPL_00043010 | ALK_ENPL_00043103 | Manas Pradhan / EX 007 - PRADHAN, M. | R; P |
| DTX-1027 | | 3.2.R.1.P.1 Executed Batch Records | ALK_ENPL_00002361 | ALK_ENPL_00002537 | Manas Pradhan / EX 008 - PRADHAN, M. | R; P |
| DTX-1028 | 07/28/20 | Alkem Laboratories Ltd. Stability Summary Report | ALK_ENPL_00007263 | ALK_ENPL_0007280 | Manas Pradhan / EX 009 - PRADHAN, M. | R; P |
| DTX-1029 | | Enalapril Maleate Oral Solution 1 mg/ML ANDA #213714 (0007) Response to Complete Response Letter | ALK_ENPL_00007319 | ALK_ENPL_00007322 | Manas Pradhan / EX 010 - PRADHAN, M. | R; P |
| DTX-1030 | | Excel Spreadsheet - Summary for August 2020 | ALK_ENPL_00043847 | | Manas Pradhan / EX 011 - PRADHAN, M. | R; P |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1031 | | Gerold L. Mosher, Ph.D. CV | SLVGT_RTU_00005539 | SLVGT_RTU_00005545 | Gerold Mosher / Mosher 01 | R; P; HRS |
| DTX-1032 | | U.S. Patent No. 10,786,482 B2 | SLVGT_RTU_00003996 | SLVGT_RTU_00004022 | Gerold Mosher / Mosher 02 | D |
| DTX-1033 | | Highlights of Prescricibing Information (EPANED (Enalapril Maleate) for Oral Solution) | | | Gerold Mosher / Mosher 03 | R; P; H |
| DTX-1034 | | Silvergate Pharmaceuticals, Inc. - NDA 208686 2.3.P.1 Description and Composition of the Drug Product | SLVGT_RTU_00005722 | | Gerold Mosher / Mosher 04 | R; P; H |
| DTX-1035 | 01/28/22 | Azurity Pharmaceuticals, Inc.'s Objections and Responses to Defendant's Notice of Rule 30(b)(6) Deposition | | | Gerold Mosher / Mosher 05 | R; P |
| DTX-1036 | | U.S. Patent No. 10,918,621 B2 | SLVGT_RTU_00005394 | SLVGT_RTU_00005421 | Gerold Mosher / Mosher 06 | D |
| DTX-1037 | 01/29/17 | E-mail from Robert Mauro; To Michael Beckloff; Re: Skywalk Pharmacy | SLVGT_RTU_00006306 | SLVGT_RTU_00006308 | Gerold Mosher / Mosher 07 | R; P; H; S; F |
| DTX-1038 | 02/02/17 | USPTO In Re Application of Gerold L. Mosher, et al.; Declaration of Gerold Mosher Under 37 CFR § 1.132; Application Filed 3/25/2016 | SLVGT_RTU_00004140 | SLVGT_RTU_00004147 | Gerold Mosher / Mosher 08 | D |
| DTX-1039 | 05/15/20 | USPTO In Re Application of Gerold L. Mosher, et al.; Declaration of Gerold Mosher Under 37 CFR § 1.132; Application Filed 10/31/2018 | SLVGT_RTU_00005546 | SLVGT_RTU_00005552 | Gerold Mosher / Mosher 09 | D |
| DTX-1040 | 05/14/20 | USPTO In Re Application of Gerold L. Mosher, et al.; Declaration of Gerold Mosher Under 37 CFR § 1.132; Application Filed 1/8/2019 | SLVGT_RTU_00005553 | SLVGT_RTU_00005563 | Gerold Mosher / Mosher 10 | D |
| DTX-1041 | 02/02/17 | USPTO In Re Application of Gerold L. Mosher, et al.; Declaration of Gerold Mosher Under 37 CFR § 1.132; Application Filed 3/25/2016 | SLVGT_RTU_00005564 | SLVGT_RTU_00005571 | Gerold Mosher / Mosher 11 | D |
| DTX-1042 | 03/25/16 | Declaration (37 CFR 1.63) for Utility or Design Application Using Application Data Sheet (37 CFR 1.76) | SLVGT_RTU_00004035 | | Gerold Mosher / Mosher 12 | D |
| DTX-1043 | 03/25/16 | Declaration (37 CFR 1.63) for Utility or Design Application Using Application Data Sheet (37 CFR 1.76) | SLVGT_RTU_00005432 | | Gerold Mosher / Mosher 13 | D |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1044 | 01/28/22 | Azurity Pharmaceuticals, Inc.'s Objections and Responses to Defendant's Notice of Rule 30(b)(6) Deposition | | | Michael Beckloff / Beckloff 1 | R; P; D |
| DTX-1045 | 02/02/15 | Silvergate Pharmaceuticals, Inc. Correspondence to FDA; Re: Request for Type B Meeting, Epaned Oral Solution 1 mg/mL (enalapril maleate) | SLVGT_RTU_00005714 | SLVGT_RTU_00005719 | Michael Beckloff / Beckloff 2 | R; P; H; S |
| DTX-1046 | | FDA Correspondence to Silvergate Pharmaceuticals, Inc.; Re: PIND and April 16, 2015 Meeting Minutes | SLVGT_RTU_00005703 | SLVGT_RTU_00005711 | Michael Beckloff / Beckloff 3 | R; P; H; S |
| DTX-1047 | 07/15/15 | Silvergate Pharmaceuticals Inc. Board of Directors Meeting - Internal Valuation Project | SLVGT_RTU_00007436 | SLVGT_RTU_00007471 | Michael Beckloff / Beckloff 4 | R; P; H; S |
| DTX-1048 | 06/30/16 | E-mail from Sabry Soukehal; To Michael Beckloff; Re: Question about Epaned powder | SLVGT_RTU_00005961 | SLVGT_RTU_00005962 | Michael Beckloff / Beckloff 5 | R; P; H; S |
| DTX-1049 | 08/18/16 | FDA Telephone Contact Report | SLVGT_RTU_00006940 | | Michael Beckloff / Beckloff 6 | R; P; H; S |
| DTX-1050 | 09/07/16 | FDA Telephone Contact Report | SLVGT_RTU_00006937 | SLVGT_RTU_00006939 | Michael Beckloff / Beckloff 7 | R; P; H; S |
| DTX-1051 | | FDA Correspondence to Silvergate Pharmaceuticals, Inc.; Re: NDA Approval | SLVGT_RTU_00006150 | SLVGT_RTU_00006175 | Michael Beckloff / Beckloff 8 | R; P; H; S |
| DTX-1052 | 01/03/17 | E-mail from Michael Beckloff; To Frank Segrave; Re: 2017 Thoughts | SLVGT_RTU_00006933 | SLVGT_RTU_00006935 | Michael Beckloff / Beckloff 9 | R; P; H; S |
| DTX-1053 | 01/06/17 | Silvergate Pharmaceuticals Inc. Epaned RTU Launch Powerpoint | SLVGT_RTU_00006551 | SLVGT_RTU_00006582 | Michael Beckloff / Beckloff 10 | R; P; H; S |
| DTX-1054 | 01/29/17 | E-mail from Robert Mauro; To Michael Beckloff; Re: Skywalk Pharmacy | SLVGT_RTU_00006306 | SLVGT_RTU_00006308 | Michael Beckloff / Beckloff 11 | R; P; H; S |
| DTX-1055 | 01/30/17 | E-mail from Larry Carbone; To Jake Olson, et al.; Re: Epaned Information | SLVGT_RTU_00006319 | SLVGT_RTU_00006320 | Michael Beckloff / Beckloff 12 | R; P; H; S |
| DTX-1056 | | The Difference Between Epaned Oral Solution and Epaned Powder | SLVGT_RTU_00006321 | | Michael Beckloff / Beckloff 13 | R; P; H; S |
| DTX-1057 | 02/01/17 | Silvergate Pharmaceuticals Inc. Management of Pediatric Patients on Enalapril Maleate (White Paper) | SLVGT_RTU_00006600 | SLVGT_RTU_00006613 | Michael Beckloff / Beckloff 15 | R; P; H; S |
| DTX-1058 | 03/06/17 | E-mail from Susan Prather; To Susan Prather/Michael Beckloff; Re: Silvergate "Silvergate, Products" | SLVGT_RTU_00006131 | | Michael Beckloff / Beckloff 16 | R; P; H; S |
| DTX-1059 | 11/29/17 | E-mail from Michael Beckloff; To Susan Prather; Re: New voicemail 1 from 17637551259 | SLVGT_RTU_00006337 | SLVGT_RTU_00006338 | Michael Beckloff / Beckloff 17 | R; P; H; S |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1060 | | Silvergate Pharmaceuticals Inc. Confidential Corporate Presentation Spring 2018 | SLVGT_RTU_00007704 | SLVGT_RTU_00007729 | Michael Beckloff / Beckloff 18 | R; P; H; S |
| DTX-1061 | 02/13/19 | Silvergate Pharmaceuticals Inc. Board of Directors Meeting | SLVGT_RTU_00007310 | SLVGT_RTU_00007416 | Michael Beckloff / Beckloff 20 | R; P; H; S |
| DTX-1062 | 02/01/19 | Silvergate Pharmaceuticals Inc. Confidential Corporate Presentation February 2019 | SLVGT_RTU_00007823 | SLVGT_RTU_00007848 | Michael Beckloff / Beckloff 21 | R; P; H; S; D |
| DTX-1063 | 03/08/21 | [Proposed] Final Pretrial Order (Silvergate v. Bionpharma Inc. and Amneal Pharmaceuticals LLC, 1:18-cv-01962-MSG, D.I. 211) | | | John Mahan / Mahan 01 | R; P; H; S; F; V; NE |
| DTX-1064 | 04/18/22 | John D. Mahan, Jr., M.D. CV | | | John Mahan / Mahan 02 | R; P; H |
| DTX-1065 | 05/05/22 | Expert Report of John D. Mahan, Jr., M.D. on Objective Indicia of Non-Obviousness for U.S. Patents 10,786,482 and 10,918,621 | | | John Mahan / Mahan 03 | R; P; H; IO; NE |
| DTX-1066 | | Pharmacologic Treatment of Chronic Pediatric Hypertension | | | John Mahan / Mahan 04 | R; P; H; S; F; |
| DTX-1067 | | Highlights of Prescricibing Information (EPANED (Enalapril Maleate) for Oral Solution) | | | John Mahan / Mahan 05 | R; P; HRS; D |
| DTX-1068 | | U.S. Patent No. 10,786,482 B2 | NO BATES | NO BATES | John Mahan / Mahan 06 | D |
| DTX-1069 | | U.S. Patent No. 10,918,621 B2 | NO BATES | NO BATES | John Mahan / Mahan 07 | D |
| DTX-1070 | | US 11,253,480 B2 | | | Steven Little / Little 01 | R; P; H; S |
| DTX-1071 | | U.S. Patent No. 10,918,621 B2 | NO BATES | NO BATES | Steven Little / Little 02 | D |
| DTX-1072 | 05/06/22 | Responsive Expert Report of Dr. Steven Little on the Validity of U.S. Patent Nos. 10,786,482 and 10,918,621 | | | Steven Little / Little 03 | R; P; H; IO; NE |
| DTX-1073 | | Highlights of Prescricibing Information (EPANED (Enalapril Maleate) for Oral Solution) | | | Steven Little / Little 04 | R; P; H; S; F |
| DTX-1074 | | Stability of Alprazolam, Chloroquine Phosphate, Cisapride, Enalapril Maleate, and Hydralazine Hydrochloride in Extemporaneously Compounded Oral Liquids (Allen and Erickson) | | | Steven Little / Little 05 | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1075 | | Preservatives in Liquid Pharmaceutical Preparations (Boukarim, Jaoude, Bahnam, Barada and Kyriacos) | | | Steven Little / Little 06 | R; P; H; S; F |
| DTX-1076 | | Physicochemical Stability of Captopril and Enalapril Extemporaneous Formulations for Pediatric Patients (Casas, Alvarez and Lucero) | | | Steven Little / Little 07 | R; P; H; S; F |
| DTX-1077 | | Stability of Extemporaneous Enalapril Maleate Suspensions for Pediatric for Pediatric Use Prepared from Commercially Available Tablets (Sosnowska, Winnicka and Czajkowska-Kosnik) | | | Steven Little / Little 08 | R; P; H; S; F |
| DTX-1078 | | Stability of Enalapril Maleate in Three Extemporaneously Prepared Oral Liquids (Nahata, Morosco and Hipple) | | | Steven Little / Little 09 | R; P; H; S; F |
| DTX-1079 | | Pharmacokinetic Assessment of Oral Enalapril Suspension of Use in Children (Rippley, Connor, Boyle, Bradstreet, Hand, Lo and Murphy) | | | Steven Little / Little 10 | R; P; H; S; F |
| DTX-1080 | | WO 2017/077425 A1 | | | Steven Little / Little 11 | R; P; H; S; F |
| DTX-1081 | 02/02/17 | USPTO In Re Application of Gerold L. Mosher, et al.; Declaration of Gerold Mosher Under 37 CFR § 1.132; Application Filed 3/25/2016 | | | Steven Little / Little 12 | D |
| DTX-1082 | 05/15/20 | USPTO In Re Application of Gerold L. Mosher, et al.; Declaration of Gerold Mosher Under 37 CFR § 1.132; Application Filed 10/31/2018 | | | Steven Little / Little 13 | D |
| DTX-1083 | 05/14/20 | USPTO In Re Application of Gerold L. Mosher, et al.; Declaration of Gerold Mosher Under 37 CFR § 1.132; Application Filed 1/8/2019 | | | Steven Little / Little 14 | D |
| DTX-1084 | 04/13/22 | Opening Expert Report of Dr. Steven Little | | | Steven Little / Little 15 | R; P; H; IO; NE |
| DTX-1085 | 06/01/22 | Reply Report of Dr. Steven Little Regarding Infringement of U.S. Patent Nos. 10.786,482 and 10,918,621 | | | Steven Little / Little 16 | R; P; H; IO; NE |
| DTX-1086 | 06/09/22 | Supplemental Report of Dr. Steven Little in Response to Dr. Rabinow's Opinions Regarding Allen 1998 | | | Steven Little / Little 17 | R; P; H; IO; NE |
| DTX-1087 | | Steven R. Little CV (Exhibit A) | | | Steven Little / Little 18 | R; P; H |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1088 | 6/12/201 22 | Adams v. Bos. Sci. Corp. (In re Bos. Sci. Corp. Pelvic Repair Sys. Prods. Liab. Litig.), U.S.D.C.(S.D.WV), MDL No. 2326; Case Law re Little Daubert Motion | | | Steven Little / Little 19 | R; P; H; S; F |
| DTX-1089 | 11/20/20 | Barron, et al. v. Atrium Medical Corp., et al., U.S.D.C.(D.NH), C.A. No. 1:17-cv-00742-LM, MDL No. 2753; D.I. 163 - Procedural Order re Little Daubert Motion | | | Steven Little / Little 20 | R; P; H; S; F |
| DTX-1090 | | Save America's Patent System, New York Times, Editorial Board, April 16, 2022 | | | Steven Little / Little 22 | R; P; H; S; F |
| DTX-1091 | | Highlights of Prescribing Information (EPANED (Enalapril Maleate) for Oral Solution) | | | Steven Little / Little 23 | R; P; H; S; F; D |
| DTX-1092 | | Stability of Enalapril Solutions Prepared from Tablets in Sterile Water (Schlatter and Saulnier) | | | Steven Little / Little 25 | R; P; H; S; F |
| DTX-1093 | | U.S. Patent No. 10,786,482 B2 | NO BATES | NO BATES | Steven Little / Little 26 | R; P; H |
| DTX-1094 | | US 8,568,747 B1 | | | Defendant's Inval. Contentions - Exhibit 1 | R; P; H; S; F |
| DTX-1095 | | Highlights of Prescribing Information (EPANED (Enalapril Maleate) for Oral Solution) | | | Defendant's Inval. Contentions - Exhibit 2 | D |
| DTX-1096 | | Stability of Alprazolam, Chloroquine Phosphate, Cisapride, Enalapril Maleate, and Hydralazine Hydrochloride in Extemporaneously Compounded Oral Liquids (Allen and Erickson) | | | Defendant's Inval. Contentions - Exhibit 3 | D |
| DTX-1097 | | Preservatives in Liquid Pharmaceutical Preparations (Boukarim, Jaoude, Bahnam, Barada and Kyriacos) | | | Defendant's Inval. Contentions - Exhibit 4 | D |
| DTX-1098 | | Physicochemical Stability of Captopril and Enalapril Extemporaneous Formulations for Pediatric Patients (Casas, Alvarez and Lucero) | | | Defendant's Inval. Contentions - Exhibit 5 | D |
| DTX-1099 | | Stability of Extemporaneous Enalapril Maleate Suspensions for Pediatric for Pediatric Use Prepared from Commercially Available Tablets (Sosnowska, Winnicka and Czajkowska-Kosnik) | | | Defendant's Inval. Contentions - Exhibit 6 | D |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1100 | | Stability of Enalapril Maleate in Three Extemporaneously Prepared Oral Liquids (Nahata, Morosco and Hipple) | | | Defendant's Inval. Contentions - Exhibit 7 | D |
| DTX-1101 | | Pharmacokinetic Assessment of Oral Enalapril Suspension of Use in Children (Rippley, Connor, Boyle, Bradstreet, Hand, Lo and Murphy) | | | Defendant's Inval. Contentions - Exhibit 8 | D |
| DTX-1102 | 06/08/06 | US 2006/0121066 A1 | | | Defendant's Inval. Contentions - Exhibit 9 | R; P; H; S; F |
| DTX-1103 | | Ghosh, T.K., and Jasti, B.R. (Eds.). (2005). Theory and Practice of Contemporary Pharmaceutics (1st ed.). CRC Press. Kolling, William M., & Ghosh, Tapash K., Chapter 12: Oral Liquid Dosage Forms: Solutions, Elixirs, Syrups, Suspensions and Emulsions. | ALK_ENPL_00257684 | ALK_ENPL_00257704 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1104 | | Bharate, Sonali S., Bharate, Sandip B. and Bajaj, Amrita N. “Incompatibilities of Pharmaceutical Excipients with Active Pharmaceutical Ingredients: A Comprehensive Review.” Journal of Excipients and Food Chemicals, [S.l.], v. 1, n. 3, p. 3-26, dec. 2010. ISSN 21502668. Available at: <https://ojs.abo.fi/ojs/index.php/jefc/article/view/26>. Date Accessed 09 Mar. 2022. | ALK_ENPL_00257705 | ALK_ENPL_00257728 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1105 | | Duncan, Michelle, and Zaretsky, Irene. “Do the Math for Shelf Life.” Technology and Applications PFQ Pharmaceutical Formulation & Quality, Vol. 13, No. 2, April - May 2011, pp. 22–28, www.pharmaquality.com. Date Accessed 4 Mar. 2022. | ALK_ENPL_00257729 | ALK_ENPL_00257736 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1106 | | “Epaned (Enalapril Powder for Oral Solution): Uses, Dosage, Side Effects, Interactions, Warning.” RxList, www.rxlist.com/epaned-drug.htm. Date Accessed 04 Mar. 2022. | ALK_ENPL_00257737 | | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1107 | | Gattari, Patrick. "Determining Inventorship for US Patent Applications." Intellectual Property & Technology Law Journal, vol. 17, no. 5, May 2005, pp. 16–19, agsci.oregonstate.edu/sites/agsci/files/main/research/vrc_release_inventorship-gattari.pdf. Date Accessed 23 Mar. 2022. | ALK_ENPL_00257738 | ALK_ENPL_00257742 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1108 | | Glass BD, Haywood A. "Stability considerations in liquid dosage forms extemporaneously prepared from commercially available products." J Pharm Pharm Sci. 2006;9(3):398-426. PMID : 17207422. Date Accessed 09 Mar 2022. | ALK_ENPL_00257743 | ALK_ENPL_00257771 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1109 | | Center for Drug Evaluation and Research. "Q1A(R2) Stability Testing of New Drug Substances and Products." U.S. Food and Drug Administration, 2003, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/q1ar2-stability-testing-new-drug-substances-and-products. Date Accessed 10 Mar. 2022. | ALK_ENPL_00257772 | ALK_ENPL_00257796 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1110 | | Hotha, Kishore Kumar, et al. "Drug-Excipient Interactions: Case Studies and Overview of Drug Degradation Pathways." American Journal of Analytical Chemistry, vol. 07, no. 01, 2016, pp. 107–140, 10.4236/ajac.2016.71011. Date Accessed 09 Mar. 2022. | ALK_ENPL_00257797 | ALK_ENPL_00257830 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1111 | | Research, Center for Drug Evaluation and. "Inactive Ingredients in Approved Drug Products Search: Frequently Asked Questions." FDA, 26 Jan. 2022, www.fda.gov/drugs/drug-approvals-and-databases/inactive-ingredients-approved-drug-products-search-frequently-asked-questions#CAS. Date Accessed 5 Apr. 2022. | ALK_ENPL_00257831 | ALK_ENPL_00257836 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1112 | | Lucas, Teresa, et al. Pharmaceutical Technology. Vol. 46285. July, 2004, pp. 68-73. | ALK_ENPL_00257837 | ALK_ENPL_00257841 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1113 | | Strickley, Robert G. "Pediatric Oral Formulations: An Updated Review of Commercially Available Pediatric Oral Formulations since 2007." Journal of Pharmaceutical Sciences, vol. 108, no. 4, Apr. 2019, pp. 1335–1365, 10.1016/j.xphs.2018.11.013. Date Accessed 13 Mar. 2022. | ALK_ENPL_00257842 | ALK_ENPL_00257872 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1114 | | Strickley, Robert G., et al. "Pediatric Drugs-A Review of Commercially Available Oral Formulations." Journal of Pharmaceutical Sciences, vol. 97, no. 5, May 2008, pp. 1731–1774, 10.1002/jps.21101. Date Accessed 13 Mar. 2022. | ALK_ENPL_00257873 | ALK_ENPL_00257916 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1115 | | Center for Drug Evaluation and Research. "Guidance for Industry and Review Staff Target Product Profile - A Strategic Development Process Tool." U.S. Food and Drug Administration, 2007, http://ncai-cc.ccf.org/skills/documents/U.S.%20FDA%20Target%20Product%20Profile%20Guidance%20Document%20(2007).pdf. Date Accessed 9 Mar. 2022. | ALK_ENPL_00257917 | ALK_ENPL_00257941 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1116 | | WO 2017/077425 A1 | ALK_ENPL_00257942 | ALK_ENPL_00257957 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | D |
| DTX-1117 | | Ivanovska, Verica & Rademaker, Carin & van Dijk, Liset & Mantel-Teeuwisse, Aukje. (2014). Pediatric Drug Formulations: A Review of Challenges and Progress. Pediatrics. 134. 10.1542/peds.2013-3225. Date Accessed 5 Nov. 2015. | ALK_ENPL_00257958 | ALK_ENPL_00257971 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |
| DTX-1118 | | De Villiers, Melgardt. 3rd Ed. (2009). Judith E. Thompson, Editor. A Practical Guide to Contemporary Pharmacy Practice. Chapter 18 - Buffers and pH Adjusting Agents. | ALK_ENPL_00257972 | ALK_ENPL_00257978 | Panayiotis P. Constantinides, Ph.D. / Opening Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1119 | | Alves A, Correia-da-Silva M, Nunes C, Campos J, Sousa E, Silva PMA, Bousbaa H, Rodrigues F, Ferreira D, Costa PC, Pinto M. Discovery of a New Xanthone against Glioma: Synthesis and Development of (Pro)liposome Formulations. Molecules. 2019 Jan 23;24(3):409. doi: 10.3390/molecules24030409. PMID: 30678085; PMCID: PMC6384625. | ALK_ENPL_00257979 | AKL_ENPL_00257995 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1120 | | Aminu, N., Chan, SY., Mumuni, M.A. et al. Physicochemical compatibility studies of triclosan and flurbiprofen with excipients of pharmaceutical formulation using binary, ternary, and multi-combination approach. Futur J Pharm Sci 7, 148 (2021). https://doi.org/10.1186/s43094-021-00302-7 | ALK_ENPL_00257996 | ALK_ENPL_00258011 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1121 | | Baertschi, S.W., Alsante, K.M., & Reed, R.A. (Eds.). (2011). Pharmaceutical Stress Testing: Predicting Drug Degradation, Second Edition (2nd ed.). CRC Press. 10-48. https://database.ich.org/sites/default/files/Q1A%28R2%29%20Guideline.pdf | ALK_ENPL_00258012 | ALK_ENPL_00258054 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1122 | | Cairns, Donald. Chemistry of Acids and Bases, Ch. 1 in Essentials of Pharmaceutical Chemistry, 3rd ed. Pharmaceutical Press, Chicago, 2008. | ALK_ENPL_00258055 | ALK_ENPL_00258351 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1123 | | "Development Services – Stasonpharma." Stasonpharma.com, stasonpharma.com/contract-manufacturing/development-services/. Accessed 6 May 2022. | ALK_ENPL_00258352 | ALK_ENPL_00258353 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1124 | | "Excipient Screening - Solutions / BOC Sciences." www.solutions.bocsci.com, www.solutions.bocsci.com/excipient-screening.htm. Accessed 6 May 2022. | ALK_ENPL_00258354 | ALK_ENPL_00258358 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1125 | | International Standard Serial Number (ISSN): 2319-8141.  International Journal of Universal Pharmacy and Bio Sciences 3(2): March-April 2014 INTERNATIONAL JOURNAL OF UNIVERSAL PHARMACY AND BIO SCIENCES IMPACT FACTOR 1.89*** ICV 5.13*** Pharmaceutical Sciences PHYSICAL CHARACTERIZATION AND ENHANCEMENT THE SOLUBILITY OF VALSARTAN BY SOLID DISPERSION METHOD Nisha Upadhyay*1 , Dr. Shridhar J. Pandya1 , Maulesh Vyas1.  "FT-IR studies : ( Furier Transform Infra Red Spectroscopy) Procedure: FTIR spectra for drug alone and with excipients were recorded using a FTIR spectrophotometer with KBR pellets to study drug-excipients and excipient-excipient compatibility." www.ijupbs.com | ALK_ENPL_00258359 | ALK_ENPL_00258372 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1126 | | Hani U, Shivakumar HG, Osmani RA, Srivastava A, Kumar Varma NS. Development of a Curcumin Bioadhesive Monolithic Tablet for Treatment of Vaginal Candidiasis. Iran J Pharm Res. 2016;15(1):23-34.  "The compatibility of curcumin-excipient as well as excipient–excipient compatibility after formulating to a tablet and the effect of compression force on thermal profiles of all the components was assessed using differential scanning calorimetry (DSC)." | ALK_ENPL_00258373 | ALK_ENPL_00258384 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1127 | | ICH HARMONISED TRIPARTITE GUIDELINE STABILITY TESTING OF NEW DRUG SUBSTANCES AND PRODUCTS Q1A(R2) Current Step 4 version dated 6 February 2003. | ALK_ENPL_00258385 | ALK_ENPL_00258408 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1128 | | MANUAL OF POLICIES AND PROCEDURES CENTER FOR DRUG EVALUATION AND RESEARCH MAPP 5015.10, POLICY AND PROCEDURES, OFFICE OF PHARMACEUTICAL SCIENCE Chemistry Review of Question-based Review (QbR) Submissions. Effective Date: 11/18/2014. | ALK_ENPL_00258409 | ALK_ENPL_00258420 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1129 | | Michelle Meadows. Promoting safe & effective drugs for 100 years. FDA Consumer Magazine, the centennial edition/January-February 2006 | ALK_ENPL_00258421 | ALK_ENPL_00258428 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1130 | | Melo SR, Homem-de-Mello M, Silveira D, Simeoni LA. Advice on Degradation Products in Pharmaceuticals: A Toxicological Evaluation. PDA J Pharm Sci Technol. 2014 5/6;68(3):221-238. | ALK_ENPL_00258429 | ALK_ENPL_00258449 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1131 | | PERMEATION ENHANCEMENT OF MODEL ANTI-HYAPERTENSIVE DRUG FROM TRANSDERMAL PATCHES USING ESSENTIAL OILS Rupal Jani1, Priyanka Chawada and Vijay J. Upadhye Plant Archives Vol. 19 No. 2, 2019 pp. .....-..... e-ISSN:2581-6063 (online),ISSN:0972-5210 “FTIR study was done for the identification of the drug and excipients and to study drug-excipients and excipient-excipient compatibility”. | ALK_ENPL_00258450 | ALK_ENPL_00258457 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1132 | | National Center for Biotechnology Information. "PubChem Compound Summary for CID 7456, Methylparaben" PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/Methylparaben. Accessed 6 May, 2022. | ALK_ENPL_00258458 | ALK_ENPL_00258514 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1133 | | Preservative Formulation and Effectiveness in Oral Solutions and Suspensions. Hang Guo Drug Product Science & Technology Department Chris Knutsen, PhD Analytical & Bioanalytical Development Department PDA Metro Meeting, Feb. 15, 2011. https://www.pda.org/docs/default-source/website-document-library/chapters/presentations/metro/preservative-formulation-and-effectiveness-in-oral-solutions-and-suspensions.pdf?sfvrsn=d9c5a38e_6 | ALK_ENPL_00258515 | ALK_ENPL_00258571 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1134 | | Peter R. Bradshaw, Selena E. Richards, Ian D. Wilson, Andrew V. Stachulski, John C. Lindon, Toby J. Athersuch. Kinetic modelling of acyl glucuronide and glucoside reactivity and development of structure–property relationships. Organic & Biomolecular Chemistry 2020, 18 (7), 1389-1401. | ALK_ENPL_00258572 | ALK_ENPL_00258584 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1135 | | Regan, S.L., Maggs, J.L., Hammond, T.G., Lambert, C., Williams, D.P. and Park, B.K. (2010), Acyl glucuronides: the good, the bad and the ugly. Biopharm. Drug Dispos., 31: 367-395. https://onlinelibrary.wiley.com/doi/10.1002/bdd.720 | ALK_ENPL_00258585 | ALK_ENPL_00258613 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1136 | | Sugar-Free Flavored Oral Syrup Vehicle Applications. https://www.perrigoweb.com/Perrigorx/files/rx/pdfs/pds175-ORA-Sweet%20SF.pdf. Date Accessed: May 5, 2022. | ALK_ENPL_00258614 - | ALK_ENPL_00258615 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1137 | | Stability of extemporaneous enalapril maleate suspensions for pediatric use prepared from commercially available tablets Katarzyna Sosnowska, Katarzyna Winnicka And Anna Czajkowska-Koånik. Acta Poloniae Pharmaceutica ñ Drug Research, Vol. 66 No. 3 pp. 321-326, 2009. https://www.ptfarm.pl/pub/File/Acta_Poloniae/2009/3/321.pdf | ALK_ENPL_00258616 | ALK_ENPL_00258621 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1138 | | Troy, David B. Remington: The Science and Practice of Pharmacy. Philadelphia, Pa, Lippincott, Williams & Wilkins, 2006. Chapter 105: Extemporaneous Prescription Compounding. 1903-1912. | ALK_ENPL_00258622 | ALK_ENPL_00258635 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1139 | | Zupanets, K.O.; Shebeko, S.K.; Ratushna, K.L.; Katilov, O.V. Cumulative Risks of Excipients in Pediatric Phytomucolytic Syrups: The Implications for Pharmacy Practice. Sci. Pharm. 2021, 89, 32. https://doi.org/10.3390/scipharm89030032 | ALK_ENPL_00258636 | ALK_ENPL_00258654 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1140 | | "INDUSTRIAL PRODUCT DEVELOPMENT." Ebrary, ebrary.net/202728/health/industrial_product_development. Accessed 6 May 2022. | ALK_ENPL_00258655 | ALK_ENPL_00258662 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1141 | | Sidelmann UG, Lenz EM, Spraul M, Hofmann M, Troke J, Sanderson PN, Lindon JC, Wilson ID, Nicholson JK. 750 MHz HPLC-NMR spectroscopic studies on the separation and characterization of the positional isomers of the glucuronides of 6,11-dihydro-11-oxodibenz[b,e]oxepin-2-acetic acid. Anal Chem. 1996 Jan 1;68(1):106-10. https://pubmed.ncbi.nlm.nih.gov/8779427/ | ALK_ENPL_00258663 | ALK_ENPL_00258667 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1142 | | U. Sidelmann, C. Gavaghan, H.A.J. Carless, R.D. Farrant, J.C. Lindon, I.D.Wilson, and J.K. Nicholson. Identification of the positional isomers of 2-fluorobenzoic acid 1-O-acyl glucuronide by directly coupled HPLC-NMR. Anal. Chem. 67: 3401–3404 (1995). https://pubs.acs.org/doi/abs/10.1021/ac00115a006 | ALK_ENPL_00258668 | ALK_ENPL_00258671 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1143 | | U. Sidelmann, A.W. Nicholls, P.E. Meadows, J.W. Gilbert, J.C. Lindon, I.D.Wilson, and J.K. Nicholson. High-performance liquid chromatography directly coupled to 19F and 1H NMR for the analysis of mixtures of isomeric ester glucuronide conjugates of trifluoromethylbenzoic acids. J. Chromatogr. A 728: 377–85 (1996). https://www.sciencedirect.com/science/article/abs/pii/0021967395008357?via%3Dihub | ALK_ENPL_00258672 | ALK_ENPL_00258680 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1144 | | Al-Omari MM, Abdelah MK, Badwan AA, Jaber AM. Effect of the drug-matrix on the stability of enalapril maleate in tablet formulations. J Pharm Biomed Anal. 2001 Jul;25(5-6):893-902. https://pubmed.ncbi.nlm.nih.gov/11377072/ | ALK_ENPL_00258681 | ALK_ENPL_00258690 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1145 | | Natasa Bubic Pajic, P. Ivana, Snezana Savic, V. Gordana. Liquid extemporaneous pharmaceutical preparations for pediatric patients. Arhiv Za Farmaciju 62(3):252-266 January 2012 (Abstract). https://www.researchgate.net/publication/282723418_Liquid_extemporaneous_pharmaceutical_preparations_for_pediatric_patients | ALK_ENPL_00258691 | ALK_ENPL_00258694 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1146 | | R D Farrant, M Spraul, I D Wilson, A W Nicholls, J K Nicholson, J C Lindon. Assignment of the 750 MHz 1H NMR resonances from a mixture of transacylated ester glucuronic acid conjugates with the aid of oversampling and digital filtering during acquisition. Journal of pharmaceutical and biomedical analysis. 13(8):971-977. July 1995. https://www.sciencedirect.com/journal/journal-of-pharmaceutical-and-biomedical-analysis/vol/13/issue/8 | ALK_ENPL_00258695 | ALK_ENPL_00258701 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F |
| DTX-1147 | | Research, Center for Drug Evaluation and. "Q6A Specifications: Test Procedures and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances." U.S. Food and Drug Administration, 14 Apr. 2020, www.fda.gov/regulatory-information/search-fda-guidance-documents/q6a-specifications-test-procedures-and-acceptance-criteria-new-drug-substances-and-new-drug-products. | ALK_ENPL_00258702 | ALK_ENPL_00258724 | Panayiotis P. Constantinides, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1148 | | Ana Santovena -Eatevez et al; Effectiveness of Antimicrobial Preservation of Extemporaneous Diluted Simple Syrup Vehicles for Pediatrics, J. Pediatr. Pharmacol. Ther. (2018) 405 – 409. | ALK_ENPL_00258725 | ALK_ENPL_00258730 | Panayiotis P. Constantinides, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1149 | | VanVliet, David. Secondary Considerations in Pharmaceutical Patents: Part One. National Affairs, Inc. 2017. | ALK_ENPL_00258731 | ALK_ENPL_00258736 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1150 | | Vanvliet, David. Secondary Considerations in Pharmaceutical Patents: Part Two. National Affairs, Inc. 2017. | ALK_ENPL_00258737 | ALK_ENPL_00258742 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1151 | | da Silva, Brianna A., and Mahesh Krishnamurthy. "The Alarming Reality of Medication Error: A Patient Case and Review of Pennsylvania and National Data." Journal of Community Hospital Internal Medicine Perspectives, vol. 6, no. 4, 7 Sept. 2016, p. 31758, www.ncbi.nlm.nih.gov/pmc/articles/PMC5016741/, 10.3402/jchimp.v6.31758. | ALK_ENPL_00258743 | ALK_ENPL_00258748 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1152 | | Tariq, Rayhan A., et al. Medication Dispensing Errors and Prevention. Www.ncbi.nlm.nih.gov, StatPearls Publishing, 16 Feb. 2021, www.ncbi.nlm.nih.gov/books/NBK519065/?report=printable. | ALK_ENPL_00258749 | ALK_ENPL_00258755 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1153 | | Alireza Salar, Fatemeh Kiani, Nasrin Rezaee, Preventing the medication errors in hospitals: A qualitative study, International Journal of Africa Nursing Sciences, Volume 13, 2020, 100235, ISSN 2214-1391, https://doi.org/10.1016/j.ijans.2020.100235. | ALK_ENPL_00258756 | ALK_ENPL_00258760 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1154 | | Tablets Vasotec® (Enalapril Maleate) Rx Only. https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/018998s079lbl.pdf Accessed: May 31, 2022. | ALK_ENPL_00258761 | ALK_ENPL_00258780 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1155 | | Epaned-Prescribing Info. https://epaned.com/Epaned-Prescribing-Info.pdf Accessed: May 31, 2022 | ALK_ENPL_00258781 | ALK_ENPL_00258782 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1156 | | V Chawla, M Singh and M Kumar. Rising Incidences of Product Recall. Universal Journal of Pharmaceutical Research 1(1):6-12. October 2016. | ALK_ENPL_00258783 | ALK_ENPL_00258790 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1157 | | The Pediatric Exclusivity Provision Status Report to Congress Department of Health and Human Services U.S. Food and Drug Administration. 2001. | ALK_ENPL_00258791 | ALK_ENPL_00258847 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |

| Ex. No. | Date | Description | BEG BATES | END BATES | Deposition Witness / Exhibit | Objections |
|---|---|---|---|---|---|---|
| DTX-1158 | | Research, Center for Drug Evaluation and. "Qualifying for Pediatric Exclusivity under Section 505A of the Federal Food, Drug, and Cosmetic Act: Frequently Asked Questions on Pediatric Exclusivity (505A)." FDA, 1 Mar. 2022, www.fda.gov/drugs/development-resources/qualifying-pediatric-exclusivity-under-section-505a-federal-food-drug-and-cosmetic-act-frequently. | ALK_ENPL_00258848 | ALK_ENPL_00258849 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F; D |
| DTX-1159 | | Lawrence A. Trissel, Trissel's™ Stability of Compounded Formulations, 5th ed., American Pharmacists Association, Washington D.C., 2012. | ALK_ENPL_00258850 | ALK_ENPL_00258864 | Barrett E. Rabinow, Ph.D. / Reply Expert Report | R; P; H; S; F |
| DTX-1160 | | Natasa Bubic Pajic, P. Ivana, Snezana Savic, V. Gordana. Liquid extemporaneous pharmaceutical preparations for pediatric patients. Arhiv Za Farmaciju 62(3):252-266 January 2012 (Abstract). https://www.researchgate.net/publication/282723418_Liquid_extemporaneous_pharmaceutical_preparations_for_pediatric_patients | ALK_ENPL_00258865 | ALK_ENPL_00258879 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F; D |
| DTX-1161 | | Natasa Bubic Pajic, P. Ivana, Snezana Savic, V. Gordana. Liquid extemporaneous pharmaceutical preparations for pediatric patients. Arhiv Za Farmaciju 62(3):252-266 January 2012 (Abstract). https://www.researchgate.net/publication/282723418_Liquid_extemporaneous_pharmaceutical_preparations_for_pediatric_patients | ALK_ENPL_00258880 | ALK_ENPL_00258895 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; S; F; D |
| DTX-1162 | | Natasa Bubic Pajic, P. Ivana, Snezana Savic, V. Gordana. Liquid extemporaneous pharmaceutical preparations for pediatric patients. Arhiv Za Farmaciju 62(3):252-266 January 2012 (Abstract). https://www.researchgate.net/publication/282723418_Liquid_extemporaneous_pharmaceutical_preparations_for_pediatric_patients (Certified Translation) | ALK_ENPL_00258896 | ALK_ENPL_00258912 | Barrett E. Rabinow, Ph.D. / Rebuttal Noninfringement Expert Report | R; P; H; AU; F; S; N; NSW |

**AZURITY'S ABBREVIATION AND FEDERAL RULES OF EVIDENCE KEY TO THE OBJECTIONS**

| Code | Objection |
|---|---|
| A | Argumentative |
| AT | Attorney objections not removed |
| AU | Authenticity or Identification (FRE 901) |
| B | Violates Best Evidence Rule (FRE 1002-1004) |
| C | Compound |
| D | Duplicative/Cumulative |
| F | Lack of Foundation (FRE 602) |
| H | Hearsay/Improper Use of Deposition (FRE 801-802: FRCP 32) |
| I | Improper/Incomplete Designation (FRE 106: FRCP 32(a)(6)) |
| IC | Improper Counter-Designation (FRE 106: FRCP 32(a)(6)) |
| ID | Improper Designation of a Witness To Be Called Live (FRCP 32) |
| IO | Improper Lay or Expert Opinion (FRE 701-703) |
| K | Lack of Personal Knowledge/Incompetent (FRE 602) |
| L | Leading Objection in Redirects |
| LC | Improper Legal Conclusion (FRE 403) |
| M | Misleading/Mischaracterizes Prior Testimony |
| MD | Mischaracterizes Underlying Document (FRE 401-403) |
| N | Not previously produced, lacks production numbers, or illegible |
| NE | Assumes Facts Not In Evidence (FRE 103) |
| NR | Nonresponsive |
| NSW | No Sponsoring Witness |
| OS | Oversized document in terms of page length, rendering meaningful objections impossible until Defendant knows the purpose for which the document is being offered |
| P | Prejudice/Confusion/Delay/Waste of Time (FRE 403) |
| R | Relevance (FRE 401/402) |
| RRW | Writing or recorded statement cannot be introduced without other writing or recorded statement (FRE 106) |
| S | Calls for Speculation (FRE 602) |
| SC | Beyond the Scope of the Witness's Testimony as a Corporate Representative |
| U | Improper Use Against Other Parties or For Other Purposes (FRE 105) |
| V | Vague/Ambiguous/Overbroad |
| X | Incomplete Document (FRE 106) |
| Y | Wrong Document or Incorrectly Described |
| Z | Reserved Because Exhibit Has Not Been Provided, the Copy Provided is Illegible, and/or the Entry Includes Multiple Documents |

# EXHIBIT 12

# TAB 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>ALKEM LABORATORIES LTD.,<br><br>*Defendant*. | : | C.A. No. 1:19-CV-02100-MSG<br><br>[redacted] |

**ALKEM LABORATORIES LTD.'S MOTION IN LIMINE**
**TO EXCLUDE THE TESTIMONY OF JOHN D. MAHAN, JR., M.D.**

Plaintiff's expert John D. Mahan, Jr., M.D., purports to offer his opinion that the patent claims Plaintiff has asserted against Alkem in this case solved an alleged long-felt but unmet need as a secondary consideration of nonobviousness. He did so without addressing or analyzing whether a nexus existed tying the alleged satisfaction of the unmet need to the patent claims at issue in this case. He also did so without regard to the actual scope of the purported claimed inventions. And, the opinion he offers in this case on Plaintiff's behalf is directly contradictory to the position Plaintiff has asserted in binding admissions on the public record in the pre-trial order in a case concerning related patents. Consequently, Dr. Mahan's opinion fails to satisfy Federal Rule of Evidence 702's requirement of reliability, his opinion should be stricken, and he should be precluded from testifying at trial. (*See* Fed. R. Evid. 702(c), (d) (requiring expert testimony to be the "product of reliable principles and methods" and to have "reliably applied the principles and methods to the facts of the case.")

First, Dr. Mahan failed to evaluate a nexus between the alleged secondary consideration of nonobviousness and the purported claimed inventions. His report on the issue mentions nothing of nexus, and he admitted during his deposition that he is not familiar with the issue in the patent context and did not assess nexus in reaching his conclusions. (*See generally* Ex A, Mahan Responsive Report; *see also* Ex. B, Mahan Dep. Tr., at 101:14-102:9). That alone is sufficient to grant Alkem the relief it seeks. *See*, *e.g.*, *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373-74 (Fed. Cir. 2019) (noting that patent defenders must demonstrate a nexus between the claimed inventions and secondary considerations and, absent a specific product that practices the invention, must do so by showing "that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention" (internal quotations omitted)); *see also*, *e.g.*, *Cot'n Wash, Inc. v. Henkel Corp.*, 56 F. Supp. 3d 626, 651 (D. Del. 2014) (J. Robinson) (excluding expert

testimony on the issue of licensing as a secondary consideration of nonobviousness due to failure to assess nexus); *Inventio AG v. Thyssenkrupp Elevator Corp.*, C.A. No. , 2014 U.S. Dist. LEXIS 157448, at *26 (D. Del. Nov. 6, 2014) (J. Andrews) (declining motion for a new trial and reaffirming holding excluding expert testimony for failure to address nexus).

Second, Dr. Mahan opines on an alleged need for liquid formulations of enalapril that provided long-term stability, specifically without requiring compounding, reconstitution or other manipulation.  (See Ex. A at ¶55.)  As Plaintiff's other expert, Steven R. Little, Ph.D., conceded at his deposition, however, the claims at issue in this case are not limited to such formulations. (*See* Ex. E, Little Dep. Tr., at 99:24-100:2, 105:21-106:12, 107:21-110:15; Ex. C, '482 patent, claims 14-23, 27-28; *id.* at 5:14-16 ("Also provided herein are stable enalapril powder formulations for reconstitution for oral liquid administration.") and 19:37-23:18 (describing embodiments of the claimed inventions that "are prepared from the reconstitution of an enalapril powder formulation"); Ex. D, '621 patent, claims 1-13, 16-27, 30; *id.* at 5:14-16 (same as '482 patent) and 19:55-23:39 (same as '482 patent)).  Thus, nexus aside, Dr. Mahan's opinion totally disregards the scope of the claimed inventions and is, therefore, unreliable and should be struck and excluded. *See Cubist Pharms, Inc. v. Hospira, Inc.*, 75 F. Supp. 3d 641, 672 (D. Del. 2014) (J. Sleet) (rejecting theory of long-felt but unmet need as a secondary consideration of nonobviousness where theory was based on an alleged improvement that was not described in the patented claims).

Third, Plaintiff should be estopped from relying on Dr. Mahan's opinion, which squarely contradicts admissions Plaintiff (then appearing as Plaintiff Azurity's predecessor in interest, Silvergate Pharmaceuticals, Inc.) made on the permanent public record in the case styled as *Silvergate Pharmaceuticals, Inc. v. Bionpharma, Inc.*, Civil Action Nos. 18-1962-, 19-1067-LPS (D. Del.).  (*See* Ex. F, Pretrial order excerpts from *Silvergate Pharmaceuticals, Inc.*, C.A. No. 18-

cv-1962-LPS, D.I. 211, at Exhibit 2 ¶¶ 371- 92.) Plaintiff, in the *Silvergate* case, asserted the very same long-felt need as it does in this case, but there it took the position that the commercialized product, Epaned®, which Plaintiff recently conceded in a discovery conference before Magistrate Judge Burke does not practice the claims asserted against Alkem in this case, satisfied the need. (*See* Ex. F, *Silvergate* Action Pretrial Order excerpts at Exhibit 2, pp. 70-75 (describing Plaintiff's satisfaction of long-felt need theory).) Now that Plaintiff has different needs, it seeks to change course without explanation, effectively misrepresenting its position to the Court, precisely the sort of conduct the doctrine of judicial estoppel was meant to stop. *See*, *e.g.*, *Fagan v. Fischer*, C.A. No. 14-7013, 2021 U.S. Dist. LEXIS 219137 at *16 (D.N.J. Nov. 12, 2021) (describing the doctrine of judicial estoppel, noting "that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory"). To hold otherwise only rewards Plaintiff, and others seeking to do the same, for misrepresenting its true position and effecting what amounts to a fraud on the Court. *See*, *e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc., v. GMC*, 337 F.3d 314,316-325 (3d Cir. 2003) (discussing judicial estoppel, affirming district court's application of the same and noting that it is appropriate when "the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court"); *cf. Wilson v. Muckala*, 303 F.3d 1207, 1215-16 (10th Cir. 2002) (describing the binding effect of the pretrial order, which "is the controlling document for trial" and "requires careful attention and review by the parties and their attorneys" (internal quotations omitted)).

For these reasons, Alkem respectfully requests that Dr. Mahan's opinion be struck in its entirety and Dr. Mahan be precluded from testifying at trial.

Dated: July 6, 2022

Respectfully submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

Timothy H. Kratz
*(Pro Hac Vice)*
George J. Barry III
*(Pro Hac Vice)*
KRATZ & BARRY LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
(404) 431-6600
tkratz@kratzandbarry.com
gbarry@kratzandbarry.com

Michael P. Hogan
*(Pro Hac Vice)*
KRATZ & BARRY LLP
325 Chestnut Street, Suite 876, #259
Philadelphia, PA 19106
(917) 216-8585
mhogan@kratzandbarry.com

*Attorneys for Defendant,*
*Alkem Laboratories Ltd.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AZURITY PHARMACEUTICALS, INC.<br>*Plaintiff*,<br>v.<br>ALKEM LABORATORIES LTD.,<br>*Defendant*. | C.A. No. 1:19-cv-02100-MSG<br><br>[redacted] |

**DECLARATION OF GEORGE J. BARRY III IN SUPPORT OF DEFENDANT, ALKEM LABORATORIES LTD.'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF JOHN D. MAHAN, JR., M.D.**

I, George J. Barry III, hereby declare, affirm, and state the following:

1. I am a Partner with the Law Firm of Kratz & Barry LLP, counsel of record for the Defendant in this Civil Action.

2. I am submitting this Declaration in support of Defendant, Alkem Laboratories Ltd.'s Motion in Limine to Exclude the Testimony of John D. Mahan, Jr., M.D.

3. The facts set forth below are known to me personally, and I have first-hand knowledge of them.

4. A true and correct copy of the Expert Report of John D. Mahan, Jr., M.D. on Objective Indicia of Non-Obviousness for U.S. Patents 10,786,482 and 10, 918,621 as served May 6, 2022 is appended hereto as **Exhibit A**.

5. A true and correct copy of applicable portions of the June 10, 2022 Deposition Transcript of John D. Mahan, Jr., M.D. is appended hereto as **Exhibit B**.

6. A true and correct copy of United States Patent No. 10,786,482 is appended hereto as **Exhibit C**.

7. A true and correct copy of United States Patent No. 10,918,621 is appended hereto as **Exhibit D**.

8. A true and correct copy of applicable portions of the June 14, 2022 Deposition Transcript of Steven Little, Ph.D. is appended hereto as **Exhibit E**.

9. A true and correct copy of applicable portions of the *Silvergate Pharmaceuticals, Inc. v. Bionpharma, Inc., et al.*, Civil Action Nos. 1:18-cv-01962-LPS, 1:19-cv-01067-LPS, 1:19-cv-00678-LPS (D. Del.) Pretrial Order (D.I. 211) is appended hereto as **Exhibit F**.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States.

Dated: July 6, 2022

*/s/ George J. Barry III*

George J. Barry III
*(Pro Hac Vice)*
KRATZ & BARRY LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
(404) 431-6600
gbarry@kratzandbarry.com

*Attorneys for Defendant,*
*Alkem Laboratories Ltd.*

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., *Plaintiff*, v. ALKEM LABORATORIES LTD., *Defendant*. | ) | C.A. No. 19-2100 (MSG) |

**EXPERT REPORT OF JOHN D. MAHAN, JR., M.D. ON OBJECTIVE INDICIA OF NON-OBVIOUSNESS FOR U.S. PATENTS 10,786,482 AND 10,918,621**

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

A. SCOPE OF ANALYSIS .......... 1

B. QUALIFICATIONS AND COMPENSATION .......... 1

C. MATERIALS CONSIDERED .......... 3

II. THE PATENTS-IN-SUIT .......... 4

III. HYPERTENSION AND HEART DISEASE .......... 4

A. HYPERTENSION .......... 4

B. HEART FAILURE .......... 6

C. LEFT VENTRICULAR DYSFUNCTION .......... 8

IV. OVERVIEW OF AVAILABLE TREATMENTS .......... 9

V. LEGAL BACKGROUND AND STANDARDS .......... 14

A. INVALIDITY – OBVIOUSNESS .......... 14

VI. SUMMARY OF OPINIONS .......... 15

VII. LEVEL OF ORDINARY SKILL IN THE ART .......... 15

VIII. LONG-FELT BUT UNRESOLVED NEED .......... 16

A. NEED FOR SAFE, EFFECTIVE PHARMACEUTICAL FORMULATIONS FOR TREATMENT OF HYPERTENSION IN CHILDREN .......... 18

B. NEED HEIGHTENED DUE TO CHILDHOOD OBESITY EPIDEMIC .......... 32

C. PREFERENCE FOR READY-TO-USE FORMULATIONS .......... 35

D. DEVELOPMENT OF SAFE, EFFECTIVE FORMULATIONS OF ENALAPRIL FOR CHILDREN .......... 44

[redacted]

# I. INTRODUCTION

## A. Scope of Analysis

1. I have been asked by counsel for plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") to provide my opinion on whether certain "objective indicia of non-obviousness" support the non-obviousness, and thus validity, of claims 14-23 and 27-28 of U.S. Patent No. 10,786,482 ("the '482 patent") and claims 1-13, 16-27, and 30 of U.S. Patent No. 10,918,621 ("the '621 patent"). I expect to testify at trial as an expert witness on this issue.

2. I also expect to testify regarding the disease states and background information relevant to this inquiry and may provide a tutorial to the Court on these issues.

## B. Qualifications and Compensation

3. My curriculum vitae, which is attached as Exhibit A, summarizes my professional experience. Below, I have provided a summary of my experience relevant to the matter.

4. I am a board-certified pediatric nephrologist, continuously participating in clinical practice since 1984. Presently, I am the Director of the Nationwide Children's Hospital Center for Faculty Development. I have several affiliations with the Nationwide Children's Hospital, one of the largest pediatric hospitals in the nation. In addition to my role as the Associate Program Director of the Pediatric Nephrology Fellowship program, I am the Medical Director for the Nationwide Children's Hospital Metabolic Bone Clinic. I also am a Research Investigator at the Nationwide Children's Hospital, where I have been involved with Pediatric Clinical Trials since 1999.

5. I am a Professor of Pediatrics at the College of Medicine, Ohio State University in Columbus, Ohio. Additionally, I serve as Senior Editor for Faculty Development for Medical Educators (FD4ME) as part of the Ohio State University, College of Medicine's Online Faculty

Development Program.

6.      I graduated from LaSalle College with a B.A. in 1973 and received my M.D. from Hahnemann Medical College in 1977.  From 1977 to 1980 I was a Pediatric Resident at the University of Minnesota Medical School in Minneapolis, Minnesota.  From 1980 to 1981, I was a Chief Resident and Instructor and in 1981 to 1984, I was a Medical Fellow completing an accredited fellowship program in pediatric nephrology.

7.      I have been affiliated with the Nationwide Children's Hospital since 1986, where I started as an attending pediatric nephrologist and also served as the Acting Director of the Rheumatology Clinic for one year before serving as an attending physician in the Pediatric Intensive Care Unit for four years.  In addition to my current roles with the Nationwide Children's Hospital and the Ohio State University College of Medicine, in my career I have also been the Medical Director of the Pediatric Kidney Transplant Program, the Medical Director of the Clinical Studies Center, the Director of the College of Medicine Center for Education and Scholarship, and the Assistant Dean for Faculty Development at the College of Medicine.

8.      I have authored or co-authored more than 250 publications, including books and full academic papers, in addition to over 140 abstracts and been invited to give over 260 presentations.  My research interests include hypertension, glomerular disorders, proteinuria, glomerular basement membrane structure, renal osteodystrophy, metabolic bone disease, growth failure in renal disorders, renal transplantation, and medical education.

9.      Throughout my career, I have received numerous honors and awards, including the Nationwide Children's Hospital Career Achievement Award in 2014.  I have been Outstanding Teacher of the Year several times for the OSU Department of Pediatrics. I received the prestigious ACGME Parker J. Palmer Courage to Teach Award in 2013, which is only

awarded to approximately 10 physicians engaged in medical education and training each year in the US. In 2019, I received the OSU Courage to Teach Master Teacher Award. Additionally, I received the Ohio State University College of Medicine Lifetime Achievement Award in 2020 and the AAP Section of Pediatric Nephrology Henry Barnett Nephrology Award in 2021.

10. I also belong to numerous professional organizations, including the American Academy of Pediatrics, the American Society of Pediatric Nephrology, the American Association for the Advancement of Science, the International Pediatric Nephrology Association, and the International Pediatric Hypertension Association and the American Society of Nephrology. I was elected to the Society for Pediatric Research in 1995. Additionally, I currently am a Board Member of the National Kidney Foundation and I am the President of the Pediatric Nephrology Research Consortium Board of Directors.

11. I have been the Principal Investigator on 20 clinical studies, most of them related to pediatric medicine, including several studies relating to the treatment of pediatric hypertension. Additionally, I have been a Co-Investigator on over two dozen clinical studies.

12. I have served as a reviewer for 19 journals, including Pediatric Research, the Journal of Pediatrics, Clinical Pediatrics, Pediatrics, and Frontiers in Pediatrics. I have also served as a grant reviewer for several entities, including the National Institute of Diabetes and Digestive and Kidney Diseases (National Institute of Health).

13. I am being compensated at my customary rate of $500 per hour for time spent working on this matter. My compensation does not depend on the outcome of this litigation.

### C. MATERIALS CONSIDERED

14. In preparing this Report, I have relied upon my knowledge, training, and experience. I have reviewed and considered U.S. Patent Nos. 10,786,482 (the "'482 patent") and

10,918,621 (the "'621 patent") (together, the "patents-in-suit"), as well as the deposition testimony cited in this report, and any document cited in my report. I have also consulted Dr. Steven Little with respect to whether Alkem's product at issue in this case meets the limitations of the claims, and have relied on his conclusions as stated below. The complete list of materials I considered is attached as Exhibit B.

15. I understand from counsel that Alkem has submitted an expert report by Dr. Panayiotis P. Constantinides regarding the validity of the '482 and '621 patents, but that this report did not consider objective indicia of non-obviousness.

## II. THE PATENTS-IN-SUIT

16. I understand there are two patents-in-suit, the '482 patent and the '621 patent. I understand each of the patents is entitled "Enalapril Formulations" and contains the same specification. I further understand the patents-in-suit contain claims reciting stable, ready-to-use oral liquid formulations of enalapril.

17. I understand that Azurity has accused defendant Alkem Laboratories Ltd. ("Alkem") of infringing the following claims of the patents-in-suit: claims 14-23 and 27-28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent.

## III. HYPERTENSION AND HEART DISEASE

18. I have included a short background of the relevant disease states below. I understand that I may present a tutorial to the Court regarding these disease states and other background aspects and may further develop this background at that time.

### A. Hypertension

19. Hypertension is a sustained elevation of blood pressure. Flynn, et al., "Clinical Practice Guideline for Screening and Management of High Blood Pressure in Children and Adolescents," Pediatrics, 140(3):e20171904 (Sep. 2017) (SLVGT_RTU_00008243-316).

Elevated blood pressure leads to a risk of complications. The effect is linear: the higher the blood pressure, the worse the outcomes. Kapur, G. & T.K. Mattoo, "Primary Hypertension in Children," Pediatric Hypertension (J. Flynn, et al. Eds.), Ch. 23 (Springer 2018) (SLVGT_RTU_00009389-413) ("Kapur"), at SLVGT_RTU_00009390. Although once considered rare, pediatric hypertension is on the rise in the United States. In fact, current estimates suggest up to 5% of children and adolescents have hypertension. K.M. Redwine, "Epidemiology of Primary Hypertension in Children," Pediatric Hypertension (J. Flynn, et al. Eds.), Ch. 18 (Springer 2018) (SLVGT_RTU_00009545-555) ("Redwine 2018"), at SLVGT_RTU_00009546. The rise in pediatric hypertension is often attributed to the prevalence of pediatric obesity. Sharma, et al., "Secondary Forms of Hypertension in Children: Overview," Pediatric Hypertension, (J. Flynn, et al. Eds.), Ch. 24 (Springer 2018) (SLVGT_RTU_00009578-596) ("Sharma"), at SLVGT_RTU_00009590.

20.    Hypertension is either primary or secondary in case (etiology).  Once a physician confirms hypertension, the physician evaluates the patient to determine the cause of the elevated blood pressure. Kapur at SLVGT_RTU_00009390. Primary (or essential) hypertension is hypertension without a known underlying cause and is diagnosed after ruling out secondary hypertension. *Id.* Primary hypertension is the most prevalent kind of hypertension amongst children and adults. However, the rate of primary hypertension in adults is higher than the rate of primary hypertension among children. Redwine 2018 at SLVGT_RTU_00009546. Factors which may lead to the development of primary hypertension include genetics and external factors such as obesity, smoking, environment factors, and a sedentary lifestyle. *Id.* at SLVGT_RTU_00009547-550.

21.    Secondary hypertension is hypertension caused by an underlying pathologic

condition. *See, generally*, Sharma. Common conditions in pediatric patients which lead to secondary hypertension include renal problems as well as renal artery stenosis and medication toxicity. *Id.* at SLVGT_RTU_00009580 (Table 1). In secondary hypertension, an ACE Inhibitor often is very effective therapy for blood pressure control and can also protect the heart and kidneys from damage induced by poorly controlled hypertension. More pediatric nephrologists choose ACE Inhibitors as the first line therapy for treatment of primary hypertension than any other single type of treatment, including calcium channel blockers, diuretics, and beta-adrenergic blockers. M.A. Ferguson, "Pharmacologic Treatment of Pediatric Hypertension," Pediatric Hypertension (J. Flynn, et al. Eds.), Ch. 44 (Springer 2018) (SLVGT_RTU_00009365-388) ("Ferguson 2018"), at SLVGT_RTU_00009369.

22. Hypertension can lead to many health threats, including strokes, seizures, retinal abnormalities, and congestive heart failure. NHBPEP Working Group on High Blood Pressure in Children and Adolescents, "The Fourth Report on the Diagnosis, Evaluation, and Treatment of High Blood Pressure in Children and Adolescents," Pediatrics, 114(2):555-576 (Aug. 2004) (SLVGT_RTU_00005900-923) ("Fourth Report"), at SLVGT_RTU_00005911.

23. Enalapril is commonly used to effectively treat both primary and secondary hypertension. ALK_ENPL_0000084-105 ("2017 Epaned Label"), at ALK_ENPL_00000086-087; Siddiqi, N. & I.F. Shata, "Antihypertensive agents: a long way to safe drug prescribing in children," Pediatric Nephrology (Nov. 1, 2019), *published online at https://doi.org/10.1007/s00467-019-04314-7* (SLVGT_RTU_0009597-613) ("Siddiqi 2019"), at SLVGT_RTU_00009598; *see* '482 patent at Abstract, 2:11-17.

### B. Heart Failure

24. Heart failure is a broad condition where the heart does not pump as much blood as

is needed for normal functions of the body.  *See* Ponikowski, et al., "2016 ESC Guidelines for the diagnoses and treatment of acute and chronic heart failure," Eur. J. Heart Failure, 18:891-975 (2016) (SLVGT_RTU_00009460-544) ("Ponikowski"), at SLVGT_RTU_00009467.  Heart failure has numerous causes, including congenital heart defects, narrowing and hardening of blood vessels, untreated left ventricular dysfunction, and damage to the heart muscle such as during a myocardial infarction.  *See, e.g., id.* at SLVGT_RTU_00009507-508.

25.    Heart failure can often be well managed with the right combination of diet and medicine.  Ponikowski at SLVGT_RTU_00009477.  Controlling hypertension may also reduce the risk of heart failure in those who have hypertension.  *Id.* at SLVGT_RTU_00009477-478.  However, if left untreated, heart failure can become more serious and may lead to congestive heart failure.

26.    Congestive heart failure occurs when the heart failure causes a buildup of fluid in the cavity around the heart and in the lungs.  Ponikowski at SLVGT_RTU_00009469-471.  The fluid makes it more even more difficult for the heart to pump blood and for the lungs to work.  Congestive heart failure is a serious medical condition which may require hospitalization and is associated with significant morbidity and increased mortality.  *See id.* at SLVGT_RTU_00009508.

27.    Heart failure may also be categorized as systolic or diastolic, which may both occur together.  *Heart Failure*, CLS Health, *available at* https://www.cls.health/heart-failure/ (SLVGT_RTU_00009277-279). Last accessed April 19, 2022. Diastolic heart failure occurs when the heart is unable to relax normally, marked by a thickened left lower chamber, which allows less blood to fill the chamber, meaning less blood is circulated in the body. *Id.* at SLVGT_RTU_00009277. In contrast, systolic heart failure occurs when the heart is weakened

such that the left lower chamber cannot contract with enough force. *Id.* This weakening decreases the amount of blood that can be circulated with each heartbeat. *Id.* Both forms can cause shortness of breath, swelling in the legs, fatigue, and palpitations. *Id.* at SLVGT_RTU_00009278.

28. Enalapril is commonly used to treat heart failure, including congestive heart failure, by reducing systemic afterload and making it easier for the left ventricle to pump blood out to the body. 2017 Epaned Label at ALK_ENPL_00000087; *see* '482 patent at Abstract, 2:11-17.

**C. Left Ventricular Dysfunction**

29. Left ventricular dysfunction is a heart issue which, although difficult to detect, can lead to further complications such as heart failure and congestive heart failure. Ponikowski, at SLVGT_RTU_00009467.

30. The heart is a complex muscle divided into four chambers separated by a series of valves. *See* Weinhaus, A.J. & K.P. Roberts, "Anatomy of the Human Heart," Handbook of Cardiac Anatomy, Physiology, and Devices, 2d Ed. (P.A. Iaizzo Ed.), Ch. 4 (Humana Press 2009) SLVGT_RTU_00009658-686, at SLVGT_RTU_00009666. Oxygen poor blood enters the right atrium, goes through a valve into the right ventricle, then goes to the pulmonary artery into the lungs. *Id.* at SLVGT_RTU_00009669.

31. After absorbing oxygen, the oxygen rich blood enters the left atrium, passes through a valve, enters the left ventricle, and is pumped through the aorta to the rest of the body. *Id.* at SLVGT_RTU_00009672. The left ventricle, therefore, is responsible for the distribution of oxygen rich blood to the entirety of the human body. *Id.* Issues with the left ventricle, where it does not function effectively, can cause severe illness if left untreated. *See* Ponikowski at

SLVGT_RTU_00009467.  Left ventricular dysfunction is often a precursor to full heart failure if left untreated. *See id*.

32.     Enalapril is commonly used to treat left ventricular dysfunction by reducing systemic afterload and making it easier for the left ventricle to pump blood out to the body. 2017 Epaned Label at ALK_ENPL_00000087; *see* '482 patent at Abstract, 2:11-17.

## IV.     OVERVIEW OF AVAILABLE TREATMENTS

33.     The patents-in-suit relate to stable liquid enalapril formulations that are ACE inhibitors for the treatment of hypertension, heart failure, and left ventricular dysfunction. '482 patent at Abstract.[1] Pediatric hypertension arises in children with renal issues but may also arise with congenital heart defects and other illnesses or disorders. D. Matossian, "Pediatric Hypertension," Pediat. Ann., 47(12):e499-e503 (2018) (SLVGT_RTU_00009414-418), at SLVGT_RTU_00009414-415.

34.     ACE inhibitors, like enalapril, treat hypertension by preventing angiotensin I from converting into angiotensin II in the Renin-Angiotensin-Aldosterone System. *See* Siddiqi 2019 at SLVGT_RTU_00009598. Angiotensin II is potent vasoconstrictor, which causes increased blood pressure. *See id*. ACE inhibitors block this production of angiotensin II, thus allowing vasodilation, which decreases blood pressure. *See id*.

35.     Before the current claimed liquid formulations, enalapril was available in a tablet form of the Epaned Kit. SLVGT_RTU_00009300-303 ("Drugs@FDA Epaned Kit"). Until the Epaned Kit was approved in 2013, enalapril was only available in a solid tablet form.

36.     I understand one reason that enalapril was limited for so long to solid forms is

---

[1] I understand that both patents-in-suit are related and share a common specification. For ease of reference, throughout my report, unless I am referring to the claims, I have cited to the '482 patent specification.

because it is a prodrug that must be hydrolyzed into an active form, enalaprilat, in the patient's liver. *See* S.S. Dhareshwar, "Case Study: Enalapril: A Prodrug of Enalaprilat," Prodrugs. Biotechnology: Pharmaceutical Aspects, Vol. V (V.J. Stella, et al. Eds), Ch. 5.7 (Springer 2007) (SLVGT_RTU_00009291-299), at SLVGT_RTU_00009293. Enalaprilat has low bioavailability when taken orally, which necessitates this step. *See id.* Because enalapril is vulnerable to hydrolysis, it has reduced shelf-life in liquid forms.

37.     Enalaprilat was and is available as an injectable form. This injectable form is not approved for use in the pediatric population. Enalaprilat label (SLVGT_RTU_00009311) (indicates "[s]afety and effectiveness in pediatric patients have not been established").

38.     It is generally known that certain patients, particularly children, have difficulty ingesting and swallowing solid oral dosage forms such as tablets. Before the Epaned Kit was available, the primary way of administering a dosage to a patient unable to take a solid tablet was compounding or crushing the tablet into a powder, dissolving it into solution, and then administering that solution to the patient. Compounding is done at a compounding pharmacy, which are not common and can be difficult to find; the hospital where I practice lacks such capabilities.[2] Compounding had a number of drawbacks, the most important of which is the risk of inaccurate dosage. *See, e.g.*, Sellers, S. & W.H. Utian, "Pharmacy Compounding Primer for Physicians: Prescriber Beware," Drugs, 72(16):2043-2050 (2012) (SLVGT_RTU_00006870-877) ("Sellers 2012"), at SLVGT_RTU_00006872; "U-M leads state effort to create new standards for kids' medicine, reduce medication errors," (Feb. 11, 2014)

---

[2] For a humorous but informative explanation of compounding pharmacies, John Oliver dedicated a show about concerns with compounding pharmacies and the lack of oversight. *See Last Week Tonight with John Oliver*, September 29, 2019, Compounding Pharmacies. https://www.youtube.com/watch?v=Nuzi7LlSDVo. Last accessed April 14, 2022.

(SLVGT_RTU_00006885-888).

39. I have also prescribed pills to parents, with instructions for them to take the pill home, crush it up, mix it up with water, and then appropriately dose their child by giving a part of the solution. If the tablet was not crushed adequately or mixed thoroughly, this could significantly affect the amount of drug the child was receiving, with potential serious adverse consequences to the child. If the child was not responding to the medication or had a dangerous reaction, I could not be sure whether the result (or lack thereof) was from the medication or inaccurate dosing. Appropriate dosing of ACE Inhibitors is especially important in pediatric patients where small mistakes in dosing can lead to large differences in treatment amounts because of their small body weights and developmental changes, particularly where kidney function has been impaired. *See* Rodieux, et al., "Effect of Kidney Function on Drug Kinetics and Dosing in Neonates, Infants, and Children," Clin. Pharmacokinet., 54:1183-1204 (2015) (SLVGT_RTU_00009556-577), at SLVGT_RTU_00009562-563. For example, ACE Inhibitors, although a frontline treatment of hypertension in pediatric kidney failure, can cause further kidney complications and worse kidney damage if given in the incorrect dose. *See* Siddiqi 2019 at SLVGT_RTU_00009602-603 (this publication thoroughly discusses common adverse effects with ACE Inhibitors and the concern regarding the most appropriate dose in pediatric patients).

40. I had one pediatric patient, a boy about a year old, who had pediatric hypertension due to acquired neonatal renal infarct. For his severe hypertension, the patient's parents were crushing up and dosing their child at home with enalapril. The patient was having blood pressure monitored routinely at the pediatrician's office. At one point the patient had dangerously high blood pressure levels and was immediately hospitalized. I was concerned that the patient's hypertension was not responding to the enalapril or that another complication had arisen.

However, once the patient was being dosed routinely by the nurses at the hospital, the enalapril adequately controlled the patient's hypertension.

41.     Also, the compounding method results in patients ingesting excipients that are included to create the tablet form of the medication but are not necessary for a liquid formulation. *See, e.g.*, Sellers 2012 at SLVGT_RTU_00006872.

42.     In 2013, the FDA approved Azurity's precursor to the current liquid enalapril formulation, the Epaned Kit, which I understand is not at issue in this case. Drugs@FDA Epaned Kit at SLVGT_RTU_00009303. The kit included a powder and a liquid. SLVGT_RTU_00009312-328 ("2014 Epaned Kit Label"), at SLVGT_RTU_00009315, 9327. A pharmacist would then mix them, which could then be given in a multiple-dose bottle to a patient.

43.     The Epaned Kit had a better consistency and more reliable dosing than previous forms because the compounding pharmacist mixed the solution rather than the patient or the caregiver. It also removed many of the extra excipients that were required to keep the powder in a tablet form.  This still required the pharmacist to correctly mix the powder into the liquid. This did not completely remove such drawbacks as variability in the actual dosage because of incomplete solubilizing of the enalapril powder in the liquid. The FDA indicated that the ready-to-use solution that did not require constitution would be clinically superior to the Epaned Kit. SLVGT_RTU_00006323-332 at SLVGT_RTU_00006330.

44.     Azurity then developed a stable oral ready-to-use formulation and filed patent applications to protect its novel formulations. The commercial product manufactured and sold by Azurity is Epaned®, the only ready-to-use enalapril liquid formulation available for children as young as one month old. There are a few other liquid formulation drugs available for

hypertension in children over six years or 50 kg, but Epaned® is the only FDA approved ACE Inhibitor available for treatment for children younger than 6 years of age. Siddiqi 2019 at SLVGT_RTU_00009599-602 (Table 1); Chu, et al., "Anti-hypertensive drugs in children and adolescents," World J. Cardiol., 6(5):234-244 (May 26, 2014) (SLVGT_RTU_00009280-290) ("Chu 2014"), at SLVGT_RTU_00009283 (Table 2).

45. The formulations in the present patent claims provide safe and effective oral liquid administrations of enalapril. '482 patent at Claims 14-23, 27-28; '621 patent at Claims 1-13, 16-27, 30. Because the ready-to-use formulations are already in solution, the risks of variability in dosage and incomplete solubilization are eliminated. '482 patent at Abstract, 5:13-6:4. Additionally, the current formulations prevent the need for compounding, and thus do not introduce extra excipients from a solid form such as a tablet. *Id.* at 5:60-6:4. This represents an improved safety advantage. *Id.*; Deposition of M. Beckloff ("Beckloff Tr.") at 30:4-22 ("[The FDA] insinuated that [a] ready-to-use type of product would -- would meet the clinical superiority on the basis of safety."); Beckloff Tr. at 30:23-31:6.

46. I understand from counsel that Alkem submitted to the United States Food and Drug Administration ("FDA") Abbreviated New Drug Application ("ANDA") No. 213714 ("Alkem ANDA"), which seeks approval to market a ready-to-use enalapril maleate oral solution ("Alkem's ANDA product"). Alkem's ANDA Product has received an "AB" therapeutic equivalence code to the reference listed drug, Epaned®. *See* "Abbreviated New Drug Application (ANDA): 213714," Drugs@FDA: FDA-Approved Drugs (SLVGT_RTU_00009308-310). An "AB" code means Alkem's ANDA Product is considered therapeutically equivalent to Azurity's Epaned® product. *See* "Orange Book Preface," U.S. Food & Drug Administration (SLVGT_RTU_00009434-459), at SLVGT_RTU_00009443. In essence, Alkem's ANDA

[redacted]

Product will be substituted at the pharmacy for Azurity's Epaned® product when a prescription is written for Epaned®.

## V. LEGAL BACKGROUND AND STANDARDS

47. Counsel has provided me with an understanding of the relevant legal principles to assist me with my opinions. My understanding of these principles as provided by counsel is as follows:

48. I understand from counsel that Azurity filed suit against Alkem for infringement of the two patents-in-suit: the '482 patent and the '621 patent. I also understand from counsel that Azurity alleges Alkem infringes claims 14-23, 27, and 28 of the '482 patent and claims 1-13, 16-27, and 30 of the '621 patent (collectively, the "Asserted Claims").

49. I understand that Dr. Little has found that Alkem's ANDA Product meets each limitation, and therefore infringes, the Asserted Claims of the '482 and '621 patents.

### A. Invalidity – Obviousness

50. I understand from counsel that a patent claim would have been "obvious," and thus invalid, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art ("POSA") to which said subject matter pertains. I understand that analysis of whether a claim would have been obvious depends on (a) the scope and content of the prior art, (b) the differences between the claimed invention and the prior art, (c) the level of ordinary skill in the art, and (d) any certain objective indicia of non-obviousness. I understand that the use of hindsight must be avoided because the obviousness of an invention is evaluated from the perspective of the POSA at the time the invention was made. Thus, in conducting an obviousness inquiry, one must be aware of the distortion caused by hindsight bias and must be cautious to avoid reading into the prior art the teachings of the claimed invention at

issue.

51. I understand from counsel that patent claims are presumed to be valid—and thus non-obvious—and that accordingly, Alkem must demonstrate by clear and convincing evidence, *i.e.* that it is highly probable, that the claims of the patents-in-suit are obvious in view of the prior art.

### *i. Objective Indicia of Non-Obviousness*

52. As stated above, I understand from counsel that a proper obviousness analysis involves an evaluation of objective indicia of non-obviousness. I understand that commonly recognized objective indicia include, among others, evidence of long-felt but unsolved needs, unexpected results, and failure of others. I understand that the consideration of such objective indicia guards against hindsight bias and that, in appropriate circumstances, evidence of objective indicia may be determinative of the ultimate question of obviousness.

53. I understand that objective indicia of non-obviousness are found in comparison with the merits of the claimed invention.

54. I also understand from counsel that the objective indicia of non-obviousness of unmet need requires a long-felt but unsolved need that is satisfied by the claimed invention. I understand the claimed invention must be commensurate with the need.

## VI. SUMMARY OF OPINIONS

55. It is my opinion that the claimed invention satisfies a long-felt but unresolved need for a stable liquid formulation of enalapril for children that did not require compounding, reconstitution, or other manipulation prior to administration—which is evidence of the non-obviousness of the Asserted Claims.

## VII. LEVEL OF ORDINARY SKILL IN THE ART

56. I understand from counsel that the claims and the issue of obviousness must be

considered from the point of view of a POSA at the time of the alleged invention. I have been advised that the relevant date is March 18, 2016.

57.      By virtue of my education, experience, and training, I am familiar with the level of skill in the art of the Asserted Patents as of March 18, 2016.

58.      Drug development often involves a team of individuals working together to solve a problem.

59.      In my opinion, a person of ordinary skill in the relevant field as of March 18, 2016 would be a person that has (i) a Ph.D. in formulation-relevant pharmaceutical science, chemistry, or a similar subject, with minimal post-degree experience in formulating pharmaceutical products; or (ii) at a minimum a bachelor's degree in pharmacy, pharmaceutical science, chemistry or a similar subject, with at least five years of post-degree practical experience in formulating pharmaceutical products. A POSA would also have experience with pharmaceutical excipients as applied to their selection and use in drug formulations.

60.      With regard to the therapeutic application of the invention, a POSA would routinely collaborate with a medical doctor with experience treating hypertension and other cardiovascular conditions – particularly in pediatric patients – or a clinical pharmacologist.

## VIII.   LONG-FELT BUT UNRESOLVED NEED

61.      It is my opinion that there has been a long-felt but unresolved need for a stable liquid formulation of enalapril for children that did not require compounding, reconstitution, or other manipulation prior to administration. This is particularly so given the increasing number of infants, small children, and children unable to swallow oral tablets who have conditions (e.g., hypertension, left ventricular dysfunction, heart failure) that require stable, consistent oral liquid formulations of an ACE inhibitor, such as enalapril. Specifically, one of the biggest changes that

I've observed in my practice over the last 20 years is that I see and treat an increasing number of very young patients—often from the neonatal intensive care unit—who present with complicated conditions. These patients, both as neonates and beyond, require treatment with oral liquid formulations of an ACE inhibitor, but are unable to swallow oral tablets (as a result of their age and/or medical condition). Presumably due to improved neonatal care, the frequency with which I encounter such patients increases year over year.

62. Additional factors that support my opinion are: (1) the childhood obesity epidemic and corresponding increase in prevalence of childhood hypertension; (2) the preference for ready-to-use and consistent formulations of pediatric medicines in populations where a liquid formulation is necessary or optimal; and (3) the fact that enalapril has been available in the form of a solid, oral tablet since the 1980s.

63. The ensuing discussion focuses on hypertension. However, left ventricular dysfunction is commonly associated with hypertension. Redwine 2018 at SLVGT_RTU_00009551 ("[M]ultiple preclinical cardiac and vascular changes are noted in children with hypertension and with other risk factors for cardiovascular disease. Left ventricular hypertrophy (LVH) is the most commonly reported type of target organ damage among hypertensive youth and is present in up to 40% of children at diagnosis . . . .); Fourth Report at SLVGT_RTU_00005910 ("Target-organ abnormalities are commonly associated with hypertension in children and adolescents. . . . Left ventricular hypertrophy (LVH) is the most prominent evidence of target-organ damage."); Fourth Report at SLVGT_RTU_00005911 ("With the use of echocardiography to measure left ventricular mass, LVH has been reported in 34% to 38% of children and adolescents with mild, untreated BP elevation."). In fact, left ventricular dysfunction can be a particularly concerning symptom of hypertension because—as

explained above—it is very likely to lead to heart failure, when left untreated. In other words, insofar as the claimed invention satisfied a long-felt but unresolved need with respect to the treatment of hypertension, it also satisfied a long-felt but unresolved need with respect to the treatment of left ventricular dysfunction and heart failure.[3] The value of ACE inhibitor therapy in improving left ventricular function and heart failure has also been increasingly detected by neonatologists and pediatric cardiologists who care for newborns and small children

64. Of further note, enalapril is one of the only antihypertensive drugs that is FDA-approved for treatment in children younger than six, and is the only such ACE inhibitor. Siddiqi 2019 at SLVGT_RTU_00009599-602 (Table 1); Chu 2014 at SLVGT_RTU_00009283 (Table 2). Moreover, ACE inhibitors are the most commonly prescribed antihypertensive class of medications in the pediatric patient population for hypertension. Siddiqi 2019 at SLVGT_RTU_00009598; Chu 2014 at SLVGT_RTU_00009281. Accordingly, for children under the age of six, any discussion of the treatment of hypertension with enalapril is effectively a discussion of the treatment of hypertension with an FDA-approved product, in general.

### A. Need for Safe, Effective Pharmaceutical Formulations for Treatment of Hypertension in Children

65. Hypertension was traditionally regarded as a rare occurrence in childhood and adolescence. Ferguson 2018 at SLVGT_RTU_00009365. In fact, until the early 1970s, the prevalence of hypertension in children and adolescents was largely unknown. B. Falkner, "Development of Blood Pressure Norms and Definition of Hypertension in Children," Pediatric

[3] Although left ventricular dysfunction and/or heart failure often arise as a consequence of hypertension, they may also occur independent of hypertension. The claimed oral liquid enalapril solutions can similarly be used to treat patients with left ventricular dysfunction and/or heart failure in the absence of hypertension, and indeed I have prescribed enalapril for such patients in my practice.

Hypertension (J. Flynn, et al. Eds.), Ch. 15 (Springer 2018) (SLVGT_RTU_00009337-349) ("Falkner 2018"), at SLVGT_RTU_00009341.

66.     In the mid-1970s, however, the National Heart, Lung, and Blood Institute (NHLBI) recognized that there were gaps in understanding the normal distribution of blood pressure levels and hypertension in childhood. Falkner 2018 at SLVGT_RTU_00009342. Accordingly, the NHLBI directed the National High Blood Pressure Education Program (NHBPEP) to appoint a Task Force on Blood Pressure Control in Children ("First Task Force"). Falkner 2018 at SLVGT_RTU_00009342. The First Task Force published its first report in 1977 ("First Report"). Falkner 2018 at SLVGT_RTU_00009342. Its goals were to: "(1) describe a standard methodology for measurement of blood pressure in the young; (2) provide blood pressure distribution curves by age and sex; (3) recommend a blood pressure level that is the upper limit of normal; and (4) provide guidelines for detection, evaluation, and treatment of children with elevated blood pressure." *Id.* The blood pressure distribution curves published by the First Task Force represented a substantial advancement in the understanding of blood pressure levels in young children because, for the first time, there was a clear view as to blood pressure levels that were outside of the normal range in young children. *Id.*

67.     The First Task Force established the importance of blood pressure levels in childhood as an indicator of health status. Falkner 2018 at SLVGT_RTU_00009343. Three subsequent task forces were convened and published reports in 1987, 1996, and 2004, respectively, which updated the guidelines for detection, evaluation, and management of hypertension in young children. *Id.* at SLVGT_RTU_00009343-345.

68.     The 2004 report ("Fourth Report") provided the operative definition of hypertension in children, until updated by the 2017 American Academy of Pediatrics (AAP)

Guidelines for Childhood Hypertension. Falkner 2018 at SLVGT_RTU_00009345-346; *see generally* D.J. Weaver, "Pediatric Hypertension: Review of Updated Guidelines," Pediatrics in Rev., 40(7):354-358 (July 2019) (SLVGT_RTU_00008343-350) ("Weaver 2019"). Based on the definition of hypertension in the Fourth Report, current estimates suggest up to 5% of children and adolescents have hypertension. Redwine 2018 at SLVGT_RTU_00009545-546.

69. In conjunction with the increased awareness of hypertension in children, there developed a well-documented need for safe, effective pharmaceutical formulations for children:

Jonville, et al., "Characteristics of Medication Errors in Pediatrics," DICP Ann. Pharmacotherapy, 25:1113-1118 (Oct. 1991) (SLVGT_RTU_00008167-172) ("Jonville 1991")

> Prevention of medication errors should involve certain main requirements: formulations and package instructions specific to pediatric patients to ensure appropriateness and accuracy . . . .

Jonville 1991 at SLVGT_RTU_00008167.

> MEDICATION ERRORS can be defined as errors in which a patient is given an inappropriate drug, or a drug is given at the wrong dose, frequency, or via an incorrect route of administration. For various reasons children especially are exposed to this danger. . . . [T]here are ***only a few formulations available that are adapted for children***.

Jonville 1991 at SLVGT_ RTU_00008167 (emphasis added).

M.C. Nahata, "Lack of Pediatric Drug Formulations," Pediatrics, 104(3):607-609 (Sept. 1999) (SLVGT_RTU_00009419-423) ("Nahata 1999")

> ***Many drugs frequently used in infants and young children are not available in suitable dosage forms***. Liquid dosage forms must be prepared extemporaneously, while using appropriate excipients.

Nahata 1999 at SLVGT_RTU_00009419 (emphasis added).

> The majority of drugs approved by the US Food and Drug Administration (FDA) for adults, however, have not been approved for use in pediatric patients. It is important to note that many of such medicines are used frequently in infants and children. One of the major impediments for their use, however, is the ***lack of suitable pediatric liquid***

[redacted]

> ***dosage forms***. Most of the medications are available either as tablets, capsules, or solutions for injection.

Nahata 1999 at SLVGT_RTU_00009419 (emphasis added).

> The National Institute of Child health and Human Development, through its Pediatric Pharmacology Research Units grant, should commit a small portion of its budget to developing stable liquid dosage forms of drugs for infants and children.

Nahata 1999 at SLVGT_RTU_00009420.

> ***Numerous drugs used in infants and children are not available in suitable liquid dosage forms***. The development of extemporaneous dosage form requires selection of appropriate drug concentration and excipients, assurance of stability and palatability, and adequate funding. Sharing of the research findings on formulations through presentations and publications should lead to their improved use in infants and children.

Nahata 1999 at SLVGT_RTU_00009421 (emphasis added).

Rippley, et al., "Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children," Biopharm. Drug Dispos., 21:339-334 (2000) (SLVGT_RTU_00008364-369) ("Rippley 2000")

> Drug administration to pediatric patients presents a number of challenges. Many drugs that are commonly used in children and infants have no labeling for pediatric use. In most cases, there is an absence of commercially available formulations suitable for use in pediatric patients and a lack of data to support the stability of extemporaneously prepared formulations. Liquid formulations are needed to allow accurate dosing based on body weight. In addition, liquids are necessary for children who are unable to swallow solid dosage forms and for children with dysphagia.

Rippley 2000 at SLVGT_RTU_00008364.

Schirm, et al., "Lack of appropriate formulations of medicines for children in the community," Acta Paediatr., 92:1486-1489 (2003) (SLVGT_RTU_00008199-202) ("Schirm 2003")

> Many children in the community receive inappropriate oral formulations. Regulatory authorities and the pharmaceutical industry need to ensure that children have access to medicines with appropriate formulations.

Schirm 2003 at SLVGT_RTU_00008199.

> ***[S]everal papers mention a lack of paediatric formulations***. Nahata found that for many drugs no liquid formulation was available. Stewart and Tucker, and more recently 't Jong et al., found that hospital pharmacies often adapt formulations for paediatric use. Similarly, many community pharmacies modify medicines for children.

[redacted]

Schirm 2003 at SLVGT_RTU_00008199 (emphasis added).

> It is of concern that for off-label drug prescriptions from the age of 3 y, tablets and capsules are more likely to be prescribed than oral solutions. This is presumably due to a ***lack of commercially available liquid formulations***. The lack of liquid formulations causes parents, doctors and pharmacists a number of problems.

Schirm 2003 at SLVGT_RTU_00008201 (emphasis added).

> In conclusion, inadequate licensing of medicine for children results in a lack of liquid formulations. As a result, parents, doctors, and pharmacists frequently face the dilemma of adapting formulations, with the possibility of an unfavourable effect on efficacy, or not adapting formulations, with the possibility of over-dosing and problems with administration.

Schirm 2003 at SLVGT_RTU_00008202.

Hurtado, J. & B.S. Moffett, "Pediatric Oral Formulations: A Continual Challenge," Int'l J. Pharm. Compounding, 11(1):17-19 (Jan./Feb. 2007) (SLVGT_RTU_00006760-762) ("Hurtado 2007")

> Relatively few medications are commercially available in liquid forms suitable for pediatric use. Thus, compounding is necessary to ensure that infants and children receive the medications they need.

Hurtado 2007 at SLVGT_RTU_00006760.

> The lack of funding for research studies in pediatric formulations means that many medications are not available in forms that can be administered to children. This is a problem not only in the U.S., but across Europe as well. Surveys have shown that children with high-acuity disorders, such as cardiac disorders, have access to few drugs for which data are available to support compounding.

Hurtado 2007 at SLVGT_RTU_00006760.

Hansen, et al., "Adolescents' struggles with swallowing tablets: barriers, strategies, and learning," Pharm. World Sci., 30:65-69 (2008) (SLVGT_RTU_00007890-894("Hansen 2008")

> Despite a growing awareness that ***children and adolescents' health issues*** need to be taken seriously, ***medicine use in this population is a neglected field*** in international research.

Hansen 2008 at SLVGT_RTU_00007890 (emphasis added).

Strickley, et al., "Pediatric Drugs—A Review of Commercially Available Oral Formulations," J. Pharm. Sci., 97(5):1731-1774 (May 2008) (SLVGT_RTU_00009614-657) ("Strickley 2008")

[redacted]

> [T]he past 10 years has seen an increased attention in the clinical development of pediatric formulations . . . . Large pharmaceutical companies have devoted some resources to pediatric drug development, but it is not a high priority due to the smaller market size compared to adult therapies. Thus there is a need for specialized pediatric pharmaceuticals companies. . . .

Strickley 2008 at SLVGT_RTU_00009656.

N. Canavan, "For the Mouths of Babes," Pharm. Formulation & Quality, 13(2):18-20 (April/May 2011)(SLVGT_RTU_00007996-8039) ("Canavan 2011")

> A recent review of practices in pediatric pharmacotherapy bluntly states that children—40% of the world's population—are treated with suboptimal dosing, suffer avoidable adverse events, and, in underdeveloped countries, lack access to new medicines for want of shelf-stable formulations.

Canavan 2011 at SLVGT_RTU_00008015.

> "There's just been so ***little thought about pediatric formulations—it's in such a bizarrely primitive state***," said Anne Zajicek, MD, PharmD, chief of the obstetric and pediatric pharmacology branch of the National Institute of Child Health and Human Development (NICHD).

Canavan 2011 at SLVGT_RTU_00008015 (emphasis added).

> "***Children*** are really ***an underserved marketplace***," said Jeff Worthington, president and founder of Senopsys LLC, Woburn, Mass., a company dedicated to the development of palatable drug products.

Canavan 2011 at SLVGT_RTU_00008017 (emphasis added).

Richey, et al., "Manipulation of drugs to achieve the required dose is intrinsic to paediatric practice but is not supported by guidelines or evidence," BMC Pediatrics, 13:81 (2013) (SLVGT_RTU_00008080-087) ("Richey 2013")

> ***A lack of commercially-available, age-appropriate formulations makes it difficult to administer medication to children accurately***. . . . Medicines are thus manipulated by the physical alteration of a dosage form with the aim of achieving the required (usually smaller) dose for administration.

Richey 2013 at SLVGT_RTU_00008080 (emphasis added).

> Manipulations may be time-consuming, can be inaccurate, and have unknown effects on the stability and bioavailability of the drug. This risks the administration of toxic or sub-therapeutic doses. Drug manipulations may also increase the risk of errors. Dose calculation errors are the most common medication error in neonatal and paediatric practice.

Richey 2013 at SLVGT_RTU_00008080.

> [T]he aim of this study was to scope which dosage forms and drugs are routinely manipulated in paediatric practice. This study also investigated reasons for undertaking manipulations and concerns raised by those undertaking manipulations.

Richey 2013 at SLVGT_RTU_00008081.

> For 55% of the reported manipulations the sole reason for the manipulation was that there was "no suitable preparation or strength available".

Richey 2013 at SLVGT_RTU_00008083.

> Thirty five percent of respondents to the questionnaire reported concerns with the accuracy of the dose achieved following manipulation.

Richey 2013 at SLVGT_RTU_00008083.

Zajicek, et al., "A Report from the Pediatric Formulations Task Force: Perspectives on the State of Child-Friendly Oral Dosage Forms," AAPS J., 15(4):1072-1081 (Oct. 2013) (SLVGT_RTU_00006890-899) ("Zajicek 2013")

> Despite the fact that a significant percentage of the population is unable to swallow tablets and capsules, these dosage forms continue to be the default standard. These oral formulations fail many patients, especially children, because of large tablet or capsule size, poor palatability, and lack of correct dosage strength. The clinical result is often lack of adherence and therapeutic failure.

Zajicek 2013 at SLVGT_RTU_00006890.

> The ***need for child-friendly formulations*** has been identified as a ***critical issue*** in pediatric drug development.

Zajicek 2013 at SLVGT_RTU_00006895 (emphasis added).

> The ***need for improved oral pediatric dosage forms*** to optimize clinical care, with easy to swallow and palatable formulations in appropriate dosage increments, ***is overwhelming***.

Zajicek 2013 at SLVGT_RTU_00006897 (emphasis added).

> Clinicians, patients, and their caregivers, as well as society as a whole, place high value on pediatric clinical care. It necessarily follows that the ***availability of suitable pediatric dosage forms*** is of ***vital importance***, as the availability of innovative, convenient, and high-quality pediatric products can spell the difference between successful treatment of a pediatric patient or failure.

Zajicek 2013 at SLVGT_RTU_00006897 (emphasis added).

Ivanokska, et al., "Pediatric Drug Formulations: A Review of Challenges and Progress," Pediatrics, 134(2):361-372 (Aug. 2014) (SLVGT_RTU_00006702-715) ("Ivanokska 2014")

> The use of inadequate drug formulations in children may pose problems not seen in adults, such as difficulty in swallowing conventionally sized tablets, safety issues with certain excipients that are acceptable in adult formulations, and adherence problems with unpalatable medicines. These issues have led to tragedies in the past, and they exist partly because only a small fraction of all marketed drugs are available in formulations that are age appropriate. As a result, many adult medicines are used off-label in children, a practice that carries additional health and environmental risks.

Ivanokska 2014 at SLVGT_RTU_00006703.

> The aim of the present review was to describe why there is a ***specific need for pediatric drug formulations*** and to illustrate the clinical consequences of the absence of suitable medicines for children.

Ivanokska 2014 at SLVGT_RTU_00006703 (emphasis added).

> Due to th[e] extensive variability in children, there is an ***obvious need for drug formulations tailored to children*** in all the target age groups.

Ivanokska 2014 at SLVGT_RTU_00006703 (emphasis added).

> [A] significant number of drug formulations are unsuitable for children, which leads to unsafe off-label and unlicensed use of adult medicines. Recent initiatives promoting pediatric drug development have made some initial progress in the neglected area of pediatric formulations. . . . Despite these advances, the new pediatric formulations are still only a small part of the full therapeutic arsenal needed to serve all pediatric patients.

Ivanokska 2014 at SLVGT_RTU_00006708.

> The following 5 priorities have been identified as critical for the further development of appropriate pediatric formulations. The first key issue is the continuous prioritization process that focuses on ***unmet public health issues*** and ensures that drug development aligns with the true ***clinical needs in children***. Special attention should be paid to innovations that improve drug delivery in neonates . . . .

Ivanokska 2014 at SLVGT_RTU_00006708-709 (emphasis added).

70.     Azurity's Mr. Beckloff discussed this need during his February 4, 2022 deposition, and indicated that this need was the reason Azurity was formed in the first place:

> [I]n 2008, I was part of a meeting that the Kauffman Foundation held here in Kansas City with a group of interested parties, Children's Mercy Hospital, University of Kansas and a

> group in Boston called the Institute for Pediatric Innovation. And the Kauffman Foundation legacy organization to Marion Labs and Ewing Kauffman had identified that there was significant unmet needs in the pediatric -- pediatric medicine area, that there were many drugs that were not pediatric-friendly, we were unable to get accurate dosing because of available dosage forms. And we met to discuss the possibility of solving this problem for pediatric patients.

Beckloff Tr. at 24:4-18.

> I was at Cardinal Health at the time, and Cardinal Health had a generic drug program. And I took -- I took this idea to Cardinal Health and said, look, you know, this is a space that – that we should participate in. It's an important space for the pediatric patients and I want to -- I want to move these programs forward. And Cardinal at the time was preoccupied with other -- other areas. They felt that this space might be too small for -- in terms of volumes for what they had in mind. And so they elected not to continue the program. But I personally felt this was a very important mission. And I continued to work on these programs, sort of nights and weekends, and developed a strategy for bringing these programs to -- to the patients that really need -- need these medicines.

Beckloff Tr. at 25:5-21.

> And so at that time, the state of Kansas had -- had a bioscience authority, the Kansas Bioscience Authority that was charged with developing the biosciences in the state of Kansas. I took this idea to the bioscience authority and requested a grant for $75,000 that we obtained that allowed us to develop the product to the point of being able to present the idea and meet with the -- meet with the FDA, present the idea and our plan, and get feedback from the FDA as to the viability of our program.

Beckloff Tr. at 25:22-26:7.

> And around that time, my -- the person that I reported to, the other co-founder of Silvergate, Frank Seagrave, left Cardinal Health and we decided at that time to -- to form Silvergate Pharmaceuticals and take this mission to -- to meet these patient needs forward with Silvergate. And Silvergate started based on -- based on those set of circumstances.

Beckloff Tr. at 26:11-18.

> [The grant from the Kansas Bioscience Authority] was provided to support the concept of developing pediatric-friendly formulations to meet the unmet medical needs.

Beckloff Tr. at 27:3-5.

> You know, there were a series of products that we were -- that we were looking at. The -- the hypertension area seemed to be significantly underserved, and so we decided to -- to begin with -- with that. And enalapril, one of the, you know, one of the most used products really was -- was the best candidate at -- at that time.

Beckloff Tr. at 27:11-18.

71.     The need for safe, effective pharmaceutical formulations for children is further
evidenced by the various legislative efforts to incentivize drug manufacturers to conduct
pharmaceutical studies in children. Specifically, in response to the small number of clinical drug
trials in children, Congress passed the Food and Drug Administration Modernization Act
(FDAMA) in 1997. Li, et al., "Pediatric Antihypertensive Clinical Trials," Clinical Hypertension
& Vascular Diseases: Pediatric Hypertension (J.T. Flynn, et al. Eds.), Ch. 33 (Springer 2011)
(SLVGT_RTU_00007940-950) ("Li 2011"), at SLVGT_RTU_00007941. The FDAMA included
financial incentives to drug manufacturers for conducting studies in children. Ferguson 2018 at
SLVGT_RTU_00009367. Specifically, Section 505A of the FDAMA, known as the Pediatric
Exclusivity Provision, provided an additional 6-month patent extension, or marketing
exclusivity, to manufacturers for completing trials designed to provide necessary pediatric
efficacy, safety, and dosing information to physicians in product labeling product labeling. *Id.*
Subsequent legislation, including the Best Pharmaceuticals for Children Act (BPCA) in 2002 and
Pediatric Research Equity Act (PREA) in 2003, extended the financial incentives provided for in
the FDAMA. *Id.* In 2012, Congress passed the Food and Drug Administration Safety and
Innovation Act (FDASLA), which permanently reauthorized BPCA and PREA. *Id.*

72.     These programs were successful in increasing pharmaceutical studies in children.[4]
Ferguson 2018 at SLVGT_RTU_00009367 ("These legislative efforts have thus far proven quite
effective, stimulating a marked increase in the number of pharmaceutical studies in children. . . .
As of September 2016, a total of 217 drugs had been granted exclusivity, 18 of which are

---

[4] As discussed further below, enalapril was one of the drugs granted exclusivity pursuant to
the provisions of the FDAMA. Ferguson 2018 at SLVGT_RTU_00009367 (Table 2); Li 2011 at
SLVGT_RTU_00007944 (Figure 2).

antihypertensive medications."); Li 2011 at SLVGT_RTU_00007941 ("Th[e] [FDAMA] program has been very successful in stimulating drug studies in children, and, as a result of the program, >200 drug labeling changes have been enacted for children."). However, the need for safe, effective pharmaceutical formulations for children remained, particularly as much of the progress that resulted from these programs seemed more aligned with adult drug development. Ivanokska 2014 at SLVGT_RTU_00006706 ("Over the past decade, the Best Pharmaceuticals for Children Act and the Pediatric Research Equity Act in the United States . . . have fueled an increasing number of pediatric clinical trials and innovations in pediatric drug formulations. Nonetheless, therapeutic areas addressed by the industry seem to be more aligned with adult drug development than with unmet public health needs in children."). At the very least, the progress underscored the need for appropriate development and evaluation of medications in children. Premier Research, "Developing Pediatric Studies" (2013) (unpublished white paper) (SLVGT_RTU_00008060-066) ("Premier 2013"), at SLVGT_RTU_00008061 ("As a result of legislation in the United States . . . requiring pediatric research, i.e., Best Pharmaceuticals for Children Act (BPCA) [and] Pediatric Research Equity Act (PREA), . . . pharmaceutical companies have substantially increased the number of pediatric research studies they conduct. The progress is certainly positive and further emphasizes the critical need for appropriate development and evaluation of medications in children, thus limiting off-label use, unproven extrapolation from adult studies, and increased risk of adverse events.").

73. The need for safe, effective pharmaceutical formulations for children was specifically recognized in the context of antihypertensives, including with respect to enalapril:

Nahata 1999 (SLVGT_RTU_00009419-423)

> A large number of both old and new drugs used in infants and children are not in liquid dosage form. A list of such medications is provided in Table 1. . . . When these drugs are

prescribed, either a crushed tablet or contents of a capsule can be mixed with solid food or with a palatable drink. These steps require preparation of each dose by the caregiver and may result in delivery of incomplete doses or errors in dosage preparation.

TABLE 1. Examples of Medications not Available in Liquid Dosage Forms[13]

| | |
|---|---|
| Acetazolamide | Levodopa/carbidopa |
| Allopurinol | Mefloquine |
| Amiodarone | Mercaptopurine |
| Amiodipine | Methyldopa |
| Azathioprine | Metropolol |
| Baclofen | Metronidazole |
| Catopril | Mexiletine |
| Chlorambucil | Midazolam |
| Ciprofloxacin | Nifedipine |
| Clonazepam | Oflaxacin |
| Dantrolene | Penicillamine |
| Dapsone | Pentoxifylline |
| Diltiazem | Phytonadione |
| Dipyridamole | Pyrimethamine |
| Disopyramide | Quinidine |
| Enalapril | Rifampin |
| Flecainide | Spironolactone |
| Flucytosine | Spironolactone/hydrochlorothiazide |
| Fluoxetine | Terbinafine |
| Gabapentin | Thioguanine |
| Granisetron | Trimethoprim |
| Hydralazine | Ursodiol |
| Isoniazid | Verapamil |
| Isradipine | |
| Ilraconazole | |
| Ilamotrigine | |
| Levofloxacin | |

Nahata 1999 at SLVGT_RTU_00009419-420 (highlighting added).

Rippley 2000 (SLVGT_RTU_00008364-369)

> The angiotensin-converting enzyme (ACE) inhibitor enalapril is commonly used to treat pediatric hypertension. ***Because some children are unable to swallow tablets*** or require doses less than the lowest available enalapril tablet, ***an enalapril suspension was developed***.

Rippley 2000 at SLVGT_RTU_00008364 (emphasis added).

> This suspension was designed to address specific objectives such as ease and reproducibility of preparation for the pharmacy . . . , ease of dosing, protection from microbial contamination, stability to support the suspension shelf-life, and acceptable taste for the patient.

Rippley 2000 at SLVGT_RTU_00008369.

> This enalapril suspension provides for greater ease and individualization of dosing in pediatric patients. In addition, the similarity of enalapril suspension to marketed tablets will provide chronically treated pediatric patients with the flexibility to change formulations over time.

Rippley 2000 at SLVGT_RTU_00008369.

Fourth Report (SLVGT_RTU_00005900-923)

> On the basis of developing evidence, it is now apparent that primary hypertension is detectable in the young and occurs commonly. The long-term health risks for hypertensive children and adolescents can be substantial; therefore, it is important that clinical measures be taken to reduce these risks and optimize health outcomes.

Fourth Report, at SLVGT_RTU_00005901.

Lugo, et al., "A Survey of Children's Hospitals on the Use of Extemporaneous Liquid Formulations in the Inpatient Setting" (2011) (unpublished presentation) (SLVGT_RTU_00006766-790 ("Lugo 2011")

> Study Objectives
> - Identify extemporaneously prepared liquid formulations that are most commonly used in children's hospitals
> - Determine the extent and variability of use of these formulations . . . .
> - Identify liquid formulations whose commercial development should be sought

Lugo 2011 at SLVGT_RTU_00006771.

> Study Design
> - Prospective survey conducted in 21 children's hospitals (50 beds or more) from 4 geographic regions across the US

Lugo 2011 at SLVGT_RTU_00006772.

> Extent and Variability of Use
>
> - Participating hospitals reported a combined total of <u>231 drug or drug combinations</u> that are currently compounded into a liquid formulation

Lugo 2011 at SLVGT_RTU_00006776 (emphasis in original).

## Top 10 Liquid Formulations

| Liquid Formulation | Conc (range) | Hospitals Reporting (n) | Total Annualized Number of Doses | Median Number of Doses Per Hospital |
|---|---|---|---|---|
| Lansoprazole | 3 mg/ml | 19 | 141,399 | 4,732 |
| Spironolactone | 2-10 mg/ml | 20 | 86,970 | 2,457 |
| Captopril | 0.75-5 mg/ml | 17 | 69,706 | 1,032 |
| Sildenafil | 2-2.5 mg/ml | 18 | 60,264 | 2,210 |
| Ursodiol | 10-60 mg/ml | 21 | 60,170 | 1,728 |
| Baclofen | 1-10 mg/ml | 19 | 47,187 | 1,163 |
| Metronidazole | 5-50 mg/ml | 21 | 36,945 | 902 |
| Tacrolimus | 0.5-1 mg/ml | 14 | 27,051 | 1,148 |
| Clonidine | 5-100 mcg/ml | 13 | 23,040 | 1,576 |
| Enalapril | 0.1-1 mg/ml | 16 | 22,977 | 426 |

Lugo 2011 at SLVGT_RTU_00006777 (highlighting added).

## Commercial Formulations Needed

- 57 liquid formulations were identified for commercial development. Most frequently cited include

| |
|---|
| Amiodarone (n=5) |
| Amlodipine (n=7) |
| Atenolol (n=3) |
| Baclofen (n=9) |
| Captopril (n=9) |
| Clonazepam (n=5) |
| Clonidine (n=5) |
| Enalapril (n=5) |
| Hydrocortisone (n=4) |
| Lansoprazole (n=14) |
| Levothyroxine (n=3) |

| |
|---|
| Metronidazole (n=13) |
| Omeprazole (n=8) |
| Sildenafil (n=10) |
| Rifampin (n=5) |
| Spironolactone (n=11) |
| Tacrolimus (n=11) |
| Topiramate (n=6) |
| Ursodiol (n=15) |
| Valganciclovir (n=6) |

Lugo 2011 at SLVGT_RTU_00006786 (highlighting added).

[redacted]

> This study reveals extensive use of extemporaneously prepared liquid formulations in children's hospitals . . . . ***Commercial formulations for the most commonly used preparations are needed*** . . . .

Lugo 2011 at SLVGT_RTU_00006789 (emphasis added).

Meyers, R.S. & A. Siu, "Pharmacotherapy Review of Chronic Pediatric Hypertension," Clinical Therapeutics, 33(10):1331-1356 (Oct. 2011) (SLVGT_RTU_00008370-395) ("Meyers 2011")

> The ***availability of appropriate dosage forms for children is another barrier. Most antihypertensive drugs are formulated for use in adults as tablets or capsules***. Preparation of these medications for younger children unable to swallow a tablet or capsule requires manipulation of the dosage form either into a partial tablet or capsule or a compounded suspension. Extemporaneous preparations can be compounded when appropriate recipes and directions are available, although manipulation of available dosage forms allows for the possibility of errors.

Meyers 2011 at SLVGT_RTU_00008390 (emphasis added).

### B. Need Heightened Due to Childhood Obesity Epidemic

74. Current estimates suggest that up to 5% of children and adolescents have hypertension. Redwine 2018 at SLVGT_RTU_00009546. However, the prevalence of pediatric hypertension has increased substantially over the last few decades, in large part due to childhood obesity epidemic. Brady, et al., "Management of high blood pressure in children: Similarities and differences between US and European guidelines," Pediatri. Nephrol., 34(3):405-412 (Mar. 2019) (SLVGT_RTU_00008412-426) ("Brady 2019"), at SLVGT_RTU_00008412-413 ("Hypertension (HTN), one of the biggest risk factors for heart disease and the number one cause of mortality worldwide, has increased almost 4-fold in prevalence among children since the 1970s."); Redwine 2018 at SLVGT_RTU_00009545 ("The prevalence of hypertension in the pediatric population has increased substantially over the last 30 years. While the concomitant obesity epidemic has played a major role in the rise of pediatric hypertension, it is now clear that multiple factors influence the development of hypertension in children and adolescents."); Ferguson 2018 at SLVGT_RTU_00009366-367 ("Screening studies dating back to the late

1970s and 1980s estimated that less than 2% of children were persistently hypertensive . . . . Disturbingly, several recent studies suggest that the percentage of children and adolescents with hypertensive BP readings has doubled in the last two decades, with 3-5% now affected . . . . This upward trend in BP has generally been attributed to the ongoing childhood obesity epidemic.”). In other words, the need for safe, effective pharmaceutical formulations for treatment of hypertension in children has increased with time, in parallel to the childhood obesity epidemic.

75. The increased prevalence of childhood obesity, and corresponding heightened need for safe, effective pharmaceutical formulations for treatment of hypertension in children, was recognized in multiple publications as of the priority date of the patents-in-suit:

<u>Fourth Report (SLVGT_RTU_00005900-923)</u>

> Both hypertension and prehypertension have become a significant health issue in the young because of the strong association of high BP with overweight and the marked increase in the prevalence of overweight children.

Fourth Report at SLVGT_RTU_00005907.

> The strong association of high BP with obesity and the marked increase in the prevalence of childhood obesity indicate that both hypertension and prehypertension are becoming a significant health issue in the young.

Fourth Report at SLVGT_RTU_00005907.

<u>Li 2011 (SLVGT_RTU_00007940-950)</u>

> Historically, systemic hypertension was felt to occur in 1-4% of children; however, the prevalence is now increasing because of the influence of childhood obesity. Over the past three decades, childhood obesity has increased dramatically and has been deemed an epidemic by the Centers for Disease Control and Prevention. The 2002 National Health and Nutrition Examination Survey reported that the prevalence of overweight and obese children aged 6-19 years was 31%, a 45% increase from the previous survey.

Li 2011 at SLVGT_RTU_00007940.

> Given these trends, the number of children prescribed antihypertensive medications is likely to increase in coming years.

Li 2011 at SLVGT_RTU_00007941.

[redacted]

Meyers 2011 (SLVGT_RTU_00008370-395)

> Over the past decade, the prevalence of hypertension in the pediatric population has increased in correlation to the rise in childhood overweight and obesity, emphasizing the need for additional research.

Meyers 2011 at SLVGT_RTU_00008370.

J. Samuels, "The Increasing Burden of Pediatric Hypertension," Hypertension, 60:276-277 (2012) (SLVGT_RTU_00008180-181) ("Samuels 2012")

> Rising blood pressures in children may reflect the rise in obesity, particularly among adolescents. Over the last generation, the prevalence of childhood obesity has more than tripled, with >15% of the US pediatric population now obese.

Samuels 2012 at SLVGT_RTU_00008180.

> Hypertension in children can no longer be regarded as a fringe diagnosis merely to be noted and passed on to our internal medicine colleagues. Instead the disease has significant burden on pediatric patients in terms of clinical manifestations, medical complexity, and overall cost of treatment.

Samuels 2012 at SLVGT_RTU_00008181.

Tran, et al., "Recent Trends in Healthcare Utilization Among Children and Adolescents With Hypertension in the United States," Hypertension, 60:296-302 (2012) (SLVGT_RTU_00008192-198) ("Tran 2012")

> The objective of this study was to evaluate the healthcare utilization of hospitalized children with hypertension. . . . We found that 71282 pediatric hypertension hospitalizations generated $3.1 billion in total charges from 1997 to 2006. Approximately 68% were 10 to 18 years old . . . .The frequency of hypertension discharges increased over time ($P$=0.02 for each of age groups 2-9 years and 2-18 years; $P$=0.03 for age group 10-18 years), as well as the fraction of inpatient charges attributed to hypertension ($P$<0.0001). . . . During the 10-year study period, the frequency of hypertension-associated hospitalizations was increasing across all of the age groups, and the fraction of charges related to hypertension was also increasing.

Tran 2012 at SLVGT_RTU_00008192.

> Hypertension is present in 1% to 3% of children in the United States. This prevalence has been rising over the past decades. Increasingly, cardiovascular sequelae of pediatric hypertension are manifesting, including left ventricular hypertrophy, increased carotid intima-media thickness, and cardiovascular disease in adulthood.

Tran 2012 at SLVGT_RTU_00008192.

[redacted]

> Our study found a higher frequency of hypertension discharges in 10- to 18-year olds as compared with 2- to 9-year olds. One may hypothesize that the higher frequency of hypertension discharges seen in the 10- to 18-year-old group in our study may be because of the rise in obesity prevalence as reported in the literature, especially among adolescents. Several studies have demonstrated an association between childhood obesity and pediatric hypertension.

Tran 2012 at SLVGT_RTU_00008194.

Chu 2014 (SLVGT_RTU_00009280-290)

> Nations throughout the developed world are facing an emerging epidemic of pediatric hypertension that has paralleled an increasing prevalence of childhood obesity. In recent cross-sectional studies, greater than one out of every seven United States children and adolescents demonstrate prehypertension with over 3% meeting diagnostic criteria for hypertension. Prevalence trends are similar in population-based assessments in numerous other nations.

Chu 2014 at SLVGT_RTU_00009280.

76. Pediatric hypertension has become so prevalent that it no longer qualifies for an Orphan Drug designation. Beckloff Tr. at 39:15-40:1. An Orphan Drug designation is given to certain drugs that treat rare diseases or conditions such that the patient population is small.

### C. Preference for Ready-to-Use Formulations

77. A ready-to-use liquid formulation is preferred over reconstitutions because it eliminates the need to mix the drug in connection with administration. As long as there are no drawbacks with respect to palatability or stability, the optimal oral drug formulation for pediatric patients is a ready-to-use liquid formulation, especially in patients under the age of six.

78. In my experience, a ready-to-use formulation is also preferable because it eliminates potential inconsistency or contamination during compounding or reconstitution. Ready-to-use formulations may also increase patient compliance because a patient does not have to refill a prescription as often and may keep an additional supply on hand.

79. The following flow chart is consistent with my opinion in this regard:



**Figure 2.** Suggested decision-making flow-chart in the choice of a pediatric oral formulation.

DOI 10.1002/jps JOURNAL OF PHARMACEUTICAL SCIENCES, VOL. 97, NO. 5, MAY 2008

SLVGT_RTU_00009638

Strickley 2008 at SLVGT_RTU_00009638 ("[This figure] is a flow-chart of the suggested decision-making in the choice of which type of pediatric formulation to develop depending on the need to develop a measurable dosage, taste-masking, solubility, and chemical stability."). In other words, where dose flexibility is required, taste is acceptable, the drug is soluble in a convenient volume, and the drug is stable in solution for a two-year shelf life, the optimal oral formulation is a ready-to-use solution or syrup.

80. Multiple publications that were available as of the priority date of the patents-in-suit evidence this preference for ready-to-use liquid formulations, provided that any taste or stability concerns can be resolved:

[redacted]

Sedrati, et al., "Splitting tablets in half," Am. J. Hosp. Pharm., 51:548, 550 (Feb. 15, 1994) (SLVGT_RTU_00008225-226) ("Sedrati 1994")

> The use of half tablets cannot replace elegantly prepared suspensions and other liquid preparations for pediatric patients . . . .

Sedrati 1994 at SLVGT_RTU_00008226.

Nahata 1999 (SLVGT_RTU_00009419-423)

> The majority of drugs approved by the US Food and Drug Administration (FDA) for adults, however, have not been approved for use in pediatric patients. It is important to note that many of such medicines are used frequently in infants and children. One of the major impediments for their use, however, is the lack of suitable pediatric liquid dosage forms. Most of the medications are available either as tablets, capsules, or solutions for injection.

Nahata 1999 at SLVGT_RTU_00009419.

> In the absence of the stability data, it is difficult to provide an appropriate liquid dosage form of medications for infants and children.

Nahata 1999 at SLVGT_RTU_00009419.

> [Assurance of drug stability] is one of the most important steps in deciding whether a drug can be administered and stored in a liquid dosage form.

Nahata 1999 at SLVGT_RTU_00009420.

> The National Institute of Child health and Human Development, through its Pediatric Pharmacology Research Units grant, should commit a small portion of its budget to developing stable liquid dosage forms of drugs for infants and children.

Nahata 1999 at SLVGT_RTU_00009420.

Rippley 2000 (SLVGT_RTU_00008364-369)

> Drug administration to pediatric patients presents a number of challenges. Many drugs that are commonly used in children and infants have no labeling for pediatric use. In most cases, there is an absence of commercially available formulations suitable for use in pediatric patients and a lack of data to support the stability of extemporaneously prepared formulations. Liquid formulations are needed to allow accurate dosing based on body weight. In addition, liquids are necessary for children who are unable to swallow solid dosage forms and for children with dysphagia.

Rippley 2000 at SLVGT_RTU_00008364.

Schirm 2003 (SLVGT_RTU_00008199-202)

> Appropriate formulations are essential in pharmacotherapy. . . . Owing to developmental differences, the requirements for paediatric formulations differ from those of adults. The specific requirements depend on the age and the abilities of the child, but the major differences involve the strength of formulation, the ability to ingest solid dosage formulations, and the taste of oral medicines. This means that frequently a different formulation (e.g. liquid, suppository) has to be chosen.

Schirm 2003 at SLVGT_RTU_00008199.

> It is of concern that for off-label drug prescriptions from the age of 3 y, tablets and capsules are more likely to be prescribed than oral solutions. This is presumably due to a lack of commercially available liquid formulations. The lack of liquid formulations causes parents, doctors and pharmacists a number of problems. . . . Adapting formulations, for instance by preparing mixtures or splitting tablets, can cause dose variability or even loss of drug action, and is inappropriate for controlled-release formulations.

Schirm 2003 at SLVGT_RTU_00008201-202.

Hurtado 2007 (SLVGT_RTU_00006760-762)

> Relatively few medications are commercially available in liquid forms suitable for pediatric use. Thus, compounding is necessary to ensure that infants and children receive the medications they need.

Hurtado 2007 at SLVGT_RTU_00006760.

Strickley 2008 (SLVGT_RTU_00009614-657)

> Oral pediatric formulations are available in 17 different varieties and can be either a ready-to-use formulation such as a solution, syrup, suspension, tablet, scored tablet, chewable tablet, orally disintegrating tablet, or thin strip, or can also be a formulation that requires manipulation such as a powder for constitution to a suspension, tablet for constitution to a suspension, powder for constitution to a solution, drops for reconstitution to a suspension, concentrated solution for dilution, effervescent tablet, bulk oral granules, bulk oral powder, or solid in a capsule to mix with food or drink.

Strickley 2008 at SLVGT_RTU_00009614.



**Figure 1.** Bar chart showing the occurrences, as identified in this review, of the 16 different types of prescription pediatric oral formulations, note that thin strips are available only over-the-counter.

Strickley 2008 at SLVGT_RTU_00009636 (highlighting added).

> A ***solubilized formulation is one of the most common types of pediatric formulations*** as at least 24 commercially available solutions or syrups were identified.

Strickley 2008 at SLVGT_RTU_00009639 (emphasis added).

> A drug molecule in which a measurable dosage form is required, the taste can be masked, is water-soluble, and chemically stable can be formulated as an aqueous-based oral solution or syrup with no organic solvents or with a small percentage (e.g., <5%) of organic solvent.

Strickley 2008 at SLVGT_RTU_00009639.

S.N. Pagay, "Pediatric Formulations," FDA (Dec. 15, 2009) (unpublished presentation) (SLVGT_RTU_00006675-701) ("Pagay 2009")

> Advantages of a ***Liquid Dosage Form for Pediatrics***
> - ***Most desirable dosage form*** up to age up to 6 years and beyond
> - Ease of administration
> - Accuracy in dosing (critical in chemotherapy)
> - Physical & Chemical properties (solubility, stability, taste, etc.) established during early development
> - Compatibility with excipients for liquid formulation can be screened more rapidly
> - Depending on the drug properties, a solution or suspension can be developed

Pagay 2009 at SLVGT_RTU_00006686 (emphasis added).

[redacted]

Verrue, et al., "Tablet-splitting: a common yet not so innocent practice," J. Advanced Nursing, 67(1):26-32 (2010) (SLVGT_RTU_00008173-179) ("Verrue 2010")

> Manufacturers could avoid the need for splitting by introducing a wider range of tablet doses or liquid formulations.

Verrue 2010 at SLVGT_RTU_00008177.

> As for policy implications, we recommend that manufactures make it possible to avoid splitting, by introducing a wider range of tablet doses or liquid formulations.

Verrue 2010 at SLVGT_RTU_00008178.

Li 2011 (SLVGT_RTU_00007940-950)

> Several of the trials of orally administered antihypertensive agents (particularly those used in the trials that failed to show a dose response) did not develop a pediatric (e.g., liquid) formulation and, thus, exhibited a wide range in exposure within each weight stratum. This is because precise dosing is not feasible using a limited number of tablets; liquid formulations allow for more precise dosing per kilogram. An ***ideal oral drug for children should be effective, be well tolerated, have good stability, and have good palatability with acceptable taste, aftertaste, and smell***.

Li 2011 at SLVGT_RTU_00007945 (emphasis added).

> Development of a liquid formulation is often challenging because bioavailability can be unreliable, and dissolving the agent in liquid can require high concentrations of alcohol. In addition, stability and bioequivalence testing of liquid formulations also require additional time and expense. Moreover, it is important that the liquid formulation be palatable and often crushed tablets suspended in an aqueous medium are bitter which ultimately will affect drug compliance. Despite these issues, pediatric formulations should be requested in the Pediatric Drug Development Programs whenever possible.

Li 2011 at SLVGT_RTU_00007945.

M. Kromelis, "Ensuring Pediatric Medicine Safety," Pharmacy Purchasing & Prods., (Nov. 2012) (SLVGT_RTU_00006763-765) ("Kromelis 2012")

> Doses must be accurately measured and delivered in a manner that is appropriate for each child; taste preferences, volume, liquid versus tablet formulation, and medication delivery method . . . are key considerations.

Kromelis 2012 at SLVGT_RTU_00006763.

> Medications prepared for children should be administered in an appropriate device, such as an oral syringe. In addition, ***increase safety by preparing medications in a ready-to-administer form*** so that no dilution or manipulation is required at the patient's bedside.

[redacted]

Kromelis 2012 at SLVGT_RTU_00006764 (emphasis added).

> ***Medications should be provided to pediatric patients in the most ready-to-administer form*** . . . .

Kromelis 2012 at SLVGT_RTU_00006765 (emphasis added).

World Health Organization, "Development of paediatric medicines: points to consider in formulation," WHO Expert Committee on Specifications for Pharmaceutical Preparations, 46th Ed. (2012) (SLVGT_RTU_00009687-935) ("WHO Specifications 2012")

> ***Paediatric medicines should preferably be presented as formulations that are ready to administer***. The need for health professionals, parents or caregivers to manipulate the dose prior to administration should be kept to a minimum.

WHO Specifications 2012 at SLVGT_RTU_00009901-902 (emphasis added).

Richey 2013 (SLVGT_RTU_00008080-087)

> A lack of commercially-available, age-appropriate formulations makes it difficult to administer medication to children accurately. . . . Medicines are thus manipulated by the physical alteration of a dosage form with the aim of achieving the required (usually smaller) dose for administration.

Richey 2013 at SLVGT_RTU_00008080.

> ***Manipulations may be time-consuming, can be inaccurate, and have unknown effects on the stability and bioavailability of the drug***. This risks the administration of toxic or sub-therapeutic doses. ***Drug manipulations may also increase the risk of errors***. Dose calculation errors are the most common medication error in neonatal and paediatric practice.

Richey 2013 at SLVGT_RTU_00008080 (emphasis added).

> Thirty five percent of respondents to the questionnaire reported concerns with the accuracy of the dose achieved following manipulation.

Richey 2013 at SLVGT_RTU_00008083.

> This study also found that tablets are manipulated by dispersion in liquid and measurement of a proportion. Highly variable dosing may occur when insoluble drugs are dispersed in water. Dispersible tablets can also yield inconsistent doses when withdrawn from different depths of the container.

Richey 2013 at SLVGT_RTU_00008086.

Zajicek 2013 (SLVGT_RTU_00006890-899)

[redacted]

> Despite the fact that a significant percentage of the population is unable to swallow tablets and capsules, these dosage forms continue to be the default standard. These oral formulations fail many patients, especially children, because of large tablet or capsule size, poor palatability, and lack of correct dosage strength. The clinical result is often lack of adherence and therapeutic failure.

Zajicek 2013 at SLVGT_RTU_00006890.

> When the age or weight range of the treated population is wide, more flexibility in dosage strengths may be necessary. ***Liquid dosage forms are considered the most flexible*** in this regard, but liquid formulations carry some important limitations. Liquids must be accurately measured by the caregiver. If the liquid is a suspension, the bottle must be well shaken to suspend the drug and distribute it evenly throughout the liquid.

Zajicek 2013 at SLVGT_RTU_00006891 (emphasis added).

Habib, et al., "Accuracy of tablet splitting: Comparison study between hand splitting and tablet cutter," Saudi Pharm. J., 22:454-459 (2014) (SLVGT_RTU_00008043-048) ("Habib 2014")

> As for policy implications, we concur with previous scientific recommendations that manufacturers make it possible to avoid splitting, by introducing a wider range of tablet doses or liquid formulations.

Habib 2014 at SLVGT_RTU_00008048.

81. This is especially true with patients up to six years old, for whom solid oral dosage forms may be unsafe to swallow:

Strickley 2008 (SLVGT_RTU_00009614-657)

> The preferred means of administration is age dependent with suppositories preferred for neonates; solution or syrups for infants; solutions, syrups, suspensions, or effervescent dosage forms for the 2-5 year age group; orally disintegrating tablets, chewable tablets, or thin strips for ages 6–11 years; tablets, capsules, powders, orally disintegrating tablets, chewable tablet, or thin strips for adolescents.

Strickley 2008 at SLVGT_RTU_00009637.

> Another major consideration is at what age a child can safely swallow a solid oral dosage such as a tablet or capsule, which is generally considered to be approximately 6 years.

Strickley 2008 at SLVGT_RTU_00009637.

Pagay 2009 (SLVGT_RTU_00006675-701)

> Preferred Dosage Forms for Drug Delivery to Different Pediatric Age Groups

- Neonates: 0-4 weeks – ???
- Infants: 1 month-2 year – Liquids-small volumes (syrups, solutions)
- Children: 2-5 years – Liquids (Liquids and effervescent tablets dispersed in liquids for administration)

Pagay 2009 at SLVGT_RTU_00006680.

> 6 years old is generally considered the age that children can safely swallow a solid oral dosage form, although this varies based on the child.

Pagay 2009 at SLVGT_RTU_00006680.

> Advantages of a Liquid Dosage Form for Pediatrics
> - Most desirable dosage form up to age up to 6 years and beyond

Pagay 2009 at SLVGT_RTU_00006686.

<u>WHO Specifications 2012 (SLVGT_RTU_00009687-935)</u>

> The oral route is the preferred and most appropriate route of administration to paediatric patients. This route is generally acceptable in all age groups if the medicine is administered in a suitable dosage form, e.g. in liquid form for children in the youngest age groups who have difficulty in swallowing solid dosage forms.

WHO Specifications 2012 at SLVGT_RTU_00009910.

> Oral liquid preparations include aqueous solutions, suspensions, emulsions and syrups. They are most appropriate for children in the youngest age groups who are unable to swallow solid dosage forms.

WHO Specifications 2012 at SLVGT_RTU_00009910.

> It has been thought generally that even small tablets and capsules to be taken whole are not acceptable for children below the age of 6 years.

WHO Specifications 2012 at SLVGT_RTU_00009913.

<u>Premier 2013 (SLVGT_RTU_00008060-066)</u>

> Just as children differ from adults, the various pediatric age groups differ from each other and are considered separate labeling indications. . . . [D]rug compliance can be difficult [with pre-term newborns, newborns, and infants/toddlers] and special formulations are often needed.

Premier 2013 at SLVGT_RTU_00008062.

> While oral liquids may seem the most appropriate for babies and very young children, this form is the most challenging because of taste and stability. Liquids typically require larger amounts of excipients which are limited in neonates and infants due to

> immature renal and hepatic functions. Solid dosage forms are more stable and have more taste masking techniques available but have less flexibility in terms of dosing.

Premier 2013 at SLVGT_RTU_00008064.

Zajicek 2013 (SLVGT_RTU_00006890-899)

> The age at which children are able to swallow tablets or capsules varies widely, but is generally expected at approximately age 7 . . . .

Zajicek 2013 at SLVGT_RTU_00006890.

> Liquid dosage forms are preferred for newborn infants and young children (below 6 years old) instead of solid oral dosage forms such as capsules or tablets because of swallowing issues.

Zajicek 2013 at SLVGT_RTU_00006894-895.

Ivanokska 2014 (SLVGT_RTU_00006702-715)

> Until recently, liquid formulations were preferred for younger children because of their easy and simple dosing across age subgroups. In 2008, a WHO expert forum proposed a paradigm shift toward pediatric oral solids in view of stability problems and the high transportation and storage costs involved in liquid formulations.

Ivanokska 2014 at SLVGT_RTU_00006707.

82. As discussed further below, enalapril has been available in the form of a solid, oral tablet since the 1980s. Accordingly, this preference for ready-to-use liquid formulations supports the non-obviousness of the Asserted Claims, given the long period during which enalapril was available but no ready-to-use liquid formulation existed.

### D. Development of Safe, Effective Formulations of Enalapril for Children

83. Enalapril was introduced into clinical practice in 1984. Rippley 2000 at SLVGT_RTU_00008364. Enalapril maleate tablets were initially approved by the FDA in December 1985, and marketed under the trade name "Vasotec®." SLVGT_RTU_00009424-433 ("Epaned Kit NDA – Pharmaceutical Development"), at SLVGT_RTU_00009426.

84. Although enalapril was not initially labeled for pediatric use, it was recommended

for use in children by the National High Blood Pressure Working Group on Hypertension Control in Children and Adolescents and was commonly used to treat pediatric hypertension. Rippley 2000 at SLVGT_RTU_00008364. Following passage of FDAMA, however, clinical trials of enalapril in children were conducted, and six months of marketing exclusivity was granted to enalapril in February 2000 pursuant to the Pediatric Exclusivity Provision of FDAMA. Ferguson 2018 at SLVGT_RTU_00009367 (Table 2); Li 2011 at SLVGT_RTU_00007944 (Figure 2). Shortly thereafter, enalapril became the first ACE inhibitor approved by the FDA for pediatric hypertension following completion of required clinical trials in 2002. Chu 2014 at SLVGT_RTU_00009281. The label for enalapril is unique insofar it has a pediatric indication for all young children except neonates. *Id.* at SLVGT_RTU_00009281. In fact, it is the only ACE inhibitor that is approved for treatment in children younger than six. Siddiqi 2019 at SLVGT_RTU_00009599-602 (Table 1); Chu 2014 at SLVGT_RTU_00009283 (Table 2).

85. Although enalapril has been commercially available since 1985, and labeled for use in pediatric patients since 2002, for many years there was no pediatric formulation of enalapril—i.e., enalapril was only available in tablet form. Epaned Kit NDA – Pharmaceutical Development at SLVGT_RTU_00009426. As discussed further below, enalapril was not commercially available in oral liquid form until the release of Azurity's Epaned Kit in 2013; and was not commercially available in a ready-to-use oral liquid form until the release of Azurity's Epaned® in 2017. In other words, it took more than 30 years to develop a ready-to-use formulation of enalapril, and 15 years to develop such a formulation following enalapril's labeling for pediatric use.

86. For patients unable to take solid tablets, particularly children, the primary way of administering enalapril was to compound or crush the tablet into a powder, dissolve the powder

into solution, and then administer the resulting solution to the patient. Specifically, the package insert for Vasotec® instructed pharmacists to place 10 20 mg tablets of Vasotec® in a bottle with 50 mL of Bicitra®, shake well for at least 2 minutes, let the concentrate stand for 60 minutes, and then add 150 mL of Ora-Sweet® SF. Epaned Kit NDA – Pharmaceutical Development at SLVGT_RTU_00009426-427. This resulted in a 1 mg/mL enalapril maleate suspension. *Id.* at SLVGT_RTU_00009427.

87. In fact, the drawbacks of compounding pharmaceutical products were often recognized in the literature:

<u>Sellers 2012 (SLVGT_RTU_00006870-877)</u>

> [D]espite best compounding practices, extemporaneous formulations generally lack studies to document stability, bioavailability, pharmacokinetics, pharmacodynamics, efficacy and safety.

Sellers 2012 at SLVGT_RTU_00006871.

> In 2006, the FDA conducted a limited survey of compounded drugs. ***Of 36 samples tested by the FDA, 12 failed at least one quality test, for a failure rate of 33%.***

Sellers 2012 at SLVGT_RTU_00006872 (emphasis added).

<u>Gudeman, et al., "Potential Risks of Pharmacy Compounding," Drugs R&D, 13:1-8 (2013) (SLVGT_RTU_00006627-634) ("Gudeman 2013")</u>

> [T]he regulatory oversight of pharmacy compounding is significantly less rigorous than that required for Food and Drug Administration (FDA)-approved drugs; as such, compounded drugs may pose additional risks to patients. . . . Unlike FDA-approved drugs, pharmacy-compounded products are not clinically evaluated for safety or efficacy. In addition, compounded preparations do not have standard product labeling or prescribing information with instructions for safe use. Compounding pharmacies are not required to report adverse events to the FDA, which is mandatory for manufacturers of FDA-regulated medications. . . . ***Published reports of independent testing by the FDA, state agencies, and others consistently show that compounded drugs fail to meet specifications at a considerably higher rate than FDA-approved drugs***.

Gudeman 2013 at SLVGT_RTU_00006627 (emphasis added).

> The FDA became aware of 55 product quality problems associated with compounded medicines between 1990 and 2001. The agency therefore conducted a limited survey of

[redacted]

> 29 different compounded medicines sourced from 12 compounding pharmacies, testing 8 different drugs of various dosage types (oral, injectable, topical, etc.) against established quality standards. ***Ten out of 29 samples (34 %) failed quality testing***, mostly for sub-standard potency ranging from 59 to 89 % of the target dose. By comparison, the FDA noted that the failure rate for over 3,000 FDA-approved commercial products tested from 1996 to 2001 was <2 %. The FDA conducted a follow-up survey in 2006 and found that ***12 of the 36 compounded products (33 %) failed quality testing***. Most of the failures were again related to potency, ranging from 68 to 268 % of the labeled dosage. The FDA concluded that the compounding processes used at pharmacies most likely caused the quality failures and reiterated that this rate of failure raises public health concerns for compounded drugs.

Gudeman 2013 at SLVGT_RTU_00006630 (emphasis added).

Richey 2013 (SLVGT_RTU_00008080-087)

> Manipulations may be ***time-consuming***, can be ***inaccurate***, and have ***unknown effects on the stability and bioavailability*** of the drug. This risks the administration of toxic or sub-therapeutic doses. Drug manipulations may also ***increase the risk of errors***. Dose calculation errors are the most common medication error in neonatal and paediatric practice.

Richey 2013 at SLVGT_RTU_00008080 (emphasis added).

Zajicek 2013 (SLVGT_RTU_00006890-899)

> Extemporaneous formulations are a common work-around for the lack of commercially available preparations, but ***concerns regarding lack of dose accuracy, stability, and consistency in preparation*** present difficulties for both practitioners and caregivers.

Zajicek 2013 at SLVGT_RTU_00006890 (emphasis added).

Ivanokska 2014 (SLVGT_RTU_00006702-715)

> Alternative treatment options are often used to make unavailable drugs accessible for children and/or to adjust drug doses according to individual patient needs. These options include . . . extemporaneous dispensing (i.e., compounding medicines from ingredients within pharmacies). Administering medicines in this way is ***difficult and unsafe*** because limited data are available to validate stability, bioavailability, pharmacokinetics, pharmacodynamics, dosing accuracy, tolerability, and reproducibility. . . . All these ***manipulations may compromise drug efficacy and/or safety*** . . . .

Ivanokska 2014 at SLVGT_RTU_00006706 (emphasis added).

88. As an example that relates specifically to enalapril, pharmacists at the University of Michigan conducted a study to determine the degree in variation of oral liquid pediatric

compounding practices in Michigan pharmacies. Rood, et al., "Variability in compounding of oral liquids for pediatric patients: A patient safety concern," J. Am. Pharm. Ass'n, 54:383-389 (Jul/Aug 2014) (SLVGT_RTU_00006716-722) ("Rood 2014"), at SLVGT_RTU_00006716. A survey sent to Michigan pharmacies listed 147 medications and asked if respondents compounded these medications and, if so, at which concentrations. *Id.* at SLVGT_RTU_00006718. For enalapril, responding pharmacies reported six different concentrations. *Id.* at SLVGT_RTU_00006721 (Table 2). Notably, pharmacies reported six different concentrations, despite the fact that the package insert for Vasotec® contains specific compounding instructions for a 1 mg/mL enalapril maleate suspension. Epaned Kit NDA – Pharmaceutical Development at SLVGT_RTU_00009426-427. As such, it appears that even the specific compounding instructions provided with Vasotec® provide no assurance that enalapril is compounded consistently.

89. In fact, compounding was of such concern that federal laws and regulations were passed to rein in the practice. In particular, Congress added section 503A to the Federal Food, Drug, and Cosmetic Act (FD&C Act) in 1997. FDA, "FDA's Human Drug Compounding Progress Report: Three Years After Enactment of Drug Quality and Security Act" (January 2017) (SLVGT_RTU_00006732-747) ("2017 FDA Progress Report"), at SLVGT_RTU_00006738). Section 503A allows for human drug compounding—and exempts compounded drug products from the premarket approval, labeling with adequate directions for use, and CGMP requirements of the FD&C Act—but only if certain conditions are met. 2017 FDA Progress Report at SLVGT_RTU_00006738. On November 27, 2013, Congress enacted the Drug Quality and Security Act (DQSA), the first title of which—known as the Compounding Quality Act— clarified and enhanced the public health protections applicable to compounded

drug products. *Id.* at SLVGT_RTU_00006740. Specifically, the DQSA removed certain advertising provisions from section 503A that had been found unconstitutional, but otherwise left section 503A intact. *Id.* at SLVGT_RTU_00006740.

90. Following enactment of the DQSA, the FDA increased its drug compounding oversight. 2017 FDA Progress Report at SLVGT_RTU_00006742. For example, the FDA has provided guidance for the industry with respect to the FDA's policies regarding section 503A. *See generally* FDA, "Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry" (January 2018) (SLVGT_RTU_00009350-364) ("2018 FDA Guidance"). In particular, to qualify for section 503A's exemptions, a drug product must be compounded by a licensed pharmacist or physician who does not compound regularly or in inordinate amounts any drug products that are essentially copies of a commercially available drug product. *Id.* at SLVGT_RTU_00009353. This means that a compounded drug product is not eligible for the exemptions in section 503A if it is (1) essentially a copy of a commercially available drug product, and (2) compounded regularly or in inordinate amounts. *Id.* at SLVGT_RTU_00009356.

91. As another example of increased FDA oversight, the FDA has inspected hundreds of compounding facilities since the enactment of the DQSA, and taken subsequent remedial action as necessary. 2017 FDA Progress Report at SLVGT_RTU_00006742-743; J.A. Axelrad, "Title I Implementation – Pharmacy Compounding in 2016," FDA (2016) (unpublished presentation) (SLVGT_RTU_00006647-674) ("Axelrad 2016"), at SLVGT_RTU_00006653-655. The FDA has commented on some of the insanitary conditions observed during such inspections: dog beds, dog feces, and dog hair in close proximity to compounding room; dead

insects in compounding room; visible mold; compounding of sterile drugs by personnel with exposed skin, which sheds particles and bacteria; coffee filters used to filter particulates; toaster ovens used for sterilization; kitchen dishwasher and detergent used to clean sterile compounding equipment and utensils; and renovations conducted next to sterile compounding operations without taking precautions to prevent contamination of the sterile products. 2017 FDA Progress Report at SLVGT_RTU_00006736, SLVGT_RTU_00006745; Axelrad 2016 at SLVGT_RTU_00006654. Accordingly, the FDA has stated that it remains concerned about the risk to patients from drugs compounded by facilities that do not comply with section 503A or other applicable requirements of the FD&C Act. 2017 FDA Progress Report at SLVGT_RTU_00006745-746.

92.     Another drawback of drug compounding is that it is done at compounding pharmacies, which are not common and can be difficult to find. For example, the hospital where I practice lacks such capabilities.

93.     Given the concerns with compounding, even though enalapril was labeled for pediatric use in 2002, there still existed a need for a safe, effective formulation of enalapril for children. Specifically, there remained a need for a palatable and stable liquid formulation of enalapril for children.

94.     Azurity developed the Epaned Kit—the precursor to the claimed liquid enalapril formulations—in response to this need for improved pediatric medicine. Beckloff Tr. at 28:15-31:6. Epaned Kit was approved by the FDA on August 13, 2013. SLVGT_RTU_00005739-779 ("Epaned® NDA – Clinical Overview"), at SLVGT_RTU_00005742. Epaned Kit was supplied as a kit containing a bottle of enalapril powder and a bottle of Ora-Sweet® SF diluent. 2014 Epaned Kit Label at SLVGT_RTU_00009315, SLVGT_RTU_00009327. The diluent was added

to the enalapril powder prior to dispensing to the patient. Specifically, pharmacists were instructed to mix the powder and diluent as follows:

> Firmly tap the EPANED Powder for Oral Solution bottle on a hard surface 5 times. Add approximately one-half (75 mL) of the Ora-Sweet SF diluent to the 150 mL EPANED Powder for Oral Solution bottle. Replace the child-resistant cap. Shake well for 30 seconds. Reopen. Add the remainder of the Ora-Sweet SF diluent to the EPANED Powder for Oral Solution bottle, replace the child-resistant cap and shake well for an additional 30 seconds. Calculate 60 days from the date of reconstitution. Write this date as the discard date on the front of the label. Affix a "Do Not Use After" or a "Discard After" label with the calculated date added to the reconstituted EPANED bottle.

2014 Epaned Kit Label at SLVGT_RTU_00009315. Once reconstituted, Epaned Kit was dispensed to the patient in the multiple-dose bottle.

95. Epaned Kit was an improvement with respect to preexisting enalapril treatment options for children. In particular, Epaned Kit was the first FDA-approved drug product containing enalapril maleate in an oral liquid form for use by patients who could not swallow tablets or had difficulty doing so. Epaned® NDA – Clinical Overview at SLVGT_RTU_00005742. Accordingly, Epaned Kit addressed some of the drawbacks of the prior practice of compounding Vasotec®—e.g., the inherent opportunity for compounding errors; the fact that compounding pharmacies are not subject to CGMPs, which could lead to product quality and stability issues. *Id.* at SLVGT_RTU_00005742.

96. However, Epaned Kit still required a pharmacist to engage in a multi-step reconstitution process in order to correctly mix the enalapril powder and diluent. 2014 Epaned Kit Label at SLVGT_RTU_00009315. Accordingly, it was still possible to experience variability in dosage due to pharmacist error and/or incomplete solubilization of the enalapril powder in the liquid. *See, e.g.*, Beckloff Tr. at 30:13-16 ("[The kit] require[s] manipulation such as adding a diluent to powder bottle and shaking and, you know, working through those kinds of processes in the pharmacy . . ."); Trial Testimony of Michael Beckloff, *Silvergate Pharmaceuticals Inc., v.*

*Bionpharma Inc.*, Nos. 18-1962 & 19-1067 (D. Del.), February 1, 2021 (D.I. 193) (SLVGT_RTU_00009936-10003), at 78:22-79:6 ("We had a number of issues over time that, that were reported to us [about Epaned Kit from pharmacists]. We had issues where the wrong diluent was used. We had issues where there were contamination issues, where it turned out to be the fibers from the pharmacist's sweater. We had reports of foreign matter in the -- in the powders that turned out to be items that people had used to poke a hole in the index seal on the top. So we had a number of issues."). In fact, a February 2017 White Paper prepared by Azurity, "Management of Pediatric Patients on Enalapril Maleate," noted a "significant concern" that the recipe called for in the Vasotec® package insert was not, in practice, always followed by pharmacists. SLVGT_RTU_00006600-613 ("2017 White Paper"), at SLVGT_RTU_00006604. In my opinion this same concern existed with respect to Epaned Kit, albeit to a lesser extent, simply by virtue of the number of steps required to properly reconstitute the product and the concerns about contamination.

97.     Moreover, after reconstitution, the resulting solution was only stable for 60 days. 2014 Epaned Kit Label at SLVGT_RTU_00009315. As such, even after Epaned Kit was introduced to the market, there still existed a need for a safe, effective formulation of enalapril for children. Specifically, there remained a need for a stable liquid formulation of enalapril for children that did not require reconstitution (or other manipulation) prior to administration.

98.     Azurity developed the patented ready-to-use liquid enalapril formulations in response to this need. Specifically, the claimed ready-to-use solutions are stable for an extended period of time, unlike any available liquid formulations of enalapril before, and do not need reconstitution, compounding, or other drug manipulation prior to administration. '482 patent at 5:60-6:4, Claims 14-23, 27-28; '621 patent at 5:60-6:4, Claims 1-13, 16-27, 30. As such, these

oral liquid enalapril formulations eliminate the accompanying risks of variability in dosage and incomplete solubilization. '482 Patent at 5:13-6:4; '621 patent at 5:13-6:4. The elimination of these risks means that the oral liquid enalapril formulations have a safety advantage relative to Epaned Kit. Beckloff Tr. at 30:4-22 ("And we were informed by FDA that – that they didn't consider the kit, the powder kit, they didn't consider that to be a distinct advantage over a compounded enalapril based on safety, clinical safety. . . . [A]nd [the FDA] insinuated that [a] ready-to-use type of product would -- would meet the clinical superiority on the basis of safety."); Beckloff Tr. at 30:23-31:6.

99.     Azurity sells the ready-to-use liquid enalapril formulation Epaned®. Epaned® NDA – Clinical Overview at SLVGT_RTU_00005742 ("Epaned Oral Solution, 1mg/mL, is targeted as an alternative to the available tablet dosage form and to the currently available Epaned Powder for Oral Solution (which requires a reconstitution preparation step) . . . ."). Epaned® was approved by the FDA on September 20, 2016. "New Drug Application (NDA): 208686," Drugs@FDA: FDA-Approved Drugs (SLVGT_RTU_00010004-006), at SLVGT_RTU_00010005. Epaned® is supplied as a ready-to-use solution that contains 1 mg/mL of enalapril maleate. 2017 Epaned Label at ALK_ENPL_00000085. Additionally, Epaned® is stable for 36 months at refrigerated conditions. SLVGT_RTU_00009329-336 ("Epaned® NDA – 2018 Stability Summary"), at SLVGT_RTU_00009336.

REDACTED

REDACTED

102.     In short, the major advantage of the claimed solutions is their ready-to-use, long-term stable formulation (which eliminates the need for manipulation). '482 patent at 5:13-6:4, Claims 14-23, 27-28; '621 patent at 5:13-6:4, Claims 1-13, 16-27, 30. By virtue of these advantages, the claimed solutions meet the long-felt need for a stable liquid formulation of enalapril for children that do not require reconstitution (or other manipulation) prior to administration, which eliminates the potential for errors or contamination in reconstitution and facilitates patient compliance.

I declare, under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2022

John D Mahan

Dr. John D. Mahan, Jr. M.D.

# EXHIBIT A

***CURRICULUM VITAE***
***John D. Mahan, Jr., M.D.***

Date and Place of Birth: November 28, 1951
Philadelphia, Pennsylvania

Academic and Professional Experience

Academic Positions

Professor of Pediatrics — 2001 - present
College of Medicine
The Ohio State University, Columbus OH

Associate Professor of Pediatrics — 1990 - 2001
College of Medicine
The Ohio State University

Assistant Professor of Pediatrics — 1984 - 1990
College of Medicine
The Ohio State University

Leadership Positions

Director, Center for Faculty Development — 2019 - present
Nationwide Children's Hospital

Director for Education, OSU COM Center for Faculty Advancement, Mentoring, and Engagement (FAME) — 2012 - 2020
College of Medicine, The Ohio State University

Senior Editor, Faculty Development for Medical Educators (FD4ME) — 2011 – present
OSU COM Online Faculty Development Program
College of Medicine, The Ohio State University

Assistant Dean for Faculty Development — 2010 - 2015
College of Medicine, The Ohio State University

Director, OSU COM Center for Education and Scholarship — 2009 – 2012
College of Medicine, The Ohio State University

Medical Director, Clinical Studies Center — 2007 - 2014
The Research Institute at Nationwide Children's Hospital
Nationwide Children's Hospital

Co-Medical Director, Clinical Studies Center — 2006 - 2007
Interim Director, Center for Clinical and Translational Research
The Research Institute at Nationwide Children's Hospital
Nationwide Children's Hospital

Vice-Chairman for Education — 2005 - 2015
Department of Pediatrics
College of Medicine, The Ohio State University

Medical Director, NCH Metabolic Bone Clinic — 2004 - present
Nationwide Children's Hospital

Director, Pediatric Nephrology Fellowship Program — 2003 - present
Nationwide Children's Hospital/The Ohio State University

Medical Director, Pediatric Kidney Transplant Program — 2000 - 2011
OPTN/UNOS Representative, Nationwide Children's Hospital

Division Director, Pediatric Nephrology — 1999 - 2005
Department of Pediatrics, College of Medicine, The Ohio State University

| | |
|---|---|
| Section Chief<br>Pediatric Nephrology, Nationwide Children's Hospital | 1999 - 2005 |
| Research Investigator<br>Pediatric Clinical Trials International/Clinical Studies Center<br>Nationwide Children's Hospital | 1999 - present |
| Director, Pediatric Residency Program<br>The Ohio State University/Nationwide Children's Hospital | 1990 - 2019 |
| Acting Director, Rheumatology Clinic<br>Nationwide Children's Hospital | 1986 - 1987 |
| Attending Physician<br>Pediatric Intensive Care Unit, Nationwide Children's Hospital | 1987 - 1990 |

Training - Clinical and Research

| | |
|---|---|
| Medical Fellow (Pediatric Nephrology) | 1981 - 1984 |
| Chief Resident and Instructor | 1980 - 1981 |
| Pediatric Resident | 1977 - 1980 |
| University of Minnesota Medical School, Minneapolis, Minnesota | |
| Hahnemann Medical College Degree: M.D.<br>Philadelphia, Pennsylvania | 1977 |
| LaSalle College Degree: BA<br>Philadelphia, Pennsylvania | 1973 |

Licensure

| | |
|---|---|
| Minnesota | 1979 |
| Ohio | 1984 |

Board Certification

| | |
|---|---|
| Diplomate National Board of Medical Examiners | |
| American Board of Pediatrics | 1982 |
| Sub-board, Pediatric Nephrology | 1985, 2010 |

Research Interests

Glomerular Disorders, Proteinuria, Glomerular Basement Membrane Structure, Hypertension, Renal Osteodystrophy, Metabolic Bone Disease, Growth Failure in Renal Disorders Renal Transplantation, Medical Education

Membership in Professional Societies

American Academy of Pediatrics (AAP # 152909)
Society for Pediatric Research
International Society of Nephrology
American Society of Nephrology
American Society of Pediatric Nephrology
Association of Pediatric Program Directors
International Pediatric Nephrology Association
American Association for the Advancement of Science
Academy of Pediatrics

Honors

| | |
|---|---|
| Public Health Service<br>Nephrology Training Grant AM 07087-09 | 1982 - 1984 |
| National Kidney Foundation Fellowship | 1981 - 1982 |
| Outstanding Teacher of the Year,<br>OSU Department of Pediatrics | 1987 |
| Elected to Society for Pediatric Research | 1995 |
| Elected to Board of Directors, Association of Pediatric Program Directors (APPD) | 2002 |
| Outstanding Teacher of the Year,<br>OSU Department of Pediatrics | 2002 |
| Elected to The Ohio State University College of Medicine<br>Medical Review Club | 2002 |
| OSU College of Medicine Faculty Teaching Award | 2006 |
| National Communication Association (Annual Meeting) 'Top Paper Award' | 2007 |
| Elected to American Society of Pediatric Nephrology Council | 2008 |
| Selected Drexel University College of Medicine<br>Alpha Omega Alpha Honor Society | 2012 |
| Drexel University College of Medicine Distinguished Alumni Award | 2012 |
| ACGME Parker J. Palmer Courage to Teach Award | 2013 |
| Arnold P. Gold Humanism Society | 2013 |
| Nationwide Children's Hospital Career Achievement Award | 2014 |
| Elected Secretary-Treasurer, Board of Directors, APPD | 2016 |
| Appointed to International Pediatric Nephrology Association Council | 2016 |
| OSU Courage to Teach Master Teacher Award | 2019 |
| OSU COM Lifetime Achievement Award | 2020 |
| AAP Section of Pediatric Nephrology Henry Barnett Nephrology Award | 2021 |

**Extramural Grants (as Principal Investigator)**

1. American Cancer Society, Principal Investigator, "Steroid Endothelial Cell Interactions in CNS Tumor Therapy." $7,637, 7/86 - 6/87.
2. National Kidney Foundation, Principal Investigator, Cell Culture Studies in Glomerulonephritis. $4000. 7/86-6/87.
3. National Institutes of Health, R29, Principal Investigator, "Glomerular and Endothelial and Mesangial Cell Immune Complex." $555,000, 9/91 - 8/96.
4. National Institutes of Health, Small Instrumentation Grant Program, Principal Investigator, "CytoFluor (fluorimeter) for cell culture and cellular studies."$28,514, 8/93 - 7/94.
5. National Institutes of Health, Principal Investigator, "SYNSORB PK for the Prevention of HUS in Children." $51,810. 7/98-6/02.
6. Novartis, Principal Investigator, "RAD (Rapamycin Derivative) in Pediatric Renal Transplant Recipients. PCTI." Recruit and oversee pharmacokinetic studies of RAD in pediatric renal transplant recipients. $23,809. 4/99-12/99.
7. Genentech, Principal Investigator, "The Use of Recombinant Growth Hormone (Nutropin) in Children Post Renal Transplant". $16,000. 7/99-6/03.
8. AstraZeneca, Principal Investigator, "Dose Ranging, Safety and Tolerability Trial of Felodipine ER in Pediatric Patients. Multicenter Double-Blind, Placebo-Controlled, Randomized, Parallel Group Trial with an Optional Open-Label Extension #216". $68,000. 9/99-12/00.
9. Pfizer, Principal Investigator, "A Randomized, Double Blind, Placebo–Controlled, Parallel Group Dose-Ranging Study to Evaluate the Efficacy and Safety of Amlodipine in the Treatment of Hypertension in Children and Population Pharmacokinetics Study (PATH-1)." $76,566. 10/99-10/00.
10. Novartis, Principal Investigator, "A Multicenter Study to Evaluate the Pharmacokinetics, Dose-Response, Efficacy, and Safety of Benazepril in Pediatric Subjects." $40,794.00. 12/99- 05/01.
11. Pfizer, Principal Investigator, "The Pediatric Use of Amlodipine in the Treatment of Hypertension: A Population Pharmacokinetic Trial (PATH-2)." $54,662. 2/00-2/01.
12. Novartis, Principal Investigator, "Multicenter, open-label, single arm, safety, tolerability, efficacy and pharmacokinetic study of RAD 001 in pediatric de novo renal transplant patients." $51,720. 5/00-1/02.

13. Bayer, Principal Investigator, "A prospective, randomized study to compare ciprofloxacin (oral or IV) versus established comparative regimens (cefixime, oral or IV) in the treatment of pediatric patients with complicated urinary tract infections or pyelonephritis." $46,760.00. 5/00- 2/01.
14. Columbus Foundation, Principal Investigator, "Student to Student Mentorship Program: Mentoring with a Purpose – Columbus Public School – The OSU College of Medicine and Public Health." $35,000. 8/01-5/03.
15. Columbus Medical Association Foundation, Principal Investigator, "Strengthening Medicine – Involving Young Physicians in the Profession." $67,000. 8/02-7/04.
16. Novartis, Principal Investigator, "An Internal, Multicenter, Randomized, OL, Parallel Efficacy and Safety Trial of Novartis Pharmaceuticals Intravenous Zoledronic Acid (0.05 mg/kg) Compared to Intravenous Pamidronate (3.0 mg/kg) In Children with Severe Osteogenesis Imperfecta." $84,939. 8/02-12/06.
17. Genentech, Principal Investigator, "Safety & Efficacy of Nutropin AQ in Children with OI and IJO" $99,970. 7/04 -6/07.
18. Genentech, Principal Investigator, "Safety & Efficacy of TIW Growth Hormone in Children on Dialysis" $150,000. 12/9-5/13.
19. Genentech, Principal Investigator, "The Relationship of Growth Response and Quality of Life to GH/IGF-1 Levels in Children with CKD", $90,000, 6/10-5/14.
20. HRSA, Local Principal Investigator, "Patient Centered Medical Home Faculty Development Initiative", $250,000, 1/1/13-6/30/14.
21. HRSA, Principal Investigator. "Sustaining Trainee Resilience, Engagement and Meaning" (1 U3NHP45413-01-00), $$2,081,016, 1/1/22-12/31/24

**Intramural Grants**

1. Ohio State University Bremer Foundation Grant, Principal Investigator, "Immunopathogenetic Studies of Glomerulonephritis in the Non-Human Primate". $5,000, 12/84-12/85.
2. Children's Hospital Research Foundation, Principal Investigator, The Immune-Complex Glomerulopathies". $100,850. 7/86-6/89.
3. Children's Hospital Research Foundation, Principal Investigator, "Bone Density in Healthy Children." $3,060. 6/87-5/89.
4. Children's Hospital Research Foundation, Principal Investigator, "Immune-Complex and Glomerular Cell Interactions". $146,670. 7/89-6/92.
5. Children's Hospital Research Foundation, Principal Investigator, "The Effect of Exercise on Diabetic Nephropathy." $4859. 1/90-12/90.

**Ex ramura Gra ts ith D . ahan as Co-inve ig tor**

1. ational In ti utes of Health, Co-Inves igato , ( .I. Lee Hebe t, MD), " mmune - Complex ediated Glomerulon ph itis in Pr ates". $8,905 (Co-Inve tigator udg t). For $ 50,0 0 6/93 5 94.
2. ational In ti utes of Health, Co-Inves igato , ( .I. Lee Hebe t, MD), "Me ha ism of IgA N ph itis in hil ren and u ts". $ 8,000 (Co-Inve tigator dge ). For $ 80,00 , 11/94 1 /96.
3. rganon, Co-Inve tiga o (PI, B Crom r, MD , "L ng Term Ef ects of ormonal Contr ce tion on Bone De sity in Adol scents" $50, 0 6/93 – .
4. Ge entech, Co-Inve tiga o (PI, M enst r, MD), A Ph se III, Multi Center, Doubl -Blind, Ra domiz d tud of th Sa ety and ff cacy of So at opin to Imp ove t e Short Stature As ocia ed with Chron c Renal Insuf iciency (U mia)". 8,800. 07/9 - 9 .
5. NIH, Co-Inves igato , ( .I. Lee Heb rt, MD mmune - Complex ediated Glomerulon ph itis in P mates. erform, pro ess and valuate histomor ho etry on prima e renal b psies; $8,905 (Co-Inve tigator dget . 6/9 - 5/94
6. NIH, Co-Inves igato , ( .I. Lee Heb rt, MD) Me ha ism of IgA N ph itis in hil ren and Adults. Recruit hil ren an a sist in na ysis of dis ase and cor elat on with co plement e ept r and C4 en type in ffected c ildren ad lts and un ffected s l ngs. $ 8,000 (Co-Inve tigator dget) 11/94 - 0/96
7. ational In ti utes of Heal h, RO1, Co-Inve ti ato (Y Y , PhD), Genetic A om lie of 4, R1, nd Fc?R in uvenil IgA-N" $ 51,23 , 0/94 o /97.
8. Roche, Co-Inve tiga o (PI, M enst r, MD), A tud of the Safety, To era ce, and ff cacy of L ng-Term Ther py with Mycop enolate Ma etil in P diatr c Renal A lograft Reci ents." 5,298. 06/9 -0 /98.
9. Upjohn, Co-Inve tiga o (PI, B Crom r, M ), "Th e fect of Depo- rovera, N rpl nt, nd oral contr cepti e ills on bone de sity in ad lescent rls". $ 45,000, 6/ 7–6 02.
10. Merck, Co-Inve tiga o (PI, D atis y, D), "An Op n-Lab l tudy to Inv sti ate the Pharmaco in tics of E al pril in Hype tensive hil ren and I nts." $44 936.00, 7/ 9-7 00.
11. ational In ti utes of Health, Co-Inves igato , (P. . Jam s Ch n, MD), " linic l tud of IgA Nep rop thy and Vit min E." $20,000 (Co-Inve tigator dget). Overal budget $ 25,0 0 8/97 10 00.
12. Abbott Labor tories, Co-Inve tiga o (PI, D atis y, MD), A Ph se III, Pros ective, Placebo-Con rolled, Doubl -Blind, Ran omized, Mult -Cent r tudy to D ter ine th Sa ety and ff cacy of al ijex in De reasi g Seru Intact Par thyroid Hormon L vels in P dia ric E d Sta e Renal Disease at ents on Hemodi lysis." ,732. 09/9 -01 00.
13. Park -Davis, Co-Inve tiga o (PI, D atis y, D), "An 8-week, Doubl -Blind, Placebo-Con rolled, arall l Gro p tudy to D ter ine th Sa ety and ff cacy of Q in pril in P diatric atie ts with Hypert sion." 1,500. 10/9 12/ 1.
14. Park -Davis, Co-Inve tiga o (PI, D atis y, MD), A tud of the Pharmaco in tics of Q in pril in P diatric atie ts With Hyper ension" $24 000.00. 11/9 -12 00.
15. Merck, Co-Inve tiga o (PI, D atis y, D), "An Op n-Lab l tudy to Inv sti ate the Pharmaco in tics of Li in pril in Hype tensive hil ren and nfants" 1,602. 3/ 0-1 /01
16. Merck, Co-Inve tiga o (PI, D atis y, MD), "A Doubl - Blind Ra domized Dose- espon e tudy of Li in pril in hild en With Hyper ension" 4,090. 3/0 12/ 1.
17. Bayer, Co-Inve tiga o (PI, K oran i, MD), "A Pros ective, Ope -Label, Non-Ran omized, Natur listic, L ng-Ter Safety Surve lance. Obser ation l tudy of Cipro lo aci in the T ea ment of P diatric atie ts with In ectious Di oses. 38,412. 05/0 -09 21.
18. AMGEN, Co-Inve tiga o (PI, D atis y, D), "An Ope -Label, Ran omized, Non-Inf riori y tudy f Novel Eryth poiesis Sti ulating Protei NESP) & Rec mbina t Human Erythr poietin ( -Hu PO) for the T ea ment o A emia in P diatric ubje ts it CRI or ESRD R ceiving Di ysis." 2,968. 10/ -9/ 1.
19. Astr Zeneca. Co-Inve tiga o (PI, D atis y, MD), "A 6-week, Mult ce ter, L tudy to D ter ine the Safety, Tole abi ity and Pharmaco in tics of T prol-XL Extended Release Ta lets in Hype tensive P diatric Su ects." $7 ,100.00 5/0 -12 05.
20. Astr Zeneca, Co-Inve tiga o (PI, D atis y, MD), "A 4-week, Mult cen er, DB, Placebo-Con rolled, Ran omized, Parall l-Gro p tudy to D ter ine the Antihype tens ve Dos Range, E ficacy Sa ety and Tole ab lity of T prol-XL Extended Release Ta lets in Hype tensive P diatric Su ects." $79 00.00. 5/0 -12 05.
1. King Pharmace ticals, C0-Inve tiga o (PI, D atis y, MD), "A Dose Esc lation, Ra do ized DB Wi hdraw l tud of the E ficacy, Dose- spo se an S fety of ami ril for the T ea ment of Hype te sion in hil ren and Adol cents. $75 00.00. 2/0 - 12 05.
22. ational In ti utes of Health, Co-Inves igato , (P I. Rick Kask l, MD), "T ea ment of FSGS in hil ren a d Young ults." $16,000 (Co-Inve tigator udget). $1, 00,00 , 12/03 12/06.

2 . Nation l Institut s f Healt , Co-Investigato , (P. . Sus n Furt , MD , "Prospecti e Stu y f Chron c Kidn y Disea e n Childr n (CK D Study) $20,0 0 (Co-Investigat r Budget . $2,000,00 , 6/ 4 - 5/0 .

2 . Nation l Institut s f Healt , Co-Investigato , (P. . Krist n Bergslan , PhD , "Uri e Cryst l Inhibiti n n Pediatr c Nephrolithiasis " $14,1 0 (Co-Investigat r Budget , $450,00 , 2/ 5 - 2/0 .

2 . AP D Speci l Projec s Gran , Co-Investigato , (P. . Shil a Sangva , MD , "Comput r Bas d Instructi n f r Inju y Preventi n Educati n n Pediatr c Residents " $10,000 , 1/07-12/0 .

2 . Nation l Institut s f Healt , Co-Investigat r (P. . Willi m Smoyer/Lar y Greenbau , MD , "T e natur l histo y f glomerul r disea e n childr n a d you g adul s (CureGN) $4,000,000 , 1/1/14-12/31/1 .

2 . Genentec , Co-Investigat r (P. . Willi m Smoye , MD , "T e RA P stud : Rituxim b vers s mycophenola e f r freque t relapsing/stero d depende t nephrot c syndro e n children " $1,800,000 , 6/1/14-5/31/1

2 . Nation l Institut s f Healt , Co-Investigat r (P. . Sus n Crear , MD . "SCTawar : A Comprehensi e Progr m o Increa e Sick e Ce l Tra t Knowled e a d Awarene s Amo g Paren s f Infan s Identifi d y Newbo n Screening " $200,00 , 4/1/19-4/1/ 1

2 . Arno d P Go d Foundatio , C0-Investigat r (P. . Ashl y Fernande , M , PhD . "Developme t a d disseminati n f nov l pediatr c reside t te m bas d learni g bioethi s curriculum " $25,00 . 7/1/19-6/30/2

3 . Nation l Institut s f Healt , Co-Investigat r (P. . Willi m Smoyer/Lar y Greenbau , MD , "T e natur l histo y f glomerul r disea e n childr n a d you g adul s (CureGN) $4,000,000 , 6/1/ 0 - 12/31/2

**Program Development**

1. Pediatric Education in Community Settings. 1996-present. With Drs. MK Kuzma, L Budin and W Long – an innovative program that incorporates pediatric residents into community pediatrician offices for longitudinal office practice education.
2. Medical Students for Kids. 2003-present – a program that engages 20-30 first year OSU medical students each year in a 6-8 month tutoring relationship with a 2nd -5th grade school child in an underserved Columbus City School.
3. MidWest Pediatric Nephrology Consortium. 2003-present. With Drs. WE Smoyer, T Mattoo and D Geary – an organization devoted to promoting collaborative research and development of junior faculty in pediatric nephrology that now includes 36 centers, mostly in Midwest of US.
4. Residents in Schools Initiative. 2004-present. With Dr. MK Kuzma – a novel program that involves pediatric residents in providing health education to 2nd-4th grade school children in underserved Columbus City Schools.
5. Pediatric Resident TEAM Project. 2007 – 2013. With Drs. S Holliday, R Donthi, JT Davis, R McClead and J Thackeray – a 3-year longitudinal leadership and personal skills development program for pediatric and medicine-pediatric residents.
6. OSU COM Center for Education and Scholarship Medical Education Consultation Program. 2010-2013 – program that provides consultation for medical education scholarship and program development to faculty of the OSU COM.
7. American Society of Pediatric Nephrology Pediatric Dialysis Essentials Medical Knowledge Competency Assessment Program. 2011- present – a competency assessment of medical knowledge for pediatric nephrology fellows linked to the Annual Pediatric Dialysis Course conducted as part of the Annual Dialysis Conference.
8. Faculty Development for Medical Educators [FD4ME]. 2011-present. With Dr C Ledford, L Hurtubise and L Mauger – an innovative interactive online faculty development program that offers effective education and CME credit for medical educators in areas of teaching, learning and leadership development.
9. American Society of Pediatric Nephrology Leadership Development Program. 2011- present. With Drs. J Flynn and W Schnaper – a 12-month longitudinal leadership development program, conducted every other year, designed to train the next generation of leaders for the ASPN.
10. American Society of Pediatric Nephrology Pediatric Nephrology Board Review Course. 2011- present. With Dr. L Feld – a onsite and online board review course for the American Board of Pediatrics Pediatric Nephrology Certifying Examination provided every two years beginning in October 2011.
11. APPD Board Examination Simulation Exercise for Pediatric Residents. 2011-present. With Drs. K Smith, M Hormann and K Boland – a multi-institutional program to promote effective board review for pediatric residents based on cooperative team-based learning principles.
12. NCH Pediatric Resident Team-Based Learning Biomedical Ethics Program. 2016-present. With Drs. Ashely Fernades, Sandra Spencer, Stephanie Lauden – a TBL based biomedical ethics education program for pediatric residents with expansion to other pediatric residency programs in Ohio and other primary care residency programs in Ohio.
13. NCH Advanced Competency in Education (ACE) Program. ACE's in Research, Advocacy, Medical Education, Global Health and Ethics certificate programs developed to provide competency-based education to pediatric residents based on their decision to pursue specific additional training, with focus on career preparation.
14. NCH Center for Faculty Development Educator Essentials Program. 2020-present. With Drs Rebecca Wallihan and Kim Bjorklund – the 6 month longitudinal cohort program for junior faculty and senior fellows focuses of perquisite knowledge and skills needed for clinical educators and includes a mentored curriculum development project for each participating scholar.

**Hospital/University Committees**

**Past**

| | |
|---|---|
| Member, Pediatric Academic Association Exec Committee | 1985 - 1990 |
| Chair, Pediatric Academic Association CHPB Sub-Committee | 1985 - 1995 |
| Secretary, Pediatric Academic Association | 1985 - 1988 |
| Member, OSU Dept of Pediatrics Fellowship Committee | 1986 - 1996 |
| Chair, Nationwide Children's Hospital Medical Staff Library Committee | 1990 - 2010 |
| Member, OSU Dept Pediatrics Post-MD Education Committee | 1986 - 2016 |
| Member, Children's Hospital Board of Trustee Facilities Committee | 1987 - 1995 |
| Member, Children's Hospital Medical Staff Information Committee | 1988 - 1992 |
| Chair, OSU Dept of Pediatrics Post-MD Education Committee | 1990 - 2016 |
| President, Pediatric Academic Association | 1988 - 1990 |
| Member, NCH, Resource Center Task Force | 1989 - 1991 |

| | |
|---|---|
| Member, NCH, Collaborative Practice Committee | 1991 - 1994 |
| Member, OSU College of Medicine Library Committee | 1994 - 2006 |
| Member, OSU Graduate Medical Education Committee | 1995 - 1998 |
| Chair, OSU Dept of Pediatrics, Pediatric Education in Community Settings, Steering Committee | 1996 - 1998 |
| Member, OSU Dept of Pediatrics, Chairman's Advisory Board | 1996 - 2004 |
| Member, NCH Education Foundation Executive Committee | 1997 - 1999 |
| Chair, OSU College of Medicine, Ambulatory Teaching Conference Committee | 1997 - 2001 |
| Member, OSU College of Medicine, 2006 Curriculum Committee | 1998 - 2000 |
| Member, OSU Departmental Teaching Excellence Award Committee | 1999 - 2001 |
| Member, NCH Faculty Development Committee | 1999 - 2019 |
| Member, NCH Medication Quality Team | 2000 - 2012 |
| Member, NCH Family Education Team | 2000 - 2005 |
| Chair, OSU College of Medicine,Health Sciences Library Committee | 2002 - 2003 |
| Member, OSU COM Dean's GME Evaluation Task Force | 2006 - 2007 |
| Chair, NCH Faculty Development Committee | 2006 - 2011 |
| Member, OSU COM Professionalism Council | 2006 - 2015 |
| Member, CH CHCA Collaborative Study Group | 2007 - 2012 |
| Chair, NCH Pediatric Program Directors Committee | 2008- 2019 |
| Chair, OSU COM LSI Faculty Development & Recruitment Committee | 2010 - 2013 |
| Chair, OSU COM FAME Education Committee | 2011-2020 |
| Director of Competence for Professionalism (LSI) OSU COM | 2016-2019 |

**Present**

| | |
|---|---|
| Member, Nationwide Children's Hospital Medical Staff Library Committee | 1986 - present |
| Member, NCH Graduate Medical Education Committee | 1994 - present |
| Member, OSU Department Pediatrics Pre-MD Education Committee | 1995 - present |
| Member, CH GME Executive Committee | 2006 - present |
| Member, OSU Department of Pediatrics Promotion and Tenure Committee | 2008- present |
| Chair, OSU COM FD4ME (Faculty Development for Medical Educators) Editorial Board | 2010-present |
| Member, OSU College Educational Leadership Team (CELT) | 2010-present |

**<u>National Professional Organizations/Committees</u>**

**Past**

| | |
|---|---|
| Member, Am Society of Pediatric Nephrology (ASPN) Education Committee | 1992 - 1994 |
| Member, American Society of Nephrology (ASN), Quality Assessment, Nephrology Training Programs | 1994 - 1995 |
| Co-Chair, ASPN Program Directors Committee | 1994 - 1995 |
| Co-Chair, Association of Pediatric Program Directors APPD) Mid-America Program Directors Regional Group | 1995 - 2005 |
| Member, SPR Multicenter Clinical Studies Committee | 1998 - 2002 |
| Member, Pfizer Children's Hospitals Advisory Council | 1999 - 2003 |
| Member, (NCH OPTN/UNOS Representative) UNOS Region 10 | 2000 - 2011 |
| Chair, APPD Learning Technology Task Force | 2001 - 2005 |
| Member, APPD Learning Technology Task Force | 2005 - 2010 |
| Member, APPD Board of Directors | 2002 - 2005 |
| Member, Genentech CRI Advisory Board | 2002 – 2008 |
| Member, Pediatric Academic Society Scientific Meeting Planning Committee | 2004 - 2006 |
| Member, ASPN, Audit Committee | 2004 - 2008 |
| Member, NIH FSGS Trial, Recruitment and Retention Committee | 2004 - 2008 |
| Member, American Academy of Pediatrics (AAP) Pedialink Resident Center Committee | 2004 - 2014 |
| Member, Editorial Board of *Pediatric Nephrology* | 2005 - 2009 |
| Co-Chair, ASPN, Training and Certification Committee | 2008 - 2010 |
| Member, AAP Pedialink Pediatric Fellow Center Committee | 2006 - 2014 |
| Member, AAP Pediatric Nephrology PREP Self-Assessment Committee | 2007 - 2014 |
| Member, ASPN Council | 2008 - 2012 |
| Co-Chair, AAP Pedialink Pediatric Fellow Center Committee | 2007 - 2010 |
| Co-Chair, AAP Pedialink Pediatric Resident Center Committee | 2008 – 2014 |
| Member, ASPN Website Committee | 2009 – 2012 |

| | |
|---|---|
| Member, International Society of Nephrology (ISN) – International Pediatric Nephrology Association (IPNA) Transition Process Working Group | 2010 – 2012 |
| Chair, IPNA Teaching Course Committee | 2017 – 2019 |
| Member, IPNA Patient/Family Education Resources Committee | 2017 – 2019 |

**Present**

| | |
|---|---|
| Member, Society for Pediatric Research (SPR) | 1995 - present |
| Co-Chair, MidWest Pediatric Nephrology Consortium (MWPNC) Steering Committee | 2003 – present |
| Chair, MWPNC Protocol Review Committee | 2003 - present |
| Member, NIH CKID, Growth Studies Sub-Committee | 2004 - present |
| Member, ASPN, Training and Certification Committee | 2005 - present |
| Co-Chair, ASPN, Training & Certification, Fellowship Program Directors Sub-Committee | 2007 - present |
| Member, ASPN Education Task Force | 2009 – present |
| Member, ASN Training Program Directors Committee | 2009 – present |
| Co-Chair, ASPN Leadership Development Program Committee | 2010 – present |
| Member, ASN Training Program Directors Executive Committee | 2010 - present |
| Co-Chair, ASPN Board Review Course Committee | 2010 – present |
| Co-Chair, Federation of Pediatric Organizations Workforce of Future Project Training Committee | 2012 – present |
| Member, AAP Pedialink Editorial Board | 2012 - present |
| Member, APPD Faculty Development Task Force | 2012 - present |
| Co-Chair, APPD Faculty Development Task Force Educator Development Sub-Committee | 2014 – present |
| Deputy Editor, *Teaching and Learning in Medicine* | 2014 - present |
| Co-Chair, Central Group on Educational Affairs (CGEA) Faculty Development Special Interest Group | 2014 – present |
| Co-Chair, Pediatric Resident Burnout – Resilience Study Consortium Steering Committee | 2015 - present |
| Chair, AAP Pedialink Editorial Board | 2016 - present |
| Secretary-Treasurer, APPD Board | 2016 – present |
| Member, IPNA Council | 2016 – present |
| Co-Chair, IPNA Professional Education Committee | 2019 – present |
| Chair, IPNA Teaching Courses Sub-Committee | 2019 - present |
| Chair, CureGN Recruitment & Retention Committee – Retention QI Team | 2019 - present |
| President, Pediatric Nephrology Research Consortium Board of Directors | 2019 - present |

**Community Boards/Organizations**

**Past**

| | |
|---|---|
| Board Member, Progeny | 1995 - 2012 |
| Chair, Medical Advisory Board, Research Committee The National Kidney Foundation – Ohio | 1996 - 1999 |
| Board Member, Communities in Schools/Columbus | 1999 - 2016 |
| Chair, Medical Advisory Board, NKF Ohio | 2000 - 2015 |
| Vice-President, Communities in Schools/Columbus | 2002 - 2005 |
| Vice President, National Kidney Foundation - Ohio | 2003 - 2005 |
| President, National Kidney Foundation – Ohio | 2005 – 2007 |
| President, Communities in Schools/Columbus | 2007 – 2016 |

**Present**

| | |
|---|---|
| Member, Medical Advisory Board, The National Kidney Foundation - Ohio | 1991 - present |
| Board Member, National Kidney Foundation – Ohio | 1999 - present |

**Publ cat ons**

**Mon ph and Ch pte s**

1 Ch sney RW D Luca F, abb gh , Mahan J , Kim YK: it min D metabo ism in lo gstandin ne hrotic yndro e and chronic nal insufficien y. In Proc edings of the Sixth Int rnational ediatric N hrology Symp sium. N therlan s, Martinus Nijho P blish rs, l984.

2. ahan JD, Fal on S, triegel JE, Kim YK, Ch sney RW: Hi tologic r sponse in pedi tric st odystroph (RO ) to treatm nt ith l,25(OH)2 an 24,24(OH)2D . In: Proc edings f the Sixt Vitami D orks p (Norm n AW, ed). Berl d Gruyt r, l98 .

3. aha JD and Vernie RL: The ongenital nep rotic syn rome. In: ediatric ep rology Ho liday B Ba ratt , Vernier L, eds). Bal imore, illi m and Wil ins C p 57-46 , l 86.

4. Mahan J , H yer JA, Verni r RL: Th N phr tic S ndro e n the irs yea of life. In: Th Nephrot c S ndrome ( ame on JS Gla sock J, eds . New Yor arcel De ker C 401- 22, 1988.

5 Ma an JD, Men se , M : Eva uati n of the chi with prote nu ia. Proc edings of edi tri N phrolo y XIV and XV Ann al Meeti s, ami, F orida. In: Grow h I munos ppression an Renal D sor ers in Ne ates and Ch ldr n. ( tra ss J, ed) ia i FL, Univer i y of Mia i Pre , 353- 68, 1989.

6. Mahan JD, Cromer B: Lo g- erm consequenc s f hyperc lci ria in child en and adol sc nts. Proc edings of edi tri N phrolo y XIV and XV Ann al Meeti s, ami, F orida. In: Grow h I munos ppression an Renal D sor ers in Ne nates an C ild en. ( tra ss J, ed) ia i FL, Univer i y of Mia i Pre , 319-3 6, 989.

7. iegel E , M han J , Joh son RS: Solid O ga Transplanta ion in Adole cen s: he Bl ssi g and the urse In: dolesce t M dicine, C ronic and isabli g isorder . ( inda C elfus, d) H n ey & Bel us, I , 293- 09, 1994.

8. ah n J : Man geme t of the c ild with ongenital nep rotic syn rome. In: Pediatric R nal Tra spl ntat on Teja i A , Fin RN, eds) N w York, Wi ey-Li , 369- 86, 199 .

9. aha JD, van S tt n P , M Allist r C, an den euve LPWJ, Mo nens LAH: E fe t of Vero oxi -1 on v ability a d rotei synthesis of human lomerular c pillar end thelia cells. In Recent Advances in V rocytoxin-p oduc ng Escheri hia Coli Inf ctions (Ka mali MA, Gogl o AG, e s) l evier Sc ence , p 325-328 19 4.

1 . M ntser MI, Maha JD: Renal Fai ure. In Pedi tric Ur logy, Thir E itio (O Donn ll B, off SA, ds) Oxford England, Bu t rworth-H inema , p 260-2 0, 997.

1. ahan JD Tu an MA, Men se MI. Eval ation of He atu ia, Proteinu ia and Hyperten on n Adolesc nts. I : Pediatr c Clinics N A erica 4:1 73-15 0, 97.

12 Mah n JD: Tu ning you Ped atric Pa ients i o T aching P ints. O U Clinica Tea hin Handboo . In: T e Clinica Te chin Hand ok. OSU C M, 00.

13 Mah n JD: De ling with Dif icult Stu ents Th Sl w, the Ru an th Uncarin . In: T e Clinica Tea hing Handb k. OSU COM 2 00.

4. atisk D, Ma an JD: Rena Ve ous Th o bosis. n: Gell s & Kegan s Curre t Pedi tr c Th rapy Vo ume 1 ( d. Burg , olin R, Ger ho , Ingelf nger p 792-79 , 002

15. Tur n MA nd Maha JD. Renal Sys em. In: Adolesc nt M dicine e ret (ed. Holl nd C an Br wn RA Cha ter 1 , 2 3.

16. ahan J . Hemoly c U emic Syn rome. In Clinical P diatri Nephro ogy, Seco d e ition (e . K er KK, Schn per HW, Mak er SP), ndover UK, Thompson ublishi g S r ices, Ch pter , p 235-2 4, 07.

17 Mah n JD: Tu ning you Ped atric Pa ients i o T ach ng Point . In: T e Clinica Teach ng Handb k, econd e it on. OSU ollege o Me i ine, C lumbu OH, p 94- 8, 07.

18 Mah n JD: De ling with Dif icult Stu ents Th Sl w, the Ru an th Uncarin . In: T e Clinica Teach ng Handb k, econd e it on. OSU ollege o Me i ine, Col mbus , p 132-135, 2007.

19. Bat sky DL. Robi son RF, M han D. Treat en of Child ood Hypertens n. n: Comprehen ive Pedia ric Nephro ogy ed. G ar DF and Scha fer F), M sby Elsev er, Philadel hia PA, Cha ter 4 , p 677- 94, 2 8.

20. M ad M, Torni hi S, M han D. Chr nic R nal Dise e. In: Behavi ral Approa he to Chr nic Dis as in Adolesc nce ed. O'Don hu WT and T lle W), Spri ger 2 .

21. M han JD. Gr wth Horm ne. In: Text oo of Nephro-Endocrino ogy ed. S ngh AK, Will ams H), Acad mic Pr ss, San D ego CA, Cha ter 2 , p 409- 26, 2 9.

22. M han D. Nephro ogy and Urol y. In: Ne son Essent al of Pediat ics 6th Editi n), Saund rs, Philadelp ia, Chap ers 161- 6 , p 607- 21, 2

23. M han D. Chr nic Ki ney Dise e. In: Clinici n's Ma ua of Pedia ric Nephrol gy, W rld Scienti ic, Singap re, Cha ter 37 p. 487- 04, 2 1.

24. Fe ris ME, Fe ris MT, V al C, Ste art HD, Fe to N, Habe ma C, Igl sia GA, Han ock LE, Har ard DH, Gille ki D, O' ei J, Impe ia R K Z, Be ton MH, oa M, Bick or K, Detwe le R, Andr on K, M han JD, S it Z, Ho pe S, Gi so K. The Self-Manage ent and Transition-to-Adult ood pro ra at the Univer it of N rth Carol na: Les ons lea ned and s ill learni ). In: Transi ion rom Pedia ri to A ult Med cal are e . D W od JG Re ss ME Fe ri et l), ova Sci nce Publish rs, Cha ter 24 p. 297- 0.

25. M han JD, P te H. Nephro ogy and Urol y. In: Ne son Essent al of Pediat ics 7th Editi n), Saund rs, Philadelp ia, Chap ers 161- 6 , p 618- 44, 2

26. el LG and M ha JD (Edito ). Succ nct Pediatr cs. oo 1. Evalua ion and Manage en of Co mon and Crit cal C re. Amer can Aca em of Pediat ics Elk G ove IL, 2 5.

27. el LG and M ha JD (Edito ). Succ nct Pediatr cs. oo 2. Evalua ion and Manage en of Infect ous Dis ase and Dematol gic Disord rs. Amer can Aca em of Pediat ics Elk G ove IL, 2 7.

28. M han JD. A oob A. Gr wth Horm ne. In: Text oo of Nephro-Endocrino ogy ed. S ngh AK, Will ams H), Acad mic Pr ss, San D ego CA, Cha ter 2 , p 259- 76, 2 7.

29. el LG and M ha JD (Edito ). Succ nct Pediatr cs. oo 3. Evalua ion and Manage ent for Newb rn, Gene ic, Neurolo ic, and Developmental-Behavi ral Disord rs. Amer can Aca em of Pediat ics Elk G ove IL, 2 8.

30. M han D. Nephro ogy and Urol y. In: Ne son Essent al of Pediat ics 8th Editi n), Internati nal Edit on, Saund rs, Philadelp ia, Chap ers 161- 6 , p 617- 37, 2

**Inv ted Revi s:**

1. Wa ler KV, ar K, M han JD, Wim att DK: Cur ent conc pt in proteinu ia. lin C m. 35:755- 65, 1 9.

2. Fren hko CE, ard KM, M han JD: The ol of the labora or in the detec io of diab tic nephropa y. ech Sa pl A m So of lin Pathologi ts, -6, 1 .

3. Eic ner ER, Pai te P, M han JD, Zambr sk E: The kid ey, exer ise and hydrat on. Sp rts Sci nce Exch nge Roundt ble Vo 5, No 3, 1 4.

4. Frie ma A, M han JD, lo U: Edit s. Proceed ng of the Amer can Soc et of Pedia ric Nephro ogy 993 Educa ion Sympos m. Vesicouret ral re lux and intersti ial inj y. Ped atr Nep rol 8:632- 40, 1 4.

5. M han JD, Bat sky L. Pedia ric Hypertens n. 999 Cen ral hio Pedia ric Soc ety Supplem n , p 12, 1 9.

6. Bat sky DL, M han D. Experie ce in Clin cal Tri s. 000 Cen ral hio Pedia ric Soc ety Supplem n , p 30, 2 0.

7. Robi son RF, Na ata MC, M han JD, Bat sky DL: Manage en of Nephr tic Synd om in Child en. Pharmacothe apy 23(8):1021 36, 2 .

**E-Learning Modules:**

1. Mahan JD. Dealing with the Difficult Learner (2012). OSU COM FD4ME. Faculty Development for Medical Educators. http://FD4ME.osu.edu

2. Stein D, Mahan JD. Adult Learners: Practices and Premises (2013). OSU COM FD4ME. Faculty Development for Medical Educators. http://FD4ME.osu.edu

3. Ellison CE, Mahan JD. Mentoring I: Mentoring relationships – an overview. (2015) OSU COM FD4ME. Faculty Development for Medical Educators. http://FD4ME.osu.edu

4. Kassis KL, Mahan JD. Mentoring II: Mentoring for the mentor in academic medicine. (2015) OSU COM FD4ME. Faculty Development for Medical Educators. http://FD4ME.osu.edu

5. Kassis KL, Mahan JD. Mentoring III: Mentoring for the mentee in academic medicine. (2015) OSU COM FD4ME. Faculty Development for Medical Educators. http://FD4ME.osu.edu

**Articles Published or Accepted (~ student, resident or fellow)**

1. Vernier RL, Klein DJ, Sisson SP, Mahan JD, Oegema TE, Brown DM: Heparin sulfate rich amnionic sites in the human glomerular basement membrane: Decreased concentration in congenital nephrotic syndrome. N Eng J Med 309:1001, 1983.

2. Mahan JD, Mauer SM, Nevins TE: The Hickman catheter: A new dialysis device for small children. Kidney Int 24:694, 1983.

3. Mahan JD, Mauer SM, Sibley RK, Vernier RL: Congenital Nephrotic Syndrome - The evolution of medical management and results of renal transplantation. J Pediatrics 105:549, 1984.

4. ~So SKS, Mahan JD, Mauer SM, Sutherland DER, Nevins TE: Hickman catheter for pediatric hemodialysis: A 3-year experience. Trans Am Soc Artif Intern Organs 30:610, 1984.

5. Fowler, A., Mahan JD, Nevins TE: The Hickman catheter - Today's Vascular access for pediatric hemodialysis. Am Neph Nurs Asso J 12:36, 1984.

6. Sibley RK, Mahan JD, Mauer SM, Vernier RL: A clinicopathologic study of forty-eight infants with nephrotic syndrome. Kidney Int 27:544-552, 1985.

7. Zager RA, Mahan JD, Merola AJ: Effects of mannitol on the post-ischemic kidney: Biochemical, functional and morphologic assessments. Lab Invest 53:433, 1985.

8. Chesney RW, Mehls O, Anast CS, Brown E, Hammerman MR, Portale A, Fallon MD, Mahan JD, Alfrey AC: Renal osteodystrophy in children: The role of Vitamin D, phosphorous and parathyroid hormone. Am J Kidney Dis 7:275-284, 1986.

9. Day DL, Scheinman JI, Mahan JD: Radiological aspects of primary hyperoxaluria. Am J Radiol 146:395, 1986.

10. Shore RM, Koff SA, Hayes JR, Smith SP, Mentser M, Mahan JD: Glomerular filtration rate in children: Validation and longitudinal use of determination for the $^{99m}$Tc DTPA renogram. Am J Kidney Dis 8:170-180, 1986.

11. Mahan JD, Sisson-Ross S, Vernier RL: Glomerular basement membrane anionic charge site changes early in aminoneucleoside nephrosis. Am J Path 125:393-401, 1986.

12. Cosio FG, Innes JT, Nahman NS, Mahan JD, Ferguson RM: Combined nephrotoxic effects of cyclosporine and endotoxin. Transplantation 44:425-428, 1987.

13. Davies KE, Patterson MN, Kenwrick SL, Bell MV, Sloan HR, Westman JA, Elsas LJ II, Mahan JD: Fine mapping of glycerol kinase deficiency and congenital adrenal hypoplasia within Xp21 on the short arm of the human X chromosome. Am J Med Genetics 29:557-564, 1988.

14. ~Nahman NS, Cosio FG, Mahan JD, Henry ML, Ferguson RM: Cyclosporine nephrotoxicity in spontaneously hypertensive rats. Transplantation 45: 768-772, 1988.

15. Mahan JD, Sisson Ross S, Vernier RL: Anionic sites in the human kidney: Ex-vivo perfusion studies. Modern Pathology 2:117-125, 1989.

16. ~Seifert-McLean C, Cromer BA, Mosher G, Mahan JD: Urinary calcium excretion in healthy adolescents. Journal of Adolescent Health Care, 10:300-304, 1989.

17. ~Waller KV, Ward K, Mahan JD, Wimsa HD: Current concepts in proteinuria. Clin Chem. 35:755-765, 1989.

18. Hamoudi AC, Mahan JD, Westman JA, Sommer AM: 4 (del p) syndrome and cytomegalovirus. J Pedi Pathol, 9:231-2, 1989.

19. Cosio FG, Sedmak D.D., Mahan JD, Nahman NS: Localization of decay-accelerating factor in normal and diseased human kidney tissue. Kidney Int, 36:100-107, 1989.

20. Cosio FG, Mahan JD, Sedmak DD: Experimental glomerulonephritis induced by antigen that binds glomerular fibronectin. Am J Kid Dis, 15:160-168, 1990.

21. Wysocki T, Herr R, Fryar M, McGlone C, Smith B, Dyas M, Monda K, Coburn T, Mahan JD and Mentser M: Behavior modification in pediatric hemodialysis. Am Neph Nurses Asso, 17:250-254, 1990.

22. ~Frenchko CE, Ward KM, Mahan JD: The role of the laboratory in the detection of diabetic nephropathy. Tech Sample Am Soc of Clin Pathologists, 1-6, 1990.

23. Hebert LA, Cosio FG, Birmingham DJ, Mahan JD, Sharma HM, Smead WL, Goel R: Experimental immune complex-mediated glomerulonephritis in the nonhuman primate. Kidney Int, 39:44-56, 1991.

24. ~Sentipal JM, Wardlaw GM, Mahan JD, Matovic V: Influence of calcium intake and growth indexes on vertebral bone mineral density in young females. Am J Clin Nutr, 54:425-428, 1991.

25. ~Southard RN, Morris JD, Mahan JD, Hayes JR, Torch MA, Sommer A, Zipf WB: Bone mass in health children: Measurement with quantitative DXA. Radiology 179:735-738, 1991.

26. Cosio FG, Bakaletz AP, Mahan JD: Role of precipitating and nonprecipitating antibodies in glomerular immune complex formation. Kidney Int, 37:1429-1437, 1991.

27. Hebert LA, Cosio FG, Birmingham DJ, Mahan JD: Biological significance of the erythrocyte complement receptor: A Primate perquisite. J Lab and Clin Med 118:301-308, 1991.

28. ~Paap CM, Nahata MC, Mentser MI, Mahan JD, Puri SK, Hubbard JW: Pharmacokinetics of cefotaxime and its active metabolite in children with renal dysfunction. Anti Agents & Chemo 35: 1879-83, 1991.

29. ~Paap CM, Nahata MC, Mentser MI, Mahan JD, Puri SK, Hubbard Ja: Cefotaxime and metabolite disposition in two pediatric continuous ambulatory peritoneal dialysis patients. Annals of Pharmacotherapy 26:341-343, 1992

30. Mahan JD, Hebert LA, Birmingham DJ, Cosio FG. Platelet involvement in experimental immune complex mediated glomerulonephritis in the nonhuman primate. Kidney Int 44:716-725, 1993.

31. Hebert LA, Birmingham D, Mahan JD, Cosio FG, Shen XP, Dillon J: Effect of chronically increased erythrocyte complement receptor on immune complex nephritis. Kidney Int. 45: 493-499, 1994.

32. Mentser M, Mahan JD, Koff S: Multicystic dysplastic kidney. Ped Neph 8:113-115, 1994.

33. ~Ward K, Mahan JD, Sherman W: Aerobic training and diabetic nephropathy in the obese zucker rat. Annals of Clinical and Lab Science 24: 266-277, 1994.

34. Mahan JD, Mentser MI, Koff SA: Complications of intestinal augmentation and substitution cystoplasty. Ped Neph 8: 505-507, 1994.

35. ~Hajinazarian M, Cosio FG, Nahman NS, Mahan JD: Angiotensin-converting enzyme inhibition partially prevents diabetic organomegaly. Am J Kidney Dis 23: 105-117, 1994.

36. ~Albright AL, Mahan JD, Ward KM, Sherman WM, Roehrig KL, Kirby TE: Diabetic nephropathy in an aerobically trained rat model of diabetes. Medicine and Science in Sports and Exercise: 1270-1277, 1995.

37. Mentser MI, Mahan JD, Koff S: Contemporary approaches to renovascular hypertension in children. Ped Neph 9: 386-388, 1995.

38. Cromer BA, Blair JM, Mahan JD, Zibners L, Naumovski Z: A prospective comparison of bone density in adolescent girls receiving depot medroxyprogesterone acetate (Depo-Provera), levonorgestrel (Norplant)or oral contraceptives. J Pediatr 129:671-676, 1996.

39. ~Van Setten PA, Van Hinsbergh VWM, Van der Velden TJAN, Van de Kar NCAJ, Verneer M, Mahan JD, Dijkman HBPM, Van der Heuvel LPWJ, Monnens LAH: Effects of TNF alpha on verocytotoxin cytotoxicity in purified human glomerular microvascular endothelial cells. Kidney Int 51(4):1245-1256, 1997.

40. Hebert LA, Birmingham DJ, Mahan JD, Cosio FG, Dillon JJ, Sedmak DD, Shen XP, McAllister C. Effect of enalapril therapy on glomerular accumulation of immune complexes and mesangial matrix in experimental glomerulonephritis in the nonhuman primate. Am J Kidney Dis 30(2):243-252, 1997.

41. Ward-Cook KM, Mahan JD, Frenchko CE, Albright A, Chiasera JM, McAllister C. Anionic charge sites in the kidney: a comparison of two diabetic rat models. Ann of Clin and Lab Science 29:286-298, 1999.

42. ~Tallian KB, Nahata MC, Turman MA, Mahan JD, Hayes JR, Mentser MI. Efficacy of amlodipine in pediatric patients with hypertension. Ped Nephrol 13:304-310, 1999.

43. Hebert LA, Agarwal G, Sedmak DD, Mahan JD, Becker W, Nagaraja HN. Proximal tubular epithelial hyperplasia in patients with chronic glomerular proteinuria. Kidney International 57: 1962-1967, 2000.

44. ~McCarthy DW, Mutabagani K, Mahan JD, Caniano D, Cooney DR. Infarction of the choledochus, liver, gallbladder and pancreas: a unique complication of the hemolytic uremic syndrome. J of Pediatric Surg 35:502-504, 2000.

45. Hebert LA, Agarwell G, Sedmak DD, Mahan JD, Becker W, Nagaraja HN. Reply from authors. Proximal tubular epithelial hyperplasia in patients with chronic glomerular proteinuria. Kidney International 59: 384-385, 2001.

46. ~Robinson, R.F., Parker, M., Mahan, J.D., Nahata, M.C.. Amlodipine therapy in pediatric patients with hypertension. Journal of the American Pharmaceutical Association42:114-117, 2002.

47. Van Damme-Lombaerts R, Webb NA, Hoyer PF, Mahan J, Lemire J, Ettenger R, McMahon L, Cambon N, Boger R, Kovarik JM; Everolimus Study Group. Single-dose pharmacokinetics and tolerability of everolimus in stable pediatric renal transplant patients. Pediatr TransplantApr;6(2):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.

48. Kari JA, Bamashoumous H, Mahan JD: Steroid-sensitive nephrotic syndrome and juvenile idiopathic arthritis. Pediatr Nephrol Nov 17(11):957-6, 2002.

49. Hoyer PF, Ettenger R, Webb NJA, Lemire J, Mentser M, Mahan JD, Loirat C, Niaudet P, VanDamme-Lombaerts R, Offner G, Kovarik J, Somberg K: Safety, efficacy and steady-state pharmacokinetics of everolimus in pediatric de novo renal transplant patients. Transplantation Jun 27;75(12): 2082-2085, 2003.

50. Trachtman H, Frank R, Mahan JD, Portman R, Restaino I, Matoo TK, Tou C, Klibaner M: Clinical trial of extended-release in pediatric essential hypertension. Pediatr Nephrol 18:548-53, 2003.

51. Chan JC, Mahan JD, Trachtman H, Scheinman J, Flynn JT, Alon US, Lande MD, Weiss RA, Norkus EP: Vitamin E therapy in IgA nephropathy: a double-blind, placebo-controlled study. Pediatr Nephrol 18: 1015-9, 2003.

52. ~Meade, M. A., Creer, T. L., & Mahan, J. D. (2003). A self-management program for adolescents and children with renal transplantation. *Journal of Clinical Psychology in Medical Settings, 10*(3), 165-171.

53. ~Robinson RF, Batisky DL, Hayes JR, Nahata MC and Mahan JD. Body mass index in primary and secondary pediatric hypertension. Pediatric Nephrology 12:1379-1384, 2004.

54. ~Robinson RF, Casavant MJ, Nahata MC and Mahan JD. Metabolic bone disease after chronic antacid administration in an infant. Annals of Pharmacotherapy 38: 265-268, 2004.

55. ~Robinson RF, Griffith JR, Nahata MC, Mahan JD and Casavant MJ. Herbal weight-loss supplement misadventures per a regional poison center. Annals of Pharmacotherapy 38: 787-790, 2004.

56. Johnson CE, Hurtubise LC, Castrop J, Groner JA, French G, Ladinsky M, McLaughlin D, Plachta L and Mahan JD. Learning management systems: Technology to measure the medical knowledge competency of the ACGME. Medical Education 38: 599–608, 2004.

57. ~Robinson RF, Koranyi K, Mahan JD and Nahata MC. Increased frequency of acute mastoiditis in children. American Journal of Health System Pharmacy 61: 304, 306, 2004.

58. ~Robinson RF, Long LD and Mahan JD. Treatment of poor linear growth in a patient with osteogenesis imperfecta type III. Clinical Therapeutics 26: 1680-1683, 2004.

59. ~Robinson RF, Nahata MC, Hayes JR, Batisky DL, Bates CM and Mahan JD. Effectiveness of pretreatment in decreasing adverse events associated with pamidronate in children and adolescents. Pharmacotherapy 24: 195-197, 2004.

60. Goldstein SL, Somers MJ, Brophy PD, Bunchman TE, Baum M, Blowey D, Mahan JD, Flores FX, Fortenberry JD, Chua A, Alexander SR, Hackbarth R, Symons JM. The Prospective Pediatric Continuous Renal Replacement Therapy (ppCRRT) Registry: design, development and data assessed. Int J Artif Organs 27:9-14, 2004.

61. ~Robinson R, Nahata M, Mahan J, Casavant M. Potential heavy metal exposure from tiger tail cucumber (Holothuria thomas) envenomation. Vet Hum Toxicol. 46(4):225, 2004.

62. ~Robinson RF, Nahata MC, Sparks E, Daniels C, Batisky DL, Hayes JR, Mahan JD. Abnormal left ventricular mass and aortic distensibility in pediatric dialysis patients. Pediatr Nephrol 20:64-68, 2005.

63. ~Robinson RF, Batisky DL, Hayes JR, Nahata MC, Mahan JD. Significance of heritability in primary and secondary pediatric hypertension. Am J Hypertens. 18(7):917-21, 2005.

64. ~Robinson RF, Nahata MC, Batisky DL, Mahan JD. Pharmacologic treatment of chronic pediatric hypertension. Paediatr Drugs. 7(1):27-40, 2005.

65. Mahan JD, Warady BA and Consensus Committee. Assessment and Treatment of Short Stature in Pediatric Patients with Chronic Kidney Disease: A Consensus Statement. Ped Neph 21:917-30, 2006.

66. Mahan JD. Applying the Growth Failure in CKD Consensus Conference: Evaluation and treatment algorithm in children with chronic kidney disease. Growth Horm IGF Res. 16 Suppl A:S68-78, 2006.

67. ~Robinson RF, Morosco RS, Smith CV, Mahan JD. Stability of cefazolin sodium in four heparinized and non-heparinized dialysate solutions at 38 degrees C. Perit Dial Int. 26:593-7, 2006.

68. Flynn JT, Nahata MC, Mahan JD Jr, Portman RJ; PATH-2 Investigators. Population pharmacokinetics of amlodipine in hypertensive children and adolescents. J Clin Pharmacol. 46:905-16, 2006.

69. Symons JM, Chua AN, Somers MJ, Baum MA, Bunchman TE, Benfield MR, Brophy PD, Blowey D, Fortenberry JD, Chand D, Flores FX, Hackbarth R, Alexander SR, Mahan J, McBryde KD, Goldstein SL. Demographic characteristics of pediatric continuous renal replacement therapy: a report of the prospective pediatric continuous renal replacement therapy registry. Clin J Am Soc Nephrol 2:732-8, 2007.

70. Patel HP, Goldstein SL, Mahan JD, Smith B, Fried CB, Currier H, Flynn JT. A standard, noninvasive monitoring of hematocrit algorithm improves blood pressure control in pediatric hemodialysis patients. Clin J Am Soc Nephrol 2:252-7, 2007.

71. Hackbarth R, Bunchman TE, Chua AN, Somers MJ, Baum M, Symons JM, Brophy PD, Blowey D, Fortenberry JD, Chand D, Flores FX, Alexander SR, Mahan JD, McBryde KD, Benfield MR, Goldstein SL. The effect of vascular access location and size on circuit survival in pediatric continuous renal replacement therapy: a report from the PPCRRT registry. Int J Artif Organs 30:1116-21, 2007.

72. Yeager ND, Hammond S, Mahan J, Davis JT, Adler B. Unique Diagnostic Features and Successful Management of a Patient With Disseminated Lymphangiomatosis and Chylothorax. J Pediatr Hematol Oncol. 30:66-69, 2008.

73. Flores FX, Brophy PD, Symons JM, Fortenberry JD, Chua AN, Alexander SR, Mahan JD, Bunchman TE, Blowey D, Somers MJ, Baum M, Hackbarth R, Chand D, McBryde K, Benfield M, Goldstein SL. Continuous renal replacement therapy (CRRT) after stem cell transplantation. A report from the prospective pediatric CRRT Registry Group. Pediatr Nephrol. 23:625-30, 2008.

74. Bowden SA, Robinson RF, Carr R, Mahan JD. Prevalence of vitamin D deficiency and insufficiency in children with osteopenia or osteoporosis referred to a pediatric metabolic bone clinic. Pediatrics 121:e1-e6, 2008.

75. Ettenger R, Hoyer PF, Grimm P, Webb N, Loirat C, Mahan JD, Mentser M, Niaudet P, Offner G, Vandamme-Lombaerts R, Hexham JM; Everolimus Pediatric Study Group. Multicenter trial of everolimus in pediatric renal transplant recipients: results at three year. Pediatr Transplant. 12:456-63, 2008.

76. Mahan JD, Patel HP. Recent advances in pediatric dialysis: a review of selected articles. Pediatr Nephrol. 23:1737-47, 2008.

77. Greenbaum LA, Hidalgo G, Chand D, Chiang M, Dell K, Kump T, Peschansky L, Smith HK, Boyle M, Kopf M, Metz LC, Kamel M, Mahan JD. Obstacles to the prescribing of growth hormone in children with chronic kidney disease. Pediatr Nephrol.23:1531-5, 2008.

78. Schwaderer AL, Cronin R, Mahan JD, Bates CM. Low bone density in children with hypercalciuria and/or nephrolithiasis. Pediatr Nephrol. 23:2209-14, 2008.

79. Ferris ME Mahan, JD. Pediatric chronic kidney disease and the process of health care transition Semin Nephrol. 29:435-44, 2009.

80. Kerlin BA, Blatt NB, Fuh B, Zhao S, Lehman A, Blanchong C, Mahan JD, Smoyer WE. Epidemiology and risk factors for thromboembolic complications of childhood nephrotic syndrome: A Midwest Pediatric Nephrology Consortium (MWPNC) Study. J Pediatr. 155:105-10, 2009.

81. Gipson DS, Massengill SF, Yao L, Nagaraj S, Smoyer WE, Mahan JD, Wigfall D, Miles P, Powell L, Lin JJ, Trachtman H, Greenbaum LA. Management of childhood onset nephrotic syndrome. Pediatrics 124:747-57, 2009.

82. Mahan JD, Smoyer WE. The need for a Children's Oncology Group-oriented approach to advance the care of children with idiopathic nephrotic syndrome. Clin J Am Soc 10:1549-50, 2009.

83. MacHardy N, Miles PV, Massengill SF, Smoyer WE, Mahan JD, Greenbaum L, Massie S, Yao L, Nagaraj S, Lin JJ, Wigfall D, Trachtman H, Hu Y, Gipson DS. Management patterns of childhood-onset nephrotic syndrome. Pediatr Nephrol 23:2193-2001, 2009.

84. Viollet L, Gailey S, Thornton DJ, Friedman NR, Flanigan KM, Mahan JD, Mendell JR. Utility of cystatin C to monitor renal function in Duchenne muscular dystrophy. Muscle Nerve. 40:438-42. 2009.

85. ~Iorember FM, Patel HP, Ohana A, Hayes JR, Mahan JD, Baker PB, Rajab A. Steroid avoidance using sirolimus and cyclosporine in pediatric transplantation: One year analysis. Pediatr Transplant. 14:93-9, 2010.

86. Sutherland SM, Zappitelli M, Alexander SR, Chua AN, Brophy PD, Bunchman TE, Hackbarth R, Somers MJ, Baum M, Symons JM, Flores FX, Benfield M, Askenazi D, Chand D, Fortenberry JD, Mahan JD, McBryde K, Blowey D, Goldstein SL. Fluid overload and mortality in children receiving continuous renal replacement therapy: the prospective pediatric continuous renal replacement therapy registry. Am J Kidney Dis. 55:316-25, 2010.

87. Mahan JD, Ferris ME. Case-based education at the 2009 Pediatric Nephrology Fellows Conference. Ren Failure 32:14- 20, 2010.

88. Roberto AJ, Goodall CE, West PM, Mahan JD. Persuading physicians to test their patients' level of kidney functioning: the effects of message frame and point of view. Health Commun. 25:107-18, 2010.

89. Mahan JD, Warady BA, Frane J, Rosenfeld RG, Swinford RD, Lippe B, Davis DA. First-year response to rhGH therapy in children with CKD: a National Cooperative Growth Study Report. Pediatr Nephrol. 25:1125-30, 2010.

90. ~Weinstein AR, Reidy K, Norwood VF, Mahan JD. Factors influencing pediatric nephrology trainee entry into the workforce. Clin J Am Soc Nephrol. 5:1770-1774, 2010.

91. Malik V, Rodino-Klapac LR, Viollet L, Wall C, King W, Al-Dahhak R, Lewis S, Shilling CJ, Kota J, Serrano-Munuera C, Hayes J, Mahan JD, Campbell KJ, Banwell B, Dasouki M, Watts V, Sivakumar K, Bien-Willner R, Flanigan KM, Sahenk Z, Barohn RJ, Walker CM, Mendell JR. Gentamicin-induced readthrough of stop codons in Duchenne muscular dystrophy. Ann Neurol. 2010: 67:771-80.

92. Bowden SA and Mahan JD. Bone health in children with neuromuscular disorders: current opinions and future directions. Pediatric Health 2010: 4, 463–465.

93. Nailescu C, Xu X, Zhou H, Hall H, Wilson AC, Leiser JD, Chand DH, Valentini RP, Hebert D, Mahan JD. Influenza vaccine after pediatric kidney transplant: a Midwest Pediatric Nephrology Consortium study. Pediatr Nephrol. 2011; 26(3):459-67.

94. ~Janjua HS, Mahan JD, Patel HP, Mentser M, Schwaderer AL. Continuous infusion of a standard combination solution in the management of hyperkalemia. Nephrol Dial Transplant. 2011; 26:2503-8.

95. ~Janjua HS, Mahan JD. The role and future challenges for recombinant growth hormone therapy to promote growth in children after renal transplantation. Clin Transpl 2011:25:E469-474.

96. ~Backes CH, Reber KM, Trittmann JK, Huang H, Tomblin J, Moorehead PA, Bauer JA, Smith CV, Mahan JD. Fellows as teachers: a model to enhance pediatric resident education. Med Educ Online. 2011;16. doi: 10.3402/meo.v16i0.7205.

97. ~Janjua HS, Mahan JD. Growth in chronic kidney disease. Adv Chronic Kidney Dis. 2011; 18:324-31.

98. Watson AR, Harden P, Ferris M, Kerr PG, Mahan JD, Ramzy MF Transition from pediatric to adult renal services: a consensus statement by the International Society of Nephrology (ISN) and the International Pediatric Nephrology Association (IPNA). Pediatr Nephrol. 2011; 26:1753-7.

99. Watson AR, Harden PN, Ferris ME, Kerr PG, Mahan JD, Ramzy MF. Transition from pediatric to adult renal services: a consensus statement by the International Society of Nephrology (ISN) and the International Pediatric Nephrology Association (IPNA). Kidney Int. 2011; 80:704-7.

100. Gipson DS, Trachtman H, Kaskel FJ, Greene TH, Radeva MK, Gassman JJ, Moxey-Mims MM, Hogg RJ, Watkins SL, Fine RN, Hogan SL, Middleton JP, Vehaskari VM, Flynn PA, Powell LM, Vento SM, McMahan JL, Siegel N, D'Agati VD, Friedman AL, Friedman A, Moxey-Mims M, Xie Y, Gassman J, Greene T, Radeva M, McMahan J, Brittain K, Drabik M, Li M, Watkins S, Hogg R, Sedor J, Balow J, Diener-West M, Fogo A, Fost N, Ingelfinger J, Levey A, Lewy JE, Zazra J, Pelt DV, Connell K, Toke D, Higgins H, Ke S, Cooley P, Al-Uzri A, Appel G, Arar M, Antonio S, Ault B, Baker W, Bartosh S, Bell L, Bitzan M, Benador N, Benfield M, Bland A, Budisavljevic M, Carter B, Cattran D, Chand D, Chandra C, Ellis D, Fildes R, Fischer D, Flynn J, Foreman J, Gipson D, Falk R, Greenbaum L, Hernandez G, Hoggard J, Holleman R, Ilyas M, John E, Johnson V, Kaplan J, Kaskel F, Lane J, Lin JJ, Mahan J, Massengill S, Matsell D, Mattoo T, McGee L, Mendley S, Midgley J, Moudgil A, Muchant D, Murphy J, Musgrave J, Neiberger R, Norwood V, Ortiz L, Pan C, Paredes A, Puliyanda D, Savin V, Scheinman J, Schelling J, Schoeneman M, Seikaly M, Shidham G, Singh A, Somers M, Springate J, Trachtman H, Vehaskari M, Warady B, Weiss R, Weiss L, Whyte D, Woods J, Yadin O. Clinical trial of focal segmental glomerulosclerosis in children and young adults. Kidney Int. 2011 Jul 6. doi: 10.1038/ki.2011.195.

101. Schwaderer AL, Srivastava T, Schueller L, Cronin R, Mahan JD, Hains D. Dietary modifications alone do not improve bone mineral density in children with idiopathic hypercalciuria. Clin Nephrol. 2011; 76:341-7.

102. ~Spencer JD, Bates CM, Mahan JD, Niland ML, Staker SR, Hains DS, Schwaderer AL. The accuracy and health risks of a voiding cystourethrogram after a febrile urinary tract infection. J Pediatr Urol. 2012;8:72-76

103. Sangvai S, Mahan JD, Lewis KO, Pudlo N, Suresh S, McKenzie LB. The impact of an interactive web-based module on residents' knowledge and clinical practice of injury prevention. Clin Pediatr (Phila). 2012; 51:165-74.

104. Davis ID, Greenbaum LA, Gipson D, Wu LL, Sinha R, Matsuda-Abedini M, Emancipator JL, Lane JC, Hodgkins K, Nailescu C, Barletta GM, Arora S, Mahan JD, Rosen CL. Prevalence of sleep disturbances in children with chronic kidney disease. Pediatr Nephrol. 2012; 27:451-459.

105. Bergsland KJ, Coe FL, White MD, Erhard MJ, Defoor WR, Mahan JD, Schwaderer AL, Asplin JR. Urine risk factors in children with calcium kidney stones and their siblings. Kidney Int. 2012:81:1140-1148. PMID: 22358148.

106. Fromme HB, Whicker SA, Mahan JD, Turner TL. Update in medical education for pediatrics: insights and directions from the 2010 literature. Med Educ Online. 2012;17. PMID: 22670086

107. Cha SD, Patel HP, Hains DS, Mahan JD. The effects of hypertension on cognitive function in children and adolescents. Int J Pediatr. 2012;2012:891094. PMID: 22518186.

108. Li ST, Tancredi DJ, Burke AE, Guillot A, Guralnick S, Trimm RF, Mahan JD. Self-assessment on the competencies and reported improvement priorities for pediatrics residents. J Grad Med Educ. 2012;4:445-53. PMID: 24294420.

109. Gipson DS, Selewski DT, Massengill SF, Wickman L, Messer KL, Herreshoff E, Bowers C, Ferris ME, Mahan JD, Greenbaum LA, Machardy J, Kapur G, Chand DH, Goebel J, Barletta GM, Geary D, Kershaw DB, Pan CG, Gbadegesin R, Hidalgo G, Lane JC, Leiser JD, Plattner BW, Song PX, Thissen D, Liu Y, Gross HE, Dewalt DA. Gaining the PROMIS perspective from children with nephrotic syndrome: a Midwest Pediatric Nephrology Consortium study. Health Qual Life Outcomes. 2013;11:30. PMID: 23510630

110. Ferris ME, Ferris MT, Viall C, Stewart HD, Fenton N, Haberman C, Iglesia EA, Hancock LE, Harward DH, Gilleskie D, O'Neill J, Imperial R, Ko Z, Benton MH, Doan M, Bickford K, Detwiler R, Andreoni K, Mahan JD, Smith Z, Gibson K. The self-management and transition to adulthood program "UNC STARx": Instruments and lessons from the field. Int J Child Adolesc Health 2013; 6:137-147.

111. Cordero L, Hart BJ, Hardin R, Mahan JD, Nankervis CA. Deliberate practice improves pediatric residents' skills and team behaviors during simulated neonatal resuscitation. Clin Pediatr. 2013; 52:747-752. PMID: 23671270.

112. Janjua HS, Hains DS, Mahan JD. Kidney transplantation in the United States: economic burden and recent trends analysis. Prog Transplant. 2013; 23:78-83. PMID: 23448826.

113. Grushkin C, Mahan JD, Mange KC, Hexham JM, Ettenger R. De novo therapy with everolimus and reduced-exposure cyclosporine following pediatric kidney transplantation: a prospective, multicenter, 12-month study. Pediatr Transplant. 2013; 17:237-43. PMID: 23279564.

114. Schwarze U, Cundy T, Pyott SM, Christiansen HE, Hegde MR, Bank RA, Pals G, Ankala A, Conneely K, Seaver L, Yandow SM, Raney E, Babovic-Vuksanovic D, Stoler J, Ben-Neriah Z, Segel R, Lieberman S, Siderius L, Al-Aqeel A, Hannibal M, Hudgins L, McPherson E, Clemens M, Sussman MD, Steiner RD, Mahan J, Smith R, Anyane-Yeboa K, Wynn J, Chong K, Uster T, Aftimos S, Sutton VR, Davis EC, Kim LS, Weis MA, Eyre D, Byers PH. Mutation in FKBP10, which result in Bruck syndrome and recessive forms of osteogenesis imperfect, inhibit the hydroxylation of telopeptide lysines in bone collage. Hum Mol Genet. 2013; 22:1-17. PMID: 22949511.

115. Cordero L, Hart BJ, Hardin R, Mahan JD, Giannone PJ, Nankervis CA. Pediatrics residents' preparedness for neonatal resuscitation assessed using high-fidelity simulation. J Grad Med Educ. 2013;5:399-404. PMID: 24404302.

116. Hurtubise L, Martin B, Gilliland A, Mahan JD. To play or not to play: leveraging video in medical education. J Grad Med Educ. 2013;5:13-8. PMID: 24404220.

117. Selewski DT, Massengill SF, Troost JP, Wickman L, Messer KL, Herreshoff E, Bowers C, Ferris ME, Mahan JD, Greenbaum LA, MacHardy J, Kapur G, Chand DH, Goebel J, Barletta GM, Geary D, Kershaw DB, Pan CG, Gbadegesin R, Hidalgo G, Lane JC, Leiser JD, Song PX, Thissen D, Liu Y, Gross HE, DeWalt DA, Gipson DS. Gaining the Patient Reported Outcomes Measurement Information System (PROMIS) perspective in chronic kidney disease: a Midwest Pediatric Nephrology Consortium study. Pediatr Nephrol. 2014;29:2347-2356. PMID: 24908324

118. Mahan JD, Clinchot D Why Medical Education is Being (Inexorably) Re-Imagined and Re-Designed. Curr Probl Pediatr Adolesc Health Care. 2014;44:137-140. doi: 10.1016/j.cppeds.2014.01.002. Review. PMID: 24981662

119. Mahan JD, Stein DS. Teaching adults-best practices that leverage the emerging understanding of the neurobiology of learning. Curr Probl Pediatr Adolesc Health Care. 2014;44:141-9. doi: 10.1016/j.cppeds.2014.01.003. PMID: 24981663

120. Reed S, Shell R, Kassis K, Tartaglia K, Wallihan R, Smith K, Hurtubise L, Martin B, Ledford C, Bradbury S, Bernstein HH, Mahan JD. Applying adult learning practices in medical education. Curr Probl Pediatr Adolesc Health Care. 2014;44:170-81. doi: 10.1016/j.cppeds.2014.01.008. PMID:2498166

121. Lewis KO, Cidon MJ, Seto TL, Chen H, Mahan JD. Leveraging e-Learning in Medical Education. Curr Probl Pediatr Adolesc Health Care. 2014;44:150-63. doi: 10.1016/j.cppeds.2014.01.004. PMID: 24981664

122. Ferris M, Iglesia E, Ko Z, Amamoo A, Mahan JD, Desai T, Gibson K, Jhaveri K, Primack W. Wanted pediatric nephrologists! – why trainees are not choosing pediatric nephrology. Ren Fail. 2014;28:1-5. PMID: 25065378

123. Cha SD, Chisolm DJ, Mahan JD. Essential pediatric hypertension: defining the educational needs of primary care pediatricians. BMC Med Educ. 2014 Jul 27;14:154. doi: 10.1186/1472-6920-14-154. PMID: 25063988

124. Lewis KO, Frank GR, Nagel R, Turner TL, Ferrell CL, Sangvai SG, Donthi R, Mahan JD. Pediatric trainees' engagement in the online nutrition curriculum: preliminary results. BMC Med Educ. 2014;14:190. doi: 10.1186/1472-6920-14-190. PMID: 25223502

125. Kusumi K, Ayoob R, Bowden SA, Ingraham S, Mahan JD. Beneficial effects of intravenous pamidronate treatment in children with osteogenesis imperfecta under 24 months of age. J Bone Miner Metab. 2015; 33:560-8.

126. Li ST, Paterniti DA, Tancredi DJ, Burke AE, Trimm RF, Guillot A, Guralnick S, Mahan JD. Resident self-assessment and learning goal development: evaluation of resident-reported competence and future goals. Acad Pediatr. 2015; 15:367-73. PMID 26142068

127. Selewski DT, Troost JP, Massengill SF, Gbadegesian RA, Greenbaum LA, Shatat IF, Cai Y, Kapur G, Hebert D, Somers MJ, Trachtman H, Pais P, Seifert M, Goebel J, Sethna CB, Mahan JD, Gross HE, Herreshoff E, Liu Y, Song PX, Reeve BB, DeWalt DA, Gipson DS. The impact of disease duration on quality of life in children with nephrotic syndrome: a Midwest Pediatric Nephrology Consortium study. Pediatr Nephrol 2015;30:1467-76.

128. Olson K, Kemper KJ, Mahan JD. What factors promote resilience and protect against burnout in first-year pediatric and medicine-pediatric residents? J Evid Based Complementary Altern Med. 2015; 20:192-8. PMID 25694128

129. Buckner JL, Bowden SA, Mahan JD. Optimizing bone health in Duchenne Muscular Dystrophy. Int J Endocrinol. 2015:2015.928385 PMID 26124831

130. Sectish TC, Hay WW Jr, Mahan JD, Mendoza FS, Spector ND, Stanton B, Szilagyi PG, Turner TL, Walker LR, Slaw K; members of the Federation of Pediatric Organizations'Visioning Summit Working Groups and Planning Committees. Blueprint for Action: Visioning Summit on the Future of the Workforce in Pediatrics. 2015; 136:161-9. PMID 26034250

131. Reed S, Kassis K, Nagel R, Verbeck N, Mahan JD, Shell R. Breaking bad news is a teachable skill in pediatric residents: a feasibility study of an educational intervention. Patient Educ Couns. 2015;98:748-52. PMID 2577592

132. Rakowsky A, Mahan J, Donthi R, Backes C. The Doctors Hospital and Nationwide Children's Hospital Dually Accredited Pediatric Residency Program: a potential best model for pediatric osteopathic GME training. J Am Osteopath Assoc. 2015;115:390-3. PMID 26024333

133. Kemper KJ, Lynn J, Mahan JD. What is the impact of online training in Mind-Body Skills? J Evid Based Complementary Altern Med. 2015;20:275-82.

134. Kemper K, Gascon G, Mahan JD. Two new scales for integrative medical education and research: confidence in providing calm, compassionate care scale (CCCS) and self-efficacy in providing non-drug therapies (SEND) to relieve common symptoms. Eur J Integrative Med 2015;7:389-395.

135. Reed S, Kassis K, Nagel R, Verbeck N, Mahan JD, Shell R. Does emotional intelligence predict breaking bad news skills in pediatric interns? A pilot study. Med Educ Online. 2015; 20:24245. doi: 10.3402/meo.v20.24245. eCollection 2015.

136. Ferris M, Cohen S, Haberman C, Javalkar K, Massengill S, Mahan JD, Kim S, Bickford K, Cantu G, Medeiros M, Phillips A, Ferris MT, Hooper SR. Self-Management and Transition Readiness Assessment: Development, Reliability, and Factor Structure of the STARx Questionnaire. J Pediatr Nurs. 2015;30:691-9.

137. Bixler GM, Brown A, Way D, Ledford C, Mahan JD. Collaborative Concept Mapping and Critical Thinking in Fourth-Year Medical Students. Clin Pediatr (Phila). 2015;4:833-9.

138. Cohen SE, Hooper SR, Javalkar K, Haberman C, Fenton N, Lai H, Mahan JD, Massengill S, Kelly M, Cantú G, Medeiros M, Phillips A, Sawicki G, Wood D, Johnson M, Benton MH, Ferris M. Self-Management and Transition Readiness Assessment: Concurrent, Predictive and Discriminant Validation of the STARx Questionnaire. J Pediatr Nurs. 2015;30:668-76.

139. Hurtubise LC, Turner TL, Ledford CH, Mahan JD. Getting started with online faculty development. J Grad Med Educ. 2015; 7:671-2. PMID: 26692986

141. Lockspeiser TM, Li ST, Burke AE, Rosenberg AA, Dunbar AE 3rd, Gifford KA, Gorman GH, Mahan JD, McKenna MP, Reed S, Schwartz A, Harris I, Hanson JL. In Pursuit of Meaningful Use of Learning Goals in Residency: A Qualitative Study of Pediatric Residents. Acad Med. 2016; 91:839-846. PMID: 26630605

142. Reed S, Lockspeiser TM, Burke A, Gifford KA, Hanson JL, Mahan JD, McKenna M, Rosenberg A, Li ST. Practical Suggestions for the Creation and Use of Meaningful Learning Goals in Graduate Medical Education. Acad Pediatr. 2016;16:20-4. PMID: 26505125

143. Selewski DT, Chen A, Shatat IF, Pais P, Greenbaum LA, Geier P, Nelson RD, Kiessling SG, Brophy PD, Quiroga A, Seifert ME, Straatmann CE, Mahan JD, Ferris ME, Troost JP, Gipson DS. Vitamin D in incident nephrotic syndrome: a Midwest Pediatric Nephrology Consortium study. Pediatr Nephrol. 2016;31:465-72. PMID: 26498119

144. Bowden SA, Akusoba CI, Hayes JR, Mahan JD. Biochemical markers of bone turnover in children with clinical bone fragility. J Pediatr Endocrinol Metab. 2016 Apr 6. pii: /j/jpem. ahead-of-print/jpem-2014-0525/jpem-2014-0525.xml. doi: 10.1515/jpem-2014-0525. [Epub ahead of print]. PMID:27049615

145. Li ST, Tancredi DJ, Schwartz A, Guillot AP, Burke AE, Trimm RF, Guralnick S, Mahan JD, Gifford KA. Competent for Unsupervised Practice: Use of Pediatric Resident Training Milestones to Assess Readiness. Acad Med, 2016, pub ahead of print

146. Bowden SA, Akusoba CI, Hayes JR, Mahan JD. Biochemical markers of bone turnover in children with clinical bone fragility. J Pediatr Endocrinol Metab. 2016 Jun 1;29(6):715-22. PMID: 27049615

147. Singh AK, Osman AS, Woodiga SA, White P, Mahan JD, King SJ. Defining the role of pneumococcal neuraminidases and O-glycosidase in pneumococcal haemolytic uraemic syndrome. J Med Microbiol. 2016 Sep;65(9):975-84. PMID: 27469261

148. Backes CH, Bonachea EM, Rivera BK, Reynolds MM, Kovalchin CE, Reber KM, Ball MK, Sutsko R, Guntupalli SR, Smith CV, Mahan JD, Carbajal MM. Preparedness of pediatric residents for fellowship: a survey of US neonatal-perinatal fellowship program directors. J Perinatol. 2016 Dec;36(12):1132-1137. PMID: 27684422

149. Fair C, Cuttance J, Sharma N, Maslow G, Wiener L, Betz C, Porter J, McLaughlin S, Gilleland-Marchak J, Renwick A, Naranjo D, Jan S, Javalkar K, Ferris M; International and Interdisciplinary Health Care Transition Research Consortium. International and Interdisciplinary Identification of Health Care Transition Outcomes. JAMA Pediatr. 2016 Mar;170(3):205-11. PMID:26619178

150. Jetton JG, Guillet R, Askenazi DJ, Dill L, Jacobs J, Kent AL, Selewski DT, Abitbol CL, Kaskel FJ, Mhanna MJ, Ambalavanan N, Charlton JR; Neonatal Kidney Collaborative. Assessment of Worldwide Acute Kidney Injury Epidemiology in Neonates: Design of a Retrospective Cohort Study. Front Pediatr. 2016 Jul 19;4:68. PMID: 27486571

151. Delacruz N, Reed S, Splinter A, Brown A, Flowers S, Verbeck N, Turpening D, Mahan JD. Take the HEAT: A pilot study on improving communication with angry families. Patient Educ Couns. 2016 Dec 19. pii: S0738-3991(16)30565-1. PMID: 28089310

152. Kemper KJ, Rao N, Gascon G, Mahan JD. Online Training in Mind-Body Therapies: Different Doses, Long-term Outcomes. J Evid Based Complementary Altern Med. 2017 Jan 1:2156587217701857. PMID: 28403656

153. Albert DV, Patel AD, Behnam-Terneus M, Sautu BC, Verbeck N, McQueen A, Fromme HB, Mahan JD. Child Neurology Education for Pediatric Residents. J Child Neurol. 2017 Mar;32(3):293-300.

154. Li ST, Tancredi DJ, Schwartz A, Guillot AP, Burke AE, Trimm RF, Guralnick S, Mahan JD, Gifford KA; Association of Pediatric Program Directors (APPD) Longitudinal Educational Assessment Research Network (LEARN) Validity of Resident Self-Assessment Group. Competent for Unsupervised Practice: Use of Pediatric Residency Training Milestones to Assess Readiness. Acad Med. 2017 Mar;92(3):385-393.

155. Mahan JD. Burnout in Pediatric Residents and Physicians: A Call to Action. Pediatrics. 2017 Mar;139(3): e20164233.

156. Mangum R, Lazar J, Rose MJ, Mahan JD, Reed S.  Exploring the Value of Just-in-Time Teaching as a Supplemental Tool to Traditional Resident Education on a Busy Inpatient Pediatrics Rotation. Acad Pediatr. 2017 Aug;17(6):589-592. PMID: 28456579

157. Akchurin OM, Kogon AJ, Kumar J, Sethna CB, Hammad HT, Christos PJ, Mahan JD, Greenbaum LA, Woroniecki R. Approach to growth hormone therapy in children with chronic kidney disease varies across North America: the Midwest Pediatric Nephrology Consortium report. BMC Nephrol. 2017 May 30;18(1):181.

158. Mahan JD, Betz CL, Okumura MJ, Ferris ME. Self-management and Transition to Adult Health Care in Adolescents and Young Adults: A Team Process. Pediatr Rev. 2017 Jul;38(7):305-319.

159. Li ST, Tancredi DJ, Schwartz A, Guillot A, Burke A, Trimm RF, Guralnick S, Mahan JD, Gifford KA; Association of Pediatric Program Directors (APPD) Longitudinal Educational Assessment Research Network (LEARN) Validity of Resident Self-Assessment Group. Identifying Gaps in the Performance of Pediatric Trainees Who Receive Marginal/Unsatisfactory Ratings. Acad Med. 2017 Jun 20. PMID: 28640031

160. Selewski DT, Troost JP, Cummings D, Massengill SF, Gbadegesin RA, Greenbaum LA, Shatat IF, Cai Y, Kapur G, Hebert D, Somers MJ, Trachtman H, Pais P, Seifert ME, Goebel J, Sethna CB, Mahan JD, Gross HE, Herreshoff E, Liu Y, Carlozzi NE, Reeve BB, DeWalt DA, Gipson DS.  Responsiveness of the PROMIS® measures to changes in disease status among pediatric nephrotic syndrome patients: a Midwest pediatric nephrology consortium study. Health Qual Life Outcomes. 2017 Aug 23;15(1):166. PMID: 28835233

161. Wilson PM, Kemper KJ, Schubert CJ, Batra M, Staples BB, Serwint JR, McClafferty H, Mahan JD; Pediatric Resident Burnout and Resilience Study Consortium (PRBRSC).  National Landscape of Interventions to Improve Pediatric Resident Wellness and Reduce Burnout.  Acad Pediatr. 2017 Nov - Dec;17(8):801-804. PMID: 28919483

162. D'Alessandri-Silva C, Carpenter M, Mahan JD. Treatment regimens by pediatric nephrologists in children with congenital nephrogenic diabetes insipidus: A MWPNC study. Clin Nephrol. 2017 Nov 22. E pub ahead of print. PMID: 29162216

163. Bowden SA, Mahan JD.  Zolendronic acid in pediatric metabolic bone disorders. Transl Pediatr. 2017 Oct;6(4):256-268.  PMID: 29184807

164. Warburton KM, Mahan JD.  Coaching Nephrology Trainees Who Struggle with Clinical Performance. Clin J Am Soc Nephrol. 2018 Jan 6;13(1):172-174. PMID: 29092892

165. Mink R, Schwartz A, Carraccio C, High P, Dammann C, McGann KA, Kesselheim J, Herman B; Steering Committee of the Subspecialty Pediatrics Investigator Network. Creating the Subspecialty Pediatrics Investigator Network. J Pediatr. 2018 Jan;192:3-4.e2.

166. Benjamin J, Groner J, Walton J, Noritz G, Gascon GM, Mahan JD.  Learning in a Web-Based World: An Innovative Approach to Teach Physical Examination Skills in Patients with Neurodisability. Acad Pediatr. 2018 Aug;18(6):714-716. doi: 10.1016/j.acap.2018.02.014.  PMID: 29518544.

167. Kemper KJ, Wilson PM, Schwartz A, Mahan JD, Batra M, Staples BB, McClafferty H, Schubert CJ, Serwint JR. Burnout in Pediatric Residents: Comparing Brief Screening Questions to the Maslach Burnout Inventory. Acad Pediatr. 2018 Nov 3. pii: S1876-2859(18)30749-6.  doi: 10.1016/j.acap.2018.11.003.  PMID: 30395934.

168. Reed S, Kemper KJ, Schwartz A, Batra M, Staples BB, Serwint JR, McClafferty H, Schubert CJ, Wilson PM, Rakowsky A, Chase M, Mahan JD.  Variability of Burnout and Stress Measures in Pediatric Residents: An Exploratory Single-Center Study From the Pediatric Resident Burnout-Resilience Study Consortium. J Evid Based Integr Med. 2018 Jan-Dec;23:2515690X18804779. doi: 10.1177/2515690X18804779. PMID: 30378438.

169. Selewski DT, Akcan-Arikan A, Bonachea EM, Gist KM, Goldstein SL, Hanna M, Joseph C, Mahan JD, Nada A, Nathan AT, Reidy K, Staples A, Wintermark P, Boohaker LJ, Griffin R, Askenazi DJ, Guillet R; Neonatal Kidney Collaborative.  The impact of fluid balance on outcomes in critically ill near-term/term neonates: a report from the AWAKEN study group. Pediatr Res. 2018 Sep 20. doi: 10.1038/s41390-018-0183-9. [Epub ahead of print].  PMID: 30237572.

170. Romcevich LE, Reed S, Flowers SR, Kemper KJ, Mahan JD.  Mind-Body Skills Training for Resident Wellness: A Pilot Study of a Brief Mindfulness Intervention. J Med Educ Curric Dev. 2018 Apr 30;5:2382120518773061. doi: 10.1177/2382120518773061.  eCollection 2018 Jan-Dec.  PMID: 29780891.

171. Li ST, Tancredi DJ, Schwartz A, Guillot A, Burke AE, Trimm RF, Guralnick S, Mahan JD, Gifford K. Pediatric Program Director Minimum Milestone Expectations Before Allowing Supervision of Others and Unsupervised Practice. Acad Pediatr. 2018 Sep - Oct;18(7):828-836. doi: 10.1016/j.acap.2018.04.010. Epub 2018 Apr 25. PMID: 29704651.

172. Kemper KJ, McClafferty H, Wilson PM, Serwint JR, Batra M, Mahan JD, Schubert CJ, Staples BB, Schwartz A; Pediatric Resident Burnout-Resilience Study Consortium. Do Mindfulness and Self-Compassion Predict Burnout in Pediatric Residents? Acad Med 2018 Dec 4 epub. PMID: 30520809.

173. Wallihan R, Smith KG, Hormann MD, Donthi RR, Boland K, Mahan JD. Utility of intermittent online quizzes as an early warning for residents at risk of failing the pediatric board certification examination. BMC Med Educ. 2018 Dec 4;18(1):287. PMID: 30514279.

174. Canetta PA, Troost JP, Mahoney S, Kogon AJ, Carlozzi N, Bartosh SM, Cai Y, Davis TK, Fernandez H, Fornoni A, Gbadegesin RA, Herreshoff E, Mahan JD, Nachman PH, Selewski DT, Sethna CB, Srivastava T, Tuttle KR, Wang CS, Falk RJ, Gharavi AG, Gillespie BW, Greenbaum LA, Holzman LB, Kretzler M, Robinson BM, Smoyer WE, Guay-Woodford LM, Reeve B, Gipson DS; CureGN Consortium. Health-related quality of life in glomerular disease. Kidney Int. 2019 May;95(5):1209-1224. PMID: 30898342.

175. Benjamin JC, Groner J, Walton J, Noritz G, Gascon GM, Mahan JD. A blended curriculum to improve resident physical exam skills for patients with neuromuscular disability. MedEdPORTAL. 2019 Jan 4;15:10792. PMID: 30800992

176. Kallash M, Smoyer WE, Mahan JD. Rituximab Use in the Management of Childhood Nephrotic Syndrome. Front Pediatr. 2019 May 10;7:178.PMID: 31134169.

177. Troost JP, Gipson DS, Carlozzi NE, Reeve BB, Nachman PH, Gbadegesin R, Wang J, Modersitzki F, Massengill S, Mahan JD, Liu Y, Trachtman H, Herreshoff EG, DeWalt DA, Selewski DT. Using PROMIS® to create clinically meaningful profiles of nephrotic syndrome patients. Health Psychol. 2019 May;38(5):410-421.PMID: 31045424.

178. Stonebrook E, Mahan JD. Treatment of Growth Retardation in a Child with CKD. Clin J Am Soc Nephrol. 2019 Jul 26. pii: CJN.03960319. PMID: 31350273.

179. Liao NN, Mahan JD, Scherzer R. The Pediatric Match Frenzy: An Overview and an Approach for Mentoring Medical Students. Acad Pediatr. 2019 Jun 12. pii: S1876-2859(19)30294-3. PMID: 31201954.

180. Rakowsky A, Backes C, Mahan JD, Wolf K, Zmuda E. The Development of a Pediatric Osteopathic Recognition Track. Acad Pediatr. 2019 Jun 8. pii: S1876-2859(19)30292-X. PMID: 31185308.

181. Stewart MT, Reed S, Reese J, Galligan MM, Mahan JD. Conceptual models for understanding physician burnout, professional fulfillment and well-being. Curr Probl Pediatr Adolesc Health Care. 2019 Nov; 49:100658.

182. Wilson PM, Batra M, Kemper KJ, Mahan JD, Staples BB, Serwint JR. Physician Well-being. Pediatr Rev. 2019 Oct;40(Suppl 1):12-20. doi: 10.1542/pir.2018-0329. PMID 31575686.

183. Selewski DT, Gist KM, Nathan AT, Goldstein SL, Boohaker LJ, Akcan-Arikan A, Bonachea EM, Hanna M, Joseph C, Mahan JD, Mammen C, Nada A, Reidy K, Staples A, Wintermark P, Griffin R, Askenazi DJ, Guillet R; Neonatal Kidney Collaborative. The impact of fluid balance on outcomes in premature neonates: a report from the AWAKEN study group. Pediatr Res. 2019 Sep 19. PMID 31537009.

184. Kemper KJ, Schwartz A, Wilson PM, Mahan JD, Schubert CJ, Staples BB, McClafferty H, Serwint JR, Batra M; PEDIATRIC RESIDENT BURNOUT-RESILIENCE STUDY CONSORTIUM. Burnout in Pediatric Residents: Three Years of National Survey Data. Pediatrics. 2020 Jan;145(1). pii: e20191030. PMID: 31843859.

185. D'Alessandri-Silva C, Carpenter M, Ayoob R, Barcia J, Chishti A, Constantinescu A, Dell KM, Goodwin J, Hashmat S, Iragorri S, Kaspar C, Mason S, Misurac JM, Muff-Luett M, Sethna C, Shah S, Weng P, Greenbaum LA, Mahan JD. Diagnosis, Treatment and Outcomes in Children with Congenital Nephrogenic Diabetes Insipidus: a Pediatric Nephrology Research Consortium Study. Front Pediatr. 2020 Jan 21;7:550. PMID: 32039113.

186. Nailescu C, Nelson RD, Verghese PS, Twombley KE, Chishti AS, Mills M, Mahan JD, Slaven JE, Shew ML. Human papillomavirus vaccination in male and female adolescents before and after kidney transplantation: a pediatric nephrology research consortium. Front Pediatr. 2020 Feb 20;8:46. PMID: 32154194.

187. Lauden SM, Wilson PM, Faust MM, Webber S, Schwartz A, Mahan JD, Batra M, Schubert CJ; Pediatric Resident Burnout-Resilience Study Consortium (PRB-RSC). Global health experiences, well-being, and burnout: Findings from a national longitudinal study. Acad Pediatr. 2020 May 11:S1876-2859(20)30184-4. PMID: 32437879.

188. Li ST, Schwartz A, Burke AE, Guralnick S, Trimm RF, Guillot A, Mahan JD, Gifford K, Tancredi DJ. Pediatric program director minimum milestone expectations before allowing supervision of others and unsupervised practice. Acad Pediatr. 2020 May 22:S1876-2859(20)30191-1. PMID:

189. Nada A, Askenazi D, Boohaker LJ, Li L, Mahan JD, Charlton J, Griffin RL; AWAKEN Study Group. Low hemoglobin levels are independently associated with neonatal acute kidney injury: a report from the AWAKEN Study Group. Pediatr Res. 2020 Jun 11. PMID: 32526767.

190. Liu A, Reed S, Mahan JD, Wallihan R. Exploring pediatric resident attitudes and preferences for board exam preparation. Cureus. 2020 May 8;12(5):e8022. PMID: 32528761.

191. Staples BB, Burke AE, Batra M, Kemper KJ, Schwartz A, Wilson PM, Schubert CJ, Mahan JD, Serwint JR; Pediatric Resident Burnout-Resilience Study Consortium. Burnout and association with resident performance as assessed by Pediatric Milestones: an exploratory study. Acad Pediatr. 2020 Aug 11:S1876-2859(20)30479-4. PMID: 32795689.

192. Murphy SL, Mahan JD, Troost JP, Srivastava T, Kogon AJ, Cai Y, Davis TK, Fernandez H, Fornoni A, Gbadegesin RA, Herreshoff E, Canetta PA, Nachman PH, Reeve BB, Selewski DT, Sethna CB, Wang CS, Bartosh SM, Gipson DS, Tuttle KR; CureGN Consortium. Longitudinal changes in health-related quality fo life in primary glomerular disease: Results from the CureGN study. Kidney Int Rep. 2020 Jul 23;5(10):1679-1689. PMID: 33102960.

193. Marsh M, Lauden SM, Mahan JD, Schneider L, Saldivar L, Hill N, Diaz C, Abdel-Rasoul M, Reed S. Family-centered communication: A pilot educational intervention using deliberate practice and patient feedback. Patient Educ Couns. 2020 Sep 28:S0738-3991(20)30531-0. PMID: 33020005.

194. Mink R, Herman BE, Carraccio C, Aye T, Baffa JM, Chess PR, Fussell JJ, Sauer CG, Stafford DEJ, Weiss P, Curran ML, Dammann CEL, High PC, Hsu D, Kesselheim JC, Mahan JD, McGann KA, Myers AL, Pitts S, Turner DA, Schwartz A. Agreement of Program Directors With Clinical Competency Committees for Fellow Entrustment. J Med Educ Curric Dev. 2020 Aug 6;7:2382120520936613. PMID: 32844115.

195. Benjamin J, Roy K, Paul G, Kumar S, Charles E, Miller E, Narsi-Prasla H, Mahan JD, Thammasitboon S. Improving Resident Self-Efficacy in Tracheostomy Management Using a Novel Curriculum. MedEdPORTAL. 2020 Nov 3;16:11010. PMID: 33204834.

196. Takei R, Dalembert G, Ronan J, Washington N, Tank S, Perry M, Mahan JD, Stewart DA, Burrows HL. Implementing Resident Team Assistant Programs at Academic Medical Centers: Lessons Learned. J Grad Med Educ. 2020 Dec;12(6):769-772. PMID: 33391603.

197. Gifford KA, Thoreson L, Burke AE, Lockspeiser TM, Lockwood LZ, Reed S, Schumacher DJ, Mahan JD**.** Describing Overarching Curricular Goals for Individualized Education. Teach Learn Med. 2020 Dec 23:1-10. PMID: 33356608.

198. Mohamed TH, Klamer B, Mahan JD, Spencer JD, Slaughter JL. Diuretic therapy and acute kidney injury in preterm neonates and infants. Pediatr Nephrol. 2020 Dec;36(12):3981-3991. PMID: 34019153

199. Webber S, Schwartz A, Kemper KJ, Batra M, Mahan JD, Babal J, Sklansky DJ; Pediatric Resident Burnout-Resilience Study Consortium (PRB-RSC). Faculty and peer support during pediatric residency: association with performance outcomes, race and gender. Acad Pediatr. 2021 Mar;21(2):366-374. PMID: 32798725.

200. Mahan JD, Kallash M, Smoyer WE. Results of the PROPINE randomized controlled trial: determining the ever-elusive target, the optimal plan for relapses of nephrotic syndrome in children. Kidney Int. 2021 Feb;99(2):311-313. PMID: 33509352

201. Kusumi K, Shaikhkhalil A, Patel HP, Mahan JD**.** Promoting bone health in children and adolescents following solid organ transplantation. Pediatr Transplant. 2021 Feb;25(1):e13940. PMID: 33341105

202. Kallash M, Mahan JD**.** Mechanisms and management of edema in pediatric nephrotic syndrome. Pediatr Nephrol. 2021 Jul;36(7):1719-1730. PMID: 33216218.

203. Bomback AS, Appel GB, Gipson DS, Hladunewich MA, Lafayette R, Nester CM, Parikh SV, Smith RJH, Trachtman H, Heeger PS, Ram S, Rovin BH, Ali S, Arceneaux N, Ashoor I, Bailey-Wickins L, Barratt J, Beck L, Cattran DC, Cravedi P, Erkan E, Fervenza F, Frazer-Abel AA, Fremeaux-Bacchi V, Fuller L, Gbadegesin R, Hogan JJ, Kiryluk K, le Quintrec-Donnette M, Licht C, Mahan

JD, Pickering MC, Quigg R, Rheault M, Ronco P, Sarwal MM, Sethna C, Spino C, Stegall M, Vivarelli M, Feldman DL, Thurman JM. Improving clinical trials for anticomplement therapies in complement-mediated glomerulopathies: a report of a scientific workshop sponsored by the national kidney foundation. Am J Kidney Dis. 2021 Sep 24:S0272-6386(21)00884-2. PMID: 34571062.

204. Nada A, Askenazi D, Kupferman JC, Mhanna M, Mahan JD, Boohaker L, Li L, Griffin RL; AWAKEN Collaborative. Low albumin levels are independently associated with neonatal acute kidney injury: a report fo rm AWAKEN study group. Pediatr Nephrol. 2021 Oct 18. PMID: 34657971.

205. Marsh MC, Reed SM, Mahan JD, Schneider L, Fernandes AK, Liao N, Spears I, Lauden S. Advanced multimodal communication curriculum for pediatric residents. J Med Educ Curric Dev. 2021 Oct 4;8:23821205211035239. PMID: 34869900.

206. Weiss PG, Schwartz A, Carraccio CL, Herman BE, Turner DA, Aye T, Fussell JJ, Kesselheim J, Mahan JD, McGann KA, Myers A, Stafford DEJ, Chess PR, Curran ML, Dammann CEL, High P, Hsu DC, Pitts S, Sauer C, Srivastava S, Mink RB. Achieving entrustable professional activities during fellowship. Pediatrics. 2021 Nov;148(5):e2021050196. PMID: 34667096.

207. Dahir K, Dhaliwal R, Simmons J, Imel EA, Gottesman GS, Mahan JD, Prakasam G, Hoch AI, Ramesan P, Díaz-González de Ferris M. Healthcare transition from pediatric- to adult-focused care in X-linked hypophosphatemia: review and expert consensus. J Clin Endocrinol Metab. 2021 Nov 6:dgab796. PMID: 34741521.

208. Zuniga LM, Mahan JD**.** Averting burnout in pediatricians: understanding the intersection of workload and meaning of work. Hosp Pediatr. 2021 Dec 1:hpeds.2021-006349. PMID: 34807974.

209. Pitts S, Schwartz A, Carraccio CL, Herman BE, Mahan JD, Sauer CG, Dammann CEL, Aye T, Myers AL, Weiss PG, Turner DA, Hsu DC, Stafford DEJ, Chess PR, Fussell JJ, McGann KA, High P, Curran ML, Mink RB. Fellow entrustment for the common pediatric subspecialty entrustable professional activities across subspecialties. Acad Pediatr. 2021 Dec 19:S1876-2859(21)00637-9. PMID: 34936942

210. Morris GA, Vaz K, Russo J, Karg K, Maltz RM, Mahan JD, Start AR. Implementing min-chalk talks to enhance teaching and learning. Clin Teach. 2021 Dec;18(6):577-582. PMID: 34240813.

211. Ashoor I, Weidemann D, Elenberg E, Halbach S, Harshman L, Kula A, Mahan JD, Nada A, Quiroga A, Mahon AR, Smith J, Somers M, Brophy PD; ASPN Workforce Summit Action Groups. The Pediatric Nephrology Workforce Crisis: A Call to Action. J Pediatr. 2021 Dec;239:5-10.e4. PMID: 33798511

212. Hoff ML, Liao NN, Mosquera CA, Saucedo A, Wallihan RG, Walton JR, Scherzer R, Bonachea EM, Wise LW, Thomas OW, Mahan JD, Barnard JA, Bignall ONR. An initiative to increase residency program diversity. Pediatrics. 2022 Jan 1;149(1):e2021050964. PMID: 34972222

213. Mahan JD, Wright M, Scott-Vernaglia SE, Turner TL. Creation of the Association of Pediatric Program Directors Faculty Development for Educators "Nuts and Bolts" Teaching Aids. Acad Pediatr. 2022 Jan-Feb;22(1):6-11. PMID: 34333178.

214. Meeting the challenge of teaching bioethics: a successful residency curricula utilizing Team-Based Learning. Spencer SP, Lauden S, Wilson S, Philip A, Kasick R, Mahan JD, Fernandes AK. Ann Med. 2022 Dec;54(1):359-368. PMID: 35114873

215. Effect of a novel mindfulness curriculum on burnout during pediatric internship: a closer randomized clinical trial. Fraiman YS, Cheston CC, Cabral HJ, Allen C, Asnes AG, Barrett JT, Batra M, Bernstein W, Bleeker T, Dietz PM, Lewis J, Li ST, Ma TM, Mahan JD, Michelson CD, Poynter SE, Vining MA, Watson K, Sox CM. JAMA Pediatr. 2022 Jan 24:e215740. doi: 10.1001/jamapediatrics.2021.5740. Online ahead of print.PMID: 35072694

216. Defining kidney outcomes in children with acute lymphoblastic leukemia in the modern era. Kumar R, Reed S, Stanek JR, Mahan JD. Pediatr Nephrol. 2022 Jan 18. doi: 10.1007/s00467-021-05402-3. Online ahead of print.PMID: 35041040

217. Pediatric CKD-MBD: existing and emerging treatment approaches. Ayoob RM, Mahan JD. Pediatr Nephrol. 2022 Jan 17. doi: 10.1007/s00467-021-05265-8. Online ahead of print.PMID: 35038008

**Collaborative/Consortia Articles Published or Accepted (~ student, resident or fellow)**

1. Selewski DT, Ambruzs JM, Appel GB, Bomback AS, Matar RB, Cai Y, Cattran DC, Chishti AS, D'Agati VD, D'Alessandri-Silva CJ, Gbadegesin RA, Hogan JJ, Iragorri S, Jennette JC, Julian BA, Khalid M, Lafayette RA, Liapis H, Lugani F, Mansfield SA, Mason S, Nachman PH, Nast CC, Nester CM, Noone DG, Novak J, O'Shaughnessy MM, Reich HN, Rheault MN, Rizk DV, Saha MK, Sanghani NS, Sperati CJ, Sreedharan R, Srivastava T, Swiatecka-Urban A, Twombley K, Vasylyeva TL, Weaver DJ, Yin H, Zee

J, Falk RJ, Gharavi AG, Gillespie BW, Gipson DS, Greenbaum LA, Holzman LB, Kretzler M, Robinson BM, Smoyer WE, Flessner M, Guay-Woodford LM, Kiryluk K; CureGN Consortium. Clinical Characteristics and Treatment Patterns of Children and Adults With IgA Nephropathy or IgA Vasculitis: Findings From the CureGN Study. Kidney Int Rep. 2018 Aug 3;3(6):1373-1384. doi: 10.1016/j.ekir.2018.07.021. eCollection 2018 Nov. PMID: 30450464.

2. Trachtman H, Nelson P, Adler S, Campbell KN, Chaudhuri A, Derebail VK, Gambaro G, Gesualdo L, Gipson DS, Hogan J, Lieberman K, Marder B, Meyers KE, Mustafa E, Radhakrishnan J, Srivastava T, Stepanians M, Tesar V, Zhdanova O, Komers R; DUET Study Group. DUET: A Phase 2 Study Evaluating the Efficacy and Safety of Sparsentan in Patients with FSGS. J Am Soc Nephrol. 2018 Nov;29(11):2745-2754. doi: 10.1681/ASN.2018010091. PMID: 30361325

3. Kirkley MJ, Boohaker L, Griffin R, Soranno DE, Gien J, Askenazi D, Gist KM; Neonatal Kidney Collaborative (NKC). Correction to: Acute kidney injury in neonatal encephalopathy: an evaluation of the AWAKEN database. Pediatr Nephrol. 2019 Feb;34(2):363. doi: 10.1007/s00467-018-4106-0. PMID: 30315405

4. Mariani LH, Bomback AS, Canetta PA, Flessner MF, Helmuth M, Hladunewich MA, Hogan JJ, Kiryluk K, Nachman PH, Nast CC, Rheault MN, Rizk DV, Trachtman H, Wenderfer SE, Bowers C, Hill-Callahan P, Marasa M, Poulton CJ, Revell A, Vento S, Barisoni L, Cattran D, D'Agati V, Jennette JC, Klein JB, Laurin LP, Twombley K, Falk RJ, Gharavi AG, Gillespie BW, Gipson DS, Greenbaum LA, Holzman LB, Kretzler M, Robinson B, Smoyer WE, Guay-Woodford LM; CureGN Consortium. CureGN Study Rationale, Design, and Methods: Establishing a Large Prospective Observational Study of Glomerular Disease. Am J Kidney Dis. 2019 Feb;73(2):218-229. doi: 10.1053/j.ajkd.2018.07.020. Epub 2018 Nov 9. PMID: 30420158.

5. Askenazi D, Abitbol C, Boohaker L, Griffin R, Raina R, Dower J, Davis TK, Ray PE, Perazzo S, DeFreitas M, Milner L, Ambalavanan N, Cole FS, Rademacher E, Zappitelli M, Mhanna M; Neonatal Kidney Collaborative. Optimizing the AKI definition during first postnatal week using Assessment of Worldwide Acute Kidney Injury Epidemiology in Neonates (AWAKEN) cohort. Pediatr Res. 2019 Feb;85(3):329-338. doi: 10.1038/s41390-018-0249-8. Epub 2018 Dec 13. PMID: 30643188.

6. Charlton JR, Boohaker L, Askenazi D, Brophy PD, Fuloria M, Gien J, Griffin R, Hingorani S, Ingraham S, Mian A, Ohls RK, Rastogi S, Rhee CJ, Revenis M, Sarkar S, Starr M, Kent AL; Neonatal Kidney Collaborative (NKC). Late onset neonatal acute kidney injury: results from the AWAKEN Study. Pediatr Res. 2019 Feb;85(3):339-348. doi: 10.1038/s41390-018-0255-x. Epub 2018 Dec 13. PMID: 30546043.

7. Waller AP, Agrawal S, Wolfgang KJ, Kino J, Chanley MA, Smoyer WE, Kerlin BA; Pediatric Nephrology Research Consortium (PNRC). Nephrotic syndrome-associated hypercoagulopathy is alleviated by both pioglitazone and glucocorticoid which target two nuclear receptors. Physiol Rep. 2020 Aug;8(15):e14515. doi: 10.14814/phy2.14515.PMID: 32776495.

8. Delbarba E, Marasa M, Canetta PA, Piva SE, Chatterjee D, Kil BH, Mu X, Gibson KL, Hladunewich MA, Hogan JJ, Julian BA, Kidd JM, Laurin LP, Nachman PH, Rheault MN, Rizk DV, Sanghani NS, Trachtman H, Wenderfer SE, Gharavi AG, Bomback AS; CureGN Consortium. Persistent disease activity inpatients with long-standing glomerular disease. Kidney Int Rep. 2020 Mar 20;5(6):860-871. doi: 10.1016/j.ekir.2020.03.017. eCollection 2020 Jun. PMID: 32518868.

**Abstracts (*accepted for oral presentation; ** accepted for poster session).**

*1. Mahan JD, Sisson SP, Vernier RL: Decrease in anionic charge sites (CS) in the lamina rara externa (LRE) in aminonucleoside nephrosis. Am Soc Nephrology - 15th Annual Meeting, Chicago, IL, 1982. Kidney Int 23:220, l983.

*2. Mahan JD, Chesney RW, Fallon MD, Kim YK: 25-$D_3$ treatment in dialysis dependent children. Soc Pediatric Res - 52nd Annual Meeting, Washington, D.C., 1983. Pediatric Research l7:353A, 1983.

*3. Sibley RD, Mahan JD, Vernier RL: Congenital and infantile nephrotic syndrome: A clinicopathologic study of 46 cases. Lab Invest 48:12P, l983.

**4. Mahan JD, Sisson SP, Vernier RL: Alterations in anionic charge sites in GBM and mesangium of congenital nephrotic syndrome as demonstrated by perfusion of human kidneys. Am Soc Nephrology - 16th Annual Meeting, Washington, D.C., 1983. Kidney Int 25:224A, l984.

*5. So SK, Mahan JD, Mauer SM, Sutherland DE, Nevins TE: Hickman catheter for pediatric hemodialysis: A 3-year experience. Am Neph Nurse Assoc J, l984.

**6. Mahan JD, Sisson SP, Vernier RL: Altered glomerular basement membrane (GBM) anionic sites in the minimal change nephrotic syndrome (MCNS) in man. Am Soc Nephrology - 17th Annual Meeting, Washington, D.C., 1984. Kidney Int 27:2l7A, l985.

**7. Mahan JD, Fallon MD, Striegel JE, Kim YK, Chesney RW: Histologic response in pediatric renal osteodystrophy (ROD) to treatment with l,25$(OH)_2D_3$ and 24,25$(OH)_2D_3$. Sixth Workshop in Vitamin D. Merano, Italy, l985.

*8. Innes JT, Cosio FG, Mahan JD, Nahman NS, Ferguson RM: Cyclosporine (CsA) enhances endotoxin (Etx) induced nephrotoxicity in rabbits. Am Soc Nephrology - 18th Annual Meeting, New Orleans, LA, 1985. Kid Int 29:43l A, l986.

**9. McClung HJ, Mahan JD, Murray R, Powers P: Hepatic failure effects on transcellular membrane vesicular traffic in the blood-brain barrier (BBB) of rabbits. Soc Pediatric Res -55th Annual Meeting, Washington, D.C., l986, Ped Res 547, 1986.

**10. Mahan JD, McAllister C, Shannon B: Immune complex promotion of mesangial and capillary cell mediated neutrophil activation. Am Soc Nephrology - 19th Annual Meeting, Washington, D.C., 1986. Kid Int 31:326 A, 1987.

*11. Mentser M, Mahan JD, Herr R: The results of home peritoneal dialysis (PD) in infants with end stage renal disease. National Kidney Foundation, 16th Annual Scientific Meeting, Washington, D.C., 1986.

12. Nahman NS Jr, Cosio FG, Hebert LA, Mahan JD, Henry ML, Ferguson RM: The role of hypertension (H) and hyperperfusion in Cyclosporine (CSA) nephrotoxicity in rats. Am Soc Nephrology - 19th Annual Meeting, Washington, D.C., 1986. Kid Int 31:465 A, 1987.

*13. Seifert CM, Cromer B, Mahan JD: Urinary calcium excretion in healthy adolescents. National Kidney Foundation, 16th Annual Scientific Meeting, Washington, D.C., 1986.

14. Patterson LT, Mahan JD, Mentser MI, Menke JA: Results of peritoneal dialysis (PD) in the neonate. Soc Pediatric Res - 56th Annual Meeting, Anaheim, CA, 1987. Ped Res 21:482 A, 1987.

*15. Cosio FG, Purcell HE, Mahan JD, Nahman Jr, NS: Fibronectin (FN): A determinant of immune complex (IC) formation in glomeruli. 10th Int Congress of Neph, London, England, July 1987.

**16. Kees-Folts D, Mahan JD, McAllister C, Shannon B, Cosio FG: Fibronectin (FN) production in human glomerular cells. Am Soc Neph 20th Annual Meeting, Washington, D.C., 1987. Kid Int 33:318A, January 1988.

**17. Mentser M, Shannon B, Mahan JD: Cyclosporine treatment of frequently relapsing minimal change nephrotic syndrome (FR-MCNS) in children: Response to therapy and evidence for a T Cell abnormality. Am Soc Nephrology - 20th Annual Meeting, Washington., D.C., 1987. Kid Int 33:329A, January 1988.

**18. Ward KW, Mahan JD, Lash JM, Sherman WA: The affect of aerobic training on glucose control kidney function and structure in the obese (Diabetic) Zucker rat (OZR). Am Soc Nephrology - 20th Annual Meeting, Washington, D.C., 1987. Kid Int 33:326A, January 1988.

**19. Cosio FG, Bakaletz AP, Mahan JD: Glomerular immune complexes (IC) formation: The role of antibody (Ab) precipitating characteristics. Am Soc Nephrology - 20th Annual Meeting, Washington, D.C., 1987. Kid Int 33: 312 A, January 1988.

**2 . Mah n , McAllist r , Shann n : Leukocy e adheren e o cultur d glomerul r capilla y cell . Tiss e Cultu e As o -39 h Annu l Meetin , L s Vega , Nevad , 198 . n Vit o Ce l & Devel p Bi l 24:28 , Mar h 198

**2 . McAllist r , Shann n , Kees-Fol z , Mah n : Isolati n f hum n glomerul r capilla y endotheli l cell Tiss e Cultu e Associati n - 39 h Annu l Meetin , L s Vega , Nevad , 198 n Vit o Ce l & Devel p Bi l 24:28 , Mar h 198

**2 . Wa d , Mah n , Bel a , La h , Sherm n : T e associati n f biochemic l paramete s o t e evoluti n f diabet c nephropat y n t e obe e Zuck r ra m As o Cl n Che , 40 h Annu l Meetin , N w Orlean , L , 198 Cl n Ch 34:119 , 198

**2 . Shann n B , McAllist r , Kees-Folt , Jaco s , Mah n J : Utili y f fl w cytomet y n t e selecti e isolati n a d cultivati n f hum n glomerul r capilla y endotheli l cel s (GCEC . Socie y f r Analytic l Cytolog , Cytomet y Suppleme t 2:7 , 198

**2 . Samud a , Mah n J , McAllist r , Shann n : Cytokin s promo e neutroph l ( ) adheren e o cultur d hum n glomerul r cell m S c Ne h 21 t Annu l Meetin , Washingto , D.C , Decemb r 198 K d Internation l 35:36 , 198

2 . Kees-Fol z , Mah n J , McAllist r , Shann n : Immu e compl x (I ) effec s n hum n glomerul r ce l fibronect n (F ) productio . m S c Ne h 21 t Annu l Meetin , Washingto , D.C , Decemb r 198 . Kidn y Internation l 35:35 , 198

*2 . Cos o F , Bakale z A , Mah n J Experiment l glomerulonephrit s (G ) induc d y injecti n f fibronect n bindi g antig n (A ) follow d y specif c antibodi s (Ab m S c Ne h 21 t Annu l Meetin , Washingto , D.C , Decemb r 198 Kidn y Internation l 35:34 , 198

*2 . Birmingh m , Hebe t L , Cos o F , Mah n J , Go l , Sme d : Immu e compl x (IC)-erythrocy e compleme t recept r ty e 1 (E-CR ) interactio s n vi o duri g inducti n f glomerulonephrit s (G ) n nonhum n primate m S c Ne h 21 t Annu l Meetin , Washingto , D.C , Decemb r 198 Kidn y Internation l 34:34 , 198

**2 . Mah n J , Hebe t L , Cos o F , Birmingh m , Sh n , Go l : Experiment l glomerulonephrit s (G ) n t e nonhum n prima e (P : Gener l descripti n f t e mode m S c Ne h 21 t Annu l Meetin , Washingto , D.C , Decemb r 198 Kidn y Internation l 35:35 , 198

*2 . Wa d K , Mah n J , Sherma , W , La h J : T e effe t f exerci e n glycem c contro , kidn y functi n a d ren l ultrastructu e n t e obe e (diabeti ) Zuck r ra m As o Cl n Ch m 40 h Annu l Meetin , Atlant , Georgi . Ju y 198

**3 . Mah n J , McAllist r , Samud a , Shann n : Interleukin- , Interleukin 2 a d gam a interfer n affe t neutroph l ( ) adheren e o hum n glomerul r capilla y cell VI I Congre s f IP A (Internation l Pediatr c Nephrolo y Association , Toront , Canad , Augu t 27-Se t , 198

**3 . Mah n J , McCalliste , , Shann n : Cytokin s affe t hum n glomerul r capilla y ce l morpholog VI I Congre s IP A (Internation l Pediatr c Nephrolo y Association Toront , Canad , Augu t 27-Se t , 198

**3 . Ments r , Batis y , Mah n J : Enalapr l treatme t f hypertensi n n infan s a d childre VI I Congre s IP A (Internation l Pediatr c Nephrolo y Association Toront , Canad , Augu t 27-Se t , 198

**3 . Habi a A , Mah n J , McAllist r C , Oro z C , Butch r E : p regulat d expressi n f endotheli l ce l (E ) activati n antig n n t e mesangi m a d proxim l tubu e (P ) n muri e immu e compl x (I ) glomerulonephrit s (GN m S c Ne h 23 d Annu l Meetin , Washingto , D.C , Decemb r 2- , 199 . JA N 1:52 , 199

3 . Mah n J , McAllist r C , Sprink l : Cytoki e alteratio s n hum n mesangi l ce l (M ) grow h a d functi n n ser m medi m S c Ne h 23 d Annu l Meetin , Washingt n D.C , Decemb r 2- , 199 JA N 1:53 , 199

3 . Mah n J , Wa d K , Albrig t A : T e effe t f aerob c traini g n diabet c nephropat y (D ) n Ty e I diabet c rat . m S c Ne h 23 d Annu l Meetin , Washingt n D.C , Decemb r 2- , 199 JA N 1:51 , 199

*3 . Mah n J , Hebe t L , McAllist r , Birmingh m D , Sh n X , Cos o F : Platel t (P ) involveme t n experiment l immu e compl x (IC)-mediat d glomerulonephrit s (G ) n primat s (PM . m S c Ne h Annu l Meetin , Washingt n D.C , 199 . JA N 2:55 , 199

3 . o , Mah n J , McNee y , McAllist r C : Bacteri l cerebriti : Acu e mediato s f inflammati n a d blood-bra n barri r change Socie y f r Neuroscienc . 199

**38. Habiba AA, Mahan JD, McAllister CA, Orosz CG, Butcher EC: Correlation of activation antigens and MHC antigens to disease forms of murine glomerulonephritis. Am Soc Neph Annual Meeting, Washington D.C., November 17-20, 1991. JASN 2:543, 1991.

39. Frenchko CE, Mahan JD, Ward KM, McAllister CA, Albright AL: Decreased glomerular anionic charge site size and number in IDDM and NIDDM in the rat. Am Soc Neph Annual Meeting, Washington D.C., November 17-20, 1991, JASN 2:541, 1991.

**40. Mahan JD, McAllister CM: Tumor necrosis factor (TNF) interleukin-1 (IL-1) affect human glomerular capillary endothelial and mesangial cell expression of adhesion molecules. 9th Congress Intl Pedi Neph Assoc, Jerusalem, Israel, 1992.

**41. Mahan JD, McAllister CM: Human glomerular capillary endothelial cells produce interleukin-6 in response to cytokines and may be a source of interglomerular IL-6 production in GN. 25th Annual Meeting Am Soc Neph, Baltimore, MD, November 15-18, 1992. JASN

**42. Mahan JD, McAllister CM: Differential expression of adhesion molecules by human glomerular capillary endothelial cells and human umbilical vein endothelial cells after exposure to tumor necrosis factor and interleukin-1. 25th Annual Meeting Am Soc Neph, Baltimore, MD, November 15-18, 1992. JASN

*43. Mahan JD, Hebert LA, MCAllister CM, Birmingham DJ, Shen SP, Cosio FG: Platelet participation in clearance of immune complexes (IC) in experimental IC-mediated glomerulonephritis (GN) in primates. 25th Annual Meeting AM Soc Neph, Baltimore, MD, Nov 15-18, 1992. JASN

**44. Hebert LA, Mahan JD, Birmingham DJ, Cosio FG, Dillon JJ, Sedmak DD, Shen X-P, McAllister C: Enalapril (EN) therapy decreases glomerular accumulation of immune complexes (IC) and mesangial matrix in a model of glomerulonephritis (GN) in the nonhuman primate. 25th Annual Meeting Am Soc Neph, Baltimore, MD, Nov 15-18, 1992.

**45. Mahan JD, McAllister CM: Human glomerular capillary endothelial cells express vascular cell adhesio n molecule 1 (VCAM-1) but not endothelial leukocyte adherence molecule 1 (ELAM-1) after cytokine exposure. SPR 1993. Ped Res

**46. Mahan JD, Igel A, Morris JD, Turman MA, Mentser MI: Idiopathic hypercalciuria is associated with decreased bone density in children. SPR 1993. Ped Res

**47. Igel A, Morris JD, Mahan JD: The role of corticosteroid dose and duration on bone density in children. SPR 1993. Ped Res

**48. Shannon B, McAllister C, Jacobs D, Mahan JD: Selective isolation and cultivation of murine glomerular capillary endothelial cells (GCEC) by florescent activated cell sorting. Flow Cytometry Meeting 1993.

*49. Mahan JD, McAllister CM: Human glomerular capillary endothelial cells express vascular cell adhesion molecule-1 (VCAM-1) but not endothelial leukocyte adhesion molecule-1 (ELAM-1) after cytokine exposure. 62nd Annual Meeting Soc Ped Research, Washington, DC, 1993. Ped Res 33:360A, 1993.

**50. Mahan JD, McAllister CM, van Setten PA: Human glomerular capillary endothelial cells (GCEC) viability and adhesiveness for neutrophils (N) and monocytes (MO). 26th Annual Meeting Am Soc Neph, 1993.

*51. Mahan JD, van Setten PA, McAllister CM, Monnens LAH: Effects of verotoxin-1 (VG-1) on human glomerular capillary endothelial cell (GCEC) viability and adhesiveness for neutrophils (N) and monocytes (MO). 26th Annual Meeting AM Soc Neph, 1993.

**52. Turman MA, Hammand S, Mahan JD: Tubulo-interstitial fibrosis (TIF) and infiltration (TII) by mononuclear cells(MNC) in a primate model of immune complex (IC)-mediated glomerulonephritis (GN). Am Soc Neph Meeting, JASN 4:638, 1993.

**53. Hebert LA, Birmingham DJ, Mahan JD, Shen XP, McAllister C, Cosio FG, Dillon JJ: Effect of chronically increased erythrocyte (E) complement receptor type 1 (CR1) on the evolution of experimental glomerulonephritis (GN) induced by chronic daily bolus intravenous (IV) antigen infusion. Am Soc Neph Meeting, JASN 4: 605, 1993.

54. Mahan JD, Van Setten PA, McAllister C, Van de Heuvel PPWJ, Monnens LAH: Effects of Verotoxin-1(VT) on human glomerular capillary endothelial cell (GCEC) viability and adhesiveness for neutrophils (N) and monocytes (M). Am Soc Neph Meeting, JASN 4: 617, 1993.

55. Mahan JD, McAllister C, Van Setten PA: Human glomerular capillary endothelial cells (GCEC) exposed to cytokines display increased adhesiveness for neutrophils (N) and monocytes (MO) associated with vascular cell adhesion molecule-1 (VCAM-1) and intracellular adhesion molecule (ICAM-1) expression. Am Soc Neph Meeting, JASN 4: 617, 1993.

*56. Mahan JD, Olson T, McAllister C: Human glomerular capillary endothelial and mesangial cells increase interleukin-6 receptor gene expression in response to cytokines. Ped Res 35: 369A, 1994. 63rd Annual Meeting of SPR, Seattle, Wash, May 2-5, 1994.

**57. Mahan JD, van Setten P, McAllister C, Karmali M, van de Heuvel L: Verocytoxin-1 (VT-1) increases the adhesiveness of human glomerular capillary endothelial (GCEC) and mesangial cells (MC) for neutrophils (N) and monocytes (MO) despite decreasing adhesion molecule expression. Ped Res 35: 369A, 1994. 63rd Annual Meeting of SPR, Seattle, Wash, May 2-5, 1994.

*58. Mahan JD, van Setten PA, McAllister C, van den Heuvel LPWJ, Monnens LAH. Effect of verotoxin-1 on viability and protein synthesis of human glomerular capillary endothelial cells. 2nd International Symposium on Verocytotoxin (Shiga-like toxin)-producing E. coli infections, Bergamo Italy, June 27, 1994.

*59. Mahan JD, van Setten P, McAllister C, ven den Heuvel LPWJ, Monnens LAH: The human mesangial cell is a target for verotoxin-1 (VT-1) of the hemolytic uremic syndrome (HUS). 27th Annual Meeting American Society of Nephrology, Boston MA, Oct 28, 1994. JASN 5:1994

60. Westcott V, Mahan JD, McAllister C, Ward K, (spon. by Zipf W.):Mesangial cells (MC) from young mice proliferate better after exposure to interleukin-6 (IL-6) than do MC from adult mice. 25th Annual Meeting Society for Pediatric Research, San Diego CA, May 5, 1995. Ped Res 37:373A, 1995.

61. Wilmer WA, Cosio FG, Mahan JD, O'Dorisio MS: Elevated serum levels of substance P (SP) in children with IgA Nephropathy (IGAN) correlate with elevated serum IgA levels. 28th Annual Meeting American Society of Nephrology, San Diego, CA, November 5, 1995. JASN 6:858, 1995.

**62. Hebert LA, Mahan JD, Birmingham DJ, Cosio FG, Dillon JJ, Sedmak DD, Shen XP, McAllister C: Effect of enalapril (EN) therapy on experimental immune complex (IC) glomerulonephritis (GN) in the nonhuman primate. 28th Annual Meeting American Society of Nephrology, San Diego, CA, November 5, 1995. JASN 6:420,1995.

63. Mahan JD, Hebert LA, McAllister C, Birmingham DJ, Shen XP, Cosio FG: Effect of enalapril (EN) therapy on resolution of glomerular immune deposits of experimental immune complex (IC) glomerulonephritis (GN) in the nonhuman primate. 28th Annual Meeting American Society of Nephrology, San Diego, CA, November 5, 1995. JASN 6:841, 1995.

**64. Mahan JD, McAllister C, Karmali M: Potential role in hemolytic uremic syndrome (HUS) for neutrophil mediated damage to (HUS) verocytotoxin-1 (VT-1) exposed human glomerular capillary endothelial cells (GCEC) and mesangial cells (MC). 28th Annual Meeting American Society of Nephrology, San Diego, CA, November 5, 1995. JASN 6:874, 1995.

**65. Mahan JD, McAllister C, Karmali M: Enhanced toxicity of the hemolytic uremic syndrome (HUS) verocytotoxin-2 (VT-2) for human mesangial cells (MC). 28th Annual Meeting American Society of Nephrology, San Diego, CA, November 5, 1995. JASN 6:875, 1995.

*66. Mahan JD, McAllister C: Human glomerular endothelial cells in culture from capillary vessel-like structures in response to matrigel. 10th Congress of the International Pediatric Nephrology Association, Santiago Chile, August 27, 1995. Ped Neph Vol 9:C36,1995.

*67. Mahan JD, McAllister C, Karmali M: The verocyttooxin-1 (VT-1) of hemolytic uremic syndrome increases the sensitivity of human mesangial cells (MC) to neutrophil (N) adherence and N-mediated cytoxicity. 10th Congress of the International Pediatric Nephrology Association, Santiago Chile, August 27, 1995. Ped Neph Vol 9:C48, 1995.

*68. Mahan JD: Cell adhesion molecules modulate renal inflammation in nephritis and rejection. 10th Congress of the International Pediatric Nephrology Association, Santiago Chile, August 27, 1995. Ped Neph Vol 9:C15, 1995.

**69. Mahan JD, McAllister C, Karmali M. Verocytotoxin-1 (VT-1) induces apoptosis in human glomerular capillary endothelial cells (GCEC) and mesangial cells (MC) in vitro. 65th Annual Meeting of the Society for Pediatric Research. Washington DC, May 6, 1996. Ped Research 39:364A,1996.

**70. Mahan JD, Turman MA, McAllister C, Karmali M. Toxicity of the hemolytic uremic syndrome (HUS) verocytotoxin-1 (VT-1) for human proximal tubular epithelial cells. 65th Annual Meeting of the Society for Pediatric Research. Washington DC, May 6, 1996. Ped Research 39:364A, 1996.

71. Mahan JD, McAllister C, Karmali M. Verocytotoxin-1 (VT-1) induction of apoptosis in human glomerular capillary endothelial cells (GCEC) *in vitro* is dependent on cytokines, cell confluence and cell cycle. 29th Annual Meeting American Society of Nephrology, Nov 3,1996. JASN 7:1661, 1996.

**72. Mahan JD, Turman MA, Birmingham DJ, Shen XP, and Hebert LA. Relationship between magnitude of proteinuria and tubulointerstitial (TI) inflammation and fibrosis in a primate model of immune complex (IC) glomerulonephritis (GN). 29th Annual Meeting American Society of Nephrology, Nov 3, 1996. JASN 7:1739, 1996.

73. Tallian K, Nahata M, Turman MA, Mahan JD, Menstser MI. Efficacy of amlodipine in pediatric patients with hypertension: a preliminary study. 29th Annual Meeting 29th Annual Meeting American Society of Nephrology, Nov 3, 1996. JASN 7:1556, 1996.

**72. Hebert LA, Mahan JD, Ferguson J, Sedmak DD. Hyperplasia of proximal renal tubular epithlium develops in patients with chronic nephrotic-range proteinuria. 29th Annual Meeting American Society of Nephrology, Nov 3, 1996. JASN 7:1319, 1996.

**73. Mahan JD, McAllister C, Hayes L, Karmali M. Verocytotoxin-1 (VT-1) induction of apoptosis in human glomerular capillary endothelial cells (GCEC) and mesangial cells (MC) in vitro and in vivo. 66th Annual Meeting of the Society for Pediatric Research. Washington DC, May 1997.

**74. Meade MA, Mahan JD, Menster MI, Turman MA, Wallace A, Creer TL. Outcome of a pilot self-management program for children with a renal transplant. Advancing Children's Health 2000. PAS and SPR Year 2000 Joint Meeting. May 12, 2000, Boston MA. Ped Res 2000.

**75. Yeager ND, English RF, Mihalov LK, Kuzma MK, Mahan JD. Procedure documentation in pediatric residency programs: state of the art and views of the future. Advancing Children's Health 2000. PAS and SPR Year 2000 Joint Meeting. May 15, 2000, Boston MA. Ped Res. 2000.

**76. Mahan JD, Webb N, Vandamme-Lombaerts R, Lemire J, Ettenger R, Hoyer PF, Kovarik J, McMahon L, Anderson DL, Boger R. Pharmacokinetics and tolerability of RAD 001 (RAD) in pediatric stable renal transplant patients. First Joint Meeting of the American Society of Transplant Surgeons and the American Society of Transplantation. May 14, 2000. Chicago IL, 2000.

**77. Johnson CE, Langkamp D, Mahan JD. Teaching by Pediatric Chief Residents and the Use of Evidence-Based Medicine in Their Teaching. PAS and SPR Year 2001 Joint Meeting, April 28, 2001, Baltimore, MD, 2001.

**78. Rich D, Wadwa P, Peters K, Mihalov L, Kuzma MK, Mahan JD. Using Palm Pilots in a Pediatric Residency. PAS and SPR Year 2001 Joint Meeting, April 28, 2001, Baltimore, MD, 2001.

**79. Lamers ML, Niland ML, Staker SR, Mihalov L, Kuzma MK, Mahan JD. The Benefits and Risks of Voiding Cystourethrogram (VCUG) Done During Admission for Acute Pyelonephritis in Children. PAS and SPR Year 2001 Joint Meeting , May 1, 2001, Baltimore, MD, 2001.

**80. Mahan JD, Uphadyay A, Hayes J, Turman MA, Mentser MI. Determinants of Lumbar Vertebral Bone Density in Children Post Renal Transplantation. PAS and SPR Year 2001 Joint Meeting, April 28, 2001, Baltimore, MD, 2001.

81. Robinson RF, Parker M, Nahata M, Batisky DL, Mahan JD, Turman MA, Bates CM. The Role of Amlodipine in Primary and Secondary Hypertension. PAS Annual Meeeting, 2001.

82. Batisky DL, Robinson R, Davis-Miller C, Kossman B, Mahan JD. Clinical Trials in Pediatric Patients with Hypertension: One Center's Experience. PAS Annual Meeting, Baltimore MD, 2001.

83. Robinson RF, Batisky DL, Nahata MC, Hayes J, Mahan JD. Comparison of Incidence of Reported Adverse Events with Pretreatment for Pamidronate Administration in Children. PAS Annual Meeting, Baltimore MD, 2002.

84. Batisky DL, Robinson RF, Nahata MC, Bates CM, Mahan JD. Significance of Body Mass Index in Primary and Secondary Pediatric Hypertension. PAS Annual Meeting, Baltimore MD, 2002.

85. Rich DH, Morrison MJ, Hayes J, MahanJD. Use of Personal Digital Assistants Among Community Pediatricians. PAS Annual Meeting, Baltimore MD, 2002.

86. Morrison MJ, Rich DH, Mahan JD, Saunders D, Hayes J. Resident Use of PDAs. PAS Annual Meeting, Baltimore MD, 2002.

87. Chan JCM, Mahan JD, Trachtman H, Scheinman J, Flynn JT, Alon U, Lande MB, Weiss RA. Outcome of Vitamin E Treatment on the Progression of IgA Nephropathy: A Double-Blind Placebo Controlled, Randomized Clinical Trial for Children, PAS Annual Meeting, Baltimore MD, 2002.

88. Flynn JT, Ludden T, Mahan JD, Nahata MC, Arbus GS, Portman RJ: Population Pharmacokinetics of Amlodipine (AML) in Children with Hypertension (HTN). PAS Annual Meeting, Baltimore MD, 2002.

89. Flynn JT, Mahan JD, Robinson R, Portman RJ, Greenleaf P: Population Pharmacokinetics of Amlodipine in Hypertension Children, Eastern Society for Pediatric Research Meeting, Baltimore MD, 2002.

90. Flynn JT, Ludden T, Mahan JD, Nahata MC, Robinson R, Arbus GS, Portman RG, Greenleaf PA: Population Pharmacokinetics of Amlodipine in Children with Hypertension, ASH 17th Annual Scientific Meeting, 2002.

91. Hayes JR, Robinson RF, Batisky DL, Mahan JD. Significance of Heritability in Primary and Secondary Pediatric Hypertension. PAS Annual Meeting, Seattle WA, 2003.

92. Robinson RF, Nahata MC, Casavant MJ, Mahan JD. Infant Aluminum Related Bone Disease (ARBD) and Hypophosphatemia After Chronic Antacid Administration. PAS Annual Meeting, Seattle WA, 2003.

93. Portman RJ, Trachtman H, Mahan JD, Poffenbarger T, Klibaner M. Altered Assessment of Antihypertensive Effectiveness in Hypertensive (HTN) Children Using Ambulatory Blood Pressure (ABP) Compared to Casual Blood Pressure (CBP) Measurements. PAS Annual Meeting, Seattle WA, 2003.

94. Emanuel JE, Robinson RF, Nahata MC, Hayes JR, Mahan JD. Prevalence of Anuria in Neonates Receiving Enalaprilat Therapy. PAS Annual Meeting, Seattle WA, 2003.

95. Engle J, Kuzma MK, Long W, Budin L, Mihalov L, Bartel M, Orlino A, Mahan JD. Faculty, Resident and Family Evaluation of the Children's Hospital/The Ohio State University (CH/OSU) Pediatric Education in Community Settings (PECS) Program: Maintaining Faculty Enthusiasm and Involvement. PAS Annual Meeting, Seattle WA, 2003.

96. Robinson RF, Hayes JR, Casavant MJ, Wilkins JR, Mahan JD. Use of a Poison Control Center Database To Better Understand Attention Deficit and Hyperactivity Disorder (ADHD) Stimulant Exposures in Children and Adolescents. PAS Annual Meeting, Seattle WA, 2003.

97. Moeller VM, Hoyer PF, Lemire J, Mahan JD, Webb N, Niaudet, Jaffe J: Everolimus in de Novo pediatric renal transplantation: Results at 24 months, American Transplant Congress, 2004.

98. Robinson RF, Nwose O, Hall D, Daley W, Mahan JD. A Multi-Center Open-Label, Steady State Study To Evaluate the Pharmacokinetics (PK) of Benazepril in Pediatric Subjects, PAS Annual Meeting, San Francisco CA, 2004.

99. Bang TC, Batisky DL, Mahan JD, Robinson RF. Utility of Renal Ultrasounds in Diagnosis of Pediatric Hypertension, PAS Annual Meeting, San Francisco CA, 2004.

100. Robinson RF, Engle C, Smith H, Hayes JR, Mahan JD, Smith CV. Medication Factors Influencing Prescribing Patterns in the Management of Pediatric Hypertension. PAS Annual Meeting, San Francisco CA, 2004.

101. Gray AC, Mahan JD, Kuzma MK, Saunders DK. Using a PDA Template To Standardize Patient Sign-Out. PAS Annual Meeting, San Francisco CA, 2004.

102. Mahan JD, Brown RT, Kopech MA, Murray RD, Meyer BM. Promoting Physician Involvement in Advocacy and Organizational Medicine. PAS Annual Meeting, San Francisco CA, 2004.

103. Somers MG, Goldstein SL, Symons JM, Brophy PD, Blowey DL, Flores FX, McBryde KD, Bunchman TE, Hackbarth R, Mahan JD, Chand DH, Alexander SR, Fortenberry JD, Chua A, Baum MA. Continuous Renal Replacement Therapy (CRRT) in Children < 10 Kg: A Report of the Prospective Pediatric Continuous Renal Replacement Therapy (ppCRRT) Registry Group, PAS Annual Meeting, Washington DC, 2005.

104. Goldstein SL, Symons JM, Somers MJG, Baum MA, Brophy PD, Blowey D, Flores FX, Bunchman TE, Hackbarth R, Mahan JD, Chand DH, Alexander SR, Chua A, McBryde K, Fortenberry J. Continuous Renal Replacement Therapy (CRRT) for Critically Ill Children: A Report from the Prospective Pediatric CRRT (ppCRRT) Registry Group. PAS Annual Meeting, Washington DC, 2005.

105. McBryde KD, Symons JM, Somers MJG, Baum MA, Brophy PD, Blowey DL, Flores FX, Bunchman TE, Hackbarth RM, Mahan JD, Chand DH, Alexander SR, Fortenberry JD, Chua A, Goldstein SL. Non-Renal Failure Indications for Continuous Renal

Replacement Therapy (CRRT): A Report from the Prospective Pediatric CRRT (ppCRRT) Registry Group. PAS Annual Meeting, Washington DC, 2005.

106. Symons JM, Somers MJG, Baum MA, Bunchman TE, Brophy PD, Blowey D, Fortenberry JD, Chand D, Flores FX, Hackbarth R, Alexander SR, Chua AN, Mahan JD, McBryde KD, Goldstein SL. Demographics of Pediatric CRRT: A Report of the Prospective Pediatric Continuous Renal Replacement Therapy (ppCRRT) Registry Group. PAS Annual Meeting, Washington DC, 2005.

107. Flores FX, Brophy PD, Symons JM, Fortenberry JD, Chua AN, Alexander SR, Mahan JD, Bunchman TE, Blowey D, Somers MJG, Baum M, Hackbarth R, Chand D, McBryde K, Goldstein SL. CRRT in Pediatric Bone Marrow Transplant Patients: A Report from the Prospective Pediatric Continuous Renal Replacement Therapy (ppCRRT) Registry Group. PAS Annual Meeting, Washington DC, 2005.

108. Blanchong CA, Batisky D, Monda K, Thornton J, Mahan JD. Increased Frequency of Pro-Thrombotic Risk Factors in Children with Thrombosis and Nephrotic Syndrome, PAS Annual Meeting, Washington DC, May 2005

109. Burke A, Stolfi A, Gori A, Mahan JD. A Survey of Regional Pediatric Program Directors' Opinions About Resident Procedural Skills, PAS Annual Meeting, Washington DC, May 2005.

110. Robinson RF, Smoyer W, Dresner I, Patel H, Chiang M, Torres A, Pan C, Geary D, Leiser J, Chand D, Lin JJ, Mahan JD. Factors That Drive Selection of Antihypertensive Medications by Pediatric Nephrologists. A Report by the Midwest Pedi atric Nephrology Consortium. PAS Annual Meeting, Washington DC, 2005.

111. Bowden SA, Robinson RF, Carr R, Henwood MJ, Binkovitz L, Germak JA, Mahan JD. The Prevalence of Vitamin D Insufficiency in Children with Osteopenia or Osteoporosis. PAS Annual Meeting, Washington DC, 2005.

112. Carr RR, Robinson RF, Mahan JD, Nahata MC. Impact of Pamidronate Therapy on Linear Growth in Children with Osteopenia/Osteoporosis. PAS Annual Meeting, Washington DC, 2005.

113. Henwood MJ, Bowden SA, Binkovitz LA, Robinson RF, Mahan JD. Comparison of Vertebral and Total Body Bone Mineral Density in Children and Adolescents with Osteoporosis. PAS Annual Meeting, Washington DC, 2005.

114. Pallant A, O'Connor B, Hayes J, Mahan JD. Factors Associated with Career Satisfaction and Success for Pediatric Program Directors, PAS Annual Meeting, San Francisco CA, May 1, 2006.

115. Bowden SA, Robinson RF, Carr R, Hayes J, Mahan JD. Does Vitamin D Insufficiency Affect Bone Mineral Density Response to Bisphosphonates?, PAS Annual Meeting, San Francisco CA, May 1, 2006.

116. Warady B, Swinford R, Mahan JD, Dana K, Lippe B, Bakker B. Recombinant Human Growth Hormone (rhGH) Therapy in Children with Chronic Kidney Disease (CKD): A Report of the National Cooperative Growth Study (NCGS), PAS Annual Meeting, San Francisco CA, May 1, 2006.

117. Fuh B, Kerlin B, Blanchong C, Blatt N, Zhoa S, Thornton J, Monda K, Smoyer W, Mahan JD. Incidence and Risk Factors of Deep Venous Thrombosis in Children with Nephrotic Syndrome, PAS Annual Meeting, Toronto Canada. May 5, 2007

118. Schwaderer AL, Cronin R, Mahan JD. Increased Incidence of Osteoporosis and Osteopenia in Children with Hypercalcuria and/or Kidney Stones, PAS Annual Meeting, Toronto Canada, May 5, 2007.

119. Iorember F, Patel HP, Hayes J, Mahan JD. Left Ventricular Mass in Pediatric Renal Transplant Recipients: A Comparison Between Steroid Sparing and Steroid Inclusive Immunosuppression Protocols. PAS Annual Meeting, Toronto Canada, May 7, 2007.

120. Blake K, Henwood M, Bowden SA, Binkovits L, Nunes M, Mahan JD. Are Total Body Bone Mineral Density and Lumbar Vertebral Bone Mineral Density Changes Linked in All Types of Pediatric Osteoporosis? PAS Annual Meeting, Toronto Canada, May 7, 2007.

121. Greenbaum LA, Pierce CB, Kaskel F, Mahan JD, Schwartz GJ, Munoz A, Warady BA, Furth SL. C-Reactive Protein and Obesity in Children with Chronic Kidney Disease, PAS Annual Meeting, Toronto Canada, May 7, 2007.

122. Mahan JD, Ferrell C, Mortensen AM, Sells LL, Bale J, Wright M, Campbell L, Burke A, Thammasitboon S, Minor M, Lake K, McGregor RM. Learning Styles (LS) in Pediatric Residents – Are LS Types Related to USMLE Results and Are Residents

Ready To Apply Their LS to Their Individualized Learning Plans (ILP's)? , PAS Annual Meeting, Toronto, Canada, May 8, 2007.

123. Blatt N, Kerlin B, Fuh B, Zhoa S, Blanchong C, Smoyer WE, Mahan JD. The Epidemiology of Deep Venous Thrombosis in Children with Nephrotic Syndrome: A MidWest Pediatric Nephrology Consortium (MWPNC) Study. ASN Annual Meeting, San Francisco, CA. November 4, 2007.

124. Iorember F, Patel HP, Stanley A, Hayes J, Mahan JD. One Year Outcomes in a Steroid Avoidance Protocol Using Sirolimus and Cyclosporine in Pediatric Renal Transplantation. PAS 2008 Annual Meeting, Honolulu HI, May 4, 2008.

125. Mahan JD, Warady BA, Frane J, Rosenfeld RG, Swinford RD, Lippe B, Bakker B. Defining the Expected Growth Response to Growth Hormone (GH) Therapy (Tx) in Children with Short Stature and Chronic Kidney Disease (CKD). PAS 2008 Annual Meeting, Honolulu HI, May 4, 2008.

126. Sangvai SG, Mahan JD, Pudlo N, Lewis KO, Suresh S. Interactive Web-Based Learning as a Means To Improve Injury Prevention Counseling by Residents in Continuity Clinic. PAS 2008 Annual Meeting, Honolulu HI.

127. Sangvai SG, Mahan JD, Pudlo N, Lewis KO, Suresh S. Determining the Gap Between Injury Prevention Recommendations and Clinical Practice By Residents in Continuity Clinic" scheduled for podium presentation at the AAP Section on Injury, Violence and Poison Prevention. AAP Annual Meeting, Boston MA, Oct 13, 2008.

128. Ayoob R, Kusumi K, Mahan JD. Improved Fracture Rates in Children with Osteogenesis Imperfecta under 24 Months of Age Treated with Intravenous Pamidronate. PAS 2013 Annual Meeting, May 3, 2013. Washington DC.

129. Reed S, Nagel R, Shell R, Kassis K, Mahan JD. Breaking Bad News the Right Way: Pediatric Resident Baseline Communication Skill. PAS 2013 Annual Meeting, May 5, 2013. Washington DC.

130. Mahan JD, Ledford C, Hurtubise L, Davis J, Clinchot D. Leveraging Online Faculty Development in Support of Curricular Change: Faculty Development for Medical Educators (FD4ME) in the Ohio State University (OSU) College of Medicine. CGEA 2014 Annual Meeting. Cleveland OH. Feb 28, 2014.

131. Reed S, Shell R, Kassis K, Mahan JD. Breaking Bad News is a Teachable Skill in Pediatrics. APPD 2014 Annual Meeting. Chicago IL, April 4, 2014.

132. Li ST, Paterniti DA, Tancredi DJ, Burke AE, Trimm RF, Guillot A, Guralnick S, Mahan JD. Platform Presentation: What Learning Goals Do Residents Develop? APPD 2014 Annual Meeting. April 3, 2014. Chicago IL.

133. Bixler G, Brown A, Way D, Mahan JD. Concept Mapping To Improve Critical Thinking in Pediatric Interns. PAS Annual Meeting, May 3, 2014. Vancouver BC.

134. Fenton NM, Holliday S, Javalkar K, Reed S, Ferris M, Mahan JD. The Role of Resilience, Work-Life Balance, and Relationship Satisfaction, in Predicting a Medical Fellow's Burnout: A Quantitative and Qualitative Approach. Pediatric Academic Societies Annual Meeting, May 3, 2014. Vancouver BC.

135. Li ST, Paterniti DA, Tancredi DJ, Burke AE, Trimm RF, Guillot A, Guralnick S, Mahan JD. Platform Presentation: What Learning Goals Do Residents Develop? PAS Platform Presentation. May 5, 2014. Vancouver BC.

136. Donthi R, Sanvai S, Skaug M, Turner TL, Barone S, Lewis KO, Mahan JD. Defining the Needs for Pediatric Nutrition Knowledge and Skills in Today's Primary Care Pediatricians: What Are the Essential Elements? Pediatric Academic Societies Annual Meeting. May 5, 2014. Vancouver BC.

137. Lewis KO, Cidon MJ, Seto TL, Chen H, Mahan JD. Leveraging e-Learning in Medical Education. Pediatric Societies Annual Meeting, May 5, 2014. Vancouver BC.

138. Nester CN, Greenbaum LA, Khalid M, Kiessling S, , Luckritz KE, Mahan JD, Miyashita Y, Rheault MN, Srivastava T, Weaver DJ, Bartosh SM. *Midwest Pediatric Nephrology Consortium*. Morbidity and Mortality of Shiga Toxin Associated Hemolytic Uremic Syndrome in a Contemporary Group of American Children American Society of Nephrology. Nov 15, 2014. Philadelphia PA.

139. Whicker SA, Wacker J, Engle D, Turner TL, Mahan JD. Teaching Motivational Interviewing Skills to Trainees and Developing Faculty to Assess Them Using a Validated Tool. ACGME 2015 Annual Educational Conference, Feb 27, 2015. San Diego CA.

140. Heksch R, Bowden SA, Hickey S, Mahan JD. Fracture and Bone Mineral Density Outcomes After Bisphosphonate

Discontinuation in Children With Osteogenesis Imperfect Treated With Pamidronate Compared To Zoledronic Acid.  Pediatric Academic Societies Annual Meeting, April 25, 2015.   San Diego CA.

141.     Bashaw H, Wacker J, Turner TL. Mahan JD.  Meeting Pediatric Resident Learner Needs: The Pediatric Nutrition Series Motivational Interviewing Modules.  Pediatric Academic Societies Annual Meeting, April 26, 2015.  San Diego CA.

142.     Wallihan R, Donthi RR, Gharfeh M, Mahan JD.  "There's  an App for That": Resident Use of a Program-Specific Mobile App.  Pediatric Academic Societies Annual Meeting, April 26, 2015.   San Diego CA.

143.     Wallihan R, Smith KG, Hormann MD, Donthi RR, Boland K, Mahan JD.  Utility of a Board Examination Simulation Exercise for Pediatric Resident Board Preparation.  Pediatric Academic Societies Annual Meeting, April 26, 2015.  San Diego CA.

144.     Rakowsky AT, Donthi RR, Mahan JD, Backes C.  Resident Outcomes and Resident Future: One Dual Accredited Pediatric Residency Program's Experience.   Pediatric Academic Societies Annual Meeting, April 27, 2015.  San Diego CA.

145.     Halbach S, Pillutla K, Seo-Mayer P, Weidemann D, Mahan JD.  The Sustainable Pediatric Nephrology  Workforce Project (SUPERPOWER):  A Pilot Study of Burnout and Resilience.  ASN 2020 Kidney Week (virtual). Session Title: Educational Research: October 22, 10:00 a.m. EDT.


**Invited Presentations**


1.     Mahan JD: The  Evaluation of the Child with Hematuria. 10th Annual Children's Hospital Pediatric Update, Barbados, February 9, 1987

2.     Mahan JD: The  Evaluation and Treatment of Hypertension in Children. 10th Annual  Children's Hospital Pediatric Update, Barbados, February 10,  1987

3.     Mahan JD: Urinary Tract Infections in Children: Pathogenesis & Therapy. 10th Annual Children's Hospital Pediatric Update, Barbados, February 12, 1987

4.     Mahan JD: An Overview of Dialysis and Renal Transplantation Therapies for Children in the 1980's. 10th Annual Children's Hospital Pediatric Update, Barbados, February 13,  1987

5.     Mahan JD: Evaluation of a Patient with Proteinuria. Pediatric Nephrology Seminar XIV, Bal Harbour Florida, February 2, 1988

6.     Mahan JD: Hematuria and Hypercalciuria in Children and Adolescents. Pediatric Nephrology Seminar XIV, Bal Harbour Florida, February 3, 1988

7.     Mahan JD: Treatment of Renal Osteodystrophy with Vitamin D Metabolites.  Pediatric Nephrology Seminar XIV, Bal Harbour Florida, February 5, 1988

8.     Mahan JD: Anemia in Chronic Renal Disease. Children's Hospital, Wexner Center Symposium, September 9, 1990

9.     Mahan JD: Moderator.  Vesicoureteral Reflux and Interstitial Injury.  American Society of Pediatric Nephrology 1993 Education Symposium, Washington DC, May 4, 1993.

10.     Mahan JD: UTI's in Children, Academy of Medicine Family Practice, Continuing Education Review, Columbus OH, November 11, 1994.

11.     Mahan JD: Dental Problems in Children with Renal Disease.  Ohio Academy of Pediatric Dentistry Education Series.  Columbus OH, February 6, 1995.

12.     Mahan JD: Renal Osteodystrophy in Children.  Regional Pediatric Nephrology Care Conference.  Columbus OH, March 1, 1996

13. Mahan JD: Education Initiatives in Pediatric Residency Programs, Association of Pediatric Program Directors Annual Spring Meeting Workshop, May 5, 1996.

14. Mahan JD: The Role of Neutrophil Cytotoxicity and Apoptosis in the Response of Human Glomerular Cells to Verocytotoxin-1. Visiting Scientist Lecture. St Radboud's Hospital, Univ of Nijmegen, Nijmegen, The Netherlands. May 23, 1996

15. Mihalov LK, Kuzma MK, May S, Mahan JD: A Training Program for Pediatric Residents in Procedural Skills and a System for Tracking Competency. Association of Pediatric Program Directors Annual Spring Meeting Workshop, Washington DC, May 1, 1997.

16. Mahan JD, Kuzma MK: Pediatric Education in Community Settings: The Ohio State University Experience. Northeast Ohio College of Medicine, Department of Pediatrics Retreat. Akron Children's Hospital. Akron OH, June 10, 1997.

17. Mahan JD: Mechanisms in the Pathogenesis of HUS. Medical College of Ohio. Department of Pediatrics Research Conference. Toledo OH, Oct 1, 1997.

18. Mahan JD: Pediatric Education in Community Settings: The Ohio State University Experience. Medical College of Ohio, Department of Pediatrics Meeting, Medical College of Ohio. Toledo, OH, Oct 1, 1997.

19. Mahan JD: Diabetic Nephropathy Symposium. Basic Mechanisms of Glucose Action: Glucose Response Elements and Transporters. Co-Chair (with F. Brosius). American Society of Nephrology, 30th Annual Meeting, San Antonio, TX, Nov 4, 1997.

20. Mahan JD: Incorporating Community Sites into Pediatric Resident Education. Pediatric Residency Program Directors Mid-America Region – Children's Hospital, Columbus OH, Dec 12, 1997.

21. Mahan JD: Dental Aspects for Children with Renal Disease. Ohio Academy of Pediatric Dentistry Education Series. Columbus OH, February 6, 1998.

22. Mahan JD: Adolescent Medicine Experiences in Pediatric Residency Training Program Directors Mid-America Region – Children's Hospital, Columbus OH, Jan 29, 1999.

23. Mahan JD: Pediatric Nephrology Symposium. Co-Chair (with P. Jose). Society for Pediatric Research, 68th Annual Meeting, San Francisco, CA, May 2, 1999.

24. Mahan JD: Pediatric Renal Transplantation: Children Are Different! Novartis RAD Investigators Meeting, London UK, June 10, 1999.

25. Mahan JD, Wallace A: Pediatric Nephrology Regional Conference 2000 – Lessons Learned from a Self-Management Program for Adolescents with a Kidney Transplant, March 3, 2000.

26. Mahan JD: The Evaluation of Hematuria and Proteinuria in Children: West Meets Mid-East. New Jeddah Clinic Hospital. Jeddah, Kingdom of Saudi Arabia, Feb 3, 2001.

27. Mahan JD: Urinary Tract Infections in Febrile Infants and Children – the 1999 AAP Practice Parameters. Jeddah City-Wide Pediatric Conference, Al Hamra Sofitel. Jeddah, Kingdom of Saudi Arabia, Feb 4, 2001.

28. Mahan JD: The Evaluation of Hematuria and Proteinuria in Children: West Meets Mid-East. King Abdulaziz University Hospital Pediatric Grand Rounds. Jeddah, Kingdom of Saudi Arabia, Feb 5, 2001.

29. Mahan JD: The Evaluation of Hematuria and Proteinuria in Children: West Meets Mid-East. King Faisal Specialist Hospital. Pediatric Grand Rounds. Jeddah, Kingdom of Saudi Arabia, Feb 6, 2001.

30. Mahan JD: Urinary Tract Infections in Febrile Infants and Children. The Saudi American Symposium on Pediatric Nephrology and Urology. Medinah, Kingdom of Saudi Arabia, Feb 6, 2001.

31. Robinson R, Mahan JD: Children's Hospital Pediatric Nephrology Regional Conference 2001 – Two Treatments that Affect Bone – Depot Growth Hormone and Bisphosphonates, March 8, 2001.

32. Mahan JD: The Difficult Learner: The Slow, the Rude and the Uncaring – A Role Playing Workshop. Teachers for the New Millennium – How to Adapt to the Ever-Changing Teaching Environment. Cincinnati OH, April 7, 2001.

33. Guzman E, Frick G, McGregor R, Rich D, Mahan JD, Lewis D. Uses of Technology in Resident Documentation: From Low Tech to High Tech Workshop. Association of Pediatric Program Directors Annual Meeting, Baltimore MD, April 27, 2001.

34. Mahan JD: Ethics: What Would You Do If? The Renal Network 9/10 2001 Nephrology Conference; Social Worker Meeting. Indianapolis IN, May 9, 2001.

35. Guzman E, Frick G, McGregor R, Rich D, Mahan JD, Lewis D. Palm Pilot Update: Uses of Technology in Pediatric Resident Training Workshop. Association of Pediatric Program Directors Annual Meeting, Baltimore MD, April 30, 2002.

36. Mahan JD: Nutropin Depot in Children with Renal Disorders: Early Experience. The Michigan Pediatric Nephrology Meeting. Detroit, Michigan, May 31, 2002

37. Mahan JD: Nutropin Depot in Children with Renal Disorders: Early Experience. Milwaukee Children's Pediatric Nephrology Meeting. Milwaukee, Wisconsin, June 5, 2002

38. Mahan JD: The Difficult Learner: The Slow, the Rude and the Uncaring. The First Annual Columbus Chief Resident Workshop. Columbus OH. June 6, 2002.

39. Johnson C, Mahan JD: Dealing with the Difficult Learner, Central Ohio Chief Residents Seminar, Columbus, OH June 7, 2002.

40. Mahan JD: Refining and Re-Defining Faculty Development Skills: The Difficult Learner, Regional Faculty Development Conference, Cincinnati, Ohio, September 27, 2002.

41. Mahan JD: Plenary Session, APPD Annual Fall Meeting. Reston Virginia, October 24, 2002.

42. Parsons MA, Berkowitz C, Mahan JD, McGregor R: RRC Workshop, APPD Annual Fall Meeting. Reston Virginia, October 24, 2002.

43. Zalneratitis E, Sectish T, Mahan JD: Professional Development Workshop, APPD Annual Fall Workshop. Reston Virginia, October 25, 2002.

44. Mahan JD: Grand Rounds: The Ever Changing Role of Continuity Clinic in Pediatric Residency Education, West Chester Medical Center, New York, October 30, 2002

45. Mahan JD: Ambulatory Pediatrics Faculty Meeting : PECS: Pediatric Education in the Community Setting, West Chester Medical Center, New York, October 30, 2002

46. Mahan JD: Resident Conference: Continuity Clinic Case Scenarios West Chester Medical Center, New York, October 31, 2002

47. Mahan JD: Causes of Osteoporosis in Children with Chronic Renal Disorders. Children's Hospital Pediatric Nephrology Regional Conference 2003, Columbus OH, March 7, 2003.

48. Mahan JD: Pediatric Chronic Renal Insufficiency. Medical Answers (with Dr. Brian Doyle) Show #903, PBS, Washington DC, March 18, 2003.

49. Mahan JD: Practical Guide to Growth Hormone Therapy in Children with Renal Disorders. Chicago Pediatric Nephrology Meeting. Chicago, IL September 8, 2003

50. Mahan JD: Growth Hormone Therapy in Children with Renal Disorders. Visiting Professor Grand Rounds. Loyola Medical Center, Chicago IL, September 9, 2003.

51. Mahan JD: Renal Disorders as a Cause of Failure to Thrive in Children. Resident Noon Conference. Loyola Medical Center, Chicago IL, September 9, 2003.

52. Mahan JD: Evaluation and Treatment of Hypertension in Children and Adolescents. Pediatric Grand Rounds. Cooper Medical Center, Camden NJ, October 3, 2003.

53. Mahan JD: Pediatric Nephrology: Board Review Questions Asked and Answered. Pediatric Resident Conference. Cooper Medical Center. Camden NJ, October 4, 2003.

54. Parsons MA, Lindsley C, Rennert WA, Mahan JD: RRC Workshop, APPD Annual Fall Meeting. Reston Virginia, October 9, 2003.

55. Zalneratitis E, Sectish T, Mahan JD: Professional Development Workshop, APPD Annual Fall Workshop. Reston Virginia, October 10, 2003.

56. Mahan JD: Treatment Algorithm for Growth Failure in Children with Chronic Renal Insufficiency. Consensus Conference on Growth in Children with Chronic Renal Insufficiency, Phoenix AZ, December 5, 2003.

57. Mahan JD: Practical Guide to Growth Hormone Therapy and Nutropin Depot in Children with Renal Disorders. Baystate Medical Center Dinner Meeting, Springfield MA, December 8, 2003.

58. Mahan JD: Growth Hormone Therapy in Children with Renal Disorders. Visiting Professor Grand Rounds. Baystate Medical Center, Springfield MA, December 9, 2003.

59. Mahan JD: Renal Disorders as a Cause of Failure to Thrive in Children. Resident Noon Conference. Baystate Medical Center, Springfield MA, December 9, 2003.

60. Mahan JD: Evaluation and Treatment of Osteoporosis in Children. Physical Medicine and Rehabilitation Grand Rounds, The Ohio State University College of Medicine and Public Health. Columbus OH, February 23, 2004.

61. Mahan JD, Ingelfinger JR and Mitsnefes M: Hypertension in Children and Growth Failure in Children with Chronic Renal Insufficiency: Case Vignettes. Children's Hospital Pediatric Nephrology Regional Conference 2004, Columbus OH, March 25, 2004.

62. Parsons MA, Fisher C, Mahan JD, Philibert I, Jones D, and McGinniss G: The Pediatric Subspecialty Program Director and the RRC/ABP: the Brave New World. APPD Annual Spring Meeting Workshop. San Francisco, CA, May 1, 2004.

63. Mahan JD, Philiburt I, Guralnick S. RRC Core Competencies and Work Duty Hours. Pediatric Academic Societies Annual Meeting 2004 Educational Workshop. May 1, 2004

64. Mahan JD, Carraccio C, and Englander R. Assessing Clinical Competence in Pediatric Medical Education: Working Backwards – Moving Forward. Pediatric Academic Societies Annual Meeting 2004 Mini Course. May 1, 2004

65. Mahan JD, Guzman E and Rich D. How the PDA Can Improve Pediatric Medical Education and Medical Care. Pediatric Academic Societies Annual Meeting 2004 Educational Workshop. May 2, 2004.

66. Robinson RF, Patel H, Mahan JD. Nephrotoxics-Drugs, Infections and Acute Renal Insufficiency in Pediatric Transplant Recipients; From Awareness to Renal Replacement. Children's Hospital Transplant Grand Rounds, Columbus Ohio, March 22, 2005.

67. Leggio L, Co J, Mahan JD, Murdock-Vlautin T and Sectish TC. Using the *Pedia*Link Resident Center for Practice-Based Learning and Improvement: New Tools for Residents and Program Directors. APPD Annual Meeting. May 13, 2005.

68. Molidor JB, Mahan JD. Here Comes Generation Why! - Interacting with the Next Generation of Learners (sponsored by PAS/APPD). Pediatric Academic Societies Annual Meeting Mini-Course, Washington DC, May 16, 2005.

69. Mahan JD. The Challenge of the Difficult Learner. Pediatric Resident Conference, Southern Illinois University Pediatric Residency Program. May 31, 2005, Springfield IL.

70. Mahan JD. The Causes and Treatment of Growth Failure in Children with Chronic Renal Insufficiency. Pediatric Resident Conference, Southern Illinois University Pediatric Residency Program. May 31, 2005, Springfield IL.

71. Mahan JD. Applying the ACGME Core Competencies to Pediatric Resident Training. The Causes and Treatment of Growth Failure in Children with Chronic Renal Insufficiency. Pediatric Resident Conference, Southern Illinois University Pediatric Residency Program. June 1, 2005, Springfield IL.

72. Mahan JD. Renal Disorders as a Cause of Failure to Thrive: 4 Case Studies. The Causes and Treatment of Growth Failure in Children with Chronic Renal Insufficiency. Pediatric Resident Conference, Southern Illinois University Pediatric Residency Program. June 2, 2005, Springfield IL.

73. Mahan JD. Evidence Based Approach to the Evaluation and Treatment of Hypertension in Children. St. John's Hospital Pediatric Grand Rounds. June 2, 2005, Springfield IL.

74. Mahan JD. GFR Awareness Campaign: A NKF-Ohio Initiative. Bethesda Hospital, Family Medicine Grand Rounds. August 9, 2005, Cincinnati OH.

75. Mahan JD. Assessment and Treatment of Short Stature in Pediatric Patients with Chronic Kidney Disease: The Growth Failure in Children with CKD Consensus Conference Statement. Washington DC Area Pediatric Nephrology Evening Conference. September 15, 2005, Washington DC.

76. Gilhooly J, Ferrell C, Sectish T and Mahan JD. Implementing the ACGME Competencies into Fellowship Training Programs. APPD Annual 2005 Fall Meeting, September 30, 2005, Reston VA.

77. Mahan JD. Applying Best Methods for Controlling the Ca x P Product to Patients – Case Based Questions and Answers. NKF-Ohio Annual 2005 Physicians Conference, October 1, 2005, Columbus OH.

78. Mahan JD. American Board of Pediatrics Board Preparation Strategies for Pediatric Residents. APPD Mid-American Region Annual 2005 Fall Conference, October 28, 2005, Columbus OH.

79. Mahan JD. The Interplay of Disordered Growth and Bone Metabolism in Children with CKD. Children's Hospital Pediatric Nephrology Regional Conference 2006, Columbus OH, March 16, 2006.

80. Mahan JD. Growth in Children with Chronic Kidney Disease: Assessment and Treatment of Short Stature in Pediatric Patients with CKD – 2006. Vanderbilt Pediatric Nephrology Evening Conference. April 13, 2006, Nashville TN.

81. Mahan JD, Heiser KE, Mihalov LK, Donthi R. Learning Styles/Emotional Intelligence – Methods to Better Assist Your Residents' Learning. APPD 2006 Spring Conference, April 28, 2006.

82. Gilhooly J, Ferrell C, Sectish T and Mahan JD. Implementing the ACGME Competencies into Fellowship Training Programs: How to Get Ready for Your Next Site Visit. APPD Annual 2005 Spring Meeting, April 28, 2006, San Francisco CA.

83. Gilhooly J, Mahan JD. "Survivor ACGME" – Fellowship Competencies in Action", Educating Pediatric Fellows in a Competency Based World. Workshop, PAS Annual Meeting, April 29, 2006, San Francisco CA.

84. Mahan JD. Applying the Growth Failure in Children with CKD Consensus Conference Algorithm - Practical Guide to Poor Growth and Growth Hormone Therapy in Children with Renal Disorders. Genentech Core Training Program, May 3, 2006, San Francisco CA.

85. Mahan JD. Educating the Public and Health Care Professionals About the Value of the "Kidney Score". NKF-Ohio Regional Conference 2006, May 10, 2006, Columbus OH.

86. Mahan JD. Applying the Growth Failure in Children with CKD Consensus Conference Algorithm - Practical Guide to Poor Growth and Growth Hormone Therapy in Children with Renal Disorders. Genentech Core Training Program, Aug 23, 2006, San Francisco CA.

87. Gilhooly J, Ferrell C, Mahan JD, and Gilhooly J. Fellowship Directors 201: Implementing the ACGME Competencies into Fellowship Training Programs: Initial Steps in Curriculum Development. APPD Annual 2006 Fall Meeting, Sept 28, 2006, Washington DC.

88. Friedman A, Spector N, Gilhooly J, Mahan JD, Ferrell C, McGregor R. Fellowship Directors 301: Developing Effective Training Programs: Competency-based Resident and Fellow Education. APPD Annual 2006 Fall Meeting, Sept 29, 2006, Washington DC.

89. Mahan JD, Miller D. Growth Delay and Recombinant Human Growth Hormone Treatment in Uremic Children and Adolescents. Fundamentals of Dialysis in Children. Annual Conference on Dialysis (18th Annual Symposium on Pediatric Dialysis). Feb 17, 2007, Denver CO.

90. Mahan JD. The Year in Pediatric Dialysis: Review of the Literature. Annual Conference on Dialysis (18th Annual Symposium on Pediatric Dialysis). Feb 20, 2007, Denver CO.

91. Donthi R, Holliday S, Mihalov L, Ledford C, Mahan JD. Integrating Professionalism into the Curriculum: Professionalism as a Measurable and Teachable Skill. APPD 2007 Spring Meeting, May 4, 2007, Toronto Canada.

92. Ferrell C, Mahan JD. Implementing ACGME Competencies into Fellowship Training Programs: Initial Steps in Curriculum Development. APPD 2007 Spring Meeting, May 5, 2007, Toronto Canada.

93. Guralnick S, Gilhooly J, Mahan JD. Pediatric Fellowships—Assessing and Documenting Scholarship and Clinical Competency PAS/APPD Mini Course. APPD 2007 Spring Meeting, May 6, 2007, Toronto Canada.

94. Mahan JD. Growth in Children with Chronic Kidney Disease: Assessment and Treatment of Short Stature in Pediatric Patients with CKD – 2007. Greenville Endocrine-Nephrology Evening Conference. May 25, 2007, Greenville SC.

95. Mahan JD. Evaluation and Treatment Options for Osteoporosis in Children. Pediatric Grand Rounds, Greenville Hospital System, May 26, 2007, Greenville SC.

96. Mahan JD. Growth in Children with Chronic Kidney Disease: Assessment and Treatment of Short Stature in Pediatric Patients with CKD – 2007. Cleveland Pediatric Nephrology Evening Conference. June 13, 2007, Cleveland OH.

97. Mahan JD. Glomerular Filtration Rate Awareness. Liking Memorial Hospital. July 9, 2007.

98. Mahan JD. Growth in Children with Chronic Kidney Disease: Assessment and Treatment of Growth Failure in Children with CKD – 2007. Genentech Annual Meeting. Sep 19, 2007, Los Angeles CA.

99. Ferrell C, Mahan JD, Gilhooly J. Fellowship Core Curriculum 201. Implementing ACGME Competencies into Fellowship Training Programs: Initial Steps in Curriculum Development. APPD 2007 Fall Spring Meeting, Oct 4, 2007, Washington DC.

100. Ferrell C, Mahan JD, Fishel JE, Chandran, L. Fellowship Directors 301. Fellowship Core Curriculum. APPD 2007 Fall Spring Meeting, Oct 5, 2007, Washington DC.

101. Mahan JD, Jackson O. "Kidney Score" from Concept to an Effective Program in Public Health Awareness. Ohio Association of Free Clinics Annual Conference. Oct 9, 2007, Columbus OH.

102. Mahan JD. Growth in Children with Chronic Kidney Disease: Assessment and Treatment of Growth Failure in Children with CKD. Mt Sinai Medical Center Pediatric Nephrology Conference. Feb 28, 2008, New York, NY.

103. Mahan JD, Miller D. Growth Delay and Growth Hormone Therapy. Fundamentals of Dialysis in Children. The Fundamentals of Dialysis in Children. Mar 1, 2008, Orlando FL.

104. Mahan JD. The Year in Pediatric Dialysis 2007: Review of the Literature. 28th Annual Dialysis Conference (19th Annual Symposium on Pediatric Dialysis). Mar 4, 2008, Orlando FL.

105. Co J, Mahan J, Guillot A, Jost A, Burke A. Individualized Learning Plans: A Primer with Tools and Concepts for Success. APPD Annual Spring Meeting. May 2, 2008. Honolulu HI.

106. Mahan JD, Warady B, Frane J, Rosenfield RG, Davis AD, Swinford RD, Lippe B, Bakker B. Defining the Expected Growth Response to Growth Hormone (GH) Therapy (Tx) in Children with Short Stature and Chronic Kidney Disease (CKD). PAS Annual Meeting. May 4, 2008.

107. Mahan JD. Growth – The Issue for Children with Chronic Kidney Disease. West Virginia University Department of Pediatrics Grand Rounds. July 30, 2008, Morgantown WV.

108. Pudlo N, Sangvai SG, Mahan JD, Lewis KO, Suresh S. Determining the Gap Between Injury Prevention Recommendations and Clinical Practice By Residents in Continuity Clinic. AAP Annual Meeting, Sept 29, 2008. Boston MA.

109. Mahan JD. Growth in Children with Chronic Kidney Disease: Assessment and Treatment of Growth Failure in Children with CKD. Cleveland Area Pediatric Nephrology Meeting. Dec 3, 2008, Cleveland OH.

110. Mahan JD. The Year in Pediatric Dialysis 2008: Review of the Literature. 29th Annual Dialysis Conference (20th Annual Symposium on Pediatric Dialysis). Mar 10, 2009, Houston TX.

111. Burke A, Jost A, Guillot A, Mahan JD. Individualized Learning Plans: A Primer with Tools and Concepts for Success. APPD Annual Spring Meeting. May 1, 2009. Baltimore MD.

112. Ledford C, Mahan JD, Potts R. Putting Professionalism into Practice Series. Considering Professionalism Errors. OSUMC. May 28, 2009.

113. Mahan JD. Emotional Intelligence: An Indispensable Clinical Tool That Can Be Assessed and Developed. Doernbecher's Children's Hospital, Portland Oregon, June 4, 2009. Portland OR.

114. Mahan JD. What Do We Know About the Epidemiology and Prevention of Burnout in Pediatrics? *Bilderback 47th Annual Lecture/Pediatric Grand Rounds. Oregon Health Sciences University.* June 5, 2009. Portland OR.

115. King MA, Mahan JD. Professionalism in Practice Workshop. Radiology Department OSUMC. Aug 18, 2009.

116. Davis T, Mansfield J, Mahan JD. Putting Professionalism into Practice (PPIP) Series. The Intersection of Patient Safety, Respect and Communication: Professionalism Challenges for all Health Care Professionals. OSUMC. Aug 28, 2009.

117. Kittredge D and Mahan JD. Measuring What Counts: Strategies for Assessing Learners in Clinical Settings. Pediatric Educational Excellence Across the Curriculum, Sept 12, 2009. Washington DC.

118. Mahan JD. Acute and Chronic Renal Failure in Children – Differentiation and Important Principles of Evaluation and Treatment. AAP PREP Course. Sept 15, 2009. Portland OR.

119. Mahan JD. Hematuria and Proteinuria; Nephritis/Nephrotic Syndrome in Children. AAP PREP Course. Sept 15, 2009. Portland OR.

120. Mahan JD. Fluids, Electrolytes and Acid-Base Disorders. AAP PREP Course. Sept 16, 2009. Portland OR.

121. Mahan JD. Graduate Medical Education: Basic Teaching Concepts for (Busy) Clinical Settings. OSU COM Graduate Medical Education Leadership Development Series. Oct 23, 2009. Columbus OH.

122. Mahan JD, Forte R, Martin B, Phieffer L. PPIP Series. "Preparing for a Crucial Conversation Before You Have to Have One." OSUMC. Dec 18, 2009.

123. Mahan JD. The Pediatric Nephrologist as an Advocate. Pediatric Nephrology Fellow Workshop, Renal Research Institute, Jan 19, 2010.

124. Mahan JD. Adult Education Principles: From Learning Theories to Learning Styles. The Ohio State University College of Medicine Teaching Skills Series. Jan 20, 2010, Columbus OH.

125. Mahan JD, McRury, Nash MG, Khandelwal S. PIPP Series. Crucial Conversations: Fostering safe questioning at the bedside. OSUMC. Feb 26, 2010.

126. Mahan JD. Keys to Career Development: Coaching and Mentoring Skills. Pediatric Nephrology Seminar in Miami. March 14, 2010. Miami FL.

127. Mahan JD. Teaching Insights: The Chief Resident Year. APPD Chief Residents Forum. APPD Spring 2010 Meeting, April 15, 2010. Chicago IL.

128. Kuzma MK, Donthi R, Rakowsky A, Groner J, Mahan JD. Making Quality Improvement (QI) Meaningful for Pediatric Residents Using Continuity Clinic as a Site for QI. APPD Spring 2010 Meeting, April 17, 2010. Chicago IL.

129. Kittredge D, Mahan JD. Measuring What Counts: Defining the Evidence for Assessing Learners in Clinical Settings. APPD Spring 2010 Meeting, April 18, 2010. Chicago IL.

130. Mahan JD, Kittredge D, Reber KM. Measuring What Counts: Defining the Evidence for Assessing Pediatric Fellows in Clinical Settings and Developing Useful Competency Assessments for Fellowship Trainees. APPD Forum for Fellowship Program Directors, April 30, 2010, Vancouver BC, Canada.

131. Mahan JD. Servant Leadership: ASPN Leadership Workshop. Pediatric Academic Meeting. May, 1, 2010. Vancouver, BC, Canada.

132. Mahan JD, Dillingham K, Martin B, McRury M. Putting Professionalism into Practice Series. Disruptive Professionals: An Insufficient Dose of Respect. OSUMC, May 28, 2010. Columbus OH.

133. Mahan JD. Adult Education Principles: Understanding How to Use Learning Theories and Learning Styles to Improve Your Teaching. OSU COM Genetic Counseling Training Program Initial Meeting. June 4, 2010. Innovation Center, Columbus OH. Columbus OH.

134. Mahan JD. Professionalism in Practice Workshop. OSU Orthopedic Resident Didactic Series. OSUMC. Jul 2, 2010. Columbus OH.

135. Mahan JD, Kirsch C. Professionalism in Practice Workshop. Radiology Department OSUMC. OSUMC. Aug 8, 2010. Columbus OH.

136. Mahan JD, Capers Q. Putting Professionalism into Practice Series. Respecting Diversity – Advocacy in the Moment. OSUMC, Aug 27, 2010. Columbus OH.

137. Mahan JD, Smoyer W. MidWest Pediatric Nephrology Consortium Randomized Comparison of Rituximab vs. Tacrolimus for Pediatric Steroid Resistant Nephrotic Syndrome. Cincinnati Children's Medical Center Pediatric Nephrology Conference, Sept 9,2010. Cincinnati OH.

138. Mahan JD and the CES Team. Lessons from *Teach Like a Champion.* Faculty Teaching Skills Series, Sep 15, 2010. Columbus OH.

139. Mahan JD, Kaskel FR. Advocacy in Pediatric Nephrology: A Skill and a Responsibility. Renal Research Institute Pediatric Nephrology Fellows Conference, January 26, 2011. Miami FL.

140. Mahan JD. Advocacy in Pediatric Nephrology: A Skill and a Responsibility. Annual Dialysis Conference, Feb 20, 2011. Phoenix AZ.

141. Mahan JD. Ethical Challenges in Pediatric Nephrology. Annual Dialysis Conference, Feb 20, 2011. Phoenix AZ.

142. Davis JT, Mahan JD, Brilli RJ. The Impact of a Robust Patient Safety Program on Busy Trainees. ACGME Annual Education Meeting, Mar 4, 2011, Nashville TN.

143. Lucy CR, Ledford C, Mahan JD, Thomas A. Turning the Titanic (Part I): Implementing a Culture of Professionalism at a Large Academic Medical Center. ACGME Annual Education Meeting, Mar 5, 2011. Nashville TN.

144. Hurtubise L, Ledford C, Mahan JD, Martin B. Turning the Titanic (Part II): Encouraging Professionalism at the Individual Level. ACGME Annual Education Meeting, Mar 5, 2011. Nashville TN.

145. Mahan JD. Prerequisites for Fellowship Training. Miami 37th Annual Pediatric Nephrology Symposium. March 20, 2011. Miami FL.

146. Mahan JD. How to Teach Professionalism in the Curriculum. Miami 37th Annual Pediatric Nephrology Symposium. March 20, 2011. Miami FL.

147. Mahan JD. Environment of Professionalism. Case Western Reserve Faculty Development Retreat, March 24, 2011, Cleveland OH.

148. Lewis K, Ferrell C, Turner TL, Mahan JD. How to make E-Learning Sing (and Work) for your Trainees. APPD Annual Spring Meeting, April 3, 2011, Miami FL.

149. Fromme HB, Wacker S, Turner TL, Mahan JD. Update in Medical Education: Review of the 2010 Literature. APPD Annual Spring Meeting, April 3, 2011. Miami FL.

150. Reber C, Backes Jr C, Mahan JD. Fellows as Teachers: Methods to Utilize Fellows to Enhance Pediatric Resident Education. APPD Fellowship Forum, April 29, 2011. Denver CO.

151. Mahan JD. Development and Use of Emotional Intelligence in the Workplace. In, Critical Leadership Skills for Academic Pediatricians: PAS Workshop. Pediatric Academic Societies Meeting, May 1, 2011. Denver CO.

152. Mahan JD. E-Learning in Medical Education. APA Special Interest Group. Pediatric Academic Societies Meeting, May 2, 2011. Denver CO.

153. Mahan JD, Norby SM, Rodriguez RA, Tucker JK. Measuring What Counts: Evaluating Nephrology Fellows in Clinical Settings Through Effective Competency Assessments. American Society of Nephrology Training Program Directors Retreat, May 21, 2011. Chicago IL.

154. Mahan JD. Managing Change Well: Lessons for Those in Academic Medical Centers. St. Christopher's Hospital for Children, Grand Rounds, July 8, 2011. Philadelphia PA.

155. Mahan JD. Pediatric Department Faculty Retreat: Pediatric Residency Redesign. St. Christopher's Hospital for Children, July 8, 2011. Philadelphia PA.

156. Mahan JD. The Power of Servant Leadership. Kirksville College of Osteopathic Medicine. Faculty Development Series, Oct 11, 2011. Kirksville MO.

157. Mahan JD. What Do We Know About the Epidemiology and Prevention of Burnout in Pediatrics? NCH Faculty Development Series. November, 2, 2011. Columbus OH.

158. Mahan JD. Autonomy vrs. Supervision: Achieving the Perfect Balance. Texas Children's Hospital Pediatric Department Medical Education Workshop Plenary Address, Nov 10, 2011. Houston TX.

159. Mahan JD. Autonomy vrs. Supervision: Applying the New ACGME Work Duty and Supervision Regulations to TCH. Texas Children's Hospital Pediatric Department Medical Education Workshop, Nov 10, 2011. Houston TX.

16 Mah n J . CA S Difficu t Learn r L I Worksho O U CO Janua y 1 , 20

16 Mah n J , Smoy r W Fellowsh p Co e Curricul m Lectu e f r Seni r Fellow Profession l Developme t & Academ Advancemen NC . Janua y 1 , 201

16 Mah n J . CA S Difficu t Learn r L I Worksho O U CO Janua y 1 , 201

16 Mah n J Gener l Nephrolo y Pearl R I Pediatr c Nephrolo y Fello s Conferenc Tam a F Janua y 2 , 201

16 Mah n J . CA S Difficu t Learn r L I Worksho O U CO Februa y , 201

16 Ledfo d , Bornste n , Levi e , Mah n J . Professionali m Laps s n Veterina y Medici e Worksho O U Colle e f Veterina y Medicin Februa y , 201

16 Mah n J , Bornste n T e Probl m wi h t e Probl m wi h Professionalis : Enhanci g Professionali m Skil s a d Resilienc Promoti g a d Maintaini g Professionalis : K y Feedba k a d Correcti n Skill Americ n Associati n f Veterina y Clinicia s (AAV ) Annu l Meeti g f Departme t Hea s a d Hospit l Director Chica o I Mar h 3 , 20

16 Mah n J Grow h a d Grow h Hormo e Therap T e Fundamenta s f Dialys s n Childre Annu l Dialys s Conferenc Mar h , 201 . Seatt e W

16 Allstea t , Pirai o , Be l , Mah n J , Jose h , Lant s Symposi m n t e Adolesce t Dialys s Patien : Pa t I Non-adheren e a d Ethic l Issue : Ca e Studi s wi h Pan l Discussio Annu l Dialys s Conferenc Mar h 1 , 201

16 Sangui o S , Cutr r W , Mah n J , McPhilli s , Rober s K , Turn r T Shapi g t e Futu e f Pediatr c Educati n n a Competency-Bas d Worl AP D 20 3 Spri g Meetin , Apr l 1 , 201 Nashvil e T

17 Lew s K , Mah n J , Turn r T , Ferre l C Creati g Collaborati e Spac : Facilitati g Medic l Educati n Usi g WIKI AP D 20 3 Spri g Meetin , Apr l 1 , 201 Nashvil e T

17 Mah n J , McPhilli s H , Hollid y , Re d , Dont i , Shugerm n R Emotion l Intelligen e (E ) Assessme t a d Developme t n Studen s a d Resident : T e N w Imperati e f r Improvi g Heal h Ca e Outcom s a d Physici n Wellnes AP D 20 3 Spri g Meetin , Apr l 1 , 201 Nashvil e T

17 Mah n J , Fent n , Ferr s , Re d , Dont i , Hollid y Worksh p : Burno t n Pediatr c Fellow : Constructi g a Progr m o Foc s n Diagnosi , Preventi n a d Interventio AP D For m f r Fellowsh p Progr m Director M y , 201 . Washingt n D

17 Mah n J Managi g Grow h a d Nutriti n n Childr n wi h CK AS N Pediatr c Nephrolo y Fell w Symposi m n Grow h a d Developme t n Chron c Kidn y Disea e a d Ren l Transplantati n a d Co e Curricul m f r Scholar y Activiti P S 20 3 Annu l Meetin , M y , 201 Washingt n D

17 Lew s K , Turn r T , Mah n J , Hurtubi e Leveragi g E-learni g 2. : Encoura e Yo r Traine s o Devel p Li e Lo g Learni g Skill P S Worksho P S 20 3 Annu l Meetin , M y , 201 Washingt n D

17 Mah n J , Turn r L (Moderators Prepari g f r t e Futu e y Buildi g n t e Presen : Pediatr c Traini g n 202 P S Top c Symposiu , P S 29 3 Annu l Meetin , M y , 201 Washingt n D

17 Mah n J Frami g t e Discussio : Pediatr c Traini g n 202 P S 29 3 Annu l Meeti g M y , 201 Washingt n D

17 Mah n J , Turn r T , Antonel i R , Rober s K Prepari g f r t e Futu e y Buildi g n t e Presen : Pediatr c Traini g n 202 P S Top c Symposiu P S 20 3 Annu l Meetin , M y , 201 Washingt n D

17 Mah n J Wh t A e t e Be t Learni g Principl s a d Method ? H w o e Utili e t e Scien e f Neurobiolo y a d Education l Principl s o Enhan e t e Formati n f Attitud s a d t e Applicati n f Knowled e a d Skil s y A l Pediatr c Provider n P S Top c Symposiu P S 20 3 Annu l Meetin , M y , 201 Washingt n D

17 Mah n J 8 Wa s o Tea h Li e a Champio Du e Universi y Scho l f Medicin . Pediatr c Facul y a d Fello s Worksho Octob r 2 , 201 Durh m N

18 Mah n J T e Emergi g Neurobiolo y f Learnin : Lesso s f r Medic l Educator . Du e Universi y Scho l f Medicin . Pediatr c Departme t Educati n D y Gra d Round Octob r 2 , 201 Durh m N .

181.  Mahan JD.  Effective Feedback in Medical Education: 5 Steps to Feedback (the LASER Model). Pediatric Resident and Fellows Workshop. October 22, 2013.  Durham NC.

182.  Mahan JD. The Neurobiology of Learning: Lessons for Nephrology Educators. ASN Annual Kidney Week 12013.  November 8, 2013.  Atlanta GA.

183.  Mahan JD. (moderator).  The Opposite End of the Age Spectrum: Dialysis Patients Under Age 40.  The American Society of Nephrology, November 9, 2013.  Atlanta GA.

184.  Mahan JD.  Growth and Growth Hormone Therapy in The Fundamentals of Dialysis in Children.  Annual Dialysis Conference, February 8, 2014.  Atlanta GA.

185.  Mahan JD.  Fellows' Case Conference: Stump the Consultants in The Fundamentals of Dialysis in Children.  Annual Dialysis Conference, February 8, 2014.  Atlanta GA.

186.  Mahan JD, Turner TL. Optimizing Pediatric Training along the Continuum: Actions We Must Take!
The Future of the Workforce in Pediatrics: A Blueprint for Action Designed at the FOPO Visioning Summit. PAS Topic Symposium. PAS 2014 Annual Meeting.  May 3, 2014.

187.  Turner TL, Spector N, Mahan JD, Yu C, Anderson M, Sectish T, Eberly M, Reed S.  Workshop: New Paradigms for a New Generation: Faculty Development in Innovative Curricular Methods for Today's Learners.  APPD 2014 Annual Meeting, April 4, 2014.  Chicago IL.

188.  Mahan JD.  E-Learning in Medical Education.  APA Special Interest Group. PAS 2014 Annual Meeting, May 5, 2014.  Vancouver BC.

189.  Mahan JD, Ledford C, Hurtubise L, Davis J, Clinchot D.  Leveraging Online Faculty Development in Support of Curricular Change: Faculty Development for Medical Educators (FD4ME) in the Ohio State University (OSU) College of Medicine.  AAMC 2014 Annual Medical Education Meeting, Nov 7, 2014.  Chicago IL.

190.  Mahan JD.  Integrating the Next Accreditation System into Clinic: Efficient Observations.  ASN Annual Kidney Week 2014.  November 14, 2014.  Philadelphia PA.

191.  Ledford C, Hurtubise LA, Turner TL, Mahan JD.  Moving Toward Online Faculty Development: The View Over the Horizon.  2015 ACGME Annual  Educational Conference, Feb 27, 2015.  San Diego CA.

192.  Li ST, Tancredi DJ, Schwartz A, Burke A, Guillot A, Guralnick S,  Mahan JD, Trimm RF, Gifford. K.  How Well Do Resident Milestone Self-Assessments Correlate with Clinical Competency Committee Milestone Assessments? Pediatric Academic Societies Annual Meeting, April 25, 2015.  San Diego CA.

193.  Li ST, Tancredi DJ, Schwartz A, Burke A, Guillot A, Guralnick S,  Mahan JD, Trimm RF, Gifford K. Which Sub-Competencies Best Identify Overall Unsatisfactory/Marginal Resident Performance?   Pediatric Academic Societies Annual Meeting, April 25, 2015.  San Diego CA.

194.  Ferris ME, Mahan JD.  Challenges and Ethical Dilemmas in Transitioning Pediatric Nephrology Patients into Adult Care: A Case Based Workshop. ASPN Workshop. Pediatric Academic Societies Annual Meeting, April 26, 2015.  San Diego CA.

195.  Gifford K, Li ST,  Tancredi DJ, Schwartz  A, Burke A, Guillot A, Guralnick S,  Mahan JD, Trimm  RF. How Do Clinical Competency Committees Function in Pediatric Residency.  Pediatric Academic Societies Annual Meeting, April 26, 2015.  San Diego CA.

196.  Selewski D, Massengill SF, Troost JP, Wickman L,  Messer KL, Herreshoff E, Bowers C, Ferris ME, Mahan JD, Greenbaum LA, MacHardy J, Kapur G, Chand DH, Goebel J, Barletta GM, Geary D, Kershaw DB, Pan CG, Gbadegesin R, Hidalgo G, Lane JC, Leiser JD, Song PX,  Thissen D, Liu Y, Gross HE, DeWalt DA, and Gipson DS.  Gaining the Patient Reported Outcomes Measurement Information System (PROMIS) Perspective in Chronic Kidney Disease: A Midwest Pediatric Nephrology Consortium Study.  Pediatric Academic Societies Annual Meeting, April 27, 2015.  San Diego CA.

197.  Kemper K, Mahan JD, McClafferty H.  Burnout in Pediatric Residents: Epidemiology, Natural History, and Interventions to Improve Resilience, Empathy,  and Confidence in Providing Compassionate Care.  CENTILE Conference: International Conference to Promote Resilience, Empathy and Well-Being in Health Care Professions, Georgetown University, Washington DC, Oct 18, 2015.

198.  Gardiner P, Lebensohn P, Mahan JD, Kemper K.  B Measuring Burnout and Resilience in Residency Settings: A Symposium on Research Methods. CENTILE Conference: International Conference to Promote Resilience, Empathy and Well-Being in Health Care

Professions, Georgetown University, Washington DC, Oct 18, 2015.

199.  Mahan JD.  Physician Burnout: Towards Understanding Its Pathogenesis and Developing Effective Prevention & Treatment Approaches.  University of Louisville, Kosair Children's Hospital. Department of Pediatrics Grand Rounds.  Louisville KY, Dec 4, 2015.

200.  Mahan JD.  The Case for Emotional and Social Intelligence in Improving Physician Performance. University of Louisville, Kosair Children's Hospital. Department of Pediatrics Resident Noon Conference.  Louisville KY.  Dec 4, 2015.

201.  Mahan JD and Batra M.  APPD LEARN: Resident Burnout and Resilience Study (APPD LEARN PRB-RSC) Webinar. Jan 25 and Feb 2, 2016.

202.  Mahan JD.  Interstitial Nephritis. ASPN Renal Pathology Webinar. Feb 1, 2016.

203.  Mahan JD. Fellows Case Conference – Stump the Consultants.  Annual Dialysis Conference. Seattle WA, Feb 27, 2016.

204.  Capello T, Ayoob R, Mahan JD. Benefits of Aggressive Nutrition in Children with CKD. Annual Dialysis Conference 2016.  Feb 28, 2016.

205.  Capello T, Mahan JD.  Growth Hormone and Nutrition: Primer and Practice for RD's.  Annual Dialysis Conference. Feb 29, 2016.

206.  Mahan JD.  Nutritional Assessment and Management in Children with CKD.  43rd Miami Pediatric Nephrology Symposium. Miami FL, Mar 12, 2016.

207.  Mahan JD, Hurtubise L, Chen J, Gorgas D. OSU COM Professionalism Climate Questionnaire: Exploring a New Tool for Professionalism Assessment (Best IME Oral Presentation Award).  Ann Arbor MI, April 6, 2016.

208.  Mahan JD.  How Developing resilience can help you and your faculty become more effective teachers. AMSPDC Webinar. May 23, 2016.

209.  Mahan JD.  Physician Burnout: Towards Understanding Its Pathogenesis and Developing Effective Prevention & Treatment, Marshall University, Department of Pediatrics Grand Rounds.  Huntington WV.  Aug 5, 2016.

210.  Mahan JD.  Evaluation and Treatment of Children with Idiopathic Nephrotic Syndrome: Best Practices 2016.  Marshall University, Department of Pediatrics, Pediatric Resident Noon Conference. Huntington WV.  Aug 5, 2016.

211.  McClafferty H and Mahan JD.  The Mindful GME Leader (Workshop).  APPD Fall 2016 Meeting, Arlington VA, Sept 24, 2016.

212.  Mahan JD and Batra M.  APPD LEARN: Resident Burnout and Resilience Study Progress Report (APPD LEARN PRB-RSC) Webinar. Dec 7 and 12, 2016.

213.  Mahan JD. Optimizing Growth in Children with CKD – 2017. 44th Miami Pediatric Nephrology Symposium. Miami FL, Mar 4, 2017.

214.  Mahan JD. Fellows Case Conference – Stump the Consultants. Annual Dialysis Conference. Long Beach CA. March 11, 2017.

215.  Mahan JD, Hastings C, Lew G, Sandler E, Shimamura A. Physician, Sustain Thyself: Building Resilience to Prevent Burnout in a Complex World. American Society of Pediatric Hematology and Oncology Annual Meeting.  Montreal CA. April 28, 2017.

216.  Mahan JD, McClafferty H, Weiss P.  Becoming the Mindful GME Leader: Strategies for Success. APPD Fellowship Forum.  San Francisco CA. May 5, 2017.

217.  Mahan JD, Seo-Mayer P, Barletta GM, Roach J, Yao L, Kocinsky H. ASPN Workforce Symposium: Exploring Novel and Sustainable Career Paths in Pediatric Nephrology.  Pediatric Academic Societies – ASPN.  San Francisco CA. May 8, 2017.

218.  Mahan JD.  Exploring Remediation for Clinical Reasoning.  Breakout Session 1, American Society of Nephrology Training Program Directors Retreat 2017.  Rosemont IL.  May 12, 2017.

219.  Mahan JD.  Talking to a Fellow About Professionalism. American Society of Nephrology Training Program Directors Retreat 2017. Rosemont IL.  May 12, 2017.

220.  Mahan JD and Steven Cheng.  Coaching & Remediation with Fellows - Breakout Session 2 - Cases Discussion 1. Am. Society of Nephrology Training Program Directors Retreat 2017.  Rosemont IL.  May 12, 2017.

221. Mahan JD. New Paradigms and Tools for Teaching and Assessing Professionalism in the Health Sciences. Visiting Professor, Department of Pediatrics Grand Rounds and Faculty Development Presentations. Roanoke, VA. May 28 & 29, 2017.

222. Mahan JD. Quiz-O-Rama 1. American Society of Nephrology Board Review Course 2017. Columbus OH, Oct 27-29, 2017.

223. Mahan JD. Fellows Case Conference – Stump the Consultants. Annual Dialysis Conference. Orlando, FL. March 6, 2018.

224. Mahan JD. Nutritional Assessment and Management in Children with CKD. 45th Miami Pediatric Nephrology Symposium. Miami FL, Mar 10, 2018.

225. Mahan JD. Growth Hormone in Treatment of Growth Failure in Children with CKD. 45th Miami Pediatric Nephrology Symposium. Miami FL, Mar 10, 2018.

226. Mahan JD. Mentorship and Mentoring Relationships. 45th Miami Pediatric Nephrology Symposium. Miami FL, Mar 10, 2018.

227. Mahan JD. Neonatal AKI. IPNA/ESPN Teaching Course May 24-27, 2018. Kazan, Russia. May 25, 2018.

228. Mahan JD. Molecular and Genetic Diagnoses in Congenital and Hereditary Glomerular Disorders. IPNA/ESPN Teaching Course May 24-27, 2018. Kazan, Russia. May 25, 2018.

229. Mahan JD. Modern Insights into Pediatric Chronic Kidney Disease – Mineral Bone Disorder (CKD-MBD). IPNA/ESPN Teaching Course May 24-27, 2018. Kazan, Russia. May 25, 2018.

230. Mahan JD. Growth in Infants and Young Children with CKD: Are we making progress? 46th Miami Pediatric Nephrology Seminar. Miami FL. March 9, 2019

231. Mahan JD. Ideal Caloric/Protein Intake in CKD. 46th Miami Pediatric Nephrology Seminar. Miami FL. March 9, 2019

232. Mahan JD. Coaching and Mentoring: Importance in Training Programs. 46th Miami Pediatric Nephrology Seminar. Miami FL. March 10, 2019

233. Mahan JD. Needs Assessment for Pediatric Nephrology Work Force in USA. 46th Miami Pediatric Nephrology Seminar. Miami FL. March 10, 2019

234. Mahan JD. Growth and Recombinant Growth Hormone Therapy. Annual Dialysis Conference. Fundamentals of Pediatric Dialysis. Dallas, TX. March 16, 2019.

235. Mahan JD. Fellows Case Conference – Stump the Consultants. Annual Dialysis Conference. Dallas TX. March 17, 2019.

236. Mahan JD, Batra M, Serwint J, Staples B, Wilson P, McClafferty H, Reed S. "Developing a Culture of Wellbeing in Pediatric Trainees and Practitioners: Priorities for Institutions and Practitioners. PAS Plenary Sessio n. Pediatric Academic Society Meeting 2019. Baltimore MD. April 27, 2019.

237. Mahan JD, Beans, Balance & Burnout: How to Successfully Care for Children with Kidney Disease While Achieving Life-Work Balance and Avoiding Burnout. ASPN Symposium. Pediatric Academic Society Meeting 2019. Baltimore MD. April 28, 2019.

238. Mahan JD. Understanding and Making the Case for Physician Wellness and the Quadruple Aim. Montefiore Children's Hospital Pediatric Department Grand Rounds. Albert Einstein University. New York City, NY. May 15, 2019.

239. Mahan JD. Building Your Teaching Scripts & Your Teaching Skills. Pediatric Resident Noon Conference. Montefiore Children's Hospital. Albert Einstein University. New York City, NY. May 15, 2019.

240. Mahan JD. Pediatric Chronic Kidney Disease – Mineral Bone Disorder (CKD-MBD). Pediatric Nephrology Fellow Weekly Conference. Montefiore Children's Hospital. Albert Einstein University. New York City, NY. May 16, 2019.

241. Mahan JD. New Horizons in Hypophosphatemic Rickets for Children and Adults. Nephrology Department Weekly Conference. Albert Einstein University. New York City, NY. May 16, 2019.

242. Mahan JD. New Concepts of AKI in Children and Adolescents. IPNA/ESPN Teaching Course May 23-25, 2019. Krasnoyarsk, Russia. May 25, 2019.

243. Mahan JD. Chronic Kidney Disease in Children and Adolescents. IPNA/ESPN Teaching Course May 23-25,

2019. Krasnoyarsk, Russia. May 25, 2019.

244. Mahan JD. Kidney Transplantation in Children: Achievement and Prospects – 2019. IPNA/ESPN Teaching Course May 23-25, 2019. Krasnoyarsk, Russia. May 25, 2019.

245. Mahan JD. A Breakthrough Therapy for X-Linked Hypophosphatemic Rickets (XLH). Adult Endocrine Fellows Weekly Conference. University of Kentucky. Lexington KY. July 17, 2019.

246. Mahan JD. A Breakthrough Therapy for X-Linked Hypophosphatemic Rickets (XLH). Chicago Endocrinology Meeting. Chicago IL. August 28, 2019.

247. Mahan JD. Professional Development: developing habits of successful academic scholarship. Renal Research Institute Senior Fellows Conference, 22nd International Conference on Dialysis Advances in Kidney Disease 2020. Los Angeles CA. January 21, 2020.

248. Mahan JD. Growth and Recombinant Growth Hormone Therapy. 40th Annual Dialysis Conference. Fundamentals of Pediatric Dialysis. Kansas City, MO. February 8, 2020.

249. Mahan JD. Fellows Case Conference – Stump the Consultants. 40th Annual Dialysis Conference. Kansas Dallas TX. February 8, 2020.

250. Mahan JD. Prenatal Diagnosis of Severe Kidney Disease. Clinical and Ethical Considerations. 40th Annual Dialysis Conference. Kansas Dallas TX. February 9, 2020.

251. Mahan JD. Promoting Wellness in Your Residency Program: Lots of Questions and A Few Answers. Keynote Address – Indiana University – Riley Children's Hospital Pediatric Chief Resident's Conference. Indianapolis IN. Aug 11, 2020.

252. Mahan JD. The Value Proposition for Promoting Wellness in Health Care Professionals Through Perso nal and Organizational Lenses. Pediatric Grand Rounds. Indiana University – Riley Children's Hospital. Indianapolis IN. Aug 12, 2020.

251. Mahan JD. A Breakthrough Therapy for X-Linked Hypophosphatemic Rickets (XLH). NYC/NE Regional Endocrine Meeting. NYC - (Virtual) NY. August 18, 2020.

252. Mahan JD. A Breakthrough Therapy for X-Linked Hypophosphatemic Rickets (XLH). Virginia Commonwealth University, Endocrine Grand Rounds. Richmond (Virtual) VA. September 9, 2020.

253. Mahan JD. UTI & VUR – Practical Points and Management. 2020 ESPN-IPNA Junior Master Class. September 19, 2020.

254. Mahan JD. A Breakthrough Therapy for X-Linked Hypophosphatemic Rickets (XLH). Southern Illinois University Endocrine Meeting. Springfield (Virtual) IL. October 22, 2020.

255. Mahan JD. Promoting a Culture of Giving and Receiving Feedback. University of Michigan, Division of Pediatric Nephrology Faculty Development Meeting. Ann Arbor (Virtual) MI. December 18, 2020.

256. Mahan JD. New Insights into the Growth Hormone-Insulin-Like Growth Factor-1 Axis and Growth in Children with Chronic Kidney Disease. NYU Langone Department of Pediatrics, Grand Rounds. NYC (Virtual) NY. February 9, 2021.

257. Mahan JD. Growth and Recombinant Growth Hormone Therapy. 41st Annual Dialysis Conference. Fundamentals of Pediatric Dialysis. Virtual. March 5, 2021.

258. Mahan JD. Fellows Case Conference – Stump the Consultants. 41st Annual Dialysis Conference. Virtual. March 5, 2021.

259. Mahan JD. SGLT-inhibitors in pediatric kidney disorders. 14th Asian Congress of Pediatric Nephrology. Taipei (Virtual) Taiwan. March 3, 2021.

260. Mahan JD. HPP and the Kidneys. Soft Bones – Patient/Family Presentation. Virtual. March 23, 2021.

261. Mahan JD. Minimal Change Nephrotic Syndrome. National Kidney Foundation 2021 Annual Clinical Meeting. SCM21 – Glomerular Disease Update. Nashville (Virtual) TN. April 6, 2021.

262. Becknell BB & Mahan JD. CAKUT in Children. 2021 Af-PNA Junior Master Class. Cairo (Virtual) Egypt. September 21, 2021.

263. Mahan JD. Future Research in Pediatric Nephrology. 2021 Af-PNA Junior Master Class. Cairo (Virtual) Egypt. September 21,

2021.

264. Mahan JD. Neonatal AKI. International Online Training Course in conjunction with the European Society of Pediatric Nephrologists (ESPN), the International Society of Pediatric Nephrologists (IPNA) and the Creative Association of Pediatric Nephrologists of Russia. "Modern Problems of Pediatric Nephrology". Moscow (Virtual) Russia. September 25, 2021.

265. Mahan JD. Steroid Sensitive Nephrotic Syndrome in Children. 2021 ESPN-IPNA Junior Master Class. Virtual. September 11, 2021.

266. Mahan JD. Use of Bone Densitometry in Children with CKD. ALANEPE Annual Meeting. Virtual. October 14, 2021.

267. Mahan JD. A Breakthrough Therapy for X-Linked Hypophosphatemic Rickets (XLH). Cincinnati Endocrinology – Nephrology Meeting. Cincinnati OH. December 6, 2021.

**Mentees**

***Medical Education***

Raj Donthi (2008 – present)
Shilpa Sangvai (2010 – 2015)
Suzanne Reed (2012 – present)
Stephan Cha (2012-2015)
Carl Backes (2012 – present)
Rebecca Wallihan (2012 – present)
Keely Smith (2012 – 2019)
Mike Bixler (2013 - 2016)
Chris Bugnitz (2014 - 2017)
Alex Rakowsky (2014 – present)
Kayloni Olson (2014 - 2015)
Dara Albert (2015 – present)
Laura Romcevich (2015 – 2018)
Kim Gifford (2016 – present)
Jennifer Benjamin (2016 – present)
Karen Warburton (2016 – present)
Nick Delacruz (2016 – 2018)
Alex Liu (2018 - present)
Maya Iyer (2019 – present)
Amy Valasek (2020 – present)
Tahagod Mohamed (2020 – present)
Hilary Michel (2020 – present)

***Nephrology***

Stan Nahman
Franca Iorember
Hiren Patel
Sasi Bowden
David Hains
Halima Janjua
Rose Ayoob
Kirsten Kusumi
Reeti Kumar
Emily Stonebrook
Cynthia de Silva

**Reviewer for Journals**

    Kidney International
    Pediatric Research
    American Journal of Kidney Diseases
    Pediatric Nephrology
    Journal of Pediatrics
    Archives of Pediatric and Adolescent Medicine
    Clinical Pediatrics
    Pediatric Transplantation
    Pediatrics
    American Journal of Perinatology
    Journal of the American Society of Nephrology
    Clinical Journal of the American Society of Nephrology
    BMC Nephrology
    BMC Medical Education
    Pediatric Neurology
    International Journal of Nephrology
    Academic Pediatrics
    Teaching and Learning in Medicine
    Frontiers in Pediatrics
    Annals of Medicine

**Grant Reviewer**

    NIH – NIDDK – Extramural Grants; 1995 (ad hoc) and 1997 (study section)
    NKF Ohio   - 1994 to present
    SPR Multicenter Clinical Studies Program – reviewer 1998 - 2002
    Peer Referee for Cochrane Renal Group 2003 to 2010
    Ad Hoc Reviewer- Detroit Medical Center Intramural Grant Program – 2007
    Thrasher Foundation – 2013, 2017

**Meeting Abstract Reviewer**

| | |
|---|---|
| Pediatric Academic Societies Annual Meeting | 2003, 2004, 2005, 2009, 2010, 2013, 2014, 2015, 2021 |
| Association of Pediatric Program Directors Annual Meeting | 2008, 2009, 2012 |
| American Society of Nephrology Annual Meeting | 2002, 2009, 2013, 2014 |
| International Pediatric Nephrology Association Meeting | 2013 |
| Annual Dialysis Conference | 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022 |

**Academic Meeting Chair**

    Pediatric Academic Societies - 1170 Medical Education: Assessments & Milestones
    Platform Session (Chairs: Hilary Haftel and John Mahan) May 3, 2014.

# EXHIBIT B

**EXHIBIT B**

**MATERIALS CONSIDERED BY DR. JOHN D. MAHAN JR., M.D.**

| DESCRIPTION | BATES RANGE(S) |
|---|---|
| **PATENTS** | |
| U.S. Patent No. 10,786,482 | SLVGT_RTU_00003996 – SLVGT_RTU_00004022 |
| U.S. Patent No. 10,918,621 | SLVGT_RTU_00005394 – SLVGT_RTU_00005421 |
| **COURT DOCUMENTS** | |
| Claim Construction Order (D.I. 98), dated November 16, 2021 | |
| Trial Testimony of Michael Beckloff, *Silvergate Pharmaceuticals Inc., v. Bionpharma Inc.*, Nos. 18-1962 & 19-1067 (D. Del.), February 1, 2021 (D.I. 193) | SLVGT_RTU_00009936 – SLVGT_RTU_00010003 |
| **DEPOSITIONS** | |
| Deposition Transcript of Michael Beckloff, February 4, 2022 | |
| **PUBLICATIONS** | |
| "Abbreviated New Drug Application (ANDA): 213714," Drugs@FDA: FDA-Approved Drugs, | SLVGT_RTU_00009308 - SLVGT_RTU_00009310 |
| "New Drug Application (NDA): 208686," Drugs@FDA: FDA-Approved Drugs | SLVGT_RTU_00010004 - SLVGT_RTU_00010006 |
| Drugs@FDA Epaned Kit | SLVGT_RTU_00009300 – SLVGT_RTU_00009303 |
| J.A. Axelrad, "Title I Implementation – Pharmacy Compounding in 2016," FDA (2016) (unpublished presentation) | SLVGT_RTU_00006647 – SLVGT_RTU_00006674 |
| Azurity, "Management of Pediatric Patients on Enalapril Maleate," (Feb. 2017 White Paper) | SLVGT_RTU_00006600 – SLVGT_RTU_00006613 |
| Brady, et al., "Management of high blood pressure in children: Similarities and differences between US and European guidelines," Pediatri. Nephrol., 34(3):405-412 (Mar. 2019) | SLVGT_RTU_00008412 – SLVGT_RTU_00008426 |
| N. Canavan, "For the Mouths of Babes," Pharm. Formulation & Quality, 13(2):18-20 (April/May 2011) | SLVGT_RTU_00007996 – SLVGT_RTU_00008039 |
| Chu, et al., "Anti-hypertensive drugs in children and adolescents," World J. Cardiol., 6(5):234-244 (May 26, 2014) | SLVGT_RTU_00009280 – SLVGT_RTU_00009290 |
| S.S. Dhareshwar, "Case Study: Enalapril: A Prodrug of Enalaprilat," Prodrugs. Biotechnology: Pharmaceutical Aspects, Vol. V (V.J. Stella, et al. eds.), Ch. 5.7 (Springer 2007) | SLVGT_RTU_00009291 – SLVGT_RTU_00009299 |
| B. Falkner, "Development of Blood Pressure Norms and Definition of Hypertension in Children," Pediatric Hypertension (J. Flynn, et al. eds.), Ch. 15 (Springer 2018) | SLVGT_RTU_00009337 – SLVGT_RTU_00009349 |

| DESCRIPTION | BATES RANGE(S) |
|---|---|
| FDA, "FDA's Human Drug Compounding Progress Report: Three Years After Enactment of Drug Quality and Security Act" (January 2017) | SLVGT_RTU_00006732 – SLVGT_RTU_00006747 |
| FDA, "Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry" (January 2018) | SLVGT_RTU_00009350 – SLVGT_RTU_00009364 |
| FDA, "Orange Book Preface," U.S. Food & Drug Administration | SLVGT_RTU_00009434 – SLVGT_RTU_00009459 |
| M.A. Ferguson, "Pharmacologic Treatment of Pediatric Hypertension," Pediatric Hypertension (J. Flynn, et al. eds.), Ch. 44 (Springer 2018) | SLVGT_RTU_00009365 – SLVGT_RTU_00009388 |
| Flynn, et al., "Clinical Practice Guideline for Screening and Management of High Blood Pressure in Children and Adolescents," Pediatrics, 140(3):e20171904 (Sep. 2017) | SLVGT_RTU_00008243 – SLVGT_RTU_00008316 |
| Gudeman, et al., "Potential Risks of Pharmacy Compounding," Drugs R&D, 13:1-8 (2013) | SLVGT_RTU_00006627 – SLVGT_RTU_00006634 |
| Habib, et al., "Accuracy of tablet splitting: Comparison study between hand splitting and tablet cutter," Saudi Pharm. J., 22:454-459 (2014) | SLVGT_RTU_00008043 – SLVGT_RTU_00008048 |
| Hansen, et al., "Adolescents' struggles with swallowing tablets: barriers, strategies, and learning," Pharm. World Sci., 30:65-69 (2008) | SLVGT_RTU_00007890 – SLVGT_RTU_00007894 |
| "Heart Failure," CLS Health, https://www.cls.health/heart-failure/ (last visited Apr. 19, 2022) | SLVGT_RTU_00009277 – SLVGT_RTU_00009279 |
| Hurtado, J. & B.S. Moffett, "Pediatric Oral Formulations: A Continual Challenge," Int'l J. Pharm. Compounding, 11(1):17-19 (Jan./Feb. 2007) | SLVGT_RTU_00006760 – SLVGT_RTU_00006762 |
| Ivanokska, et al., "Pediatric Drug Formulations: A Review of Challenges and Progress," Pediatrics, 134(2):361-372 (Aug. 2014) | SLVGT_RTU_00006702 – SLVGT_RTU_00006715 |
| Jonville, et al., "Characteristics of Medication Errors in Pediatrics," DICP Ann. Pharmacotherapy, 25:1113-1118 (Oct. 1991) | SLVGT_RTU_00008167 – SLVGT_RTU_00008172 |
| Kapur, G. & T.K. Mattoo, "Primary Hypertension in Children," Pediatric Hypertension (J. Flynn, et al. Eds.), Ch. 23 (Springer 2018) | SLVGT_RTU_00009389 – SLVGT_RTU_00009413 |
| M. Kromelis, "Ensuring Pediatric Medicine Safety," Pharmacy Purchasing & Prods., (Nov. 2012) | SLVGT_RTU_00006763 – SLVGT_RTU_00006765 |
| Li, et al., "Pediatric Antihypertensive Clinical Trials," Clinical Hypertension & Vascular Diseases: Pediatric Hypertension (J.T. Flynn, et al. eds.), Ch. 33 (Springer 2011) | SLVGT_RTU_00007940 – SLVGT_RTU_00007950 |

| DESCRIPTION | BATES RANGE(S) |
|---|---|
| Lugo, et al., "A Survey of Children's Hospitals on the Use of Extemporaneous Liquid Formulations in the Inpatient Setting" (2011) (unpublished presentation) | SLVGT_RTU_00006766 – SLVGT_RTU_00006790 |
| Meyers, R.S. & A. Siu, "Pharmacotherapy Review of Chronic Pediatric Hypertension," Clinical Therapeutics, 33(10):1331-1356 (Oct. 2011) | SLVGT_RTU_00008370 – SLVGT_RTU_00008395 |
| D. Matossian, "Pediatric Hypertension," Pediat. Ann., 47(12):e499-e503 (2018) | SLVGT_RTU_00009414 – SLVGT_RTU_00009418 |
| M.C. Nahata, "Lack of Pediatric Drug Formulations," Pediatrics, 104(3):607-609 (Sept. 1999) | SLVGT_RTU_00009419 – SLVGT_RTU_00009423 |
| NHBPEP Working Group on High Blood Pressure in Children and Adolescents, "The Fourth Report on the Diagnosis, Evaluation, and Treatment of High Blood Pressure in Children and Adolescents," Pediatrics, 114(2):555-576 (Aug. 2004) | SLVGT_RTU_00005900 – SLVGT_RTU_00005923 |
| S.N. Pagay, "Pediatric Formulations," FDA (Dec. 15, 2009) (unpublished presentation) | SLVGT_RTU_00006675 – SLVGT_RTU_00006701 |
| Ponikowski, et al., "2016 ESC Guidelines for the diagnoses and treatment of acute and chronic heart failure," Eur. J. Heart Failure, 18:891-975 (2016) | SLVGT_RTU_00009460 – SLVGT_RTU_00009544 |
| Premier Research, "Developing Pediatric Studies" (2013) (unpublished white paper) | SLVGT_RTU_00008060 – SLVGT_RTU_00008066 |
| K.M. Redwine, "Epidemiology of Primary Hypertension in Children," Pediatric Hypertension (J. Flynn, et al. eds.), Ch. 18 (Springer 2018) | SLVGT_RTU_00009545 – SLVGT_RTU_00009555 |
| Richey, et al., "Manipulation of drugs to achieve the required dose is intrinsic to paediatric practice but is not supported by guidelines or evidence," BMC Pediatrics, 13:81 (2013) | SLVGT_RTU_00008080 – SLVGT_RTU_00008087 |
| Rippley, et al., "Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children," Biopharm. Drug Dispos., 21:339-334 (2000) | SLVGT_RTU_00008364 – SLVGT_RTU_00008369 |
| Rodieux, et al., "Effect of Kidney Function on Drug Kinetics and Dosing in Neonates, Infants, and Children," Clin. Pharmacokinet., 54:1183-1204 (2015) | SLVGT_RTU_00009556 – SLVGT_RTU_00009577 |
| Rood, et al., "Variability in compounding of oral liquids for pediatric patients: A patient safety concern," J. Am. Pharm. Ass'n, 54:383-389 (Jul/Aug 2014) | SLVGT_RTU_00006716 – SLVGT_RTU_00006722 |
| J. Samuels, "The Increasing Burden of Pediatric Hypertension," Hypertension, 60:276-277 (2012) | SLVGT_RTU_00008180 – SLVGT_RTU_00008181 |
| Schirm, et al., "Lack of appropriate formulations of medicines for children in the community," Acta Paediatr., 92:1486-1489 (2003) | SLVGT_RTU_00008199 – SLVGT_RTU_00008202 |

| DESCRIPTION | BATES RANGE(S) |
|---|---|
| Sedrati, et al., "Splitting tablets in half," Am. J. Hosp. Pharm., 51:548, 550 (Feb. 15, 1994) | SLVGT_RTU_00008225 – SLVGT_RTU_00008226 |
| Sellers, S. & W.H. Utian, "Pharmacy Compounding Primer for Physicians: Prescriber Beware," Drugs, 72(16):2043-2050 (2012) | SLVGT_RTU_00006870 – SLVGT_RTU_00006877 |
| Sharma, et al., "Secondary Forms of Hypertension in Children: Overview," Pediatric Hypertension, (J. Flynn, et al. eds.), Ch. 24 (Springer 2018) | SLVGT_RTU_00009578 – SLVGT_RTU _00009596 |
| Siddiqi, N. & I.F. Shata, "Antihypertensive agents: a long way to safe drug prescribing in children," Pediatric Nephrology (Nov. 1, 2019), https://doi.org/10.1007/s00467-019-04314-7 | SLVGT_RTU_00009597 – SLVGT_RTU_00009613 |
| Strickley, et al., "Pediatric Drugs—A Review of Commercially Available Oral Formulations," J. Pharm. Sci., 97(5):1731-1774 (May 2008) | SLVGT_RTU_00009614 – SLVGT_RTU_00009657 |
| Tran, et al., "Recent Trends in Healthcare Utilization Among Children and Adolescents With Hypertension in the United States," Hypertension, 60:296-302 (2012) | SLVGT_RTU_00008192 – SLVGT_RTU_00008198 |
| "U-M leads state effort to create new standards for kids' medicine, reduce medication errors," (Feb. 11, 2014) | SLVGT_RTU_00006885 |
| Verrue, et al., "Tablet-splitting: a common yet not so innocent practice," J. Advanced Nursing, 67(1):26-32 (2010) | SLVGT_RTU_ 00008173 – SLVGT_RTU_ 00008179 |
| D.J. Weaver, "Pediatric Hypertension: Review of Updated Guidelines," Pediatrics in Rev., 40(7):354-358 (July 2019) | SLVGT_RTU_00008343 – SLVGT_RTU_00008350 |
| Weinhaus, A.J. & K.P. Roberts, "Anatomy of the Human Heart," Handbook of Cardiac Anatomy, Physiology, and Devices, 2d ed. (P.A. Iaizzo ed.), Ch. 4 (Humana Press 2009) | SLVGT_RTU_00009658 – SLVGT_RTU_00009686 |
| World Health Organization, "Development of paediatric medicines: points to consider in formulation," WHO Expert Committee on Specifications for Pharmaceutical Preparations, 46th ed. (2012) | SLVGT_RTU_00009687 – SLVGT_RTU_00009935 |
| Zajicek, et al., "A Report from the Pediatric Formulations Task Force: Perspectives on the State of Child-Friendly Oral Dosage Forms," AAPS J., 15(4):1072-1081 (Oct. 2013) | SLVGT_RTU_00006890 – SLVGT_RTU_00006899 |
| **OTHER DOCUMENTS** | |
| 2017 Epaned Label | ALK_ENPL_00000084- ALK_ENPL_00000105 |
| 2014 Epaned Kit Label | SLVGT_RTU_00009312 – SLVGT_RTU_00009328 |
| Vasotec® ("Epaned Kit NDA – Pharmaceutical Development") | SLVGT_RTU_00009424 – SLVGT_RTU_00009433 |

| DESCRIPTION | BATES RANGE(S) |
|---|---|
| Epaned® NDA – Clinical Overview | SLVGT_RTU_00005739 – SLVGT_RTU_00005779 |
| Epaned® NDA – 2018 Stability Summary | SLVGT_RTU_00009329 – SLVGT_RTU_00009336 |
| 2019 Alkem ANDA Product Label | ALK_ENPL_00006154 – ALK_ENPL_00006171 |
| Alkem Response to Information Request – Quality: Drug Product Deficiency-1 | ALK_ENPL_00257564 |
| Alkem Response to Information Request – Quality: Expiration Dating Period | ALK_ENPL_00257602 |
| Letter from FDA to Silvergate, attaching Memorandum of Meeting Minutes and Meeting Minutes, dated May 5, 2015 | SLVGT_RTU_00006323 – SLVGT_RTU_00006332 |
| Enalaprilat Injection, USP Label, dated March 15, 2010 | SLVGT_RTU_00009311 |

# Exhibit B



Planet Depos
We Make It Happen™

[REDACTED] - PURSUANT TO PROTECTIVE ORDER

# Transcript of John D. Mahan, Jr., M.D.

**Date:** June 10, 2022
**Case:** Azurity Pharmaceuticals, Inc. -v- Alkem Laboratories Ltd. (Enalapril)

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AZURITY PHARMACEUTICALS, INC.,
Plaintiff,
v.
Case No. 1:19 cv 2100 MSG
ALKEN LABORATORIES, LTD.,
Defendant.

[REDACTED] PURSUANT TO PROTECTIVE ORDER

Videotaped Deposition of JOHN D. MAHAN, JR., M.D.
Conducted Remotely via Zoom
Friday, June 10, 2022
11:05 a.m. EDT

Job No.: 452365
Pages: 1 238
Reported By: Lisa A. Knight, RDR, CRR, CLR, RSA

2

Videotaped Deposition of JOHN D. MAHAN, JR., M.D., conducted remotely via Zoom:

Pursuant to Notice, before Lisa A. Knight, Realtime Diplomate Reporter, Certified Realtime Reporter, and Realtime Systems Administrator.

3

A P P E A R A N C E S
All appearing remotely

ON BEHALF OF THE PLAINTIFF:
KRISTINA HANSON, ESQUIRE
JESSICA RAMSEY, ESQUIRE
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza
Spear Tower, Suite 3300
San Francisco, California 94105
415.947.2000

ON BEHALF OF THE DEFENDANT:
GEORGE J. BARRY III, ESQUIRE
KRATZ & BARRY, LLP
1050 Crown Point Parkway
Suite 500
Atlanta, Georgia 30338
404.431.6600

ALSO PRESENT:
JOYCE YAO, Wilson Sonsini
ADAM NUDELMAN, Videographer
LAUREN KIDD, Deposition Technician

4

C O N T E N T S

| EXAMINATION OF JOHN D. MAHAN, JR., M.D.: | PAGE |
|---|---|
| By Mr. Barry | 7 |

E X H I B I T S
Attached to transcript.

| MAHAN DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | [Proposed] Final Pretrial Order Silvergate Pharmaceuticals v. Bionpharma Inc. | 76 |
| Exhibit 2 | Curriculum Vitae, John D. Mahan, Jr., M.D. | 103 |
| Exhibit 3 | Expert Report of John D. Mahan, Jr., M.D., on Objective Indicia of Non Obviousness for U.S. Patents 10,786,482 and 10,918,621 | 123 |

Index continued

| MAHAN DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 4 | Article entitled Pharmacologic Treatment of Chronic Pediatric Hypertension, by Renee Robinson and others | 123 |
| Exhibit 5 | Drug label for Epaned oral solution | 139 |
| Exhibit 6 | U.S. Patent 10,786,482 Mosher et al. | 142 |
| Exhibit 7 | U.S. Patent 10,918,621 Mosher et al. | 145 |

Index complete

**REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

PROCEEDINGS

THE VIDEOGRAPHER: Here begins Tape No. 1 in the videotaped deposition of John D. Mahan, Jr., M.D., in the matter of Azurity Pharmaceuticals, Inc., versus Alkem Laboratories, Ltd., in the United States District Court for the District of Delaware, Case No. 1:19-cv-02100-MSG.

Today's date is June 10, 2022; the time on the record is 11:05 a.m. The videographer today is Adam Nudelman, representing Planet Depos. This video deposition is taking place remotely.

Would all counsel please voice identify themselves, state whom they represent.

MS. HANSON: Tina Hanson representing Azurity Pharmaceuticals, Inc., and the witness, from Wilson Sonsini. And with me today also from Wilson Sonsini is Jessica Ramsey and Joyce Yao.

MR. BARRY: Hi. This is George Barry with Kratz & Barry. We represent Alkem.

THE VIDEOGRAPHER: The court reporter today is Lisa Knight, also of Planet Depos. She will now administer the oath, and we can proceed.

///

JOHN D. MAHAN, JR., M.D.,
having been first duly sworn to state the whole truth, testified as follows:

EXAMINATION

BY MR. BARRY:

Q. Good morning, Dr. Mahan. We met briefly just before we started the deposition. My name is George Barry. I represent Alkem in this. And thank you for being here today. I have questions regarding the report that you prepared, obviously. I'm looking forward to discussing that with you.

the cart in front of the horse. You might get used to that with me by the end of the day.

But could you, for the record, just state your full name?

**A. Yes. John D. Mahan, Jr., M.D.**

Q. Thank you.

And do you have anybody in the room with you?

**A. No.**

Q. And I assume you're at a desk on a computer. Is that right?

**A. Yes.**

Q. And do you have anything on your desk?

**A. Yes. Besides the computer, I have the expert report of my preparation, I have the Rabionow reply report, and I have documents cited in my report. It's almost too heavy to lift, but you can see it there.**

Q. Yes. Thank you.

Anything else besides that, besides those things?

**A. No. I have my phone. I still have a clinical practice, so I have to be available to my nurses. And they know that I'm in a meeting, so**

BY MR. BARRY:
Q. All right. Thank you.
MR. BARRY: It looks like -- I don't know. We've had some disruptions, but by my clock, it looks like we've been going over an hour or so. And I'm changing gears here, so it seems like it would be a good time for a break. I really only need a couple minutes, but I'm happy to take ten, if everybody could use a break.
MS. HANSON: I defer to Dr. Mahan. I just need five minutes.
THE DEPONENT: Five will be good by me.
MS. HANSON: All right. We'll take five. What if we just say 10:30? Or 12:30.
MR. BARRY: That sounds good.

103

Or 1:30.
MS. HANSON: De ending on where you are.
THE VIDEOGRAPHER: Off the record at 13:25.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record. 13:31.
BY MR. BARRY:
Q. Dr. Mahan, welcome back.
So I'm going to spend a little time now talking to you about your background.
MR. BARRY: So if we could have Exhibit 2 pulled up and put on the screen and also made available in the Chat.
(Mahan Exhibit 2 marked for identification and attached to transcript.)
BY MR. BARRY:
Q. All right. Dr. Mahan, we've just put on the screen the document that's been marked as Exhibit 1 [sic]. We can scroll through the document if you like. You can also pull the document off of the Chat so you can look at it yourself on the side.
I was going to ask you -- well,

104

actually, before I start asking you questions about the CV, let me ask a little background.
Could you -- and I realize this might take you a little while, but could you tell us what educational degrees you hold and from where?
**A. Yes. So I have a BA in Biology from La Salle University in Philadelphia. My M.D. is from Hahnemann University, which is now Drexel University School of Medicine in Philadelphia. I completed my pediatric residency at University of Minnesota, including a chief resident year.**
**Then I completed my pediatric nephrology fellowship at the University of Minnesota. Graduated there in 1984. At that point, I joined the faculty at The Ohio State University College of Medicine, and I've remained at OSU, on the faculty, since 1984.**
Q. Thank you.
Do you have any chemistry in your education background?
MS. HANSON: Ob ect to form.
**A. No -- other than some required chemistry courses, Counsel. I did have some required chemistry courses and biochemistry**

# Exhibit C

US010786482B2

(12) **United States Patent**
**Mosher et al.**

(10) **Patent No.: US 10,786,482 B2**
(45) **Date of Patent: *Sep. 29, 2020**

(54) **ENALAPRIL FORMULATIONS**

(71) Applicant: **Silvergate Pharmaceuticals, Inc.**, Greenwood Village, CO (US)

(72) Inventors: **Gerold L. Mosher**, Kansas City, MO (US); **David W. Miles**, Kansas City, MO (US)

(73) Assignee: **SILVERGATE PHARMACEUTICALS, INC.**, Greenwood Village, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/177,159**

(22) Filed: **Oct. 31, 2018**

(65) **Prior Publication Data**

US 2019/0070147 A1 Mar. 7, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/003,994, filed on Jun. 8, 2018, now Pat. No. 10,154,987, which is a continuation of application No. 15/802,341, filed on Nov. 2, 2017, now Pat. No. 10,039,745, which is a continuation of application No. 15/613,622, filed on

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***A61K 31/401*** | (2006.01) |
| ***A61K 9/00*** | (2006.01) |
| ***A61K 47/26*** | (2006.01) |
| ***A61K 47/12*** | (2006.01) |

(52) **U.S. Cl.**
CPC .......... ***A61K 31/401*** (2013.01); ***A61K 9/0053*** (2013.01); ***A61K 9/0095*** (2013.01); ***A61K 47/12*** (2013.01); ***A61K 47/26*** (2013.01)

(58) **Field of Classification Search**
CPC ...... A61K 31/401; A61K 47/12; A61K 47/26; A61K 9/0053; A61K 9/0095
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,374,829 | A | 2/1983 | Harris et al. |
| 4,472,380 | A | 9/1984 | Harris et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 1275350 C | 10/1990 |
| EP | 2903690 A1 | 8/2015 |

(Continued)

OTHER PUBLICATIONS

Nahata et al., "Stability of elanapril maleate in three extemporaneously prepared oral liquids", Am. J. Health-Syst. Pharm., 1998, vol. 55, pp. 1155-1157 (Year: 1998).*

(Continued)

*Primary Examiner* — Savitha M Rao
(74) *Attorney, Agent, or Firm* — Wilson, Sonsini, Goodrich & Rosati, P.C.

(57) **ABSTRACT**

Provided herein are stable enalapril oral liquid formulations. Also provided herein are methods of using enalapril oral liquid formulations for the treatment of certain diseases including hypertension, heart failure and asymptomatic left ventricular dysfunction.

**28 Claims, 2 Drawing Sheets**



tion that sets forth illustrative embodiments, in which the principles of the invention are utilized, and the accompanying drawings of which:

FIG. **1**: Effect of pH on degradant formation after 8 weeks of storage of various enalapril solution formulations at 5° C.

FIG. **2**: Effect of pH on degradant formation after 8 weeks of storage of various enalapril solution formulations at room temperature (19-22° C.).

## DETAILED DESCRIPTION OF THE INVENTION

Provided herein are stable enalapril oral liquid formulations. Also provided herein are stable enalapril powder formulations for reconstitution for oral liquid administration. These enalapril formulations described herein are useful for the treatment of hypertension, prehypertension, heart failure as well as ventricular dysfunction. The formulations are advantageous over conventional solid dosage administration of enalapril ranging from ease of administration, accuracy of dosing, accessibility to additional patient populations such as to children and the elderly, and an increased patient compliance to medication.

It is generally known that certain segments of the population have difficulty ingesting and swallowing solid oral dosage forms such as tablets and capsules. As many as a quarter of the total population has this difficulty. Often, this leads to non-compliance with the recommended medical therapy with the solid dosage forms, thereby resulting in rending the therapy ineffective. Further, solid dosage forms are not recommended for children or elderly due to increased risk in choking.

Furthermore, the dose of enalapril to be given to children is calculated according to the child's weight. When the calculated dose is something other than the amount present in one or more intact solid dosage forms, the solid dosage form must be divided to provide the correct dose. This leads to inaccurate dosing when solid dosages forms, such as tablets, are compounded to prepare other formulations for children.

For enalapril, one solution to overcoming the use of the tablet form is for a compounding pharmacist to pulverize and crush the enalapril tablet(s) into a powder via mortar and pestle and reconstitute the powder in some liquid form. However forming a enalapril oral liquid in this fashion has significant drawbacks including large variability in the actual dosage, incomplete solubilizing of the enalapril tablet in the liquid, rapid instability, inconsistent formulation methods per compounding pharmacy, and a number of other potential issues. The crushed tablet liquid formulation may also be potentially unsafe due to contamination with residual drugs and other substances from the mortar and pestle or other crushing agent.

Alternatively, enalapril is formulated as enalapril powder compositions for reconstitution as oral liquids as described in U.S. Pat. No. 8,568,747. The powder compositions as described in this patent require mannitol and colloidal silicon dioxide for stability and dissolution. While these powder compositions are an improvement over crushing tablets, they still require a step of mixing with a diluent. The stable enalapril oral liquid formulations described herein require no extra steps or manipulation prior to administration to a subject. Further, the stable enalapril oral liquid formulations described herein do not require or need mannitol or colloidal silicon dioxide for stability and dissolution.

The present embodiments described herein provide a safe and effective oral administration of enalapril for the treatment of hypertension and other disorders. In particular, the embodiments provide stable enalapril oral liquid formulations as well as alternatively enalapril powder formulations for oral liquid administration.

As used herein, "enalapril" refers to enalapril base, its salt, or solvate or derivative or isomer or polymorph thereof. Suitable compounds include the free base, the organic and inorganic salts, isomers, isomer salts, solvates, polymorphs, complexes etc. U.S. Pat. Nos. 4,374,829; 4,472,380 and 4,510,083 disclose exemplary methods in the preparation of enalapril. In some embodiments, the enalapril used in the formulations described herein is an enalapril salt. In some instances, the enalapril salt is enalapril maleate. In other instances, the enalapril salt is in the form of enalapril sodium.

Other ACE inhibitors are contemplated in the formulations within and include but are not limited to quinapril, indolapril, ramipril, perindopril, lisinopril, benazepril, imidapril, zofenopril, trandolapril, fosinopril, captopril, and their salts, solvates, derivatives, polymorphs, or complexes, thereof.

Enalapril Oral Liquid Formulations

Oral liquids include, but are not limited to, solutions (both aqueous and nonaqueous), suspensions, emulsions, syrups, slurries, juices, elixirs, dispersions, and the like. It is envisioned that solution/suspensions are also included where certain components described herein are in a solution while other components are in a suspension.

In one aspect, the enalapril liquid formulations described herein comprise enalapril, a preservative, a sweetening agent, a buffer, and water. In one embodiment, the sweetening agent is sucralose. In one embodiment, the sweetening agent is xylitol. In one embodiment, the sweetening agent is not mannitol. In another embodiment, the preservative is sodium benzoate. In some embodiments, the preservative is a paraben. In some embodiments, the preservative is a mixture of parabens. In yet another embodiment, the buffer comprises citric acid. In some embodiments, the buffer further comprises sodium citrate. In one aspect, the enalapril liquid formulation described herein comprises enalapril, sucralose, sodium benzoate, citric acid, sodium citrate, and water. In some embodiments, the enalapril liquid formulation herein further comprises a flavoring agent. In some embodiments, the enalapril liquid formulation is not obtained from crushing enalapril tablet and dissolving the powder in a suitable vehicle for oral administration. In some embodiments, the enalapril liquid formulation does not contain silicon dioxide. In some embodiments, the enalapril liquid formulation does not contain mannitol. In some embodiments, the enalapril liquid formulation does not contain lactose. In some embodiments, the enalapril liquid formulation does not contain magnesium stearate. In some embodiments, the enalapril liquid formulation does not contain sodium bicarbonate. In some embodiments, the enalapril liquid formulation does not contain iron oxides.

In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.6 to about 1.2 mg/ml in the oral liquid formulation. In other embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.6 mg/ml, about 0.61 mg/ml, about 0.62 mg/ml, about 0.63 mg/ml, about 0.64 mg/ml, about 0.65 mg/ml, about 0.66 mg/ml, about 0.67 mg/ml, about 0.68 mg/ml, about 0.69 mg/ml, about 0.7 mg/ml, about 0.71 mg/ml, about 0.72 mg/ml, about 0.73 mg/ml, about 0.74 mg/ml, about 0.75 mg/ml, about 0.76 mg/ml, about 0.77 mg/ml, about 0.78 mg/ml, about 0.79 mg/ml, about 0.8 mg/ml, about 0.81 mg/ml, about 0.82 mg/ml, about 0.83

months, at least 24 months, at least 30 months and at least 36 months. In some embodiments, refrigerated condition is 5±3° C. In some embodiments, refrigerated condition is about 2° C., about 2.1° C., about 2.2° C., about 2.3° C., about 2.4° C., about 2.5° C., about 2.6° C., about 2.7° C., about 2.8° C., about 2.9° C., about 3° C., about 3.1° C., about 3.2° C., about 3.3° C., about 3.4° C., about 3.5° C., about 3.6° C., about 3.7° C., about 3.8° C., about 3.9° C., about 4° C., about 4.1° C., about 4.2° C., about 4.3° C., about 4.4° C., about 4.5° C., about 4.6° C., about 4.7° C., about 4.8° C., about 4.9° C., about 5° C., about 5.1° C., about 5.2° C., about 5.3° C., about 5.4° C., about 5.5° C., about 5.6° C., about 5.7° C., about 5.8° C., about 5.9° C., about 6° C., about 6.1° C., about 6.2° C., about 6.3° C., about 6.4° C., about 6.5° C., about 6.6° C., about 6.7° C., about 6.8° C., about 6.9° C., about 7° C., about 7.1° C., about 7.2° C., about 7.3° C., about 7.4° C., about 7.5° C., about 7.6° C., about 7.7° C., about 7.8° C., about 7.9° C., or about 8° C. At accelerated conditions, the enalapril oral liquid formulations described herein are stable for at least 1 month, at least 2 months, at least 3 months, at least 4 months, at least 5 months, at least 6 months, at least 7 months, at least 8 months, at least 9 months, at least 10 months, at least 11 months or at least 12 months. Accelerated conditions for the enalapril oral liquid formulations described herein include temperature and/or relative humidity (RH) that are at or above ambient levels (e.g. 25±5° C.; 55±10% RH). In some instances, an accelerated condition is at about 25° C., about 30° C., about 35° C., about 40° C., about 45° C., about 50° C., about 55° C. or about 60° C. In other instances, an accelerated condition is above 55% RH, about 65% RH, about 70% RH, about 75% RH or about 80% RH. In further instances, an accelerated condition is about 40° C. or 60° C. at ambient humidity. In yet further instances, an accelerated condition is about 40° C. at 75±5% RH humidity.

Enalapril Oral Powder Formulation

In another aspect, enalapril oral liquid formulations described herein are prepared from the reconstitution of an enalapril powder formulation. In some embodiments, the enalapril powder formulation comprising enalapril, a sweetener, a preservative, and optionally an excipient is dissolved in water, a buffer, other aqueous solvent, or a liquid to form an enalapril oral liquid formulation. In one embodiment, the sweetening agent is sucralose. In one embodiment, the sweetener is not mannitol. In one embodiment, the sweetening agent is xylitol. In another embodiment, the preservative is sodium benzoate. In one embodiment, the preservative is a paraben preservative. In one aspect, the enalapril powder formulation described herein comprises enalapril, sucralose, and sodium benzoate. In some embodiments, the enalapril powder formulation herein further comprises a flavoring agent. In some embodiments, the enalapril powder formulation herein further comprises one or more buffering agents.

In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.5% w/w to about 30% w/w of the powder formulation. In other embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.5% w/w, about 1% w/w, about 1.5% w/w, about 2% w/w, about 2.5% w/w, about 3% w/w, about 3.5% w/w, about 4% w/w, about 4.5% w/w, about 5% w/w, about 5.5% w/w, about 6% w/w, about 6.5% w/w, about 7% w/w, about 7.5% w/w, about 8% w/w, about 8.5% w/w, about 9% w/w, about 9.5% w/w, about 10% w/w, about 10.5% w/w, about 11% w/w, about 11.5% w/w, about 12% w/w, about 12.5% w/w, about 13% w/w, about 13.5% w/w, about 14% w/w, about 14.5% w/w, about 15% w/w, about 15.5% w/w, about 16% w/w, about 16.5% w/w, about 17% w/w, about 17.5% w/w, about 18% w/w, about 18.5% w/w, about 19% w/w, about 19.5% w/w, about 20% w/w, about 20.5% w/w, about 21% w/w, about 21.5% w/w, about 22% w/w, about 22.5% w/w, about 23% w/w, about 23.5% w/w, about 24% w/w, about 24.5% w/w, about 25% w/w, about 25.5% w/w, about 26% w/w, about 26.5% w/w, about 27% w/w, about 27.5% w/w, about 28% w/w, about 28.5% w/w, about 29% w/w, about 29.5% w/w, or about 30% w/w of the powder formulation. In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 10% w/w to about 25% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 13.5% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 19.5% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 24.5% w/w of the powder formulation. In some embodiments, enalapril is present in about 10.5% w/w of the powder formulation. In some embodiments, enalapril is present in about 14.5% w/w of the powder formulation. In some embodiments, enalapril is present in about 18% w/w of the powder formulation.

In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.1% w/w to about 1% w/w of the powder formulation. In other embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.1% w/w, about 0.15% w/w, about 0.2% w/w, about 0.25% w/w, about 0.3% w/w, about 0.35% w/w, about 0.4% w/w, about 0.45% w/w, about 0.5% w/w, about 0.55% w/w, about 0.6% w/w, about 0.65% w/w, about 0.7% w/w, about 0.75% w/w, about 0.8% w/w, about 0.85% w/w, about 0.9% w/w, about 0.95% w/w, or about 1% w/w of the powder formulation. In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.4% w/w to about 0.7% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 0.45% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 0.6% w/w of the powder formulation. In some embodiments, enalapril is present in about 0.4% w/w of the powder formulation. In some embodiments, enalapril is present in about 0.5% w/w of the powder formulation.

Various amounts and concentrations of other components (sweeteners, buffers, preservatives, and the like) in the enalapril powder formulations are found in the previous section describing the amounts and concentrations for the analogous enalapril oral liquid formulations. For example, in some embodiments where sucralose is present in about 1% w/w to about 30% w/w of the solids in the oral liquid formulation; in an analogous enalapril powder formulation, sucralose would be about 1% w/w to about 30% w/w in the powder formulation. In some embodiments where sodium benzoate is present in about 1% w/w to about 30% w/w of the solids in the oral liquid formulation, in an analogous enalapril powder formulation sodium benzoate is present in about 1% w/w to about 30% w/w in the powder formulation.

Liquid vehicles suitable for the enalapril powder formulations to be reconstituted into an oral solution described herein are selected for a particular oral liquid formulation (solution, suspension, etc.) as well as other qualities such as clarity, toxicity, viscosity, compatibility with excipients, chemical inertness, palatability, odor, color and economy. Exemplary liquid vehicles include water, ethyl alcohol, glycerin, propylene glycol, syrup (sugar or other sweetener based, e.g., Ora-Sweet® SF sugar-free flavored syrup), juices (apple, grape, orange, cranberry, cherry, tomato and the like), other beverages (tea, coffee, soft drinks, milk and

the like), oils (olive, soybean, corn, mineral, castor and the like), and combinations or mixtures thereof. Certain liquid vehicles, e.g., oil and water, can be combined together to form emulsions. In some embodiments, water is used for as a vehicle for a enalapril oral liquid formulation. In other embodiments, a syrup is used for as a vehicle for a enalapril oral liquid formulation. In yet other embodiments, a juice is used for as a vehicle for a enalapril oral liquid formulation.

Buffering agents maintain the pH of the liquid enalapril formulation. Non-limiting examples of buffering agents include, but are not limited to sodium bicarbonate, potassium bicarbonate, magnesium hydroxide, magnesium lactate, magnesium gluconate, aluminum hydroxide, aluminum hydroxide/sodium bicarbonate co precipitate, mixture of an amino acid and a buffer, a mixture of aluminum glycinate and a buffer, a mixture of an acid salt of an amino acid and a buffer, and a mixture of an alkali salt of an amino acid and a buffer. Additional buffering agents include citric acid, sodium citrate, sodium tartrate, sodium acetate, sodium carbonate, sodium polyphosphate, potassium polyphosphate, sodium pyrophosphate, potassium pyrophosphate, disodium hydrogenphosphate, dipotassium hydrogenphosphate, trisodium phosphate, tripotassium phosphate, sodium acetate, potassium metaphosphate, magnesium oxide, magnesium hydroxide, magnesium carbonate, magnesium silicate, calcium acetate, calcium glycerophosphate, calcium chloride, calcium hydroxide, calcium lactate, calcium carbonate, calcium bicarbonate, and other calcium salts. Some buffering agents also impart effervescent qualities when a powder is reconstituted in a solution.

In some embodiments, the reconstituted oral liquid formulation comprises a buffer. In some embodiments, the buffer comprises citric acid and sodium citrate.

In further embodiments, the enalapril powder formulation described herein comprises additional excipients including, but not limited to, glidants, flavoring agents, coloring agents and thickeners. Additional excipients such as bulking agents, tonicity agents and chelating agents are within the scope of the embodiments.

Glidants are substances that improve flowability of a powder. Suitable glidants include, but are not limited to, calcium phosphate tribasic, calcium silicate, cellulose (powdered), colloidal silicon dioxide, magnesium silicate, magnesium trisilicate, silicon dioxide, starch, talc and the like. In some embodiments, the enalapril powder formulations described herein comprise a glidant.

In another embodiment, the enalapril powder formulation described herein comprises a flavoring agent or flavorant to enhance the taste or aroma of the formulation in liquid form. Suitable natural or synthetic flavoring agents can be selected from standard reference books, for example Fenaroli's Handbook of Flavor Ingredients, 3rd edition (1995). Non-limiting examples of suitable natural flavors, some of which can readily be simulated with synthetic agents or combinations thereof, include almond, anise, apple, apricot, bergamot, blackberry, blackcurrant, blueberry, cacao, caramel, cherry, cinnamon, clove, coffee, coriander, cranberry, cumin, dill, eucalyptus, fennel, fig, ginger, grape, grapefruit, guava, hop, lemon, licorice, lime, malt, mandarin, molasses, nutmeg, mixed berry, orange, peach, pear, peppermint, pineapple, raspberry, rose, spearmint, strawberry, tangerine, tea, vanilla, wintergreen, etc. Also useful, particularly where the formulation is intended primarily for pediatric use, is tutti-frutti or bubblegum flavor, a compounded flavoring agent based on fruit flavors. Presently preferred flavoring agents include anise, cinnamon, cacao, orange, peppermint, cherry (in particular wild cherry), grape, bubblegum, vanilla, and mixed berry. Flavoring agents can be used singly or in combinations of two or more.

In further embodiments, the enalapril powder formulation described herein comprises a coloring agent for identity and/or aesthetic purposes. Suitable coloring agents illustratively include FD&C Red No. 3, FD&C Red No. 20, FD&C Red No. 40, FD&C Yellow No. 6, FD&C Blue No. 2, D&C Green No. 5, D&C Orange No. 5, caramel, ferric oxide and mixtures thereof.

In further embodiments, the enalapril powder formulation described herein comprises a thickener. Thickeners impart viscosity or weight to the resultant liquid forms from the enalapril formulation described herein. Exemplary thickeners include dextrin, cellulose derivatives (carboxymethylcellulose and its salts, ethylcellulose, hydroxyethyl cellulose, methylcellulose, hypromellose, and the like) starches, pectin, polyethylene glycol, polyethylene oxide, trehalose and certain gums (xanthan gum, locust bean gum, etc.).

Additional excipients are contemplated in the enalapril powder formulation embodiments. These additional excipients are selected based on function and compatibility with the the enalapril powder formulation described herein and may be found, for example in *Remington: The Science and Practice of Pharmacy*. Nineteeth Ed (Easton, Pa.: Mack Publishing Company, 1995); Hoover, John E., *Remington's Pharmaceutical Sciences*. (Easton, Pa.: Mack Publishing Co 1975); Liberman, H. A. and Lachman, L., Eds., *Pharmaceutical Dosage Forms* (New York, N.Y.: Marcel Decker 1980); and *Pharmaceutical Dosage Forms and Drug Delivery Systems*, Seventh Ed (Lippincott Williams & Wilkins 1999), herein incorporated by reference in their entirety.

In some embodiments, the enalapril oral liquid formulation prepared from the powder formulations described herein are homogenous. Homogenous liquids as used herein refer to those liquids that are uniform in appearance, identity, consistency and drug concentration per volume. Non-homogenous liquids include such liquids that have varied coloring, viscosity and/or aggregation of solid particulates, as well as non-uniform drug concentration in a given unit volume. Homogeneity in liquids are assessed by qualitative identification or appearance tests and/or quantitative HPLC testing or the like. The mixing methods and excipients described herein are selected to impart a homogenous quality to a resultant enalapril oral liquid formulation.

Mixing methods encompass any type of mixing that result in a homogenous enalapril oral liquid formulation. In some embodiments, a quantity of an enalapril powder formulation is added to a liquid vehicle and then mixed by a stirring, shaking, swirling, agitation element or a combination thereof. In certain instances, a fraction of a enalapril powder formulation (i.e., one-half, one-third, one-fourth, etc.) is added to a liquid vehicle, mixed by stirring, shaking, swirling, agitation or a combination thereof, and the subsequent powder fraction(s) is added and mixed. In other embodiments, a liquid vehicle is added to an enalapril powder formulation in a container, for example, a bottle, vial, bag, beaker, syringe, or the like. The container is then mixed by stirring, shaking, swirling, agitation, inversion or a combination thereof. In certain instances, a fractional volume of the liquid vehicle (i.e., one-half, one-third, one-fourth volume, etc.) is added to a enalapril powder formulation in a container, mixed by stirring, shaking, swirling, agitation, inversion or a combination thereof, and the subsequent liquid fraction(s) is added and mixed. In certain instances, a one-half fractional volume of the liquid vehicle is added to an enalapril powder formulation in a container and mixing by shaking; the other one-half fractional volume of the

liquid vehicle is then subsequently added and mixed. In any of the above embodiments, mixing (i.e., stirring, shaking, swirling, agitation, inversion or a combination thereof) occurs for a certain time intervals such as about 10 seconds, about 20 seconds, about 30 seconds, about 45 seconds, about 60 seconds, about 90 seconds, about 120 seconds, about 2.5 minutes, about 3 minutes, about 3.5 minutes, about 4 minutes, or about 5 minutes. In embodiments, where there are two or more mixing steps, the time intervals for each mixing can be the same (e.g., 2×10 seconds) or different (e.g., 10 seconds for first mixing and 20 seconds for second mixing). In any of the above embodiments, a enalapril oral liquid formulation is allowed to stand for a period of time such as about 10 minutes, about 20 minutes, about 30 minutes, about 45 minutes, about 1 hour, about 1.5 hours or about 2 hours, to allow any air bubbles resultant from any of the mixing methods to dissipate.

Stability of Enalapril Powder Formulation

The enalapril powder formulations described herein are stable in various storage conditions including refrigerated, ambient and accelerated conditions. Stable as used herein refer to enalapril powder formulations having about 95% or greater of the initial enalapril amount and 5% w/w or less total impurities or related substances at the end of a given storage period. The percentage of impurities is calculated from the amount of impurities relative to the amount of enalapril. Stability is assessed by HPLC or any other known testing method. In some embodiments, the stable enalapril powder formulations have about 5% w/w, about 4% w/w, about 3% w/w, about 2.5% w/w, about 2% w/w, about 1.5% w/w, about 1% w/w, or about 0.5% w/w total impurities or related substances. In other embodiments, the stable enalapril powder formulations have about 5% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 4% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 3% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 2% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 1% w/w total impurities or related substances.

At refrigerated and ambient conditions, in some embodiments, the enalapril powder formulations described herein are stable for at least 1 week, 2 weeks, 4 weeks, 6 weeks, 8 weeks, 10 weeks, 12 weeks, 16 weeks, 20 weeks, at least 24 weeks, at least 30 weeks, or at least 36 weeks. At accelerated conditions, in some embodiments, the enalapril powder formulations described herein are stable for at least 1 week, at least 2 weeks, at least 3 weeks, at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks or at least 12 weeks. Accelerated conditions for the enalapril powder formulations described herein include temperature and/or relative humidity (RH) that are above ambient levels (e.g. 25±4° C.; 55±10% RH). In some instances, an accelerated condition is at about 30° C., about 35° C., about 40° C., about 45° C., about 50° C., about 55° C. or about 60° C. In other instances, an accelerated condition is above 65% RH, about 70% RH, about 75% RH or about 80% RH. In further instances, an accelerated condition is about 40° C. or 60° C. at ambient humidity. In yet further instances, an accelerated condition is about 40° C. at 75±5% RH humidity.

Kits and Articles of Manufacture

For the enalapril powder and liquid formulations described herein, kits and articles of manufacture are also described. Such kits can comprise a carrier, package, or container that is compartmentalized to receive one or more containers such as vials, tubes, and the like, each of the container(s) comprising one of the separate elements to be used in a method described herein including an enalapril powder or liquid formulation. Suitable containers include, for example, bottles, vials, syringes, and test tubes. The containers can be formed from a variety of materials such as glass or plastic.

A kit will typically may comprise one or more additional containers, each with one or more of various materials (such as reagents, optionally in concentrated form, and/or devices) desirable from a commercial and user standpoint for an enalapril powder or liquid formulation described herein. Non-limiting examples of such materials include, but not limited to, buffers, diluents, filters, needles, syringes; carrier, package, container, vial and/or tube labels listing contents and/or instructions for use, and package inserts with instructions for use associated with an enalapril powder or liquid formulation. A set of instructions will also typically be included.

A label can be on or associated with the container. A label can be on a container when letters, numbers or other characters forming the label are attached, molded or etched into the container itself; a label can be associated with a container when it is present within a receptacle or carrier that also holds the container, e.g., as a package insert. A label can be used to indicate that the contents are to be used for a specific therapeutic application. The label can also indicate directions for use of the contents, such as in the methods described herein.

Methods

Provided herein, in one aspect, are methods of treatment comprising administration of the enalapril oral liquid formulations described herein to a subject. In some embodiments, the enalapril oral liquid formulations described herein treat hypertension in a subject. Hypertension as used herein includes both primary (essential) hypertension and secondary hypertension. In certain instances, hypertension is classified in cases when blood pressure values are greater than or equal to 140/90 (systolic/diastolic) mm Hg in a subject. In certain instances, the enalapril oral liquid formulations described herein treat a subject having a blood pressure values are greater than or equal to 140/90 mm Hg. In certain instances, the enalapril oral liquid formulations described herein treat primary (essential) hypertension in a subject. In other instances, the enalapril oral liquid formulations described herein treat secondary hypertension in a subject.

In other embodiments, the enalapril oral liquid formulations described herein treat prehypertension in a subject. Prehypertension as used herein refers to cases where a subject's blood pressure is elevated above normal but not to the level considered to be hypertension. In some instances, prehypertension is classified in cases when blood pressure values are 120-139/80-89 mm Hg. In certain instances, the enalapril oral liquid formulations described herein treat a subject having blood pressure values of 120-139/80-89 mm Hg.

In yet other embodiments, the enalapril oral liquid formulations described herein are prophylactically administered to subjects suspected of having, predisposed to, or at risk of developing hypertension. In some embodiments, the administration of enalapril oral liquid formulations described herein allow for early intervention prior to onset

109%, respectively. The 90% CI for comparing the maximum exposure to enalapril and enalaprilat, based on ln ($C_{max}$), was within the accepted 80% to 125% limits. The 90% CIs for comparing total systemic exposure to enalapril and enalaprilat, based on ln ($AUC_{last}$) and ln ($AUC_{inf}$), was within the accepted 80% to 125% limits. Therefore, the test formulation of enalapril maleate oral solution, 1 mg/mL, is bioequivalent to the reference product, Epaned Powder for Oral Solution (reconstituted), 1 mg/mL, under fasted conditions.

While preferred embodiments of the present invention have been shown and described herein, it will be obvious to those skilled in the art that such embodiments are provided by way of example only. Numerous variations, changes, and substitutions will now occur to those skilled in the art without departing from the invention. It should be understood that various alternatives to the embodiments of the invention described herein may be employed in practicing the invention. It is intended that the following claims define the scope of the invention and that methods and structures within the scope of these claims and their equivalents be covered thereby.

What is claimed is:

**1**. An oral liquid formulation, comprising:
(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;
(ii) a buffer comprising a mixture of citric acid and sodium citrate, wherein the buffer is present at a concentration between about 5 mM and about 20 mM in the oral liquid formulation;
(iii) about 1 mg/ml sodium benzoate; and
(iv) water;
wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3° C.

**2**. The oral liquid formulation of claim **1** further comprising a sweetener.

**3**. The oral liquid formulation of claim **2**, wherein the sweetener is sucralose.

**4**. The oral liquid formulation of claim **1** further comprising a flavoring agent.

**5**. The oral liquid formulation of claim **1**, wherein the formulation does not contain mannitol.

**6**. The oral liquid formulation of claim **1**, wherein the formulation does not contain silicon dioxide.

**7**. The oral liquid formulation of claim **1**, wherein the buffer comprises about 0.8 to about 3.5 mg/ml citric acid.

**8**. The oral liquid formulation of claim **1**, wherein the buffer comprises about 0.1 to about 0.8 mg/ml sodium citrate.

**9**. The oral liquid formulation of claim **1**, wherein the pH of the oral liquid formulation is less than about 3.5.

**10**. The oral liquid formulation of claim **1**, wherein the pH of the oral liquid formulation is between about 3 and about 3.5.

**11**. The oral liquid formulation of claim **1**, wherein the pH of the oral liquid formulation is about 3.3.

**12**. The oral liquid formulation of claim **1**, wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 18 months at about 5±3° C.

**13**. An oral liquid formulation, consisting essentially of:
(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;
(ii) a buffer comprising a mixture of citric acid and sodium citrate, wherein the buffer is present at a concentration between about 5 mM and about 20 mM in the oral liquid formulation;
(iii) about 1 mg/ml sodium benzoate;
(iv) water; and
(v) optionally a sweetener, a flavoring agent, or both;
wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3° C.

**14**. An oral liquid formulation, comprising:
(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;
(ii) a buffer comprising a mixture of citric acid and sodium citrate, wherein the buffer is present at a concentration between about 5 mM and about 20 mM in the oral liquid formulation;
(iii) about 1 mg/ml of a preservative, wherein the preservative is a paraben or a mixture of parabens; and
(iv) water;
wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 12 months at about 5±3° C.

**15**. The oral liquid formulation of claim **14** further comprising a sweetener.

**16**. The oral liquid formulation of claim **15**, wherein the sweetener is sucralose.

**17**. The oral liquid formulation of claim **14** further comprising a flavoring agent.

**18**. The oral liquid formulation of claim **14**, wherein the formulation does not contain mannitol.

**19**. The oral liquid formulation of claim **14**, wherein the formulation does not contain silicon dioxide.

**20**. The oral liquid formulation of claim **14**, wherein the pH of the oral liquid formulation is less than about 3.5.

**21**. The oral liquid formulation of claim **14**, wherein the pH of the oral liquid formulation is between about 3 and about 3.5.

**22**. The oral liquid formulation of claim **14**, wherein the pH of the oral liquid formulation is about 3.3.

**23**. The oral liquid formulation of claim **14**, wherein the formulation maintains about 95% w/w or greater of the initial enalapril amount at the end of a storage period of at least 18 months at about 5±3° C.

**24**. The oral liquid formulation of claim **1**, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate, and wherein the enalapril maleate is present in the oral liquid formulation at about 1.0 mg/ml.

**25**. The oral liquid formulation of claim **1**, wherein the buffer is present at a concentration between about 10 mM and about 20 mM in the oral liquid formulation.

**26**. The oral liquid formulation of claim **1**, wherein the buffer is present at a concentration of about 10 mM in the oral liquid formulation.

**27**. The oral liquid formulation of claim **14**, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate, and wherein the enalapril maleate is present in the oral liquid formulation at about 1.0 mg/ml.

**28**. The oral liquid formulation of claim **14**, wherein the buffer is present at a concentration between about 10 mM and about 20 mM in the oral liquid formulation.

* * * * *

# Exhibit D

US010918621B2

(12) **United States Patent**
**Mosher et al.**

(10) **Patent No.: US 10,918,621 B2**
(45) **Date of Patent: *Feb. 16, 2021**

(54) **ENALAPRIL FORMULATIONS**

(71) Applicant: **Silvergate Pharmaceuticals, Inc.**, Greenwood Village, CO (US)

(72) Inventors: **Gerold L. Mosher**, Kansas City, MO (US); **David W. Miles**, Kansas City, MO (US)

(73) Assignee: **SILVERGATE PHARMACEUTICALS, INC.**, Greenwood Village, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/991,575**

(22) Filed: **Aug. 12, 2020**

(65) **Prior Publication Data**

US 2020/0368200 A1 Nov. 26, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/883,553, filed on May 26, 2020, now Pat. No. 10,799,476, which is a continuation of application No. 16/242,898, filed on Jan. 8, 2019, now Pat. No. 10,772,868, which is a continuation of application No. 16/177,159, filed on Oct. 31, 2018, now Pat. No. 10,786,482, which is a continuation of application No. 16/003,994, filed on

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***A61K 31/401*** | (2006.01) |
| ***A61K 9/00*** | (2006.01) |
| ***A61K 47/26*** | (2006.01) |
| ***A61K 47/12*** | (2006.01) |

(52) **U.S. Cl.**

CPC .......... ***A61K 31/401*** (2013.01); ***A61K 9/0053*** (2013.01); ***A61K 9/0095*** (2013.01); ***A61K 47/12*** (2013.01); ***A61K 47/26*** (2013.01)

(58) **Field of Classification Search**

CPC ...... A61K 31/401; A61K 47/12; A61K 47/26; A61K 9/0053; A61K 9/0095

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,374,829 A 2/1983 Harris et al.
4,472,380 A 9/1984 Harris et al.

(Continued)

FOREIGN PATENT DOCUMENTS

CA 1275350 C 10/1990
EP 2903690 A1 8/2015

(Continued)

OTHER PUBLICATIONS

AAPS American Association of Pharmaceutical Scientists, Preliminary Program, 2011 AAPS Annual Meeting and Exposition, Washington, D.C., Oct. 23-27, 2011, 112 pages.

(Continued)

*Primary Examiner* — Savitha M Rao

(74) *Attorney, Agent, or Firm* — Wilson Sonsini Goodrich & Rosati, P C.

(57) **ABSTRACT**

Provided herein are stable enalapril oral liquid formulations. Also provided herein are methods of using enalapril oral liquid formulations for the treatment of certain diseases including hypertension, heart failure and asymptomatic left ventricular dysfunction.

**30 Claims, 2 Drawing Sheets**

tion that sets forth illustrative embodiments, in which the principles of the invention are utilized, and the accompanying drawings of which:

FIG. **1**: Effect of pH on degradant formation after 8 weeks of storage of various enalapril solution formulations at 5° C.

FIG. **2**: Effect of pH on degradant formation after 8 weeks of storage of various enalapril solution formulations at room temperature (19-22° C.).

## DETAILED DESCRIPTION OF THE INVENTION

Provided herein are stable enalapril oral liquid formulations. Also provided herein are stable enalapril powder formulations for reconstitution for oral liquid administration. These enalapril formulations described herein are useful for the treatment of hypertension, prehypertension, heart failure as well as ventricular dysfunction. The formulations are advantageous over conventional solid dosage administration of enalapril ranging from ease of administration, accuracy of dosing, accessibility to additional patient populations such as to children and the elderly, and an increased patient compliance to medication.

It is generally known that certain segments of the population have difficulty ingesting and swallowing solid oral dosage forms such as tablets and capsules. As many as a quarter of the total population has this difficulty. Often, this leads to non-compliance with the recommended medical therapy with the solid dosage forms, thereby resulting in rending the therapy ineffective. Further, solid dosage forms are not recommended for children or elderly due to increased risk in choking.

Furthermore, the dose of enalapril to be given to children is calculated according to the child's weight. When the calculated dose is something other than the amount present in one or more intact solid dosage forms, the solid dosage form must be divided to provide the correct dose. This leads to inaccurate dosing when solid dosages forms, such as tablets, are compounded to prepare other formulations for children.

For enalapril, one solution to overcoming the use of the tablet form is for a compounding pharmacist to pulverize and crush the enalapril tablet(s) into a powder via mortar and pestle and reconstitute the powder in some liquid form. However forming a enalapril oral liquid in this fashion has significant drawbacks including large variability in the actual dosage, incomplete solubilizing of the enalapril tablet in the liquid, rapid instability, inconsistent formulation methods per compounding pharmacy, and a number of other potential issues. The crushed tablet liquid formulation may also be potentially unsafe due to contamination with residual drugs and other substances from the mortar and pestle or other crushing agent.

Alternatively, enalapril is formulated as enalapril powder compositions for reconstitution as oral liquids as described in U.S. Pat. No. 8,568,747. The powder compositions as described in this patent require mannitol and colloidal silicon dioxide for stability and dissolution. While these powder compositions are an improvement over crushing tablets, they still require a step of mixing with a diluent. The stable enalapril oral liquid formulations described herein require no extra steps or manipulation prior to administration to a subject. Further, the stable enalapril oral liquid formulations described herein do not require or need mannitol or colloidal silicon dioxide for stability and dissolution.

The present embodiments described herein provide a safe and effective oral administration of enalapril for the treatment of hypertension and other disorders. In particular, the embodiments provide stable enalapril oral liquid formulations as well as alternatively enalapril powder formulations for oral liquid administration.

As used herein, "enalapril" refers to enalapril base, its salt, or solvate or derivative or isomer or polymorph thereof. Suitable compounds include the free base, the organic and inorganic salts, isomers, isomer salts, solvates, polymorphs, complexes etc. U.S. Pat. Nos. 4,374,829; 4,472,380 and 4,510,083 disclose exemplary methods in the preparation of enalapril. In some embodiments, the enalapril used in the formulations described herein is an enalapril salt. In some instances, the enalapril salt is enalapril maleate. In other instances, the enalapril salt is in the form of enalapril sodium.

Other ACE inhibitors are contemplated in the formulations within and include but are not limited to quinapril, indolapril, ramipril, perindopril, lisinopril, benazepril, imidapril, zofenopril, trandolapril, fosinopril, captopril, and their salts, solvates, derivatives, polymorphs, or complexes, thereof.

### Enalapril Oral Liquid Formulations

Oral liquids include, but are not limited to, solutions (both aqueous and nonaqueous), suspensions, emulsions, syrups, slurries, juices, elixirs, dispersions, and the like. It is envisioned that solution/suspensions are also included where certain components described herein are in a solution while other components are in a suspension.

In one aspect, the enalapril liquid formulations described herein comprise enalapril, a preservative, a sweetening agent, a buffer, and water. In one embodiment, the sweetening agent is sucralose. In one embodiment, the sweetening agent is xylitol. In one embodiment, the sweetening agent is not mannitol. In another embodiment, the preservative is sodium benzoate. In some embodiments, the preservative is a paraben. In some embodiments, the preservative is a mixture of parabens. In yet another embodiment, the buffer comprises citric acid. In some embodiments, the buffer further comprises sodium citrate. In one aspect, the enalapril liquid formulation described herein comprises enalapril, sucralose, sodium benzoate, citric acid, sodium citrate, and water. In some embodiments, the enalapril liquid formulation herein further comprises a flavoring agent. In some embodiments, the enalapril liquid formulation is not obtained from crushing enalapril tablet and dissolving the powder in a suitable vehicle for oral administration. In some embodiments, the enalapril liquid formulation does not contain silicon dioxide. In some embodiments, the enalapril liquid formulation does not contain mannitol. In some embodiments, the enalapril liquid formulation does not contain lactose. In some embodiments, the enalapril liquid formulation does not contain magnesium stearate. In some embodiments, the enalapril liquid formulation does not contain sodium bicarbonate. In some embodiments, the enalapril liquid formulation does not contain iron oxides.

In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.6 to about 1.2 mg/ml in the oral liquid formulation. In other embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.6 mg/ml, about 0.61 mg/ml, about 0.62 mg/ml, about 0.63 mg/ml, about 0.64 mg/ml, about 0.65 mg/ml, about 0.66 mg/ml, about 0.67 mg/ml, about 0.68 mg/ml, about 0.69 mg/ml, about 0.7 mg/ml, about 0.71 mg/ml, about 0.72 mg/ml, about 0.73 mg/ml, about 0.74 mg/ml, about 0.75 mg/ml, about 0.76 mg/ml, about 0.77

about 3% w/w, about 2.5% w/w, about 2% w/w, about 1.5% w/w, about 1% w/w, or about 0.5% w/w total impurities or related substances. In other embodiments, the stable enalapril oral liquid formulations have about 5% w/w total impurities or related substances. In yet other embodiments, the stable enalapril oral liquid formulations have about 4% w/w total impurities or related substances. In yet other embodiments, the stable enalapril oral liquid formulations have about 3% w/w total impurities or related substances. In yet other embodiments, the stable enalapril oral liquid formulations have about 2% w/w total impurities or related substances. In yet other embodiments, the stable enalapril oral liquid formulations have about 1% w/w total impurities or related substances.

At refrigerated condition, the enalapril oral liquid formulations described herein are stable for at least 1 month, at least 2 months, at least 3 months, at least 6 months, at least 9 months, at least 12 months, at least 15 months, at least 18 months, at least 24 months, at least 30 months and at least 36 months. In some embodiments, refrigerated condition is 5±3° C. In some embodiments, refrigerated condition is about 2° C., about 2.1° C., about 2.2° C., about 2.3° C., about 2.4° C., about 2.5° C., about 2.6° C., about 2.7° C., about 2.8° C., about 2.9° C., about 3° C., about 3.1° C., about 3.2° C., about 3.3° C., about 3.4° C., about 3.5° C., about 3.6° C., about 3.7° C., about 3.8° C., about 3.9° C., about 4° C., about 4.1° C., about 4.2° C., about 4.3° C., about 4.4° C., about 4.5° C., about 4.6° C., about 4.7° C., about 4.8° C., about 4.9° C., about 5° C., about 5.1° C., about 5.2° C., about 5.3° C., about 5.4° C., about 5.5° C., about 5.6° C., about 5.7° C., about 5.8° C., about 5.9° C., about 6° C., about 6.1° C., about 6.2° C., about 6.3° C., about 6.4° C., about 6.5° C., about 6.6° C., about 6.7° C., about 6.8° C., about 6.9° C., about 7° C., about 7.1° C., about 7.2° C., about 7.3° C., about 7.4° C., about 7.5° C., about 7.6° C., about 7.7° C., about 7.8° C., about 7.9° C., or about 8° C. At accelerated conditions, the enalapril oral liquid formulations described herein are stable for at least 1 month, at least 2 months, at least 3 months, at least 4 months, at least 5 months, at least 6 months, at least 7 months, at least 8 months, at least 9 months, at least 10 months, at least 11 months or at least 12 months. Accelerated conditions for the enalapril oral liquid formulations described herein include temperature and/or relative humidity (RH) that are at or above ambient levels (e.g. 25±5° C.; 55±10% RH). In some instances, an accelerated condition is at about 25° C., about 30° C., about 35° C., about 40° C., about 45° C., about 50° C., about 55° C. or about 60° C. In other instances, an accelerated condition is above 55% RH, about 65% RH, about 70% RH, about 75% RH or about 80% RH. In further instances, an accelerated condition is about 40° C. or 60° C. at ambient humidity. In yet further instances, an accelerated condition is about 40° C. at 75±5% RH humidity.

Enalapril Oral Powder Formulation

In another aspect, enalapril oral liquid formulations described herein are prepared from the reconstitution of an enalapril powder formulation. In some embodiments, the enalapril powder formulation comprising enalapril, a sweetener, a preservative, and optionally an excipient is dissolved in water, a buffer, other aqueous solvent, or a liquid to form an enalapril oral liquid formulation. In one embodiment, the sweetening agent is sucralose. In one embodiment, the sweetener is not mannitol. In one embodiment, the sweetening agent is xylitol. In another embodiment, the preservative is sodium benzoate. In one embodiment, the preservative is a paraben preservative. In one aspect, the enalapril powder formulation described herein comprises enalapril, sucralose, and sodium benzoate. In some embodiments, the enalapril powder formulation herein further comprises a flavoring agent. In some embodiments, the enalapril powder formulation herein further comprises one or more buffering agents.

In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.5% w/w to about 30% w/w of the powder formulation. In other embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.5% w/w, about 1% w/w, about 1.5% w/w, about 2% w/w, about 2.5% w/w, about 3% w/w, about 3.5% w/w, about 4% w/w, about 4.5% w/w, about 5% w/w, about 5.5% w/w, about 6% w/w, about 6.5% w/w, about 7% w/w, about 7.5% w/w, about 8% w/w, about 8.5% w/w, about 9% w/w, about 9.5% w/w, about 10% w/w, about 10.5% w/w, about 11% w/w, about 11.5% w/w, about 12% w/w, about 12.5% w/w, about 13% w/w, about 13.5% w/w, about 14% w/w, about 14.5% w/w, about 15% w/w, about 15.5% w/w, about 16% w/w, about 16.5% w/w, about 17% w/w, about 17.5% w/w, about 18% w/w, about 18.5% w/w, about 19% w/w, about 19.5% w/w, about 20% w/w, about 20.5% w/w, about 21% w/w, about 21.5% w/w, about 22% w/w, about 22.5% w/w, about 23% w/w, about 23.5% w/w, about 24% w/w, about 24.5% w/w, about w/w, about 25.5% w/w, about 26% w/w, about 26.5% w/w, about 27% w/w, about 27.5% w/w, about 28% w/w, about 28.5% w/w, about 29% w/w, about 29.5% w/w, or about 30% w/w of the powder formulation. In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 10% w/w to about 25% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 13.5% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 19.5% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 24.5% w/w of the powder formulation. In some embodiments, enalapril is present in about 10.5% w/w of the powder formulation. In some embodiments, enalapril is present in about 14.5% w/w of the powder formulation. In some embodiments, enalapril is present in about 18% w/w of the powder formulation.

In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.1% w/w to about 1% w/w of the powder formulation. In other embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.1% w/w, about 0.15% w/w, about 0.2% w/w, about 0.25% w/w, about 0.3% w/w, about 0.35% w/w, about 0.4% w/w, about 0.45% w/w, about 0.5% w/w, about 0.55% w/w, about 0.6% w/w, about 0.65% w/w, about 0.7% w/w, about 0.75% w/w, about 0.8% w/w, about 0.85% w/w, about 0.9% w/w, about 0.95% w/w, or about 1% w/w of the powder formulation. In some embodiments, enalapril or a pharmaceutically acceptable salt thereof, is present in about 0.4% w/w to about 0.7% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 0.45% w/w of the powder formulation. In some embodiments, enalapril maleate is present in about 0.6% w/w of the powder formulation. In some embodiments, enalapril is present in about 0.4% w/w of the powder formulation. In some embodiments, enalapril is present in about 0.5% w/w of the powder formulation.

Various amounts and concentrations of other components (sweeteners, buffers, preservatives, and the like) in the enalapril powder formulations are found in the previous section describing the amounts and concentrations for the analogous enalapril oral liquid formulations. For example, in

some embodiments where sucralose is present in about 1% w/w to about 30% w/w of the solids in the oral liquid formulation; in an analogous enalapril powder formulation, sucralose would be about 1% w/w to about 30% w/w in the powder formulation. In some embodiments where sodium benzoate is present in about 1% w/w to about 30% w/w of the solids in the oral liquid formulation, in an analogous enalapril powder formulation sodium benzoate is present in about 1% w/w to about 30% w/w in the powder formulation.

Liquid vehicles suitable for the enalapril powder formulations to be reconstituted into an oral solution described herein are selected for a particular oral liquid formulation (solution, suspension, etc.) as well as other qualities such as clarity, toxicity, viscosity, compatibility with excipients, chemical inertness, palatability, odor, color and economy. Exemplary liquid vehicles include water, ethyl alcohol, glycerin, propylene glycol, syrup (sugar or other sweetener based, e.g., Ora-Sweet® SF sugar-free flavored syrup), juices (apple, grape, orange, cranberry, cherry, tomato and the like), other beverages (tea, coffee, soft drinks, milk and the like), oils (olive, soybean, corn, mineral, castor and the like), and combinations or mixtures thereof. Certain liquid vehicles, e.g., oil and water, can be combined together to form emulsions. In some embodiments, water is used for as a vehicle for a enalapril oral liquid formulation. In other embodiments, a syrup is used for as a vehicle for a enalapril oral liquid formulation. In yet other embodiments, a juice is used for as a vehicle for a enalapril oral liquid formulation.

Buffering agents maintain the pH of the liquid enalapril formulation. Non-limiting examples of buffering agents include, but are not limited to sodium bicarbonate, potassium bicarbonate, magnesium hydroxide, magnesium lactate, magnesium gluconate, aluminum hydroxide, aluminum hydroxide/sodium bicarbonate co precipitate, mixture of an amino acid and a buffer, a mixture of aluminum glycinate and a buffer, a mixture of an acid salt of an amino acid and a buffer, and a mixture of an alkali salt of an amino acid and a buffer. Additional buffering agents include citric acid, sodium citrate, sodium tartrate, sodium acetate, sodium carbonate, sodium polyphosphate, potassium polyphosphate, sodium pyrophosphate, potassium pyrophosphate, disodium hydrogenphosphate, dipotassium hydrogenphosphate, trisodium phosphate, tripotassium phosphate, sodium acetate, potassium metaphosphate, magnesium oxide, magnesium hydroxide, magnesium carbonate, magnesium silicate, calcium acetate, calcium glycerophosphate, calcium chloride, calcium hydroxide, calcium lactate, calcium carbonate, calcium bicarbonate, and other calcium salts. Some buffering agents also impart effervescent qualities when a powder is reconstituted in a solution.

In some embodiments, the reconstituted oral liquid formulation comprises a buffer. In some embodiments, the buffer comprises citric acid and sodium citrate.

In further embodiments, the enalapril powder formulation described herein comprises additional excipients including, but not limited to, glidants, flavoring agents, coloring agents and thickeners. Additional excipients such as bulking agents, tonicity agents and chelating agents are within the scope of the embodiments.

Glidants are substances that improve flowability of a powder. Suitable glidants include, but are not limited to, calcium phosphate tribasic, calcium silicate, cellulose (powdered), colloidal silicon dioxide, magnesium silicate, magnesium trisilicate, silicon dioxide, starch, talc and the like. In some embodiments, the enalapril powder formulations described herein comprise a glidant.

In another embodiment, the enalapril powder formulation described herein comprises a flavoring agent or flavorant to enhance the taste or aroma of the formulation in liquid form. Suitable natural or synthetic flavoring agents can be selected from standard reference books, for example Fenaroli's Handbook of Flavor Ingredients, 3rd edition (1995). Non-limiting examples of suitable natural flavors, some of which can readily be simulated with synthetic agents or combinations thereof, include almond, anise, apple, apricot, bergamot, blackberry, blackcurrant, blueberry, cacao, caramel, cherry, cinnamon, clove, coffee, coriander, cranberry, cumin, dill, eucalyptus, fennel, fig, ginger, grape, grapefruit, guava, hop, lemon, licorice, lime, malt, mandarin, molasses, nutmeg, mixed berry, orange, peach, pear, peppermint, pineapple, raspberry, rose, spearmint, strawberry, tangerine, tea, vanilla, wintergreen, etc. Also useful, particularly where the formulation is intended primarily for pediatric use, is tutti-frutti or bubblegum flavor, a compounded flavoring agent based on fruit flavors. Presently preferred flavoring agents include anise, cinnamon, cacao, orange, peppermint, cherry (in particular wild cherry), grape, bubblegum, vanilla, and mixed berry. Flavoring agents can be used singly or in combinations of two or more.

In further embodiments, the enalapril powder formulation described herein comprises a coloring agent for identity and/or aesthetic purposes. Suitable coloring agents illustratively include FD&C Red No. 3, FD&C Red No. 20, FD&C Red No. 40, FD&C Yellow No. 6, FD&C Blue No. 2, D&C Green No. 5, D&C Orange No. 5, caramel, ferric oxide and mixtures thereof.

In further embodiments, the enalapril powder formulation described herein comprises a thickener. Thickeners impart viscosity or weight to the resultant liquid forms from the enalapril formulation described herein. Exemplary thickeners include dextrin, cellulose derivatives (carboxymethylcellulose and its salts, ethylcellulose, hydroxyethyl cellulose, methylcellulose, hypromellose, and the like) starches, pectin, polyethylene glycol, polyethylene oxide, trehalose and certain gums (xanthan gum, locust bean gum, etc.).

Additional excipients are contemplated in the enalapril powder formulation embodiments. These additional excipients are selected based on function and compatibility with the the enalapril powder formulation described herein and may be found, for example in *Remington: The Science and Practice of Pharmacy*, Nineteenth Ed (Easton, Pa.: Mack Publishing Company, 1995); Hoover, John E., *Remington's Pharmaceutical Sciences*, (Easton, Pa.: Mack Publishing Co 1975); Liberman, H. A. and Lachman, L., Eds., *Pharmaceutical Dosage Forms* (New York, N.Y.: Marcel Decker 1980); and *Pharmaceutical Dosage Forms and Drug Delivery Systems*, Seventh Ed (Lippincott Williams & Wilkins 1999), herein incorporated by reference in their entirety.

In some embodiments, the enalapril oral liquid formulation prepared from the powder formulations described herein are homogenous. Homogenous liquids as used herein refer to those liquids that are uniform in appearance, identity, consistency and drug concentration per volume. Non-homogenous liquids include such liquids that have varied coloring, viscosity and/or aggregation of solid particulates, as well as non-uniform drug concentration in a given unit volume. Homogeneity in liquids are assessed by qualitative identification or appearance tests and/or quantitative HPLC testing or the like. The mixing methods and excipients described herein are selected to impart a homogenous quality to a resultant enalapril oral liquid formulation.

Mixing methods encompass any type of mixing that result in a homogenous enalapril oral liquid formulation. In some

embodiments, a quantity of an enalapril powder formulation is added to a liquid vehicle and then mixed by a stirring, shaking, swirling, agitation element or a combination thereof. In certain instances, a fraction of a enalapril powder formulation (i.e., one-half, one-third, one-fourth, etc.) is added to a liquid vehicle, mixed by stirring, shaking, swirling, agitation or a combination thereof, and the subsequent powder fraction(s) is added and mixed. In other embodiments, a liquid vehicle is added to an enalapril powder formulation in a container, for example, a bottle, vial, bag, beaker, syringe, or the like. The container is then mixed by stirring, shaking, swirling, agitation, inversion or a combination thereof. In certain instances, a fractional volume of the liquid vehicle (i.e., one-half, one-third, one-fourth volume, etc.) is added to a enalapril powder formulation in a container, mixed by stirring, shaking, swirling, agitation, inversion or a combination thereof and the subsequent liquid fraction(s) is added and mixed. In certain instances, a one-half fractional volume of the liquid vehicle is added to an enalapril powder formulation in a container and mixing by shaking; the other one-half fractional volume of the liquid vehicle is then subsequently added and mixed. In any of the above embodiments, mixing (i.e., stirring, shaking, swirling, agitation, inversion or a combination thereof) occurs for a certain time intervals such as about 10 seconds, about 20 seconds, about 30 seconds, about 45 seconds, about 60 seconds, about 90 seconds, about 120 seconds, about 2.5 minutes, about 3 minutes, about 3.5 minutes, about 4 minutes, or about 5 minutes. In embodiments, where there are two or more mixing steps, the time intervals for each mixing can be the same (e.g., 2×10 seconds) or different (e.g., 10 seconds for first mixing and 20 seconds for second mixing). In any of the above embodiments, a enalapril oral liquid formulation is allowed to stand for a period of time such as about 10 minutes, about 20 minutes, about 30 minutes, about 45 minutes, about 1 hour, about 1.5 hours or about 2 hours, to allow any air bubbles resultant from any of the mixing methods to dissipate.

## Stability of Enalapril Powder Formulation

The enalapril powder formulations described herein are stable in various storage conditions including refrigerated, ambient and accelerated conditions. Stable as used herein refer to enalapril powder formulations having about 95% or greater of the initial enalapril amount and 5% w/w or less total impurities or related substances at the end of a given storage period. The percentage of impurities is calculated from the amount of impurities relative to the amount of enalapril. Stability is assessed by HPLC or any other known testing method. In some embodiments, the stable enalapril powder formulations have about 5% w/w, about 4% w/w, about 3% w/w, about 2.5% w/w, about 2% w/w, about 1.5% w/w, about 1% w/w, or about 0.5% w/w total impurities or related substances. In other embodiments, the stable enalapril powder formulations have about 5% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 4% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 3% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 2% w/w total impurities or related substances. In yet other embodiments, the stable enalapril powder formulations have about 1% w/w total impurities or related substances.

At refrigerated and ambient conditions, in some embodiments, the enalapril powder formulations described herein are stable for at least 1 week, 2 weeks, 4 weeks, 6 weeks, 8 weeks, 10 weeks, 12 weeks, 16 weeks, 20 weeks, at least 24 weeks, at least 30 weeks, or at least 36 weeks. At accelerated conditions, in some embodiments, the enalapril powder formulations described herein are stable for at least 1 week, at least 2 weeks, at least 3 weeks, at least 4 weeks, at least 5 weeks, at least 6 weeks, at least 7 weeks, at least 8 weeks, at least 9 weeks, at least 10 weeks, at least 11 weeks or at least 12 weeks. Accelerated conditions for the enalapril powder formulations described herein include temperature and/or relative humidity (RH) that are above ambient levels (e.g. 25±4° C.; 55±10% RH). In some instances, an accelerated condition is at about 30° C., about 35° C., about 40° C., about 45° C., about 50° C., about 55° C. or about 60° C. In other instances, an accelerated condition is above 65% RH, about 70% RH, about 75% RH or about 80% RH. In further instances, an accelerated condition is about 40° C. or 60° C. at ambient humidity. In yet further instances, an accelerated condition is about 40° C. at 75±5% RH humidity.

## Kits and Articles of Manufacture

For the enalapril powder and liquid formulations described herein, kits and articles of manufacture are also described. Such kits can comprise a carrier, package, or container that is compartmentalized to receive one or more containers such as vials, tubes, and the like, each of the container(s) comprising one of the separate elements to be used in a method described herein including an enalapril powder or liquid formulation. Suitable containers include, for example, bottles, vials, syringes, and test tubes. The containers can be formed from a variety of materials such as glass or plastic.

A kit will typically may comprise one or more additional containers, each with one or more of various materials (such as reagents, optionally in concentrated form, and/or devices) desirable from a commercial and user standpoint for an enalapril powder or liquid formulation described herein. Non-limiting examples of such materials include, but not limited to, buffers, diluents, filters, needles, syringes; carrier, package, container, vial and/or tube labels listing contents and/or instructions for use, and package inserts with instructions for use associated with an enalapril powder or liquid formulation. A set of instructions will also typically be included.

A label can be on or associated with the container. A label can be on a container when letters, numbers or other characters forming the label are attached, molded or etched into the container itself; a label can be associated with a container when it is present within a receptacle or carrier that also holds the container, e.g., as a package insert. A label can be used to indicate that the contents are to be used for a specific therapeutic application. The label can also indicate directions for use of the contents, such as in the methods described herein.

## Methods

Provided herein, in one aspect, are methods of treatment comprising administration of the enalapril oral liquid formulations described herein to a subject. In some embodiments, the enalapril oral liquid formulations described herein treat hypertension in a subject. Hypertension as used herein includes both primary (essential) hypertension and

via a 10 mL oral dosing syringe and followed with 240 mL of room temperature tap water. Each drug administration was separated by a washout period of at least 7 days.

During each study period, meals were the same and scheduled at approximately the same times relative to dose. In addition, during each period, blood samples were obtained prior to and following each dose at selected times through 72 hours postdose. Pharmacokinetic samples were analyzed for enalapril and its metabolite enalaprilat using a validated analytical method; appropriate pharmacokinetic parameters were calculated for each formulation using non-compartmental methods. Blood was also drawn and urine collected for clinical laboratory testing at screening and at the end of the study.

Statistical Methods: The concentration-time data were analyzed using noncompartmental methods in Phoenix™ WinNonlin® (Version 6.3, Pharsight Corporation). Concentration-time data that were below the limit of quantitation (BLQ) were treated as zero in the data summarization and descriptive statistics. In the pharmacokinetic analysis, BLQ concentrations were treated as zero from time-zero up to the time at which the first quantifiable concentration was observed; embedded and/or terminal BLQ concentrations were treated as “missing”. Actual sample times were used for all pharmacokinetic and statistical analyses. Analysis of variance (ANOVA) and the Schuirmann’s two one-sided t-test procedures at the 5% significance level were applied to the log-transformed pharmacokinetic exposure parameters, $C_{max}$, $AUC_{last}$, and $AUC_{inf}$. The 90% confidence interval for the ratio of the geometric means (Test/Reference) was calculated. Bioequivalence was declared if the lower and upper confidence intervals (CIs) of the log-transformed parameters were within 80% to 125% for enalapril and enalaprilat.

Results: A total of 32 subjects participated in the study and 29 of these subjects completed both study periods. Based on the geometric mean ratios of enalapril and enalaprilat AUCs ($AUC_{last}$ and $AUC_{inf}$), the bioavailability of the enalapril maleate oral solution (formulation E-5) relative to the Epaned Powder for Oral Solution (reconstituted) was approximately 105% to 110%. The geometric mean ratios of enalapril and enalaprilat $C_{max}$ were approximately 115% and 109%, respectively. The 90% CI for comparing the maximum exposure to enalapril and enalaprilat, based on ln ($C_{max}$), was within the accepted 80% to 125% limits. The 90% CIs for comparing total systemic exposure to enalapril and enalaprilat, based on ln ($AUC_{last}$) and ln ($AUC_{inf}$), was within the accepted 80% to 125% limits. Therefore, the test formulation of enalapril maleate oral solution, 1 mg/mL, is bioequivalent to the reference product, Epaned Powder for Oral Solution (reconstituted), 1 mg/mL, under fasted conditions.

While preferred embodiments of the present invention have been shown and described herein, it will be obvious to those skilled in the art that such embodiments are provided by way of example only. Numerous variations, changes, and substitutions will now occur to those skilled in the art without departing from the invention. It should be understood that various alternatives to the embodiments of the invention described herein may be employed in practicing the invention. It is intended that the following claims define the scope of the invention and that methods and structures within the scope of these claims and their equivalents be covered thereby.

What is claimed is:

**1**. A stable oral liquid formulation, consisting essentially of:

(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;

(ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;

(iii) a preservative, wherein the preservative is a paraben or a mixture of parabens; and

(iv) water;

wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;

wherein the formulation is stable at about 5±3° C. for at least 12 months; and

wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

**2**. The stable oral liquid formulation of claim **1**, comprising a sweetener.

**3**. The stable oral liquid formulation of claim **1**, comprising a flavoring agent.

**4**. The stable oral liquid formulation of claim **1**, wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.

**5**. The stable oral liquid formulation of claim **1**, wherein the buffer concentration is about 10 mM to about 20 mM.

**6**. The stable oral liquid formulation of claim **1**, wherein the buffer maintains the pH between about 3 and about 4.

**7**. The stable oral liquid formulation of claim **1**, wherein the buffer maintains the pH at about 3.3.

**8**. The stable oral liquid formulation of claim **1**, comprising about 1.0 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof.

**9**. The stable oral liquid formulation of claim **1**, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate.

**10**. The stable oral liquid formulation of claim **1**, wherein the preservative is a mixture of parabens.

**11**. The stable oral liquid formulation of claim **1**, wherein the paraben or the mixture of parabens is methylparaben, ethylparaben, propylparaben, butylparaben, salts thereof, or a combination thereof.

**12**. The stable oral liquid formulation of claim **1**, wherein the preservative is a mixture of methylparaben and propylparaben.

**13**. The stable oral liquid formulation of claim **1**, wherein the paraben or the mixture of parabens is present at about 0.1 mg/ml to about 2 mg/ml in the oral liquid formulation.

**14**. The stable oral liquid formulation of claim **1**, wherein the paraben or the mixture of parabens is present at about 1.6 mg/ml to about 2 mg/ml in the oral liquid formulation.

**15**. The stable oral liquid formulation of claim **1**, wherein the paraben or the mixture of parabens is present at about 0.1 mg/ml to about 0.5 mg/ml in the oral liquid formulation.

**16**. The stable oral liquid formulation of claim **1**, wherein the paraben or the mixture of parabens is present at about 2% w/w to about 30% w/w of the solids in the oral liquid formulation.

**17**. The stable oral liquid formulation of claim **1**, wherein the formulation is stable at about 5±3° C. for at least 18 months.

**18**. The stable oral liquid formulation of claim **1**, wherein the formulation is stable at about 5±3° C. for at least 24 months.

**19**. A stable oral liquid formulation, consisting essentially of:

(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;

(ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;

(iii) a preservative, wherein the preservative is methylparaben, ethylparaben, propylparaben, butylparaben, or a combination thereof; and

(iv) water;

wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;

wherein the formulation is stable at about 5±3° C. for at least 12 months; and

wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

**20**. The stable oral liquid formulation of claim **19**, wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.

**21**. The stable oral liquid formulation of claim **19**, wherein the buffer concentration is about 10 mM to about 20 mM.

**22**. The stable oral liquid formulation of claim **19**, wherein the buffer maintains the pH between about 3 and about 4.

**23**. The stable oral liquid formulation of claim **19**, wherein the buffer maintains the pH at about 3.3.

**24**. The stable oral liquid formulation of claim **19**, comprising about 1.0 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof.

**25**. The stable oral liquid formulation of claim **19**, wherein the enalapril or a pharmaceutically acceptable salt or solvate thereof is enalapril maleate.

**26**. The stable oral liquid formulation of claim **19**, wherein the preservative is a mixture of parabens that are selected from methylparaben, ethylparaben, propylparaben, and butylparaben.

**27**. The stable oral liquid formulation of claim **19**, wherein the preservative is present at about 0.1 mg/ml to about 2 mg/ml in the oral liquid formulation.

**28**. The stable oral liquid formulation of claim **19**, wherein the preservative is present at about 1.6 mg/ml to about 2 mg/ml in the oral liquid formulation.

**29**. The stable oral liquid formulation of claim **19**, wherein the preservative is present at about 0.1 mg/ml to about 0.5 mg/ml in the oral liquid formulation.

**30**. A stable oral liquid formulation, consisting essentially of:

(i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof;

(ii) a buffer to maintain the pH about 4.5 or below;

(iii) a preservative, wherein the preservative is methylparaben, ethylparaben, propylparaben, butylparaben, or a combination thereof; and

(iv) water;

wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;

wherein the formulation is stable at about 5±3° C. for at least 12 months; and

wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

* * * * *

# Exhibit E



# Transcript of Steven Little, Ph.D.

**Date:** June 14, 2022
**Case:** Azurity Pharmaceuticals, Inc. -v- Alkem Laboratories Ltd. (Enalapril)

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AZURITY PHARMACEUTICALS, INC.,
Plaintiff,
vs. Civil Action No. 1:19 cv 02100 MSG
ALKEM LABORATORIES LTD.,
Defendant.

* [redacted] *

VIDEOTAPED DEPOSITION OF STEVEN LITTLE, Ph.D.
via videoconference
Tuesday, June 15, 2022
9:10 a.m. EST

Job No.: 452367
Pages: 1 274
Stenographically Reported By:
Alison C. Webster, CSR 6266, RPR, RMR, CRR, RDR

2

A P P E A R A N C E S

ON BEHALF OF THE DEFENDANT

GEORGE G. BARRY III, ESQUIRE
Kratz & Barry LLP
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
404.341.6600
gbarry@kratzandbarry.com

ALSO PRESENT:
Andrew Stromberg, Planet Depos tech
Jean Louis Ziesch, video technician

3

T A B L E O F C O N T E N T S

| Witness | Page |
|---|---|
| STEVEN LITTLE, Ph.D. | |
| EXAMINATION | |
| BY MR. BARRY: | 10 |

E X H I B I T I N D E X

| Exhibit | Page |
|---|---|
| Exhibits attached to transcript. | |
| EXHIBIT 2 | 30 |
| Patent No.: US 10,918,621 B2 Mosher | |
| EXHIBIT 1 | 74 |
| Patent No.: US 11,253,480 B2 Little | |
| EXHIBIT 26 | 132 |
| Patent No.: US 10,786,482 B2 Mosher | |
| EXHIBIT 23 | 133 |
| Highlights of Prescribing Information EPANED enalapril maleate oral solution | |

4

E X H I B I T I N D E X C O N T I N U E D

| Exhibit | Page |
|---|---|
| EXHIBIT 3 | 150 |
| Responsive Expert Report of Dr. Steven Little On the Validity of U.s. Patent Nos. 10,786,482 and 10,918,621 | |
| EXHIBIT 4 | 167 |
| Highlights of Prescribing Information EPANED® enalapril for Oral Solution | |
| EXHIBIT 5 | 170 |
| Article, Stability of Alprazolam, Chloroquine Phosphate, Cisapride, Enalapril Maleate, and Hydralazine Hydrochloride in Extemporaneously Compounded Oral Liquids | |
| EXHIBIT 6 | 186 |
| Article, Preservatives in Liquid Pharmaceutical Preparations | |
| EXHIBIT 7 | 196 |
| Article, Physicochemical Stability of Captopril and Enalapril Extemporaneous Formulations For Pediatric Patients | |

EXHIBIT INDEX CONTINUED

EXHIBIT 8 198
Article, Stability of Extemporaneous Enalapril Maleate Suspensions for Pediatric Use Prepared From Commercially Available Tablets
EXHIBIT 12 207
Declaration of Gerold Mosher Under 37 C.F.R. § 1.132
SLVGT RTU 00004140 4147
EXHIBIT 13 209
Declaration of Gerold Mosher Under 37 C.F.R. § 1.132
SLVGT RTU 00005546 5552
EXHIBIT 14 211
Declaration of Gerold Mosher Under 37 C.F.R. § 1.132
37 C.F.R. § 1.132
SLVGT RTU 00005553 5563
EXHIBIT 15 227
Opening Expert Report of Dr. Steven Little

EXHIBIT INDEX CONTINUED

EXHIBIT 16 235
Reply Report of Dr. Steven Little Regarding Infringement of U.s. Patent Nos. 10,786,482 and 10,918,621
EXHIBIT 17 235
Supplemental Report of Dr. Steven Little In Response to Dr. Rabinow's Opinions Regarding Allen 1998
EXHIBIT 19 241
Adams v. Bos. Sci. Corp. In re Bos. Sci. Corp. Pelvic Repair Sys. Prods. Liab. Litig.
EXHIBIT 20 248
Procedural Order
EXHIBIT 9 254
Article, Stability of Enalapril Maleate in Three Extemporaneously Prepared Oral Liquids
EXHIBIT 10 256
Article, Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children

EXHIBIT INDEX CONTINUED

EXHIBIT 11 258
International Publication Number WO 2017/077425 A1
EXHIBIT 22 264
Article, Save America's Patent System

DEPOSITION OF STEVEN LITTLE, PH.D.
Tuesday, June 14, 2022

VIDEO TECHNICIAN: It is the beginning of Media Number 1 of the videotaped deposition of Dr. Steven Little in the matter of Azurity Pharmaceuticals et al., versus Alkem Laboratories et al., in the U.S. District Court for the District of Delaware, Case Number 1:19 cv 02100 MSG.
Today's date is June 14, 2022. The time on the video monitor is 9:10 a.m. Eastern Standard Time. The certified videographer today is Jean Louis Ziesch, representing Planet Depos. This video deposition is taking place remotely.
Would counsel please identify yourselves and state whom you represent.
MR. BARRY: Good morning. This is George Barry with Kratz & Barry, for Alkem.
MS. DEVINE: This is Wendy Devine with Wilson Sonsini Goodrich & Rosati for the plaintiff and the witness, and with me is my colleague Jody Karol.
VIDEO TECHNICIAN: The court reporter today is Alison Webster, representing Planet Depos. Would the reporter please swear in the witness.

STENOGRAPHER: The attorneys participating in this deposition and the witness have verified that he is Steven Little, Ph.D. In lieu of an oath administered in person, the witness will visually affirm his testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting or admissibility of the transcript.

If there any objections to proceeding in this manner by any party, please state so now.

[No objections made]

STENOGRAPHER: Hearing no objections, Dr. Little, would you please raise your right hand.

Do you swear or affirm the testimony you are about to give in this matter will be the truth, the whole truth, and nothing but the truth?

DR. LITTLE: I do.

STENOGRAPHER: Thank you.

You may proceed.

STEVEN LITTLE, PH.D.,

was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was

examined and testified as follows:

MR. BARRY: Hi, Dr. Little. Good morning. My name is George Barry. I represent Alkem in this matter. Thank you for being here today. I'll be asking you some questions and hopefully we can get through this fairly quickly.

EXAMINATION

BY MR. BARRY:

Q. Have you been deposed before?
**A. Yes.**
Q. How many times have you been deposed?
**A. I'd say between 20 and 25 times.**
Q. And were you an expert witness for all of those depositions?
**A. I believe so, yes.**
Q. Did all of those depositions concern drug products?
**A. No.**
Q. Approximately how many of the 20 to 25 do you recall being related to drug products?
**A. I would say three-quarters.**
Q. Okay. And do you know how many of those pertain to drugs that were approved for oral administration?
**A. Maybe half or a little more.**
Q. Half of the three-quarters?
**A. Yes.**

Q. Okay. Well, you've been deposed quite a bit, so we won't tie things up with the rules. The one that I will note is you're aware of the rule that precludes you from discussing the substance of your deposition with counsel while the deposition is ongoing?
**A. Yes.**
Q. Okay. And this is not a endurance test, so if at any time you need a break, don't hesitate to let me know. Happy to take one. If there's a question pending, I would just ask you to answer it. Okay?
**A. Yes.**
Q. And where are you today?
**A.** [redacted]
Q. And are you at a desk?
**A. Yes.**
Q. And what do you have available to you on the desk right now?
**A. I have a laptop, there's a glass of water, and I have some binders behind me with reports.**
Q. And when you say the reports, some reports, are those reports that you prepared for this case?

**A. Yes. Reports I've prepared and also the reports to which I've responded.**
Q. Fair enough. Do you think of yourself as a formulator of pharmaceutical products?
**A. Yes.**
Q. And what kinds of pharmaceutical products have you formulated?
**A. Well, we've -- you could categorize them in a number of ways. We've formulated a number of small molecule drug products, biologic products, protein-based products. Nucleic acid products, for instance.**
Q. You used the word "we." Who are you referring to when you say "we"?
**A. Well, thus far in my career I have worked typically in a laboratory with others. I currently lead the University of Pittsburgh's laboratory in that regard, and I have a number of people that study under me.**
Q. So is it that you -- so in your capacity as the head of the laboratory, you supervise those projects; is that correct?
**A. I do.**
Q. Have you ever, yourself, formulated a drug product for oral administration?
**A. Yes.**
Q. Approximately how many products?



97

MS. DEVINE: Objection. Asked and answered. Misstates prior testimony.

98

99

00

Transcript of Steven Little, Ph.D.
Conducted on June 14, 2022

27 (105 to 108)

105

107

Go ahead.

A.

106

108

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM



Transcript of Steven Little, Ph.D.
Conducted on June 14, 2022
28 (109 to 112)

09

BY MR. BARRY:

0

2

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM



# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SILVERGATE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BIONPHARMA INC.,<br><br>Defendant. | C.A. No. 18-1962 (LPS)<br>C.A. No. 19-1067 (LPS) |
| SILVERGATE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>AMNEAL PHARMACEUTICALS LLC,<br><br>Defendant. | C.A. No. 19-678 (LPS)<br><br>REDACTED - PUBLIC VERSION |

**[PROPOSED] FINAL PRETRIAL ORDER**

This matter comes before the Court at a final pretrial conference held pursuant to Rule 16 of the Federal Rules of Civil Procedure.

The parties are Plaintiff Silvergate Pharmaceuticals, Inc. ("Plaintiff" or "Silvergate") and Defendants Bionpharma Inc. ("Bionpharma") and Amneal Pharmaceuticals LLC ("Amneal") (collectively, "Defendants"). Pursuant to Local Rule 16.3, Plaintiff and Defendants hereby submit for the Court's approval this proposed Final Pretrial Order governing the consolidated, virtual bench trial of C.A. Nos. 18-1962 (LPS), 19-1067 (LPS), and 19-678 (LPS) currently scheduled to begin on February 1, 2021.

**Plaintiff's Counsel**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mdellinger@mnat.com

WILSON SONSINI GOODRICH & ROSATI PC
Wendy Devine (*pro hac vice*)
Tina Hanson (*pro hac vice*)
Jody Karol (*pro hac vice*)
One Market Plaza Spear Tower Suite 3300
San Francisco, CA 94105
(415) 947-2000
wdevine@wsgr.com
thanson@wsgr.com
jkarol@wsgr.com

Natalie Morgan (*pro hac vice*)
12235 El Camino Real
San Diego, CA 92130
(858) 350-2300
nmorgan@wsgr.com

Ty Callahan (*pro hac vice*)
Granville Kauffman (*pro hac vice*)
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
(323) 210-2900
tcallahan@wsgr.com
gkauffman@wsgr.com

**Defendant Bionpharma Inc.'s Counsel**

MORRIS JAMES LLP
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6988
kdorsney@morrisjames.com
chitch@morrisjames.com

TAFT STETTINIUS & HOLLISTER LLP
Andrew M. Alul
Richard T. Ruzich
Roshan P. Shrestha, Ph.D.
111 East Wacker Suite 2800
Chicago, IL  60601
(312) 836-4135
aalul@taftlaw.com
rruzich@taftlaw.com
rshrestha@taftlaw.com

**Defendant Amneal Pharmaceuticals LLC's Counsel**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Anne Shea Gaza (#4093)
Karen L. Pascale (#2903)
Samantha G. Wilson (#5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
kpascale@ycst.com
swilson@ycst.com

MADDOX EDWARDS, PLLC
Steven Maddox
Jeremy Edwards
Matthew Ruedy
Kaveh Saba
Anthony Son
1900 K Street NW, Suite 725
Washington, D.C. 20006
(202) 830-0707
smaddox@meiplaw.com
jedwards@meiplaw.com
mruedy@meiplaw.com
ksaba@meiplaw.com
ason@meiplaw.com

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SILVERGATE PHARMACEUTICALS, INC., Plaintiff, v. BIONPHARMA INC., Defendant. | ) | C.A. No. 18-1962 (LPS)<br>C.A. No. 19-1067 (LPS) |
| SILVERGATE PHARMACEUTICALS, INC., Plaintiff, v. AMNEAL PHARMACEUTICALS LLC, Defendant. | ) | C.A. No. 19-678 (LPS) |

**EXHIBIT 2**

**PLAINTIFF'S STATEMENT OF ISSUES OF FACT**
**THAT REMAIN TO BE LITIGATED**

**EXHIBIT 2**

**TABLE OF CONTENTS**

**PAGE(S)**

I. BACKGROUND ..... 1

II. STATEMENTS OF INTENDED PROOF ..... 5

III. BIONPHARMA'S ANDA PRODUCT INFRINGES THE ASSERTED CLAIMS ..... 6

A. PERSON OF ORDINARY SKILL IN THE ART ..... 6

B. BIONPHARMA'S ANDA PRODUCT ..... 6

C. BIONPHARMA'S ANDA PRODUCT LABEL ..... 8

D. BIONPHARMA'S ANDA PRODUCT INFRINGES CLAIM 1 OF THE '745 PATENT UNDER THE DOCTRINE OF EQUIVALENTS ..... 9

1. Bionpharma's ANDA Product Infringes the Buffer Limitation Under the Doctrine of Equivalents ..... 10

2. Bionpharma's ANDA Product Infringes the Preservative Limitation Under the Doctrine of Equivalents ..... 15

E. BIONPHARMA'S ANDA PRODUCT INFRINGES CLAIMS 4, 7, AND 10 OF THE '745 PATENT ..... 19

F. IF BIONPHARMA MARKETS THE BIONPHARMA ANDA PRODUCT WITH THE PROPOSED LABEL, BIONPHARMA WILL INDIRECTLY INFRINGE CLAIMS 18 AND 25 OF THE '987 PATENT ..... 20

1. If Bionpharma Markets the Bionpharma ANDA Product with the Proposed Label, Bionpharma Will Induce Infringement of Claims 18 and 25 of the '987 Patent ..... 21

2. If Bionpharma Markets the Bionpharma ANDA Product with the Proposed Label, Bionpharma Will Contributorily Infringe Claims 18 and 25 of the '987 Patent ..... 23

G. USE OF BIONPHARMA'S ANDA PRODUCT IN ACCORDANCE WITH BIONPHARMA'S PROPOSED LABEL WILL INFRINGE CLAIMS 20, 23, AND 30 OF THE '987 PATENT ..... 24

IV. AMNEAL'S ANDA PRODUCT INFRINGES THE ASSERTED CLAIMS ..... 24

A. PERSON OF ORDINARY SKILL IN THE ART ..... 25

B. AMNEAL'S ANDA PRODUCT ..... 25

**EXHIBIT 2**

C. AMNEAL'S ANDA PRODUCT LABEL ........................................................................ 26

D. AMNEAL'S ANDA PRODUCT INFRINGES CLAIM 1 OF THE '008 PATENT...................... 27

1. Amneal's ANDA Product Infringes the Buffer Limitation Under the Doctrine of Equivalents..................................................................................................... 28

E. AMNEAL'S ANDA PRODUCT INFRINGES CLAIMS 3 AND 8-10 OF THE '008 PATENT .... 33

F. IF AMNEAL MARKETS THE AMNEAL ANDA PRODUCT WITH THE PROPOSED LABEL, AMNEAL WILL INDIRECTLY INFRINGE CLAIMS 1, 16, AND 24 OF THE '442 PATENT .... 34

1. If Amneal Markets the Amneal ANDA Product with the Proposed Label, Amneal Will Induce Infringement of Claims 1, 16, and 24 of the '442 Patent................. 35

2. If Amneal Markets the Amneal ANDA Product with the Proposed Label, Amneal Will Contributorily Infringe Claims 1, 16, and 24 of the '442 Patent ................. 37

G. USE OF AMNEAL'S ANDA PRODUCT IN ACCORDANCE WITH AMNEAL'S PROPOSED LABEL WILL INFRINGE CLAIMS 9-10, 21, AND 29 OF THE '442 PATENT ..................... 38

H. AMNEAL'S ANDA PRODUCT INFRINGES THE ASSERTED CLAIMS OF THE '745 PATENT ..................................................................................................... 39

1. Amneal's ANDA Product Infringes Claim 1 of the '745 Patent .......................... 39

2. Amneal's ANDA Product Infringes Claims 4, 7, and 10 of the '745 Patent........ 40

I. IF AMNEAL MARKETS THE AMNEAL ANDA PRODUCT WITH THE PROPOSED LABEL, AMNEAL WILL INDIRECTLY INFRINGE CLAIMS 1, 18, AND 25 OF THE '987 PATENT ...... 41

J. USE OF AMNEAL'S ANDA PRODUCT IN ACCORDANCE WITH AMNEAL'S PROPOSED LABEL WILL INFRINGE CLAIMS 7, 20, 23 AND 30 OF THE '987 PATENT ........................ 43

V. AMNEAL HAS FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS WOULD HAVE BEEN OBVIOUS TO A PERSON OF SKILL IN THE ART.......................................................................................... 44

A. PRIOR ART REFERENCES.......................................................................................... 45

1. Epaned® Kit ............................................................................................. 45

2. The '747 Patent.......................................................................................... 45

3. Allen.......................................................................................................... 46

4. Ip & Brenner ............................................................................................. 46

**EXHIBIT 2**

5. Boukarim, Handbook, FDA Stability Guidance, the WHO Report, Helin-Tanninen, Remington ..... 46

6. Background References ..... 47

B. THE ASSERTED CLAIMS OF THE '008, '442, '745, AND '987 PATENTS ARE NOT OBVIOUS ..... 48

1. None of the Prior Art Provides a POSA Motivation to Modify Epaned® Kit / the '747 Patent to Create a Stable Ready-to-Use Enalapril Maleate Formulation ..... 48

2. A POSA Would Not Have Used the Prior Art to Create an Aqueous Solution Buffered with Citric Acid and Sodium Citrate Dihydrate ..... 50

3. A POSA Would Not Have Found the Sodium Benzoate Preservative Obvious ..... 51

4. The Prior Art Does Not Teach the Claimed pH ..... 53

5. The Prior Art Does Not Teach the Claimed Stability ..... 54

6. A POSA Would Not Have Been Motivated to Exclude Mannitol and Silicon Dioxide ..... 55

7. The Commercial Success of Epaned® Establishes That the Asserted Patents Are Not Invalid for Obviousness ..... 56

8. Other Secondary Considerations of Non-Obviousness Demonstrate That the Asserted Patents Are Not Invalid for Obviousness ..... 70

VI. AMNEAL HAS FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT THE ASSERTED CLAIMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION OR LACK OF ENABLEMENT ..... 76

VII. PROSECUTION HISTORY ESTOPPEL DOES NOT BAR APPLICATION OF THE DOCTRINE OF EQUIVALENTS ..... 78

A. PROSECUTION HISTORY OF APPLICATION NO. 15/081,603 ..... 78

1. September 2, 2016 Rejection of Claims ..... 78

2. January 17, 2017 Rejection of Claims ..... 79

3. February 3, 2017 Applicant Response to Office Action ..... 80

4. March 20, 2017 Interview ..... 86

5. March 22, 2017 Supplemental Amendment ..... 86

**EXHIBIT 2**

6. April 19, 2017 Notice of Allowance ........ 86

7. United States Patent No. 9,669,008 ........ 87

8. United States Patent No. 9,808,442 ........ 87

9. United States Patent No. 10,039,745 ........ 87

10. United States Patent No. 10,154,987 ........ 87

B. ARGUMENT BASED ESTOPPEL DOES NOT APPLY ........ 88

1. Bionpharma Cannot Prove That Silvergate Clearly and Unambiguously Disavowed All Formulations Beyond Those Having the Claimed Ingredients at the Claimed Amounts/Concentrations ........ 88

2. Amneal Cannot Prove That Silvergate Clearly and Unambiguously Disavowed All Buffers Beyond the Claimed Citric Acid/Sodium Citrate Buffer ........ 91

C. AMENDMENT BASED ESTOPPEL DOES NOT APPLY ........ 92

1. The Amendment Was Not Narrowing and Was Not Made for Reasons Related to Patentability ........ 92

2. Even if the Amendment Was Narrowing and Made for Reasons Related to Patentability, the Amendment Was Tangential to Defendants' Respective, Equivalent Buffers ........ 94

VIII. CLAIM VITIATION DOES NOT APPLY TO BAR APPLICATION OF THE DOCTRINE OF EQUIVALENTS TO THE BUFFER IN BIONPHARMA'S ANDA PRODUCT ........ 95

IX. CLAIM VITIATION DOES NOT APPLY TO BAR APPLICATION OF THE DOCTRINE OF EQUIVALENTS TO THE BUFFER IN AMNEAL'S ANDA PRODUCT ........ 96

X. THE DISCLOSURE DEDICATION DOCTRINE DOES NOT APPLY TO BAR APPLICATION OF THE DOCTRINE OF EQUIVALENTS TO BIONPHARMA'S PRESERVATIVE ........ 96

**EXHIBIT 2**

Pursuant to D. Del. LR 16.3(c)(4), Plaintiff Silvergate Pharmaceuticals, Inc. ("Silvergate") submits the following Statement of Issues of Fact That Remain to Be Litigated. The following statement is based on the parties' pleadings, documentary and testimony evidence, expert reports, and on Silvergate's current understanding of Defendants Bionpharma Inc. ("Bionpharma") and Amneal Pharmaceuticals LLC ("Amneal") (collectively, "Defendants") respective claims and defenses. Silvergate reserves the right to revise, amend, supplement, or modify the following statement based on any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence, or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.

To the extent that Silvergate's Statement of Issues of Law That Remain to Be Litigated set forth in Exhibit 4 contains issues of fact, those issues are incorporated herein by reference. Should the Court determine that any issue identified below is more appropriately considered as issue of law, Silvergate incorporates such issue by reference in Exhibit 4. By including a fact herein, Silvergate does not assume the burden of proof or production with regard to that fact.

Silvergate contends that the issues of fact that remain to be litigated at trial are as follows:

## I. Background

1. Epaned® is an FDA-approved ready-to-use oral solution ACE inhibitor for the treatment of hypertension in children under the age of six. Epaned® is also approved for the treatment of hypertension in adults, heart failure, and asymptomatic left ventricular dysfunction.

2. Left ventricular dysfunction is commonly associated with hypertension. In fact, left ventricular dysfunction can be a particularly concerning symptom of hypertension because it is very likely to lead to heart failure. Moreover, although left ventricular dysfunction and/or heart failure often arise as a consequence of hypertension, they may also occur independently of

hypertension. Epaned® can be used to treat patients with left ventricular dysfunction and/or heart failure in the absence of hypertension.

3. Epaned® ready-to-use oral liquid formulation represents the research and effort of inventors Gerold Mosher and David Miles. Dr. Mosher, Dr. Miles, and the rest of the Silvergate team devoted themselves to developing and manufacturing an effective oral hypertensive solution for the most vulnerable segments of the population: the very young and the very old.

4. The active ingredient in Epaned® is enalapril. Enalapril is a pro-drug in the class of anti-hypertensive compounds known as angiotensin converting enzyme (ACE) inhibitors.

5. A pro-drug is a compound that metabolizes to a pharmacologically active drug following administration to a patient. The pro-drug enalapril converts into the compound enalaprilat. Enalaprilat is an effective anti-hypertensive, but suffers from poor gastrointestinal tract absorption.

6. Enalapril tablets for oral administration were initially approved by FDA in December 1985 and marketed under the trade name Vasotec®. Such tablets are ill-suited for patients that have trouble swallowing, including pediatric patients and the elderly. Thus, for some segments of the population, tablets are not an appropriate method of administrating vital anti-hypertensive medications like enalapril.

7. For many years following the approval of Vasotec®, enalapril was only available in tablet form. For those patients with issues swallowing these solid tablets, the primary way of administering enalapril was via compounding of the solid enalapril tablets. Compounding involves crushing a solid tablet into a powder using a mortar and pestle; the crushed powder is then combined with a diluent, resulting in a liquid solution.

8. Unfortunately, these compounded solutions had significant drawbacks. First, compounding presents a substantial risk of inaccurate and inconsistent dosing. A pharmacist cannot precisely, accurately gauge how much of the drug product to dispense from cutting up a tablet. The pill may be inadequately crushed or dissolved into the solution. Additionally, compounding does not guarantee that the entirety of the compounded tablet is mixed with the diluent as some of the crushed tablet can cling to the mortar and pestle and the crushed tablet may not be consistently suspended in the diluent. Further, compounding carries the risk of cross-contamination. Lingering drug substances from previous compounding can inadvertently slip into the compounded mixture. Also, compounding results in patients ingesting excipients that are included to create the tablet form of the medication but are not necessary for a liquid formulation. Finally, compounding must be done at compounding pharmacies, which are not common and can be difficult to find. The drawbacks of compounding are especially acute in the treatment of pediatric patients, where small mistakes in dosing can lead to large differences in treatment because of the patient's small body weight and developmental status.

9. Recognizing these concerns, Silvergate endeavored to develop a liquid enalapril dosage form.

10. The first of Silvergate's enalapril products was a powder for reconstitution dosage form known as the Epaned® Kit. The Epaned® Kit came with one bottle of a dry powder blend (that contained enalapril, mannitol, and colloidal silicone dioxide) and one bottle of Ora-Sweet SF diluent. Pharmacists were instructed to follow a multi-step process in order to mix the powder and diluent. Once reconstituted, Epaned® Kit was dispensed to the patient in a multiple-dose bottle. Epaned® Kit was the first FDA-approved drug product containing enalapril in an oral liquid form

**EXHIBIT 2**

11. The Epaned® Kit is a commercial embodiment of U.S. Patent No. 8,568,747 (the "'747 patent"), assigned to Silvergate and the University of Kansas.

12. While Epaned® Kit was an improvement over the pre-existing enalapril tablets and compounded solutions, it did not eliminate all issues surrounding liquid dosage forms of enalapril. For example, Epaned® Kit still required a pharmacist to engage in a multi-step reconstitution process in order to mix the enalapril powder and diluent, creating room for dosage errors, contamination, and inconsistencies.

13. Moreover, after reconstitution, the solution resulting from Epaned® Kit was only stable for 60 days. This limited stability meant that the product needed to be supplied as a Kit for reconstitution as it was not shelf-stable for long enough to enable manufacture and distribution as a ready-to-use solution.

14. Thus, even after development and launch of the Epaned® Kit, there remained a need for an oral liquid dosage form of enalapril.

15. Recognizing the need for a ready-to-use enalapril oral solution that did not require reconstitution (or other manipulation) prior to administration, and which had long-term stability, Silvergate developed Epaned®. Epaned® addresses the needs left unresolved by Epaned® Kit. Specifically, because Epaned® is supplied as a ready-to use solution, there is no need for reconstitution, compounding, or other manipulation prior to administration. As such, Epaned® eliminates the accompanying risks of variability in dosage and incomplete solubilization. The elimination of these risks means that Epaned® has a safety advantage relative to Epaned® Kit.

16. Moreover, Epaned® is stable for 36 months. Thus, patients can keep Epaned® until the expiration date on the bottle (up to 36 months from manufacture). In contrast, patients were instructed to discard Epaned® Kit within two months of reconstitution. As such, Epaned®

has enhanced stability and storage properties as compared to Epaned® Kit, which facilitates patient compliance and ease of use.

17. Epaned® has improved the lives of patients who otherwise would have to take oral tablets or rely on solutions requiring manipulation prior to administration.

18. Defendants Bionpharma and Amneal now seek FDA approval to make and sell generic versions of Epaned® before the expiration of the Asserted Patents.[1]

## II. Statements of Intended Proof

19. Silvergate bears the burden of proof with respect to its assertions of infringement of the Asserted Claims.[2] Silvergate intends to show that it has met its burden by proving by a preponderance of the evidence that each of Bionpharma's ANDA product and Amneal's ANDA product infringes the respective Asserted Claims. Specifically, Silvergate intends to show that the accused products meet every limitation in the respective Asserted Claims literally or equivalently. Additionally, Silvergate intends to show that the defendants' equivalents were not disclosed but unclaimed in the Asserted Patents, and that no claim limitation is vitiated.

20. With regard to amendment-based estoppel, Silvergate intends to show that (1) the amendment in question was not narrowing; (2) the amendment was not made for a reason related to patentability; and (3) the amendment was tangential to the equivalent in question. With regard to argument-based estoppel, Silvergate intends to show that there was no clear and unambiguous surrender of claim scope through argument to the Examiner.

---

[1] The Asserted Patents are United States Patent Nos. 9,669,008 (the "'008 patent"); 9,808,442 (the "'442 patent"); 10,039,745 (the "'745 patent"); and 10,154,987 (the "'987 patent").

[2] Silvergate asserts that Bionpharma infringes claims 4, 7, and 10 of the '745 patent and claims 20, 23, and 30 of the '987 patent. Silvergate asserts that Amneal infringes claims 3 and 8-10 of the '008 patent, claims 9, 10, 21, and 29 of the '442 patent, claims 4, 7, and 10 of the '745 patent, and claims 7, 20, 23, and 30 of the '987 patent.

**EXHIBIT 2**

21. Bionpharma is not presenting an invalidity defense. Amneal bears the burden of overcoming the statutory presumption of patent validity by demonstrating that the Asserted Claims are invalid by clear and convincing evidence. Silvergate intends to show that Amneal has not met this burden of proving by clear and convincing evidence that the Asserted Claims are invalid.

## III. Bionpharma's ANDA Product Infringes the Asserted Claims

22. Silvergate will demonstrate by a preponderance of the evidence that Bionpharma's ANDA product infringes claims 4, 7, and 10 of the '745 patent and claims 20, 23, and 30 of the '987 patent.

### A. Person of Ordinary Skill in the Art

23. A person of ordinary skill in the art in this case would have a Ph.D. in formulation relevant pharmaceutical science, chemistry, or a similar subject, with at least five years of post-degree practical experience in formulating pharmaceutical products. Additionally, a person of ordinary skill would have experience with pharmaceutical excipients as applied to their selection and use in drug formulations. Moreover, a person of ordinary skill would routinely collaborate with a medical doctor with experience in treating hypertension and cardiovascular conditions, preferably one with experience in pediatric patients, or a clinical pharmacologist.

### B. Bionpharma's ANDA Product

24. Bionpharma's ANDA product is an enalapril oral solution. [redacted]

25. Additionally, Bionpharma's ANDA product contains [redacted]

Case 1:18-cv-02196-MSG Document 121-1 Filed 08/01/22 Page 40 of 59 PageID #: 3402

**EXHIBIT 2**

26. Bionpharma's ANDA product contains [redacted]

27. Bionpharma's ANDA product contains [redacted]

28. Bionpharma's ANDA product contains [redacted]

29. Bionpharma's ANDA product contains [redacted]

30. Bionpharma's ANDA product contains [redacted]

31. Bionpharma's ANDA product contains [redacted]

32. Bionpharma's ANDA product contains [redacted]

33. Bionpharma's ANDA product is stable at about 5±3°C for at least 12 months and through 24 months. [redacted]

---

[3] [redacted] Normality refers to an equivalent weight of a solute per liter of solution.

**EXHIBIT 2**

[redacted]

**C. Bionpharma's ANDA Product Label**

34. The proposed label for Bionpharma's ANDA product states that [redacted]

35. [redacted], Bionpharma's proposed label states that [redacted]

36. [redacted], Bionpharma's proposed label states that [redacted].

37. Bionpharma's proposed label discusses a clinical trial ([redacted]

38. Bionpharma's proposed label discusses a second clinical trial ([redacted]

Case 1:18-cv-02196-MSG Document 123-1 Filed 08/01/22 Page 42 of 52 PageID #: 3702

**EXHIBIT 2**

39. Bionpharma's proposed label discusses a third clinical trial [redacted]

40. Bionpharma's proposed label also discusses clinical trials in patients with [redacted]

**D. Bionpharma's ANDA Product Infringes Claim 1 of the '745 Patent Under the Doctrine of Equivalents[4]**

41. Claim 1 of the '745 patent recites "a stable oral liquid formulation, comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3°C for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

42. As set forth in Exhibit 1, ¶¶ 47-52, Bionpharma's ANDA product literally meets each of these limitations with the exception of [redacted]

[4] Asserted Claims 4, 7, and 10 of the '745 patent depend from independent claim 1.

**EXHIBIT 2**

43. Bionpharma's ANDA 212408 describes a "stable oral liquid." [redacted]

44. Bionpharma's ANDA No. 212408 describes a product which is a solution containing [redacted] of enalapril. [redacted]

45. Bionpharma's ANDA product contains [redacted]

46. Bionpharma's ANDA No. 212408 describes a formulation with stability up to [redacted]

47. In addition, as set forth below, Bionpharma's ANDA product meets limitations (ii) and (iii) under the doctrine of equivalents.

***1. Bionpharma's ANDA Product Infringes the Buffer Limitation Under the Doctrine of Equivalents***

48. Bionpharma's ANDA product contains [redacted]

49. Bionpharma's ANDA product contains [redacted] of enalapril oral solution, [redacted]

50. The combination of the [redacted] in Bionpharma's ANDA product forms, [redacted] that is equivalent to the claim limitation requiring "a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate."

**EXHIBIT 2**

51. The amount of [REDACTED] in Bionpharma's ANDA product performs the same function in the same way to achieve the same result as the claimed amount of citric acid-sodium citrate buffer.

52. The difference between the [REDACTED] in Bionpharma's ANDA product and the claimed citric acid-sodium citrate buffer is insubstantial.

***a. Function-Way-Result Test***

53. The [REDACTED] in Bionpharma's ANDA product performs substantially the same function in substantially the same way to achieve substantially the same result as the buffer claimed in limitation (ii) (about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate buffer) (the "citric acid/sodium citrate buffer").

**i. Function**

54. The function of the claimed citric acid/sodium citrate buffer is to adjust the pH to the desired value then resist further changes in pH of the liquid enalapril formulation. Furthermore, a person of ordinary skill in the art would understand that the function of the claimed citric acid/sodium citrate buffer is to maintain the pH of the formulation.

55. [REDACTED]

56. The function of [REDACTED] is to likewise modify and maintain the formulation's pH.

57. [REDACTED]

**EXHIBIT 2**

58. Thus, Silvergate will demonstrate that the combination of [REDACTED] [REDACTED] in Bionpharma's ANDA product has substantially the same function as the claimed citric acid/sodium citrate buffer because both function to adjust and stabilize the solution's pH.

**ii. Way**

59. The way that the claimed citric acid/sodium citrate buffer maintains the pH is by neutralizing excess ions which could otherwise cause a change in pH.

60. The pH of a solution is calculated by taking the logarithm of the concentration of $H^+$ ions. An acid donates a proton ($H^+$) whereas a base accepts a proton. When put into a solution, an acid exists in equilibrium with its conjugate base. Buffering systems adjust and stabilize pH by absorbing excess $H^+$ or $OH^-$ ions.

61. In an aqueous solution, an acid will undergo a reversible dissociation reaction: ($[HA] \rightleftharpoons [H^+] + [A^-]$). At the pH where an acid is partially ionized, the addition of more $H^+$ will shift this equilibrium to the left of the equation while the addition of $OH^-$ ions will create water and move the equilibrium to the right. The movement of this equilibrium maintains the pH of the solution and is the reasoning for the buffering.

62. Both the claimed citric acid/sodium citrate buffer and Bionpharma's [REDACTED] [REDACTED] [REDACTED] lower the pH of the solution by existing in equilibrium with their conjugate bases and neutralizing any excess ions which would otherwise give rise to a pH.

63. When the claimed buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate is in solution, there exists an equilibrium between citric acid and citrate.

64. Similarly, when [REDACTED] in Bionpharma's ANDA product is in solution, there exists an equilibrium between [REDACTED]

**EXHIBIT 2**

65. Thus, Silvergate will demonstrate that Bionpharma's [redacted] functions in substantially the same way as the claimed citric acid/sodium citrate buffer because both absorb excess $H^+$ or $OH^-$ ions.

**iii. Result**

66. The result of a buffer which functions to maintain the pH by absorbing excess protons is a stable solution.

67. Silvergate's Epaned® product—an embodiment of the Asserted Claims—is stable for at least 24 months. SLVGT-EPA_0102147. Also, the claimed formulation is stable for at least 24 months. *E.g.*, '745 patent at claim 10; '987 patent at claims 23 and 30.

68. Bionpharma's ANDA product has [redacted]

69. Thus, Silvergate will demonstrate that Bionpharma's [redacted] achieves substantially the same result as the claimed citric acid/sodium citrate buffer.

***b. Insubstantial Differences Test***

70. The difference between the claimed citric acid/sodium citrate buffer and Bionpharma's [redacted]

71. As discussed above, the claimed citric acid/sodium citrate buffer and Bionpharma's [redacted] perform substantially the same function (adjusting and resisting change in pH) in substantially the same way (by absorbing excess ions) to achieve substantially the same result (a stable solution).

72. A person of ordinary skill would recognize that both citric acid and [redacted] are common buffering agents used widely in pharmaceutical applications. Additionally, a person

Case 1:19-cv-02196-MSG Document 123-1 Filed 08/08/22 Page 47 of 52 PageID #: 7403

**EXHIBIT 2**

of ordinary skill in the art would recognize and appreciate the similar properties of [redacted] and citric acid.

73. Both [redacted] and citric acid have similar pKa values. The pKa of [redacted] and the pKa of citric acid is 3.1 at 25°C.

74. Both [redacted] and citric acid are water soluble.

75. Both [redacted] and citric acid contain a carboxylic acid group, the functional group responsible for donating protons. Moreover, sodium citrate and [redacted] respective conjugate bases of citric acid and [redacted] both contain deprotonated carboxylic acid, the functional group responsible for absorbing excess protons.

76. Furthermore, a person of ordinary skill would understand how to interchange the amount of citric acid for [redacted] and vice versa) in a buffer system based on their known properties to achieve the desired pH and stability.

77. The amount of the claimed buffer is approximately the amount of the buffer in Bionpharma's ANDA product.

78. The differences between the amount of the claimed buffer and the amount of the buffer in Bionpharma's ANDA product is insubstantial.

79. The amount of the buffer created [redacted] a substantially equivalent effect on adjusting and maintaining the pH as the claimed buffer comprising between about 0.8 to about 3.5 mg/mL citric acid and between about 0.1 to about 0.8 mg/mL sodium citrate.

80. Thus, Silvergate will demonstrate that the difference between the [redacted] in Bionpharma's ANDA product and Silvergate's claimed citric acid/sodium citrate buffer is insubstantial.

**EXHIBIT 2**

*2. Bionpharma's ANDA Product Infringes the Preservative Limitation Under the Doctrine of Equivalents*

81. Bionpharma's ANDA product contains [REDACTED].

82. [REDACTED].

83. The use of [REDACTED] Bionpharma's ANDA product infringes the preservative claim limitation under the doctrine of equivalents. Specifically, Bionpharma's ANDA product infringes under the function-way-result test and under the insubstantial differences test.

***a. Function-Way-Result Test***

84. The [REDACTED] performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed about 0.7 to about 1.2 mg/mL sodium benzoate.

**i. Function**

85. The [REDACTED] performs substantially the same function as the claimed 0.7 to about 1.2 mg/mL sodium benzoate.

86. The claimed about 0.7 to about 1.2 mg/mL sodium benzoate functions as a preservative.

87. The [REDACTED] within Bionpharma's ANDA product function as preservatives. In fact, Bionpharma explicitly recognized that [REDACTED]

88. Thus, Silvergate will demonstrate that the [REDACTED] in Bionpharma's ANDA product performs substantially the same

**EXHIBIT 2**

function as the about 0.7 to about 1.2 mg/mL sodium benzoate in the claimed formulation because all three are preservatives.

**ii. Way**

89. The [REDACTED] in Bionpharma's ANDA product functions in substantially the same way as the claimed about 0.7 to about 1.2 mg/mL sodium benzoate.

90. The claimed sodium benzoate functions as a preservative by exerting antimicrobial effects at a pH of less than 3.5.

91. Likewise, [REDACTED] within Bionpharma's ANDA product function as preservatives by exerting antimicrobial effects at pH's of less than 3.5.

92. Both the claimed sodium benzoate and Bionpharma's [REDACTED] inhibit microbial growth.

93. Both the claimed sodium benzoate and Bionpharma's [REDACTED] as preservatives by inhibiting the growth of microorganisms.

94. Thus, Silvergate will demonstrate that the [REDACTED] in Bionpharma's ANDA product functions in substantially the same way as the claimed about 0.7 to about 1.2 mg/mL sodium benzoate because both preservatives inhibit microbial growth at a pH of less than 3.5.

**iii. Result**

95. The result of a preservative that exerts antimicrobial effectiveness at a pH of less than 3.5 is insignificant microorganism growth in an acidic solution.

96. Silvergate's Epaned® product, which is an embodiment of the Asserted Claims, exhibits insignificant microbial growth. SLVGT-EPA_0003226.

Case 1:18-cv-01962-MSG Document 121-1 Filed 08/01/22 Page 70 of 529 PageID #: 4703

**EXHIBIT 2**

97. Likewise, Bionpharma's ANDA product exhibits insignificant microbial growth. [redacted]

98. Thus, Silvergate will demonstrate that the [redacted] in Bionpharma's ANDA product achieves substantially the same result as the claimed about 0.7 to about 1.2 mg/mL sodium benzoate because both the claimed formulation and Bionpharma's ANDA product exhibit insignificant microbial growth.

***b. Insubstantial Differences Test***

99. The difference between the claimed about 0.7 to about 1.2 mg/mL sodium benzoate preservative and Bionpharma's [redacted] preservative is insubstantial.

100. As discussed above, the claimed sodium benzoate preservative and the [redacted] in Bionpharma's ANDA product perform substantially the same function (preservative) in substantially the same way (by exerting antimicrobial effects at a pH of less than 3.5) to achieve substantially the same result (a product exhibiting insignificant microbial growth).

101. Further, sodium benzoate, [redacted] are all structurally similar.

102. The structural similarity is seen in the diagram below. Sodium benzoate is on the left and the [redacted]

**EXHIBIT 2**

vs.

Sodium Benzoate

103. Sodium benzoate, [REDACTED] all function as antimicrobial preservatives at a low pH.

104. A person of ordinary skill would consider a sodium benzoate preservative and a [REDACTED]

105. The amount of sodium benzoate recited in the claim is between about 0.7 to about 1.2 mg/mL.

106. The amount of [REDACTED] Bionpharma's ANDA product [REDACTED]

107. The amount of [REDACTED] in Bionpharma's ANDA product is [REDACTED]

108. The total amount of [REDACTED]

109. [REDACTED] Also, a person of ordinary skill would understand that [REDACTED] would exert a substantially equivalent preservative effect against the growth of the same types of microorganisms, including aerobic microbials, combined yeast and molds, and *E. Coli* as the claimed amount of sodium benzoate preservative.

Case 1:19-cv-02196-MSG Document 121-1 Filed 08/08/22 Page 427 of 552 PageID #: 4803

**EXHIBIT 2**

110. Thus, Silvergate will demonstrate that the difference between Bionpharma's [REDACTED] and the claimed sodium benzoate preservative is insubstantial.

**E. Bionpharma's ANDA Product Infringes Claims 4, 7, and 10 of the '745 Patent**

111. Claim 4 depends from claim 1 and recites "the stable oral liquid formulation of claim 1, wherein the formulation does not contain mannitol." Bionpharma's ANDA No. 212408 describes a product which does not contain mannitol. [REDACTED] Thus, if Bionpharma is found to infringe claim 1, Bionpharma will also infringe claim 4.

112. Claim 7 depends from claim 1 and recites "the stable oral liquid formulation of claim 1, wherein the pH of the stable oral liquid formulation is between about 3 and about 3.5." Bionpharma's ANDA product has a pH of [REDACTED]. Thus, if Bionpharma is found to infringe claim 1, Bionpharma will also infringe claim 7.

113. Claim 10 depends from claim 1 and recites "the stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5±3° C. for at least 24 months." As discussed above, Bionpharma's ANDA product contains an impurity content of [REDACTED] Thus, if Bionpharma is found to infringe claim 1, Bionpharma will also infringe claim 10.

**EXHIBIT 2**

### F. If Bionpharma Markets the Bionpharma ANDA Product with the Proposed Label, Bionpharma Will Indirectly Infringe Claims 18 and 25 of the '987 Patent[5]

114. Claim 18 of the '987 patent recites a "method of treating heart failure in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

115. Claim 25 of the '987 patent recites a "method of treating left ventricular dysfunction in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

[5] Asserted Claims 20 and 23 of the '987 patent depend from independent claim 18. Asserted Claim 30 of the '987 patent depends from independent claim 25.

**EXHIBIT 2**

116. As set forth above in in Section III.D, *supra*, Bionpharma's ANDA product, when used for treatment as indicated in Bionpharma's proposed label, literally meets each of the these limitations with the exception of [REDACTED]

117. The proposed label for Bionpharma's ANDA product, which Bionpharma intends to distribute with its ANDA product, states that Bionpharma's ANDA product is indicated for the treatment of [REDACTED]

118. The proposed label for Bionpharma's ANDA product, which Bionpharma intends to distribute with its ANDA product, indicates that the Bionpharma ANDA product will be dosed in a therapeutically effective amount for treatment of [REDACTED]

119. As set forth above in Section III.D, *supra*, Bionpharma's ANDA product infringes limitations (ii) and (iii) under the doctrine of equivalents.

***1. If Bionpharma Markets the Bionpharma ANDA Product with the Proposed Label, Bionpharma Will Induce Infringement of Claims 18 and 25 of the '987 Patent***

120. Bionpharma will induce infringement of claims 18 and 25 of the '987 patent by knowingly inducing infringement of the claimed methods and possessing the specific intent to encourage such infringement. Specifically, the proposed label for Bionpharma's ANDA product encourages, recommends, and promotes infringement of the claimed methods.

121. The proposed label for Bionpharma's ANDA product states that Bionpharma's ANDA product is indicated for the treatment of [REDACTED]

Case 1:18-cv-02196-MSG Document 121-1 Filed 08/01/22 Page 481 of 579 PageID #: 7341

**EXHIBIT 2**

122. As discussed above, the use of Bionpharma's ANDA product to treat [redacted] as indicated in Bionpharma's proposed label, will infringe claim 18 or 25 of the '987 patent, respectively.

123. Bionpharma knows of the '987 patent, and knows that administration of its ANDA product will be an act of infringement.

124. Furthermore, Bionpharma specifically intends to encourage such infringement insofar as Bionpharma's proposed label encourages, recommends, and promotes infringement of the methods in claims 18 and 25 of the '987 patent. In particular, the proposed label for Bionpharma's ANDA product states that Bionpharma's ANDA product is specifically indicated for the treatment of [redacted]

125. Bionpharma's proposed label also includes information regarding the dosing information for [redacted].

126. Additionally, as discussed above in Section III.C, *supra*, Bionpharma's proposed label discusses successful clinical trials in patients with medical conditions that are the target of treatment [redacted].

**EXHIBIT 2**

127. In light of the above, a physician or medical care provider reading Bionpharma's proposed label would administer the drug for the treatment of [redacted] and it is Bionpharma's intent that its ANDA product be administered as such.

128. Thus, Silvergate will demonstrate that if Bionpharma markets its ANDA product with its proposed label, Bionpharma will induce infringement of claims 18 and 25 of the '987 patent.

### 2. *If Bionpharma Markets the Bionpharma ANDA Product with the Proposed Label, Bionpharma Will Contributorily Infringe Claims 18 and 25 of the '987 Patent*

129. Bionpharma will contributorily infringe claims 18 and 25 of the '987 patent by supplying a material part of the claimed methods for which there are no substantial non-infringing uses.

130. As discussed above, the use of Bionpharma's ANDA product to treat [redacted], as indicated in Bionpharma's proposed label, will infringe claim 18 or 25 of the '987 patent, respectively. Further, Bionpharma knows of the '987 patent, and knows that administration of its ANDA product will be an act of infringement.

131. Bionpharma's ANDA product, as evidenced by Bionpharma's proposed label, is only indicated for the treatment of [redacted]. Accordingly, there are no substantial uses of Bionpharma's ANDA product that would not practice claim 18 or 25 of the '987 patent.

132. By supplying Bionpharma's ANDA product, Bionpharma would be supplying a material part of the claimed methods in claims 18 and 25 of the '987 patent. Bionpharma's ANDA product is the entire claimed stable oral liquid formulation which is to be administered in claims 18 and 25 of the '987 patent.

**EXHIBIT 2**

133. Thus, Silvergate will demonstrate that if Bionpharma markets its ANDA product with its proposed label, Bionpharma will contributorily infringe claims 18 and 25 of the '987 patent.

**G. Use of Bionpharma's ANDA Product in Accordance with Bionpharma's Proposed Label Will Infringe Claims 20, 23, and 30 of the '987 Patent**

134. Claim 20 depends from claim 18 and recites "the method of claim 18, wherein the formulation does not contain mannitol or silicon dioxide." Bionpharma's ANDA product does not contain [REDACTED] . Thus, if Bionpharma is found to infringe claim 18, Bionpharma will also infringe claim 20.

135. Claim 23 depends from claim 18 and recites "the method of claim 18, wherein the formulation is stable at about 5±3° C. for at least 24 months." Bionpharma's ANDA product contains an impurity content of [REDACTED] Thus, if Bionpharma is found to infringe claim 18, Bionpharma will also infringe claim 23.

136. Claim 30 depends from claim 25 and recites "the method of claim 25, wherein the formulation is stable at about 5±3° C. for at least 24 months." Bionpharma's ANDA product contains an impurity content of [REDACTED] Thus, if Bionpharma is found to infringe claim 25, Bionpharma will also infringe claim 30.

**IV. Amneal's ANDA Product Infringes the Asserted Claims**

137. Silvergate will demonstrate by a preponderance of the evidence that Amneal's ANDA product infringes claims 3 and 8-10 of the '008 patent, claims 9, 10, 21 and 29 of the

EXHIBIT 2

’442 patent, claims 4, 7, and 10 of the ’745 patent, and claims 7, 20, 23, and 30 of the ’987 patent.

**A. Person of Ordinary Skill in the Art**

138. A person of ordinary skill in the art in this case would have a Ph.D. in formulation relevant pharmaceutical science, chemistry, or a similar subject, with at least five years of post-degree practical experience in formulating pharmaceutical products. Additionally, a person of ordinary skill would have experience with pharmaceutical excipients as applied to their selection and use in drug formulations. Moreover, a person of ordinary skill would routinely collaborate with a medical doctor with experience in treating hypertension and cardiovascular conditions, preferably one with experience in pediatric patients, or a clinical pharmacologist.

**B. Amneal’s ANDA Product**

139.

140.

141.

142.

143.

144.

145.

**EXHIBIT 2**

146. [redacted]

**C. Amneal's ANDA Product Label**

147. [redacted].

148. [redacted]

149. [redacted]

150. [redacted]

151. [redacted]

152. [redacted]

**EXHIBIT 2**

153.

154.

155.

**D. Amneal's ANDA Product Infringes Claim 1 of the '008 Patent[6]**

156. Claim 1 of the '008 patent recites "a stable oral liquid formulation, comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the formulation is less than about 3.5; and [(vi)]

[6] Asserted Claims 3 and 8-10 of the '008 patent depend from independent claim 1.

wherein the formulation is stable at about 5±3°C. for at least 12 months; [(vii)] wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

157. [redacted]

158. As set forth below, Amneal's ANDA product meets limitation (ii) under the doctrine of equivalents.

### *1. Amneal's ANDA Product Infringes the Buffer Limitation Under the Doctrine of Equivalents*

159. [redacted]

160. [redacted] in Amneal's ANDA product performs the same function in the same way to achieve the same result as the claimed amount of citric acid-sodium citrate buffer.

161. The difference between the [redacted] Amneal's ANDA product and the claimed citric acid-sodium citrate buffer is insubstantial.

#### *a. __Function-Way-Result__*

162. [redacted] Amneal's ANDA product performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed buffer comprising about 1.82 mg/mL citric acid and about 0.15 mg/mL sodium citrate dihydrate (the "citric acid/sodium citrate buffer").

#### i. Function

163. The function of the claimed citric acid/sodium citrate buffer is to adjust the pH to the desired value then resist further changes in pH of the liquid enalapril formulation.

**EXHIBIT 2**

Furthermore, a person of ordinary skill in the art would understand that the function of the claimed citric acid/sodium citrate buffer is to maintain the pH of the formulation.

164. [REDACTED]

165. Thus, Silvergate will demonstrate that the [REDACTED] in Amneal's ANDA product performs substantially the same function as the claimed citric acid/sodium citrate buffer because [REDACTED].

166. The function of the claimed citric acid/sodium citrate buffer does not encompass *in vivo* stability and/or stability in the gastrointestinal tract. The specification of the Asserted Patents contains no discussion of stability other than the stability of the liquid formulation prior to administration. The specification does not even mention terms such as "*in vivo*," "stomach," "gut," "gastrointestinal," "intestines," or "intestinal," which are terms a person of ordinary skill in the art ("POSA") would expect to encounter if the function of a claimed component included *in vivo* stability. Rather, the Asserted Patents consistently discuss, and indeed claim, stability in the context of storage time. *E.g.*, '008 patent at claim 1 ("wherein the formulation is stable at about 5±3° C. for at least 12 months"), 18:29-31 ("The enalapril oral liquid formulations described herein are stable in various storage conditions including refrigerated, ambient and accelerated conditions."), 18:31-35 ("Stable as used herein refers to enalapril oral liquid formulations having about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of a given storage period.").

**EXHIBIT 2**

**ii. Way**

167. The way that the claimed citric acid/sodium citrate buffer maintains the pH is by neutralizing excess ions which could otherwise cause a change in pH.

168. The pH of a solution is calculated by taking the logarithm of the concentration of $H^+$ ions. An acid donates a proton ($H^+$) whereas a base accepts a proton. When put into a solution, an acid exists in equilibrium with its conjugate base. Buffering systems adjust and stabilize pH by absorbing excess $H^+$ or $OH^-$ ions.

169. In an aqueous solution, an acid will undergo a reversible dissociation reaction: ($[HA] \rightleftharpoons [H^+] + [A^-]$). At the pH where an acid is partially ionized, the addition of more $H^+$ will shift this equilibrium to the left of the equation while the addition of $OH^-$ ions will create water and move the equilibrium to the right. The movement of this equilibrium maintains the pH of the solution and is the reasoning for the buffering.

170. Both the claimed citric acid/sodium citrate buffer and Amneal's [redacted]

171. When the claimed buffer comprising about 1.82 mg/mL citric acid and about 0.15 mg/mL sodium citrate dihydrate is in solution, there exists an equilibrium between citric acid and citrate.

172. [redacted] in Amneal's ANDA product is [redacted]

173. Thus, Silvergate will demonstrate that the [redacted] in Amneal's ANDA product functions in substantially the same way as the claimed citric acid/sodium citrate buffer because [redacted].

EXHIBIT 2

174. For the same reasons as discussed above with respect to "function," the "way" in which the claimed citric acid/sodium citrate buffer functions does not encompass *in vivo* stability and/or stability in the gastrointestinal tract.

**iii. Result**

175. The result of a buffer which functions to maintain the pH by absorbing excess protons is a stable solution.

176. Silvergate's Epaned® product—an embodiment of the Asserted Claims—is stable for at least 24 months. SLVGT-EPA_0102147. Also, the claimed formulation demonstrates stability for at least 24 months. *E.g.*, '008 patent at claim 8; '442 patent at claims 9, 21, and 29; '745 patent at claim 10; '987 patent at claims 23 and 30.

177. [REDACTED]

178. Additionally, Amneal stipulated to the fact that its ANDA product meets the stability limitations of the Asserted Patents.

179. Thus, Silvergate will demonstrate that the [REDACTED] in Amneal's ANDA product achieves substantially the same result as the claimed citric acid/sodium citrate buffer.

180. For the same reasons as discussed above with respect to "function," the "result" achieved by the claimed citric acid/sodium citrate buffer does not encompass *in vivo* stability and/or stability in the gastrointestinal tract.

***b. Insubstantial Differences Test***

181. The difference between the claimed citric acid/sodium citrate buffer and Amneal's [REDACTED] is insubstantial.

**EXHIBIT 2**

182. As discussed above, the claimed citric acid/sodium citrate buffer and Amneal's [REDACTED] perform substantially the same function (adjusting and resisting change in pH) in substantially the same way (by absorbing excess ions) to achieve substantially the same result (a stable solution).

183. A person of ordinary skill in the art would recognize that both citric acid and [REDACTED] are common buffering agents used widely in pharmaceutical applications. Additionally, a person of ordinary skill in the art would recognize and appreciate the similar properties of [REDACTED] and citric acid.

184. Both [REDACTED] and citric acid have similar pKa values. The pKa of [REDACTED] the pKa of citric acid is 3.1 at 25°C.

185. Both [REDACTED] and citric acid are water soluble.

186. Both [REDACTED] and citric acid contain a carboxylic acid group, the functional group responsible for donating protons. Moreover, sodium citrate and [REDACTED]—the respective conjugate bases of citric acid and [REDACTED]—both contain deprotonated carboxylic acid, the functional group responsible for absorbing excess protons.

187. Furthermore, a person of ordinary skill would understand how to interchange the amount of citric acid for [REDACTED] (and vice versa) in a buffer system based on their known properties to achieve the desired pH and stability.

188. The amount of the claimed buffer is approximately the amount of [REDACTED] in Amneal's ANDA product.

189. The differences between the amount of the claimed buffer and the amount of [REDACTED] in Amneal's ANDA product is insubstantial.

**EXHIBIT 2**

190. [REDACTED] exerts a substantially equivalent effect on adjusting and maintaining the pH as the claimed buffer comprising between about 0.8 to about 3.5 mg/mL citric acid and between about 0.1 to about 0.8 mg/mL sodium citrate.

191. Thus, Silvergate will demonstrate that the difference between the [REDACTED] in Amneal's ANDA product and Silvergate's claimed citric acid/sodium citrate buffer is insubstantial.

**E. Amneal's ANDA Product Infringes Claims 3 and 8-10 of the '008 Patent**

192. Claim 3 depends from claim 1 and recites "the formulation of claim 1, wherein the pH is between about 3 and about 3.5." [REDACTED] Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 3.

193. Claim 8 depends from claim 1 and recites "the formulation of claim 1, wherein the formulation is stable at 5±3° C. for at least 24 months." [REDACTED]. Also, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 8.

194. Claim 9 depends from claim 1 and recites "the formulation of claim 1, wherein the formulation does not contain mannitol." [REDACTED]. Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 9.

195. Claim 10 depends from claim 1 and recites "the formulation of claim 1, wherein the formulation does not contain silicon dioxide." [REDACTED]

**EXHIBIT 2**

[REDACTED] Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 10.

**F. If Amneal Markets the Amneal ANDA Product with the Proposed Label, Amneal Will Indirectly Infringe Claims 1, 16, and 24 of the '442 Patent[7]**

196. Claim 1 of the '442 patent recites "a method of treating hypertension in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; and (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the stable oral liquid formulation is less than about 3.5; [(vi)] wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 12 months; and [(vii)] wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

197. Claim 16 of the '442 patent recites "a method of treating heart failure in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; and (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the stable oral liquid formulation is less than about 3.5; [(vi)] wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 12 months; and [(vii)] wherein the stable oral liquid formulation has

[7] Asserted Claims 9 and 10 of the '442 patent depend from independent claim 1. Asserted Claim 21 of the '442 patent depends from independent claim 16. Asserted Claim 29 of the '442 patent depends from independent claim 24.

about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

198. Claim 24 of the '442 patent recites "a method of treating left ventricular dysfunction in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; and (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the stable oral liquid formulation is less than about 3.5; [(vi)] wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 12 months; and [(vii)] wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

199. As set forth in Exhibit 1, ¶¶ 54-89, Amneal's ANDA product, if used for treatment as indicated in Amneal's proposed label, literally meets each of these limitations with the exception of "(ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate."

200. As set forth above in Section IV.D, *supra*, Amneal's ANDA product infringes limitation (ii) under the doctrine of equivalents.

#### ***1. If Amneal Markets the Amneal ANDA Product with the Proposed Label, Amneal Will Induce Infringement of Claims 1, 16, and 24 of the '442 Patent***

201. Amneal will induce infringement of claims 1, 16, and 24 of the '442 patent by knowingly inducing infringement of the claimed methods and possessing the specific intent to encourage such infringement. Specifically, the proposed label for Amneal's ANDA product encourages, recommends, and promotes infringement of the claimed methods.

**EXHIBIT 2**

202.



203.

204. Amneal knows of the ’442 patent, and knows that administration of its ANDA product will be an act of infringement.

205. Furthermore, Amneal specifically intends to encourage such infringement insofar as Amneal’s proposed label encourages, recommends, and promotes infringement of the methods in claims 1, 16, and 24 of the ’442 patent. In particular, the

206.

**EXHIBIT 2**

[redacted].

207. Additionally, as discussed above in Section IV.C, *supra*, [redacted]

208. In light of the above, a physician or medical care provider reading Amneal's proposed label would administer the drug for the treatment of hypertension, heart failure, or left ventricular dysfunction, and it is Amneal's intent that its ANDA product be administered as such.

209. Thus, Silvergate will demonstrate that if Amneal markets its ANDA product with its proposed label, Amneal will induce infringement of claims 1, 16, and 24 of the '442 patent.

#### 2. *If Amneal Markets the Amneal ANDA Product with the Proposed Label, Amneal Will Contributorily Infringe Claims 1, 16, and 24 of the '442 Patent*

210. Amneal will contributorily infringe claims 1, 16, and 24 of the '442 patent by supplying a material part of the claimed methods for which there are no substantial non-infringing uses.

211. As discussed above, the use of Amneal's ANDA product to treat hypertension, heart failure, or left ventricular dysfunction, as indicated in Amneal's proposed label, will infringe claim 1, 16, or 24 of the '442 patent, respectively. Further, Amneal knows of the '442 patent, and knows that administration of its ANDA product will be an act of infringement.

212. [redacted] Accordingly, there are no

**EXHIBIT 2**

substantial uses of Amneal's ANDA product that would not practice claim 1, 16, or 24 of the '442 patent.

213. By supplying Amneal's ANDA product, Amneal would be supplying a material part of the claimed methods in claims 1, 16, and 24 of the '442 patent. Amneal's ANDA product is the entire claimed stable oral liquid formulation which is to be administered in claims 1, 16, and 24 of the '442 patent.

214. Thus, Silvergate will demonstrate that if Amneal markets its ANDA product with its proposed label, Amneal will contributorily infringe claims 1, 16, and 24 of the '442 patent.

### G. Use of Amneal's ANDA Product in Accordance with Amneal's Proposed Label Will Infringe Claims 9-10, 21, and 29 of the '442 Patent

215. Claim 9 depends from claim 1 and recites "the method of claim 1, wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 24 months." [redacted] Also, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 9.

216. Claim 10 depends from claim 1 and recites "the method of claim 1, wherein the stable oral liquid formulation does not contain mannitol or silicon dioxide." [redacted] Also, Amneal stipulated that the Amneal ANDA product meets the limitation "the stable oral liquid formulation." Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 10.

217. Claim 21 depends from claim 16 and recites "the method of claim 16, wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 24 months." Amneal's ANDA

**EXHIBIT 2**

[redacted]. Also, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 16, Amneal will also infringe claim 21.

218. Claim 29 depends from claim 24 and recites "the method of claim 24, wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 24 months." [redacted] Also, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 24, Amneal will also infringe claim 29.

### H. Amneal's ANDA Product Infringes the Asserted Claims of the '745 Patent

#### *1. Amneal's ANDA Product Infringes Claim 1 of the '745 Patent*[8]

219. Claim 1 of the '745 patent recites "a stable oral liquid formulation, comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3°C for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

220. As set forth in Exhibit 1, ¶¶ 54-89, Amneal's ANDA product literally meets each of these limitations with the exception of "a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate."

---

[8] Asserted Claims 4, 7, and 10 of the '745 patent depend from independent claim 1.

**EXHIBIT 2**

221. As set forth above in Section IV.D, *supra*, Amneal's ANDA product infringes this remaining limitation under the doctrine of equivalents. Specifically, for the reasons set forth above, the [REDACTED] Amneal's ANDA product performs substantially the same function in substantially the same way to reach substantially the same result as the claimed about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate, and any difference between the two is insubstantial. Moreover, [REDACTED] within about 0.8 to about 3.5 mg/ml.

### *2. Amneal's ANDA Product Infringes Claims 4, 7, and 10 of the '745 Patent*

222. Claim 4 depends from claim 1 and recites "the stable oral liquid formulation of claim 1, wherein the formulation does not contain mannitol." [REDACTED] Also, Amneal stipulated that the Amneal ANDA product meets the limitation "the stable oral liquid formulation." Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 4.

223. Claim 7 depends from claim 1 and recites "the stable oral liquid formulation of claim 1, wherein the pH of the stable oral liquid formulation is between about 3 and about 3.5." [REDACTED]. Also, Amneal stipulated that the Amneal ANDA product meets the limitation "the stable oral liquid formulation." Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 7.

224. Claim 10 depends from claim 1 and recites "the stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5±3°C for at least 24 months." [REDACTED]

**EXHIBIT 2**

[REDACTED]. Also, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 10.

**I. If Amneal Markets the Amneal ANDA Product with the Proposed Label, Amneal Will Indirectly Infringe Claims 1, 18, and 25 of the '987 Patent[9]**

225. Claim 1 of the '987 patent recites a "method of treating hypertension in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

226. Claim 18 of the '987 patent recites a "method of treating heart failure in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has

---

[9] Asserted Claim 7 of the '987 patent depends from independent claim 1. Asserted Claims 20 and 23 of the '987 patent depend from independent claim 18. Asserted Claim 30 of the '987 patent depends from independent claim 25.

**EXHIBIT 2**

about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

227. Claim 25 of the '987 patent recites a "method of treating left ventricular dysfunction in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

228. As set forth in Exhibit 1, ¶¶ 54-89, Amneal's ANDA product, if used for treatment as indicated in Amneal's proposed label, literally meets each of these limitations with the exception of "a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate."

229. As set forth above in Section IV.H.1, *supra*, Amneal's ANDA product infringes this remaining limitation under the doctrine of equivalents.

230. Moreover, for the same reasons set forth above in Section IV.F, *supra*, if Amneal markets its ANDA product with its proposed label—[REDACTED]

[REDACTED]—

Amneal will induce infringement of claims 1, 18, and 25 of the '987 patent. Likewise, Amneal will contributorily infringe claims 1, 18, and 25 of the '987 patent.

**J. Use of Amneal's ANDA Product in Accordance with Amneal's Proposed Label Will Infringe Claims 7, 20, 23 and 30 of the '987 Patent**

231. Claim 7 depends from claim 1 and recites "the method of claim 1, wherein the formulation is stable at about 5±3° C. for at least 24 months." [redacted] Also, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 1, Amneal will also infringe claim 7.

232. Claim 20 depends from claim 18 and recites "the method of claim 18, wherein the formulation does not contain mannitol or silicon dioxide." [redacted]. Thus, if Amneal is found to infringe claim 18, Amneal will also infringe claim 20.

233. Claim 23 depends from claim 18 and recites "the method of claim 18, wherein the formulation is stable at about 5±3° C. for at least 24 months." [redacted]Also, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 18, Amneal will also infringe claim 23.

234. Claim 30 depends from claim 25 and recites "the method of claim 25, wherein the formulation is stable at about 5±3° C. for at least 24 months." [redacted]lso, Amneal stipulated that the Amneal ANDA product meets this limitation. Thus, if Amneal is found to infringe claim 25, Amneal will also infringe claim 30.

**EXHIBIT 2**

## V. Amneal Has Failed to Prove by Clear and Convincing Evidence That the Asserted Claims Would Have Been Obvious to a Person of Skill in the Art

235. Amneal cannot prove by clear and convincing evidence that any of the asserted claims would have been obvious to a person of ordinary skill in the art at the time of their invention.

236. Amneal alleges that asserted claims 3 and 8-10 of the '008 patent, claims 9-10, 21, and 29 of the '442 patent, claims 4, 7, and 10 of the '745 patent, and claims 7, 20, 23, and 30 of the '987 patent are invalid for obviousness under 35 U.S.C. § 103.

237. In alleging that the claimed formulation would have been obvious, Amneal relies on the Epaned® Kit product (as reflected in its proposed labeling, NDA summary review, and NDA chemistry review) and U.S. Patent No. 8,568,747 (the "'747 patent") (which describes the Epaned® Kit product) either alone or in combination with one or all of Allen, Ip & Brenner, Boukarim, the Handbook of Pharmaceutical Excipients ("the Handbook"), the 2003 FDA Guidance on Stability Testing ("FDA Stability Guidance"), the WHO Report, Helin-Tanninen, and/or Remington.

238. None of the prior art cited by Amneal discusses solution formulations of enalapril with long-term stability sufficient for them to be manufactured and distributed as ready-to-use products.

239. With the exception of Epaned® Kit, which is a powder for reconstitution, all of the prior art that Amneal cites discusses compounding of tablets resulting in solutions with only short-term stability.

240. Amneal's obviousness argument is entirely hindsight based.

241. Amneal's obviousness argument is based on the same art that was overcome during prosecution.

**EXHIBIT 2**

**A. Prior Art References**

***1. Epaned® Kit***

242. The Epaned® Kit is an enalapril powder for reconstitution in Ora-Sweet.

243. The Epaned® Kit label describes a powder containing enalapril maleate, mannitol, and colloidal silicon dioxide. The Epaned® Kit required reconstitution with the diluent Ora-Sweet SF, which contained a number of additional excipients.

244. Epaned® Kit is disclosed in the specification of the Asserted Patents. *E.g.*, ’008 patent at 39:18-40:23 (Example H).

245. The product information of Ora-Sweet® SF was considered by the Patent Office during prosecution of the application that resulted in the ’008, ’442, ’745, and ’987 patents. SLVGT-EPA_0000827. In fact, the product information of Ora-Sweet® SF is one of the prior art references that the examiner referred to in the September 2, 2016 and January 17, 2017 obviousness rejections during prosecution of the application that resulted in the ’008 patent.

***2. The ’747 Patent***

246. The ’747 patent describes a powder that can be reconstituted into an enalapril maleate oral liquid formulation that is stable for 12 weeks. The ’747 patent describes the Epaned® Kit product. The ’747 patent describes an enalapril powder for reconstitution formulation that contains enalapril, mannitol, colloidal silicon dioxide, sucrose, glycerin, sorbitol, flavoring, citric acid, sodium phosphate, methylparaben, potassium sorbate, and water.

247. The ’747 patent was considered by the Patent Office during prosecution of the application that resulted in the ’008, ’442, ’745, and ’987 patents. SLVGT-EPA_0000819. In fact, the ’747 patent is one of the prior art references that the examiner referred to in the September 2, 2016 and January 17, 2017 obviousness rejections during prosecution of the application that resulted in the ’008 patent.

**EXHIBIT 2**

***3. Allen***

248. Loyd V. Allen et al., *Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids*, Am. J. Health-Sys. Pharm., 5:1915-20 (Sept. 15, 1998) ("Allen"), discusses compounded liquid formulations with one of five APIs, including some compounded formulations of enalapril, none of which exhibited stability for longer than 60 days and none of which were made at a pH of 3.

249. Allen was considered by the Patent Office during prosecution of the application that resulted in the '008, '442, '745, and '987 patents. SLVGT-EPA_0000819.

***4. Ip & Brenner***

250. Dominic P. Ip & Gerald S. Brenner, *Enalapril Maleate*, Analytical Profiles of Drug Substances, 16:207-43 (July 1987) ("Ip & Brenner") discusses properties of enalapril maleate.

251. Ip & Brenner provides no disclosure regarding development of an enalapril liquid with long-term stability.

***5. Boukarim, Handbook, FDA Stability Guidance, the WHO Report, Helin-Tanninen, Remington***

252. None of Boukarim, the Handbook, the FDA Stability Guidance, the WHO Report, Helin-Tanninen, and/or Remington discuss formulations of enalapril.

253. Chawki Boukarim et al., *Preservatives in Liquid Pharmaceutical Preparations*, J. Applied Research, 9(1)(2):14-17 (2009) ("Boukarim") discusses side effects associated with certain preservatives.

254. Boukarim was considered by the Patent Office during prosecution of the application that resulted in the '442, '745, and '987 patents. SLVGT-EPA_0000294.

**EXHIBIT 2**

255. The Handbook is a reference containing monographs for various excipients.

256. The FDA Stability Guidance is general guidance from the FDA designed to assist applicants for new drug products to prepare their stability data packages.

257. The WHO Report is a report by the World Health Organization on pharmaceutical preparation, a portion of which discusses pediatric formulations. The WHO Report does not mention enalapril maleate. Rather, it lists general practices and procedures that formulators should follow when designing pediatric medications in general.

258. Minna Helin-Tanninen et al., *Comparison of six different suspension vehicles in compounding of oral extemporaneous nifedipine suspension for paediatric patients*, Eur. J. Hosp. Pharm., 19:432-37 (2012) ("Helin-Tanninen") describes extemporaneous preparations of 1 mg/mL nifedipine suspension in one of six different suspension vehicles. Nifedipine is a drug used to treat hypertension but is not an ACE-inhibitor like enalapril.

259. Remington, The Science and Practice of Pharmacy, (David B. Troy et al. eds., 21st ed. 2005) ("Remington") provides a general overview of the principles of pharmaceutical formulation.

***6. Background References***

260. Although not part of Amneal's obviousness combinations, Amneal cites Nahata and Sosnowska as background references.

261. Milap C. Nahata et al., *Stability of enalapril maleate in three extemporaneously prepared oral liquids*, Am. J. Health-Sys. Pharm., 55:1155-57 (June 1, 1998) ("Nahata") describes the stability of three compounded oral liquid formulations. Nahata does not discuss the stability of the compounded formulations for longer than 91 days and none were made at a pH of 3.

**EXHIBIT 2**

262. Nahata was considered by the Patent Office during prosecution of the application that resulted in the ’008, ’442, ’745, and ’987 patents. SLVGT-EPA_0000826. In fact, Nahata is one of the prior art references that the examiner referred to in the September 2, 2016 and January 17, 2017 obviousness rejections during prosecution of the application that resulted in the ’008 , ’442, ’745, and ’987 patents.

263. Katarzyna Sosnowska et al., *Stability of Extemporaneous Enalapril Maleate Suspensions for Pediatric Use Prepared From Commercially Available Tablets*, Acta Poloniae Pharmaceutica-Drug Research, 66(3):321-26 (“Sosnowska”) discusses compounded enalapril suspensions in sugar-containing and sugar-free vehicles. Sosnowska does not discuss the stability of the compounded suspensions for more than 30 days.

264. Sosnowska was considered by the Patent Office during prosecution of the application that resulted in the ’008, ’442, ’745, and ’987 patents. SLVGT-EPA_0000829.

**B. The Asserted Claims of the ’008, ’442, ’745, and ’987 Patents Are Not Obvious**

***1. None of the Prior Art Provides a POSA Motivation to Modify Epaned® Kit / the ’747 Patent to Create a Stable Ready-to-Use Enalapril Maleate Formulation***

265. A person of ordinary skill in the art would not have had a motivation to create the claimed stable, oral liquid formulation by using the prior art related to extemporaneously prepared formulations.

266. The Epaned® Kit and the ’747 patent do not provide a POSA with motivation to develop an oral liquid enalapril formulation with stability up to and beyond 12 months. A POSA would appreciate the superiority of a drug product capable of administration without the need for manipulation by others compared to a drug product which requires manipulation prior to administration. Knowing that, a POSA would view the Epaned® Kit and the ’747 patent as

**EXHIBIT 2**

evidence that a ready-to-use formulation was not viable. A POSA would understand that the Epaned® Kit would not have launched if a stable, ready-to-use formulation was feasible and that the Epaned® Kit represented a compromise between compounded formulations and the ideal, but not feasible, ready-to-use formulation.

267. Indeed, a POSA would understand that the Epaned® Kit and the ’747 patent, instead of providing guidance or motivation for the creation of a stable, ready-to-use liquid formulation, actually teach away from the creation of a stable, ready-to-use liquid formulation.

268. Likewise, a POSA would not have found motivation in the WHO Report to modify the Epaned® Kit and/or the ’747 patent to create a ready-to-use formulation. The WHO Report only indicates that ready-to-use formulations are desirable—it does not teach how to achieve them. A POSA would understand that the reason for the lack of a ready-to-use enalapril formulation and for the compromise embodied in the Epaned® Kit and ’747 patent is the fact that enalapril is inherently unstable in aqueous solutions. The Epaned® Kit offered a way to minimize the amount of time enalapril maleate spent in solution.

269. Furthermore, a POSA would not have been able to engage in routine optimization to create the claimed ready-to-use liquid formulation.

270. First, a POSA must have some sort of motivation to engage in routine optimization. As discussed above, the prior art provides no such motivation for a POSA to create a ready-to-use liquid enalapril maleate formulation.

271. Second, the prior art provides no guidance as to how a POSA could go about optimizing the prior art. Indeed, during prosecution involving the same prior art that Amneal cites, Silvergate successfully argued to the Examiner that the prior art provided no guidance to

**EXHIBIT 2**

combine the multitudinous excipients taught in the prior art into the stable oral liquid formulation of the claims.

272. Finally, the amount of experimentation a POSA would have to undertake to create the claimed ready-to-use liquid formulation from the extemporaneously prepared prior art solutions would be undue.

### *2. A POSA Would Not Have Used the Prior Art to Create an Aqueous Solution Buffered with Citric Acid and Sodium Citrate Dihydrate*

273. A POSA would not have pursued an aqueous liquid formulation and would not have included a buffer comprised of citric acid and sodium citrate. As discussed above, a POSA would know that enalapril is unstable in an aqueous solution.

274. Additionally, although Ora-Sweet contains numerous excipients, none of the prior art using Ora-Sweet demonstrates stability at 5±3°C for at least 12 months. A POSA would not have had a reason, based on Ora-Sweet, to use a citric acid-sodium citrate buffer instead of any of the other buffers cited in the prior art or otherwise known to a POSA.

275. Moreover, a POSA would not consider the Sosnowska reference when determining which buffer to use. Although Sosnowska does discuss compounded suspensions of enalapril containing a citric acid buffer, the suspensions in Sosnowska only demonstrated stability for 30 days. Sosnowska does not provide any expectation of success that a citric acid buffer could maintain the pH of a solution for up to at least 12 months. Additionally, Sosnowska does not provide any motivation for a POSA to combine the compounded suspensions with any other piece of prior art, or a motivation to modify the existing Epaned® Kit, to create a ready-to-use formulation with stability of at least 12 months.

276. Even if a POSA would have considered citric acid-sodium citrate buffers, the prior art provides no guidance as to the amount of buffer the claimed formulation requires.

**EXHIBIT 2**

### *3. A POSA Would Not Have Found the Sodium Benzoate Preservative Obvious*

277. A POSA would have understood that the selection of a preservative is neither trivial nor easy. A POSA would at least consider the effective pH range of the preservative, the level of antimicrobial effectiveness, any potential interactions and incompatibilities with other excipients and the API, and any potential side effects on the targeted patient population. A POSA would further understand that selecting the correct preservative requires testing.

278. The prior art teaches a multitude of preservatives which could potentially be used in an enalapril formulation. Remington describes preservatives as a general class then lists sodium benzoate as one of thirty commonly used preservatives. Similarly, the Handbook lists sodium benzoate as one of sixty indexed preservatives. Boukarim notes that sodium benzoate as well as potassium sorbate and methyl hydroxybenzoate are commonly used preservatives. However, Boukarim provides no guidance as to whether any of those three preservatives could provide optimal antimicrobial efficiency in an enalapril maleate aqueous solution. Indeed, a POSA would understand that Boukarim is merely a limited study on a few of the many commonly use preservatives.

279. None of the prior art gives guidance on whether to choose sodium benzoate, instead of the numerous other preservatives which a formulator may consider alone or in combination with each other, for use in an enalapril maleate ready-to-use formulation. Moreover, none of the prior art teaches that a POSA should or could modify the prior art extemporaneously prepared solutions using sodium benzoate to arrive at the claimed ready-to-use oral liquid formulation.

280. Remington lists multiple preservatives but provides a POSA with no guidance as to which would work best with enalapril maleate.

**EXHIBIT 2**

281. Additionally, the Handbook lists several other preservatives. For example, these other preservatives include benzoic acid with an optimal pH below 4.5; benzyl alcohol with an optimal pH of below 5; and boric acid which exhibits antimicrobial properties and forms an aqueous solution with a pH of about 3.5-4.1. The Handbook does not provide a POSA guidance as to which of the many preservatives works best with enalapril maleate. Indeed, as a book on excipients, a POSA would not expect the Handbook to contain data regarding enalapril, an API.

282. Furthermore, a POSA would understand that the Epaned® Kit product contained a propylparaben preservative. A POSA starting with the Epaned® Kit would have no reason to look replace the paraben preservative with a sodium benzoate preservative. Additionally, the ’747 patent teaches numerous other preservatives, such as benzoic acid, without any guidance as to how or why a POSA should choose any particular preservative.

283. Indeed, a POSA reviewing the prior art would not find any guidance as to which of the commonly used preservatives, either taught in the prior art or otherwise known to the POSA, would demonstrate compatibility with the claimed ready-to-use enalapril maleate formulation.

284. Moreover, even if a POSA managed to stumble across sodium benzoate, the prior art provides no guidance as to how to arrive at the claimed amount of sodium benzoate used in the claimed formulation. A POSA would have to undertake undue experimentation to determine the optimal amount.

285. A POSA reviewing the Handbook could understand that, in oral medications, formulators generally include 0.2 to 5 mg/mL of sodium benzoate. However, in light of the factors mentioned earlier that a formulator considers when choosing a preservative, a POSA

**EXHIBIT 2**

would not find this concentration range particularly illuminating. A POSA still would have to undertake experimentation to determine which concentration within that range is appropriate.

***4. The Prior Art Does Not Teach the Claimed pH***

286. A POSA would not find guidance or motivation regarding the claimed pH in the prior art.

287. Ip & Brenner and Allen state that enalapril has maximum stability at a pH of around 3. However, a POSA would want to understand the basis for the stability statements in Ip & Brenner and Allen. Ip & Brenner cites only to an unpublished personal communication. A POSA would not find this unpublished and unsubstantiated personal communication reliable. Allen cites the Merck Index, which is silent as to stability and does not state that enalapril is most stable at a pH of 3. A POSA reviewing the prior art would not find a reliable statement as to the pH where enalapril exhibits maximum stability.

288. Regardless, even if a POSA credited the personal communication relied on in Ip & Brenner, the claimed formulation requires a pH of about 3.5. The prior art does not provide a POSA with guidance or motivation regarding raising the pH to the claimed level. Indeed, the prior art does not provide a POSA with any indication that an enalapril formulation with a pH of 3.5 would exhibit the claimed level of stability.

289. Despite stating that the ideal pH is 3, the authors of Allen did not make their enalapril formulations at a pH of 3. Indeed, most of the prior art cited by Amneal—which post-dates Ip & Brenner (published in 1987) by several years—to the extent it discusses enalapril, does not disclose formulations of enalapril at pH 3, where enalapril is purportedly most stable. Instead, Epaned® Kit had a pH of above 4 when reconstituted; Allen disclosed formulations at a

**EXHIBIT 2**

pH of 3.9-4.8; Boulton[10] disclosed a formulation at a pH of 5; and Nahata disclosed formulations at a pH of 4.7, 5.1, 7.1. Only Sosnowska (which is not part of any obviousness combination advanced by Amneal) disclosed a formulation at a pH of 3. But, as discussed above, Sosnowska does not discuss stability beyond 30 days.

290. Additionally, the '747 patent does not teach the claimed pH and provides no motivation to combine with any other art to reach the claimed pH.

***5. The Prior Art Does Not Teach the Claimed Stability***

291. The claimed formulations require that the oral liquid formulation retains 95% or more of the initial enalapril amount and less than about 5% w/w of total impurities after storage at 5±3°C for at least 12 months. None of the prior art extemporaneously prepared formulations achieve or suggest the claimed stability.

292. As discussed above, none of the prior art would provide a POSA with the reasonable expectation of success in creating a formulation with the claimed stability.

293. Moreover, a POSA would not understand the FDA Stability Guidelines as providing a motivation to combine. A POSA would understand that the FDA Stability Guidelines do not define stability as the formulation containing greater than 95% of the initial amount after a specific period of time. A POSA would interpret the FDA Stability Guidelines as relating to acceptable dose variations with regards to clinical data to determine what an acceptable degradation percentage is such that the drug would still perform as if it were at 100% potency. The amount of acceptable degradation varies depending on the API, the excipients, and the patient population. A POSA would not find that the FDA Stability Guidelines provide any

[10] David W. Boulton et al., *The Stability of an Enalapril Maleate Oral Solution Prepared from Tablets*, 24 Aust. J. Hosp. Pharm. 2:151-156 (1994) ("Boulton") was discussed in Allen.

**EXHIBIT 2**

motivation for a formulator to specifically achieve a stability where 95% of the initial drug product remains after 12 months.

294. Nonetheless, even assuming that the FDA Stability Guidelines do provide the required motivation, as demonstrated above, the prior art does not provide a POSA with motivation or guidance regarding how to combine the prior art to create the claimed formulation.

295. Relatedly, even assuming that stability is an inherent property of the claimed invention, the prior art still does not provide a guidance or a motivation to combine the references into the claimed oral liquid formulation.

296. Finally, a POSA may not use the benefit of hindsight to say that a patented invention is obvious. A POSA can only rely on the knowledge available at the priority date of the Asserted Patents, which in this case was March 18, 2016. In March of 2016, there were no stable oral liquid formulations of enalapril maleate. Indeed, the only prior art available were those describing extemporaneously prepared formulations, none of which achieved the claimed stability. Furthermore, as explained above, none of those prior art references provided guidance, motivation, or a reasonable expectation of success with regards to creating the claimed formulation.

***6. A POSA Would Not Have Been Motivated to Exclude Mannitol and Silicon Dioxide***

297. A POSA would not have had any motivation to exclude mannitol and silicon dioxide, both of which were ingredients present in Epaned® Kit. In particular, a POSA would not have had any motivation to replace mannitol—a sweetening agent—with the alternative sweetener sucralose (as claimed in the Asserted Patents).

298. Thus, Amneal cannot demonstrate by clear and convincing evidence that the Asserted Claims of the Asserted Patents are invalid as obvious.

EXHIBIT 2

### 7. *The Commercial Success of Epaned® Establishes That the Asserted Patents Are Not Invalid for Obviousness*

#### a. *Epaned® Is a Commercial Embodiment of the Asserted Claims*

299. Epaned®—or use thereof by physicians or health care providers in accordance with the label—is a commercial embodiment of claims 3 and 8-10 of the '008 patent, claims 9, 10, 21, and 29 of the '442 patent, claims 4, 7, and 10 of the '745 patent, and claims 7, 20, 23, and 30 of the '987 patent.

##### i. Claim 1 of the '008 Patent[11]

300. Claim 1 of the '008 patent recites "a stable oral liquid formulation, comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the formulation is less than about 3.5; and [(vi)] wherein the formulation is stable at about 5±3°C. for at least 12 months; [(vii)] wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

301. Epaned® is a stable oral liquid formulation. *E.g.*, SLVGT-EPA_0003224; SLVGT-EPA_0003226; SLVGT-EPA_0003228.

302. Epaned® contains 1 mg/mL enalapril maleate. SLVGT-EPA_0003204.

303. Epaned® contains a buffer comprising 1.82 mg/mL citric acid and 0.15 mg/mL sodium citrate dihydrate. SLVGT-EPA_0003204.

304. Epaned® contains 1 mg/mL of a sodium benzoate preservative. SLVGT-EPA_0003204.

305. Epaned® contains water. SLVGT-EPA_0003204.

[11] Asserted Claims 3 and 8-10 of the '008 patent depend from independent claim 1.

**EXHIBIT 2**

306. Epaned® has a pH specification of 3.1-3.5 (3.2 to 3.4 for release), and thus has a pH of less than about 3.5. SLVGT-EPA_0003199.

307. Epaned® is stable at about 5±3°C for at least 12 months, with about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period. For example, stability testing of Epaned® conducted after 36 months resulted in presence of enalapril at 96.0% to 96.4% and the presence of related substances at 3.07% to 3.94%. SLVGT-EPA_00102147.

308. In light of the above, Epaned® is a commercial embodiment of claim 1 of the ’008 patent.

**ii. Claims 3 and 8-10 of the ’008 Patent**

309. Claim 3 further requires “wherein the pH is between about 3 and about 3.5.” Epaned® has a pH specification of 3.1-3.5 (3.2 to 3.4 for release), and thus has a pH between about 3 and 3.5. SLVGT-EPA_0003199. Thus, Epaned® is also a commercial embodiment of claim 3 of the ’008 patent.

310. Claim 8 further requires “wherein the formulation is stable at 5±3° C. for at least 24 months.” As discussed above with respect to claim 1 of the ’008 patent, Epaned® was stable after 36 months. Thus, Epaned® is also a commercial embodiment of claim 8 of the ’008 patent.

311. Claim 9 further requires “the formulation of claim 1, wherein the formulation does not contain mannitol.” Epaned® does not contain mannitol. SLVGT-EPA_0003204. Thus, Epaned® is also a commercial embodiment of claim 9 of the ’008 patent.

312. Claim 10 further requires “wherein the formulation does not contain silicon dioxide.” Epaned® does not contain silicon dioxide. SLVGT-EPA_0003204. Thus, Epaned® is also a commercial embodiment of claim 10 of the ’008 patent.

**EXHIBIT 2**

**iii. Claims 1, 16, and 24 of the '442 Patent[12]**

313. Claim 1 of the '442 patent recites "a method of treating hypertension in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; and (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the stable oral liquid formulation is less than about 3.5; [(vi)] wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 12 months; and [(vii)] wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

314. Claim 16 of the '442 patent recites "a method of treating heart failure in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; and (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the stable oral liquid formulation is less than about 3.5; [(vi)] wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 12 months; and [(vii)] wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

315. Claim 24 of the '442 patent recites "a method of treating left ventricular dysfunction in a subject comprising administering to that subject a therapeutically effective

[12] Asserted Claims 9 and 10 of the '442 patent depend from independent claim 1. Asserted Claim 21 of the '442 patent depends from independent claim 16. Asserted Claim 29 of the '442 patent depends from independent claim 24.

**EXHIBIT 2**

amount of a stable oral liquid formulation comprising: (i) about 1 mg/ml enalapril maleate; (ii) a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/mL sodium citrate dihydrate; and (iii) about 1 mg/ml of a preservative that is sodium benzoate; and (iv) water; [(v)] wherein the pH of the stable oral liquid formulation is less than about 3.5; [(vi)] wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 12 months; and [(vii)] wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

316. Claims 1, 16, and 24 of the '442 patent contain the same limitations as claim 1 of the '008 patent, except for new limitations directed to a method of treating hypertension (claim 1), heart failure (claim 16), and left ventricular dysfunction (claim 24) "in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation."

317. As to those limitations that are also present in claim 1 of the '008 patent, Epaned® is a commercial embodiment of those limitations for the same reasons discussed with respect to claim 1 of the '008 patent.

318. Epaned®—or use thereof by physicians or health care providers in accordance with the label—is also a commercial embodiment of the additional limitations, as set forth below.

319. The Epaned® label instructs physicians to prescribe Epaned® for the treatment of hypertension in adults and children. SLVGT-EPA_0101966. It also instructs physicians to prescribe an initial dose of 5 mg once a day and titrate upwards as needed to a maximum of 40 mg per day for adults and 0.08 mg/kg (up to 5 mg) once daily for children. SLVGT-EPA_0101968. This is the amount approved by the FDA. As such, Epaned® (or use thereof)

**EXHIBIT 2**

meets the additional "method of treating hypertension" and "therapeutically effective amount" limitations of claim 1.

320. The Epaned® label instructs physicians to prescribe Epaned® for the treatment of heart failure in patients. SLVGT-EPA_0101966. It also instructs physicians to prescribe an initial dose of 2.5 mg twice a day and titrate upwards as tolerated to a maximum of 20 mg twice a day. SLVGT-EPA_0101968. This is the amount approved by the FDA. As such, Epaned® (or use thereof) meets the additional "method of treating heart failure" and "therapeutically effective amount" limitations of claim 16.

321. The Epaned® label instructs physicians to prescribe Epaned® for the treatment of asymptomatic left ventricular dysfunction in patients. SLVGT-EPA_0101966. It also instructs physicians to prescribe an initial dose of 2.5 mg twice per day and titrate upwards to a maximum of 10 mg twice per day as tolerated. SLVGT-EPA_0101969. This is the amount approved by the FDA. As such, Epaned® (or use thereof) meets the additional "method of treating left ventricular dysfunction" and "therapeutically effective amount" limitations of claim 24.

322. In light of the above, Epaned®—or use thereof by physicians or health care providers in accordance with the label—is a commercial embodiment of claims 1, 16, and 24 of the '442 patent.

**iv. Claims 9, 10, 21, and 29 of the '442 Patent**

323. Claims 9, 21, and 29 further require "wherein the stable oral liquid formulation is stable at about 5±3° C. for at least 24 months." This is the same limitation as claim 8 of the '008 patent. Accordingly, for the same reasons, Epaned® (or use thereof) is also a commercial embodiment of claims 9, 21, and 29 of the '442 patent.

324. Claim 10 further requires "wherein the stable oral liquid formulation does not contain mannitol or silicon dioxide." This is the same limitation as claims 9 and 10 of the '008

**EXHIBIT 2**

patent. Accordingly, for the same reasons, Epaned® (or use thereof) is also a commercial embodiment of claim 10 of the '442 patent.

**v. Claim 1 of the '745 Patent[13]**

325. Claim 1 of the '745 patent recites "a stable oral liquid formulation, comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3°C for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

326. Epaned® is a stable oral liquid formulation. *E.g.*, SLVGT-EPA_0003224; SLVGT-EPA_0003226; SLVGT-EPA_0003228.

327. Epaned® contains 1 mg/mL enalapril maleate, which is about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof. SLVGT-EPA_0003204.

328. Epaned® contains a buffer comprising 1.82 mg/mL citric acid and 0.15 mg/mL sodium citrate dihydrate, which is about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate. SLVGT-EPA_0003204.

329. Epaned® contains 1 mg/mL of a sodium benzoate preservative, which is about 0.7 to about 1.2 mg/ml sodium benzoate. SLVGT-EPA_0003204.

330. Epaned® contains water. SLVGT-EPA_0003204.

[13] Asserted Claims 4, 7, and 10 of the '745 patent depend from independent claim 1.

331. As discussed above with respect to claim 1 of the '008 patent, Epaned® is stable at about 5±3°C for at least 12 months, with about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period.

332. In light of the above, Epaned® is a commercial embodiment of claim 1 of the '745 patent.

**vi. Claims 4, 7, and 10 of the '745 Patent**

333. Claim 4 further requires "wherein the formulation does not contain mannitol." This is the same limitation as claim 9 of the '008 patent. Accordingly, for the same reasons, Epaned® is also a commercial embodiment of claim 4 of the '745 patent.

334. Claim 7 further requires "wherein the pH of the stable oral liquid formulation is between about 3 and about 3.5." This is the same limitation as claim 3 of the '008 patent. Accordingly, for the same reasons, Epaned® is also a commercial embodiment of claim 7 of the '745 patent.

335. Claim 10 further requires "wherein the formulation is stable at about 5±3°C for at least 24 months." This is the same limitation as claim 8 of the '008 patent. Accordingly, for the same reasons, Epaned® is also a commercial embodiment of claim 10 of the '745 patent.

**vii. Claims 1, 18, and 25 of the '987 Patent[14]**

336. Claim 1 of the '987 patent recites a "method of treating hypertension in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about

[14] Asserted Claim 7 of the '987 patent depends from independent claim 1. Asserted Claims 20 and 23 of the '987 patent depend from independent claim 18. Asserted Claim 30 of the '987 patent depends from independent claim 25.

**EXHIBIT 2**

0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

337. Claim 18 of the '987 patent recites a "method of treating heart failure in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

338. Claim 25 of the '987 patent recites a "method of treating left ventricular dysfunction in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; [(v)] wherein the formulation is stable at about 5±3° C. for at least 12 months; and [(vi)] wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period."

**EXHIBIT 2**

339. Claims 1, 18, and 25 of the '987 patent contain the same limitations as claim 1 of the '745 patent, except for the limitations directed to a method of treating hypertension (claim 1), heart failure (claim 18), and left ventricular dysfunction (claim 25) "in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation."

340. As to those limitations that are also present in claim 1 of the '745 patent, Epaned® is a commercial embodiment of those limitations for the same reasons discussed with respect to claim 1 of the '745 patent.

341. Epaned®—or use thereof by physicians or health care providers in accordance with the label—is also a commercial embodiment of the additional limitations, as set forth below.

342. The Epaned® label instructs physicians to prescribe Epaned® for the treatment of hypertension in adults and children. SLVGT-EPA_0101966. It also instructs physicians to prescribe an initial dose of 5 mg once a day and titrate upwards as needed to a maximum of 40 mg per day for adults and 0.08 mg/kg (up to 5 mg) once daily for children. SLVGT-EPA_0101968. This is the amount approved by the FDA. As such, Epaned® (or use thereof) meets the additional "method of treating hypertension" and "therapeutically effective amount" limitations of claim 1.

343. The Epaned® label instructs physicians to prescribe Epaned® for the treatment of heart failure in patients. SLVGT-EPA_0101966. It also instructs physicians to prescribe an initial dose of 2.5 mg twice a day and titrate upwards as tolerated to a maximum of 20 mg twice a day. SLVGT-EPA_0101968. This is the amount approved by the FDA. As such, Epaned® (or

use thereof) meets the additional "method of treating heart failure" and "therapeutically effective amount" limitations of claim 18.

344. The Epaned® label instructs physicians to prescribe Epaned® for the treatment of asymptomatic left ventricular dysfunction in patients. SLVGT-EPA_0101966. It also instructs physicians to prescribe an initial dose of 2.5 mg twice per day and titrate upwards to a maximum of 10 mg twice per day as tolerated. SLVGT-EPA_0101969. This is the amount approved by the FDA. As such, Epaned® (or use thereof) meets the additional "method of treating left ventricular dysfunction" and "therapeutically effective amount" limitations of claim 25.

345. In light of the above, Epaned®—or use thereof by physicians or health care providers in accordance with the label—is a commercial embodiment of claims 1, 18, and 25 of the '987 patent.

**viii. Claims 7, 20, 23 and 30 of the '987 Patent**

346. Claims 7, 23, and 30 further require "wherein the formulation is stable at about 5±3° C. for at least 24 months." This is the same limitation as claims 9, 21, and 29 of the '442 patent. Accordingly, for the same reasons, Epaned® (or use thereof) is also a commercial embodiment of claims 7, 23, and 30 of the '987 patent.

347. Claim 20 further requires "wherein the formulation does not contain mannitol or silicon dioxide." This is the same limitation as claim 10 of the '442 patent. Accordingly, for the same reasons, Epaned® (or use thereof) is also a commercial embodiment of claim 20 of the '987 patent.

***b. Epaned® Has Been a Commercial Success***

348. Epaned® launched in January 2017, and has been a commercial success for Silvergate.

Case 1:18-cv-01962-MSG Document 131-1 Filed 03/01/22 Page 15 of 59 PageID #: 7405

**EXHIBIT 2**

349. Prior to Epaned®, Silvergate marketed and sold Epaned® Kit, which it launched in October of 2013. [REDACTED] Epaned® Kit was discontinued in early 2017.

350. [REDACTED]

351. [REDACTED]

352. [REDACTED]

353. [REDACTED]



**EXHIBIT 2**

354. Silvergate has generated substantial revenues and profits from the sale of both Epaned® Kit and Epaned®, and has experienced significant increase in all financial metrics following the introduction of Epaned®.

355.

356.

357. Demand for Epaned® has increased, as evidenced by the increase in sales despite the increase in price.

358.

359.

360.

**EXHIBIT 2**

[redacted]

*c.* ***There Is a Nexus Between the Patented Features of Epaned® and Its Commercial Success***

361. The commercial success of Epaned® is attributable to its patented features.

362. The Asserted Patents cover the key features of Epaned® relative to Epaned® Kit—namely the ready-to-use, liquid formulation.

363. Epaned® provides several benefits to patients and their doctors relative to the benefits of Epaned® Kit. These benefits include: (1) improved safety for the patient, due to reduction in the likelihood of mixing errors; (2) fewer excipients and additives; (3) reduced preparation time and elimination of the need for shaking; and (4) increased shelf stability. These benefits are due to the claimed inventions in the Asserted Patents. Specifically, the major advantages of Epaned® relative to Epaned® Kit are its ready-to-use formulation (which eliminates the need for manipulation) and its improved stability and compliance. It is these patented features that are responsible for the benefits to patients and their doctors discussed above.

364. [redacted]

365. These benefits to patients and their doctors are also reasons why practitioners chose to prescribe Epaned®. The fact that Epaned® is ready-to-use—and thus reduces or eliminates the preparation time, likelihood of mixing errors, and need for shaking—is one of the

**EXHIBIT 2**

primary reasons that physicians prescribe Epaned®. Moreover, the improved stability and fewer excipients of Epaned® relative to Epaned® Kit are other motivating factors in prescribing Epaned®.

366. Furthermore, Silvergate regularly touts these benefits to patients and their doctors in Silvergate's correspondence with patients, physicians, pharmacies, payers, and other pharmaceutical companies, among others, related to the commercialization of Epaned®.

367. These benefits to patients and their doctors do not exist for Epaned® Kit and are a function of the claimed inventions in the Asserted Patents. Accordingly, they establish a nexus between the commercial success of the Epaned® and the Asserted Patents.

***d. Other Potential Inventors Had Incentive to Develop a Ready-to-Use Enalapril Oral Solution Product***

368. As of March 2016, when Silvergate filed the application for the '008 patent, there were no intellectual property rights or other constraints that would have limited any other inventor's efforts to develop and market a ready-to-use enalapril oral solution.

369. If other potential inventors had evaluated the marketplace for a ready-to-use enalapril oral solution, they could have reached the same conclusion that Silvergate did—*i.e.*, that there was a market for such a product and it potentially could be very profitable.

370. In sum, Silvergate will demonstrate that Epaned®—a commercial embodiment of the Asserted Claims—was a commercial success, that this success was due to the patented features of Epaned®, and that other potential inventors would have had the same or similar incentive to develop a ready-to-use to formulation of enalapril at the time of Silvergate's invention, which demonstrates that the Asserted Claims are not invalid for obviousness.

**EXHIBIT 2**

### 8. *Other Secondary Considerations of Non-Obviousness Demonstrate That the Asserted Patents Are Not Invalid for Obviousness*

#### a. *Epaned® Satisfied a Long-Felt but Unresolved Need*

371. Epaned® satisfied the long-felt but unresolved need for a stable liquid formulation of enalapril for children that did not require compounding, reconstitution, or other manipulation prior to administration.

372. Although hypertension[15] was historically regarded as a rare occurrence in childhood and adolescence, in the mid-1970's there emerged for the first time a clear view as to blood pressure levels that were outside of the normal range in children. This led to increased awareness of hypertension in children.

373. In conjunction with this increased awareness, there developed a well-documented need for safe, effective pharmaceutical formulations for children. In fact, this need was the reason that Silvergate formed as a company in the first place.

374. The need for safe and effective pediatric pharmaceutical formulations can also be seen via the numerous legislative efforts to incentivize drug manufacturers to conduct pharmaceutical studies in children. For example, Congress passed the Food and Drug Administration Modernization Act (FDAMA) in 1997. The FDAMA included financial incentives for drug manufacturers to conduct studies in children. Subsequent legislation, including the Best Pharmaceuticals for Children Act (BPCA) in 2002 and Pediatric Research Equity Act (PREA) in 2003, extended the financial incentives provided for in the FDAMA. And

[15] Left ventricular dysfunction is commonly associated with hypertension. In fact, left ventricular dysfunction can be a particularly concerning symptom of hypertension because it is very likely to lead to heart failure. Moreover, although left ventricular dysfunction and/or heart failure often arise as a consequence of hypertension, they may also occur independently of hypertension. Epaned® can be used to treat patients with left ventricular dysfunction and/or heart failure in the absence of hypertension.

**EXHIBIT 2**

in 2012, Congress passed the Food and Drug Administration Safety and Innovation Act (FDASLA), which permanently reauthorized BPCA and PREA.

375. The need for safe and effective pharmaceutical formulations for children has been specifically recognized in the context of antihypertensives, including with respect to enalapril. Numerous publications have recognized and discussed this need.

376. In recent years, this need has increased due to the ongoing childhood obesity epidemic and corresponding increase in childhood hypertension. Recent estimates indicate that up to 5% of children and adolescents have hypertension. The prevalence of pediatric hypertension has increased substantially over the last few decades. Several publications have recognized and discussed the heightened need for safe, effective pharmaceutical formulations for treatment of hypertension in children, as a result of the childhood obesity epidemic.

377. Moreover, one major change in physician practice over the last 20 years is that physicians see and treat an increasing number of very young patients, often from the neonatal intensive care unit. This is likely due to improved neonatal care. These patients often present with complicated conditions, and if treatment with an ACE inhibitor is required, they are unable to swallow oral tablets as a result of their age and/or medical condition. Accordingly, they require treatment with oral liquid formulations of an ACE inhibitor.

378. Furthermore, for pediatric patients, the optimal oral drug formulation is a ready-to-use liquid formulation. This preference is evidenced by multiple publications. Specifically, a ready-to-use solution is optimal when (1) dose flexibility is required; (2) taste is acceptable; (3) the API is soluble in a convenient volume; and (4) the drug is stable in solution for a two-year shelf life. The preference for ready-to-use formulations is especially true for infants and small

**EXHIBIT 2**

children (*e.g.*, under the age of six), who may have difficulty safely swallowing solid oral dosage forms.

379.     Enalapril has been available in clinical practice since 1984.  Enalapril maleate tablets were initially approved by the FDA in December 1985, and marketed under the trade name Vasotec®.  Although not initially labeled for pediatric use, it was commonly used to treat pediatric hypertension.  In fact, the National High Blood Pressure Working Group on Hypertension Control in Children and Adolescents recommended enalapril for pediatric use.

380.     Enalapril received FDA approval for treatment of pediatric hypertension in 2002. It was the first ACE inhibitor approved by the FDA for pediatric hypertension.  The label for enalapril is unique in insofar it has a pediatric indication for all young children except neonates. It is the only ACE inhibitor that is approved for treatment in children younger than six.  It is also one of the only antihypertensive drugs that is FDA-approved for treatment in children younger than six.

381.     However, although enalapril had been commercially available since 1985 and labeled for pediatric use since 2002, enalapril was only available in tablet form for many years. Enalapril was not commercially available in oral liquid form until the release of Silvergate's Epaned® Kit in 2013.

382.     For patients unable to take solid tablets, particularly children, the primary way of administering enalapril was to compound or crush the tablet into a powder, dissolve the powder into solution, and then administer the resulting solution to the patient.  For example, the package insert for Vasotec® instructed pharmacists to place 10 20 mg tablets of Vasotec® in a bottle with 50 mL of Bicitra®, shake well for at least 2 minutes, let the concentrate stand for 60 minutes, and then add 150 mL of Ora-Sweet® SF.  This resulted in a 1 mg/mL enalapril maleate suspension.

**EXHIBIT 2**

383. Compounding pharmaceutical products has many drawbacks, however, as discussed in Section I, *supra*. The drawbacks of compounded were frequently discussed in the literature. In fact, compounding is of such a concern that Congress has intervened multiple times to address safety issues surrounding the practice. Congress added section 503A to the Food Drug and Cosmetic Act in 1997, which allows for human drug compounding but only if certain conditions are met. Congress additionally enacted the Drug Quality and Security Act ("DQSA") in 2013 which clarified and enhanced the public health protections related to compounded drug products.

384. Following passage of the DQSA, FDA has increased its oversight. In particular, FDA has provided industry guidance with respect to section 503A. Additionally, FDA has inspected hundreds of compounding facilities since the passage of the DQSA and taken remedial measures as necessary.

385. In short, given these concerns with compounding, and despite the fact that enalapril had been commercially available since 1985 and labeled for pediatric use since 2002, there existed a need for a safe, effective formulation of enalapril for children.

386. Silvergate developed Epaned® Kit—the precursor to Epaned®—in response to this need. As discussed above, although Epaned® Kit was an improvement over the pre-existing enalapril tablets and compounded solutions, it did not eliminate all issues surrounding liquid dosage forms of enalapril. For example, Epaned® Kit still required a pharmacist to engage in a multi-step reconstitution process in order to mix the enalapril powder and diluent, creating room for dosage errors and inconsistencies.

387. Moreover, after reconstitution, the solution resulting from Epaned® Kit was only stable for 60 days. This limited stability meant that the product needed to be supplied as a Kit

**EXHIBIT 2**

for reconstitution as it was not shelf-stable for long enough to enable manufacture and distribution as a ready-to-use solution.

388.    Thus, even after development and launch of the Epaned® Kit, there remained a need for a stable liquid formulation of enalapril for children that did not require reconstitution (or other manipulation) prior to administration.

389.    Silvergate developed Epaned® in response to this need.  Indeed, Epaned® addresses the needs left unresolved by Epaned® Kit.  Because Epaned® is a ready-to-use oral liquid formulation, there is no need for reconstitution, compounding, or other drug manipulation prior to administration.  This eliminates the accompanying risks of variability in dosage and incomplete solubilization, and means that Epaned® has a safety advantage relative to Epaned® Kit.

390.    Furthermore, Epaned® has long-term stability for 36 months at refrigerated conditions, followed by 2 months at room temperature.  In contrast, patients were instructed to discard Epaned® Kit within two months of reconstitution.  Thus, Epaned® has enhanced stability and storage properties as compared to Epaned Kit, which facilitates patient compliance and ease of use.

391.    Until the release of Epaned® in 2017, enalapril was unavailable as a ready-to-use oral liquid formulation.  Thus, it took over 30 years from the time of enalapril's initial entry into the market (1985) to develop a ready-to-use enalapril liquid formulation.  Additionally, it took 15 years from the time enalapril received FDA approval for pediatric use (2002) to develop a ready-to-use enalapril liquid formulation.

392.    In short, the major advantages of Epaned® are its ready-to-use formulation (which eliminates the need for manipulation) and its improved stability and compliance.  By virtue of

**EXHIBIT 2**

these advantages, Epaned® met the long-felt need for a stable liquid formulation of enalapril for children that did not require reconstitution (or other manipulation) prior to administration. As such, Silvergate will demonstrate that Epaned® met a long-felt but unresolved need, which demonstrates that the Asserted Claims are not invalid for obviousness.

***b. Epaned® Has Received Industry Acceptance and Praise***

393. Epaned® has received industry acceptance and praise.

394. For example, the Nationwide Children's Hospital, one of the largest pediatric hospitals in the nation, uses Epaned® as the standard, first line treatment for hypertension, left ventricular dysfunction, and heart failure in young children and children who are otherwise unable to tolerate treatment with ACE inhibitor pills.

395. At industry meetings, such as meetings of the American Society of Pediatric Nephrology, and the Renal Research Institute, Epaned® is routinely discussed as the first agent of choice for treatment of hypertension, left ventricular dysfunction, and heart failure in young children and children who are otherwise unable to tolerate treatment with ACE inhibitor pills.

396. Specifically, those in the industry praise the ready-to-use nature of Epaned®, including the elimination of the need for reconstitution or other manipulation, the improved stability of the formulation, and greater ability to adjust dosing to portions of a milligram (which is impossible with oral tablets).

397. Moreover, Silvergate has received multiple communications from practitioners or other in the industry praising Epaned®, particularly with respect to the features of Epaned® that are due to its nature as a ready-to-use oral liquid formulation.

398. Additionally, during Silvergate's attempts to gain Orphan Drug Exclusivity ("ODE") for both Epaned® Kit and Epaned®, FDA recognized the clinical superiority of ready-to-use enalapril formulations when compared to extemporaneously prepared solutions.

**EXHIBIT 2**

399. Thus, Silvergate will demonstrate that Epaned® has received industry acceptance and praise, which demonstrates that the Asserted Claims are not invalid for obviousness.

## VI. Amneal Has Failed to Prove by Clear and Convincing Evidence That the Asserted Claims Are Invalid for Lack of Written Description or Lack of Enablement

400. Amneal cannot prove by clear and convincing evidence that any of the asserted claims are invalid for lack of written description or lack of enablement.

401. Amneal alleges that asserted claims 3 and 8-10 of the '008 patent, claims 9, 10, 21, and 29 of the '442 patent, claims 4, 7, and 10 of the '745 patent, and claims 7, 20, 23, and 30 of the '987 patent are invalid for lack of sufficient written description and/or lack of enablement under 35 U.S.C. § 112. Specifically, Amneal alleges that because all asserted claims require the formulation to be stable at about 5±3°C for at least 12, 18, or 24 months, the claims contain no upper temporal limit on stability (*e.g.*, they cover formulations that would be stable indefinitely).

402. A POSA would not understand the claim language in the context of the Asserted Patents requiring stability for at least 12, 18, or 24 months to encompass formulations that would be stable indefinitely. A POSA would not expect something that is stable for at least 12, 18, or 24 months to be stable indefinitely.

403. Rather, a POSA would know that the process of degradation of the API (in this case the hydrolysis of the enalapril molecule) will occur constantly in aqueous solution. Thus, the formulation will not be stable indefinitely no matter what the aqueous solution formulation consists of. A POSA would recognize that the constant degradation of the API would place an inherent upper limit on the stability of the claimed formulation.

404. It is common in the art to set specifications, such as defining stability, and to set a minimum time period for which that stability specification must be maintained. A POSA would

**EXHIBIT 2**

understand that the time period is given to show the duration for which a certain stability specification can be achieved (with suitable storage conditions as appropriate).

405. Moreover, the specification of the Asserted Patents describes a formulation that is stable for at least 12, 18, or 24 months. *E.g.*, '008 patent at 18:54-60 ("At refrigerated condition, the enalapril oral liquid formulations described herein are stable for at least 1 month, at least 2 months, at least 3 months, at least 6 months, at least 9 months, at least 12 months, at least 15 months, at least 18 months, at least 24 months, at least 30 months and at least 36 months. In some embodiments, refrigerated condition is 5±3° C.").

406. In addition, the specification lists several examples of formulations exhibiting stability for up to 62 weeks. *E.g.*, '008 patent at 37:45:38-29, Table E-2. All of the formulations recited in Table E-2 contain enalapril maleate, citric acid, sodium citrate, sodium benzoate, and water. *E.g.*, '008 patent at 37:30-40, Table E-1. All of the formulations far exceed the required stability at 5°C for up to 52 weeks, and some exhibit stability for up to 62 weeks. *E.g.*, '008 patent at 37:45:38-29, Table E-2.

407. These disclosures in the specification of the Asserted Patents, as informed by the POSA's understanding that claims directed to formulations that are stable for "at least" a specified amount of time have an inherent upper limit (*e.g.*, they do not cover formulations that are stable indefinitely), reasonably convey to a POSA that the inventor had possession of the claimed subject matter as of the filing date of the Asserted Patents. In other words, a POSA would understand that specification describes formulations capable of exhibiting stability up to at least 12, 18, and 24 months.

408. Moreover, these disclosures in the specification of the Asserted Patents, as informed by the POSA's understanding that claims directed to formulations that are stable for "at

**EXHIBIT 2**

least" a specified amount of time have an inherent upper limit (*e.g.*, they do not cover formulations that are stable indefinitely), provide sufficient information such that a POSA could make and use the claimed invention without undue experimentation. In other words, the specification enables a POSA to make a formulation that meets the claimed stability requirements of at least 12, 18, and 24 months without undue experimentation.

409. Thus, Amneal cannot prove by clear and convincing evidence that the asserted claims are invalid for lack of written description and/or lack of enablement due to the fact that the claims require the formulation to be stable at about 5±3°C for at least 12, 18, or 24 months.

## VII. Prosecution History Estoppel Does Not Bar Application of the Doctrine of Equivalents

410. Bionpharma and Amneal have asserted that both argument-based and amendment-based prosecution history estoppel apply to bar the application of the doctrine of equivalents. However, Silvergate will demonstrate that prosecution history estoppel does not apply.

### A. Prosecution History of Application No. 15/081,603

411. All Asserted Patents claim priority to Application No. 15/081,603 (the "'603 Application") filed on March 25, 2016.

#### *1. September 2, 2016 Rejection of Claims*

412. In prosecution of the '603 Application, the first action from the Examiner was a September 2, 2016 rejection of the pending claims. SLVGT-EPA_00000816-818.

413. On September 2, 2016, the Examiner rejected all 20 pending claims as obvious in view of five references:

a. U.S. Patent No. 8,568,747 (the "'747 patent");

b. A 2000 article by Rippley et al., *Pharmacokinetic Assessment of an Oral Suspension for Use in Children* ("Rippley");

**EXHIBIT 2**

c. A 1998 article by Nahata et al., *Stability of enalapril maleate in three extemporaneously prepared oral liquids* ("Nahata");

d. Product information of Bicitra, "Sodium Citrate and Citric Acid Oral Solution USP" ("Bicitra"); and

e. Product information of Ora-Sweet ("Ora-Sweet").

414. The September 2, 2016 rejection did not discuss any ground for rejection other than obviousness.

415. The September 2, 2016 rejection states, in part, that the '747 patent discloses oral liquid formulations that include enalapril and sodium citrate.

416. The September 2, 2016 rejection states, in part, that Rippley discloses oral liquid formulations comprising 1 mg/mL enalapril and Bicitra or Ora-Sweet.

417. The September 2, 2016 rejection states, in part, that "Nahata discloses a composition comprising 1 mg/mL enalapril, citrate buffer, sweetened suspending agent."

418. The September 2, 2016 rejection states, in part, that "Bicitra comprises sodium citrate, citric acid, sodium benzoate, and sorbitol solution."

419. The September 2, 2016 rejection states, in part, that "[t]he Examiner suggests presenting evidence demonstrating criticality of the selection of ingredients of the amounts and specific ingredients, such as evidence demonstrating that the prior art composition does not have the same long term stability as the instantly claimed composition."

420. Rejected claim 20 included the limitation "a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/ml sodium citrate dihydrate."

***2. January 17, 2017 Rejection of Claims***

421. In prosecution of the '603 Application, the second action from the Examiner was a January 17, 2017 rejection of the pending claims. SLVGT-EPA_00000835-837.

**EXHIBIT 2**

422. On January 17, 2017, the Examiner rejected all 20 pending claims as indefinite. With respect to the indefiniteness rejection, the office action states "The term 'stable' is a reative [*sic*] term, and renders the claims indefinite. It is unclear if stability refers to, e.g., homogeneity, amount of enalapril, amount of precipitation, amount of impurities. Claims do not disclose a standard or threshold of measurement."

423. On January 17, 2017, the Examiner also rejected all 20 pending claims as obvious in view of the same five references that formed the basis of the September 2, 2016 obviousness rejection.

424. The January 17, 2017 rejection states, in part, that the prior art discloses enalapril formulations that include "buffers such as citric acid and sodium citrate."

425. The January 17, 2017 rejection states, in part, that "the inventive example requires sodium citrate dihydrate and is not representative of the broadest claimed composition."

426. Rejected claim 20 included the limitation "a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/ml sodium citrate dihydrate."

***3. February 3, 2017 Applicant Response to Office Action***

427. On February 3, 2017, Applicant filed a response to the January 17, 2017 Office Action. SLVGT-EPA_00000857-879.

428. In the February 3, 2017 response, Applicant amended the three independent claims (claims 1, 12, and 20) to add stability limitations as follows:

a. ~~An~~ <u>A stable</u> oral liquid formulation…

b. Adding the limitation: "wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period."

(collectively, "the Stability Amendments").

**EXHIBIT 2**

429. In the February 3, 2017 response, Applicant amended claim 1 to add the limitation "and about 0.15 mg/mL sodium citrate dihydrate" to the buffer limitation, and amended claim 12 to add the limitation "and about 2.9% (w/w of solids) sodium citrate dihydrate" to the buffer limitation (collectively, "the Buffer Amendments").

430. In the February 3, 2017 response, the buffer limitation of claim 20, which already recited "a buffer comprising about 1.82 mg/ml citric acid and about 0.15 mg/ml sodium citrate dihydrate," was not amended.

431. In the February 3, 2017 response, Applicant stated that the Stability Amendments were added to the claims for purposes of overcoming the indefiniteness rejection.

432. In the February 3, 2017 response, Applicant did not expressly identify the purpose of the Buffer Amendments.

433. With respect to the Examiner's rejections in view of the prior art, Applicants stated the following:

a. First, Applicant argued that "Nahata and the '747 patent do not disclose or suggest any liquid formulations of enalapril having this stability at *about 5±3°C for at least 12 months* nor any methods of achieving this stability. None of the other cited references, Bicitra, Ora-sweet, and Rippley, reveal any enalapril or other pharmaceutical liquid formulations having this stability of methods thereof. Because this stability element is not present in any of the cited references, the Office has not set forth a *prima facie* case of obviousness." SLVGT-EPA_0000868.

b. Second, Applicant argued that the prior art did not provide any reason or guidance regarding how to combine the disparate prior art references into a stable, ready-to-

**EXHIBIT 2**

use oral formulation. Applicant argued that "[t]he '747 patent therefore fails to provide one of ordinary skill in the art any reason to attempt to make the claimed enalapril oral liquid formulations as this reference only describes the preparation and use of enalapril powders for reconstitution." SLVGT-EPA_0000869-70. Likewise, Applicant argued that "Nahata therefore fails to provide one of ordinary skill in the art any reason to attempt to make the claimed enalapril oral liquid formulations as this reference only describes extemporaneously making oral liquid suspensions from enalapril tablets. Nahata does not teach or suggest modifying or improving these oral liquid suspensions by adding or changing excipients." SLVGT-EPA_0000870-71.

c. Third, Applicant argued that the prior art did not provide a reasonable expectation of success regarding combining the disparate prior art references into a stable, ready-to-use oral formulation. Applicant noted that "the Office is combining five disparate references to arrive at the claimed enalapril formulations of the present application." SLVGT-EPA_0000871. Applicant further argued that "[w]hile elements of the instant claims can be found scattered throughout these different references, there is no context or disclosure which brings forth these elements to the forefront and allows one to combine them successfully." SLVGT-EPA_0000872. Furthermore, Applicant argued that "there is no guidance whatsoever to keep or eliminate the components if one were to use Nahata or the '747 patent as a starting point to arrive at the claimed enalapril liquid formulation. When the '747 patent, Nahata, Bicitra, Ora-sweet, and Rippley are combined, one ordinarily skilled in the art is merely taught that any one of the many excipients

**EXHIBIT 2**

disclosed in these references may potentially be combined with the extemporaneous enalapril formulations of Nahata and/or the reconstituted formulations of the '747 patent. As such, the prior art does not provide any expectation that any particular combination would be successful for stable enalapril oral liquid formulations, much less any expectation that the combination of [*sic*] with enalapril, citric acid, sodium citrate, sodium benzoate, sucralose and water at the recited concentrations and at a pH of less than about 3.5 would be successful in forming a stable enalapril liquid formulation." SLVGT-EPA_0000873-74.

d. With regard to independent claim 20, which was drafted in "consisting essentially of" format, Applicant argued that the prior art did not teach the specific materials recited in the claims, and only those specific materials, such that a person of ordinary skill could combine the prior art into a formulation with the claimed pH. Applicant stated that "[w]hile these claimed ingredients and excipients may individually be disclosed in the '747 patent, Nahata, Bicitra, Ora-sweet, and Rippley, none of these references teach or suggest the claimed combination of only enalapril, citric acid, sodium citrate, sodium benzoate, sucralose and water at the recited concentrations and pH as stated in claim 20. Because these cited references alone or together do not teach or suggest this claimed formulation, the Office has not set forth a *prima facie* case of obviousness for this additional reason." SLVGT-EPA_0000868.

e. Furthermore, Applicant argued that neither the '747 patent nor the Nahata reference, both relating to extemporaneously prepared solutions, taught a

formulation stable at the conditions and for the amount of time claimed. Nahata demonstrated stability for only 91 days. The '747 patent demonstrated stability for about 180 days. The claimed invention demonstrated stability for up to 12, 18, and 24 months.

f. Moreover, Applicant argued that there was no motivation to combine the five references cited by the Examiner. The references provided no context which would allow a person of ordinary skill in the art to decide which excipients were needed to achieve the claimed stability. Furthermore, Applicant argued that "the extemporaneously prepared formulation from Nahata contains 19 components in addition to enalapril and water and the reconstituted formulation from the '747 patent contains 10 components in addition to enalapril and water. In contrast, the formulation of the present claims has only four ingredients along with enalapril or water. Moreover, these additional excipients in the other formulations are not needed or contemplated in the claimed enalapril liquid formulations as none of them are needed or necessary to produce an oral enalapril liquid formulation of the present claims that is stable and homogenous for at least 12 months at 5±3°C." SLVGT-EPA_0000873.[16]

g. In addition, Applicant argued that the prior art provided no reasonable expectation of success for similar reasons as discussed above. The prior art provided no reason for a person of ordinary skill to suspect that combining the various

[16] The formulation with "four ingredients" referred to in this quoted passage refers to an enalapril formulation with sucralose.

excipients in the prior art extemporaneously prepared formulations would result in a ready-to-use oral formulation with the claimed, long-term stability.

h. Finally, Applicant argued that "the subject matter in the claims have unexpected results with respect to stability of present enalapril liquid formulations." SLVGT-EPA_0000875. In particular, Applicant stated that "[a]s explained in the Mosher Declaration, the claimed stable enalapril liquid formulations are dramatically much more stable than the extemporaneous enalapril formulations of Nahata and the reconstituted enalapril formulations of the '747 patent." SLVGT-EPA_0000875. Further, "[t]he unexpected stability results of the E7 and E8 formulations[17] are not taught by Nahata or the '747 patent, and could not have been predicted or contemplated by the cited prior art." SLVGT-EPA_0000878.

434. In conjunction with the February 3, 2017 response, Applicant also filed a declaration by named co-inventor, Dr. Gerold L. Mosher ("the Mosher Declaration"). SLVGT-EPA_0000880-893. The Mosher Declaration discussed how the claimed formulation demonstrated improved and unexpected stability over the prior art formulations. For example, the Mosher Declaration states:

a. "It should be appreciated that the oral liquid formulations of the present claims are stable at 5±3°C for 12 months or longer with minimal degradation. The stability is an important aspect of the present formulations." SLVGT-EPA_0000882.

[17] E7 and E8 were formulations "similar to or within the instant claims." SLVGT-EPA_0000875.

**EXHIBIT 2**

b. "In my review of the references cited in the Office Action, none of the references describe this stability of at least 12 months 5±3°C or any means of achieving this stability for enalapril formulations." SLVGT-EPA_0000883.

c. "The additional enalapril content data submitted for E7 and E8 shows that the formulations of the present application are significantly more stable, which in my opinion reflects the superior results and advantages, obtained with the oral liquid enalapril formulation of the present claims." SLVGT-EPA_0000887.

***4. March 20, 2017 Interview***

435. An interview occurred on March 20, 2017 between Silvergate's patent prosecution counsel and the Examiner. SLVGT-EPA_00001150-151. The Examiner noted and appreciated the superior stability of the claimed formulation over the prior art.

436. Additionally, the Examiner suggested moving the sweetener and sucralose limitations from the independent claims into the dependent claims.

***5. March 22, 2017 Supplemental Amendment***

437. Silvergate filed a Supplemental Amendment on March 20, 2017 in further response to the January 17, 2017 Office Action and the March 20, 2017 interview. SLVGT-EPA_00000940-945.

438. The Supplemental Amendment moved the sweetener and sucralose limitations from the independent claims into the dependent claims as per the Examiner's suggestions in the March 20, 2017 Interview.

***6. April 19, 2017 Notice of Allowance***

439. On April 19, 2017, the Examiner allowed claims 1, 2, 4-13, and 15-22 of the '603 application. SLVGT-EPA_00001145-151.

440. Those claims issued as claims 1-20 of U.S. Patent No. 9,669,008.

**EXHIBIT 2**

***7. United States Patent No. 9,669,008***

441. The '008 patent issued on June 6, 2017 from the '603 Application, filed on March 25, 2016.

442. As discussed above, the Examiner allowed claims 1, 2, 4-13, and 15-22, which issued as claims 1-20.

***8. United States Patent No. 9,808,442***

443. The '442 patent issued on November 7, 2017 from Application No. 15/613,622 filed on June 5, 2017.

444. The '442 patent claims priority to the '603 Application.

445. The only rejection the '442 patent received during prosecution was a "double patenting" rejection. Silvergate filed a terminal disclaimer to overcome the rejection.

446. The Examiner allowed claims 1-30.

***9. United States Patent No. 10,039,745***

447. The '745 patent issued on August 7, 2018 from Application No. 15/802,341 filed on November 2, 2017.

448. The '745 patent claims priority to the '603 Application.

449. The only rejection the '745 patent received during prosecution was a "double patenting" rejection. Silvergate filed a terminal disclaimer to overcome the rejection.

450. The Examiner allowed claims 1-20.

***10. United States Patent No. 10,154,987***

451. The '987 patent issued on December 18, 2018 from Application No. 16/003,994 filed on June 8, 2018.

452. The '987 patent claims priority to the '603 Application.

**EXHIBIT 2**

453. The only rejection the '987 patent received during prosecution was a "double patenting" rejection. Silvergate filed a terminal disclaimer to overcome the rejection.

454. The Examiner allowed claims 1-30.

**B. Argument Based Estoppel Does Not Apply**

455. Both defendants allege that argument-based estoppel precludes application of the doctrine equivalents. But neither defendant can prove that Silvergate's statements and arguments to the Patent Office during prosecution of the '008 patent constitute the requisite clear and unambiguous disavowal of equivalents to the claimed components.

***1. Bionpharma Cannot Prove That Silvergate Clearly and Unambiguously Disavowed All Formulations Beyond Those Having the Claimed Ingredients at the Claimed Amounts/Concentrations***

456. Bionpharma alleges that Silvergate's statements to the Patent Office clearly and unmistakably express Silvergate's intent to surrender enalapril oral liquid formulations beyond those that have the claimed ingredients at the requisite amounts/concentrations.

457. Bionpharma cannot prove that Silvergate's statements and arguments to the Patent Office during prosecution of the '008 patent constitute a clear and unambiguous disavowal of all formulations beyond those having the claimed ingredients at the claimed amounts/concentrations, including, specifically, a buffer of [REDACTED].

458. Rather, Silvergate's arguments as to the prior art were demonstration that the Examiner had not made a *prima facie* case for obviousness, because the prior art did not provide sufficient guidance nor a reasonable expectation of success. Additionally, the Mosher Declaration discussed and touted the superior stability of the claimed invention but did not limit the claimed invention to any specific ingredients at specific amounts/concentrations.

459. In particular, Silvergate demonstrated to the Examiner that although each of the claimed ingredients previously existed in the prior art, none of the prior art formulations demonstrated similar stability. For example, Silvergate demonstrated to the Examiner that the compounded formulations in Nahata lost about 5% of their initial enalapril content after 91 days at 4-5°C. Additionally, Silvergate demonstrated to the Examiner that the reconstituted formulation embodied by the '747 patent lost over 5% of its initial enalapril content after 91 days at 25°C.

460. By contrast, the claims maintain at least 95% of the initial enalapril amount over 12, 18, and 24 months. None of the prior art formulations demonstrated similar stability.

461. Silvergate repeatedly pointed to the lack of similar stability in the prior art—none of which taught a ready-to-use formulation—to demonstrate that the Examiner had not made a *prima facie* case for obviousness.

462. Because none of the prior art demonstrated stability close to the claimed stability, the prior art did not provide a reason for a POSA to attempt to create a solution from the prior art, with the claimed stability of at least 12 months.

463. Similarly, Silvergate argued that the sheer number of ingredients in the prior art formulations would prevent a POSA from creating the claimed stable oral liquid formulation from the prior art. For example, the Nahata reference discussed formulations containing 19 ingredients in addition to water and enalapril. Additionally, the '747 patent discussed formulations containing 10 ingredients in addition to water and enalapril.

464. By contrast, at least one embodiment of the claimed invention contained only four ingredients in addition to water and enalapril.

**EXHIBIT 2**

465. Silvergate pointed to this difference to demonstrate that the prior art provided no guidance whatsoever as to which of a multitude of ingredients would or would not contribute to stability. Thus, a person of ordinary skill would not have any expectation of success that any combination of the prior art would create the claimed stable oral liquid formulation.

466. Finally, the Mosher Declaration discussed and touted the superior stability of the claimed invention. A POSA would understand that the Mosher Declaration related to distinguishing the limited stability of the prior art from the long-term stability of the pending claims. A POSA would not understand the Mosher Declaration to limit the claimed invention to any specific ingredients at specific amounts/concentrations.

467. In short, a POSA would understand that Silvergate's statements and arguments to the Examiner regarding particular ingredients were made to demonstrate that the Examiner had failed to provide any reason to combine particular ingredients in the prior art (from many options), nor any reasonable expectation of success in doing so. A POSA would not understand Silvergate's statements in this regard to be a disavow all ingredients other than those claimed.

468. Similarly, a POSA would understand the Mosher Declaration and other statements regarding the unexpected stability of the claimed invention to simply be recognizing the superior stability of the claimed invention. A POSA would not understand any such statements regarding the enhanced stability of the invention to disavow all ingredients other than those claimed.

469. Thus, Silvergate will demonstrate that Silvergate did not clearly and unambiguously disavow all formulations beyond those having the claimed ingredients at the claimed amounts/concentrations.

**EXHIBIT 2**

*2. Amneal Cannot Prove That Silvergate Clearly and Unambiguously Disavowed All Buffers Beyond the Claimed Citric Acid/Sodium Citrate Buffer*

470. Amneal alleges that Silvergate's statements to the Patent Office clearly and unmistakably express Silvergate's intent to surrender buffers beyond the claimed buffer of citric acid and sodium citrate.

471. Amneal cannot prove that Silvergate's statements and arguments to the Patent Office during prosecution of the '008 patent constitute a clear and unambiguous disavowal of all buffers beyond the claimed citric acid/sodium citrate buffer, including, specifically, [REDACTED] [REDACTED]

472. As discussed above, a POSA would understand that Silvergate's statements and arguments to the Examiner regarding particular ingredients were made to demonstrate that the Examiner had failed to provide any reason to combine particular ingredients in the prior art (from many options), nor any reasonable expectation of success in doing so. A POSA would not understand Silvergate's statements in this regard to disavow all buffers other than that claimed.

473. As also discussed above, a POSA would similarly understand the Mosher Declaration and other statements regarding the unexpected stability of the claimed invention to simply be recognizing the superior stability of the claimed invention. A POSA would not understand any such statements regarding the enhanced stability of the invention to disavow all buffers other than that claimed.

474. Thus, Silvergate will demonstrate that Silvergate did not clearly and unambiguously disavow all buffers beyond the claimed the claimed citric acid/sodium citrate buffer.

**EXHIBIT 2**

**C. Amendment Based Estoppel Does Not Apply**

475. Both defendants allege that amendment-based estoppel precludes application of the doctrine equivalents, by virtue of the amendment adding "sodium citrate dihydrate" to two independent claims during prosecution of the '008 patent. Neither defendant can prove that the amendment in question was a narrowing amendment made for reasons related to patentability. Moreover, even assuming the amendment was narrowing and made for reasons related to patentability, the amendment was tangential to defendants' respective equivalent buffers.

***1. The Amendment Was Not Narrowing and Was Not Made for Reasons Related to Patentability***

476. Silvergate will demonstrate that the amendment adding sodium citrate to the buffer limitations was not narrowing.

477. Silvergate's addition of sodium citrate dihydrate was merely a substitution of one buffer system (*i.e.* citric acid alone) for an alternative buffer system (*i.e.* citric acid with sodium citrate dihydrate).

478. In particular, the two buffers maintain the pH of a solution with a pH range of about 3-3.5 in the same way, insofar as the citrate ions will be able to accept hydrogen ions from solution and therefore lower pH and the unionized acid groups will be able to donate hydrogen ions to solution and increase the pH. Moreover, both buffers would be expected to have the same results in terms of stability.

479. Because a buffer of citric acid and a buffer of citric acid and sodium citrate are alternative, equivalent buffers, Silvergate will demonstrate that the amendment adding sodium citrate to the buffer limitations was not narrowing.

**EXHIBIT 2**

480. Even assuming that the addition of sodium citrate dihydrate was narrowing, however, Silvergate will demonstrate that the amendment was not made for reasons of patentability.

481. At the time of the amendment, all pending claims stood rejected for obviousness and indefiniteness.

482. A POSA would understand that the addition of the sodium citrate dihydrate was not related to the indefiniteness rejection. As discussed above, the indefiniteness rejection was addressed by the addition of the Stability Amendments.

483. Similarly, a POSA would understand that the addition of the sodium citrate dihydrate limitation was not related to the obviousness rejection. This is because when Silvergate amended the citric acid buffer limitation in two independent claims to add sodium citrate dihydrate, a third independent claim (claim 20) already claimed a buffer comprised of both citric acid and sodium citrate dihydrate. Yet, all claims were rejected as obvious over the same prior art, which the Examiner had explicitly noted taught formulations with both citric acid and sodium citrate. SLGVT-EPA_0000835-837. As such, the addition of sodium citrate dihydrate could not have overcome any obviousness rejection.

484. Accordingly, the reason for Silvergate's addition of sodium citrate dihydrate was not to overcome the Examiner's obviousness rejection, because the addition of sodium citrate dihydrate could not have overcome any obviousness rejection.

485. Although the prosecution history does not expressly state why the sodium citrate dihydrate language was added, the prosecution history does demonstrate that the reason for the amendment was not related to addressing either the indefiniteness or obviousness rejections. The

**EXHIBIT 2**

amendment made all claims consistent with claim 20 (which already contained the sodium citrate dihydrate limitation) but was not made for a reason related to patentability.

486. Thus, Silvergate will demonstrate that the reason for the addition of the sodium citrate dihydrate language was unrelated to patentability, even if the addition was a narrowing amendment.

***2. Even if the Amendment Was Narrowing and Made for Reasons Related to Patentability, the Amendment Was Tangential to Defendants' Respective, Equivalent Buffers***

487. Even assuming that the amendment was narrowing and made for reasons related to patentability, Silvergate will demonstrate that the amendment was tangential to both Bionpharma's equivalent buffer of [REDACTED] and Amneal's [REDACTED]

488. Bionpharma alleges that the purpose of the amendment was to distinguish the claimed formulations qualitatively and quantitatively from the prior art formulations. But this does not account for the fact that claim 20 stood rejected over the same prior art despite already having the sodium citrate dihydrate language, including the amount. Moreover, even if the purpose of the amendment was to distinguish prior art formulations, the arguments made to the Examiner relating to obviousness were to stress the superior stability of the claimed invention. In other words, the purpose of distinguishing prior art formulations related to stability, not buffers.

489. Thus, Silvergate will demonstrate that the amendment was tangential to Bionpharma's equivalent buffer of [REDACTED]

**EXHIBIT 2**

490. Amneal alleges that the purpose of the amendment was to ensure that evidence and arguments regarding the "inventive example" were applicable to the claims. But even if Amneal is correct, this reason is not at all related to the functionally [redacted]

491. Thus, Silvergate will demonstrate that the amendment was tangential to Amneal's [redacted]

**VIII. Claim Vitiation Does Not Apply to Bar Application of the Doctrine of Equivalents to the Buffer in Bionpharma's ANDA Product**

492. Claim vitiation does not apply to prevent Silvergate from arguing that Bionpharma's ANDA product infringes the buffer limitation under the doctrine of equivalents because Bionpharma's ANDA product [redacted]

493. Bionpharma alleges that claim vitiation precludes application of the doctrine of equivalents because the asserted claims [redacted]

494. Bionpharma also alleges that claim vitiation precludes application of the doctrine of equivalents because, unlike the buffer limitations of the asserted claims, Bionpharma's ANDA Product [redacted]

495. Thus, claim vitiation does not preclude Silvergate from arguing that Bionpharma's ANDA product infringes the buffer limitation under the doctrine of equivalents.

**EXHIBIT 2**

## IX. Claim Vitiation Does Not Apply to Bar Application of the Doctrine of Equivalents to the Buffer in Amneal's ANDA Product

496. Claim vitiation does not apply to prevent Silvergate from arguing that Amneal's ANDA product infringes the buffer limitation under the doctrine of equivalents because Amneal's ANDA product contains a [REDACTED].

497. Amneal alleges that claim vitiation precludes application of the doctrine of equivalents because the conjugate base of [REDACTED] is not added to the solution. However, as discussed above, the conjugate base of [REDACTED] is formed *in situ*. Moreover, a [REDACTED]

498. Thus, claim vitiation does not preclude Silvergate from arguing that Amneal's ANDA product infringes the buffer limitation under the doctrine of equivalents.

## X. The Disclosure Dedication Doctrine Does Not Apply to Bar Application of the Doctrine of Equivalents to Bionpharma's Preservative

499. The disclosure dedication doctrine does not apply to prevent Silvergate from arguing that Bionpharma infringes the preservative limitation under the doctrine of equivalents because Bionpharma cannot demonstrate that Silvergate disclosed but did not claim [REDACTED] such that the preservative is dedicated to the public.

500. Nowhere in the specification of the Asserted Patents is the specific combination [REDACTED] contemplated as a complete preservative combination without the presence of other preservatives. Indeed, many of the references in the specification are to [REDACTED]. A POSA (and the FDA) would understand that salts are a different species and different compounds from their free acids.

**EXHIBIT 2**

501. Moreover, although the specification mentions [redacted] For example, the specification states:

> [redacted]

[redacted] First, a POSA would understand this as nothing more than a passing reference to [redacted]

502. In short, a POSA upon reading the specification would not understand that the specification disclosed [redacted] to have been clearly and unambiguously disclosed as an alternative to sodium benzoate.



**EXHIBIT 2**

503. Thus, Bionpharma cannot demonstrate that Silvergate clearly and unambiguously disclosed but did not claim a [REDACTED] is dedicated to the public.

# TAB 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-2100 (MSG) |
| | ) | [redacted] |
| ALKEM LABORATORIES LTD., | ) | |
| | ) | [redacted] |
| Defendant. | ) | |

**PLAINTIFF AZURITY PHARMACEUTICALS, INC.'S OPPOSITION TO DEFENDANT ALKEM LABORATORIES, LTD.'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF JOHN D. MAHAN, JR., M.D**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiff Azurity Pharmaceuticals, Inc.*

OF COUNSEL:

Wendy L. Devine
Kristina M. Hanson
Jody Karol
Nicholas Halkowski
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000

Natalie J. Morgan
Evan Sumner
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real, Suite 200
San Diego, CA 92130-3002
(858) 350-2300

Ty W. Callahan
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
(323) 210-2900

July 18, 2022

The Court should deny Alkem's motion *in limine*. The testimony in question fully complies with Rule 702. The inventions at issue in the upcoming bench trial include liquid formulations for the treatment of hypertension in infants and children. Solid tablets containing the active ingredient enalapril are not feasible forms of treatment for young children due to difficulty swallowing and inaccurate partial dosing from cutting pills. Prior to the inventions, physicians would often administer "compounded" liquid formulations made by crushing a tablet containing enalapril, then mixing the crushed tablet powder with a liquid solution. Compounded formulations are risky: dosing of the active ingredient is imprecise and the liquid expires within a short period of time. Those risks are exponentially magnified when treating infants and children.

Dr. John D. Mahan, M.D., is an award-winning Professor of Pediatrics at The Ohio State University College of Medicine and has practiced pediatric nephrology since 1984. Dr. Mahan has decades of hands-on experience treating pediatric patients suffering from hypertension and has first-hand knowledge regarding how the inventions squarely address a long standing, significant need. He will testify that at the time of the invention, when *ad hoc* compounding was common, pediatric nephrologists felt a long-standing need for liquid enalapril that was "ready-to-use" and stable (*i.e.*, will not expire) for at least a year. Alkem—who will not present testimony from a physician or anybody who has treated pediatric hypertension—points to Rule 702 as a basis to exclude Dr. Mahan's testimony. However, Dr. Mahan's testimony more than satisfies Rule 702. Dr. Mahan's impeccable qualifications are unchallenged, as are the facts underlying his opinions. His testimony is the product of reliable principles and methods of treating pediatric hypertension that reside at the heart of Dr. Mahan's experience over the past several decades, and which he reliably applies to assess the long-felt need satisfied by the inventions at issue.

Alkem's bases for preclusion are spurious. Alkem first argues that "Dr. Mahan failed to evaluate a nexus between the alleged secondary consideration of nonobviousness and the purported claimed inventions." Alkem Br. at 1. However, Dr. Mahan will testify regarding the need for a stable, ready-to-use enalapril formulation, (Ex. A, ¶ 61), and how the unique

characteristics of the claimed inventions meet this need (*id.*, ¶¶ 98, 102).[1]  His testimony is more than sufficient to prove nexus.  *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373-74 (Fed. Cir. 2019) (nexus is demonstrated "by showing that the evidence of secondary considerations is the direct result of the unique characteristics of the claimed invention.") (internal quotations omitted).  Alkem's arguments regarding the absence of the word "nexus" from Dr. Mahan's expert report and Dr. Mahan's lack of familiarity with patent terms such as "nexus" lack merit because they insist upon a non-substantive "gotcha" while ignoring the substance of his testimony.  *See Mfg. Res. Int'l., Inc. v. Civiq Smartscapes, LLC*, No. 17-269-RGA, 2019 WL 4198194 at *7 (D. Del. Sept. 4, 2019) ("Though Dr. Silzars does not explicitly identify the nexus, his opinions clearly tie the evidence of secondary considerations to the claimed invention.").  In addition, Alkem's motion amounts to a long-winded objection to the sufficiency of Azurity's evidence and should be denied. *Amag Pharms. v. Sandoz*, No. 16-1508, 2018 WL 1041035 at *2 (D.N.J. Feb. 22, 2018) ("An in limine motion is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense[.]").  The Court will be in a better position to weigh the evidence *after* hearing all testimony on long-felt need, not *before* as Alkem requests.[2]

Next, Alkem argues that Dr. Mahan "totally disregards the scope of the claimed inventions" because he stated that the claimed inventions did not "require[e] compounding, reconstitution or other manipulation prior to administration."  Br. at 3 (citing to Ex. A, ¶ 55).  However, a plain reading of the Asserted Claims confirms that no claim *requires* compounding, reconstitution or other manipulation prior to administration and no party has advocated for a construction that would

---

[1]  Dr. Mahan is a physician, not a pharmaceutical formulator, so his understanding of the asserted claims relies on testimony from Azurity's formulation expert, Dr. Steven Little.

[2]  The cases cited in Alkem's brief are inapplicable.  *Fox Factory* reiterates the rule that a party must link secondary considerations to the claims.  *See* 944 F.3d at 1373-74.  In both *Cot'n Wash, Inc. v. Henkel Corp.*, 56 F.Supp. 3d 626, 650-651 (D. Del. 2014) and *Inventio AG v. Thssenkrupp Elevator Corp.*, No. 08-00874, 2014 U.S. Dist. LEXIS 157448 at *26 (D. Del. Nov. 6, 2014), the patentee did not provide specific evidence linking the secondary considerations to the patented invention.  Dr. Mahan provides such evidence.  Ex. A at ¶¶ 61, 98, 101-102.

import such requirements into any claim.   Thus, Alkem's argument relies on fundamental misunderstandings of what the claims require and should be rejected.[3]

Finally, Alkem's judicial estoppel argument fails to address the elements required to establish judicial estoppel: that "(1) [Azurity] took two positions that are irreconcilably inconsistent, (2) [Azurity] changed [its] position in 'bad faith,' and (3) no lesser sanction would adequately remedy the damage done by [Azurity's] misconduct."  *See Fagan v. Fischer*, No. 14-7013, 2021 U.S. Dist. LEXIS 219137 at *16 (D.N.J. Nov. 12, 2021).   Rather than address those requirements, Alkem argues that Azurity "misrepresent[ed] its position to the Court,"  Alkem Br. at 3, because Azurity ran similar long-felt need arguments in a prior case on related patents that covered Azurity's Epaned® product.   There is no misrepresentation or inconsistency: the Epaned® patents and the Asserted Patents here—which stem from the same family and share a common specification—meet the long-felt need described by Dr. Mahan as of their shared priority date. The fact that multiple claims in the same patent family address the same long-felt need is expected—not surprising or inconsistent as Alkem contends.  *See Reckitt Benckiser Pharms., Inc. v. Dr. Reddy's Labs. S.A.*, No. 14-1451-RGA, 2017 WL 3837312 at *19 (D. Del. Aug. 31, 2017) (different patents fulfilling same long-felt need).   Alkem's "misrepresentation" accusation lacks merit and fails to establish any required element of judicial estoppel, much less all three.[4]

For the foregoing reasons, Alkem's motion *in limine* to preclude Azurity from relying on Dr. Mahan's long-felt but unmet need opinions should be denied.

---

[3]   Alkem's citation to *Cubist Pharmaceuticals, Inc. v. Hospira, Inc.* is inapposite. 75 F.Supp. 3d 641 (D. Del. 2014)  There, the court addressed the issue of nexus ***after*** a five-day bench trial and post-trial briefing. *Id.* at 645. Moreover, the *Cubist* court determined that the purported long-felt need related to an improvement not found in the claims. *Id.* at 672.  Here, Dr. Mahan will testify that a liquid enalapril formulation with long-term stability—a requirement of every asserted claim—addressed a long-felt need.

[4]   Alkem's case law does not support its argument.  Judicial estoppel did not apply in *Fagan*, 2021 U.S. Dist. LEXIS 219137 at *16.  In *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. GMC*, the defendant demonstrated the existence of all three factors.  337 F.3d 314, 320-325 (3d. Cir. 2003).  And *Wilson v. Muckala* does not discuss judicial estoppel.  303 F.3d 1207 (10th Cir. 2002).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Megan E. Dellinger*

Jack B. Blumenfeld (#1014)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiff Azurity Pharmaceuticals, Inc.*

OF COUNSEL:

Wendy L. Devine
Kristina M. Hanson
Jody Karol
Nicholas Halkowski
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower,
Suite 3300
San Francisco, CA 94105
(415) 947-2000

Natalie J. Morgan
Evan Sumner
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real, Suite 200
San Diego, CA 92130-3002
(858) 350-2300

Ty W. Callahan
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, CA 90071
(323) 210-2900

July 18, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2022, copies of the foregoing were caused to be served upon the following in the manner indicated:

R Touhey Myer, Esquire
KRATZ & BARRY, LLP
800 North West Street
Wilmington, DE 19801
*Attorneys for Defendant Alkem Laboratories Ltd.*

*VIA ELECTRONIC MAIL*

Timothy H. Kratz, Esquire
George J. Barry III, Esquire
KRATZ & BARRY, LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
*Attorneys for Defendant Alkem Laboratories Ltd.*

*VIA ELECTRONIC MAIL*

Michael P. Hogan, Esquire
KRATZ & BARRY, LLP
325 Chestnut Street, Suite 876, #259
Philadelphia, PA 19106
*Attorneys for Defendant Alkem Laboratories Ltd.*

*VIA ELECTRONIC MAIL*

*/s/ Megan E. Dellinger*

Megan E. Dellinger (#5739)

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AZURITY PHARMACEUTICALS, INC., *Plaintiff*, v. ALKEM LABORATORIES LTD., *Defendant*. | C.A. No. 19-2100 (MSG) |

**EXPERT REPORT OF JOHN D. MAHAN, JR., M.D. ON OBJECTIVE INDICIA OF NON-OBVIOUSNESS FOR U.S. PATENTS 10,786,482 AND 10,918,621**

issue.

51. I understand from counsel that patent claims are presumed to be valid—and thus non-obvious—and that accordingly, Alkem must demonstrate by clear and convincing evidence, *i.e.* that it is highly probable, that the claims of the patents-in-suit are obvious in view of the prior art.

***i. Objective Indicia of Non-Obviousness***

52. As stated above, I understand from counsel that a proper obviousness analysis is involves an evaluation of objective indicia of non-obviousness. I understand that commonly recognized objective indicia include, among others, evidence of long-felt but unsolved needs, unexpected results, and failure of others. I understand that the consideration of such objective indicia guards against hindsight bias and that, in appropriate circumstances, evidence of objective indicia may be determinative of the ultimate question of obviousness.

53. I understand that objective indicia of non-obviousness are found in comparison with the merits of the claimed invention.

54. I also understand from counsel that the objective indicia of non-obviousness of unmet need requires a long-felt but unsolved need that is satisfied by the claimed invention. I understand the claimed invention must be commensurate with the need.

## VI. SUMMARY OF OPINIONS

55. It is my opinion that the claimed invention satisfies a long-felt but unresolved need for a stable liquid formulation of enalapril for children that did not require compounding, reconstitution, or other manipulation prior to administration—which is evidence of the non-obviousness of the Asserted Claims.

## VII. LEVEL OF ORDINARY SKILL IN THE ART

56. I understand from counsel that the claims and the issue of obviousness must be

considered from the point of view of a POSA at the time of the alleged invention. I have been advised that the relevant date is March 18, 2016.

57.     By virtue of my education, experience, and training, I am familiar with the level of skill in the art of the Asserted Patents as of March 18, 2016.

58.     Drug development often involves a team of individuals working together to solve a problem.

59.     In my opinion, a person of ordinary skill in the relevant field as of March 18, 2016 would be a person that has (i) a Ph.D. in formulation-relevant pharmaceutical science, chemistry, or a similar subject, with minimal post-degree experience in formulating pharmaceutical products; or (ii) at a minimum a bachelor's degree in pharmacy, pharmaceutical science, chemistry or a similar subject, with at least five years of post-degree practical experience in formulating pharmaceutical products. A POSA would also have experience with pharmaceutical excipients as applied to their selection and use in drug formulations.

60.     With regard to the therapeutic application of the invention, a POSA would routinely collaborate with a medical doctor with experience treating hypertension and other cardiovascular conditions – particularly in pediatric patients – or a clinical pharmacologist.

## VIII.   LONG-FELT BUT UNRESOLVED NEED

61.     It is my opinion that there has been a long-felt but unresolved need for a stable liquid formulation of enalapril for children that did not require compounding, reconstitution, or other manipulation prior to administration. This is particularly so given the increasing number of infants, small children, and children unable to swallow oral tablets who have conditions (e.g., hypertension, left ventricular dysfunction, heart failure) that require stable, consistent oral liquid formulations of an ACE inhibitor, such as enalapril. Specifically, one of the biggest changes that

I've observed in my practice over the last 20 years is that I see and treat an increasing number of very young patients—often from the neonatal intensive care unit—who present with complicated conditions. These patients, both as neonates and beyond, require treatment with oral liquid formulations of an ACE inhibitor, but are unable to swallow oral tablets (as a result of their age and/or medical condition). Presumably due to improved neonatal care, the frequency with which I encounter such patients increases year over year.

62. Additional factors that support my opinion are: (1) the childhood obesity epidemic and corresponding increase in prevalence of childhood hypertension; (2) the preference for ready-to-use and consistent formulations of pediatric medicines in populations where a liquid formulation is necessary or optimal; and (3) the fact that enalapril has been available in the form of a solid, oral tablet since the 1980s.

63. The ensuing discussion focuses on hypertension. However, left ventricular dysfunction is commonly associated with hypertension. Redwine 2018 at SLVGT_RTU_00009551 ("[M]ultiple preclinical cardiac and vascular changes are noted in children with hypertension and with other risk factors for cardiovascular disease. Left ventricular hypertrophy (LVH) is the most commonly reported type of target organ damage among hypertensive youth and is present in up to 40% of children at diagnosis . . . .); Fourth Report at SLVGT_RTU_00005910 ("Target-organ abnormalities are commonly associated with hypertension in children and adolescents. . . . Left ventricular hypertrophy (LVH) is the most prominent evidence of target-organ damage."); Fourth Report at SLVGT_RTU_00005911 ("With the use of echocardiography to measure left ventricular mass, LVH has been reported in 34% to 38% of children and adolescents with mild, untreated BP elevation."). In fact, left ventricular dysfunction can be a particularly concerning symptom of hypertension because—as

explained above—it is very likely to lead to heart failure, when left untreated. In other words, insofar as the claimed invention satisfied a long-felt but unresolved need with respect to the treatment of hypertension, it also satisfied a long-felt but unresolved need with respect to the treatment of left ventricular dysfunction and heart failure.[3] The value of ACE inhibitor therapy in improving left ventricular function and heart failure has also been increasingly detected by neonatologists and pediatric cardiologists who care for newborns and small children

64. Of further note, enalapril is one of the only antihypertensive drugs that is FDA-approved for treatment in children younger than six, and is the only such ACE inhibitor. Siddiqi 2019 at SLVGT_RTU_00009599-602 (Table 1); Chu 2014 at SLVGT_RTU_00009283 (Table 2). Moreover, ACE inhibitors are the most commonly prescribed antihypertensive class of medications in the pediatric patient population for hypertension. Siddiqi 2019 at SLVGT_RTU_00009598; Chu 2014 at SLVGT_RTU_00009281. Accordingly, for children under the age of six, any discussion of the treatment of hypertension with enalapril is effectively a discussion of the treatment of hypertension with an FDA-approved product, in general.

### A. Need for Safe, Effective Pharmaceutical Formulations for Treatment of Hypertension in Children

65. Hypertension was traditionally regarded as a rare occurrence in childhood and adolescence. Ferguson 2018 at SLVGT_RTU_00009365. In fact, until the early 1970s, the prevalence of hypertension in children and adolescents was largely unknown. B. Falkner, "Development of Blood Pressure Norms and Definition of Hypertension in Children," Pediatric

[3] Although left ventricular dysfunction and/or heart failure often arise as a consequence of hypertension, they may also occur independent of hypertension. The claimed oral liquid enalapril solutions can similarly be used to treat patients with left ventricular dysfunction and/or heart failure in the absence of hypertension, and indeed I have prescribed enalapril for such patients in my practice.

to the enalapril powder prior to dispensing to the patient. Specifically, pharmacists were instructed to mix the powder and diluent as follows:

> Firmly tap the EPANED Powder for Oral Solution bottle on a hard surface 5 times. Add approximately one-half (75 mL) of the Ora-Sweet SF diluent to the 150 mL EPANED Powder for Oral Solution bottle. Replace the child-resistant cap. Shake well for 30 seconds. Reopen. Add the remainder of the Ora-Sweet SF diluent to the EPANED Powder for Oral Solution bottle, replace the child-resistant cap and shake well for an additional 30 seconds. Calculate 60 days from the date of reconstitution. Write this date as the discard date on the front of the label. Affix a "Do Not Use After" or a "Discard After" label with the calculated date added to the reconstituted EPANED bottle.

2014 Epaned Kit Label at SLVGT_RTU_00009315. Once reconstituted, Epaned Kit was dispensed to the patient in the multiple-dose bottle.

95. Epaned Kit was an improvement with respect to preexisting enalapril treatment options for children. In particular, Epaned Kit was the first FDA-approved drug product containing enalapril maleate in an oral liquid form for use by patients who could not swallow tablets or had difficulty doing so. Epaned® NDA – Clinical Overview at SLVGT_RTU_00005742. Accordingly, Epaned Kit addressed some of the drawbacks of the prior practice of compounding Vasotec®—e.g., the inherent opportunity for compounding errors; the fact that compounding pharmacies are not subject to CGMPs, which could lead to product quality and stability issues. *Id.* at SLVGT_RTU_00005742.

96. However, Epaned Kit still required a pharmacist to engage in a multi-step reconstitution process in order to correctly mix the enalapril powder and diluent. 2014 Epaned Kit Label at SLVGT_RTU_00009315. Accordingly, it was still possible to experience variability in dosage due to pharmacist error and/or incomplete solubilization of the enalapril powder in the liquid. *See, e.g.*, Beckloff Tr. at 30:13-16 ("[The kit] require[s] manipulation such as adding a diluent to powder bottle and shaking and, you know, working through those kinds of processes in the pharmacy . . ."); Trial Testimony of Michael Beckloff, *Silvergate Pharmaceuticals Inc., v.*

[redacted]

*Bionpharma Inc.*, Nos. 18-1962 & 19-1067 (D. Del.), February 1, 2021 (D.I. 193) (SLVGT_RTU_00009936-10003), at 78:22-79:6 ("We had a number of issues over time that, that were reported to us [about Epaned Kit from pharmacists]. We had issues where the wrong diluent was used. We had issues where there were contamination issues, where it turned out to be the fibers from the pharmacist's sweater. We had reports of foreign matter in the -- in the powders that turned out to be items that people had used to poke a hole in the index seal on the top. So we had a number of issues."). In fact, a February 2017 White Paper prepared by Azurity, "Management of Pediatric Patients on Enalapril Maleate," noted a "significant concern" that the recipe called for in the Vasotec® package insert was not, in practice, always followed by pharmacists. SLVGT_RTU_00006600-613 ("2017 White Paper"), at SLVGT_RTU_00006604. In my opinion this same concern existed with respect to Epaned Kit, albeit to a lesser extent, simply by virtue of the number of steps required to properly reconstitute the product and the concerns about contamination.

97. Moreover, after reconstitution, the resulting solution was only stable for 60 days. 2014 Epaned Kit Label at SLVGT_RTU_00009315. As such, even after Epaned Kit was introduced to the market, there still existed a need for a safe, effective formulation of enalapril for children. Specifically, there remained a need for a stable liquid formulation of enalapril for children that did not require reconstitution (or other manipulation) prior to administration.

98. Azurity developed the patented ready-to-use liquid enalapril formulations in response to this need. Specifically, the claimed ready-to-use solutions are stable for an extended period of time, unlike any available liquid formulations of enalapril before, and do not need reconstitution, compounding, or other drug manipulation prior to administration. '482 patent at 5:60-6:4, Claims 14-23, 27-28; '621 patent at 5:60-6:4, Claims 1-13, 16-27, 30. As such, these

oral liquid enalapril formulations eliminate the accompanying risks of variability in dosage and incomplete solubilization. ’482 Patent at 5:13-6:4; ’621 patent at 5:13-6:4. The elimination of these risks means that the oral liquid enalapril formulations have a safety advantage relative to Epaned Kit. Beckloff Tr. at 30:4-22 (“And we were informed by FDA that – that they didn’t consider the kit, the powder kit, they didn’t consider that to be a distinct advantage over a compounded enalapril based on safety, clinical safety. . . . [A]nd [the FDA] insinuated that [a] ready-to-use type of product would -- would meet the clinical superiority on the basis of safety.”); Beckloff Tr. at 30:23-31:6.

99. Azurity sells the ready-to-use liquid enalapril formulation Epaned®. Epaned® NDA – Clinical Overview at SLVGT_RTU_00005742 (“Epaned Oral Solution, 1mg/mL, is targeted as an alternative to the available tablet dosage form and to the currently available Epaned Powder for Oral Solution (which requires a reconstitution preparation step) . . . .”). Epaned® was approved by the FDA on September 20, 2016. “New Drug Application (NDA): 208686,” Drugs@FDA: FDA-Approved Drugs (SLVGT_RTU_00010004-006), at SLVGT_RTU_00010005. Epaned® is supplied as a ready-to-use solution that contains 1 mg/mL of enalapril maleate. 2017 Epaned Label at ALK_ENPL_00000085. Additionally, Epaned® is stable for 36 months at refrigerated conditions. SLVGT_RTU_00009329-336 (“Epaned® NDA – 2018 Stability Summary”), at SLVGT_RTU_00009336.

100. Alkem’s ANDA Product, as discussed above, is a therapeutic equivalent of Azurity’s Epaned® product that will be substituted for Epaned® at the pharmacy. Alkem’s ANDA Product is, like Epaned®, a ready-to-use solution. *See* ALK_ENPL_00006154-171, at ALK_ENPL_00006154. Critically, it also has a shelf life of up to two years, greater than the Epaned Kit once reconstituted, with data demonstrating long-term stability at refrigerated storage

conditions. ALK_ENPL_00257564; ALK_ENPL_00257602.

102. In short, the major advantage of the claimed solutions is their ready-to-use, long-term stable formulation (which eliminates the need for manipulation). ’482 patent at 5:13-6:4, Claims 14-23, 27-28; ’621 patent at 5:13-6:4, Claims 1-13, 16-27, 30. By virtue of these advantages, the claimed solutions meet the long-felt need for a stable liquid formulation of enalapril for children that do not require reconstitution (or other manipulation) prior to administration, which eliminates the potential for errors or contamination in reconstitution and facilitates patient compliance.

I declare, under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2022

John D Mahan

Dr. John D. Mahan, Jr. M.D.

# TAB 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC.<br>*Plaintiff*,<br>v.<br>ALKEM LABORATORIES LTD.,<br>*Defendant*. | : | C.A. No. 1:19-CV-02100-MSG |

**ALKEM LABORATORIES LTD.'S REPLY IN SUPPORT OF ALKEM'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF JOHN D. MAHAN, JR., M.D.**

Plaintiff fails to identify any analysis by Dr. Mahan linking the satisfaction of the long-felt need he alleges to the patent claims at issue in this case. His report contains no such analysis, which is required to demonstrate nexus. *See e.g.*, *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373-74 (Fed. Cir. 2019). Therefore, Dr. Mahan's opinions are wholly unreliable.

Plaintiff's focus on formulations that allegedly do not require manipulation ignores the plain scope of the asserted patent claims, which do not exclude such formulations. Every formulation described in the asserted claims ***could be*** reconstituted or otherwise manipulated. (*See* Alkem Opening Br. at 2 (citing patents and testimony from Plaintiff's other expert, Dr. Little).) Dr. Mahan thus failed to identify any "unique characteristic of the claimed invention" that allegedly satisfied a long-felt need. *See id.* His opinions are, thus, unreliable.

Finally, Plaintiff now argues that the claims Plaintiff asserted against the *Bionpharma* defendants and the claims now asserted against Alkem somehow ***collectively*** satisfied the same long-felt need. Plaintiff's position lacks support in both logic and jurisprudence.[1] Moreover, Dr. Mahan's expert report does not address Plaintiff's novel theory, which it raised for the first time only in response to Alkem's motion. Instead, Dr. Mahan's opinions in this case squarely conflict with Plaintiff's position in the *Bionpharma* case. Plaintiff should not be permitted to chart out a different course in this case. (*See* Alkem Opening Br. at 2-3 (citing relevant materials).)

For these reasons, as discussed in greater detail in Alkem's opening brief, Dr. Mahan's opinions should be struck, and Dr. Mahan should be precluded from testifying at trial.

---

[1] *Reckitt Benckiser Pharms. Inc. v. Dr. Reddy's Labs. S.A.*, No. 14-14541-RGA, 2017 WL 3837312, 2017 U.S. Dist. LEXIS 140634 (D. Del. Aug. 31, 2017) cited by Plaintiff is readily distinguishable. At issue there were two patents directed, in the first instance, to a pharmaceutical film composition, and, in the second, a method of manufacturing the same. *See id.* at 2017 U.S. Dist. LEXIS at *5-*7 (describing the asserted claims). Here Plaintiff contends two entirely different drug formulations, only one of which is commercialized, satisfied the same alleged need.

Dated: July 21, 2022                                Respectfully submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

Timothy H. Kratz
*(Pro Hac Vice)*
George J. Barry III
*(Pro Hac Vice)*
KRATZ & BARRY LLP
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
(404) 431-6600
tkratz@kratzandbarry.com
gbarry@kratzandbarry.com

Michael P. Hogan
*(Pro Hac Vice)*
KRATZ & BARRY LLP
325 Chestnut Street, Suite 876, #259
Philadelphia, PA 19106
(917) 216-8585
mhogan@kratzandbarry.com

*Attorneys for Defendant,*
*Alkem Laboratories Ltd.*