**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **AZURITY PHARMACEUTICALS, INC.,** | |
| *Plaintiff,* | Civil Action |
| *v.* | No. 19-cv-2100 |
| **ALKEM LABORATORIES LTD.,** | |
| *Defendant.* | |

**<u>MEMORANDUM OPINION</u>**

Goldberg, J.[1]                                   **February 10, 2023**

This lawsuit was brought under the Hatch Waxman Act for patent infringement pursuant to 35 U.S.C. § 271(e)(2)(a). Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity") claims that an Abbreviated New Drug Application (ANDA) submitted by Defendant Alkem Laboratories Ltd. ("Alkem") infringes U.S. Patent Nos. 10,786,482 (the '482 patent) and 10,918,621 (the '621 patent), both titled "Enalapril formulations." Azurity asserts claims 16, 18, 22, 23, and 28 of the '482 patent and claims 4, 7, 17, and 18 of the '621 patent. Alkem denies infringement and alleges that the patents in suit are invalid due to obviousness and insufficient written description.

After presiding over a three-day bench trial, I find that Azurity has established by a preponderance of the evidence that Alkem's ANDA infringes all asserted claims. However, I also conclude that Alkem has presented clear and convincing evidence that those claims are invalid for obviousness and lack of written description. This opinion sets forth my reasons in reaching these verdicts.

---

[1] Pursuant to 28 U.S.C. § 292(b), I have been designated to serve as a visiting judge for the District of Delaware to handle this matter and other District of Delaware cases.

## I. BACKGROUND

The patents in suit claim liquids containing the blood pressure medicine enalapril. Azurity did not invent enalapril, which had existed for decades preceding Azurity's invention. Azurity claims to have invented a way to mix enalapril with water and prevent the mixture from degrading over a period of 12 to 24 months. Alkem's ANDA is also a mixture of enalapril in water that does not degrade over 24 months.

Alkem concedes that its ANDA infringes most asserted claim limitations, disputing only two. First, Alkem contends that its ANDA does not infringe because it contains an ingredient that is not recited in any asserted claim: a "pH adjuster" added to ensure that the pH of the mixture is within a target range. According to Alkem, because none of the asserted claims recite pH adjusters, the presence of these ingredients precludes infringement of those claims that are partially closed to unlisted ingredients. Azurity responds that pH adjusters are optional in Alkem's ANDA and therefore do not affect the infringement analysis. Alternatively, Azurity argues that when a pH adjuster is added, it disappears by reacting with other ingredients in the mixture such that it is no longer present in the final liquid, thus defeating Alkem's noninfringement argument.

Alkem also contends that Azurity failed to prove that the concentration of the buffer in Alkem's ANDA is within the claimed range, again relying on the pH adjusters in conjunction with testimony from Azurity's expert Dr. Little, who opined that the pH adjusters react with citric acid to form components of the buffer. Alkem reasons that if Dr. Little's testimony is credited, the reaction he described must produce some unknown quantity of buffer, meaning there is a failure of proof that the amount of buffer left after the reaction is within the claimed range.

On the issue of validity, Alkem alleges that the asserted patent claims would have been obvious in light of the prior art and that the claims are inadequately described by the patents' written

specification.  More specifically, Alkem alleges that it would have been obvious to a person of or-dinary skill in the art (a POSA) to make an enalapril liquid as set out in the claims: (1) using each claimed ingredient; (2) in the claimed amounts; (3) with no other ingredients that "materially affect the basic and novel properties of the invention"; and (4) meeting the two limitations regarding the liquid being "stable" and having at least 95% enalapril with no more than 5% impurities at the end of the storage period.  (See, e.g., '621 patent, Claim 4.)

While Azurity did not concede that any aspect of its invention was obvious, at trial Azurity did not dispute that the individual claimed ingredients—enalapril, water, citrate buffers, paraben preservatives, sweeteners, and flavors—were known prior to its invention.  Instead, the focus of the parties' dispute is whether it would have been obvious how to combine those ingredients into a liquid that would be stable for as long as the claims require—12 to 24 months.  As set forth in greater detail below, the parties offered prior studies on the tendency of enalapril to degrade in water and presented conflicting views as to what a POSA would glean from those studies about the possibility of keeping enalapril stable for 12 to 24 months.

Regarding written description, the issue is whether the patents' specification adequately describes stable enalapril liquids that contain paraben preservatives.  Alkem asserts that although the specification states that parabens can be used as a preservative, it does not say which liquids containing parabens will be stable for 12 to 24 months.

## II.  INFRINGEMENT

### A.  Facts Relevant to Infringement

#### 1.  Expert Testimony

The parties stipulated that all experts were qualified, and, indeed, the background and experience of each expert was impressive.  Briefly summarized, Azurity's witness Dr. Stephen Little is an expert in pharmaceutical formulation who has undergraduate and doctoral degrees in chemical engineering and has founded multiple companies engaged in pharmaceutical formulation.  (N.T. 93-97.)  Azurity's witness Dr. John Mahan is an expert in the treatment of young children with hypertension who holds various teaching, research, and leadership roles in pediatric nephrology. (N.T. 387-90.)  Alkem's witness Dr. Barrett Rabinow is also an expert in pharmaceutical formulation who has undergraduate and doctoral degrees in chemistry and spent over 39 years as a chemist working on pharmaceutical formulations.  (N.T. 177-85.)  Finally, Alkem's witness Dr. Panayiotis Constantinides, also an expert in pharmaceutical formulation, has degrees in chemistry and biochemistry and has developed pharmaceutical formulations over a period of 35 years.  (N.T. 244-50.)[2]

#### 2.  Asserted Claims

Azurity asserts claims 16, 18, 22, 23, and 28 of the '482 patent and claims 4, 7, 17, and 18 of the '621 patent. Claim 4 of the '621 patent is illustrative, and reads:

> A stable oral liquid formulation, consisting essentially of:
> > (i) about 0.6 to about 1.2 mg/mL enalapril or a pharmaceutically acceptable salt or solvate thereof;
> > (ii) a buffer to maintain the pH about 4.5 or below, wherein the buffer concentration is about 5 mM to about 20 mM;

---

[2] These experts also offered testimony relevant to validity.

      (iii)  a preservative, wherein the preservative is a paraben or a mixture of parabens; and

      (iv)  water;

wherein the formulation optionally comprises a sweetener, a flavoring agent, or both;

wherein the formulation is stable at about $5 \pm 3°$ C. for at least 12 months; []

wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period[; and]

wherein the buffer comprises a citrate, a phosphate, a citrate/phosphate, an acetate, a glycinate, an amino acid, or a tartrate buffer.

('621 patent, Claim 4 (independent claims inserted).)[3]

### 3.  Alkem's Accused Product

Alkem's accused product is an abbreviated new drug application (ANDA) for an enalapril liquid.  It is undisputed that Alkem's ANDA contains many of the same ingredients in the same amounts as the asserted claims require, including the same active ingredient, preservative, water, and sweetener. (Amended Undisputed Facts ¶¶ 38-48; N.T. 115-16 (Little).)  It is also undisputed that Alkem's ANDA meets the pH and stability limitations of all asserted claims, and that it meets the limitation of claim 18 of the '482 patent that the formulation not contain mannitol. (N.T. 118-23 (Little).)

But for two reasons, Alkem does not concede infringement.  First, Alkem points to the fact that its ANDA states that pH adjusters—sodium hydroxide and hydrochloric acid—should be added in an amount "q.s." The term "q.s." means "quantum satis" or "the quantity that's necessary." (N.T. 138 (Little).)  Thus, sodium hydroxide and hydrochloric acid will be added as necessary to Alkem's ANDA to achieve the target pH range.  (N.T. 141, 172 (Little).)  Alkem's ANDA does

---

[3] The parties stipulated that "no terms of the patents-in-suit require construction" and thus no hearing on claim construction was held. (ECF No. 84.)

not explicitly say whether the target pH range can be achieved without adding pH adjusters. (N.T. 173-74 (Little).) The ANDA describes "exhibit batches" of the formulation, all of which required the addition of sodium hydroxide to meet the target pH range. (N.T. 139-40, 151-52, 158-59, 164 (Little).)

The patents in suit do not claim pH adjusters, and, for that reason, Alkem argues that its ANDA does not infringe certain asserted claims. In response, Azurity's expert Dr. Little testified that sodium hydroxide (the pH adjuster) "dissociates" or splits apart in water. (N.T. 140 (Little).) In addition, when sodium hydroxide is added to the citrate buffer present in Alkem's ANDA, it reacts with citric acid. (N.T. 140-43 (Little).) For either of these two reasons, Azurity maintains that the pH adjusters are no longer present after Alkem's ANDA solution is mixed, meaning that their addition does not preclude infringement.

Alkem's second reason for asserting that its ANDA does not infringe is that Azurity has not proven that its ANDA has a buffer in the same concentration that the claims require. Alkem's ANDA specifies that a buffer should be added that consists of 1.820 mg/mL (milligrams per milliliter) of citric acid and 0.150 mg/mL of sodium citrate. (N.T. 116 (Little).) Dr. Little testified that when these numbers are converted from mg/mL to molar concentration and added together, the total is between 5 mM ("millimolar") and 20 mM, which matches the asserted claims. (N.T. 117 (Little).) But for reasons explained in more detail below, Alkem disputes that this computation shows that the buffer concentration limitation is met. Alkem points to the reaction between sodium hydroxide and citric acid Dr. Little testified to, and argues that the products of this reaction must affect the buffer concentration in some unknown way. Alkem did not offer testimony to support this argument.

### B.  Discussion

It is an act of patent infringement to "submit . . . an application under . . . the Federal Food, Drug, and Cosmetic Act . . . for a drug claimed in a patent or the use of which is claimed in a patent[.]" 35 U.S.C. § 271(e)(2)(A). "The patentee bears the burden of proving infringement by a preponderance of the evidence." SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1123 (Fed. Cir. 1985).

"Determining infringement requires two steps. First, the claim must be properly construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process." Absolute Software, Inc. v. Stealth Signal, Inc., 659 F.3d 1121, 1129 (Fed. Cir. 2011).  "For literal infringement, the patentee must prove that the accused product meets all the limitations of the asserted claims; if even one limitation is not met, there is no literal infringement." E.I. du Pont De Nemours & Co. v. Unifrax I LLC, 921 F.3d 1060, 1073 (Fed. Cir. 2019).

After considering the evidence presented at trial, I find that Azurity has proven by a preponderance of the evidence that Alkem's ANDA infringes all asserted claims.  I address the two disputed claim limitations below.

### 1.  Presence of pH Adjusters

The asserted claims of the '621 patent recite an ingredient list preceded by the phrase "consisting essentially of." By using this phrase, a patentee "signals that the invention necessarily includes the listed ingredients but is open to unlisted ingredients that do not materially affect the basic and novel properties of the invention." HZNP Medicines LLC v. Actavis Labs. UT, Inc., 940 F.3d 680, 893 (Fed. Cir. 2019) (alterations omitted).  Alkem argues that this limitation is not

met because its ANDA contains pH adjusters—sodium hydroxide and hydrochloric acid—that materially affect its pH, which, in turn, impacts stability.

Azurity offers several responses. The first is that the ANDA infringes under the assumption that the pH adjusters will not be added to every batch. In Azurity's view, the designation "q.s." for the pH adjusters was a representation to the FDA that Alkem could make a compliant batch without adding the pH adjusters. (See N.T. 142-43, 151 (Little).)

To prove infringement under 35 U.S.C. § 271(e)(2)(A), Azurity must establish that if the ANDA is approved, Alkem "will likely market an infringing product." Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 1570 (Fed. Cir. 1997). Where the ANDA itself "does not clearly describe a product that meets the limitations of the asserted claims," a court must look to factual evidence bearing on "[w]hat is likely to be sold, or, preferably, what will be sold." Ferring B.V. v. Watson Labs., Inc., 764 F.3d 1382, 1387-88 (Fed. Cir. 2014) (quotation marks and alterations omitted).

Azurity's assertion that the pH adjusters will not be added to every batch misreads the ANDA. The designation "q.s." means that Alkem will add as much sodium hydroxide or hydrochloric acid as needed to achieve the target pH. (N.T. 138, 207.) Whether that amount could be zero is a factual question the ANDA does not answer. (See N.T. 173-74 (Little).) As an analogy, if a recipe were to call for "1 cup of flour and enough water to make the dough hold together," it would be incorrect to read that as stating that the dough could be made without water or to say that infringement could be proven on the assumption that water would not be added.

Azurity argues that this case is analogous to Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals, Inc., 731 F.3d 1271 (Fed. Cir. 2013). There, Teva's ANDA permitted it to sell a range of products, some of which would infringe Sunovion's patent. Id. at 1278. The Federal Circuit held that Teva could not avoid infringement based on "internal manufacturing guidelines"

and a "declaration" that it would limit the products actually sold to ones outside the patent's scope. Id. Here, unlike in Sunovion, Alkem's ANDA does not leave Alkem free to add or not add pH adjusters at its discretion. Rather, the ANDA requires pH adjusters to be added whenever the other ingredients do not yield a pH within the specified range. (See PTX-60 at ALK_ENPL_00000402 ("Check the pH of the solution … and adjust the pH about 3.30 (ranges 3.00 to 3.60) … ."); id. at 414 ("If required adjust the pH … .").) Thus, Alkem's ANDA does not authorize Alkem to sell a range of products, some infringing and some not. And, although the ANDA is silent as to how often liquids made using the required procedure will need pH adjustment, "silence does not answer the question of infringement." See Ferring B.V., 764 F.3d at 1409.[4]

Because the ANDA does not answer the question of whether the pH adjusters will be added to every batch, Azurity "must rely on evidence" to show what product would be sold if the ANDA were approved. See Ferring B.V., 764 F.3d at 1388. Azurity offers only speculation that some batches might vary in pH such that no pH adjustment would be necessary. Contrary to Azurity's argument, I do not read Alkem's expert Dr. Rabinow's statement that sodium hydroxide is "not necessarily" added to every batch as a concession that pH adjustment is sometimes unnecessary. (N.T. 207-09.) Rather, I view this testimony only as an acknowledgment that the ANDA is ambiguous as to how often the pH adjusters will be added. For these reasons, Azurity has failed to prove that Alkem would likely market some batches of its product without pH adjusters.

---

[4] At oral argument, Azurity noted that Alkem's ANDA includes a proposed product label stating that the drug "may" contain sodium hydroxide and hydrochloric acid. But this statement is consistent with the ANDA's requirement to add pH adjustors whenever the pH is outside of the specified range. And, even if the word "may" in the label carried a negative inference that some units of the product would lack pH adjusters, Azurity cites no authority that Alkem would be allowed to deviate from the product's specification in the ANDA based on more permissive language in a proposed label.

Azurity next argues that pH adjusters do not matter for infringement because they do not "materially affect the basic and novel properties" of Azurity's claimed invention. Azurity notes that after the pH of Alkem's ANDA is adjusted, the final pH will always be within the ranges specified in the asserted claims. Azurity thus reasons that pH adjusters must not materially affect the pH because they do not change whether claim limitations related to the pH are satisfied. But Azurity presented no evidence that Alkem's ANDA would be stable if its pH were not adjusted. And expert testimony persuasively demonstrated that adding pH adjusters to a liquid does affect its pH, that pH affects stability, and that stability is a basic and novel property of Azurity's invention. (N.T. 149 (Little); N.T. 200-01 (Rabinow).) Therefore, I agree with Alkem that the pH adjusters, to the extent they are present, "materially affect the basic and novel properties of the invention."[5]

Importantly, however, I do accept Azurity's final alternative argument that adding pH adjusters to the mixture does not avoid the "consisting essentially of" limitation. This is because the pH adjusters are consumed and are no longer present once the solution is mixed. On this point, I credit Dr. Little's testimony that the pH adjuster sodium hydroxide is consumed when it reacts with citric acid. (N.T. 140-43 (Little).) Alkem's expert Dr. Rabinow essentially conceded that this reaction occurs and that it results in the pH adjusters being eliminated. (N.T. 211-13 (Rabinow).) The products of this reaction are water and sodium citrate, both of which are ingredients listed in the asserted claims (either verbatim or contained within the term "citrate buffer"). (See N.T. 140-43.)

While neither party requested construction of whether the claimed ingredients must be

---

[5] I also note that Azurity's argument that the effect of an unlisted ingredient is not "material" so long as all other claim limitations are met would make the "consisting essentially of" limitation superfluous.

present before or after mixing, claims to a mixture ordinarily go to "a composition that contains the specified ingredients at any time from the moment the ingredients are mixed together." Mars, Inc. v. H.J. Heinz Co., L.P., 377 F.3d 1369, 1374 (Fed. Cir. 2004) (emphasis deleted). Therefore, the fact that sodium hydroxide is an unlisted ingredient does not preclude infringement provided that the mixture ultimately contains only listed ingredients, and I accept Dr. Little's explanation that it does. For that reason, Azurity has proven by a preponderance of the evidence that the "consisting essentially of" limitation is met.

### 2. Buffer Concentration

All asserted claims require that a buffer be present in a certain concentration, such as "wherein the buffer concentration is about 5 mM to about 20 mM." ('621 patent, Claim 4 (independent claim inserted).) Alkem argues that Azurity has not proven that the ANDA contains a buffer in the same concentration. Specifically, Alkem characterizes Dr. Little's testimony that the pH adjuster sodium hydroxide reacts with citric acid to form sodium citrate as suggesting that adding pH adjusters alters the buffer concentration, a detail that Azurity's infringement testimony does not account for. As before, I will analyze the issue under the assumption that pH adjusters will be added to every batch because Azurity has not proven that Alkem would likely market a batch without them.

I credit Dr. Little's testimony that the buffer concentration in Alkem's ANDA can be determined by calculating the amounts of citric acid and sodium citrate and adding those two quantities together. (See N.T. 117 ("[Y]ou do this calculation and add them together" to obtain "the total of the buffer concentration . . . .").) I also find convincing Dr. Little's explanation that when this calculation is performed for Alkem's ANDA, the result is within the limitation recited in the claim.

Based on these facts, I conclude that the asserted buffer concentration limitations are met.

Alkem asks me to not accept Dr. Little's calculation because he also testified that added sodium hydroxide reacts with citric acid to form water and sodium citrate, which Alkem hypothesizes must "grow" the buffer. But no expert testified that this reaction grows the buffer; rather, Alkem asks me to infer it as a matter of logic. A court must not "dr[aw] on its own knowledge" of technical matters without the aid of expert testimony. See Flash-Control, LLC v. Intel, No. 2020-2141, 2021 WL 2944592, at *4 (Fed. Cir. July 14, 2021). And even if Alkem is correct that adding sodium hydroxide could change the buffer concentration, Alkem provided no reason to believe the effect is so substantial that Dr. Little should have accounted for it. For these reasons, Alkem's unsupported hypothesis that adding sodium hydroxide "grows" the buffer does not persuade me to discredit Dr. Little's otherwise convincing calculation that the buffer limitation is met.[6]

Because Azurity has proven by a preponderance of the evidence that Alkem's ANDA meets all asserted claim limitations, I conclude that Alkem's ANDA infringes all asserted claims.

## III. OBVIOUSNESS

### A. Facts Relevant to Obviousness

#### 1. Background on Liquid Dosage Forms for Drugs

Azurity's claimed invention is a liquid dosage form of enalapril, which is important because not all patients can swallow pills. (See N.T. 104 (Little).) The parties' experts testified to three

---

[6] In light of this disposition, it is unnecessary to address Azurity's contention that Alkem forfeited its argument that the addition of pH adjusters affects the buffer concentration. However, I note that the issue in dispute is whether Dr. Little's testimony should be disbelieved because it is internally inconsistent. Given that it was Azurity's burden to present evidence of infringement and "credibility is always at issue," United States v. Green, 617 F.3d 233, 251 (3d Cir. 2010), it is unlikely that Alkem could forfeit its right to point out inconsistencies in Dr. Little's testimony.

ways that liquid dosage forms can be produced. The first is by compounding, in which a pharmacist crushes a tablet and mixes it with a liquid. (N.T. 69 (Beckloff); N.T. 104 (Little).) Compounding has drawbacks in that it creates risks of contamination and causes variation from pharmacy to pharmacy. (N.T. 105 (Little).) A second way is reconstitution, in which the drug is sold as a powder and a pharmacist mixes the powder with a liquid. (N.T. 69 (Beckloff); N.T. 106-07 (Little).) The third way is for the drug itself to be manufactured as a "ready-to-use" (or "RTU") liquid. (N.T. 107 (Little).) Ready-to-use liquids avoid the contamination issues associated with compounding. (N.T. 107 (Little).)

### 2.  Drug Development Process

The parties agreed that a POSA would have experience developing drug formulations. (N.T. 110-11, 191.) The process by which drug formulations are developed is relevant to understanding whether Azurity's claimed invention would have been obvious before the priority date.

When developing a drug formulation, a formulator (someone who develops drug formulations) would start with a "target product profile," which describes the desired characteristics of the drug. (N.T. 258-59 (Constantinides); Mosher[7] 26.) The target product profile includes the dosage form (such as an oral liquid) and the required stability. (N.T. 259.)

Before the invention at issue, it was known in the art that stability is a critical part of the development of an oral liquid. (N.T. 259 (Constantinides).) For example, a ready-to-use liquid needs to be stable for at least 12 months to account for distribution time. (Mosher 63-64.) The term "stability" encompasses many different kinds of stability: chemical stability, physical stability, stability of taste, stability of smell, and others. (N.T. 328.) This case involves chemical stability.

---

[7] Citations to "Mosher" refer to Dr. Mosher's video deposition transcript.

"The chemical stability of many drugs in solution may be improved by maintaining the pH of the solution in a particular range." (DTX-1118, de Villiers[8] at 225; see also Casas[9] at 272 ("[S]ome active ingredients … require a certain pH range to achieve maximum stability in aqueous solution, and in such cases, the pH must be adjusted to the requirements of stability of the preparation.").) Thus, a formulator developing a drug would determine how the drug's stability depends on the pH of the formulation. (N.T. 260 (Constantinides).)

Formulators sometimes measure the stability of a drug for a short time and use that data to predict stability over a longer period, a process called "accelerated" stability testing. (N.T. 553 (Little).) Accelerated stability testing can be an "exploratory tool." (N.T. 553 (Little).) But accelerated stability testing is not always predictive of long-term stability because the way a drug degrades in the short-term can be different than the way it degrades in the long-term. (N.T. 551-52.)

The FDA has published a guidance document, dated November 2003, that "is intended to define what stability data package for a new drug substance or drug product is sufficient for a registration application … ." (FDA Guidance[10] § 1.1.) For drugs intended to be stored in a refrigerator, the FDA Guidance permits a registration application to use 12 months of stability data at refrigerated temperature or 6 months of stability data at an elevated temperature. (Id. § 2.1.7.2.) The FDA Guidance defines a "significant change" during testing as, among other things, "[a] 5 percent change in assay from [the drug's] initial value." (Id. § 2.2.7.1.)

---

[8] de Villiers, "Buffers and pH Adjusting Agents" (3d ed., J.E Thomson ed. 2009) ("de Villiers").

[9] PTX-78, Casas et al., "Physicochemical stability of captopril and enalapril extemporaneous formulations for pediatric patients," Pharm. Dev. & Tech., 20(3):271-78 (Nov. 26, 2013) ("Casas").

[10] DTX-1109, "Guidance for Industry: Q1A(R2) Stability Testing of New Drug Substances and Products," United States Food and Drug Administration ("FDA Guidance").

### 3. Buffers

Buffers are used to maintain pH, and their use was basic knowledge for a POSA as of the priority date. (N.T. 192 (Rabinow); N.T. 257 (Constantinides).)

Alkem's expert Dr. Constantinides, Azurity's employee Dr. Mosher, and the published source de Villiers provided consistent information about how a POSA would choose a buffer for a drug, taking into account information such as the desired pH, among other factors (such as the buffer's "pK$_a$"). (<u>See</u> Mosher 33-35.) de Villiers suggests buffer types appropriate for specific pH ranges, with a citrate buffer being appropriate for a pH of 2.5 to 6.5. (de Villiers at 225-29.) A formulator will also usually have experience with many buffer systems and may rely on experience to choose one. (Mosher 58-59.)

Once the type of buffer is selected, the concentration of the buffer needs to be chosen. The buffer concentration can be determined using well-known chemical principles such as those described in the literature. (N.T. 291-94 (Constantinides, citing de Villiers).) The literature includes example concentrations of citric acid and sodium citrate that can be used to make a buffer suitable over a pH range from 2.5 to 6.5 (de Villiers at 228-30.)

### 4. Enalapril

Enalapril is a drug used to treat hypertension (high blood pressure). (N.T. 100 (Little).) Before enalapril can affect blood pressure, it must be converted to another chemical called "enalaprilat." (N.T. 100-01 (Little).) But because enalaprilat is not absorbed by the body, the drug that is administered to the patient must be enalapril, which then converts to enalaprilat in the body. (N.T. 103 (Little).)

The reaction that converts enalapril to enalaprilat is called "hydrolysis," and, when enalapril

is mixed with water, it can undergo hydrolysis even when it is not in the human body. (N.T. 100-02 (Little).)  It was thus known before the present invention that enalapril can degrade in water, a fact relevant to enalapril's chemical stability. (N.T. 102-03, 454-55 (Little); N.T. 328; Allen[11] at 1917-18.)

It was also known in the art that the stability of enalapril in water depends strongly on the pH of the solution.  (N.T. 202 (Rabinow); Allen at 1917-18; Al-Omari[12] at 898.)  Thus, a formulator seeking to make an oral liquid formulation of enalapril could increase its stability by using an appropriate pH. (Allen at 1918.)

Two prior art sources state that enalapril is most stable when the pH of the solution is near 3.  (Allen at 1917; Sosnowska[13] at 322.)  These prior-art teachings are important because a central point in dispute is whether a POSA would have known how to make enalapril stable before Azurity's invention.[14]

The parties' experts disagreed how easy it would have been before Azurity's invention to make enalapril stable in water.  Alkem's expert Dr. Constantinides testified that it would have

---

[11] DTX-1074, Allen et al., "Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids," Am. J. Health-Syst. Pharm., 55:1915-1920 (Sept. 1998) ("Allen").

[12] DTX-1144, Al-Omari et al., "Effect of the drug-matrix on the stability of enalapril maleate in tablet formulations," J. Pharm. Biomed. Anal., 25(5-6), pp. 893-902 (July 2001) ("Al-Omari").

[13] DTX-1077, Sosnowska et al., "Stability of extemporaneous enalapril maleate suspensions for pediatric use prepared from commercially available tables," Acta Poloniae Pharmaceutica-Drug Research, 66(3):321-26 (2009).

[14] Azurity argued at trial that one or both of these publications may inaccurately cite enalapril's stable pH to another source, The Merck Index, An Encyclopedia of Chemicals, Drugs, and Bio-logicals (12th ed.) (the "Merck Index").  In context, it appears that Allen's citation to the Merck Index corresponds to other information in the same sentence (enalapril's "$pK_a$ values") and does not inaccurately cite the Merck Index for enalapril's stable pH. Sosnowska, on the other hand, does inaccurately cite the Merck Index for enalapril's stable pH.

been "easy" for a POSA to make enalapril in water 95% stable for 24 months at refrigerated temperature through "routine experimentation" based on what was known in the prior art.  (N.T. 315-16.)  Azurity's expert Dr. Little opined that a formulator would not consider stability for 18 months an achievable goal.  (N.T. 486, 532.)  In Dr. Little's view, "all of the various things in the formulation" are needed to achieve long-term stability, and, therefore, if a POSA attempted to "optimize" an enalapril liquid for stability, any alteration to the formulation could have undesirable effects.  (N.T. 500, 526-27.)  According to Dr. Little, Azurity managed to make enalapril stable in water by finding a "specific combination of things" that avoids "all of the different reactions that could potentially happen with" enalapril in water.  (N.T. 533.)

### 5.  Enalapril Liquid Formulations Predating Azurity's Invention

The priority date of the asserted patents is March 18, 2016.  (Revised (8/14/2022) Uncontested Facts ¶¶ 15, 28.)  Prior art publications consist of those that were published and publicly accessible before that date.  See VidStream LLC v. Twitter, Inc., 981 F.3d 1060, 1066 (Fed. Cir. 2020).

Liquid dosage forms of enalapril had been developed prior to Azurity's invention, although no prior liquid form of enalapril met all limitations of any asserted claim.  (See N.T. 352 (Constantinides).)  In particular, no prior art publication had described an enalapril liquid that was stable for 12 months.  (See N.T. 352 (Constantinides).)  The liquid dosage forms of enalapril that had been developed before Azurity's invention are summarized below.

**Nahata (June 1998)**   Nahata describes a study "to determine the stability of enalapril maleate" in various liquids at refrigerated and room temperature.[15]   (Nahata[16] at 1156.)  Nahata notes that this work was undertaken because there was "limited data on the stability of enalapril in extemporaneously prepared oral liquids" and, in particular, "no known stability data for enalapril in readily available vehicles . . . ." (Id. at 1155-56.)

Nahata studied enalapril in: (1) water, (2) a citrate buffer solution, and (3) a mixture of the commercially available liquids Ora-Plus and Ora-Sweet.  The pHs of these liquids are, respectively, 7.1, 5.1, and 4.7.  (Nahata at 1156.)  pH is important to the obviousness analysis because enalapril was reported to be more stable at some pHs than others.  As noted above, enalapril was known to be most stable at a pH near 3, and Nahata's Ora-Plus and Ora-Sweet mixture is closest to this value.

Nahata reports data on the stability of the three studied enalapril liquids.  Nahata evaluates stability by measuring how much enalapril remains in the liquid over time.  The data for the Ora-Plus and Ora-Sweet mixture at refrigerated temperature start at 100.0 plus-or-minus 3.6% at the beginning of the study and end at 95.8 plus-or-minus 5.9% after 90 days, with a visible downward trend in between. (Nahata at 1156.)

**Allen (Sept. 1998)**   Allen reports on a study of liquid forms of various drugs, including enalapril.  Like Nahata, Allen studied enalapril in three different liquids:  (1) a mixture of Ora-Sweet and Ora-Plus, (2) a mixture of Ora-Sweet SF and Ora-Plus, and (3) cherry syrup.  The pHs of these liquids are 4.7-4.8, 4.7-4.8 again, and 3.9.  As noted, Allen states that enalapril is most

---

[15] Refrigerated temperature is 5 plus-or-minus 3 °C. (N.T. 548 (Little).)

[16] DTX-1078, Nahata et al., "Stability of enalapril maleate in three extemporaneously prepared oral liquids," Am. J. Health-Sys. Pharm., 55:1155-57 (June 1, 1998) ("Nahata").

stable at a pH near 3, and the pH of the cherry syrup liquid is closest to this value.  (Allen[17] at 1918.)

Allen tested the stability of those three enalapril liquids and reports the resulting data.  The study runs for a period of 60 days.  Some of the tests are done at refrigerated temperature.  The reported stability numbers for the cherry syrup liquid at refrigerated temperature start at 97.2 plus-or-minus 1.0% and end at 97.0 plus-or-minus 1.1%. (Allen at 1918.)

Allen also discusses prior work on the stability of enalapril and notes that a prior study found that enalapril liquids with pHs of "2 and 5 were stable for 262 and 114 days, respectively," at room temperature. (Allen at 1917-18.) Another study mentioned by Allen found that enalapril in a citrate buffer with a pH of 5 was stable for 90 days at refrigerated temperature but not as stable at room temperature.  (Id. at 1918.)  Regarding those prior studies, Allen observes that "[t]hose liquids were buffered to a pH that was 2 units less acidic than the pH at which the drug has maximum stability." (Id. at 1918.)  In contrast to those studies, Allen's enalapril liquids use pHs "somewhat closer to the pH for maximum stability"—i.e., 3.  (Id. at 1918-19.)  Thus, Allen provides evidence that as early as 1998, it was known in the art that a formulator seeking to make an enalapril liquid should use a pH near 3 to achieve the greatest stability.

**Al-Omari (2001)**   Al-Omari's study provides no information about long-term stable liquids but was offered by Alkem to demonstrate the importance of pH in making enalapril stable. Al-Omari's primary aim was to study the stability of enalapril in tablets, but Al-Omari's publica-

---

[17]DTX-1074, Allen et al., "Stability of alprazolam, chloroquine phosphate, cisapride, enalapril maleate, and hydralazine hydrochloride in extemporaneously compounded oral liquids," Am. J. Health-Syst. Pharm., 55:1915-1920 (Sept. 1998) ("Allen").

tion contains information about enalapril liquids as well. (Al-Omari[18] at 893.) Al-Omari studied enalapril liquids with pHs of 10.5, 7.0, 5.5, 3.4, and 2.2. Stability data for each of these liquids are presented in a graph showing how fast each liquid degraded over time. This data was collected at 80 °C for under 140 hours (that is, substantially warmer than refrigerated temperature and substantially shorter than one year). (Al-Omari at 898.)

Al-Omari's graph shows that the enalapril liquid with a pH of 3.4 degraded the slowest among the liquids tested. The liquid with a pH of 2.2 was the next slowest. (Al-Omari at 898; N.T. 196-97 (Rabinow).) Al-Omari concludes from these data that "the rate of enalapril loss is dependent upon the solution pH and it is obvious that the degradation at pH 10.5 is more significant than that at lower pH values." (Al-Omari at 898.) Al-Omari also notes that a prior study had found that the rate at which enalapril degrades "depend[ed] upon [the] pH of the solution[.]" (Id. at 894.) Alkem thus offers Al-Omari to support its expert Dr. Rabinow's opinion that pH was known to be the "dominant" driver of the stability of enalapril. (N.T. 195-97, 202 (Rabinow).)[19]

**Sosnowska (2009)**   The purpose of Sosnowska's study was to examine enalapril liquids "prepared from commercially available tablets" by compounding. (Sosnowska at 321 (abstract).) According to Sosnowska, "[i]t is important that the drug should be stable in the vehicle for the proposed duration of storage and administration of the product." (Id. at 321.)

---

[18] DTX-1144, Al-Omari et al., "Effect of the drug-matrix on the stability of enalapril maleate in tablet formulations," J. Pharm. Biomed. Anal., 25(5-6), pp. 893-902 (July 2001) ("Al-Omari").

[19] At trial, Azurity pointed out that Al-Omari's graph is poorly labeled and obscures the exact rate at which each studied liquid degraded. (Al-Omari at 898.) Although Alkem's expert Dr. Rabinow relied on Al-Omari for its teaching about the relationship between pH and stability, Dr. Rabinow conceded that Al-Omari's poorly labeled graph was a "mistake." (N.T. 214 (Rabinow).) But Dr. Rabinow pointed out that, even though the exact rate at which each liquid degraded is unclear, he could tell that some of the liquids degraded at least "tenfold . . . , perhaps more." (See N.T. 214-15 (Rabinow).)

Sosnowska studied enalapril liquids that all had a pH of 3—the value Sosnowska and Allen give for the pH at which enalapril is most stable. Sosnowska's liquids used citric acid as a buffer to maintain this pH. (Sosnowska at 322.)  Stability data for Sosnowska's enalapril liquids are reported.  Sosnowska tested these liquids for 30 days, some at refrigerated temperature.  (Id. at 322.) The average stability after 30 days was at least 98% under all studied conditions.  (Id. at 322.)

**Casas (Nov. 2013)**   Casas's objective was to develop enalapril liquids that could be made by compounding and administered to children. (Casas[20] at 271.) To achieve that objective, Casas prepared solutions of enalapril in water and measured the stability of these solutions at various temperatures.  The solutions had pHs in the range of 2.55 to 2.78.  (Id. at 275.)  According to Casas, these liquids are ones that "a Pharmacist could easily prepare with available and low cost materials . . . ." (Id. at 272.) Casas also states that paraben preservatives should not be used in these formulations because parabens can cause allergic reactions, especially in infants, newborns, and toddlers. (Id. at 272.)

Casas presents data on the stability of the studied liquids in a graph.  At refrigerated temperature, the graph shows no visible change in the amount of enalapril remaining over the 50 days of study. (Casas at 278.) But Casas also states, without corresponding data or points on the graph, that "[a]fter 3 months of study, at the three temperatures studied drug content of [the formulation] decreased by 40%." (Id. at 277.)

---

[20] PTX-78, Casas et al., "Physicochemical stability of captopril and enalapril extemporaneous formulations for pediatric patients," Pharm. Dev. & Tech., 20(3):271-78 (Nov. 26, 2013) ("Casas").

**The Epaned Kit and the '747 Patent (Oct. 2013)**   The next prior liquid formulation of enalapril is Azurity's own "Epaned Kit" product.  Prior to inventing a ready-to-use enalapril liquid, Azurity marketed the Epaned Kit, which consisted of an enalapril powder and a liquid (the "diluent") that could be combined to make an enalapril liquid. (N.T. 64-65 (Beckloff).)

Azurity's patent related to the Epaned Kit is U.S. Patent No. 8,568,747 (the '747 patent), which was published on October 29, 2013, and claims enalapril powders that are reconstituted into oral liquids.  (See DTX-1094, '747 patent, claim 1.)  The '747 patent states that some of the described liquids are "stable" for 36 weeks at "refrigerated and ambient conditions." The patent defines "stable" as "having at least about 90% enalapril and 5% or less total impurities or substances at the end of a given storage period." (Id., col. 13:5-33.) The '747 patent reports stability data for some example reconstituted liquids measured over 12 weeks, including some tests at refrigerated temperatures. The data at refrigerated temperature consistently show at least 95% of the enalapril remaining over the 12 weeks of study. (Id., col. 23.)

Relevant to some of the specific ingredients recited in the asserted claims, the '747 patent includes example liquids in which the concentration of enalapril is 1.0 mg/mL and describes the use of paraben preservatives with an enalapril liquid that is described as "stable." ('747 patent, cols. 5:28-32, 7:51-59, 22:59.)  It also describes the use of sweeteners in these enalapril liquids, including sucralose and xylitol. (Id., cols. 7:60-8:37.)

**Kit Insert (2014)**   Azurity's prescribing literature for the Epaned Kit included a document the parties referred to as the "Epaned Kit Insert," which is dated September 2014.  (DTX-1073.) The Kit Insert contains information about the composition of the powder and liquid used to make the Kit.  It states that the Epaned Kit uses Ora-Sweet SF as the liquid, which contains citric acid

and sodium citrate that are described as a "buffer[]." (Kit Insert § 11.) It also states that Ora-Sweet SF contains methylparaben and propyl paraben and gives the amounts of these ingredients. (Id.) Dr. Constantinides testified that the amount of preservative stated in the Kit Insert is very close to the concentration of preservative recited in the asserted claims. (N.T. 301-02 (Constantinides).)

The Kit Insert further states that the Kit powder contains mannitol, a fact Azurity offered in an effort to show that an enalapril liquid made without mannitol (as some asserted claims require) would not have been obvious. Mannitol is a "bulking agent" used in powders. (N.T. 265, 306 (Constantinides).) According to Alkem's expert Dr. Constantinides, a POSA attempting to make a long-term stable solution of enalapril in water would not try adding mannitol because it is not needed. (N.T. 265.) Azurity's expert Dr. Little disagreed and stated that mannitol has uses in liquid formulations, including as a sweetener and as a "tonicity agent." (N.T. 492-93.) Dr. Little also testified that mannitol can be used as a "stabilizing agent." (N.T. 492.)

### 6. Issues with Prescribing Enalapril to Children Before the Present Invention

Azurity presented evidence that before the Epaned Kit became available, physicians prescribing enalapril to children would use compounding, a practice with numerous drawbacks. Azurity also attempted to show that there were drawbacks to using its own Epaned Kit product, although for the reasons explained below, that testimony was largely speculative.

As of 2014, enalapril was the only anti-hypertensive drug that was usable by a broad age range of patients. (N.T. 403-04 (Mahan).) Given the lack of alternatives, Azurity's expert Dr. Mahan prescribed enalapril to children before there was a liquid form available, coming up with work-arounds when patients could not swallow pills. (N.T. 404-05.) As described above, some of these work-arounds, such as compounding, created safety risks.

Azurity's Epaned Kit was an improvement over compounding, leading Dr. Mahan to use the Kit over compounding.  (N.T. 422-23.)  The Kit became available in 2013 and was safe and effective. (N.T. 439 (Mahan).)  Even with the Kit, Dr. Mahan was still concerned that pharmacies might make mistakes because many steps were involved in reconstitution.  Dr. Mahan sometimes suspected that pharmacies made errors with reconstitution.  (N.T. 423-25.)  Azurity's head of research and development Mr. Beckloff also testified that he believed pharmacy technicians sometimes made errors with the Kit, including using the wrong diluent, poking a pen through the seal, and causing contamination with fibers from the pharmacist's sweater. (N.T. 65-66.)

But Dr. Mahan could not identify a specific instance in which a pharmacy reconstituted the Kit incorrectly. He had only heard "stories." (N.T. 440-43.) Mr. Beckloff testified that an error that resulted in a liquid of the wrong concentration would have "safety implications," but did not testify that any such error occurred. (N.T. 66.)

### B.  Discussion—Obviousness

"A patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103.  The accused infringer bears the burden of proving invalidity by clear and convincing evidence.  Microsoft Corp. v. i4i Ltd. Partnership, 564 U.S. 91, 95 (2011).  The obviousness inquiry is "flexible" and "functional." KSR Int'l Co. v. Teleflex Inc. 550 U.S. 398, 415 (2007).  "[A] court can take account of the inferences and creative steps that a [POSA] would employ." Id. at 418.  But analysis based on hindsight is forbidden. Insite Vision Inc. v. Sandoz, Inc., 783 F.3d 853, 859 (Fed. Cir. 2015).  An

24

invention is not obvious merely because it is "sufficiently simple to appear obvious to judges after the discovery is finally made." <u>Outside the Box Innovations, LLC v. Travel Caddy, Inc.</u>, 695 F.3d 1285, 1298 (Fed. Cir. 2012).

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." <u>KSR</u>, 550 U.S. at 418. Rather, it must be shown "by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." <u>In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.</u>, 676 F.3d 1063, 1068-69 (Fed. Cir. 2012). "In considering motivation . . . , the problem examined is not the specific problem solved by the invention," because "[d]efining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness." <u>Insite Vision Inc. v. Sandoz, Inc.</u>, 783 F.3d 853, 859 (Fed. Cir. 2015). Rather, motivation must be viewed from the perspective of the prior art. <u>Id.</u>

"The ultimate judgment of obviousness is a legal determination." <u>KSR</u>, 550 U.S. at 427. The court must make subsidiary factual findings as to: "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness." <u>In re Cyclobenzaprine Hydrochloride</u>, 676 F.3d at 1068; <u>see also</u> <u>Graham v. John Deere Co.</u>, 383 U.S. 1, 17 (1966); <u>KSR</u>, 550 U.S. at 415.

The parties agree that all ingredients in the asserted claims, including enalapril itself, were individually known prior to Azurity's invention, and that it was known that enalapril could be mixed with water to make a liquid dosage form. Azurity also did not seriously challenge Alkem's evidence that it was known that enalapril liquids could include buffers, preservatives, sweeteners,

and flavors—including the same choices for these ingredients as used in the asserted claims. Notably, at the time of the invention at issue, Azurity itself marketed the Epaned Kit, which contained enalapril in the claimed concentration, a citrate buffer, sweeteners, and paraben preservatives. (Kit Label § 11.)

It was, however, also undisputed that the prior art did not disclose any liquid formulation of enalapril known to be stable for a year or more at refrigerated temperature. The parties disagree as to whether a POSA would have expected, before Azurity's invention, that enalapril in water could be as stable as the asserted claims require. The parties also disagree as to whether it would have been obvious to use the particular combination of ingredients recited in the claims.

For the reasons discussed below, I find that Alkem has proven by clear and convincing evidence that the asserted claims would have been obvious to a POSA as of March 18, 2016. Alkem's evidence persuasively established that a POSA would have expected that enalapril could be stable for a year or more in water at refrigerated temperature. I also credit Alkem's interpretation of the prior art that enalapril in water would be most stable if combined with a buffer to keep the pH at "about 3," a range that includes claimed pHs near 3.3. The remaining ingredients—flavors, sweeteners, and preservatives—were known, and the requirements of a manufactured oral liquid would provide a motivation to combine these known ingredients into a single product. The result is Azurity's claimed invention.

### 1. Expectation of Success in Developing a Long-Term Stable Enalapril Liquid

The heart of the parties' obviousness dispute is whether a POSA would have reasonably expected that enalapril in water could be as stable as the claims require—that is, at least 95% stable at refrigerated temperature after 12, 18, or 24 months. To prove that Azurity's invention

was obvious, Alkem must establish that "a [POSA] would have had a reasonable expectation that" attempting to make a long-term stable enalapril liquid "would succeed." Leo Pharmaceutical Prods. v. REA, 726 F.3d 1346, 1357 (Fed. Cir. 2013). For Alkem to meet this burden, "the expectation of success need only be reasonable, not absolute." Pfizer, Inc. v. Apotex, Inc, 480 F.3d 1348, 1364 (Fed. Cir. 2007). It is not enough for Alkem to show that it would have been "obvious to try" making a long-term stable enalapril liquid, but, at the same time, "absolute predictability of success is not required." Id. at 1365. And the fact that any candidate stable enalapril liquid would require "verifi[cation] through testing" does not necessarily mean that a POSA would not reasonably expect the attempt to succeed. Id. at 1364.

No prior art reference states either that it was or was not possible to make an enalapril liquid that was 95% stable for 12 to 24 months at refrigerated temperature. The longest examples of stability mentioned in the prior art are in: (1) the '747 patent, which states that some liquids are 90% stable for 36 weeks (252 days) at an unspecified temperature; and (2) a prior study mentioned in Allen, which reportedly produced enalapril liquids stable for 262 days (at an unspecified per-centage) at room temperature despite using a non-optimal pH. (See '747 patent, col. 13:5-33; Allen at 1917-18.) On the other hand, no prior art reference includes data showing that enalapril in water at refrigerated temperature and a pH near 3 was less than 95% stable for the duration of whatever test was conducted. Thus, prior art publications did not conclusively reveal whether enalapril in water at a pH near 3 could be stable for 12 to 24 months.

Azurity interprets this state of the art as teaching that enalapril was generally unstable in water and that long-term stability was out of reach. Azurity's expert Dr. Little testified that the "breadcrumbs" in the prior art suggesting how to achieve long-term stability were too thin to create a likelihood of success. (N.T. 487-89.) Dr. Little also considered it significant that prior art studies

of enalapril used various pHs, some quite different than Allen's reported most stable pH of 3. (N.T. 488.)

Alkem responds that a POSA would have expected that enalapril could be stable in water. Alkem's counsel acknowledged that the prior art did not provide a "direct road map" for making enalapril stable, but Alkem's expert Dr. Constantinides testified that it would be an "easy task" to make an enalapril liquid stable for 18 or 24 months based on knowledge in the prior art. (N.T. 320 (counsel); N.T. 316, 371 (Constantinides).) Specifically, Dr. Constantinides testified that a POSA would be motivated to optimize the stability of an enalapril liquid to 12, 18, preferably 24 months and would have known how to do so, making such level of stability expected. (N.T. 308, 321-22, 355 (Constantinides).)

The parties agree on the contents of the prior art but disagree as to how a POSA would interpret statements in those publications. First, the parties disagree how a POSA would interpret positive statements expressing that enalapril could be stable in water. For example, Allen shows high stability at a pH of 3.9 over 60 days at refrigerated temperature and concludes that these liquids "were stable" for the duration of the test; Sosnowska shows enalapril liquids with a pH of 3 that are at least 98% stable over 30 days at refrigerated temperature; Nahata shows an enalapril liquid with a pH of 4.7 having 95.8% of the enalapril remaining after 91 days and concludes that "enalapril maleate is stable in widely available vehicles"; Casas shows a graph with no visible change in enalapril concentration at pHs of 2.55 to 2.78 over 50 days refrigerated temperature (although Casas mentions, without data, significant degradation after 90 days); and the specification of the '747 patent states that liquid formulations exist that are 90% stable for 36 weeks (which is 252 days or 69% of a year).

Dr. Constantinides opined that these studies would have given a POSA confidence that

long-term stability was possible.  (See N.T. 382-84.) I find his opinion convincing.  The stability

of enalapril had been investigated numerous times and was always found to be sufficiently stable

for the application at hand.  And, with the exception of one sentence unaccompanied by data in

Casas, no study had shown any substantial degradation of enalapril in water at a pH near 3 and

refrigerated temperature. Contrary to Azurity's interpretation, the prior art simply does not convey

an impression that enalapril is generally unstable in water.[21]

Azurity advocates that an expectation of success has not been proven on several grounds.

First, Azurity notes that Dr. Little testified that extrapolating from prior-art data to the high level of

stability required by the claims (95% at 12, 18, or 24 months) was too speculative to give a POSA

hope that the high level of stability required by the claims could be achieved.  But Dr. Little's

opinion placed too much emphasis on studies of enalapril under conditions that were known not

to be ideal.  Such studies show only that some prior researchers who were not trying to achieve

long-term stability made formulations that were not long-term stable, not that long-term stability

was difficult to achieve.

For example, prior-art publications that studied the feasibility of compounding used com-

mercially available liquids to evaluate whether an enalapril mixture made from those liquids could

---

[21] Alkem also asks me to consider the fact that formulators commonly use accelerated stability
testing, in which degradation is measured at elevated temperatures.  I agree with Alkem that this
fact is relevant, but will give it less weight because no expert clarified how far the stability data
in the prior art could be extrapolated.  Alkem attempted to elicit this testimony from Dr. Constan-
tinides, but it was objected to on the ground that it went outside the scope of his report, and the
question was withdrawn. (N.T. 271-76.) I also place little weight on Alkem's reference to the sta-
bility of enalapril powders described in the '747 patent because I credit Dr. Little's testimony that
enalapril was known to react with water and a POSA would not view the stability of enalapril pow-
der as indicative of its stability in water.  Nevertheless, for the reasons stated above, I am ultimately
persuaded by Dr. Constantinides's view that the prior art would have conferred an expectation of
success that enalapril could be long-term stable in water.

be left on the shelf, unrefrigerated, for short periods of time.  (E.g., Casas at 272 (developing an enalapril liquid that "a Pharmacist could easily prepare with available and low cost materials"); Allen at 1918 (using Ora-Sweet and cherry syrup); Sosnowska at 321 (using "commercially available tablets"); Nahata at 1155-56 (using "readily available vehicles"); N.T. 558 (Little) (prior art studies were not trying to achieve long-term stability); N.T. 373-74 (Constantinides) (Nahata was using "commercially available vehicles").)  Allen itself makes the point that prior studies that used a pH of 5 rather than 3 may not be indicative of the stability that could be achieved at a pH closer to 3.  (Allen at 1918.)  I find that a POSA would not be dissuaded by these studies from believing that long-term stability was achievable.

Azurity also points to a sentence in Casas stating that "[a]fter 3 months of study, at the three temperatures studied drug content of [the formulation] decreased by 40%." (Casas at 277.)  Azurity notes that although Casas was studying compounded liquids, it included liquids with pHs of 2.78 (which Dr. Constantinides testified was "about 3") that were stored at refrigerated temperatures.  I agree with Azurity that Casas could suggest to a POSA that it was possible to make an enalapril liquid that was not stable in water at refrigerated temperature for more than 90 days even if a pH near 3 were used.  Dr. Constantinides also acknowledged that the stability data presented in Casas is not predictive of 12 months of stability.  (N.T. 347-48.)  However, in the context of the other prior art, I conclude that Casas would not dissuade a POSA or teach away from expecting success in making a long-term stable enalapril liquid.  Notably, the '747 patent mentions that some liquids created by mixing enalapril in Ora-Sweet SF remain at least 90% stable after 252 days.  ('747 patent, cols. 13:5-33.)  Thus, a POSA could interpret Casas's mention of 40% degradation after 90 days not as the inevitable result of putting enalapril in water but as only the result of "[that] particular study."  (See N.T. 347 (Constantinides).)  And, moreover, Casas was not attempting to

achieve long-term stability, Casas's graph contains no data beyond 60 days, and Casas discarded test formulations after 30 days due to microbial contamination. (Casas at 275.)

I also find that Dr. Little's testimony overemphasized the way prior art references <u>defined</u> "stable" rather than the level of stability that was actually achieved. For example, Dr. Little opined that a POSA would not expect that 95% stability was achievable because Sosnowska defined "stable" as at least 90% enalapril remaining, even though the data in Sosnowska showed that the average amount of enalapril remaining at the end of the test period was at least 98%. (N.T. 517-18; Sosnowska at 322.) Similarly, the fact that prior-art researchers collected data for less than a year reflects the requirements of compounding and does not convey the researchers' view that the drug would become unstable after the testing period. (<u>E.g.</u>, Nahata at 1157 (concluding that enalapril "is stable" based on short-term studies).)

Throughout trial, Azurity pointed to the 60-day shelf life of its Epaned Kit as evidence that the two-year stability of the present invention was a dramatic improvement. (<u>E.g.</u>, N.T. 64-65, 74 (Beckloff).) But the present invention claims stability at refrigerated temperature, not room temperature. No witness testified how long the Kit liquid would be stable if it were kept refrigerated. And Azurity's ready-to-use Epaned product also has a shelf-life of 60 days when not refrigerated, the same as the Kit. (N.T. 74 (Beckloff).) The comparison Azurity attempts to draw between the present invention and the Epaned Kit is therefore uninformative.

Azurity also directs me to FDA guidance stating that a "registration application" submitted to that Agency should contain stability data spanning at least 6, and preferably 12 months. (FDA Guidance §§ 1.1 (scope), 2.2.7.) I do not find the FDA's guidance informative on the question before me. The rigor of testing needed to approve a product is naturally greater than that needed to confer an expectation of success, which "need only be reasonable, not absolute." <u>Pfizer v. Apotex,</u>

480 F.3d at 1364.

For these reasons, I find that Alkem has proven by clear and convincing evidence that the prior art would have led a POSA to expect success in making a long-term stable enalapril liquid. The prior art did not show that enalapril's long-term stability in water was guaranteed, or that it would necessarily be stable for any particular length of time or meet any particular threshold. But the prior art did confer a reasonable expectation that mixing enalapril with water and adjusting the pH to about 3 could result in a drug that was highly stable for a long period of time.

## 2.  Motivation to Make an Enalapril Liquid Long-Term Stable

Alkem must also prove that a POSA would be motivated to make an enalapril liquid as stable as the claims require. Motivation "may be found in many different places and forms." <u>PAR Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.,</u> 773 F.3d 1186, 1197 (Fed. Cir. 2014). It "does not have to be explicitly stated in the prior art, and can be supported by testimony of an expert witness regarding knowledge of a person of skill in the art at the time of invention." <u>Id.</u>

I conclude that a POSA would know that it was necessary to make an enalapril liquid with long-term stability due to the requirements of distribution time and the FDA's requirements regarding shelf-life. (<u>See, e.g.</u>, N.T. 63-64 (Beckloff); N.T. 316 (Constantinides); Sosnowska at 321 ("It is important that the drug should be stable in the vehicle for the proposed duration of storage and administration of the product.").) Dr. Constantinides also credibly testified that a formulator making a ready-to-use liquid would want it to be as stable as the product already on the market—the Kit—which was 24 months. (N.T. 379.) The FDA's guidance provides a motivation to measure stability with a 95% threshold because it defines a "significant change" as, among other things, "[a] 5 percent change in assay from [the drug's] initial value." (FDA Guidance § 2.2.7.1.) Thus, a

POSA would have been motivated to make an enalapril formulation as stable as the claims require.

Azurity posits that once the Epaned Kit became available, there was no longer a motivation to make enalapril stable enough to be used as a ready-to-use liquid. But Alkem does not need to show that a ready-to-use liquid was a better way to make a liquid dosage form of enalapril than the Epaned Kit, just that it was a "suitable" way "from which the prior art did not teach away." PAR Pharmaceutical, 773 F.3d at 1197-98. I find that Alkem has met that burden.

### 3. Achieving Claimed Stability

Alkem must also show that it would have been obvious to a POSA "how" to make an enalapril liquid as stable as the claims require. See In re O'Farrell, 853 F.2d 894, 903 (Fed. Cir. 1988) (invention not obvious where prior art did not teach "how to achieve it").

I disagree with Alkem that the stability limitations would have been obvious through the doctrine of "inherency," which renders a claim limitation obvious if it is "the natural result of the combination of elements explicitly disclosed by the prior art." PAR Pharmaceutical, 773 F.3d at 1196. No evidence was offered at trial that the claimed stability was a "property[] inherently possessed" by any formulation made prior to Azurity's invention. Persion Pharmaceuticals LLC v. Alvogen Malta Operations Ltd., 945 F.3d 1184, 1190 (Fed. Cir. 2019). Alkem also failed to establish that stability is "necessarily present" in the combination of claimed ingredients. See In re Kubin, 561 F.3d 1351, 1357 (Fed. Cir. 2009).

But I agree with Alkem that the claimed stability would have been obvious because a POSA would have known how to achieve it through "routine application of a well-known problem-solving strategy." Pfizer v. Apotex, 480 F.3d at 1368 (quotation marks omitted); see also Jerry Harvey 809 F. App'x 919, 922-23 (Fed. Cir. 2020) (finding obviousness where there was a motivation

to achieve the claimed result, an expectation of success in doing so, and capability to achieve it through routine experimentation).  A formulator would have been immediately guided to focus on adjusting a single variable, the pH. The prior-art literature strongly conveys that pH drives the stability of enalapril in water and does not suggest that any other variable should be adjusted. (Azurity's contention with respect to mannitol is discussed later.)  In view of these teachings, I accept Dr. Constantinides's opinion that this optimization would have been "easy" through "routine experimentation." (N.T. 316, 352; see also N.T. 469 (Little) (noting the ease with which a formulator could make formulations and test them for stability).)  The variable was known, the target range (about 3) was known, and the method of adjusting and testing was known.  For example, Al-Omari provides a clear template for a POSA to prepare enalapril formulations at a range of pHs within the target range and test the stability of each formulation.

In addition, a formulator would not have needed to wait years for the experimental formulations to degrade; the formulator would have stored the preparations at an elevated temperature and measured the rate of degradation, as in Al-Omari.  Azurity criticizes the use of accelerated stability studies, but those criticisms are unavailing.  Azurity's first criticism is that accelerated stability results can be misleading because different reactions can occur in the short and long term, such that a solution that appears stable short-term can "fall off a cliff" when tested for longer.  But the vague suggestion that short-term stability tests can, in theory, be misleading does not inform whether they would have been misleading for enalapril specifically.  Dr. Little did not testify that enalapril degrades differently in the short and long term.  Azurity's second criticism is that short-term stability cannot guarantee long-term stability.  For example, the FDA does not accept short-term stability tests for use in demonstrating that a formulation is stable for 12 months. But a POSA would not have to conclude that long-term stability was <u>guaranteed</u> to choose a formulation

for long-term testing.

Although Azurity makes a principled argument that optimizing pharmaceutical formulations can sometimes be a daunting task due to the number of variables potentially involved, the facts of this case show that optimizing the stability of enalapril in water is a narrower task that does not involve many variables. "[O]bviousness law . . . recognizes an important distinction between combining known options into a finite number of identified, predictable solutions and merely throwing metaphorical darts at a board in hopes of arriving at a successful result[.]" Leo Pharmaceutical Prods., 726 F.3d at 1357 (citations and quotation marks omitted); see also Adapt Pharma Operations Ltd. v. Teva Pharmaceuticals USA, Inc., 25 F.4th 1354, 1383 (Fed. Cir. 2022) (a " 'general motivation' to experiment" does not make an invention obvious). Thus, "the discovery of an optimum value of a variable in a known process is usually obvious," in contrast to situations "where there are 'numerous parameters' to try." Pfizer v. Apotex, 480 F.3d at 1368. In addition, a narrow range within which to optimize (a pH of about 3) was known. See In re Cohen, 767 F. App'x 985, 988-89 (Fed. Cir. 2019) (finding optimization within a range known in the prior art to be obvious); In re Peterson 315 F.3d 1325, 1329-30 (Fed. Cir. 2003) (selecting within a range known in the prior art usually obvious). Optimizing a known variable within a known range is a more straightforward task than the open-ended problem of finding some combination of ingredients that achieves stability.

Given all of the above, I find that Alkem has proven by clear and convincing evidence that a POSA would have been able to make a liquid formulation that was long-term stable at refrigerated temperature through routine application of the known method of adjusting the formulation and testing for stability.

### 4. Choosing the Claimed pH

Some of the asserted claims require that the formulation have a pH within a certain range. The narrowest of these limitations requires that the pH be "about 3.3." (E.g., '621 patent, Claim 7.) Alkem therefore must prove that the asserted claims remain obvious when these limitations are included.

A POSA seeking to develop a liquid formulation of enalapril would review published literature and conclude that the pH at which enalapril was most stable in water was about 3. (Mosher 30 (discussing literature review in general); N.T. 202 (Rabinow); N.T. 260 (Constantinides); Allen at 1917-18; Al-Omari at 898; Casas at 272.) Dr. Constantinides's opinion that a POSA would view 3.3 as "about 3" is credible in light of Allen's statement setting the cut-off for stability at about 2 units away from optimal. (See Allen at 1917 ("At a pH >5, the rate of decomposition increases."); id. at 1918 ("Those liquids were buffered to a pH that was 2 units less acidic than the pH at which the drug has maximum stability.").)

Azurity criticizes the reported optimal pH based on the fact that two references reporting it—Allen and Sosnowska—include a citation to the Merck Index, which lacks that information. In context, however, it appears that Allen cites the Merck Index only for the "pK$_a$ value" of enalapril. (See Allen at 1917; Sosnowska at 322; Merck Index at No. 3605.) I conclude that a POSA would not infer from the Merck Index citations that Allen was incorrect about the maximally stable pH.

Azurity also counters that some published studies on enalapril liquids used pHs other than 3. (E.g., Allen at 1918; Nahata at 1156.) However, those sources do not represent the formulations they describe to be ideal, and several studies expressly state that they used readily available liquids rather than liquids optimized for stability. (E.g., Casas at 272 (developing an enalapril liquid that "a Pharmacist could easily prepare with available and low cost materials"); Allen at 1918 (using

36

Ora-Sweet and cherry syrup); Sosnowska at 321 (using "commercially available tablets"); Nahata at 1155-56 (using "readily available vehicles"); N.T. 559 (Little) ("the prior art do not state that in those publications the goal was to achieve" long-term stability); N.T. 373 (Constantinides) (Nahata was an "academic investigation").) A POSA would not read these publications as suggesting that a pH other than those near 3 should be used.

Alkem does not contend that a formulator in 2016 would have known before trying to choose 3.3 from among the pHs that are about 3, but takes the position that a formulator would have "optimized" the formulation to find the right pH—that is, tried different values until stability was achieved. For the reasons stated previously, a POSA would have expected success in optimizing stability through pH adjustment and would have been able to achieve the claimed stability through "ordinary skill and common sense" rather than "innovation." KSR, 550 U.S. at 402-03. In particular, a POSA would have focused on pH as the variable to adjust and would have known to adjust it within the range of pHs that are about 3, including 3.3. "[D]iscovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art." In re Boesch, 617 F.2d 272, 276 (Fed. Cir. 1980).

For these reasons, I find that Alkem has proven by clear and convincing evidence that the pH limitations of the asserted claims would have been obvious in combination with the other limitations.

### 5. Choosing the Claimed Ingredients

Alkem must also show, by clear and convincing evidence, that the particular formulation Azurity claimed would have been obvious, including the particular combination of all claimed ingredients. This inquiry "requires assessment of the invention as a whole." Princeton Biochem-

icals, Inc. v. Beckman Coulter, Inc., 411 F.3d 1332, 1337 (Fed. Cir. 2005).  "This 'as a whole' assessment of the invention requires a showing that an artisan of ordinary skill in the art at the time of invention, confronted by the same problems as the inventor and with no knowledge of the claimed invention, would have selected the various elements from the prior art and combined them in the claimed manner." Id. "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR, 550 U.S. at 418.

In evaluating whether a POSA would have been motivated to combine ingredients known in the prior art, I find that the process of drug formulation is instructive. The testimony of Dr. Constantinides, which was consistent with that of Dr. Mosher, was that a formulator begins with the product's desired characteristics—its "target product profile"—and proceeds by selecting ingredients to meet that goal. Thus, the process of formulation provides a motivation to combine elements needed to meet the target properties of the drug, such as combining a preservative (needed for a drug stored in a multi-use container) with a sweetener (needed for a drug administered orally to children). This process also provides a motivation to combine these ingredients with the stability and pH limitations, as a liquid containing these ingredients would need to be stable for the reasons stated above and would need to have a pH at which enalapril is stable.

With that background in mind, I note that it was generally known in the prior art that enalapril could be mixed with water, that those liquids should use pH at which enalapril is stable, that a buffer could be used to maintain the pH, and that enalapril liquids should include sweeteners and preservatives necessary for liquids that are stored in a bottle and orally administered to children.  (See N.T. 259, 288-89, 303 (Constantinides); Mosher 70.)  In addition, the particular choices of buffers, sweeteners, and preserves claimed were individually known and—more impor-

tantly—known to be usable with enalapril. (See, e.g., Kit Label § 11; '747 patent, col. 8.) Several of them are found in Azurity's own Epaned Kit.

Thus, a formulator seeking to make a ready-to-use enalapril liquid would know to mix enalapril with water, include a buffer to keep it at a pH near 3, and add the other ingredients required by the target profile of an oral liquid stored in a bottle, including a sweetener like sucralose and a preservative such as a mixture of parabens. That is, essentially, the entirety of Azurity's invention. While Azurity claims it found a "specific combination of things" that avoids "all of the different reactions that could potentially happen with" enalapril in water, the steps Azurity took to achieve that goal were largely to try the obvious combination of ingredients and realize that they worked.

Azurity disagrees with this characterization of its invention for several reasons. First, Azurity stresses that it would not have been obvious to take a given enalapril liquid described in the prior art and change its characteristics to match the claimed invention—for example, taking the Epaned Kit and removing mannitol. But the testimony at trial was that drug formulators do not work by taking existing formulations and adding or deleting ingredients. Rather, a formulator would work from a target product profile and add those ingredients required to meet it. (See N.T. 258-59 (Constantinides); Mosher 26.) Dr. Mosher specifically testified that a POSA seeking to make an enalapril liquid would not start with the commercially available liquid Ora-Sweet and attempt to reverse engineer it because determining the effect of each of its numerous ingredients would be prohibitively complicated. (Mosher 69.) Thus, the fact that a prior art reference used, for example, a different preservative than the claimed one does not make the claimed preservative nonobvious if it would have been obvious to a POSA to use the claimed preservative to meet the target product profile.

Azurity next argues that its specific choices of claimed ingredients were not obvious, either

individually or in combination. I address those specific ingredients below.

**Choice and Concentration of Buffer**   The choice and concentration of the claimed buffer follow from the known stable pH of enalapril.  Relying on de Villiers, a formulator would have selected a buffer made from sodium citrate and citric acid because de Villiers reports that such a buffer can be used at a pH near 3.  And de Villiers shows that determining an appropriate buffer concentration for the target pH would have been routine.  The need to make the drug stable would have provided a motivation to combine such a buffer with the other claim limitations.

**Preservative and sweetener**   The need to use a preservative and sweetener follow from the drug's target product profile as an oral liquid, which also provides the motivation to combine these ingredients with the other claim limitations.  Azurity's choice of preservative (parabens) and sweetener (sucralose) were known and known to work with enalapril.  ('747 patent, cols. 5:28-32, 7:51-59, 7:60-8:37, 22:59;  Kit Insert § 11;  N.T. 301-02 (Constantinides).)  To the extent other preservatives and sweeteners were also known to work with enalapril, a claimed design choice need not "be the best option" to be obvious; it only needs to be "a suitable option from which the prior art did not teach away." <u>PAR Pharmaceutical</u>, 773 F.3d at 1197-98.

Azurity argues that Casas would dissuade a formulator from using preservatives—and, in particular, paraben preservatives—because it states that some patients (especially children) are allergic to them.  But Casas made that statement in the context of compounded liquids with short shelf lives, and indeed some of Casas's liquids showed "microbial contamination" after just 30 days.  (Cases at 275.)  By contrast, a drug in a multi-use container needs a preservative.  (Mosher 70.)  Casas therefore does not teach that preservatives should not be used in a liquid intended for long-term storage.  I also note that Azurity does not claim that its invention dealt with the allergy

risks of parabens any differently than the prior art; rather, Azurity used a known ingredient with all its known advantages and disadvantages.

I therefore conclude that Alkem has proven that Azurity's choice of preservative and sweetener, and its decision to include a flavoring agent, would have been obvious in combination with the other claim limitations.

**Absence of Mannitol and Silicon Dioxide**   Claim 18 of the '482 patent requires that the invention not contain mannitol.  In addition, all claims of the '621 patent require that the invention not contain unlisted ingredients that "materially affect the basic and novel properties of the invention," which potentially excludes mannitol and silicon dioxide.  Azurity argues that a POSA would not think it obvious to make a formulation without mannitol because the '747 patent describes mannitol as a "stabilizing agent." (See N.T. 492-93 (Little).)  The '747 patent also includes stability data for three liquids reconstituted from powders—one powder made with mannitol, one made with lactose, and the other made with sucrose—and states that the powder made with mannitol was most stable. ('747 patent, col. 23.)

I find that Azurity's argument is inconsistent with how a POSA would choose ingredients for a ready-to-use enalapril liquid.  A formulator would not start with the formulation described in the '747 patent and attempt to modify it to achieve long-term stability.  (Mosher 69.)  Rather, a formulator would start with a target product profile and add those ingredients required to meet it. I credit Dr. Constantinides's testimony that a formulator working in this way would simply not introduce mannitol because it is rarely used in liquids.

Because I find that a POSA would have no reason to include mannitol in a ready-to-use enalapril liquid, its absence would have been obvious. To the extent the claims of the '621 patent

also exclude silicon dioxide, the same reasoning applies.

### 6. Secondary Considerations

In determining whether patent claims are obvious, secondary considerations of nonobviousness must be considered. Fromson v. Advance Offset Plate, Inc., 755 F.2d 1549, 1557 (Fed. Cir. 1985). Azurity offers three: (1) unexpected results, (2) failure of others, and (3) long-felt but unresolved need.

Alkem makes a threshold argument that no secondary considerations apply because any such considerations would lack a nexus to the claimed invention. "In order to accord substantial weight to secondary considerations in an obviousness analysis, the evidence of secondary considerations must have a 'nexus' to the claims, i.e., there must be a legally and factually sufficient connection between the evidence and the patented invention." Fox Factory, Inc. v. SRAM, LLC, 944 F.3d 1366, 1373 (Fed. Cir. 2017) (quotation marks omitted). "The patentee bears the burden of showing that a nexus exists." Id. Alkem argues there is no nexus in this case because Azurity happens to market a commercial enalapril product—Epaned RTU—that does not practice the asserted claims.

I disagree with Alkem's nexus argument. The nexus rule is that the evidence of secondary considerations must relate to the "the patented invention," not necessarily to any particular product. See Fox Factory, 944 F.3d at 1373. Azurity must show a nexus, but it is a nexus between the evidence and the claims, not between the claims and an unrelated commercial product.

With that understanding, I consider Azurity's evidence of secondary considerations.

**Unexpected Results**   "To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art,

and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention." Bristol-Meyers Squibb Co. v. Teva Pharmaceuticals USA, Inc., 752 F.3d 967, 977 (Fed. Cir. 2014). "While a 'marked superiority' in an expected property may be enough in some circumstances to render a compound patentable, a 'mere difference in degree' is insufficient." Id.

The parties' experts disagreed as to whether it would have been unexpected as of March 2016 that an enalapril formulation using the claimed ingredients would have been stable, with Dr. Little testifying that the stability was unexpected and Dr. Constantinides testifying that it was not. (N.T. 321-22 (Constantinides); N.T. 534 (Little).) For the reasons discussed previously with respect to expectation of success, it was not unexpected that enalapril would be stable in water at refrigerated temperature for 24 months. (See, e.g., N.T. 321-22 (Constantinides).) Although the exact stability was not known, published studies suggested it was likely enalapril could be stable long-term. This secondary consideration does not apply.[22]

**Failure of Others**   Evidence that others "tried but failed" to make the claimed invention "is particularly probative of obviousness." In re Cyclobenzaprine Hydrochloride, 676 F.3d at 1082. Azurity did not offer evidence that anyone tried and failed to make a liquid form of enalapril that was long-term stable. Some prior art references described enalapril liquids that were not long-term stable, but, for the reasons discussed previously, none of these authors were trying to achieve long-term stability. This secondary consideration therefore does not apply.

---

[22] Alkem asks me to disregard Azurity's contention of unexpected results because the evidence Azurity used to support this contention before the Patent and Trademark Office (PTO) consisted of formulations that lacked parabens and therefore did not practice the asserted claims. Given my finding that Azurity's invention was not unexpectedly stable, it is unnecessary to reach Alkem's alternative argument. However, I note that while Azurity does have to prove that any unexpected results have a nexus to the asserted claims, Alkem has not pointed to any prohibition on using evidence gleaned from alternative formulations to support that conclusion.

**Long-Felt but Unresolved Need**    "Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer the need would not have persisted had the solution been obvious." Apple Inc. v. Samsung Electronics Co., 839 F.3d 1034, 1056 (Fed. Cir. 2016).

Whether there was a long-felt but unresolved need is typically assessed as of the filing date. Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc., 566 F.3d 989, 998 (Fed. Cir. 2009). By the filing date here (March 2016), the Epaned Kit was available, and Azurity has not shown that there was a long-felt but unresolved need for an enalapril liquid that was ready-to-use as opposed to a powder kit. The problems Dr. Mahan attempted to identify with the Epaned Kit were speculative, as he could not name a single instance of a pharmacy reconstituting the Kit incorrectly. (N.T. 440-43.)  Similarly, Dr. Mahan's comparison of shelf-life between the Epaned Kit and Epaned RTU is uninformative because it compared the Kit's unrefrigerated shelf-life after compounding to the RTU's refrigerated shelf-life from the date of manufacture. (See N.T. 434-36.) For these reasons, I conclude there did not exist a long-felt but unresolved need for Azurity's invention as of its filing date.

Azurity also argues that because enalapril was administered to children using compounding for so many years, this is evidence that a long-term stable formulation was not obvious, even if compounding had ceased by the time the present invention came about.  This evidence consists of Dr. Mahan's testimony that compounding was routinely used to administer enalapril to children even though it entailed safety risks.  Because the obviousness inquiry must be "expansive and flexible," KSR, 550 U.S. at 415, I have considered this evidence, but I find it less probative of nonobviousness because it predates the Epaned Kit's patent and label.  Even if Dr. Mahan's testimony could show that a long-term stable enalapril liquid was nonobvious prior to the release

of the Epaned Kit, his testimony would not rebut evidence that the Epaned Kit made the claimed invention obvious.  In particular, Dr. Mahan's testimony does not overcome Dr. Constantinides's detailed explanation showing how the composition and stability information disclosed in the '747 patent made it obvious how to to develop a ready-to-use enalapril liquid.  (See N.T. 286-90 (Constantinides).)[23]

### 7.  Determination of Obviousness

For the reasons set out above, and considering that secondary considerations of nonobviousness are only minimally probative, I find that Alkem has proven by clear and convincing evidence that the asserted claims would have been obvious to a POSA as of the filing date.[24]

---

[23] The need Dr. Mahan identified is also not especially probative of nonobviousness because no testimony was offered tying the lack of a commercially available enalapril liquid to a lack of scientific know-how for making one—as opposed to it being unprofitable, burdened by regulation, not in demand, or difficult to monetize.  (Cf. N.T. 559-60; Casas at 272 ("There are many factors that determine the lack of cost-effectiveness of this market of commercial pediatric oral liquid forms.").)  Azurity has thus not shown a "nexus" between the long-felt but unresolved need and the claimed invention.  Fox Factory, 944 F.3d at 1373.

[24] Alkem further asks me to defer to the patent examiner's initial decision to reject the asserted claims for obviousness before ultimately allowing those claims based on evidence that different formulations—ones not using the claimed preservatives—were unexpectedly stable.  Azurity objects because the PTO's reasons for initially denying the asserted claims are not in the record.  "The basis (as opposed to the mere existence) of an examiner's initial finding of prima facie obviousness of an issued patent is … at most only one factual consideration that the trial court must consider in context of the totality of the evidence in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence."  Pfizer v. Apotex, 480 F.3d at 1360.  Alkem's post-trial brief identifies the examiner's initial rejection but provides little information about its basis.  Because I find that the trial evidence constituted clear and convincing proof of obviousness, I need not consider what additional effect the examiner's initial rejection might have on that conclusion.

## IV.  WRITTEN DESCRIPTION

### A.  Facts Relevant to Written Description

The shared specification of the '482 and '621 patents describes enalapril liquid formulations based on their ingredients, pH, stability, and other characteristics.  But, although every asserted claim requires that the liquid contain a preservative that is a paraben or mixture of parabens, the patents' shared specification does not contain a complete example of a liquid that uses only parabens as a preservative.  (See N.T. 332-32 (Constantinides); N.T. 543 (Little).)  Instead, liquids made using paraben preservatives can only be be constructed by combining ingredients from separate places in the specification.

First, the specification describes a formulation with all of the claimed ingredients except for paraben preservatives:

> In one aspect, the enalapril oral liquid formulation consists essentially of (i) about 1 mg/mL enalapril maleate; (ii) about 0.70 mg/mL of a sweetener that is sucralose; (iii) a buffer comprising about 1.82 mg/mL citric acid and about 0.15 mg/mL sodium citrate dihydrate; (iv) about 1 of a preservative that is sodium benzoate; (v) a flavoring agent; and (vi) water; wherein the pH of the formulation is less than about 3.5 adjusted by sodium hydroxide or hydrochloric acid; and wherein the formulation is stable at about $5 \pm 3$ °C. for at least 12 months.

(Col. 3:39-48.)  Second, the specification states that parabens can be used as the preservative, although it does not say which other ingredients these parabens should be combined with. (Col. 6:37-39.) Finally, with regard to the stability limitations, the specification states that "[t]he enalapril oral liquid formulations described herein are stable" under various definitions, some of which closely parallel the claim language and some of which are significantly less stringent (e.g., "for at least 1 month"). (Cols. 18:57-63, 19:15-20.)

Azurity's expert Dr. Little acknowledged that the specification does not contain "a disclosure of a formulation that meets all of the asserted claim limitations" of any asserted claim. (N.T.

543 (Little).)  Dr. Little also testified that to find a paraben-containing stable combination from ingredients in the specification, a POSA would "mak[e] … embodiments which are described in the specification and test[] them for stability." (N.T. 469.)

The specification also contains six sections of "examples" of enalapril liquids identified as A, B, C, D, E, and G. ('621 patent, cols. 32-40.)  Examples A though E contain data on the stability of those liquids. (See cols. 32-39.) Each example liquid contains at least one preservative that is not a paraben.  (Id.; N.T. 332-32 (Constantinides).)  Only Examples A and C describe liquids containing parabens, although these liquids also contain other preservatives, as well as other unclaimed ingredients such as mannitol and silicon dioxide. ('621 patent, cols. 32-34; N.T. 331-32 (Constantinides).)  The specification contains stability data for these examples, none of which extends beyond 8 weeks of testing, and the specification does not state whether any of the example liquids would be stable for 12, 18, or 24 months.

### B.  Discussion

A patent must contain a written description that "clearly allow[s] persons of ordinary skill in the art to recognize that the inventor invented what is claimed." Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (alterations and quotation marks omitted). "The essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe his or her invention so that the public will know what it is and that he or she has truly made the claimed invention." Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc., 923 F.3d 1368, 1376 (Fed. Cir. 2019).  "Requiring a written description of the invention limits patent protection to those who actually perform the difficult work of 'invention'—that is, conceive of the complete and final invention with all its claimed

limitations—and disclose the fruits of that effort to the public." Id. Therefore, "a description that merely renders the invention obvious does not satisfy the requirement[.]" Ariad Pharmaceuticals, 598 F.3d at 1351. And "[t]eaching how to make and use an invention does not necessarily satisfy the written description requirement." Nuvo Pharmaceuticals, 923 F.3d at 1382.

"[T]he written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." Ariad Pharmaceuticals, 598 F.3d at 1352. "[W]ritten description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described; it is not about whether the patentee has proven to the skilled reader that the invention works, or how to make it work, which is an enablement issue." Alcon Research Ltd. v. Barr Labs., Inc., 745 F.3d 1180, 1191 (Fed. Cir. 2014). Thus, a lack of empirical data showing that described formulations meet all claim limitations does not mean that the claims lack written description. See id.

The claims at issue in this case use "functional language" to mark the boundaries of the claimed invention. See Ariad Pharmaceuticals, 598 F.3d at 1349. That is, Azurity does not claim ownership of all enalapril liquids made from water, buffers, sweeteners, and parabens—it only claims the subset of those liquids that are stable. The need for written description "is especially acute" when functional language is used. Id. In such a case, "the specification must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus." Id. The specification can meet this standard by disclosing "either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus."

48

Id. at 1350. Alkem argues that the specification here does not meet this standard because a POSA reading the specification would not know which enalapril formulations containing parabens are as stable as the asserted claims require.

For the reasons that follow, I find that all asserted claims lack written description because the specification describes a large variety of ways to combine ingredients but does not say which combinations that use paraben preservatives are stable. That is, if a POSA were to combine ingredients from the specification, they would not know whether they would have the claimed invention.

Initially, Azurity is correct that aspects of the invention described separately in the specification can be combined to meet all limitations of the asserted claims. Those are: (1) ingredients other than parabens that appear in column 3; (2) parabens that appear in column 6; and (3) stability characteristics that are described in column 18. The difficulty is that the specification does not say whether any combination involving parabens meets the stability limitations. The specification lists many buffers, sweeteners, preservatives, and pHs that can be combined, but is largely silent on how these ingredients relate to stability. As Dr. Little acknowledged, a POSA seeking to determine which combinations involving parabens are stable would "mak[e] … embodiments … and test[] them for stability." (N.T. 469 (Little).) Therefore, while a formulation meeting all claim limitations could theoretically be constructed by picking and choosing different parts of the specification, "a POSA is deprived of any meaningful guidance into what [formulations] beyond the examples and formulas, if any, would provide the" claimed stability. Idenix Pharmaceuticals LLC v. Gilead Sciences Inc., 941 F.3d 1149, 1164 (Fed. Cir. 2019). Because "the claimed invention does not appear in the specification," the patents' written description is inadequate. Ariad Pharmaceuticals, 598 F.3d at 1348.

Azurity also takes the position that it would have been simple for a POSA to determine

experimentally which combinations involving parabens are stable.  Azurity's position is credible in light of my finding that a stable enalapril liquid with a paraben preservative was obvious even before Azurity's invention.  But "a description that merely renders the invention obvious does not satisfy the written description requirement[.]" <u>Ariad Pharmaceuticals</u>, 598 F.3d at 1351.  Because "one could not know which, if any, individual [variants] would yield [the claimed stability] without actually making and testing the variants," stable variants containing parabens are not adequately described.  <u>Novozymes A/S v. DuPont Nutrition Biosciences APS</u>, 723 F.3d 1336, 1350 (Fed. Cir. 2013). The specification does not need to prove which paraben-containing formulations are stable or provide evidence that they are stable, but it does need to guide a reader to identify formulations meeting all claim limitations.  <u>Ariad Pharmaceuticals</u>, 598 F.3d at 1348. The specification here does not provide the required guidance regarding which paraben-containing enalapril formulations are stable.

Azurity also references the stability testing data contained in the specification.  But this data also fails to provide guidance as to which paraben-preserved formulations are stable.  First, no example is preserved using only parabens: each contains at least one preservative that is not a paraben.[25]  (N.T. 331-34 (Constantinides).)  Second, the specification draws no conclusion that any tested formulations are stable. While I assume, given Alkem's burden and the lack of contrary evidence, that these short-term stability tests are valid, the specification does not identify any of

---

[25] Azurity points out that the asserted claims of the '482 patent may be construed to encompass formulations that contain multiple preservatives. But Dr. Little's concession that the specification does not disclose a formulation meeting all claim limitations implies that these examples differ from the claims.  (<u>See</u> N.T. 543 (Little).)  In any event, if the specification only describes how to make paraben formulations stable by mixing them with other preservatives, it does not describe formulations that (like the accused product in this case) use only paraben preservatives.

these examples as a stable, paraben-preserved liquid.

For the foregoing reasons, I find that Alkem has proven by clear and convincing evidence that the asserted claims are invalid for lack of written description.[26]

## V.  CONCLUSION

For the reasons set out above, I conclude that Alkem's ANDA infringes all asserted claims. I also find that those claims are invalid for obviousness and lack of written description.

An appropriate order follows.

---

[26] I do not reach Alkem's alternative argument that the asserted claims lack written description because the specification does not describe formulations using single-paraben preservatives.